**No. 2022-1521**

# United States Court of Appeals for the Federal Circuit

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
*Appellant,*

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION,
*Appellee,*

GENERAL ELECTRIC COMPANY, SAVANT TECHNOLOGIES LLC, HOME DEPOT PRODUCT AUTHORITY, LLC, HOME DEPOT U.S.A., INC., THE HOME DEPOT, INC., IKEA SUPPLY AG, IKEA U.S. RETAIL LLC, IKEA OF SWEDEN AB, SATCO PRODUCTS, INC., GLOBAL VALUE LIGHTING LLC, SIGNIFY NORTH AMERICA CORP., FEIT ELECTRIC COMPANY, INC.
*Intervenors.*

Appeal from the United States International Trade Commission in Investigation No. 337-TA-1220

**CORRECTED NONCONFIDENTIAL OPENING BRIEF OF APPELLANT**

*Counsel of Record for The Regents of the University of California on Subsequent Page*

Seth D. Levy
Shawn G. Hansen
Vincent C. Capati
**NIXON PEABODY LLP**
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
regents_itc2@nixonpeabody.com

Evan H. Langdon
**NIXON PEABODY LLP**
799 9th Street, NW, Suite 500
Washington, DC 20001-5327

Angelo J. Christopher
Paulina M. Starostka
**NIXON PEABODY LLP**
70 West Madison Street, Suite 5200
Chicago, IL 60602-4378

*Counsel for Appellant The Regents of the University of California*

**U.S. Patent No. 10,593,854, Claim 1**[1]

1. A light emitting device, comprising:

***a transparent surface***, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

***at least one III-nitride light emitting diode (LED)*** comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and

a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

**U.S. Patent No. 10,658,557, Claim 1**

1. A light emitting device, comprising:

***a sapphire plate***, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

***a plurality of III-nitride light emitting diodes (LEDs)***, each comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate; and

a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

---

[1] Bold, italic text highlights the differences between these two claims.

**CERTIFICATE OF INTEREST**

Counsel for The Regents of the University of California ("The Regents") certifies the following:

1. The full name(s) of every party or amicus represented by us are:

The Regents of the University of California

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is: N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are: N/A

4. The names of all law firms and the partners and associates that appeared for the Appellant in the trial court or are expected to appear for Appellant in this Court are:

**NIXON PEABODY LLP**, Peter J. Wied, Vincent Yip, Staci Jennifer Trager, Neal Gauger, Kristen Jamberdino, Ronald F. Lopez, Vivian Sandoval, Jennifer Hayes, Joshua Rodriguez, Sarah Andre, and Tracy Ickes.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

- *The Regents of the University of California v. Walmart, Inc.*, Case No. 2:19-cv-06570 (C.D. Cal.)
- *The Regents of the University of California v. Amazon.Com, Inc. et al.*, Case No. 2:19-cv-06571 (C.D. Cal.)
- *The Regents of the University of California v. Target Corp.*, Case No. 2:19-cv-06572 (C.D. Cal.)

- *The Regents of the University of California v. Ikea of Sweden AB et al.*, Case No. 2:19-cv-06573 (C.D. Cal.)
- *The Regents of the University of California v. General Electric Co.*, Case No. 2:19-cv-10792 (C.D. Cal.)
- *The Regents of the University of California v. The Home Depot, Inc.*, Case No. 2:20-cv-07943 (C.D. Cal.)
- *Satco Products, Inc. v. The Regents of the University of California*, Case No. 2:19-cv-06444 (E.D.N.Y.)
- *Satco Products, Inc. v. The Regents of the University of California*, Case No. 2:20-cv-04956 (E.D.N.Y.)
- *The Regents of the University of California v. Satco Products, Inc.*, 22-1106 (Fed. Cir.)
- *The Regents of the University of California v. Satco Products, Inc.*, 22-1107 (Fed. Cir.)
- *The Regents of the University of California v. Satco Products, Inc.*, 22-1108 (Fed. Cir.)
- *The Regents of the University of California v. Satco Products, Inc.*, 22-1109 (Fed. Cir.)

# TABLE OF CONTENTS

Page

PATENT CLAIMS ....................................................................................... i
CERTIFICATE OF INTEREST ................................................................... ii
TABLE OF AUTHORITIES ....................................................................... vii
TABLE OF ABBREVIATIONS .................................................................. xiii
I. STATEMENT OF RELATED CASES .................................................... 1
II. JURISDICTIONAL STATEMENT ........................................................... 2
III. STATEMENT OF THE ISSUES ............................................................. 3
IV. STATEMENT OF THE CASE ................................................................ 4
A. Introduction ................................................................................... 4
B. Proceedings Below ......................................................................... 10
1. Claim Construction ................................................................ 11
a) The ALJ Failed to Construe "Transparent" .................... 11
b) A Process Requirement was Erroneously Imposed on "Molding" ........................................................................ 13
2. The Erroneous Construction of "Transparent" Tainted the Equivalence Analysis for "Sapphire Plate" ............................. 13
3. There is Not Substantial Evidence for Factual Predicates of the Commission's Obviousness Findings ...................................... 14
4. Rulings Presented for Review .................................................. 14
V. SUMMARY OF THE ARGUMENTS ....................................................... 15
A. The Commission's Non-Infringement Findings Regarding the '854 Patent Should Be Reversed ............................................................ 15
B. The Commission's Non-Infringement Findings Regarding the '557 Patent Should Be Reversed ............................................................ 16
C. The Commission's Obviousness Findings Should Be Reversed ........ 17
VI. ARGUMENTS ....................................................................................... 18
A. Standard of Review ......................................................................... 18

B. The Regents' Appeals Regarding "Transparent Surface" in Claim 1 of the '854 Patent ........ 20

1. The Commission Erred in Applying a Minimum Transmissivity Threshold ........ 21

a) The Evidence Showed Transmissivity of About 20%–60% in the Accused Rigid Products and About 60%–80% in the Accused Flexible Products ........ 23

b) The Commission's Transmissivity Threshold Lacks Supporting Expert Testimony ........ 24

c) Intrinsic Evidence Shows that "Transparent" Means "Allows Light to Pass Through" ........ 25

d) Extrinsic Evidence Confirms that "Transparent" Means "Allows Light to Pass Through" ........ 30

2. There is Not Substantial Evidence of Absorption ........ 36

3. The Commission Erred in Rejecting Equivalence ........ 38

C. The Regents' Appeals Regarding "Molding" in Claim 1 of the '854 Patent ........ 40

1. The Contextual Claim Language Confirms that "Molding" Means a "Formed Component" ........ 40

2. No Process is an Essential Part of the Invention ........ 41

3. Even if the Commission's Construction Were Correct, the Relevant Area of the Molding Does Not Have Irregularities ... 42

D. The Regents' Appeals Regarding "Sapphire Plate" in Claim 1 of the '557 Patent ........ 46

1. Professor Schubert's Function-Way-Result Analysis ........ 46

2. Major Suppliers Market Ceramic Submounts as Transparent and Confirm Equivalence ........ 47

3. Miyahara Highlights the Advantages of Scattering Caused by Polycrystalline Structures Inside Ceramic Submounts ........ 48

4. Differences Between Ceramic and Sapphire Submounts are a Matter of Degree, Not of Kind ........ 48

E. The Regents' Appeals Regarding "Molding" in Claim 1 of the '557 Patent ........ 48

F. The Regents' Appeals Regarding the Commission's Obviousness Findings ....49
1. Obviousness Based On Yamazaki and Uemura ....49
a) The "SGS" Limitation ....49
b) The "Cathode/Anode" Limitation ....58
2. Obviousness Based on Minato and Uemura ....65
a) The "SGS" Limitation ....65
b) The "Cathode/Anode" Limitation ....67
3. Objective Evidence of Non-Obviousness ....68
VII. CONCLUSION AND STATEMENT OF RELIEF ....69

**CONFIDENTIAL MATERIAL OMITTED**

Pursuant to FCR 25.1(e)(1)(B), material subject to the Protective Order entered in the underlying Investigation, Inv. No. 337-TA-1220, has been redacted from the public version of the Initial Determination (Appx401) in the addendum. Redacted information includes identities of third-party suppliers on pages Appx420, Appx426–427, Appx429, Appx445–448, Appx453, Appx556, Appx561, Appx607–608; non-public third-party information, including a technical diagram and internal product numbers, on pages Appx459, Appx489; The Regents' royalty and licensing information on pages Appx441, Appx632, Appx645–646; and the Intervenors' inventory quantities on pages Appx643–644. Although the Commission issued both confidential (Appx1) and public (Appx75) versions of the Commission Opinion, there is no confidential business information in the Commission Opinion. There is no confidential information contained in the Opening Brief.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acoustic Tech., Inc. v. Itron Networked Solutions, Inc.*,
949 F.3d 1366 (Fed. Cir. 2020) ....................51, 65

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ....................27

*Alexsam, Inc. v. IDT Corp.*,
715 F.3d 1336 (Fed. Cir. 2013) ....................52

*Altx, Inc. v. United States*,
370 F.3d 1108 (Fed. Cir. 2004) ....................61

*Arendi S.A.R.L. v. Apple Inc.*,
832 F.3d 1355 (Fed. Cir. 2016) ....................50, 52, 66

*Asyst Techs., Inc. v. Emtrak, Inc.*,
544 F.3d 1310 (Fed. Cir. 2008) ....................62, 63

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) ....................*passim*

*Bio-Technology Gen. Corp. v. Genentech, Inc.*,
80 F.3d 1553 (Fed. Cir. 1996) ....................8

*Brand v. Miller*,
487 F.3d 862 (Fed. Cir. 2007) ....................53

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) ....................38, 39

*Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015) ....................43, 45, 46

*Certain Static Random Access Memories & Prods. Containing Same*,
Inv. No. 337-TA-792, Comm'n Op. at 26 (June 28, 2013) ....................57

*Certain Two-Way Radio Equip. & Sys., Related Software & Components Thereof*,
Inv. No. 337-TA-1053, Comm'n Op. ....................51

*CommScope Tech. LLC v. Dali Wireless Inc.*,
10 F.4th 1289 (Fed. Cir. 2021) ....................19

*Continental Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019), and (2)....................16, 41

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020) ....................57

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
849 F.3d 1034 (Fed. Cir. 2017) ....................51, 65

*IGT v. Bally Gaming Int'l*,
659 F.3d 1109 (Fed. Cir. 2011) ....................40

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
757 F. App'x 974 (Fed. Cir. 2019) ....................34

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ....................21, 26

*Interactive Gift Express, Inc. v. CompuServe Inc.*,
256 F.3d 1323 (Fed. Cir. 2001) ....................25

*InTouch Tech., Inc. v. VGO Comm'n, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ....................63, 67

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999) ....................35

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006) ....................51, 61

*Lincoln v. Vigil*,
508 U.S. 182 (1993)....................55

*Lisle Corp. v. A.G. Mfg.*,
398 F.3d 1306 (Fed. Cir. 2005) ....................42

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................................................................50

*Mayborn Grp., Ltd. v. ITC*,
965 F.3d 1350 (Fed. Cir. 2020) ..............................................................18, 19

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007) ..............................................................16, 27

*MEMS Tech. Berhad v. Int'l Trade Comm'n*,
447 F. App'x 142 (Fed. Cir. 2011) ..............................................................31

*Motorola Mobility, LLC v. Int'l Trade Comm'n*,
737 F.3d 1345 (Fed. Cir. 2013) ....................................................................19

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................................................................61

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) .........................................................12, 21, 22

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) ..............................................................29, 30

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
806 F.2d 1565 (Fed. Cir. 1986) .........................................................54, 65, 66

*Personal Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ......................................................................53

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ..............................................................54, 66

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
429 F.3d 1364 (Fed. Cir. 2005) ....................................................................48

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ..........................................................*passim*

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ..............................................................63, 67

*Satco Prods., Inc. v. The Regents of the Univ. of California*,
2:19-cv-06444 (E.D.N.Y.) ............................................................................1

*Satco Prods., Inc. v. The Regents of the Univ. of California*,
2:20-cv-04956 (E.D.N.Y.) ............................................................................1

*Satco Prods., Inc. v. The Regents of the Univ. of California*,
IPR2021-00662 ...........................................................................................1, 8

*Sound View Innovations, LLC v. Hulu, LLC*,
33 F.4th 1326 (Fed. Cir. 2022) ....................................................................36

*St. Jude Med., Inc. v. Access Closure, Inc.*,
729 F.3d 1369 (Fed. Cir. 2013) ...................................................................65

*SunTiger, Inc. v. Sci. Research Funding Group*,
189 F.3d 1327 (Fed. Cir. 1999) ...................................................................43

*Swagway, LLC v. Int'l Trade Comm'n*,
934 F.3d 1332 (Fed. Cir. 2019) ...................................................................55

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015).......................................................................12, 19, 22

*The Regents of the Univ. of California v. Amazon.com, Inc. et al.*,
2:19-cv-06571 (C.D. Cal.) ............................................................................1

*The Regents of the Univ. of California v. Gen. Elec. Co.*,
2:19-cv-10792 (C.D. Cal.) ............................................................................1

*The Regents of the Univ. of California v. The Home Depot, Inc.*,
2:20-cv-07943 (C.D. Cal.) ............................................................................1

*The Regents of the Univ. of California v. IKEA of Sweden AB et al.*,
2:19-cv-06573 (C.D. Cal.) ............................................................................1

*The Regents of the Univ. of California v. Target Corp.*,
2:19-cv-06572 (C.D. Cal.) ............................................................................1

*The Regents of the Univ. of California v. Walmart Inc.*,
2:19-cv-06570 (C.D. Cal.) ............................................................................1

*The Regents of the University of California v. Satco Products, Inc.*,
22-1106 (Fed. Cir.) ....................................................................................1

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..............................................................41, 42, 43

*TQ Delta, LLC v. Cisco Sys.*,
942 F.3d 1352 (Fed. Cir. 2019) ......................................................................*passim*

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010) ..........................................................................39

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
699 F.3d 1340 (Fed. Cir. 2012) ..........................................................................68

*TRUSTID, Inc. v. Next Caller, Inc.*,
No. 2020-1950, 2021 WL 4427918 (Fed. Cir. Sept. 27, 2021)............................60

*Virnetx, Inc. v. Cisco Sys.*,
767 F.3d 1308 (Fed. Cir. 2014) ..........................................................................41

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
200 F.3d 795 (Fed. Cir. 1999) ............................................................................42

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
442 F.3d 1322 (Fed. Cir. 2006), and (2)........................................................16, 35

**Statutes**

5 U.S.C. § 706.............................................................................................18

5 U.S.C. § 706(2) ........................................................................................55

5 U.S.C. § 706(2)(A).....................................................................................56

19 U.S.C. § 1337(c) .......................................................................................2

28 U.S.C. § 1295(a)(6)....................................................................................2

35 U.S.C. § 282.............................................................................................55

**Other Authorities**

19 C.F.R. § 210.38(a)..........................................................................................51

# TABLE OF ABBREVIATIONS

| Abbreviation | Abbreviated Phrase |
|---|---|
| ’464 patent | Patent No. 9,859,464 |
| ’529 patent | Patent No. 9,240,529 |
| ’557 patent | Patent No. 10,658,557 |
| ’854 patent | Patent No. 10,593,854 |
| Accused Flexible Products | Accused Products identified at Appx128773 |
| Accused Products | Accused Products identified at Appx128770, Appx128773, Appx128775-128782, Appx128784-128788 |
| Accused Rigid Products | Accused Products identified at Appx128770 |
| APA | Administrative Procedure Act |
| Asserted Claims | ’557 patent: claim 1;’854 patent: claim 1 |
| The Regents | The Regents of the University of California |
| Feit | Respondent Feit Electric Company, Inc. |
| Feit Flexible Accused Product | Feit Vintage ST19 product identified at Appx128773 |
| Licensee DI Products | Filament LEDs made by licensees of the Regents’ Patents identified at Appx432-Appx434 |
| Minato | JP 2001-126515 |
| Miyahara | Japanese Patent Publication No. 2005-035864 |
| OCCC | Order No. 39, Order Construing Certain Claims (June 15, 2021) |
| Satco | Respondent Satco Products, Inc. |
| SGS | Sapphire growth substrate |
| SMJ | Surface mount j-leads |
| Tamaoki | Patent No. 6,961,190 |
| Tanda | Patent Publication 2007/0139949 |
| Tanda ’734 patent | Patent No. 9,752,734 |
| The Regents’ Patents | The ’854 and ’557 patents |
| Uemura | Patent No. 6,310,364 |
| Yamazaki | Japanese Patent Publication No. 2003-249692 |

## I. STATEMENT OF RELATED CASES

No other appeal from the same proceeding was previously before this or any other appellate court. The following United States Courts and PTAB proceedings may directly affect or be directly affected by the outcome of this appeal:

**Pending Proceedings**: *The Regents of the University of California v. Satco Products, Inc.*, 22-1106 (Fed. Cir.) (consolidating appeals 22-1106 lead with 22-1107, 22-1108, 22-1109 members); *Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2021-00662 (PTAB).

**Stayed Proceedings**: *Satco Prods., Inc. v. The Regents of the Univ. of California*, 2:20-cv-04956 (E.D.N.Y.); *Satco Prods., Inc. v. The Regents of the Univ. of California*, 2:19-cv-06444 (E.D.N.Y.); *The Regents of the Univ. of California v. The Home Depot, Inc.*, 2:20-cv-07943 (C.D. Cal.); *The Regents of the Univ. of California v. Gen. Elec. Co.*, 2:19-cv-10792 (C.D. Cal.); *The Regents of the Univ. of California v. Walmart Inc.*, 2:19-cv-06570 (C.D. Cal.); *The Regents of the Univ. of California v. Amazon.com, Inc. et al.*, 2:19-cv-06571 (C.D. Cal.); *The Regents of the Univ. of California v. Target Corp.*, 2:19-cv-06572 (C.D. Cal.); *The Regents of the Univ. of California v. IKEA of Sweden AB et al.*, 2:19-cv-06573 (C.D. Cal.).

Counsel is not aware of any other case that may directly affect or be directly affected by the outcome of this appeal.

## II. JURISDICTIONAL STATEMENT

This is an appeal from a final determination of the Commission issued on February 16, 2022. The Regents timely filed a Notice of Appeal with this Court on March 9, 2022. *See* 19 U.S.C. § 1337(c). This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(6).

## III. STATEMENT OF THE ISSUES

1. Did the Commission err in finding that The Regents failed to meet its burdens regarding the limitations "transparent surface" and "molding" of claim 1 of the '854 patent?

2. Did the Commission err in finding that The Regents failed to meet its burdens regarding the limitations "sapphire plate" and "molding" of claim 1 of the '557 patent?

3. Did the Commission err in concluding that the Asserted Claims of the '854 and '557 patents would have been obvious in view of Yamazaki and Minato?

# IV. STATEMENT OF THE CASE

## A. Introduction

This appeal arises from an investigation before the Commission where The Regents asserted, *inter alia*, two patents directed to LED packaging technology dating back to 2006: The Regents' Patents.

For LEDs to provide illumination, photons emitted inside an active layer must pass through the LED chip and surrounding structures, referred to as "packaging," to reach the outside world. The Regents' Patents describe improvements to the efficiency of LED devices by increasing the amount of light extracted from the inside of the LED. Devices according to the inventions make more usable light, while using less power and generating less heat. A central concept of the inventions, which defied the conventional paradigm, is supporting the LED chip on a submount that allows light to be extracted from both front and back sides of the LED and that is structurally supported and powered by electrodes on either end.

The most heavily contested issue in this case is whether the submounts of the accused filament LED products—the structures the LED chips are mounted on—meet the "transparent surface" limitation of the '854 patent. The Accused Products fall into one of two categories: (1) Accused Rigid Products, with LEDs supported by a rigid, ceramic submount, and (2) Accused Flexible Products, with LEDs supported by a flexible, polyimide submount. Both categories are accused of

infringing the ’854 patent. Only the Accused Rigid Products are accused of infringing the ’557 patent.

These filament LEDs mimic the appearance of traditional incandescent filaments, but with a significant improvement in energy efficiency and longer lifespan. Exemplary rigid filament LEDs are shown below.



Appx116213 (slides 4, 6).

Evidence demonstrated that when the LEDs are on, they are readily visible through the ceramic submounts in these products (encapsulant removed below).




Appx116213 (slide 52). The Commission found these submounts opaque. Appx89.

An exemplary flexible filament LED is shown below.





Appx116213 (slides 4, 6).

In the flexible products, LEDs are visible through the polyimide submounts, even when off.






Appx116213 (slide 46). The Commission found these submounts also opaque. Appx120.

The Parties introduced measurements of how much light passes through the submounts. The Regents measured the light intensity 360° around each filament

intact to approximate real-world conditions. Further measurements were taken with the orange encapsulant removed to expose the LEDs and submount. The Regents offered unrebutted testimony that the differences in intensity on the top and bottom sides of a filament LED are essentially, if not entirely, imperceptible to the human eye, which perceives differences on a logarithmic scale. The example below shows the remarkable uniformity of light intensity around the filament.




Appx115634.

LEDs emit blue light. To create white light, both sides of the submount surrounding the LEDs include a wavelength-converting phosphor.






Appx115573. The sole purpose of this expensive phosphor on the back side of submount is to convert the wavelength of light that passes through the transparent surface. Appx3499 (1074:12–23); Appx3554 (1193:6–20); Appx134341.

In this appeal, The Regents presents for review the Commission's rulings regarding The Regents' Patents, the reversal of which would be sufficient to vacate the Commission's finding of no violation of Section 337. Unlike the patents at issue in the Companion Cases, the PTAB declined to institute *inter partes* review of The Regents' Patents. Appx140948–140949; Appx140995. The Regents does not appeal the Commission's rulings regarding the '529 and '464 patents to avoid potential mootness from the Companion Cases. As the Commission's non-infringement and invalidity rulings are without preclusive effect, The Regents need not appeal them to preserve its rights to assert the '529 and '464 patents in other matters. *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1563–64 (Fed. Cir. 1996).

Regarding the '854 patent, the Commission's findings as to non-infringement, commercial success as objective evidence of non-obviousness, and technical prong of domestic industry were based on improperly narrow constructions of the terms "transparent" and "molding."

Regarding the '557 patent, the Commission rendered an unsupported rejection of the doctrine of equivalents for the "sapphire plate" claim limitation. The Commission ignored key evidence that pointedly showed accused ceramic

submounts are equivalent to the claimed sapphire plate under the function-way-result test, as confirmed by the imperceptibility to humans of the differences in light intensity around the filaments.

The Commission's obviousness findings are also erroneous. During the hearing, Intervenors' expert offered conclusory testimony that certain references "invalidate" The Regents' Patents. He then testified why a few claim limitations were allegedly disclosed or rendered obvious by the references and brushed aside other claim limitations as "undisputed." For example, Intervenors failed to adduce any evidence whether it would have been obvious to modify the Yamazaki and Minato references to use an LED with a SGS.

To compensate for the lack of record evidence, the Commission misapplied the ALJ's ground rules and inverted the burden of proof by finding limitations obvious solely because The Regents did not disclose a rebuttal contention prior to the evidentiary hearing beyond asserting that the Intervenors could not meet their burden. Precedent is clear that the burden of proof never shifts to the patentee to prove validity, but the Commission did that here. Moreover, the Commission violated the APA requirement that the Commission follow its own rules and not apply them in an arbitrary and capricious fashion.

### B. Proceedings Below

The Regents alleged that certain filament LEDs and products containing the same imported and sold after importation by Intervenors infringe, among other claims, claim 1 of the ’854 patent and claim 1 of the ’557 patent. Appx78–79.

On June 15, 2021, the ALJ issued the OCCC, construing, among other terms, “transparent,” “sapphire,” and “molding.” Appx651. The evidentiary hearing was held August 29 through September 2, 2021. The Final Initial Determination (“FID”) issued on November 19, 2021. The Regents petitioned the Commission to review the FID based on numerous legal and procedural errors and failures of proof.

The Regents petitioned for review the following issues raised in this appeal: ***First***, the erroneous findings in the OCCC and FID related to construction of “transparent,” “sapphire,” and “molding.” Appx112859–112888, 112891–112896. ***Second***, erroneous non-infringement, commercial success, and technical prong of domestic industry findings based on flawed claim constructions. Appx112859–112888, 112891–112896, 112898. ***Third***, pervasive legal errors by the ALJ in the invalidity analysis, including reliance on material that is not evidence, improper burden shifting, and violating the Commission’s and ALJ’s own rules. Appx112808–112816. And ***fourth***, the clearly erroneous invalidity findings that followed from the improper invalidity analysis. Appx112821–112852.

On February 16, 2022, the Commission determined to review, in-part, the FID (Appx401) and issued its Commission Opinion. Appx75; Appx149. The Commission Opinion failed to correct many of the FID's procedural and legal errors. Accordingly, The Regents filed its Notice of Appeal with this Court on March 9, 2022.

### 1. Claim Construction

The OCCC addressed several terms, including "transparent," "sapphire," and "molding." *See* Appx651–652. The Parties agreed a POSITA at the time of the invention would have: (1) a Bachelor's degree in electrical engineering, physics, or a comparable field of study, and (2) at least three years of professional experience with semiconductor optoelectronic devices and packaging. Appx660.

#### a) The ALJ Failed to Construe "Transparent"

The Parties proposed the following constructions for "transparent":

| TERMS AND CLAIMS | RESPONDENTS' CONSTRUCTION | STAFF'S CONSTRUCTION | COMPLAINANT'S CONSTRUCTION |
|---|---|---|---|
| "**transparent**"<br><br>'854 patent: claims 1, 6<br>'529 patent: claims 1, 6, 8, 9<br>'464 patent: claims 1, 7, 9, 10 | IKEA, GE Lighting, Home Depot, Satco, GVL, Signify: "permitting the passage of light without significant deviation/scattering or absorption"; otherwise indefinite<br><br>Feit Electric: "transmits light without scattering so that objects can be clearly seen"; otherwise indefinite | "permitting the passage of light without significant deviation/scattering or absorption" | Plain and ordinary meaning, which is "allows light to pass through" |

Appx3749. The OCCC rejected the Intervenors' indefiniteness arguments and construed "transparent" as having its plain and ordinary meaning. Appx661. The

OCCC neither adopted nor rejected The Regents' definition of the plain and ordinary meaning. Appx660–661.

The OCCC recognized "***the parties agree that transparent at least means allowing light to pass through***." Appx661 (emphasis added). It then identified the parties' dispute to be about, "***how much light can be scattered by a transparent plate or a transparent surface***." *Id*. (emphasis added). The OCCC deemed that "a factual question." *Id*.

The question of construing "transparent" is, however, a ***legal*** one based on ***subsidiary factual findings***. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 333 (2015). After making factual findings regarding the meaning of a term in the art, a court must then determine as a matter of law whether that meaning is appropriate in the context of the patent. *Id.*

The OCCC should have resolved any subsidiary factual questions regarding claim construction before the hearing, but it did not. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Instead, the ALJ deferred resolution of the meaning of "transparent" until the hearing, where it became erroneously commingled with evidence regarding the Accused Products. This not only violated the ALJ's duty under *O2 Micro*, but also violated the APA by effectively changing the construction of "transparent" without notice to the Parties and without an opportunity to present evidence and argument under the final

construction. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015).

#### b) A Process Requirement was Erroneously Imposed on "Molding"

The OCCC construed "molding" as "a component formed by or as if by a mold"—erroneously importing a process requirement that no party proposed. Appx668–669. The FID further erred by imposing a new limitation on the construction of "molding" neither present in the OCCC nor supported by any evidence: excluding "random irregularities and an uneven surface." Appx564; Appx118. Similar to the "transparent" construction, the belated imposition of a new limitation on "molding" prejudiced The Regents, which was foreclosed from presenting arguments related to the newly-imposed limitation.

In affirming the FID's findings that the Accused Products do not meet the term "molding," the Commission failed to address the errors in the ALJ's construction. Appx118. Regardless, analyzed correctly, the Accused Products meet both the correct construction and the Commission's erroneous construction.

### 2. The Erroneous Construction of "Transparent" Tainted the Equivalence Analysis for "Sapphire Plate"

The Commission affirmed the FID's finding that the:

> polycrystalline aluminum oxide plate in the Accused Rigid Products does not perform substantially the same function as the sapphire plate in the same way to achieve the same result because they do not effectively transmit light due in

> part to the presence of grains, pores, and grain boundaries, which absorb, reflect, and scatter light.

Appx126 (citing Appx591). The Commission also found clear and substantial structural differences between the ceramic submounts of the Accused Rigid Products and sapphire plates. *Id.* But these findings are merely recycled versions of the Commission's erroneous findings regarding "transparent" that should be reversed for the reasons discussed above with respect to the "transparent surface" limitation. *See supra* at IV.B.1.a.

#### 3. There is Not Substantial Evidence for Factual Predicates of the Commission's Obviousness Findings

Intervenors offered testimony from Dr. Lebby regarding their invalidity theories, but failed to establish basic foundational issues, including whether Dr. Lebby even applied the relevant claim constructions. Dr. Lebby provided conclusory statements that a reference invalidates the Asserted Claims and testified ***only*** about claim limitations he understood were "disputed." *See, e.g.,* Appx3571–3572 (1260:13–1265:14).

#### 4. Rulings Presented for Review

As to infringement of claim 1 of the '854 patent, the Commission reviewed and affirmed with supplemental analysis the FID's claim construction and non-infringement findings with respect to the term "transparent surface." Appx118.

The Commission affirmed, without review, the FID's claim construction and findings of non-infringement with respect to the term "molding" in the Asserted Claims of The Regents' Patents. *Id*.

As to infringement of claim 1 of the '557 patent, the Commission reviewed and affirmed with supplemental analysis the FID's non-infringement findings with respect to the term "sapphire plate." *Id*.

Based on the same analysis, the Commission affirmed the FID's findings with respect to commercial success and the technical prong of domestic industry with respect to the Asserted Claims of The Regents' Patents. Appx128, Appx143.

The Commission affirmed with modification the FID's finding that Asserted Claims of The Regents' Patents are obvious over Yamazaki or Minato, but reversed the FID's finding that those claims are anticipated by Minato, and took no position on the FID's finding on invalidity over Uemura and Tamaoki. Appx142.

## V. SUMMARY OF THE ARGUMENTS

### A. The Commission's Non-Infringement Findings Regarding the '854 Patent Should Be Reversed

***To this day***, the Commission has not defined the scope of the term "transparent." It has only found that the submounts in all but one of the Accused and Licensee DI Products, respectively, ***are not*** "transparent." That is, the Commission determined, based on the transmissivity of the Accused Products, what ***does not***

infringe. But the Commission never determined, as a legal matter, what transmissivity values ***are*** within the scope of "transparent."

The Commission erred by: (1) improperly relying on the Accused and Licensee DI Products to construe "transparent" to exclude those products, *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1331 (Fed. Cir. 2006), and (2) erroneously imposing an unspecified transmissivity threshold and excluding scattering structures. These limitations are found nowhere in the intrinsic or relevant extrinsic evidence and improperly exclude embodiments in the specification. *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007).

Regarding "molding," the Commission erred by: (1) imposing a process limitation that no party advocated, *Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 799 (Fed. Cir. 2019), and (2) improperly changing the prehearing construction after the hearing to exclude manufacturing imperfections. *Belden*, 805 F.3d at 1080.

### B. The Commission's Non-Infringement Findings Regarding the '557 Patent Should Be Reversed

The Commission's findings with respect to claim 1 of the '557 patent are similar to those for claim 1 of the '854 patent and should be reversed for similar reasons. Appx126–29; Appx143.

The Commission determined that The Regents "failed to establish that the Accused Rigid Products, which have ceramic submounts, satisfy the 'sapphire plate'

limitation under the doctrine of equivalents" and determined the same for the Licensee DI Products. Appx126, Appx143.

The Commission's analysis of equivalence of "sapphire plate" was doomed by its erroneous construction of "transparent," which it imported into the function-way-result test for equivalence of "sapphire plate." Appx126. Further, the Commission erred by relying on the lack of literal infringement as establishing that the doctrine of equivalents did not apply.

The Commission erred with respect to "molding" in claim 1 of the '557 patent for the same reasons discussed above with respect to "molding" in claim 1 of the '854 patent. *See supra* at Section IV.B.1.b; *see also infra* at Sections VI.C, E.

**C. The Commission's Obviousness Findings Should Be Reversed**

The Commission's determinations that claim 1 of each of The Regents' Patents are obvious over Yamazaki and Uemura should be reversed. First, the Commission's finding that the claimed SGS would have been obvious over Yamazaki alone is not supported by record evidence. *See* Appx136–137. There is no expert testimony in the record regarding this limitation. The Commission's reliance on this limitation being "undisputed" in The Regents' pre-hearing brief as a substitute for clear and convincing evidence is foreclosed by this Court's precedent and conflicts with the Commission's rules. *See* Appx136.

Second, the Commission erred in finding that Yamazaki discloses or renders obvious the cathode/anode support limitation because that finding is not supported by substantial evidence. Appx133–134. The Commission also erred in finding that it would be obvious to modify Yamazaki in view of Uemura to meet this limitation. *Id*.

The Commission's determinations that claim 1 of each of The Regents' Patents are obvious over Minato and Uemura should also be reversed. First, for the same or similar reasons discussed as for Yamazaki, the Commission's finding that the SGS limitation would have been obvious over Minato is not supported by the evidence and violated the APA. *See* Appx141. Second, the Commission's finding that it would have been obvious to modify Minato in view of Uemura is predicated on faulty logic and lacks substantial evidence. *See id.*

## VI. ARGUMENTS

### A. Standard of Review

This Court reviews the Commission's final determination under the standards of the APA, 5 U.S.C. § 706. *Mayborn Grp., Ltd. v. ITC*, 965 F.3d 1350, 1353 (Fed. Cir. 2020). Legal determinations are reviewed *de novo* and factual findings for substantial evidence. *Id*.

"Whether an accused device infringes requires a two-step analysis—the court first 'determines the scope and meaning of the patent claims asserted, and then the

properly construed claims are compared to the allegedly infringing device.'" *CommScope Tech. LLC v. Dali Wireless Inc.*, 10 F.4th 1289, 1295 (Fed. Cir. 2021) (internal citation omitted).

The first step, claim construction, is a question of law. *Teva*, 574 U.S. at 332–33. When the Commission relies only on intrinsic evidence, this Court reviews that construction *de novo*. *Id*. at 331. In some cases, however, a court may need to look beyond the patent's intrinsic evidence and "consult extrinsic evidence in order to understand...the meaning of a term in the relevant art during the relevant time period" and make subsidiary factual findings. *Id*. Subsidiary factual findings by the Commission are reviewed under the substantial evidence standard. *Mayborn*, 965 F.3d at 1353. The second step of the infringement analysis is factual. *Id*.

"Obviousness is a legal conclusion based on underlying findings of fact." *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348 (Fed. Cir. 2013). "These factual findings are: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art at the time the invention was made; and (4) objective indicia of nonobviousness, if any." *Id*. "All factual propositions and inferences underlying an invalidity defense must be proven by clear and convincing evidence." *Mayborn*, 965 F.3d at 1355.

## B. The Regents' Appeals Regarding "Transparent Surface" in Claim 1 of the '854 Patent

The Commission found that the Accused Products (rigid and flexible), except the Feit Flexible Accused Product, do not satisfy the "transparent surface" limitation of claim 1 of the '854 patent. Appx119. The Commission largely relied on its analysis of "transparent plate" in the '529 patent, which is based on light transmission measurements and the presence of grain, pore, and grain boundary structures within ceramic submounts. Appx88–91, Appx121; *see also* Appx450–458, Appx548–549.

Relying on the same analysis, the Commission concluded the "transparent surface" limitation was not met by the Licensee DI Products (rigid and flexible) on which The Regents relied for the technical prong of domestic industry as to the '854 patent and for commercial success as objective evidence of non-obviousness. Appx127–128, Appx143.

The Commission relied on The Regents' evidence to find that the Feit Flexible Accused Product meets the "transparent" limitation. Appx119–122; Appx548. The Commission also found that The Regents' LUX plots of transmission testing results correlate to Intervenors' testing data collected with the silicone encapsulant intact, "indicat[ing] the reliability and increased probative value of [Intervenors'] findings." Appx121–122; Appx457. But the Commission failed to acknowledge that this

correlation equally validated the probative value of The Regents' transmission testing results.

### 1. The Commission Erred in Applying a Minimum Transmissivity Threshold

The Parties agreed that the term "transparent surface," as used in the '854 patent, means "transparent LED support component." Appx3748. Thus, analysis of "transparent surface" turns on construction of "transparent." "In the absence of modifiers, general descriptive terms are typically construed as having their full meaning." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004). Claim 1 of the '854 patent recites no modifier of "transparent." Thus, the term should be construed as having its full meaning, which the record showed was broad.

In adopting the plain and ordinary meaning—rather than Intervenors' narrow constructions—the OCCC recognized that "transparent at least means allowing light to pass through." Appx661. The OCCC, however, expressly declined to resolve the parties' dispute regarding "how much light can be scattered by a transparent plate or a transparent surface." *Id*. The OCCC deemed this to be "a factual question." *Id*. In other words, the ALJ deferred resolving the Parties' dispute about the scope of the term "transparent" until after the evidentiary hearing.

"When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro*, 521 F.3d at 1362. The ALJ

failed to resolve the parties' dispute regarding the scope of "transparent" before the hearing beyond seemingly rejecting Intervenors' proposed constructions and indefiniteness arguments and agreeing with The Regents that the plain and ordinary meaning should apply.

While determining claim scope often involves subsidiary factual findings, claim construction is ultimately a question of law. *Teva*, 574 U.S. at 333. Where the court "makes a factual finding that...a certain term of art had a particular meaning" to a POSITA, the court "must then conduct a legal analysis: whether a skilled artisan would ascribe that same meaning to that term ***in the context of the specific patent claim under review***." *Id*. at 332 (emphasis in original). The Commission erred by doing what *Teva* proscribes: relying selectively on ambiguous fact testimony to find facts regarding the meaning of "transparent" without meaningful legal analysis of whether a skilled artisan would ascribe the same meaning ***in the context of the '854 patent***. *Id*.

This approach not only violated *Teva* and *O2 Micro*, it also violated the APA by effectively changing the construction of "transparent" during and after hearing without giving the Parties notice and an opportunity to address the ALJ's final construction. *See Belden*, 805 F.3d at 1080.

#### a) The Evidence Showed Transmissivity of About 20%–60% in the Accused Rigid Products and About 60%–80% in the Accused Flexible Products

The Commission applied "transparent" to require light transmissivity above 60%—without specifying how much above 60% and while rejecting a minimum of 80%—and to exclude grain, pore, and/or grain boundary structures. Appx89–92; *see also* Appx450–451. The transmissivity figures in evidence express the light intensity on the bottom side of a filament—light transmitted through the submount—as a percentage of the light intensity on the top side of the filament. For example, if light intensity on the bottom is 60% of light intensity on the top, then the submount is 60% transmissive. The grain, pore, and/or grain boundary structures reduce transmissivity, so their effects are manifested in the transmissivity measurements.

The Commission compared the Parties' transmission testing data for intact Accused Rigid Products, which showed transmissivity values between about 20% and 60%. Appx453–457. Transmissivity values for the Accused Flexible Products were higher, between about 60% and 80%, with the exception of the Feit Flexible Accused Product. Appx550–551.

The Regents adduced unrebutted expert testimony that it is difficult, if not impossible, for the human eye to distinguish between the light intensity on the front and back sides of filament LEDs in the Accused and Licensee DI Products. Appx3356 (604:22–606:21); *see also* Appx3452 (888:24–889:15). To the human

eye, light transmitted through the submount is about as bright as light on the other side that does not pass through the submount. In practical terms, this is evidence that the submount is transparent.

#### b) The Commission's Transmissivity Threshold Lacks Supporting Expert Testimony

The Regents' expert, Professor Schubert,[2] opined that the plain and ordinary meaning of the term "transparent," in view of the specification, to a POSITA in the field of LEDs in 2006 was, "allows light to pass through." Appx8127–8135.

Feit's expert, Dr. Bretschneider, testified in a different matter to the same plain and ordinary meaning of "transparent" in the field of LEDs. Appx7873–7874. GE Lighting advocated for the same construction in four since-withdrawn petitions for *inter partes* review of, *inter alia*, the '529 and '464 patents, and the '916 patent from which The Regents' Patents claim priority. Appx7838–7839; Appx7848; Appx7857–7858; Appx7866.

Neither Intervenors' testifying expert, Dr. Eden, nor The Regents' expert, Professor Schubert, opined that any minimum threshold of transmissivity was required for a material to be considered "transparent." Appx3489 (1034:4–1035:22); Appx3404 (796:4–797:3). Another of Intervenors' experts, Professor Ballato,

---

[2] Professor Schubert is the author of the most widely-used LED textbook, has been cited 40,000+ times in peer-reviewed technical literature, and ranks in the top 1% of researchers based on citation. Appx3352 (588:3–25).

explained that the transmittance of a typical single-crystal sapphire window, which the parties agree is within the scope of the term "transparent," is about 85%. Appx3489 (1034:4–19).

Therefore, the extrinsic expert testimony showed that 85% transmissivity is an upper bound of transmissivity of a single-crystal sapphire "transparent surface," and no expert opined that a lower bound existed at all. Nevertheless, the Commission imposed a minimum threshold of something greater than 60% transmissivity.

#### c) Intrinsic Evidence Shows that "Transparent" Means "Allows Light to Pass Through"

The plain and ordinary meaning of the term "transparent" is "allows light to pass through."[3] *See supra* at Section IV.B.1.a. The '854 patent describes exemplary "transparent" materials such as "glass, quartz, sapphire, diamond ***or other material transparent for the desired emission wavelength***, wherein the transparent glass plate 2220 ***effectively extracts the light 2218 emitted from the LED 2200 to the shaped optical element 2212***." Appx748 (20:50–57) (emphasis added). No quantitative requirements for light extraction appear in the specification.

[3] The Regents has maintained this proposed construction throughout the proceedings below and may "clarify[] or defend[] the original scope of its claim construction," and to "support[] its existing claim construction position with new citations to the specification." *Interactive Gift Express, Inc. v. CompuServe Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001).

### (1) Surrounding Claim Language

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). Claim 1 of the '854 patent, in describing the relationship between the "transparent surface" and the "at least one III-nitride light emitting diode (LED)," recites: "the LED and transparent surface configured to extract light emitted by the LED through the transparent surface." Appx749. Reading this claim language together, the meaning of the term "transparent" is reflected in the configuration of the surface to "extract light...through the transparent surface." *Id*. With no modifiers, the claim itself supports construing the term "transparent" broadly. *See Innova*, 381 F.3d at 1118.

Claim 1 of the '464 patent also confirms The Regents' proposed construction is correct.[4] That claim recites, "wherein the LED chip resides on or above the transparent plate and ***at least some of the light emitted by the LED chip is transmitted through the transparent plate***[.]" Appx715 (emphasis added), Appx90. The Commission found that this language "sets forth a separate requirement" but "does not recite a test to determine that the plate is transparent if it allows transmission of 'at least some light.'" Appx90. The Commission does not explain

[4] The Commission Opinion notes that, although the '854 patent is not related to the '529 and '464 patents by claim of priority, the ALJ adopted the plain meaning of the term "transparent" for all three patents. Appx88.

how there could be a "separate requirement" of partial transmission through a structure that necessarily transmits all or substantially all light as the Commission applied "transparent" to require. Nor could it, for its construction of "transparent" swallows the "at least some light" limitation. A claim construction that gives meaning to all the terms of the claim is preferred over one that does not, and one that renders claim language superfluous is disfavored. *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016).

**(2) Embodiments in the Specification**

"[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *MBO Labs.*, 474 F.3d at 1333. Scattering surfaces on transparent elements are described extensively in the specification as advantageous, so it is error to exclude scattering from the construction of "transparent." *Id*.

For instance, among the advantages of the invention described in the '854 patent is that roughened surfaces increase light extraction: "The combination of a transparent electrode with ***roughened, textured, patterned or shaped surfaces***, with the LED embedded within a shaped optical element or lens, ***results in increased light extraction***." Appx749 (21:1–4) (emphasis added). The specification describes various "transparent" structures by reference to the fact that light is extracted through them, using roughened surfaces to ***increase scattering***, which enhances extraction.

Appx742 (8:62–9:34). In addition, the ’854 patent is replete with illustrations of ***intentional scattering*** to increase light extraction (shown as arrows indicating light changing direction at roughened surfaces). *See, e.g.*, Appx727-730 (FIGS. 4A, 6, 8A); *see also* Appx698–699, Appx701–703.

Indeed, the Commission credited The Regents’ unrebutted expert testimony, in the context of the ’529 and ’464 patents, that scattering caused by “roughening the surface of a material on the scale of the wavelength to be extracted increases light extraction by extracting light that would otherwise be trapped by total internal reflection.” Appx97–98. This confirms that scattering is consistent with the goal of improving extraction as described in the specification.

**(3) Prosecution History**

The Commission points to a statement taken out of context from the prosecution history of a different patent in rejecting The Regents’ proposed construction of “transparent.” Appx91. That portion includes an argument made to distinguish teachings in Kneissl regarding a Distributed Bragg Reflector (“DBR”) in a vertical cavity surface emitting laser (“VCSEL”), not an LED. *See* Appx6544–6547.

Claims 1–4 and 26 of related Application No. 11/954,154[5] were rejected as allegedly obvious. Appx6490–6493. The rejection concerned whether Kneissl

[5] The Regents’ Patents claim priority to this application. Appx719; Appx752.

disclosed an LED in which all layers, except the emitting layer, are transparent such that light is extracted from both front and back sides of the LED. Appx6519. The rejection ***did not*** address directly the question whether the transparent substrate or sub-mount was transparent, but implied it was. Appx6519.

Prosecution counsel argued that the embodiment in Kneissl relied upon was a VCSEL, not an LED, and that Kneissl's separate description of an LED embodiment emitted from one side only. Appx6547. The statement cited by the Commission appears in the following excerpt:

> ***A DBR is a mirror, and is therefore not transparent***. While the above cited portions of Kneissl describe emitting a light beam through the DBR, ***the DBR is primarily reflective and would not be considered transparent (there is a difference between transparent and allowing some light to be transmitted)***.

Appx6547–6548 (emphases added).

This Court has "declined to apply the doctrine of prosecution disclaimer where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). For prosecution disclaimer to attach, "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Id.* at 1325–26. The parenthetical in the above excerpt is far from clear and unmistakable when read in context. The Commission did not find that a disclaimer occurred. Even if it had, any disclaimer or narrowing of claim scope should be specific to the VCSEL DBRs in Kneissl. *See*

Appx3007–3008 (77:9–78:9). Absent clear and unmistakable disclaimer, courts "must give the claim language its presumptive full ordinary meaning." *Omega Eng'g*, 334 F.3d at 1328.

#### d) Extrinsic Evidence Confirms that "Transparent" Means "Allows Light to Pass Through"

##### (1) Two District Court Constructions of "Transparent" in Tanda

The intrinsic evidence of the '854 patent includes the prior art cited during the examination of the patent. *Phillips*, 415 F.3d at 1317. That includes Tanda. *See* Appx721 ('854 patent list of references cited); Appx139177 (Tanda). The Commission determined that Tanda is ***not*** prior art (Appx578–579, Appx587), but credited Intervenors' argument that Tanda was a simultaneous invention. Appx145, Appx442–443, Appx587, Appx605.

The Commission relied on Tanda's "transparent board 20" as disclosing the "transparent surface" of claim 1 of the '854 patent. Appx145; Appx587. Tanda describes that its "transparent board 20 has transmittance of 70% or more...and serves as a support board...." Appx139191 (¶[0029]). Tanda generally describes its "transparent" elements with reference to their ability to "help[] light to outgo" and to "allow[s] the light to pass." *Id.* Tanda's statement that the "transparent board 20 has transmittance of 70%," as recited in the specification, strongly implies that the

term "transparent" would not be understood inherently to require transmittance of that level. *See, e.g.*, *Phillips*, 415 F.3d at 1314.

Where the plain and ordinary meaning of a term is at issue, judicial interpretations of that term in the context of unrelated patents in the same field can be an appropriate form of non-binding extrinsic evidence. *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 153 (Fed. Cir. 2011). The Commission erroneously dismissed as "irrelevant" two district court constructions of the term "transparent" in the context of Tanda to mean "allows light to pass through."

"Transparent" was twice construed to mean "allows light to pass through" in litigation of Tanda's descendant, the Tanda '734 patent.[6] Judge Richard G. Andrews of the District of Delaware construed "transparent" in the Tanda '734 patent to mean "allows light to pass through." Appx7895. That case involved disputes similar to those presented here: the parties agreed that a "transparent" element allows transmission of light and disputed "whether the transmission must be without 'appreciable scattering' of light, and whether one must also be able to see 'clearly and distinctly' through the transparent element." Appx7895.

Judge Andrews determined that "transparent":

> takes on a broader meaning in the field of "light emitting devices" than in its ordinary English usage. "Transparent" ordinarily indicates the ability to see objects on the other

[6] Tanda is a publication of U.S. Patent Application Serial No. 11/639,062. The Tanda '734 patent issued from a series of continuations of Tanda.

> side "clearly and distinctly." As Plaintiff's expert points out, however, light-scattering features of a "light emitting device" can enhance the device's ability to illuminate an area—its intended purpose—even as it obscures sight through the device. The ordinary lay usage of "transparent" is therefore inappropriately limiting.

Appx7896. Judge Andrews also held that, "the relevant field for interpreting 'transparent' is 'light emitting devices' rather than visual science or 'imaging optics.'" Appx7896. Similar to the '854 patent, the Tanda '734 patent described features of the device designed to allow light to "effectively" or "easily" "outgo" in contrast to prior art devices that prevented effective passage of light and disclosed examples in which scattering surfaces enhanced light transmission. Appx7897.

In another case regarding the Tanda '734 patent, Judge George H. Wu of the Central District of California applied similar reasoning to adopt the same construction of "transparent." Appx8101.

**(2) Technical Dictionaries**

One technical dictionary defines "transparent" as "[p]ermitting passage of radiation or particles," consistent with The Regents' construction. Appx7914. Another technical dictionary defines "transparent," consistent with The Regents' construction, as "[a] body, material, or medium which passes any type of particle." Appx7909. The Commission did not explain why these definitions did not support The Regents' proposed construction or support the Commission's requirement of greater than 60% transmissivity.

### (3) Miyahara

Intervenors' expert, Dr. Lebby, testified at trial: "Miyahara, that does have a transparent plate." Appx3556 (1200:22). Miyahara teaches that its transparent plate has light transmittance of ***as low as 1%***. Appx138632–138633 (¶[0008]). By relying on Miyahara, Dr. Lebby implicitly adopted Miyahara's teaching that "transparent" encompasses structures that transmit as little as 1% of light.

Miyahara also teaches that transparent plates are preferably made of polycrystalline ceramics that scatter light passing through and thereby produce light that is "more gentle on the human eye." Appx138628–138629 (¶[0005]). Miyahara thus aligns with the specification of the '854 patent and confirms that skilled artisans at the time of the invention would understand that scattering from polycrystalline ceramic structures is desirable in transparent submounts for LEDs.

### (4) "Semi-Transparent" is a Species of "Transparent"—Not Mutually Exclusive

The Commission erroneously concluded that "transparent" is mutually exclusive with "semi-transparent," which appears once in the specification. Appx744 (11:9–12). The ALJ questioned inventor Professor DenBaars at length on this subject. Appx3205–3206 (231:22–233:10). He explained that, "[s]emi-transparent is kind of just a different way to say I think it's got some percentage of transparency to it." Appx3205 (232:10–11). The Commission did not offer any reasoning for rejecting Dr. DenBaars' explanation that "semi-transparent" is a

species of “transparent” in reaching its conclusion that these terms are, instead, mutually exclusive. *See Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 757 F. App’x 974, 979 (Fed. Cir. 2019).

The Commission relies on the testimony of The Regents’ fact witness, Dr. Wong, who is a recent graduate student, but not an inventor nor a skilled artisan at the relevant time. Appx92, Appx3254 (314:1–18) (Dr. Wong received his Ph.D. in 2020). Dr. Wong was asked about usage of the term “semi-transparent” in papers from the 1990s that he read decades later during his Ph.D. studies in the late 2010s, which are not in evidence. Appx3263 (349:1–22). Dr. Wong recalled that those papers described thin metal contact layers that transmit about 40% as “semi-transparent.” *Id*.

The Commission also relies on another of The Regents’ non-inventor fact witnesses, Professor Speck, who also was examined regarding the meaning of the term “semi-transparent,” and prior testimony regarding what “low” light loss in “transparent” materials would mean. Appx92. On the latter point, Professor Speck testified, “[m]aybe in the 1 to 10 percent range, just as a ballpark guess.” Appx3246 (281:15–282:17). Yet the Commission seized on that equivocal, out-of-context testimony as support for its construction of “transparent.” Appx92.

The Commission did not explain how Dr. Wong's or Professor Speck's testimony supports the Commission's implicit transmissivity requirement of something greater than 60%.

#### (5) Paper, Ears, and White Clothing Are Irrelevant "Fluff"

*Phillips* cautions that there is "a virtually unbounded universe of potential extrinsic evidence of some marginal relevance," leaving the court with the "considerable task of filtering the useful extrinsic evidence from the fluff." *Phillips*, 415 F.3d at 1318. The Commission failed in that task when justifying its construction with what clearly amounts to "fluff"—"sheets of paper, human ears, and white clothing[, which] all allow the transmission of *some* light, but no reasonable fact finder would say those items are 'transparent.'" Appx450, Appx90. Reliance on irrelevant lay notions of transparency exemplifies the erroneous approach of Commission's analysis of "transparent." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999) (cautioning that "claim construction is not philosophy; we need not wring our hands when considering the implications of a metaphysical analysis of claim terms").

#### (6) The Accused Products Are Not Proper Extrinsic Evidence

"[A] court may not use the accused product or process as a form of extrinsic evidence to supply limitations for patent claim language." *Wilson*, 442 F.3d at 1331.

Throughout the analysis of the "transparent" term, however, the Commission relied on evidence regarding the Accused and Licensee DI Products as support for what "transparent" ***does not*** encompass. *See, e.g.,* Appx89–91; Appx127–128.

For example, the Commission declined to adopt a proposed 80% minimum transmissivity requirement but then relied on evidence that the Accused Rigid Products have transmissivity below about 60% as evidence that the submounts in those products are not "transparent." Appx89–90, Appx450–451. The Commission thus improperly relied on the Accused Rigid Products to define what the term "transparent" ***did not*** cover but did not define what it ***does*** cover. *See, e.g., Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326, 1336 (Fed. Cir. 2022).

**2. There is Not Substantial Evidence of Absorption**

The FID stated, "although only circumstantial evidence of transparency, SEM testing showed the presence of grains, pores, and grain boundaries in the submounts of the Accused Rigid Products…[that] cause the material to be 'highly absorbing and scattering,' indicating that the submounts are opaque." Appx463. The Commission adopted this express reliance on the Accused Products to again define what "transparent" ***does not*** cover. Appx89.

But the evidence does not support a finding that absorption occurs. The Commission cites expert testimony by Intervenors' experts, Dr. Eden and Dr. Shanfield, for the proposition that absorption occurs. Appx89, Appx463.

Dr. Eden's cited testimony is conclusory and based on unreliable principles and methods. *See generally* Appx3478–3479. Dr. Eden admitted under cross-examination that: (1) scattering and absorption are different phenomena, (2) he did not measure absorption directly, and (3) he could have differentiated scattering and absorption but chose not to. Appx3488–3489 (1031:5–8; 1035:25–1036:7); Appx3490 (1038:11–16). Despite the categorical difference between scattering and absorption, in Dr. Eden's measurements, "scattering losses are lumped into the numbers for absorption." Appx3489 (1036:19–1037:20).

The Regents' expert, Professor Schubert, explained that Dr. Eden's absorption values were "contrary to common sense" because, among other reasons, the filaments are white in color, which skilled artisans understand to indicate a material is not absorbing. Appx3356 (607:2–25). Professor Schubert further explained how Dr. Eden's experimental setup prevented measurement of some scattered light and thus underestimated light transmission. Appx3357 (608:2–609:13); Appx115470.

Dr. Eden's flawed methodology makes it impossible to ascertain how much of his purported absorption values are scattering versus absorption, nor of how much scattered light was excluded from measurement by his experimental design. In the absence of any direct measurement of absorption, and in view of the fatal flaws in Dr. Eden's commingling of categorically different scattering and absorption values,

there is not substantial evidence in the record to support a finding that absorption of any specific extent occurs in the Accused Rigid Products.

Dr. Shanfield's cited testimony is entirely conclusory and without ***any*** evidentiary support. Appx3554 (1192:25–1193:5). "Conclusory expert testimony does not qualify as substantial evidence." *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019).

### 3. The Commission Erred in Rejecting Equivalence

The Commission affirmed, with supplemental analysis, the FID's findings regarding the doctrine of equivalents as to "transparent surface." Appx118. The FID stated, *inter alia*, "[f]inding something that is not transparent to be equivalent to something that is transparent would entirely vitiate the 'transparent' limitation." Appx464. However, "[t]he vitiation test cannot be satisfied merely by noting that the equivalent substitute is outside the claimed limitation's literal scope." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).

The FID found that, "[f]or substantially the same reasons discussed…with respect to the '529 patent, the Accused Rigid Products do not satisfy this limitation under the doctrine of equivalents." Appx120 (quoting Appx554). The FID also found that "[f]or [] substantially the same reasons [as discussed in connection with the '529 patent], [Complainant] has not persuasively shown that the Accused

Flexible Products satisfy th[e] [transparent surface] limitation under the doctrine of equivalents." *Id*.

The FID's reasoning is legally erroneous because "[c]laim vitiation applies when there is a 'clear, substantial difference or a difference in kind' between the claim limitation and the accused product....It does not apply when there is a 'subtle difference in degree.'" *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1355 (Fed. Cir. 2010). As discussed *supra*, the differences in transmissivity between the Accused Rigid Products (20% to 60%, *see* Appx453–457) and an ideal single-crystal sapphire filament (85%) are, in fact, relatively small differences of degree, not categorical differences in kind. Transmissivity differences with respect to the Accused Flexible Products (60% to 80%, *see* Appx549–51) are even smaller.

The record shows what a difference in kind for this limitation looks like. All Parties and experts agreed that filaments having metal submounts do not allow light to pass through, *i.e.*, are not transparent. Appx430. Metal submounts thus are an example of a difference in kind, and clear, substantial difference that would vitiate the "transparent" plate / surface limitation. *Trading Techs.*, 595 F.3d at 1355.

The Regents contended that Accused Products in which "at least some of the light emitted by the LED chip is transmitted" through its submount is equivalent to the "transparent surface" limitation as construed by the ALJ. The FID correctly found that for many of the Accused Products, "not-insubstantial amounts of light

pass through the submounts" such that The Regents' proposed equivalent ***literally practices*** the claim limitation as correctly construed. Appx451–48; Appx549–554; Appx559.

### C. The Regents' Appeals Regarding "Molding" in Claim 1 of the '854 Patent

#### 1. The Contextual Claim Language Confirms that "Molding" Means a "Formed Component"

The contextual claim language makes clear that "molding" comprises a phosphor, surrounds the LED, and is configured to extract light from the front and back sides of the device. Appx749; *see also Phillips*, 415 F.3d at 1314; *IGT v. Bally Gaming Int'l*, 659 F.3d 1109, 1117 (Fed. Cir. 2011). Nowhere does the claim language (1) impose a process for creating the molding, or (2) exclude the presence of "random irregularities and an uneven surface," an analysis the Commission adopted in finding this limitation not met. Appx564; *see also* Appx118.

The claims unambiguously define molding with a composition, orientation, structure, and objective criteria for a person of skill in the art to ascertain whether the "molding" limitation is met. Appx749; Appx782. And the specification describes the molding "formed on opposite sides, *e.g.*, the top/front side 2214 and bottom/back side 2216 of the LED 2200, wherein the emitting layer 2200 emits light 2218 that is extracted from both the top/front side 2214 and bottom/back side 2216 of the LED 2200." Appx748 (20:41–59); Appx781 (20:24–32).

The specification and prosecution history do not require that the "molding" be defined by a process or that it has a uniform shape. The Commission erred by relying on one dictionary definition and legally unrelated patents to import that limitation. *Compare* Appx668–669 *with Virnetx, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1316–17 (Fed. Cir. 2014).

Even if the'529 and '464 patents were intrinsic to The Regents' Patents, they did not disavow the presence of "non-uniform" phosphor layers. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). They merely describe the state of the art, then continue to further describe and claim lenses (and moldings or shaped optical elements that specifically act as a lens) that are distinct from the phosphor layer. *See, e.g.*, Appx693 (cl. 3, 15); Appx690 (10:39–42); Appx691 (11:12–17); Appx692 (13:42–44).

Properly analyzed in the context of the claims as a whole, the contextual claim language confirms that "molding" means a "formed component" without regard to any imported process or exclusion of imperfections.

### 2. No Process is an Essential Part of the Invention

"[A] novel product that meets the criteria of patentability is not limited to the process by which it was made." *Continental Circuits*, 915 F.3d at 799 (internal quotations and citations omitted). It makes no sense to separate "molding" from its contextual claim language and import a process that must generate a filament free of

"random irregularities and an uneven surface" when the claim language that surrounds the "molding" term merely requires a certain composition and orientation conducive to extracting light. *Lisle Corp. v. A.G. Mfg.*, 398 F.3d 1306, 1314 (Fed. Cir. 2005).

In addition, the claim uses the transitional language "a molding ***comprising***," which is "understood to signify that the claims ***do not exclude*** the presence in the accused apparatus or method of factors in addition to those explicitly recited." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999) (emphasis added). The Commission failed to identify any special circumstance or estoppel, let alone to the "exacting" standard explained by *Thorner*, specifically excluding the presence of "random irregularities and an uneven surface" to satisfy the molding limitation. *See* Appx564–565; Appx571–572, Appx575, Appx594, Appx598; Appx668–669; *see also Thorner*, 669 F.3d at 1365.

### 3. Even if the Commission's Construction Were Correct, the Relevant Area of the Molding Does Not Have Irregularities

The imperfections the Commission relied on are identified only in isolated portions of the filaments, and other portions of the same Accused Products still satisfy the "molding" limitation. The claim language recites, "a molding comprising a phosphor and surrounding the LED...." Appx749. While the molding may cover other portions of the device (*e.g.*, the terminal ends of the filaments), the claim limitation is directed to the portion that is "surrounding the LED." *Id*. But the

Commission's findings are based solely on the presence of "random irregularities and an uneven surface" in ***other*** regions that are ***not*** "surrounding the LED." Appx564; Appx118. In regions "surrounding the LED," no irregularities were identified. *Id.*; *see also SunTiger, Inc. v. Sci. Research Funding Group*, 189 F.3d 1327, 1336–37 (Fed. Cir. 1999) ("If a claim reads merely on a part of an accused device, that is enough for infringement.").

Even applying the Commission's faulty construction, it was error to find the Accused and Licensee DI Products fail to practice the "molding" limitation because the accused phosphor coatings comprise a phosphor, surround at least one LED, and are configured to extract light from the front and back sides of the device. Appx749; Appx782.

The presence of what amount to artifacts of manufacturing at the terminal ends of the filaments in the accused molding is not a defense to infringement, even if it suggests that the Accused Products are suboptimal versions of the claimed invention (although there is no evidence in the record as to whether such features indeed render the Accused Products suboptimal). *See Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 807 F.3d 1283, 1292–93 (Fed. Cir. 2015).

In all of the examples relied upon in the FID and shown by red ovals below, the supposed imperfections are surrounding the leads, not surrounding each individual LED chip:




RDX-0001.069.




Tr. (Shanfield) at 1150:2-16 (rigid filament).



CX-0201.0017, Tr. (Shanfield) at 1183:19-1185:8 (flexible filament).

Appx565 (red oval annotations in original; blue rectangles added). As the above annotated blue rectangles show, in looking at a single LED (Appx116213, slide 17)—which is all that is required by the claim—or even a series of two to three LEDs (Appx116213, slide 17; Appx135292), there are no "random irregularities and an uneven surface." Dr. Eden's own cross section demonstrates that the shape of the phosphor coating surrounding the LED chip is uniform:




Appx566.

Thus, the Accused and Licensee DI Products meet the FID's narrowed molding construction, even if it were not erroneous. This is also consistent with the FID's finding regarding the "surrounding" limitation: "[t]he fact that the phosphor coating [i.e., "molding"] does not completely surround the submount / transparent surface does not mean that it does not surround the LED, which is all that is required by this claim." Appx567. The FID found that the molding comprising a phosphor need only surround the LED—not multiple LEDs and not the complete submount/transparent surface—because that is what is required by this claim. *Id*. This same analysis must be applied to the "molding" limitation.

Assuming that Dr. Shanfield's *ipse dixit* that the phosphor coating on the Accused and Licensee DI Products were formed by, in his words, "glob-top" deposition process having a "triangular spout" is true, the spout is a mold through which material is extruded onto the filament. Appx112430. The OCCC states that molding means "a component formed by or as if by mold"—that construction on its

face encompasses extrusion molding. Appx668–669. The OCCC did not find any lexicography or disavowal of extrusion molding. *Id*. Thus, the extrusion molded phosphor coatings in the Accused and Licensee DI Products literally practice the construction of "molding."

### D. The Regents' Appeals Regarding "Sapphire Plate" in Claim 1 of the '557 Patent

The Commission observed that, "the FID finds that the term 'sapphire plate' is narrow and that '[The Regents] is not...allowed to extend the scope of 'sapphire' to encompass a ceramic material, polycrystalline aluminum oxide, simply because it shares the same elemental composition." Appx125. But, as discussed below, that is not what The Regents contended.

#### 1. Professor Schubert's Function-Way-Result Analysis

The Regents' expert testified that the ceramic submounts in the Accused Rigid Products were equivalent to the claimed "sapphire plate" based on the function-way-result test, as follows:

> The function of the claimed sapphire plate is to structurally support the LEDs, the semiconductor die, and extract light through the sapphire plate. The same function or substantially the same function is performed by the accused ceramic submount.
>
> The way concerns the way the function is implemented. And it is implemented by using a transparent material, sapphire, that is sufficiently sturdy to support the LED die and is suitable for LED packaging. And this way is replicated in the same manner or substantially the same manner by the ceramic submount. That is, likewise for the

> ceramic submount, we have a transparent material suitable for LED packaging that transmits light and supports the LED die.
>
> The result of the claimed sapphire plate is to support the LED chip, to have a package that is viable, to transmit light through the transparent plate, and the same result or substantially the same result is obtained by the ceramic submount.

Appx3362 (628:11–15; 628:19–629:2; 629:5–9).

#### 2. Major Suppliers Market Ceramic Submounts as Transparent and Confirm Equivalence

Professor Schubert testified that documents produced by two of Intervenors' largest filament LED suppliers showed that ceramic submounts in their filament LEDs are equivalent to the claimed sapphire plate because, "these documents either explicitly or implicitly convey that the plate is transparent and also that LED chips are structurally supported by the plate." Appx3362 (629:13–16); *see also* Appx115479 (excerpting Appx123674), Appx115480 (excerpting Appx115844).

These manufacturer documents show that the LED industry views sapphire and ceramics as transparent submounts, which is evidence that the industry considers sapphire and ceramic submounts to be equivalents with respect to transparency, regardless of whether there is specific connection between these documents and the Accused Rigid Products.

#### 3. Miyahara Highlights the Advantages of Scattering Caused by Polycrystalline Structures Inside Ceramic Submounts

As discussed *supra*, Intervenors' Miyahara prior art reference articulates the same concepts offered by Professor Schubert as to the desirable scattering functionality of polycrystalline ceramic submounts. Appx138628–138629 (¶[0005]).

#### 4. Differences Between Ceramic and Sapphire Submounts are a Matter of Degree, Not of Kind

At most, the difference in crystalline structure between sapphire and polycrystalline aluminum oxide is a matter of degree, not of kind, as they are of the same elemental composition and exhibit similar properties. Intervenors' expert, Dr. Ballato, declared that, "in the polycrystal each grain is single-crystalline, but grain boundaries that break the single-crystal order between grains exist." Appx7372–7373 (Ballato Decl. at ¶25). Thus, the crystal structure of the same elemental composition is the only difference between sapphire, construed to mean single-crystal aluminum oxide, and the polycrystalline aluminum oxide submounts in the Accused Rigid Products. *See, e.g., Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1379 (Fed. Cir. 2005).

### E. The Regents' Appeals Regarding "Molding" in Claim 1 of the '557 Patent

The Commission erred with respect to "molding" in claim 1 of the '557 patent for the same reasons discussed above with respect to "molding" in claim 1 of the

’854 patent, and should be reversed. *See supra* at Section VI.C; *see also supra* at Sections IV.B.1.b; V.B.

### F. The Regents’ Appeals Regarding the Commission’s Obviousness Findings

#### 1. Obviousness Based On Yamazaki and Uemura

##### a) The “SGS” Limitation

Claim 1 of the ’854 patent recites “at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate.” Appx749. Similarly, claim 1 of the ’557 patent recites a plurality of LEDs, “each comprising a sapphire growth substrate.” Appx782. The specifications of The Regents’ Patents disclose multiple embodiments for the growth substrate, including an example where “a GaN substrate is used instead of a sapphire substrate.” Appx745 (13:41–42); Appx778 (13:29–30). In another embodiment, the LED is grown on a sapphire substrate that is “removed using a laser de-bonding technique” such that it would not be present in the final LED. Appx744 (12:5–7); Appx777 (61–63).

The FID found that Respondents “failed to show that Yamazaki discloses the required [SGS] limitation.” Appx580; *see also* Appx135. With respect to whether the SGS limitation would have been obvious, the FID found that “***the record appears to be devoid of any evidence*** of such obviousness.” Appx580 (emphasis added). Nevertheless, the FID *sua sponte* found the SGS limitation obvious in view of Uemura. Appx581. The FID’s reliance on an invalidity theory not raised by

Intervenors at least violated the APA. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016).

On review, the Commission (1) "reverse[d] the FID's finding that the asserted claims of the '854 and '557 [patents] are not invalid as obvious based on Yamazaki alone" and (2) "vacate[d] the FID's finding based on Yamazaki in combination with Uemura" because "Respondents did not rely on the combination of Yamazaki and Uemura." Appx136–137. The Commission then found the SGS limitation obvious based on Yamazaki alone. *Id.* These findings are not supported by record evidence and cannot stand.

**(1) The Record is Devoid of Evidence to Support the Commission's Obviousness Findings Regarding SGS**

A patent claim "can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016). This Court requires "reasoned analysis and evidentiary support, especially when dealing with a limitation missing from the [applied reference]." *Id*. at 1362.

Expert conclusions are not substantial evidence. *TQ Delta,* 942 F.3d at 1358. Intervenors' invalidity expert, Dr. Lebby, only offered conclusions during the hearing. Appx3561 (1220:10–1221:19). Dr. Lebby never uttered the words "sapphire growth substrate" in his testimony. The closest Dr. Lebby came to opining

on the SGS limitation was labeling it as "obvious" on a demonstrative slide (which is not evidence). Appx135359. Even if Dr. Lebby's assertion is credited, this conclusory statement is not substantial evidence sufficient to sustain a legal conclusion of obviousness. *TQ Delta*, 942 F.3d at 1359; *see also In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

The Commission did not rely on any admitted evidence to support its conclusion that Yamazaki rendered the SGS limitation obvious, tacitly admitting there is none. *See* Appx136–137. Instead, the Commission pointed to "extensive discussion" of the SGS limitation in Respondents' *pre-hearing brief* and alleged "evidence from Dr. Lebby's expert report." Appx136 (emphasis added). But "[a]ttorney argument is not evidence." *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1043 (Fed. Cir. 2017); *see also Acoustic Tech., Inc. v. Itron Networked Solutions, Inc.*, 949 F.3d 1366, 1375 (Fed. Cir. 2020).

Neither Dr. Lebby's report nor Intervenors' pre-hearing brief were admitted as evidence during the hearing, nor is Dr. Lebby's report part of the record under the Commission's rules. 19 C.F.R. § 210.38(a) (defining the scope of the Commission record); Appx111678 (providing that expert reports "shall not be filed with the Office of the Secretary of the Commission"); *Certain Two-Way Radio Equip. & Sys., Related Software & Components Thereof*, Inv. No. 337-TA-1053, Comm'n Op. (Pub. Version) at 13 n.6 (Dec. 18, 2018) (confirming that "evidence" is "material

received into the record during the evidentiary hearing"). The ALJ's ground rules provided that "all direct testimony must be given by a live witness," which further confirms that Dr. Lebby's live testimony—not his written report—is what the Commission must base its findings. Appx111687.

While not present in its discussion of this limitation, the Commission found that nothing in this Court's precedent "suggests that expert testimony is required for undisputed limitations." Appx103–104. To the extent the Commission implicitly found that expert testimony was not required to establish how the SGS limitation is allegedly obvious because it was "undisputed," this is simply wrong. This Court has required expert testimony "not only to explain what the prior-art references disclosed, but also to show that a person skilled in the art would have been motivated to combine them." *Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1348 (Fed. Cir. 2013). This case clearly called for such testimony given the required level of skill in the art—"especially when dealing with a limitation missing from the [applied reference.]" *Arendi*, 832 F.3d at 1362; Appx439. The Commission cited no authority for the proposition that a presumptively valid patent claim can be rendered obvious in the absence of expert testimony.

In particular, there is no evidence why a skilled artisan would have modified Yamazaki to include an SGS—as opposed to a different growth substrate—or keep the SGS in the final device after fabrication. *See, e.g.*, Appx744 (12:5–7); Appx745

(13:41–42). That The Regents' Patents teach multiple alternatives as to the growth substrate underscores why expert testimony was necessary to establish why it would have been obvious to select SGS over the other possibilities.

In addition, the Commission violated the APA by making an obviousness finding unsupported by the record. *Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992 (Fed. Cir. 2017). The Commission had an "obligation to develop an ***evidentiary basis*** for its findings." *TQ Delta*, 942 F.3d at 1358 (emphasis added). As discussed *supra*, the Commission did not base its decision on ***any*** admitted evidence. To the extent the Commission purports "to base its factual findings on its expertise, rather than on evidence in the record," this Court has held that this is "impermissible." *Brand v. Miller*, 487 F.3d 862, 869 (Fed. Cir. 2007).

**(2) The Regents did not Waive Intervenors' Burden to Prove Invalidity by Clear and Convincing Evidence**

The Commission also based its erroneous obviousness finding on The Regents' purported "failure to dispute this [SGS] limitation in its pre-hearing brief as required under the ALJ's Ground Rules." Appx135; *see also* Appx136 (finding that The Regents "waived any argument that the 'sapphire growth substrate' limitation is not obvious over Yamazaki"). The Commission's waiver finding is not supported by the ALJ's ground rules. But even if it were, the Commission's reliance

on the absence of rebuttal contentions in The Regents' pre-hearing brief as a substitute for clear and convincing evidence improperly inverts the burden of proof.

It is axiomatic that a "patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence" and the burden "never shifts to the patentee to prove validity." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). Accordingly, "a patentee need submit *no* evidence in support of a conclusion of validity" such that "a court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to convincingly establish the contrary." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986) (emphasis in original).

The Regents was not obligated to dispute every factual element of Intervenors' invalidity contentions in its pre-hearing brief to hold Intervenors to their burden of proof. The Regents' pre-hearing brief contended that none of the Asserted Claims would be proven invalid. Appx10406. The Regents also contended that Respondents would not meet their burden for their Yamazaki-based invalidity theories. Appx10545; Appx10629.

The Commission flipped the burden of proof by focusing on what The Regents did not include in its pre-hearing brief, as opposed to what Intervenors did not adduce during the hearing. In so doing, the Commission used the ALJ's ground rules to strip

The Regents' Patents of their statutory presumption of validity. 35 U.S.C. § 282; 5 U.S.C. § 706(2); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993).

Further, the Commission's waiver finding is not supported by the ALJ's ground rules. *Swagway, LLC v. Int'l Trade Comm'n*, 934 F.3d 1332, 1343 (Fed. Cir. 2019) (holding that "the Commission is bound to follow and must strictly comply with its rules"). First, the ALJ's ground rules provided that "[t]he pre-hearing brief shall set forth a party's contentions on every issue the party intends to address ***at hearing***." Appx111679 (emphasis added). On its face, the rule does not constrain challenges to evidence admitted during the hearing, it only limits what parties may offer. *Id*.

Second, the same ground rule provided that "contentions not set forth in detail in the pre-hearing brief….shall be deemed abandoned or waived, ***except contentions of which a party is not aware and could not be aware in the exercise of reasonable diligence at the time of filing the pre-hearing brief***." *Id*. (emphasis added). The Regents could not possibly have raised arguments about Dr. Lebby's hearing testimony (or in this case, the lack thereof) until after the hearing, so this argument fell squarely within the ground rule's exception. *Id*.

Third, the ALJ's ground rule for responsive post-hearing briefs authorized the Parties to address "the issues and evidence raised in the post-hearing initial briefs of the opposing party." Appx111688–111689. The responsive post-hearing brief rule

also provided that "contentions ... which a party does not answer in detail in the post-hearing responsive brief shall be deemed unopposed." Appx111689. By contrast, the pre-hearing brief ground rule does not have a similar provision about unaddressed contentions being "deemed unopposed" or admitted. Appx111679.

Beyond reproducing Dr. Lebby's demonstrative slide referring to the SGS limitation as "obvious, undisputed," Intervenors' post-hearing brief did not set forth ***any*** argument or evidence why the SGS limitation was allegedly obvious. Appx111823–111825. In response, The Regents' post-hearing brief argued that Dr. Lebby failed to address where Yamazaki purportedly discloses an SGS. Appx112525–112526.

Fourth, Intervenors' post-hearing brief did not "set forth in detail" why the SGS limitation was allegedly obvious, so that contention should have been deemed "abandoned or withdrawn." Appx111688. Indeed, the alleged "extensive discussion" in Respondents' pre-hearing brief relied upon by the Commission does not appear in Respondents' post-hearing brief and was thus waived. Appx136; Appx111823–111825. On one hand, the Commission found that Intervenors met their burden by clear and convincing evidence despite no evidence or argument in their post-hearing brief, yet on the other hand, found that The Regents waived any argument that Intervenors failed to prove their case. This result cannot stand. *See* 5 U.S.C. § 706(2)(A) (explaining that a reviewing court can hold unlawful and set

aside agency findings that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

Even if this Court finds that waiver occurred, it can exercise its discretion to consider waived issues. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1322 (Fed. Cir. 2020). Reasons justifying an appellate court's consideration of such issues include, among others, that the proper resolution is beyond any doubt, for error that works manifest injustice, or where it would result in an unfair procedure. *Interactive Gift Exp.*, 256 F.3d at 1344–45. Here, the proper resolution of whether the SGS limitation is obvious is beyond doubt because there no evidence to support such a finding. *Supra* at Section VI.F.1.a.(1). The Commission's finding also would result in an unfair procedure whereby patent challengers would be absolved of their burden of proof based on the scope of the patentee's potential rebuttal.

The Commission's waiver finding is also unjust because the Commission had previously held that "Respondents bear the burden of proving by clear and convincing evidence that each and every claim element is disclosed in the prior art" and that it is improper to merely "rely on the fact that certain limitations in [the challenged claim] are 'undisputed.'" *Certain Static Random Access Memories & Prods. Containing Same*, Inv. No. 337-TA-792, Comm'n Op. at 26 (June 28, 2013).

The Commission's reasoning that Intervenors were not obliged to adduce evidence on "undisputed" limitations reversed course on its prior practice.

#### b) The "Cathode/Anode" Limitation

Claim 1 of the '854 patent requires that "the cathode and anode provide structural support to the transparent surface" and claim 1 of the '557 patent requires that "the cathode and anode provide structural support to the sapphire plate" (hereinafter, "the cathode/anode limitation"). Appx749; Appx782. The Commission affirmed and supplemented the FID's finding that "Yamazaki alone or in combination with Uemura teaches or suggests the" cathode/anode limitation. Appx134.

##### (1) The Commission's Finding that Yamazaki's Conductive Pattern 11a Provides Structural Support Lacks Substantial Evidence

The Commission affirmed the FID's finding that FIG. 1 of Yamazaki illustrates a cathode and an anode that are "wrapped around the ends of the glass/sapphire plate" and therefore "provide structural support to the plate at each end" as required by the cathode/anode limitation. Appx130. This finding should be reversed because (1) it is not supported by substantial evidence, and (2) the Commission failed to address The Regents' evidence and arguments.

Yamazaki does not expressly state that the conductive pattern 11a structurally supports the chip substrate 11. *See* Appx138583–138586. Regarding the alleged

"wrap around" of the j-lead between the top and bottom of chip substrate 11, FIG. 2 top view shows a gap between the edge of the top of the chip substrate 11 and the electrically conductive pattern 11a (the alleged cathode/anode).




Appx138587 (FIG. 2) (annotated). The same gap is also in FIG. 3's bottom view, which does not include reference number 11a for the electrically conductive pattern.




Appx138587 (FIG. 3) (annotated).

Given the gap between the conductive pattern 11a and the edge of the chip substrate 11 in the top and bottom views, the FID's finding that the conductive pattern 11a (the alleged cathode and anode) is "wrapped around the ends of the" chip

substrate 11 in FIG. 1 is irreconcilable with FIGS. 2–3. Appx130; *Application of Wesslau*, 353 F.2d 238, 241 (C.C.P.A. 1965) ("It is impermissible . . . to pick and choose from any one reference only so much of it as will support a given position").




Appx138587 (FIG. 1)




Appx138587 (FIG. 2) (annotated)

Neither the Commission nor the FID addressed these inconsistencies in Yamazaki's figures. Appx130–134; Appx580. The Commission also failed to address evidence that a POSITA would understand that the conductive ***pattern*** 11a is a thin metallization that does not provide structural support as required by the cathode/anode limitation. Appx3589 (1331:16–1332:8). Failing to address The Regents' evidence and arguments regarding the conductive pattern 11a constitutes reversible error. *TRUSTID, Inc. v. Next Caller, Inc.*, No. 2020-1950, 2021 WL 4427918, at *8 (Fed. Cir. Sept. 27, 2021) (recognizing that "summarily reject[ing]...arguments without explanation...is not sufficient under the APA and our

precedent”); *In re Nuvasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016); *Altx, Inc. v. United States*, 370 F.3d 1108, 1113–14 (Fed. Cir. 2004).

In addition, the Commission found that the conductive pattern 11a meets the cathode/anode limitation because “they are how the LED package is physically attached to the circuit board.” Appx130–131 (quoting Appx580). This conclusion is not supported by substantial evidence: Dr. Lebby could only “guess” that Yamazaki would be connected to a circuit board with “a solder bump or something like that.” Appx3558 (1209:13–18). This speculative and conclusory testimony is insufficient. *TQ Delta*, 942 F.3d at 1359; *Kahn*, 441 F.3d at 988.

Further casting doubt on the Commission’s conclusions is the FID’s finding that Yamazaki “was designed for applications where light emits from both sides of the package.” Appx496. Surface mount devices (which is allegedly what Yamazaki is directed to) would be “glued on to another surface that’s not transparent.” Appx3542 (1114:22–1145:3). Dr. Lebby failed to explain how Yamazaki would emit light from both sides if connected to a non-transparent surface with “a solder bump or something like that.” Appx3558 (1209:13–18). The Commission failed to address this problem with Dr. Lebby’s speculation. *See Nuvasive*, 842 F.3d at 1383.

**(2) There is Not Substantial Evidence for the Commission's Finding That It Would Have Been Obvious to Combine Yamazaki and Uemura**

The Commission affirmed the FID's alternative findings that claim 1 in both of The Regents' Patents is obvious over Yamazaki in combination with Uemura. Appx131–134. The Commission premised its obviousness finding on Yamazaki's SMJs being interchangeable with Uemura's through-pin leads. Appx131–132.

First, even accepting the Commission's characterizations of Yamazaki and Uemura as true—that (1) Yamazaki discloses a "j-lead," and (2) "j-leads" and "through pin" leads were known alternatives—in an obviousness inquiry, this Court requires evidence regarding the advantages of each alternative "and the circumstances in which one of ordinary skill would have selected one of the two devices over the other." *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1315 (Fed. Cir. 2008). There is no evidence in the record why a POSITA would select a through-pin lead package over a j-lead package, or vice versa. *See* Appx3562–3563 (1225:22–1228:11).

The Commission also affirmed the FID's finding that "Uemura provides specific motivation to pursue through-pin lead frame packaging" because Uemura's approach "requires less manufacturing precision" and "would lower the manufacturing cost of packaging LEDs." Appx132 (quoting Appx503). This does not supply a motivation to use through-pin leads. Dr. Lebby testified that "if you

look at the specification of Uemura, what they're trying to do is lower the manufacturing cost by using the alignment of the parts as they are packaging them." Appx3564 (1232:4–13). Uemura explains:

> … the semiconductor Light-emitting device is fixed on the base, and the base is attached to the first and second lead frames. Therefore, the demand for the working precision of the first and second lead frames can be relaxed ***by the design of the base*** and it is easier to attach the base to the first and second lead frames.

Appx138155 (3:16–21) (emphasis added). Uemura describes modifying *a base* of the light emitting device to make it easier to align the two leads. *Id*. Neither Dr. Lebby's testimony nor Uemura support the notion that using a through-pin lead would lower the manufacturing cost relative to j-lead packages (which is allegedly what Yamazaki is directed to). Thus, the Commission's reference to manufacturing cost and precision does not support its finding that it would be obvious to substitute through-pin leads for j-leads. *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068–69 (Fed. Cir. 2018) (holding it is error to focus "on what a skilled artisan would have been able to do, rather than what a skilled artisan would have been motivated to do"); *see also InTouch Tech., Inc. v. VGO Comm'n, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014).

Second, as discussed above, Yamazaki does not disclose "j-leads"—as Dr. Schubert explained, the conductive pattern 11a is a thin metallization that does not provide structural support. *Supra* at Section VI.F.1.b.(1). The thin metallization is

neither a j-lead nor a through-pin lead. The Commission's obviousness finding is predicated on the supposed interchangeability of j-leads and through-pin leads, but there is no evidence that thin metallizations (like Yamazaki) and through-pin leads were known alternatives. Appx131–134. This warrants reversal, or at a minimum, the Commission's obviousness finding should be vacated for failing to consider whether Yamazaki's conductive pattern 11a is a thin metallization. *Supra* at Section VI.F.1.b.(1).

Third, the Commission's obviousness finding suffers from another failure of proof. The Commission characterized the FID as finding "that Uemura's 'through-pin leads provide structural support to the device.'" Appx132 (quoting Appx502). The quoted portion, however, was referring to Fig. 1 of a different reference—Shimizu—not Uemura. Appx502 ("As shown in Fig. 1 [of Shimizu] above, the through-pin leads provide structural support to the device[.]"). Even that finding is not supported by hearing testimony. *Id*. The Commission failed to make a finding as to how Uemura meets the cathode/anode limitation.

Finally, the Commission stated that "when one party presents expert testimony on a disputed issue, the other party cannot rebut such testimony without presenting rebuttal expert testimony." Appx103. This is patently incorrect. The Commission further erred insofar as it relied on this premise to support its obviousness finding. As discussed above, "a patentee need submit no evidence in

support of a conclusion of validity." *Orthokinetics*, 806 F.2d at 1570. Indeed, this Court has found expert testimony lacking to establish invalidity even without crediting rebuttal testimony. *See, e.g., St. Jude Med., Inc. v. Access Closure, Inc.*, 729 F.3d 1369, 1381–82 (Fed. Cir. 2013). The fact that Dr. Schubert did not opine on alleged obviousness does not mean that Intervenors carried their burden by clear and convincing evidence.

#### 2. Obviousness Based on Minato and Uemura

##### a) The "SGS" Limitation

The Commission acknowledged that "[t]he FID makes no specific finding as to whether Minato discloses the 'sapphire growth substrate' limitation." Appx140. Indeed, the FID's findings with respect to Minato and the claims of The Regents' Patents merely referred to its analysis of different claims from different patents that lacked many limitations in The Regents' Patents' claims—including the SGS limitation. Appx581; Appx603.

On review, the Commission found "that Respondents' pre-hearing contentions that Minato discloses the [SGS] limitation are sufficient and undisputed" and thus Respondents met their burden to show the SGS limitation "is obvious over Minato." Appx141. Respondents' pre-hearing contentions are not evidence and cannot sustain a legal conclusion of obviousness. *Icon Health*, 849 F.3d at 1043; *Acoustic Tech.*, 949 F.3d at 1375. Intervenors elicited no testimony during the

hearing as to how the SGS limitation is allegedly obvious in view of Minato. Appx3568–3569 (1246:6–1252:1); *Arendi*, 832 F.3d at 1361. Further, the Commission did not comply with its obligations under the APA by failing to identify an evidentiary basis for its findings—"especially when dealing with a limitation missing from the [applied reference]." *Id*.

To make up for the lack of evidence, the Commission found The Regents "waived any argument that the [SGS] limitation is not obvious over Minato based on [The Regents'] failure to raise the issue in its pre-hearing brief." Appx141. Similar to the Commission's erroneous wavier finding with respect to Yamazaki, the Commission's reliance on the absence of a rebuttal contention in The Regents' pre-hearing brief, as opposed to the absence of evidence of obviousness, improperly shifted the burden to The Regents to prove validity. *See Pfizer*, 480 F.3d at 1359; *Orthokinetics*, 806 F.2d at 1570.

As with the Commission's waiver finding with respect to Yamazaki, the Commission's waiver finding for Minato and the SGS limitation finds no support in the ALJ's ground rules. *See supra* at Section VI.F.1.a.(2). The Regents could not have waived any argument that Intervenors failed to proffer evidence of obviousness during the hearing until they failed to do so. *See* Appx111679. The waiver finding is also at odds with post-hearing brief ground rules, which authorized—and even required—The Regents to respond to evidence and arguments in Intervenors' initial

brief (in this case, the lack thereof). Appx111688–111689. Further, Intervenors offered no analysis whatsoever of the SGS limitation in their post-hearing brief, waiving any arguments as to this limitation. Appx111823–111825. The Commission's finding that The Regents waived any rebuttal argument under the ground rules in the face of Intervenors' clear violation of the same ground rules was both erroneous and arbitrary and capricious.

#### b) The "Cathode/Anode" Limitation

The Commission reversed the FID's findings that the claims of The Regents' Patents were anticipated by Minato because Minato does not disclose the cathode/anode claim limitation. Appx138–140. Dr. Schubert explained that Minato's pull-out leads 32 and 33 are "very thin wires" or "a stranded wire would not be able to provide structural support" as required by the cathode/anode limitation. Appx3589 (1332:11–20); *see also* Appx512. The Commission, however, affirmed the FID's finding that this limitation is obvious in view of Uemura. Appx139–140.

Dr. Lebby testified that one could modify Minato to include Uemura's leads, but failed to explain ***why*** a POSITA would have allegedly done so. Appx3568–3569 (1248:21–1252:1); *Polaris*, 882 F.3d at 1070; *InTouch*, 751 F.3d at 1352. Rather than pointing to evidence ***why*** a POSITA would combine Minato and Uemura (because none was identified), the Commission relied on the FID's finding that

"there were two well-known, interchangeable options for packaging LEDs: using through-pins or using SMJs." Appx139 (quoting Appx502). Even if that is true, Minato does not have SMJs—it has very thin wires. Appx3589 (1332:11–20); Appx512. The fact that Minato has leads that are neither "j-leads" or "through pin" leads undermines any assertion that SMJs and through-pins were the only possible options. Further, there is no evidence that a POSITA would consider Uemura's "through-pin" leads to be interchangeable with Minato's thin pull-out leads (which are not "j-leads"). Accordingly, the only alleged rationale for combining Minato and Uemura is entirely inapplicable.

#### 3. Objective Evidence of Non-Obviousness

Objective evidence of non-obviousness "must always when present be considered." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012). The Commission found that several factors weighed in favor of non-obviousness, including skepticism, licensing of The Regents' Patents, and commercial success of products practicing the Regents' Patents, and that simultaneous invention weighed against non-obviousness. Appx142–144. Despite finding three factors for non-obviousness and just one against, the Commission concluded "[o]n balance," the factors did not outweigh its obviousness conclusions. Appx145. But it did not explain how one factor could outweigh three.

With respect to commercial success, the Commission found "this factor carries limited weight in favor of non-obviousness" because of its findings with respect to infringement and domestic industry. Appx143. As discussed *supra*, however, the Commission erred in finding the Accused and Domestic Industry Products do not infringe or practice the Regents' Patents. *Supra* at Sections V.A–B; VI.B–E. While this Court should reverse the Commission's obviousness findings for reasons discussed herein, (*supra* at Sections VI.F.1–3), to the extent it does not, the obviousness findings should be vacated and remanded for further consideration of commercial success under correct claim constructions.

## VII. CONCLUSION AND STATEMENT OF RELIEF

The Commission's conclusions regarding infringement, commercial success, and failure to satisfy the technical prong of domestic industry as they relate to the terms "transparent surface" and "molding" in claim 1 of the '854 patent, and the terms "sapphire plate" and "molding" in claim 1 of the '557 patent, should be reversed because the facts before the Commission establish that The Regents has met its burden of proof under the correct constructions of these terms.

The Commission's conclusions that claims 1 of The Regents' Patents would have been obvious in view of the Yamazaki and Minato references also should be reversed because of the Commission's legal errors in analyzing obviousness and the lack of substantial evidence sufficient to support conclusions of obviousness.

Based on the requested reversals, the Commission's conclusion of no violation of Section 337 should be vacated.

Date: August 2, 2022

Respectfully submitted,

*/s/ Shawn G. Hansen*

Seth D. Levy
Shawn G. Hansen
Vincent C. Capati
**NIXON PEABODY LLP**
1 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

Evan H. Langdon
**NIXON PEABODY LLP**
799 9th Street, NW, Suite 500
Washington, DC 20001-5327
Telephone: (202) 585-8000
Facsimile: (202) 585-8080

Angelo J. Christopher
Paulina M. Starostka
**NIXON PEABODY LLP**
70 West Madison Street, Suite 5200
Chicago, IL 60602-4378
Telephone: (312) 977-4400
Facsimile: (844) 709-6738

*Counsel for Appellant*
*The Regents of the University of California*

# ADDENDUM TABLE OF CONTENTS


| Document | Appendix Page(s) |
|---|---|
| Commission Opinion [Public] | Appx75–148 |
| Notice of Commission Decision to Review in Part a Final Initial Determination; Commission Final Determination Finding No Violation of Section 337; Termination of Investigation | Appx149–151 |
| Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond (Nov. 19, 2021) [Public] | Appx401–650 |
| Order No. 39: Construing Certain Claims; Inv. No. 337-TA-1220 | Appx651–671 |
| Certified Copy of U.S. Patent No. 10,593,854 (JX-0003) | Appx717–749 |
| Certified Copy of U.S. Patent No. 10,658,557 (JX-0005) | Appx750–782 |

# ADDENDUM

**PUBLIC VERSION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN FILAMENT LIGHT-EMITTING DIODES AND PRODUCTS CONTAINING SAME (II)** | **Investigation No. 337-TA-1220** |

**COMMISSION OPINION**

The Commission has determined to review in part the final initial determination ("FID") issued by the presiding administrative law judge ("ALJ") on November 19, 2021. On review, the Commission has determined that there has been no violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("section 337") with respect to U.S. Patent Nos. 9,240,529 ("the '529 patent"); 9,859,464 ("the '464 patent"); 10,593,854 ("the '854 patent"); and 10,658,557 ("the '557 patent") (collectively, "the Asserted Patents").

This opinion sets forth the Commission's reasoning in support of its determinations. The Commission affirms all findings in the FID that are not inconsistent with this opinion.

**PUBLIC VERSION**

**TABLE OF CONTENTS**


I. BACKGROUND ........ 1

A. Procedural Background ........ 1

B. Complainant's Domestic Industry Products ........ 4

C. Respondents' Accused Products ........ 4

II. COMMISSION REVIEW OF THE FID ........ 5

III. ANALYSIS ........ 6

A. The '529 and '464 Patents ........ 7

1. Technical Overview and Asserted Claims ........ 8

2. Infringement ........ 11

(i) Transparent Plate (Claims 1 of the '529 and '464 Patents and Asserted Dependent Claims) ........ 11

(ii) Roughened, Textured, or Patterned to Increase Light Extraction / Transmission (Claim 6 of the '529 Patent and Claim 7 of the '464 Patent) ........ 18

(iii) Infringement Conclusion ........ 21

3. Domestic Industry – Technical Prong ........ 21

(i) Transparent Plate (Claims 1 of the '529 and '464 Patents and Asserted Dependent Claims) ........ 22

(ii) Roughened, Textured or Patterned to Increase Light Extraction / Transmission (Claim 6 of the '529 Patent and Claim 7 of the '464 Patent) ........ 24

(iii) Technical Prong Conclusion ........ 25

4. Invalidity ........ 25

(i) Complainant's Alleged General Errors in the FID's Invalidity Findings ........ 26

(ii) Yamazaki ........ 28

(iii) Minato ........ 32

(iv) Okamoto or Uemura ........ 34

(v) Invalidity Conclusion ........ 35

B. The '854 and '557 Patents ........ 35

1. Technical Overview and Asserted Claims ........ 35

2. Claim Construction ........ 37

3. Infringement ........ 41

(i) Transparent Surface (Claim 1 of the ’854 Patent) .................. 42

(ii) Sapphire Plate (Claim 1 of the ’557 Patent) ............................ 45

(iii) Infringement Conclusion ........................................................ 49

4. Domestic Industry - Technical Prong ................................................ 49

(i) Transparent Surface (Claim 1 of the ’854 Patent) .................. 50

(ii) Sapphire Plate (Claim 1 of the ’557 Patent) ............................ 51

(iii) Technical Prong Conclusion ................................................... 52

5. Invalidity ............................................................................................. 52

(i) Yamazaki ...................................................................................... 53

(ii) Minato ........................................................................................... 60

(iii) Uemura or Tamaoki ................................................................. 65

(iv) Invalidity Conclusion .................................................................. 65

C. Secondary Considerations ......................................................................... 65

1. Commercial Success ............................................................................ 66

2. Skepticism ........................................................................................... 66

3. Licensing ............................................................................................. 67

4. Simultaneous Invention ....................................................................... 68

5. Conclusion .......................................................................................... 68

D. Domestic Industry - Economic Prong ...................................................... 69

IV. CONCLUSION ............................................................................................... 69

# I. BACKGROUND

## A. Procedural Background

On October 5, 2020, the Commission instituted this investigation under section 337 based on a complaint filed by The Regents of the University of California of Oakland, California ("Complainant"). *See* 85 Fed. Reg. 62761-62 (Oct. 5, 2020). The complaint, as supplemented, alleges a violation of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain filament light-emitting diodes and products containing the same by reason of infringement of claims 1, 6, and 8 of the '529 patent; claims 1, 7, and 9 of the '464 patent; claim 1 of the '854 patent; and claim 1 of the '557 patent.[1]

The notice of investigation named the following respondents: Feit Electric Company, Inc. of Pico Rivera, California ("Feit"); Home Depot Product Authority, LLC, Home Depot U.S.A., Inc., and The Home Depot, Inc. of Atlanta, Georgia (collectively, "Home Depot"); IKEA Supply AG of Pratteln, Switzerland, IKEA U.S. Retail LLC of Conshohocken, Pennsylvania, and IKEA of Sweden AB of Almhult, Sweden (collectively, "IKEA"); General Electric Company of Boston, Massachusetts and Savant Technologies LLC (formerly, Consumer Lighting (U.S.) LLC) of Cleveland, Ohio (collectively, "GE Lighting"); Savant Systems, Inc. ("Savant Systems") of Hyannis, Massachusetts; and Satco Products, Inc. ("Satco") of Brentwood, New

---

[1] U.S. Patent No. 10,644,213 was also asserted in this investigation but was terminated based on the withdrawal of the allegations in the complaint as to that patent. *See* Order No. 37 (June 15, 2021), *unreviewed by* Comm'n Notice (June 29, 2021). The Commission also terminated the investigation as to claim 9 of the '529 patent, claim 10 of the '464 patent, claims 2 and 6 of the '854 patent, and claim 2 of the '557 patent, based on withdrawal of the complaint's allegations as to those claims. *See id.*

York (collectively, "Respondents"). *See id.* The Office of Unfair Import Investigations is also a party to the investigation. *See id.*

On November 5, 2020, the ALJ granted motions of Signify North America Corp. and Global Value Lighting LLC (collectively, "Intervenors") to intervene in this investigation.[2] *See* Order No. 14 (Nov. 5, 2020), *unreviewed by* Comm'n Notice (Nov. 30, 2020); Order No. 15 (Nov. 16, 2020), *unreviewed by* Comm'n Notice (Dec. 8, 2020). On September 16, 2021, the Commission terminated respondent Savant Systems from the investigation for good cause. *See* Order No. 47 (Aug. 27, 2021), *unreviewed by* Comm'n Notice (Sept. 16, 2021).

On June 15, 2021, the ALJ issued a claim construction order construing certain terms disputed by the parties before the ALJ, including the terms "transparent," "sapphire," "lead frame,"[3] "roughened, textured or patterned," and "a molding." *See* Order No. 39 (June 15, 2021).

On November 19, 2021, the ALJ issued the FID finding no violation of section 337. Specifically, the FID finds no infringement as to any asserted claim of the Asserted Patents. The FID also finds that the asserted claims of the Asserted Patents are invalid. The FID further finds that the technical prong of the domestic industry requirement is satisfied with respect to the '529 and '464 patents, but not with respect to the '854 and '557 patents. Still further, the FID finds that the economic prong of the domestic industry requirement is satisfied with respect to all of the Asserted Patents.

---

[2] As used hereinafter, the term "Respondents" includes Intervenors.

[3] The term "lead" in "lead frame" refers to a frame that includes leads (in the electrical sense) and provides an electrical interface to a semiconductor die. *See* Order No. 39 at 11.

On December 3, 2021, Complainant filed a petition[4] requesting Commission review of the FID's findings with respect to: (1) claim construction; (2) infringement; (3) invalidity for anticipation or obviousness under 35 U.S.C. § 102 or 103, respectively; and (4) the technical prong of the domestic industry requirement. On the same day, Feit, the other respondents, and the Commission's Investigative Attorney ("IA") each filed contingent petitions for review of the FID, including with respect to the economic prong of the domestic industry requirement.[5] On December 13, 2021, the parties filed responses to petitions.[6]

On December 21, 2021, Complainant filed a statement on the public interest pursuant to Commission Rule 210.50, 19 C.F.R. § 210.50.[7] No other party filed a statement on the public interest. The Commission did not receive any submissions in response to its *Federal Register* notice requesting submissions on the public interest. *See* 86 Fed. Reg. 70863 (Dec. 13, 2021).

---

[4] *See* Complainant's Petition for Review of Initial Determination on Violation of Section 337 (Dec. 3, 2021) ("Complainant's Pet.").

[5] *See* Respondents' and Intervenors' Corrected Contingent Joint Petition for Review of Final Initial Determination (Dec. 6, 2021) ("Respondents' Pet."); Respondent Feit Electric Co., Inc.'s Petition for Commission Review of Initial Determination (Dec. 3, 2021) ("Feit's Pet."); Petition of the Office of Unfair Import Investigations for Review-in-Part of the Initial Determination on Violation of Section 337 (Dec. 3, 2021) ("IA's Pet.").

[6] *See* Complainant's Consolidated Response to Respondents' and OUII's Petitions for Review and Contingent Petition for Review of the Initial Determination on Violation of Section 337 (Dec. 13, 2021) ("Complainant's Resp."); Respondents' and Intervenors' Response to Complainant's Petition for Commission Review of Initial Determination on Violation of Section 337 (Dec. 13, 2021) ("Respondents' Resp."); Respondent Feit Electric Co., Inc.'s Response to Petitions for Commission Review of Initial Determination (Dec. 13, 2021) ("Feit's Resp."); Response of the Office of Unfair Import Investigations to the Private Parties' Petitions for Review of the Initial Determination on Violation of Section 337 (Dec. 13, 2021) ("IA's Resp.").

[7] *See* Complainant The Regents of the University of California's Submission on the Public Interest (Dec. 21, 2021) (hereinafter, "Complainant's PI Br.").

### B. Complainant's Domestic Industry Products

The FID notes that Complainant identified the domestic industry ("DI") products as: (1) certain prototype filament LED devices which were developed by researchers at the Solid State Lighting & Energy Electronics Center ("SSLEEC"), an entity at the University of California Santa Barbara (the "SSLEEC DI Products"); and (2) filament LED products licensed to certain entities comprising either ceramic plates (the "Licensee Rigid DI Products") or flexible filaments (the "Licensee Flexible DI Products") (collectively, the "Licensee DI Products"). *See* FID at 22-25. The rigid DI products include ceramic submounts, except the Wong FY2021 DI Product (SSLEEC DI Product) and the Acclaim Tamarac DI Product (Licensee DI Product) which have sapphire plates.

Complainant asserted that the SSLEEC DI Products practice one or more claims of the '529 and '464 patents. *See id.* at 23; Complainant's Initial Post-Hearing Brief ("CIB") at 17. Complainant also asserted that the Licensee Flexible DI Products practice claim 1 of the '854 patent and that the Licensee Rigid DI Products satisfy all asserted claims of the Asserted Patents. *See* FID at 25; CIB at 101, 109.

### C. Respondents' Accused Products

The notice of investigation defines the scope of the investigation and the accused products as follows:

> light bulbs containing filament LEDs and lighting products containing filament LEDs.

*See* 85 Fed. Reg. at 62762.

The FID notes that the accused products are certain "filament LEDs with ceramic submounts" (the "Accused Rigid Products") and filament LEDs with flexible (polyimide) surfaces (the "Accused Flexible Products"). *See* FID at 10 (citing CX-2213C at 1, 4).

Complainant argues that the Accused Rigid Products (with ceramic submounts) infringe each of the asserted claims and the Accused Flexible Products (with polyimide submounts) infringe claim 1 of the '854 patent. The FID finds that Complainant failed to establish infringement by any of the accused products. The FID also finds that Complainant failed to establish that the accused models are representative of other rigid or flexible products, except as to Satco in view of Satco's stipulation that the analyzed models are representative of its accused products. *See id.* at 12-21 (citing JX-17C).

## II. COMMISSION REVIEW OF THE FID

The Commission may review an ID either upon petition by one of the parties or on its own motion. *See* 19 C.F.R. §§ 210.43 & 210.44. The Commission will grant a petition for review, in whole or in part, if it appears:

> (i) that a finding or conclusion of material fact is clearly erroneous;
>
> (ii) that a legal conclusion is erroneous, without governing precedent, rule or law, or constitutes an abuse of discretion; or
>
> (iii) that the determination is one affecting Commission policy.

*See* 19 C.F.R. § 210.43(b)(1) & (d)(2).

In addition, the Commission will "grant a petition for review and order review of an initial determination or certain issues therein when at least one of the participating Commissioners votes for ordering review." *See* 19 C.F.R. § 210.43(d)(3). "Any issue not raised in a petition for review will be deemed to have been abandoned by the petitioning party and may be disregarded by the Commission in reviewing the initial determination (unless the Commission chooses to review the issue on its own initiative under § 210.44)." 19 C.F.R. § 210.43(b)(2).

When the Commission reviews an initial determination, in whole or in part, it reviews the determination *de novo*. *Certain Soft-Edged Trampolines and Components Thereof*, Inv. No. 337- TA-908, Comm'n Op. at 4 (May 1, 2015). Upon review, the "Commission has 'all the powers which it would have in making the initial determination,' except where the issues are limited on notice or by rule." *Certain Flash Memory Circuits & Prods. Containing Same*, Inv. No. 337-TA-382, USITC Pub. No. 3046, Comm'n Op. at 9–10 (July 1997) (quoting *Certain Acid-Washed Denim Garments & Accessories*, Inv. No. 337-TA-324, Comm'n Op. at 5 (Nov. 1992)). With respect to the issues under review, "the Commission may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, the initial determination of the administrative law judge." 19 C.F.R. § 210.45(c). The Commission also "may take no position on specific issues or portions of the initial determination," and "may make any finding or conclusions that in its judgment are proper based on the record in the proceeding." *Id.*; *see also Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984).

## III. ANALYSIS

For the reasons set forth below, the Commission has determined to review the FID in part and, on review, to affirm with modification the FID's finding of no violation of section 337 as to all Asserted Patents. Specifically, the Commission has determined to review the following findings and to reach the following determinations:

- the FID's claim construction findings as to the term "sapphire" in connection with the '557 patent and, on review, affirm and supplement such findings;

- the FID's non-infringement findings as to all four Asserted Patents and, on review, affirm and supplement such findings;

- the FID's findings– as an alternative analysis in the event the patent claims are not found invalid – that the technical prong of the domestic industry requirement is satisfied as to the '529 and '464 patents but not as to the '854 and '557 patents and, on review, affirm and supplement such findings;

- the FID's findings that the asserted claims of all four Asserted Patents are invalid as anticipated and/or obvious over Yamazaki[8] or Minato[9] (alone or in combination with other prior art including Uemura[10] or Hakujin[11]) and, on review, affirm and supplement such findings, except that the Commission has determined to reverse the FID's finding that the asserted claims of the '854 and '557 patents are invalid as anticipated by Minato;

- the FID's findings that the asserted claims are invalid as anticipated and/or obvious over Okamoto[12] as to the '529 and '464 patents, over Uemura as to the '529, '464, and '557 patents, and over Tamaoki[13] as to the '854 patent and, on review, take no position as to such findings;

- the FID's findings – as an alternative analysis in the event the patent claims are not found invalid – that Complainant has satisfied the economic prong of the domestic industry requirement with respect to the Asserted Patents and, on review, take no position as to such findings.

- In view of its invalidity findings, the Commission also finds no domestic industry relating to articles protected by a valid patent.

### A. The '529 and '464 Patents[14]

Concerning the '529 and '464 patents, the Commission has determined to review, and on review, affirm with modification the FID's findings with respect to infringement, invalidity, and the technical prong of the domestic industry requirement.

---

[8] Japanese Patent Application Publication No. 2003-249692 ("Yamazaki") (RX-828).

[9] Japanese Patent No. JP 2001-126515 ("Minato") (RX-723).

[10] U.S. Patent No. 6,310,364 ("Uemura") (RX-779).

[11] Japanese Application Publication No. 2004-4158557 ("Hakujin") (RX-830).

[12] Japanese Patent No. JP 2000-277808 ("Okamoto") (RX-720).

[13] U.S. Patent No. 6,961,190 ("Tamaoki") (RX-724).

[14] With respect to all of the Asserted Patents, the FID determines that "a person of ordinary skill in the art [("POSITA")] at the time of the alleged invention of the Asserted Patents would have had (1) a bachelor of science degree in electrical engineering, physics, or a comparable field of study, and (2) at least three years of professional experience with semiconductor optoelectronic devices and packaging." FID at 30.

### 1. Technical Overview and Asserted Claims

The ’529 and ’464 patents are related and share essentially the same specification. The patents relate to “LED light extraction for optoelectronic applications” and more specifically, to (Al, Ga, In)N[15] based light emitting diodes (LED) combined with a textured, or shaped, phosphor layer. *See* JX-1 (’529 Patent) at Abstract, 5:33-37. The specification explains that “[t]he present invention combines the high light extraction efficiency LED chip with shaped (textured) phosphor layers to increase the total luminous efficacy of the device.” *Id.* at 5:37-41.

For instance, the specification states that “Light Emitting Diode (LED) **100** comprises LED chip **102** and a phosphor layer **104**.” JX-1 (’529 Patent) at 8:44-45, Figure 1. The specification explains that “[t]he phosphor layer **104** is excited by the blue light from the LED chip **102**,” (*i.e.*, a first wavelength) and “converts the blue light, in the first wavelength region, to light in a second wavelength region.” *Id.* at 8:45-48. The specification further discloses that “[t]he surface **108** of the phosphor layer is roughened to increase the converted light extraction **110** from the phosphor layer **104**.” *Id.* at 8:51-53. The specification explains that “[a]t least a portion of surface **108**, rather than being completely planar, is roughened, textured, patterned, or otherwise made not normal to the light **112** emitted from the LED chip **102** so that reflection of light **112** is reduced” thereby increasing the light efficacy of the device. *Id.* at 8:53-56, 5:45-50 (explaining that the internal reflection of the LED light is further minimized through “surface roughening of AlInGaN by patterning or anisotropically etching, or the roughening of ITO and ZnO,[16] or the roughening of epoxy and glass or the roughening of the phosphor layer”).

---

[15] “AlN” is aluminium nitride, “GaN” is gallium nitride, and “InN” is indium nitride.

[16] “ITO” is indium tin oxide and “ZnO” is zinc oxide.

**PUBLIC VERSION**

Figure 19A (reproduced below) illustrates another embodiment wherein "LED **1900** uses a lead frame **1522** where the LED chip **1502** is placed." *Id.* at 13:21-22. The specification also discloses that "a transparent plate **1902** such as glass, quartz and other materials, . . . is attached to the lead frame using a transparent epoxy **1904** as a die-bonding material" and "[t]he transparent glass plate is used to extract the LED light **1604** to the epoxy molding **1508** on the underside of LED **1900** effectively." *Id.* at 13:22-27.




FIG. 19A

As noted above, Complainant asserted claims 1, 6, and 8 of the '529 patent and claims 1, 7, and 9 of the '464 patent, which recite the following (with disputed limitations emphasized):

| Claim 1 of the '529 Patent | Claim 1 of the '464 Patent |
|---|---|
| A light emitting device, comprising: | A light emitting device, comprising: |
| an LED chip emitting light at a first wavelength, wherein the emitted light is extracted from both front and back sides of the LED chip; | |

**PUBLIC VERSION**

| **Claim 1 of the ’529 Patent** | **Claim 1 of the ’464 Patent** |
|---|---|
| a **lead frame** to which the LED chip is attached, wherein the LED chip resides on or above a **transparent plate** in the lead frame that allows the emitted light to be extracted out of the LED chip through the **transparent plate** in the **lead frame**; and | a **lead frame** including a **transparent plate**; and |
| a **phosphor** for converting the light emitted by the LED chip at the first wavelength to a second wavelength. | an LED chip, attached to the **lead frame**, for emitting light; |
| | wherein the LED chip resides on or above the **transparent plate** and at least some of the light emitted by the LED chip is transmitted through the **transparent plate**; and |
| | wherein at least a portion of the light emitted by the LED chip is extracted from a front side of the **lead frame** and another portion of the light emitted by the LED chip is extracted from a back side of the **lead frame**. |

| **Claim 6 of the ’529 Patent** | **Claim 7 of the ’464 Patent** |
|---|---|
| The device of claim l, wherein the **transparent plate** is **roughened, textured or patterned** to increase light extraction from the LED chip through the **transparent plate** in the **lead frame**. | The device of claim 1, wherein the **transparent plate** is **roughened, textured or patterned** to increase transmission of the light through the **transparent plate**. |

| **Claim 8 of the ’529 Patent** | **Claim 9 of the ’464 Patent** |
|---|---|
| The device of claim 1, wherein the LED chip includes a transparent substrate and the transparent substrate is adjacent the transparent plate. | The device of claim 1, wherein the LED chip includes a transparent substrate positioned adjacent the transparent plate. |

*See* JX-1 (’529 Patent) at claims 1, 6, 8 (emphasis added); JX-2 (’464 Patent) at claims 1, 7, 9 (emphasis added).

**PUBLIC VERSION**

**2. <u>Infringement</u>**

As discussed *supra* section I(C), Complainant asserted that the Accused Rigid Products infringe the asserted claims of the ’529 and ’464 patents. The FID finds that Complainant failed to establish infringement with respect to any of the Accused Rigid Products both literally and under the doctrine of equivalents. *See* FID at 34-61, 123-27. As explained below, the Commission has determined to review the FID’s infringement findings with respect to the terms “transparent plate” (claim 1 of the ’529 and ’464 patents and asserted dependent claims) and “roughened, textured or patterned to increase light extraction” (claim 6 of the ’529 patent and claim 7 of the ’464 patent). *See id.* at 41-55, 57-59, 123-26. On review, the Commission has determined to affirm with modification the FID’s finding that the Accused Rigid Products do not infringe the asserted claims of the ’529 and ’464 patents. Specifically, the Commission finds that the Accused Rigid Products do not satisfy the “transparent plate” limitation, but that they satisfy the “roughened, textured or patterned” limitation.

**(i) <u>Transparent Plate (Claims 1 of the ’529 and ’464 Patents and Asserted Dependent Claims)</u>**

The FID finds that the Accused Rigid Products do not satisfy the “transparent plate” limitation either literally or under the doctrine of equivalents. The ALJ construed the term “transparent” as “having its plain and ordinary meaning.”[17] *See* Order No. 39 at 9.

[17] Although the ’854 patent is not related to the ’529 and ’464 patents, the parties proposed their respective constructions of the term “transparent” for all three patents, and the ALJ adopted the plain meaning of the term for all three patents. *See* Order No. 39 at 8-9. The Commission also notes that all three patents have common inventors and similar priority dates (November or December 2006) which is the relevant period for ascertaining the meaning of “transparent” from the perspective of a person having ordinary skill in the art. *See* JX-1 (’529 patent); JX-2 (’464 patent); JX-3 (’854 patent).

**PUBLIC VERSION**

**(a) <u>Literal Infringement</u>**

The FID rejects Complainant's argument that "transparent" means any material that lets some light through. *See* FID at 41. The FID finds that the ceramic submounts of the Accused Rigid Products are not transparent based on transmission testing (showing a transmissivity below 60 percent) and SEM testing (showing "[t]he presence of grain boundaries and pores [which] cause the material to be 'highly absorbing and scattering,' indicating that the submounts are opaque"). *See id.* at 42, 54. The FID explains that "none of the products measured transmittance anywhere near the 80 or even 90% transmission rates of materials the parties and experts agree are transparent, such as single crystal sapphire, glass, quartz, ITO, and others." *Id.* at 49. The FID also credited Dr. Eden's testimony and the transmittance testing conducted by Covalent Metrology which showed that "none [of the Accused Rigid Products] transmit more than 50%, with some transmitting as little as 1.7% of incident light." *See id.* at 51-53 (citing RDX-1.46; Hr'g Tr. (Eden[18]) at 979:22-989:11).

In addition to the transmissivity data, the FID relies on SEM[19] testing of the Accused Rigid Products showing the presence of grains, pores, and grain boundaries in the submounts. *Id.* at 54 (citing Hr'g Tr. (Eden) at 993:9-994:13, 995:7-13). The FID finds that "[t]he presence of grain boundaries and pores cause the material to be 'highly absorbing and scattering,' indicating that the submounts are opaque." *Id.* (citing Hr'g Tr. (Eden) at 994:11-13, 994:24-995:6; Hr'g Tr. (Shanfield[20]) at 1192:25-1193:5). In contrast, the FID continues, "the same analysis of the licensed Acclaim [DI] product, which has a sapphire submount, shows no pores,

---

[18] Dr. J. Gary Eden is one of Respondents' expert witnesses in this investigation.

[19] "SEM" refers to a scanning electron microscope.

[20] Dr. Stanley Shanfield is one of Respondents' expert witnesses in this investigation.

**PUBLIC VERSION**

grains, or grain boundaries." *Id.* (citing Hr'g Tr. (Eden) at 994:14-23; RX-178.29 (reproduced below); CX-198.21 (reproduced below)). Thus, the FID concludes that the Accused Rigid Products do not literally satisfy the "transparent" limitation.

<table>
<tr><th>Accused Ceramic Product (Satco S29876)</th><th>Licensed Sapphire Submount (Tamarac)</th></tr>
<tr><td>
</td><td>
</td></tr>
<tr><td>(RX-0178.0029)</td><td>(CX-0198.0021)</td></tr>
</table>

Complainant does not contest Respondents' transmissivity data but argues that the FID erred in setting a transmissivity threshold at all. *See* Complainant's Pet. at 58-59. Complainant suggests that a material is transparent as long as "some light" is transmitted. *See id.* at 60. Complainant contends that the surrounding claim language of the '464 patent (which recites that "at least some of the light emitted by the LED chip is transmitted through the transparent plate") supports its interpretation. *See id.* at 59-60.

The Commission disagrees that the surrounding claim language, recited in claim 1 of the '464 patent, expands the scope of the term "transparent." The surrounding claim language recited by Complainant sets forth a separate requirement that at least some of the LED light is transmitted through the transparent plate, but it does not recite a test to determine that the plate is transparent if it allows transmission of "at least some light" as Complainant suggests. In addition, as the FID finds, although some materials like "sheets of paper, human ears, and white clothing all allow the transmission of some light, . . . no reasonable fact finder would say those items are 'transparent.'" *See* FID at 41; *accord* Respondents' Resp. at 58 (arguing that

Complainant's construction of transparent is absurd because it would "encompass any material that transmits even 1% of the incident light") (Hr'g Tr. (DenBaars[21]) 192:2-7); *id.* ("This is in direct contrast to the materials described as transparent in the specification (*e.g.*, glass, quartz, sapphire, and diamond), which transmit the large majority of light in order to effectively extract that light through the transparent material without significant scattering or absorption[.]") (citing RX-174.57; Hr'g Tr. (Eden) at 999:4-22, 962:1-19).

This is consistent with the intrinsic record which describes "a transparent plate **1902** such as glass, quartz and other materials" that "is used to extract the LED light **1604** to the epoxy molding **1508** on the underside of LED **1900** effectively." JX-1 ('529 patent) at 13:21-27; *see also* RXM-5.59 (prosecution history of U.S. Patent No. 8,294,166 (U.S. Patent Application Serial No. 11/954, 154) which relates to the '854 patent) (distinguishing a Distributed Bragg Reflector ("DBR") which "is primarily reflective and would not be considered transparent" and stating that "there is a difference between transparent and allowing some light to be transmitted").

The Commission also finds that, at the time of the invention, the term "transparent" was distinct from at least the term "semi-transparent," which corresponds to a transmissivity of about 40 percent.[22] *See* FID at 41-42; *see also* JX-3 ('854 patent) at 11:9-12. As the FID notes, "older technologies used in the field of LEDs used metal contact layers described as 'semi-

[21] Dr. Steven DenBaars is one of Complainant's fact witnesses in this investigation and an inventor of the '529 and '464 patents.

[22] Complainant argues that the term "semi-transparent" is "obsolete." *See* Complainant's Pet. at 67. It does not matter whether the term "semi-transparent" may be obsolete today. What matters is the understanding of persons of ordinary skill in the art at the time of the invention. For example, both the terms "transparent" and "semi-transparent" are used in the specification of the '854 patent, which shows that the inventors used, and distinguished those terms from each other, at the time of the invention. *See* JX-3 ('854 patent) at 11:9-12.

transparent,' which had transmissivity of 'about 40 percent compared to' more modern contact materials that are considered transparent, like indium tin oxide (ITO), Gallium Nitride (GaN), and tunnel junctions, which have transmissivity of 'at least 85 percent,' '95 percent' and '95 percent,' respectively." *See* FID at 41-42 (citing Hr'g Tr. (Wong[23]) at 349:9-17); *id.* at 42 (finding that "'transparent' means 'low' light loss, which means 'maybe 1 to 10 percent' loss, that is, 99 to 90 percent transmissivity") (citing Hr'g Tr. (Speck[24]) at 280:2-282:21). Thus, the FID correctly concludes that "the Accused Rigid Products [which] have transmissivity below about 60 percent of light incident on their submounts . . . are not 'transparent.'" *Id.*

The Commission also agrees with the FID that the SEM testing shows that the Accused Rigid Products are not transparent. As the FID finds, "[t]he presence of grain boundaries and pores cause the material to be 'highly absorbing and scattering,' indicating that the submounts are opaque." *Id.* at 54 (citing Hr'g Tr. (Eden) at 994:11-13, 994:24-995:6, Hr'g Tr. (Shanfield) at 1192:25-1193:5). In contrast, "the same analysis of the licensed Acclaim [DI] product, which has a sapphire submount, shows no pores, grains, or grain boundaries." *Id.* (citing Hr'g Tr. (Eden) at 994:14-23).

Complainant also relies on technical dictionaries arguing they "support the construction that 'transparent' means 'allows light to pass through.'" Complainant's Pet. at 63 (citing CXM-12 (McGraw-Hill (1994)) (defining "transparent" as "[PHYS] Permitting passage of radiation or particles"); CXM-11 (Wiley (2004)) (defining "transparent" as "freely pass[ing] . . . light")). As Respondents note, however, "freely" is not the same as "allows light to pass through." *See* Respondents' Resp. at 56 (citing RX-608 (CXM-11)). In addition, the McGraw-Hill (1994)

---

[23] Dr. Matthew Wong is one of Complainant's fact witnesses in this investigation.

[24] Dr. James Speck is one of Complainant's fact witnesses in this investigation.

dictionary defines "'transparent medium' in the field of 'OPTICS' as '[a] medium which has the property of transmitting light in such a way that the human eye may see through the medium distinctly.'" *See id.* at 56-57 (citing CXM-12).

Furthermore, Complainant relies on district court cases construing the term "transparent," but those cases involved different patents, different inventors, and different intrinsic or extrinsic records. *See* Feit's Resp. at 6. Thus, those decisions are not relevant to the FID's infringement decision, which is based on the present record. Similarly, GE Lighting's position before the PTAB[25] with respect to the meaning of the term "transparent" does not outweigh the intrinsic and extrinsic records developed before the Commission.

Lastly, Complainant's reliance on documents from non-parties Samsung, Inc. and OSRAM Opto Semiconductors ("OSRAM") is not persuasive. Complainant argues that those companies consider ceramics to be transparent. *See* Complainant's Pet. at 73-74 (citing CX-2031C.4; CX-44.6). As the FID finds, "Complainant points to no evidence that th[e] [Samsung] document describes all Samsung rigid LED filaments, nor is there any evidence tying the filament depicted in the cartoon to any Accused Rigid Product." FID at 50 (citing CX-2031C.4); *accord* Respondents' Resp. at 57-58 (citing RXM-9.3 (discussing "grain scattering that makes . . . [a] material translucent and not transparent"); RXM-10.11 (distinguishing "transparent Ce:YAG ceramics" from "translucent or scattering Ce:YAG ceramics")). In addition, as the FID finds, "while the OSRAM submount depicted transmits *some* light, the submount does not constitute the claimed 'transparent plate.'" *See* FID at 51 (citing CX-44.6).

---

[25] Complainant states that "GE Lighting argued to the [PTAB] in its petitions for *inter partes* review of the asserted '529 and '464 patents, and the '916 patent (parent to the asserted '854, and '557 patents) that a person of ordinary skill in the art understands 'transparent' to mean 'allowing light to pass through.'" Complainant's Pet. at 65 (citations omitted).

Thus, the Commission finds that Complainant failed to satisfy its burden to establish that the Accused Rigid Products literally infringe the "transparent plate" limitation. Accordingly, the Commission has determined to affirm and supplement the FID's finding that the Accused Rigid Products do not literally satisfy the "transparent plate" limitation.

**(b) <u>Infringement Under the Doctrine of Equivalents</u>**

The FID also finds no infringement under the doctrine of equivalents as to the term "transparent plate." *See* FID at 55. The FID finds that "Complainant's analysis reduces to a variation of its claim construction argument that the term 'transparent' means 'allows light to pass through.'" *Id.* (citing Order No. 39 at 8; Hr'g Tr. (Schubert[26]) at 625:4-626:22).

The Commission agrees with the FID's conclusion that Complainant failed to satisfy its burden to establish infringement under the doctrine of equivalents. Complainant admits that "[m]etal submounts would be an example of a difference in kind and clear, substantial difference that vitiates the 'transparent' plate / surface limitation." *See* Complainant's Pet. at 68 (citing *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1355 (Fed. Cir. 2010)). Complainant, however, fails to explain why the accused ceramic submounts have insubstantial differences with a transparent material. Instead, Complainant repeats its flawed theory that "the claims require only that light passes through the transparent plate / surface." *See id.* at 71.

The evidence shows that there are clear and substantial structural differences between transparent materials and the Accused Rigid Products. As the FID finds, "[t]he presence of grain boundaries and pores cause the [accused ceramic] material to be 'highly absorbing and scattering,' indicating that the submounts are opaque." *See* FID at 54 (citing Hr'g Tr. (Eden) at 994:11-13, 994:24-995:6, Hr'g Tr. (Shanfield) at 1192:25-1193:5); *accord* Respondents' Pet. at

---

[26] Dr. E. Fred Schubert is one of Complainant's expert witnesses in this investigation.

66; *see also Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1362 (Fed. Cir. 2005) (reversing the district court's infringement where a "structural difference . . . is not a 'subtle difference in degree,' but rather, 'a clear, substantial difference or difference in kind'") (citation omitted). In contrast, "the [SEM] analysis of the licensed Acclaim [DI] product, which has a sapphire submount, shows no pores, grains, or grain boundaries." FID at 54 (citing Hr'g Tr. (Eden) at 994:14-23).

The evidence also shows that the Accused Rigid Products: (1) do not perform the same function as the claimed LED, which allows a significantly higher percentage of light to be extracted through the transparent plate (as evidenced by the transmissivity data discussed above), (2) do not perform such function in the same way, given the substantial structural differences between the Accused Rigid Products (as evidenced by the SEM testing showing the presence of pores and grain boundaries) and the claimed LED (*e.g.*, Acclaim), and (3) do not achieve the same result, given that the claimed LED results in a significantly higher percentage of light being extracted through the transparent plate (as evidenced by the transmissivity data discussed above).

Thus, the Commission finds that Complainant failed to demonstrate insubstantial differences between the Accused Rigid Products and the claimed transparent plate and therefore failed to satisfy its burden to establish infringement under the doctrine of equivalents. Accordingly, the Commission has determined to affirm and supplement the FID's finding that the Accused Rigid Products do not satisfy the "transparent plate" limitation under the doctrine of equivalents.

**(ii) <u>Roughened, Textured, or Patterned to Increase Light Extraction / Transmission (Claim 6 of the '529 Patent and Claim 7 of the '464 Patent)</u>**

The FID finds no evidence that the Accused Rigid Products include a plate that is "roughened, textured, or patterned *to increase light extraction*." *See* FID at 57 (emphasis in

original). The ALJ construed the terms "roughened, textured, or patterned" or "patterned" in accordance with "their broad, ordinarily understood meanings" which "encompass[] characteristics that come about as a result of a process applied to an object as well as characteristics innate to an object." *See* Order No. 39 at 16.

The FID notes that "Complainant relies on . . . : 1) microscopy, optical profilometry, and visual inspection, such as the white color of the submount, allegedly showing that Accused Rigid Products' submounts have a roughened surface; (2) the quantification of the roughening, around 0.31 micrometers, which is on the order of the wavelength of light and would cause the type of scattering beneficial to light extraction; and (3) a visual inspection purportedly showing the plates are roughened to increase light extraction." *See* FID at 57 (citing Hr'g Tr. (Schubert) at 637:23-638:11, 638:16-639:11, 661:25-662:12, 664:4-21; CDX-2C.80-83). Respondents (except IKEA[27]) disputed Complainant's evidence arguing that "the submount surfaces are substantially smooth as compared to the roughening contemplated in the [patent] specification." *Id.*; *see also* Hr'g Tr. (Shanfield) at 1146:14-1147-8.

The FID finds that "Complainant failed . . . to demonstrate that roughening present on the Accused Products—if any—will 'increase light extraction.'" *See* FID at 59. The FID notes that "Dr. Schubert testified that the roughness of at least one Accused Rigid Product was sufficient to cause the type of light scattering that improves light extraction," but the FID finds that "he did not show that the alleged roughening does, in fact, increase light extraction given the underlying characteristics of the substrate material." *Id.* (citing Hr'g Tr. (Eden) at 1007:15-1008:11). Rather, the FID finds that "determin[ing] whether a surface was roughened 'to

[27] As noted in the FID, IKEA did not join Respondents' argument as to this claim term. *See* FID at 57 n.14.

improve light extraction' would require a comparison of light extraction efficiency between the same material in roughened and not roughened states." *Id.* (citing Hr'g Tr. (Speck) at 296:23-297:18; Hr'g Tr. (Eden) at 1059:2-22; Hr'g Tr. (DenBaars) at 189:21-191:17).

Complainant argues that the FID "err[s] by requiring direct evidence that the roughened surfaces of the Accused Products . . . increased light extraction." Complainant's Pet. at 86. Complainant explains that "[a] patentee is entitled to rely on circumstantial evidence to establish infringement." *Id.* at 85. Complainant contends that both its witnesses and Respondents' witnesses "agreed that roughening of surfaces on the order of the wavelength of light emitted by the LEDs increases light extraction." *Id.* at 86-87 (Hr'g Tr. (DenBaars) at 155:13-21, 233:18-234:17; Hr'g Tr. (Lebby[28]) at 1211:7-1213:4; Hr'g Tr. (Schubert) 662:13-663:8; 690:25-691:11).

The Commission agrees with Complainant that direct evidence is not required to establish that the Accused Rigid Products include a plate that is "roughened, textured, or patterned to increase light extraction [or transmission]." For example, the FID recognizes that the roughening in the Accused Products of around 0.31 micrometers is "on the order of the wavelength of light and would cause the type of scattering beneficial to light extraction." *See* FID at 57 (citing Hr'g Tr. (Schubert) at 637:23-638:11, 638:16-639:11, 661:25-662:12, 664:4-21; CDX-2C.80-83). While Dr. Shanfield compared the roughness of the accused submounts to the "120-grit" particles disclosed in the '529 patent, such disclosure does not limit the scope of the "roughened, textured or patterned" limitation. *See* Hr'g Tr. (Shanfield) at 1146:14-1148:6.

Significantly, Respondents do not address Complainant's arguments (based on expert testimony) that "each of the Accused Products has an average roughness greater than 0.1 μm on the order of the wavelength of light to increase light extraction" and that "roughening the surface

[28] Dr. Michael Lebby is Respondents' technical expert in this investigation.

of a material on the scale of the wavelength to be extracted increases light extraction by extracting light that would otherwise be trapped by total internal reflection." *See* Complainant's Pet. at 86-87 (citing Hr'g Tr. (Schubert) 662:13-663:8; 690:25-691:11; Hr'g Tr. (DenBaars) 155:13-21, 233:18-234:17). The Commission finds such circumstantial evidence sufficient to establish that the Accused Rigid Products satisfy the limitation requiring the plate to be "roughened, textured, or patterned to increase light extraction [or transmission]."

Thus, the Commission finds that Complainant satisfied its burden to establish that the Accused Rigid Products include a plate that is "roughened, textured, or patterned to increase light extraction." Accordingly, the Commission has determined to reverse the FID's finding that the Accused Rigid Products do not satisfy the "roughened, textured, or patterned" limitation recited in claim 6 of the '529 patent and claim 7 of the '464 patent.

**(iii) Infringement Conclusion**

Because the Commission agrees with the FID that the Accused Rigid Products do not include a transparent plate as recited in claims 1 of the '529 and '464 patents and the asserted dependent claims, the Commission has determined to affirm with modification the FID's finding that the Accused Rigid Products do not infringe the asserted claims of the '529 and '464 patents.

**3. Domestic Industry – Technical Prong**

As discussed *supra* section I(B), Complainant asserted that the Licensee Rigid DI Products practice the asserted claims of the '529 and '464 patents.

The FID[29] finds that Complainant failed to satisfy the technical prong of the domestic industry requirement with respect to the rigid DI products except as to the Wong FY2021 Product (SSLEEC DI Product) and the Acclaim DI Product (Licensee Rigid DI Product), which the FID finds to practice claims 1 and 8 of the '529 patent and claims 1 and 9 of the '464 patent. *See* FID at 61-85, 127-37.[30] As to the Licensee Rigid DI Products (other than the Acclaim DI Product), the FID finds (and Complainant disputes) that they do not satisfy the following limitations: (i) a "transparent plate" (claim 1 of the '529 and '464 patents and asserted dependent claims) and (ii) a plate that is "roughened, textured or patterned to increase light extraction [or transmission]" (claim 6 of the '529 patent and claim 7 of the '464 patent). *See id.* at 41-55, 57-61, 124-27. The Commission has determined to review the FID's findings as to the technical prong of the domestic industry requirement. On review, the Commission has determined to affirm with modified analysis the FID's finding that the Licensee Rigid DI Products do not satisfy the "transparent plate" limitation, but to reverse the FID's finding that the Licensee Rigid DI Products do not satisfy the "roughened, textured or patterned" limitation.

**(i) <u>Transparent Plate (Claims 1 of the '529 and '464 Patents and Asserted Dependent Claims)</u>**

The FID finds that the rigid DI products do not satisfy the "transparent plate" limitation either literally or under the doctrine of equivalents except as to the Wong FY2021 and the

---

[29] The FID correctly states that, because the patent claims that Complainant relies upon for the technical prong are invalid, the domestic industry products are not protected by their respective patents, and therefore, Complainant cannot satisfy the domestic industry requirement. *See* FID at 201. However, the FID assesses the technical prong for each patent as an alternative analysis in the event that the relevant patent claims are found not invalid. *See id.*

[30] Respondents did not petition for review of the FID's findings that the Wong FY2021 and Acclaim DI Products practice one or more asserted claim of the '529 and '464 patents, and Complainant did not petition for review of the FID's findings that other SSLEEC DI Products do not practice any asserted claim. Accordingly, any arguments as to these issues are waived. *See* 19 C.F.R. § 210.43(b)(2).

Acclaim DI Products, which include transparent sapphire plates. *See* FID at 69, 83. As to the Licensee Rigid DI Products, which include a ceramic plate, the FID finds (and Complainant disputes) that "[t]est results for the GE Relax and Sunlite . . . show the submounts in those devices are not transparent because only around half of light is being transmitted through the back of the submount." *Id.* at 83 (citing CX-199.44; CX-212.44). The FID further finds that "[a]nalysis reports of the other Ceramic Domestic Industry Products conspicuously omitted . . . LUX plot testing entirely." *Id.* (citing CX-196; CX-197; CX-213; CX-214; CX-215). Thus, the FID concludes that "Complainant has failed to meet its burden of showing that the Ceramic Domestic Industry Products practice this limitation." *Id.*

Complainant makes the same arguments with respect to the Licensee Rigid DI Products as it does with respect to the Accused Rigid Products.[31] Specifically, Complainant argues that the claims merely require that some light pass through the submount. *See* Complainant's Pet. at 70. The Commission agrees with the FID that Complainant's interpretation of "transparent" and related showings are insufficient to satisfy its burden with respect to the technical prong of the domestic industry requirement either literally or under the doctrine of equivalents.[32] *See* FID at 81-83; *accord* IA's Resp. at 45.

[31] Contrary to Complainant's assertion (*see* Complainant's Pet. at 95), the FID correctly finds that Complainant did not properly assert the technical prong under the doctrine of equivalents because Complainant merely "incorporate[d] by reference its discussion at § II.A" (relating to infringement by the accused products) in its initial post-hearing brief. *See* FID at 83 n.16 (citing CIB at 56); *see also* Order No. 42, G.R. 14.1 ("Any contentions for which a party has the burden of proof that are not set forth in detail in the post-hearing initial brief shall be deemed abandoned or withdrawn."); *accord* IA's Resp. at 55. In any event, as the FID notes, Complainant's technical prong arguments under the doctrine of equivalents fail for the same reasons as the accused products. *See* FID at 83 n.16.

[32] "The test for satisfying the 'technical prong' of the industry requirement is essentially same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1375 (Fed. Cir. 2003) (quotation omitted).

Thus, the Commission finds that Complainant failed to meet its burden of showing that the Licensee Rigid DI Products with ceramic submounts satisfy the "transparent plate" limitation.

**(ii) Roughened, Textured or Patterned to Increase Light Extraction / Transmission (Claim 6 of the '529 Patent and Claim 7 of the '464 Patent)**

The FID notes that the parties do not appear to dispute that the ceramic DI products have a "roughened, textured or patterned" plate but that "Respondents dispute whether the plate in the Ceramic Domestic Industry Products is roughened, textured or patterned 'to increase light extraction' from the LED chip." *See* FID at 83-84. The FID finds Complainant's microscopic evidence insufficient to satisfy its burden as to this limitation. *See id.* (CDX-2C.83; Hr'g Tr. (Schubert) at 666:7-12).

Complainant makes the same arguments with respect to the Licensee Rigid DI Products as it does with respect to the Accused Rigid Products. *See* Complainant's Pet. at 87; *see also* CIB at 61 ("The optical profilometry analyses show the average roughness (Ra) is on the order of the wavelength of light (0.45 μm), which a POSITA would understand to result in scattering and increased light extraction.") (citing Hr'g Tr. (Schubert) at 662:22-663:7, 690:25-691:11; Hr'g Tr. (DenBaars) at 155:13-21, 233:18-234:17; CX-199 at 54 (Ra=0.402); CX-212 at 54 (Ra=0.285); Hr'g Tr. (Eden) at 994:4-13; Hr'g Tr. (Lebby) at 1211:10-13, 1212:20-1213:4). Complainant argues that direct evidence is not required to establish that the Licensee Rigid DI Products include a plate that is "roughened, textured, or patterned to increase light extraction [or transmission]." *See* Complainant's Pet. at 87.

The Commission agrees with Complainant that direct evidence is not required and that Complainant's circumstantial evidence (including the optical profilometry evidence and related expert testimony) is sufficient to satisfy its burden to establish that the ceramic Licensee Rigid

DI Products include a plate that is "roughened, textured, or patterned to increase light extraction." Accordingly, the Commission has determined to reverse the FID's finding that the ceramic Licensee Rigid DI Products do not satisfy this limitation.

**(iii) Technical Prong Conclusion**

Because the Commission agrees with the FID that the ceramic Licensee Rigid DI Products do not include a transparent plate (a claim limitation recited in claim 1 of the '529 and '464 patents and asserted dependent claims), the Commission has determined to affirm with modification the FID's finding that Complainant failed to satisfy the technical prong of the domestic industry requirement (except as to the Wong FY2021 and Acclaim DI Products). Furthermore, as discussed below, the Commission finds that the '529 and '464 patents are invalid and therefore finds no domestic industry relating to articles protected by a valid claim of those patents.

**4. Invalidity**

The FID finds that the asserted claims of the '529 and '464 patents are invalid as anticipated and/or obvious over each of the following prior art references (alone or in combination with other prior art including Uemura or Hakujin): (1) Yamazaki (RX-828); (2) Minato (RX-723); (3) Okamoto (RX-720); and (4) Uemura (RX-779). *See* FID at 87-123, 138. As discussed below, the Commission has determined to review these invalidity findings, and on review, to affirm with supplemental analysis, the FID's finding of invalidity as to Yamazaki and Minato, but to take no position on invalidity as to Okamoto and Uemura.[33]

[33] While the Commission takes no position with respect to the FID's reliance on Uemura as a primary reference, this determination does not apply to the FID's reliance on Uemura as a secondary reference.

#### (i) <u>Complainant's Alleged General Errors in the FID's Invalidity Findings</u>

Complainant argues that Respondents were required to submit expert testimony to establish invalidity for each of the disputed as well as the undisputed claim limitations, and that Respondents failed to present such expert testimony with respect to the undisputed limitations. *See* Complainant's Pet. at 7-8 (citing *Fleming v. Escort Inc.*, 774 F.3d 1371, 1375 (Fed. Cir. 2014); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004)). Complainant contends that the ALJ improperly excused Respondents' lack of expert testimony. *See id.* at 7 (citing FID at 91 (relating to the "phosphor" claim limitation), 95 n.18 (relating to the "lead frame" claim limitation)). Complainant asserts that there are only "limited exceptions" where expert testimony is not required such as in cases that do not involve complex technology. *See id.* at 8 (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1240 n.5 (Fed. Cir. 2010); *Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008); *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1369 (Fed. Cir. 2004)).

Complainant misapprehends Federal Circuit precedent with respect to expert testimony. The cases on which Complainant relies do not relate to undisputed claim limitations. *Accord* IA's Resp. at 5-7. Rather, the case law provides that, in complex technology cases, when one party presents expert testimony on a disputed issue, the other party cannot rebut such testimony without presenting rebuttal expert testimony. *See Centricut*, 390 F.3d at 1370 ("We do not state a per se rule that expert testimony is required to prove infringement when the art is complex. Suffice it to say that in a case involving complex technology, where the accused infringer offers expert testimony negating infringement, the patentee cannot satisfy its burden of proof by relying only on testimony from those who are admittedly not expert in the field."). None of the cited

cases suggests that expert testimony is required for undisputed limitations. Thus, Complainant's objections are misplaced.

Complainant also misapprehends the facts. The FID does not excuse Respondents' alleged failure to present expert testimony as Complainant argues. Rather, the FID correctly declines to excuse Complainant's failure to set forth an argument in its pre-hearing brief that the Yamazaki reference does not disclose the "phosphor" limitation, which is relevant to the '529, '854, and '557 patents, but instead waited until its responsive post-hearing brief to contend that "the word 'phosphor' does not appear in Yamazaki." *See* FID at 90. Thus, "[b]ecause Complainant did not give proper notice of its novel phosphor argument," pursuant to the ALJ's Ground Rules, the FID enforced the Ground Rules governing the proceeding by granting Respondents' motion to strike that argument. *Id.* at 91 (enforcing Ground Rule 11.2). The purpose of the ALJ's Ground Rules is to streamline and provide an orderly proceeding for the resolution of disputed issues. A party cannot ignore the Ground Rules and then surprise the opponent with belated objections after that opponent no longer has an opportunity to develop the record. Notwithstanding Complainant's procedural misstep, the ALJ addressed Complainant's phosphor argument on the merits. *Id.* at 91-92. The FID finds that Respondents "elicited testimony from the perspective of a person of ordinary skill in the art that the fluorescent material in the Yamazaki resin is a phosphor." *See id.* at 92 (citing Hr'g Tr. at 1206:5-6 (Lebby) (testifying that in Yamazaki, the "resin molding portions **13** and **14** . . . contain phosphor")). The FID further notes that Dr. Lebby's "testimony is unrebutted." *See id.* Dr. Lebby also testified that the Minato reference also discloses a phosphor. *See* FID at 103 (citing RX-723 (Minato) at ¶ 16; Hr'g Tr. 1242:6-19 (Lebby)); *accord* Respondents' Resp. at 13; IA's Resp. at

16-17. Complainant's attorney arguments are insufficient to rebut Respondents' expert testimony.

As to the "lead frame" limitation, which is relevant to the asserted claims of the '529 and '464 patents, the FID notes that "the proof of invalidity is the [Yamazaki] reference itself, not the expert's testimony." *See* FID at 95 n.18. Beyond the clear disclosure in Yamazaki itself, the FID also relies extensively on Dr. Lebby's testimony explaining the state of the art and the disclosures of the prior art with respect to the "lead frame" limitation. *See id.* at 89-90, 92-95. Thus, Complainant's argument also fails on the facts with respect to the "lead frame" limitation. *See* Complainant's Pet. at 7 (citing FID at 95 n.18).

**(ii) <u>Yamazaki</u>**

The FID finds that the asserted claims of the '529 and '464 patents are anticipated and/or obvious over Yamazaki alone or in combination with other prior art (*e.g.*, Uemura or Hakujin). *See* FID at 87-101, 138. The Commission has determined to review the FID's findings as to the following claim limitations: (1) "phosphor" (claim 1 of the '529 patent); and (2) "transparent substrate [that] is adjacent the transparent plate" (claim 8 of the '529 patent and claim 9 of the '464 patent). On review, the Commission has determined to affirm with supplemental analysis the FID's finding that the asserted claims of the '529 and '464 patents are invalid over Yamazaki alone or in combination with other prior art.

**(a) <u>Phosphor (Claim 1 of the '529 Patent)</u>**

The FID notes that Complainant did not dispute that Yamazaki discloses a "phosphor" in its pre-hearing brief but waited until its responsive post-hearing brief to argue that "the word 'phosphor' does not appear in Yamazaki." *See* FID at 90. Thus, the FID grants Respondents' motion to strike that argument. *See id.* at 91 (citing Order No. 42 at G.R. 11.2 ("The pre-

hearing brief shall set forth a party's contentions on every issue the party intends to address at hearing, *no matter which party has the burden on the issue*.") (emphasis added)).

Complainant argues that "[its] pre-hearing brief could not have argued that Respondents failed to present any contentions on the 'phosphor' limitation at the hearing until the hearing occurred." Complainant's Pet. at 21. Complainant, however, was on notice that Respondents asserted that Yamazaki anticipates claim 1 of the '529 and '464 patents, and Complainant was aware of Respondents' contentions from the discovery period. *Accord* IA's Resp. at 16; Respondents' Resp. at 13; Feit's Resp. at 27. For example, Complainant indicated that the claim limitations "lead frame" and "roughened, textured or patterned" were in dispute. *See* Complainant's Pre-Hearing Br. ("CPB") at 195-97. As required by the ALJ's Ground Rules, Complainant should have also indicated in its pre-hearing brief that it would dispute the "phosphor" claim limitation.

In addition, as the FID finds, Respondents "elicited testimony from the perspective of a person of ordinary skill in the art that the fluorescent material in the Yamazaki resin is a phosphor." *See* FID at 92 (citing Hr'g Tr. at 1206:5-6 (Lebby) (in Yamazaki, it is "resin molding portions **13** and **14** that contain phosphor")). The FID further notes that Dr. Lebby's "testimony is unrebutted." *See id.*; *accord* Respondents' Resp. at 13; IA's Resp. at 16-17. Complainant's belated attorney arguments are insufficient to rebut Respondents' contentions and expert testimony. *See* Complainant's Pet. at 21 ("Dr. Lebby . . . never asserted that a POSITA would understand the 'fluorescent' material in Yamazaki to be a phosphor.").

Complainant also wrongly faults the FID for reaching its own conclusion regarding how a POSITA would understand the prior art without the benefit of evidence to support such a conclusion. Complainant's Pet. at 21. On the contrary, the FID's finding that "Yamazaki

teaches that the fluorescent material will emit white light when 'excited by the blue light,' just like the phosphor recited in claim 1" is entirely consistent with the claim language and with Respondents' arguments before the ALJ. *See* FID at 92; JX-1 ('529 patent) at claim 1 (reciting "a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength"); Respondents' Pre-Hearing Br. ("RPB") at 193; RPB, Ex. C, at 4.[34]

Thus, Complainant's objections as to the "phosphor" limitation are meritless and the result of Complainant's own failure to comply with the ALJ's Ground Rules. Accordingly, the Commission has determined to affirm the FID's findings as to this limitation.

**(b) Transparent Substrate Adjacent the Transparent Plate (Claim 8 of the '529 Patent and Claim 9 of the '464 Patent)**

The FID finds that "Complainant's pre-hearing brief provided no contention that the LED chip of Yamazaki did not have a transparent substrate." *See* FID at 99. Thus, the FID properly grants Respondents' motion to strike that argument. *See id.* at 99-100 (citing Order No. 42 at G.R. 11.2). The FID also finds that Yamazaki "express[ly] teach[es] that light is emitted though both sides of LED chip **12**, including the side of chip **12** adjacent to transparent plate **11**." *Id.* at 100-01 (citing RX-828 (Yamazaki) at ¶ 16).

Complainant faults the FID for finding that "'Respondents were not obligated to do any more' than submit Yamazaki into evidence—without any expert testimony." Complainant's Pet. at 27. As discussed above, however, expert testimony is not required on undisputed issues. In addition, as discussed *supra* section III(A)(4)(ii)(a) (in connection with the "phosphor"

[34] Exhibits C and D refer to more detailed claim charts provided with Respondents' pre-hearing brief. *See* RPB at 192, 204 ("Claim charts summarizing how Yamazaki [or Minato] meets each element of the asserted claims are provided below. More detailed claim charts are also attached as Ex. C [or D].").

limitation), Complainant was on notice of Respondents' contentions and failed to indicate in its pre-hearing brief that the "transparent substrate" limitation was in dispute. On the other hand, Respondents provided an analysis in their prehearing brief, citing support, including explanatory material in Dr. Lebby's expert report, stating why Yamazaki discloses each limitation (disputed and undisputed) and therefore satisfied their burden before the ALJ. *See* RPB at 194; RPB, Ex. C at 5-6, 10; *see also* IA's Pre-Hearing Br. ("SPB") at 156. Thus, Complainant has no basis to object to Respondents' alleged failure to discuss that limitation in their initial post-hearing brief. Nor can Complainant raise new arguments about that limitation for the first time in its reply post-hearing brief.

The Commission, however, vacates the FID's sentence stating an alternative obviousness ground over Yamazaki "for the same reasons articulated with respect to Okamoto" as no such ground was raised by any of the parties. *See* FID at 101 ("Alternatively, if Yamazaki does not disclose that LED chip 12 has a transparent substrate adjacent to transparent plate 11, I would find that such an arrangement would have been obvious at the time of the invention for the same reasons articulated below with respect to Okamoto."); Complainant's Pet. at 28.

Thus, the Commission has determined to affirm the FID's finding that Yamazaki discloses the "transparent substrate" limitation and the FID's decision to strike Complainant's arguments as to this limitation. The Commission, however, has also determined to vacate the FID's alternative obviousness finding over Yamazaki "for the same reasons articulated with respect to Okamoto." *See* FID at 101.

#### (c) <u>Yamazaki Conclusion</u>

The Commission finds that the FID correctly determines that the asserted claims of the '529 and '464 patents are anticipated and/or obvious over Yamazaki alone or in combination

with other prior art. As discussed *infra* section III(C), the Commission also finds that the secondary considerations of non-obviousness do not outweigh the findings of obviousness over Yamazaki. Thus, the Commission has determined to affirm with modification the FID's findings that the asserted claims of the of the '529 and '464 patents are invalid over Yamazaki, as discussed above.

**(iii) <u>Minato</u>**

The FID finds that the asserted claims of the '529 and '464 patents are anticipated and/or obvious over Minato alone or in combination with other prior art (*e.g.*, Uemura or Hakujin). *See* FID at 101-09, 138. The Commission has determined to review the FID's findings as to the following claim limitations: (1) "phosphor" (claim 1 of the '529 patent); and (2) "transparent substrate . . . adjacent the transparent plate" (claim 8 of the '529 patent and claim 9 of the '464 patent). On review, the Commission has determined to affirm with supplemental analysis the FID's finding that the asserted claims of the '529 and '464 patents are invalid over Minato alone or in combination with other prior art.

**(a) <u>Conflicting Translations</u>**

Complainant first faults the FID for striking its arguments regarding conflicting translations of Minato. *See* Complainant's Pet. at 33 (citing FID at 101 n.19). Complainant argues that its pre-hearing brief clearly discloses and relies on the Minato translation that uses the term "pull-out lead." *See id.* Complainant, however, did not explain in its pre-hearing brief any identified conflict between the two Minato translations. Thus, the Commission finds that the FID correctly strikes Complainant's argument based on Ground Rule 11.2. *See* FID at 101 n.19 (citing Order No. 42 at G.R. 11.2).

**(b) Phosphor (Claim 1 of the '529 Patent)**

As discussed *supra* at section III(A)(4)(ii)(a), the FID properly strikes Complainant's arguments as to the "phosphor" limitation for failure to raise them in its pre-hearing brief. *See* FID at 104, 101 n.19. In addition, the FID properly finds that the fluorescent material in Minato is a phosphor. *See* FID at 103 (citing RX-723 (Minato) at ¶ 16; Hr'g Tr. 1242:6-19 (Lebby)); *accord* Respondents' Resp. at 29; IA's Resp. at 16-17; *see also* RPB at 206; RPB, Ex. D, at 4. The Commission further finds that Complainant's attorney argument is insufficient to rebut Respondents' expert testimony and evidence with respect to this limitation.

**(c) Transparent Substrate Adjacent the Transparent Plate (Claim 8 of the '529 Patent and Claim 9 of the '464 Patent)**

As to the "transparent substrate adjacent the transparent plate" limitation, Complainant repeats the same arguments as with Yamazaki, and those arguments fail for the same reasons as discussed *supra* at section III(A)(4)(ii)(b). Complainant failed to dispute this limitation in its pre-hearing brief and has therefore waived any challenge at this juncture. *See* CPB at 192-94. Thus, the Commission finds that the FID properly strikes Complainant's arguments as to that limitation. *See* FID at 101 n.19.

In addition, because the limitation was not in dispute, Respondents were not required to adduce expert testimony on this limitation. *See supra* at section III(A)(4)(i); *accord* FID at 108-09. Both Respondents and the IA argued in their pre-hearing briefs that Minato discloses a transparent sapphire substrate that is adjacent to the sapphire plate. *See* RPB at 207; RPB, Ex. D, at 5, 9-10; SPB at 167. The Commission thus finds that Respondents satisfied their burden as to this limitation.

The Commission, however, vacates the FID's alternative finding that "if Minato does not disclose that LED chips **25**, **26**, and **27** have a transparent substrate adjacent to transparent plate

**21**, . . . such an arrangement would have been obvious at the time of the invention for the same reasons articulated below with respect to Okamoto." FID at 109. As Complainant argues, none of the parties raised this obviousness ground before the ALJ. *See* Complainant's Pet. at 39.

Thus, the Commission has determined to affirm the FID's finding that Minato discloses the "transparent substrate" limitation and the FID's decision to strike Complainant's arguments as to this limitation. The Commission, however, has determined to vacate the FID's alternative obviousness finding over Minato "for the same reasons articulated with respect to Okamoto." *See* FID at 109.

**(d) <u>Minato Conclusion</u>**

The Commission finds that the FID correctly determines that the asserted claims of the '529 and '464 patents are anticipated and/or obvious over Minato alone or in combination with other prior art. As discussed *infra* section III(C), the Commission also finds that the secondary considerations of non-obviousness do not outweigh the findings of obviousness over Minato. Thus, the Commission has determined to affirm with modification the FID's finding that the asserted claims of the '529 and '464 patents are invalid over Minato, as discussed above.

**(iv) <u>Okamoto or Uemura</u>**

The FID finds that the asserted claims of the '529 and '464 patents are anticipated and/or obvious over Okamoto or Uemura. *See* FID at 109-23, 138. The Commission has determined to review this finding and, on review, to take no position on the FID's invalidity findings over Okamoto or Uemura (as primary references). *See Beloit*, 742 F.2d at 1423.

#### (v) Invalidity Conclusion

As explained above, the Commission has determined to affirm with modification the FID's finding that the asserted claims of the '529 and '464 patents are invalid over Yamazaki or Minato, but to take no position as to the FID's invalidity findings over Okamoto and Uemura.

### B. The '854 and '557 Patents

Concerning the '854 and '557 patents, the Commission has determined to review and, on review, to affirm with modification the FID's findings with respect to claim construction, infringement, invalidity, and the technical prong of the domestic industry requirement.

#### 1. Technical Overview and Asserted Claims

The '854 and '557 patents are related and share essentially the same specification. The patents relate to a "Transparent Light Emitting Device with Light Emitting Diodes" and more particularly "transparent light emitting diodes (LED) includ[ing] a plurality of III-nitride layers, including an active region that emits light." *See* JX-3 ('854 patent) at Abstract.

The patent specification explains that "[i]n conventional LEDs, in order to increase the light output power from the front side of the LED, the emitting light is reflected by the mirror on the backside of the sapphire substrate or the mirror coating on the lead frame . . . ." JX-3 ('854 patent) at 10:64-11:2. "This reflected light is re-absorbed by the emitting layer (active layer) . . . [and] the efficiency or output power of the LEDs is decreased due to the re-absorption by the emitting layer." *Id.* at 11:3-8. For example, Figure 1 discloses "a conventional LED includ[ing] a sapphire substrate **100**, emitting layer **102** (active layer), and semi-transparent or transparent electrodes **104**, such as ITO or ZnO." *Id.* at 11:9-12. In Figure 1, "[t]he LED is die-bonded on a lead frame **106** with a clear epoxy molding **108** without any mirror on the back

side of the sapphire substrate **100**." *Id.* at 11:12-14. Rather, "the coating material on the lead frame **106**, or the surface of the lead frame **106**, becomes a mirror **110**." *Id.* at 11:14-16.

The specification states that "the present invention describes a light emitting device comprised of a plurality of III-nitride layers, including an active region that emits light, wherein all of the layers except for the active region are transparent for an emission wavelength of the light, such that the light is extracted effectively through all of the layers and in multiple directions through the layers." *Id.* at 11:51-57. In effect, the claimed invention minimizes re-absorption by eliminating the reflective layer or mirror from the bottom of the LED chip. *Id.* at 20:60-63 ("One advantage of the present invention is that all of the layers of the LED are transparent for the emission wavelength, except for the emitting layer, such that the light is extracted effectively through all of the layers."), 20:64-67 ("Moreover, by avoiding the use of intentional mirrors with the LED, re-absorption of light by the LED is minimized, light extraction efficiency is increased, and light output power is increased.").

The technology at issue in the '854 and '557 patents is similar to that in the '529 and '464 patents. While the patents are not related, there are common inventors, and many figures are identical between the two patent families, including Figure 19A (disclosing the claimed embodiment of the '529 and '464 patent including a transparent plate), which corresponds to Figure 22A of the '854 and '557 patents. The claims of the '854 and '557 patents recite "[a] cathode and [an] anode provid[ing] structural support" (compare to the "lead frame" of the '529 and '464 patents, which was construed to ***not*** require the leads to provide structural support) to a "transparent surface" or "sapphire plate" (similar to the "transparent plate" of the '529 and '464 patents and construed similarly as discussed *supra* at section V(B)(2)(i)). The claims of the '854 and '557 patents further recite a "molding comprising a phosphor."

**PUBLIC VERSION**

As noted above, Complainant asserts claim 1 of the ’854 patent and claim 1 of the ’557 patent, which recite the following (with disputed limitations emphasized):

| **Claim 1 of the ’854 Patent** | **Claim 1 of the ’557 Patent** |
|---|---|
| A light emitting device, comprising: | A light emitting device, comprising: |
| a **transparent** surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein **the cathode and anode provide structural support to the transparent surface** and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device; | a **sapphire plate**, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein **the cathode and anode provide structural support** to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device; |
| at least one III-nitride light emitting diode (LED) comprising a **sapphire growth substrate**, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and | a plurality of III-nitride light emitting diodes (LEDs), each comprising a **sapphire growth substrate** and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate; and |
| a **molding** comprising a **phosphor** and surrounding the LED, the molding **configured to extract light from both a front side of the light emitting device and a back side of the light emitting device**. | a **molding** comprising a **phosphor** and surrounding the LEDs, the molding **configured to extract light from both a front side of the light emitting device and a back side of the light emitting device**. |

*See* JX-3 (’854 Patent) at claim 1 (emphasis added); JX-5 (’557 Patent) at claim 1 (emphasis added).

**2. <u>Claim Construction</u>**

The Commission has determined to review the ALJ’s construction of the term “sapphire” and, on review, to affirm and supplement the FID’s analysis as explained below.

The parties’ proposed constructions for “sapphire” before the ALJ were as follows:

**PUBLIC VERSION**

| Claim Term | Complainant's Construction | Respondents' Construction | IA's Construction |
|---|---|---|---|
| **"sapphire"**<br><br>('854 Patent, claim 1; '557 Patent, claim 1) | "crystalline aluminum oxide ($Al_2O_3$) [plate / growth substrate]" | "single-crystal $Al_2O_3$ transparent [plate / growth substrate] | "a plate of single crystal aluminum oxide ($Al_2O_3$)"<br><br>"a growth substrate of single crystal aluminum oxide ($Al_2O_3$)" |

*See* Order No. 39 at 9.

The ALJ construed the term "sapphire" "according to its plain and ordinary meaning, which is single crystal aluminum oxide." *Id.* at 11. The ALJ noted that "the parties agree that 'sapphire' is a form of crystalline aluminum oxide ($Al_2O_3$)" but that "[t]he central dispute is whether 'sapphire' would be understood by a person of skill in the art to mean only a single crystal form of aluminum oxide or would also encompass polycrystalline forms." *Id.* at 10.

The ALJ noted that Complainant's witnesses admitted in *Certain Filament Light-Emitting Diodes and Products Containing Same*, Investigation No. 337-TA-1172, that "polycrystalline aluminum oxide is not sapphire." *Id.* (citing RXM-16C.4 (DenBaars) at 271:2-12; RXM-17C.4 (Schubert) at 190:19-191:5); *accord* Respondents' Resp. at 82-83 (citing Hr'g Tr. (DenBaars) at 196:25-198:8; Hr'g Tr. (Schubert) at 862:13-863:7). The ALJ also noted that Complainant "did not provide any explanation, either in briefing or at oral argument, why that testimony should be ignored when considering how a person of ordinary skill would interpret the same term here." *See* Order No. 39 at 10. The ALJ also found that, because Complainant "conceded 'sapphire' must be a single crystal structure in the context of a '[sapphire] growth substrate,' . . . the term should be so understood consistently throughout the claims, particularly

**PUBLIC VERSION**

where there is no disclosure in the patents that 'sapphire' might include polycrystalline structures." *Id.* at 11.

Complainant incorrectly argues in its petition that "sapphire" can include both single crystal and polycrystalline structures. Complainant's Pet. at 88. Complainant contends that "a word that has an ordinary meaning encompassing two relevant alternatives may be construed to encompass both alternatives." *Id.* (citing *Inverness Medical Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1379 (Fed. Cir. 2002)). The Federal Circuit, however, recognized in *Inverness* that "before finally concluding that the term encompasses both [alternative] meanings, [the Court] must determine whether the specification or prosecution history clearly demonstrates that only one of the multiple meanings was intended." *Inverness*, 309 F.3d at 1379. Indeed, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). As explained below, the Commission finds that the term "sapphire" is distinct from polycrystalline structures and that the plain and ordinary meaning of "sapphire" is single crystal aluminum oxide.

Complainant argues that nothing in the claims or the specification compels a single crystal structure rather than a polycrystalline structure. *See* Complainant's Pet. at 89 (citing JX-5 ('557 patent) at claim 1, 20:33-41 ("The transparent plate **2220** may be comprised of glass, quartz, sapphire, diamond or other material transparent for the desired emission wavelength, wherein the transparent glass plate **2220** effectively extracts the light **2218** emitted from the LED **2200** to the shaped optical element **2212**.")). The cited portion of the '557 patent specification, however, confirms that the sapphire is single crystal because polycrystalline aluminum oxide is

not transparent and would not be a suitable material for the transparent plate. *See* IA's Resp. at 51 (citing IA's Claim Construction Br. ("SCB") at 23-25 (itself citing SMX-14 (Concise Dictionary of Materials Science (2003)) at 1 (defining "α-$Al_2O_3$" as "[p]ure alumina" and explaining that "[p]olycrystalline $Al_2O_3$ is known as corundum and *single crystals* as sapphire") (emphasis in original); SMX-15 (Williams Dictionary of Biomaterials (1999)) at 12 (defining "alumina" (*i.e.*, aluminum oxide) as "highly crystalline ceramic, typically polycrystalline" and noting that it "[a]lso exists as the abrasive corundum and, in single crystal form, as sapphire"); SMX-16 (Engineering Ceramics (2001)) at 302 (explaining that "[m]ost crystalline ceramics are opaque in bulk," "[t]he opacity is due to the presence of grain boundaries, which are sites of reflection," "[i]f these boundaries are limited and the material is thin, the material may become transparent," and "[s]ingle-crystal oxide ceramics are transparent in the visible spectrum"))). Other intrinsic evidence also indicates that the patentee understood sapphire to be single crystal aluminum oxide and to be transparent. *See* Respondents' Resp. at 82 (citing Respondents' Claim Construction Br. ("RCB") at 17 (itself citing RXM-15.34 (Prosecution History of Application Serial No. No. 16/828,585 (continuation of applications which issued as the '854 and '557 patents) (reciting a "sub-mount compris[ing] single crystal aluminum oxide (sapphire)")))); *id.* at 80 n.17 (citing RXM-14.13 (Prosecution History of Application Serial No. 16/422,323 (parent of the '854 and '557 patents)) (arguing that "sapphire plate" is a "significant narrowing, *e.g.*, to specify the material of the transparent plate as sapphire")).

Thus, the Commission agrees with the ALJ that the term "sapphire" means a single crystal aluminum oxide ($Al_2O_3$). Accordingly, the Commission has determined to affirm the ALJ's construction of the limitation "sapphire" with the supplemental analysis discussed above.

### 3. Infringement

As discussed *supra* at section I(C), Complainant asserted that the Accused Flexible and Rigid Products infringe the asserted claim of the ’854 patent and that the Accused Rigid Products infringe the asserted claim of the ’557 patent. The FID finds that Complainant failed to establish infringement with respect to any of the Accused Rigid and Flexible Products either literally or under the doctrine of equivalents. *See* FID at 139-158, 178-85. Specifically, the FID finds that Complainant failed to establish infringement with respect to these terms: (1) “transparent surface” (claim 1 of the ’854 patent); (2) “sapphire plate” (claim 1 of the ’557 patent); and (3) “molding” (claim 1 of the ’854 and ’557 patents). As explained below, the Commission has determined to review the FID’s infringement findings with respect to the terms “transparent surface” and “sapphire plate,” and on review, to affirm those findings with the supplemental analysis discussed below.[35] *See id.* at 139-46, 179-83.

[35] The Commission does not review, and therefore affirms, the FID’s findings that the Accused Products do not satisfy the term “molding” recited in asserted claims 1 of the ’854 and ’557 patents. *See* 19 C.F.R. § 210.42(h).

**(i) <u>Transparent Surface (Claim 1 of the ’854 Patent)</u>**

The FID finds that the Accused Products (rigid or flexible) do not satisfy the “transparent surface” limitation either literally or under the doctrine of equivalents. The ALJ construed the term “transparent” as “having its plain and ordinary meaning.”[36] *See* Order No. 39 at 9.

**(a) <u>Literal Infringement</u>**

The FID finds that the Accused Products (rigid and flexible), except the Feit flexible product (Feit Vintage ST19 Dimmable), do not satisfy the “transparent surface” limitation for the same reasons as discussed in connection with the “transparent” limitation of the ’529 patent. *See* FID at 139; *see also supra* at section III(A)(2)(i).

As to the Accused Flexible Products, the FID notes that they have flexible submounts made of polyimide. *See* FID at 140 (citing Hr’g Tr. (Schubert) at 633:1-2, 764:3-14). The FID finds that “for the same reasons discussed . . . with respect to the Accused Rigid Products, [the transmission testing] in fact show[s] that the submounts in the Accused Flexible Products, with the exception of the Feit Accused Flexible Product . . . , are not ‘transparent’ and therefore do not satisfy this limitation.” *Id.* at 142 (citing Hr’g Tr. (Eden) at 1018:3-16, 969:19-24).

In its petition, Complainant again relies on a flawed construction of “transparent” which merely requires that some light passes through the ceramic and flexible submounts. *See* Complainant’s Pet. at 70-72. As discussed *supra* at section III(A)(2)(i), the FID correctly finds that Complainant failed to satisfy its burden on infringement under the FID’s proper construction of the term “transparent.”

---

[36] As discussed *supra* note 17, although the ’854 patent is not related to the ’529 and ’464 patents, the ALJ adopted the plain meaning of the term for all three patents. The Commission also notes that all three patents have common inventors and similar priority dates (November or December 2006) which is the relevant period for ascertaining the meaning of “transparent” from the perspective of a person having ordinary skill in the art.

The Commission also finds that the SEM testing for the Accused Flexible Products shows an abundance of pores that cause scattering and absorption, thereby indicating that the flexible submounts are opaque rather than transparent. *See* Hr'g Tr. (Eden) 995:17-996:16, 1018:22-1019:5; RDX-1.50, 78 (reproduced below); RX-178.59 (Satco S9966); RX-182.10, 15 (IKEA Rollsbo); RX-177.99 (GE Vintage).




Satco S9966 (RX-0178.0059)

Thus, the Commission agrees with the FID's findings with respect to literal infringement as to the claim term "transparent surface" and affirms the FID's findings with the supplemental analysis discussed above.

**(b) <u>Infringement Under the Doctrine of Equivalents</u>**

The FID finds that "[f]or substantially the same reasons discussed . . . with respect to the '529 patent, the Accused Rigid Products do not satisfy this limitation under the doctrine of equivalents." *See* FID at 145; *see also supra* at section III(A)(2)(i). The FID also finds that "[f]or [] substantially the same reasons [as discussed in connection with the '529 patent], [Complainant] has not persuasively shown that the Accused Flexible Products satisfy th[e] [transparent surface] limitation under the doctrine of equivalents." FID at 146 (citing Hr'g Tr. (Eden) at 1023:7-22).

Complainant relies on the same analysis as for the Accused Rigid Products in arguing infringement under the doctrine of equivalents. *See* Complainant's Pet. at 70. As discussed *supra* at section III(A)(2)(i)(b), Complainant essentially argues that "the claims require only that light passes through the transparent plate / surface." *See id.* at 71. The Commission finds that Complainant failed to explain why the accused flexible submounts have insubstantial differences with a transparent material.

As the FID finds, the transmission testing shows that "the submounts in the Accused Flexible Products . . . are not 'transparent.'" *See* FID at 142 (citing Hr'g Tr. (Eden) at 1018:3-16, 969:19-24); *id.* at 146 (citing Hr'g Tr. (Eden) at 1023:7-22). In addition, as discussed above, the SEM analysis demonstrated an abundance of pores which cause scattering and absorption, thereby indicating that the accused flexible submounts are not transparent and that clear and substantial structural differences exist between transparent materials and the Accused Flexible Products. *See* Hr'g Tr. (Eden) 995:17-996:16, 1018:22-1019:5; RDX-1.50, 78 (reproduced above); RX-178.59 (Satco S9966); RX-182.10, 15 (IKEA Rollsbo); RX-177.99 (GE Vintage); *see also Freedman*, 420 F.3d at 1362 ("We think that this structural difference in the mounting of the moveable end to the seatbase is not a 'subtle difference in degree,' but rather, 'a clear, substantial difference or difference in kind.'").

The evidence also shows that the Accused Flexible Products: (1) do not perform the same function as the claimed LED, which allows a significantly higher percentage of light to be extracted through the transparent surface (as evidenced by the transmissivity data discussed above), (2) do not perform such function in the same way, given the substantial structural differences between the Accused Flexible Products (as evidenced by the SEM testing discussed above showing the presence of pores and grain boundaries) and the claimed LED, and (3) do not

achieve the same result given that the claimed LED results in a significantly higher percentage of light being extracted through the transparent surface (as evidenced by the transmissivity data discussed above).

Thus, the Commission finds that Complainant failed to demonstrate insubstantial differences between the Accused Products and the claimed LED with a transparent surface and therefore, Complainant failed to satisfy its burden to establish infringement under the doctrine of equivalents. Accordingly, the Commission has determined to affirm the FID's non-infringement findings under the doctrine of equivalents with the supplemental analysis discussed above.

**(ii) Sapphire Plate (Claim 1 of the '557 Patent)**

The FID finds that the Accused Rigid Products[37] do not satisfy the "sapphire plate" limitation either literally (*see* FID at 179-80 (citing Hr'g Tr. (Eden) at 1025:12-1026:1)) or under the doctrine of equivalents (*see* FID at 180-83). As discussed *supra* at section III(B)(2), the ALJ correctly construed the term "sapphire" in accordance with its "plain and ordinary meaning, which is single crystal aluminum oxide." *See* Order No. 39 at 11.

**(a) Literal Infringement**

The FID finds no literal infringement of the term "sapphire plate" under the ALJ's construction for that term. *See* FID at 179-80; Order No. 39 at 11. The FID rejects Complainant's argument that the Accused Rigid Products include a sapphire plate because they include grains of single crystal aluminum oxide. *See* FID at 179. The FID explains that "[c]laim 1 of the '557 patent does not recite a plate 'comprising sapphire' or a plate 'including

[37] As discussed supra section I(C), Complainant asserted claim 1 of the '854 patent against the Accused Flexible Products and all asserted claims of the Asserted Patents against the Accused Rigid Products.

sapphire'" but "a sapphire plate." *See id.* at 180; *id.* (finding that "the claim is directed to 'a sapphire plate,' not a plate comprised of sapphire crystals").

In its petition, Complainant argues that the accused rigid ceramic plates infringe because they include the same "elemental composition" (*i.e.*, $Al_2O_3$) as sapphire.[38] *See* Complainant's Pet. at 92. The elemental composition, however, does not establish that the Accused Products literally infringe the "sapphire plate" limitation. Indeed, despite sharing the same elemental composition, the ceramic plates in the Accused Rigid Products have substantial differences in structure and properties compared to sapphire plates. *See* IA's Resp. at 51-52; Respondents' Resp. at 84-85; RXM-44 (Ballato[39] Decl.) at ¶ 17 (explaining that diamond and graphite have identical constituent elements (carbon atoms) but different crystal structures and different properties); *see also* FID at 54 (citing Hr'g Tr. (Eden) at 994:14-23; RX-178.29 (reproduced below); CX-198.21 (reproduced below)).

| Accused Ceramic Product (Satco S29876) | Licensed Sapphire Submount (Tamarac) |
| --- | --- |
|  (RX-0178.0029) |  (CX-0198.0021) |





---

[38] The Commission notes Feit's argument that "the submounts in its accused rigid products are aluminum silicate, not aluminum oxide" and thus do not share the same elemental composition as sapphire plates. *See* Feit's Pet. at 10.

[39] Dr. John Ballato was retained by Respondents as a materials science expert in this investigation.

As the FID explains, "[t]he presence of grain boundaries and pores cause the material to be 'highly absorbing and scattering,' indicating that the submounts are opaque." *Id.* at 54 (citing Hr'g Tr. (Eden) at 994:11-13, 994:24-995:6, Hr'g Tr. (Shanfield) at 1192:25-1193:5). In contrast, "the same analysis of the licensed Acclaim [DI] product, which has a sapphire submount, shows no pores, grains, or grain boundaries." *Id.* (citing Hr'g Tr. (Eden) at 994:14-23).

Thus, the Commission agrees with the FID that Complainant failed to establish that the Accused Rigid Products, which have ceramic submounts, literally satisfy the term "sapphire plate."

**(b) <u>Infringement Under the Doctrine of Equivalents</u>**

The FID rejects Complainant's argument that "'a sapphire plate' is equivalent to 'a plate composed of polycrystalline alumina.'" *See* FID at 180. Instead, the FID credits Respondents' expert testimony and finds that "the ceramic submounts are substantially different with respect to visual testing, transmission testing, SEM analysis, and integrating sphere testing from the claimed 'sapphire' plates described in the patent." *See id.* (citing Hr'g Tr. (Eden) at 1026:7-14).

The FID also finds that unlike the testimony of Complainant's expert, Dr. Schubert, "which was made without reference to the specification, Dr. Eden's testimony was persuasive and clearly tied to the teachings of the patent." *Id.* at 181. The FID explains that Dr. Eden "provided a more appropriate function-way-result analysis, showing that the Accused Rigid Products do not satisfy this limitation under the doctrine of equivalents." *Id.* Specifically, the FID finds that "Dr. Eden testified that the function of the sapphire plate is to effectively extract light, the way this function is performed is by the plate being a transparent material, and the result is the effective extraction of light." *Id.* at 181-82 (citing Hr'g Tr. (Eden) at 1026:24-

1028:7). In contrast, the FID continues, [t]he Accused Rigid Products' plates have a comparatively poor ability to extract light and thus do not achieve or practice substantially the same function, in substantially the same way, to substantially achieve the same result." *Id.* at 182.

In its petition, Complainant relies on Respondents' expert, Dr. Ballato, to argue that the accused polycrystalline materials are equivalent to sapphire plates because they include "many sapphire grains." Complainant's Pet. at 91-92 (citing RXM-44 (Ballato Decl.) at ¶ 25). Complainant, however, takes Dr. Ballato's statements out of their appropriate context. Dr. Ballato nowhere discussed "sapphire grains." Instead, he explained that a "sapphire" is "a material comprised of single-crystalline aluminum oxide that does not have *any significant amount* of grains, grain boundaries, and pores." RXM-44 (Ballato Decl.) at ¶ 20 (emphasis added). In contrast, Dr. Ballato explained that polycrystalline aluminum oxide is "a material comprised of aluminum oxide that has grains, separated by [grain] boundaries, and generally has pores." *Id.* at ¶¶ 19, 25 ("[I]n the polycrystal each grain is single-crystalline, but grain boundaries that break the single-crystal order between grains exist.").

Complainant also argues incorrectly that the FID finds that "sapphire" has no equivalent. Instead, the FID finds that the term "sapphire plate" is narrow and that "Complainant is not . . . allowed to extend the scope of 'sapphire' to encompass a ceramic material, polycrystalline aluminum oxide, simply because it shares the same elemental composition." *See* FID at 182; *see also id* at 180 (citing Hr'g Tr. (Eden) at 1026:7-14 (testifying that the ceramic submounts are substantially different with respect to visual testing, transmission testing, SEM analysis, and integrating sphere testing from the claimed "sapphire" plates described in the patent)).

The Commission agrees with the FID that the "polycrystalline aluminum oxide plate in the Accused Rigid Products does not perform substantially the same function as the sapphire plate in the same way to achieve the same result because they do not effectively transmit light due in part to the presence of grains, pores, and grain boundaries, which absorb, reflect, and scatter light." *Id.* at 182 (citing Hr'g Tr. (Eden) at 992:16-995:6, 1000:13-25; RDX-1.49, 57). The Commission also finds clear and substantial structural differences between the ceramic submounts of the Accused Rigid Products and sapphire plates. *See id.* at 54 (citing Hr'g Tr. (Eden) at 994:11-995:6, Hr'g Tr. (Shanfield) at 1192:25-1193:5; RX-178.29; CX-198.21); *see also Freedman*, 420 F.3d 1350, 1362 (Fed. Cir. 2005) (reversing the district court's infringement where a "structural difference . . . is not a 'subtle difference in degree,' but rather, 'a clear, substantial difference or difference in kind'") (citation omitted).

Thus, the Commission agrees with the FID that Complainant failed to establish that the Accused Rigid Products, which have ceramic submounts, satisfy the "sapphire plate" limitation under the doctrine of equivalents.

**(iii) <u>Infringement Conclusion</u>**

The Commission finds that the FID correctly determines that the Accused Products (rigid or flexible) do not infringe the asserted claims of the '854 and '557 patents, either literally or under the doctrine of equivalents. Accordingly, the Commission has determined to affirm the FID's infringement findings with the supplemental analysis as explained above.

**4. <u>Domestic Industry - Technical Prong</u>**

Complainant asserted that the Licensee DI Products (not the SSLEEC DI Products), *i.e.*, the Licensee Rigid and Flexible DI Products, practice claim 1 of the '854 patent. Complainant also asserted that the Licensee Rigid DI Products practice claim 1 of the '557 patent. The FID

finds that none of the Licensee DI Products (rigid or flexible) practices the asserted claims of the ’854 and ’557 patents, and therefore Complainant failed to satisfy the technical prong of the domestic industry requirement in connection with those patents. *See* FID at 158-66, 185-89.

Specifically, the FID finds that none of the Licensee DI Products satisfies the “molding” limitation (claim 1 of the ’854 and ’557 patents). In addition, the FID finds that the Licensee DI Products (except the Acclaim DI Product) do not satisfy the “transparent surface” (claim 1 of the ’854 patent) and “sapphire plate” (claim 1 of the ’557 patent) limitations.

As explained below, the Commission has determined to review the FID’s technical prong findings with respect to the terms “transparent surface” and “sapphire plate,” and on review, to affirm and supplement those findings.[40]

**(i) <u>Transparent Surface (Claim 1 of the ’854 Patent)</u>**

The FID finds that the Licensee DI Products (except the Acclaim DI Product) do not include a transparent surface. *See* FID at 159-60, 163-64. As to the Licensee Rigid DI Products, the FID relies on the same reasons as discussed in connection with the “transparent plate” limitation of the ’529 and ’464 patents. *See id.* at 160; *see also supra* at section III(A)(3)(i). As to the Licensee Flexible DI Products, the FID notes that “[t]he sole quantitative transmission analysis Complainant presented for these products, a LUX plot for the Globe Electric Flexible Domestic Industry Product, shows that it does not have a transparent surface, transmitting only about 60% of the light incident on it through.” FID at 164.

In its petition, Complainant makes the same arguments with respect to the Licensee DI Products as it does with respect to the Accused Products and those arguments fail for the same

---

[40] The Commission does not review, and therefore affirms, the FID’s findings that the Licensee DI Products do not satisfy the term “molding” (claim 1 of the ’854 and ’557 patents). *See* 19 C.F.R. § 210.42(h).

reasons as discussed *supra* at section III(B)(3)(i). *See* Complainant's Pet. at 70-75. Specifically, Complainant argues that the claims merely require that some light pass through the submount. *See* Complainant's Pet. at 70. The Commission agrees with the FID that Complainant's interpretation of "transparent" and related showings are insufficient to satisfy its burden with respect to the technical prong of the domestic industry requirement. *See* FID at 159-60, 163-64; *see also supra* at section III(B)(3)(i).

Thus, the Commission finds that the FID correctly determines that Complainant failed to meet its burden of showing that the Licensee DI Products (except the Acclaim DI Product) satisfy the "transparent surface" limitation. Accordingly, the Commission has determined to affirm the FID's technical prong findings as to that limitation with the supplemental analysis discussed above.

**(ii) <u>Sapphire Plate (Claim 1 of the '557 Patent)</u>**

The FID finds that the Licensee Rigid DI Products (except for the Acclaim DI Product) do not practice this limitation either literally or under the doctrine of equivalents for the same reasons as discussed in connection with the Accused Rigid Products. *See* FID at 186-87.

Complainant, in its petition, makes the same arguments with respect to the Licensee Rigid DI Products as it does with respect to the Accused Rigid Products, and those arguments fail for the same reasons as discussed *supra* at section III(B)(3)(ii). *See* Complainant's Pet. at 92-93. Specifically, Complainant recognizes that the Licensee Rigid DI Products include polycrystalline aluminum oxide submounts but argue that they practice the "sapphire plate" limitation (construed as single crystal aluminum oxide) both literally and under the doctrine of equivalents. *See id.* The Commission agrees with the FID that Complainant's interpretation of "sapphire plate" and related showings are insufficient to satisfy its burden with respect to the

technical prong of the domestic industry requirement. *See* FID at 186-87; *see also supra* at section III(B)(3)(ii).

Thus, the Commission finds that the FID correctly determines that Complainant failed to meet its burden of showing that the Licensee Rigid DI Products (except the Acclaim DI Product) satisfy the "sapphire plate" limitation. Accordingly, the Commission has determined to affirm the FID's technical prong findings as to that limitation with the supplemental analysis discussed above.

**(iii) <u>Technical Prong Conclusion</u>**

The Commission agrees with the FID that none of the Licensee DI Products practices the "molding" (claim 1 of the '854 and '557 patents) limitation, and that the Licensee DI Products (except the Acclaim DI Product) further fail to practice the "transparent surface" (claim 1 of the '854 patent) and the "sapphire plate" (claim 1 of the '557 patent) limitations. Accordingly, the Commission has determined to affirm with the supplemental analysis discussed above, the FID's finding that Complainant failed to satisfy the technical prong of the domestic industry requirement with respect to the asserted claims of the '854 and '557 patents. Furthermore, as discussed below, the Commission finds that the '854 and '557 patents are invalid and therefore finds no domestic industry relating to articles protected by a valid claim of those patents.

**5. <u>Invalidity</u>**

The FID finds that the asserted claims of the '854 and '557 patents are invalid as anticipated and/or obvious over each of the following references alone or in combination with other prior art (*e.g.*, Uemura): (1) Yamazaki (RX-828); (2) Minato (RX-723); (3) Uemura (RX-779); and/or (4) Tamaoki (RX-724). *See* FID at 167-76, 190-96. As discussed below, the Commission has determined to review these invalidity findings, and on review to: (1) affirm

with modification the FID's obviousness findings over Yamazaki or Minato; (2) reverse the FID's finding that Minato anticipates the asserted claims of the '854 and '557 patents; and (3) take no position as to the FID's invalidity findings over Uemura or Tamaoki.[41]

**(i) <u>Yamazaki</u>**

The FID finds that the asserted claims of the '854 and '557 patents are obvious over Yamazaki alone or in combination with Uemura. *See* FID at 170-72, 192-93. As discussed below, the Commission has determined to review, and on review, to affirm with modification the FID's findings as to the following limitations: (1) "the cathode and anode provide structural support to the [transparent surface or sapphire plate]" (claim 1 of the '854 and '557 patents); (2) "molding comprising a phosphor" (claim 1 of the '854 and '557 patents); and (3) "sapphire growth substrate" (claim 1 of the '854 patent).

**(a) <u>The Cathode and Anode Provide Structural Support (Claim 1 of the '854 and '557 Patents)</u>**

The FID finds that "Yamazaki's Figure 1 shows a surface-mount LED package whose leads are wrapped around the ends of the glass/sapphire plate." FID at 171, 192. In addition, the FID continues, "[a] person of ordinary skill would understand that these leads are a cathode and an anode, and that they provide structural support to the plate at each end." *Id.* at 171 (citing Hr'g Tr. (Lebby) at 1221:20-1222:17; RDX-3.25). The FID also finds that "these leads are used to mount the package onto a circuit board, providing both the physical and electrical connection between the package and the board" and that the leads "provide structural support

[41] While the Commission takes no position with respect to the FID's reliance on Uemura as a primary reference, this determination does not apply to the FID's reliance on Uemura as a secondary reference.

because they are how the LED package is physically attached to the circuit board." *Id.* (citing Hr'g Tr. (Lebby) at 1225:10-21).

The FID also incorporates its obviousness findings over Yamazaki in view of Uemura as determined in the context of the '529 and '464 patents. *See id.*; *accord* Respondents' Resp. at 25-26.[42] Specifically, the FID finds that Uemura's "through-pin leads provide structural support to the device." FID at 93-95. The FID states that if the leads (cathode and anode) are required to provide structural support, "the claimed lead frame would have been obvious in view of Yamazaki, [Uemura], and the state of the art represented by U.S. Patent No. 5,998,925 ('Shimizu') (RX-784)." *See id.* at 92.

The FID credits Dr. Lebby's testimony about the state of the art at the time of the invention and finds that "by the mid-1990s people in the art knew of two interchangeable alternatives for LED packaging: through-pin packages and surface-mount J-lead packages, or SMJs." *See id.* at 93 (citing Hr'g Tr. (Lebby) at 1203:7-1204:3, 1226:6-15). The FID also finds that "[t]he Shimizu reference confirms the state of the art at that time, namely that through-pin packaging and SMJ packaging was interchangeable." *Id.* (citing RDX-3.28 (reproduced below)).

[42] The FID incorrectly refers to "part VI.B.1" to support its finding that "Yamazaki renders claim 1 of the '854 patent obvious in combination with Uemura." *See* FID at 172 (citing part VI.B.1). The relevant section, however, is part V.D.2.

**PUBLIC VERSION**




Significantly, the FID finds that Uemura's "through-pin leads provide structural support to the device." *Id.* at 93-95. The FID concludes, "[b]ecause both were within the 'technical grasp' of an ordinary artisan at the time of the invention, such a person would have had, in the words of *KSR*, 'good reason to pursue' either." *Id.* at 93 (citing Hr'g Tr. (Lebby) at 1227:1-18; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)).

In addition, the FID finds that "Uemura provides specific motivation to pursue through-pin lead frame packaging with an LED mounted on a transparent plate." *Id.* at 94. The FID explains that "a person of skill would understand Uemura's approach, which requires less manufacturing precision, would 'lower the manufacturing cost' of packaging LEDs." *Id.* (quoting Hr'g Tr. (Lebby) at 1231:14-1232:13). The FID also finds that "packaging Yamazaki in a lead frame with through-pins would be predictable, as Dr. Lebby described and illustrated." *Id.* at 95 (citing Hr'g Tr. (Lebby) at 1227:19-1228:11; RDX-3.30 (reproduced below)).

**PUBLIC VERSION**

## Using Through-Pin Leads With Yamazaki

RX-0779 RX-0828 ’854, ’557




Substituting Uemura’s through-pin configuration for Yamazaki’s surface-mount configuration

RDX-0003.030

In its petition, Complainant argues that Yamazaki does not disclose the limitation requiring that “the cathode and anode provide structural support to the [transparent surface or sapphire plate].” Complainant explains that “[a]s the term ‘pattern’ strongly implies, a POSITA would understand that the conductive pattern **11a** is a thin metallization that does not provide structural support.” Complainant’s Pet. at 22 (citing Hr’g Tr. (Schubert) at 1331:16-1332:8); *accord* SIB at 169 (“Yamazaki’s metallizations/leads/anode and cathode are thin and do not provide structural support”).

As to the combination of Yamazaki and Uemura, Complainant argues (without support) that “[t]here is no evidence that a POSITA would consider thin metallizations and through pin leads interchangeable alternatives.” Complainant’s Pet. at 25. Complainant reasons that “[a] POSITA would not combine Yamazaki and Uemura because Uemura is directed to a device that only emits light in one direction.” *Id.* The Commission finds that Complainant’s conclusory attorney arguments are insufficient to counter the substantial evidence and expert testimony

supporting the FID's obviousness findings over Yamazaki in combination with Uemura. *Accord* Respondents' Resp. at 25; Feit's Resp. at 45; IA's Resp. at 18-19.

Thus, the Commission finds that Yamazaki alone or in combination with Uemura teaches or suggests the limitation requiring that "the cathode and anode provide structural support to the [transparent surface or sapphire plate]." Accordingly, the Commission has determined to affirm and supplement the FID's findings as to this limitation.

**(b) A Molding Comprising a Phosphor (Claim 1 of the '854 and '557 Patents)**

Complainant in its petition levels the same criticism at the FID's findings with respect to the "phosphor" limitation as it does in connection with the '529 and '464 patents. Complainant further faults the FID for striking its arguments as to this limitation. *See* Complainant's Pet. at 20-21; *see also* FID at 172 n.25. Complainant, however, failed to identify this limitation as a disputed issue in its pre-hearing brief as required under the ALJ's Ground Rules. *See* Order No. 42 (G.R. 11.2).

As discussed *supra* at section III(A)(4)(ii)(a), the FID properly determines that Yamazaki discloses the "phosphor" limitation. The FID states that "[f]or substantially the same reasons discussed *supra* part VI.B.1,[43] . . . Yamazaki teaches most of the limitations of claim 1 of the '854 patent." FID at 171. The Commission clarifies and confirms that the FID's findings with respect to the "phosphor" limitation, made in the context of the '529 patent, similarly apply to the '854 and '557 patents. *See* FID at 90-92; *supra* at section III(A)(4)(ii)(a).

[43] As discussed *supra* note 42, the FID incorrectly refers to "part VI.B.1," while the relevant section is part V.D.2.

**PUBLIC VERSION**

**(c) Sapphire Growth Substrate (Claim 1 of the '854 and '557 Patents)**

The FID finds that Yamazaki alone does not disclose the "sapphire growth substrate" limitation but that Yamazaki in view of Uemura teaches the limitation. *See* FID at 171-72. The FID notes that "[t]he parties agree . . . that the sapphire growth substrate is not expressly disclosed, but Respondents contend that limitation is obvious" in view of Yamazaki alone. *Id.* at 171. The FID disagrees and finds that "the record appears to be devoid of any evidence of such obviousness." *Id.* The FID, however, finds obviousness based on Yamazaki in combination with Uemura. The FID explains that "Uemura expressly teaches that its LEDs are blue GaN-based LEDs and [are] grown on a sapphire substrate." *Id.* at 172 (citing RX-779 (Uemura) at 4:63-65, 7:6-9, 7:33-40, Table 1).

Complainant argues in its petition that Respondents provided no expert testimony as to this limitation and did not even rely on an obviousness ground based on Yamazaki in view of Uemura. *See* Complainant's Pet. at 19. Complainant also argues that the FID "does not address the lack of a sapphire growth substrate in Yamazaki at all in its discussion of the '557 patent." *Id.* at 26. Complainant, however, does not acknowledge its own failure to dispute this limitation in its pre-hearing brief as required under the ALJ's Ground Rules. *See* FID at 170 ('854 patent) ("Complainant only affirmatively disputes that Yamazaki discloses "wherein the cathode and anode provide structural support to the transparent surface.") (citing CPB at 326; Complainant's Reply Post-Hearing Br. ("CRB") at 43); *id.* at 192 ('557 patent) ("Complainant only disputes that Yamazaki discloses 'wherein the cathode and anode provide structural support to the transparent surface' and a 'plurality of LEDs.'") (citing CRB at 58); *see also id.* at 172 n.25 (granting Respondents' motion to strike Complainant's arguments as to the "sapphire growth substrate"); Order No. 42 (G.R. 11.2).

**PUBLIC VERSION**

Nor does Complainant acknowledge that Respondents provided extensive discussion in their pre-hearing brief establishing that Yamazaki renders the limitation obvious (including evidence from Dr. Lebby's expert report). *See* Respondents' Resp. at 19 (citing RPB, Ex. C at 13, 15-16). The relevant section is reproduced below:

> Yamazaki discloses using blue LED chips. (RX-0828 at [0014], [0027]; Lebby Rpt. at ¶¶ 516, 538.) As of 2006, a person of ordinary skill would understand that conventional blue LEDs are III-nitride LEDs, which are commonly grown on a sapphire (i.e., transparent) growth substrate. (Lebby Rpt. at ¶ 516.) That Yamazaki does not specifically use the words "sapphire growth substrate" is not surprising. (Lebby Rpt. at ¶ 516.) Blue LEDs were well-known by this time, and a person of ordinary skill would not need a disclosure of all of its constituent layers to understand that it would typically be grown on sapphire. (Lebby Rpt. at ¶ 516.) Thus, a POSITA would have understood and reasonably expected Yamazaki's blue LED to feature a sapphire growth substrate. (Lebby Rpt. at ¶¶ 516, 539-540.) Moreover, Complainant concedes that it was widely known to use sapphire growth substrate with blue LEDs. (Lebby Rpt. at ¶¶ 517, 539-540 ("[s]apphire also is widely used as a growth substrate for III-nitride LEDs." (quoting Exhibit E-1 to Complainant's First Supplemental Infringement and Technical Domestic Industry Claim Charts (Dec. 7, 2020) at 16.).)

*Id.*

While the Commission agrees with Complainant that Respondents did not rely on the combination of Yamazaki and Uemura, the Commission finds that Respondents satisfied their burden as to the "sapphire growth limitation" based on Yamazaki alone with respect to both the '854 and '557 patents. The Commission also finds that Complainant waived any argument that the "sapphire growth substrate" limitation is not obvious over Yamazaki based on Complainant's failure to raise the issue in its pre-hearing brief. *Accord* Respondents' Resp. at 18.

Accordingly, the Commission has determined to review the FID's findings as to the "sapphire growth substrate" limitation, and on review, to reverse the FID's finding that the

asserted claims of the ’854 and ’557 are not invalid as obvious based on Yamazaki alone and to vacate the FID’s finding based on Yamazaki in combination with Uemura as to this limitation.[44]

**(d) Yamazaki Conclusion**

The Commission finds that the FID correctly concludes that the asserted claims of the ’854 and ’557 patents are obvious over Yamazaki alone or in combination with Uemura. As discussed *infra* section III(C), the Commission also finds that the secondary considerations of non-obviousness do not outweigh the findings of obviousness over Yamazaki. Accordingly, the Commission has determined to affirm with modification the FID’s invalidity findings over Yamazaki with the modified analysis discussed above.

**(ii) Minato**

The FID finds that the asserted claims of the ’854 and ’557 patents are anticipated and/or obvious over Minato alone or in combination with Uemura. *See* FID at 172, 194. The FID notes that “Complainant only affirmatively disputes that Minato discloses ‘wherein the cathode and anode provide structural support to the transparent surface,’” and strikes Complainant’s arguments concerning “a sapphire growth substrate” and “a molding comprising a phosphor” limitations for failure to raise them in its pre-hearing brief. *Id.* at 172 (citing CRB at 46-47; CPB at 324-26); *id.* at 172 n.25.

The Commission has determined to review the FID’s findings as to the following limitations: (1) “the cathode and anode provide structural support to the [transparent surface or sapphire plate]” (claim 1 of the ’854 and ’557 patents); (2) “molding comprising a phosphor” (claim 1 of the ’854 and ’557 patents); and (3) “sapphire growth substrate” (claim 1 of the ’854

---

[44] While both the IA and Respondents raised Yamazaki in view of Uemura as a ground for obviousness, they did not rely on Uemura’s disclosure for the “sapphire growth substrate” limitation.

and '557 patents). On review, the Commission has determined to vacate the FID's anticipation finding over Minato, and to affirm with modification the FID's obviousness findings over Minato in combination with Uemura.

**(a) <u>The Cathode and Anode Provide Structural Support (Claim 1 of the '854 and '557 Patents)</u>**

The FID finds that "[f]or substantially the same reasons" discussed in connection with the '529 patent, "Minato either anticipates, or alternatively renders obvious in combination with Uemura, claim 1 of the '854 patent." FID at 172, 194 ('557 patent). In its petition, Complainant argues that "Minato's pull-out leads **32** and **33** are 'very thin wires' and 'would not be able to provide structural support.'" Complainant's Pet. at 35-36 (citing Hr'g Tr. (Schubert) at 1332:11-20). The IA agrees and argues that in the context of the '529 patent, the FID does not find that Minato's pull-out leads provide structural support. *See* IA's Resp. at 27. As the IA notes, "[u]nlike 'lead frame,' the cathode/anode limitation requires that 'both the cathode and the anode provide structural support.'" *Id.*

Respondents argue that "Dr. Lebby explained that 'leads **32** and **33**' are the mechanism for physically supporting the LED package shown in Minato's Figure 2, so a person of ordinary skill would understand that they must be providing 'structural support.'" Respondents' Resp. at 31 (citing Hr'g Tr. (Lebby) at 1247:23-1248:2). The FID, however, does not rely on that testimony but instead on its findings in the context of the '529 patent (reciting a "lead frame") which do not appear to provide support for the FID's anticipation determination over Minato as to the '854 or '557 patents (reciting a cathode/anode providing structural support). Thus, the Commission agrees with Complainant and the IA that the present record does not support the FID's finding that Minato anticipates claims 1 of the '854 or '557 patents.

**PUBLIC VERSION**

As to the FID's obviousness determination over Minato in view of Uemura, the Commission agrees with the FID that the combination of those references teaches the cathode/anode limitation for the same reasons as discussed in the context of the '529 patent, where the FID makes an alternative obviousness finding over Yamazaki or Minato in view of Uemura based on an interpretation of "lead frame" where the leads (cathode and anode) provide structural support.

In particular, the FID finds that "Respondents . . . elicited testimony from the perspective of a person of ordinary skill in the art about the scope and content of the[] [Minato, Uemura, and Shimizu] references, how an artisan would be motivated to combine them, and what the expected result would be." FID at 105 (citing Hr'g Tr. (Lebby) at 1247:10-1252:1). That testimony, the FID continues, is "unrebutted." *Id.* The FID further notes that "[a]t the time of the invention . . . , there were two well-known, interchangeable options for packaging LEDs: using through-pins or using SMJs." *Id.* at 106. "Because both were within the 'technical grasp' of an ordinary artisan at the time of the invention," the FID finds that "such a person would have had, in the words of *KSR*, 'good reason to pursue' either." *Id.* (citing *KSR*, 550 U.S. at 421; Hr'g Tr. (Lebby) at 1248:21-1249:18).

Complainant argues that "Respondents did not establish that SMJs and through-pin leads are 'interchangeable' (or that through-pins provide structural support)." Complainant's Pet. at 37. As discussed *supra* at section III(B)(5)(i)(a), Complainant's unsupported arguments are insufficient to rebut the Respondents' expert testimony and the FID's findings based thereon. *Accord* Respondents' Resp. at 32; IA's Resp. at 27.

Thus, the Commission has determined to review the FID's invalidity findings over Minato alone or in combination with Uemura and, on review, to: (1) reverse the FID's finding

that Minato anticipates the asserted claims of the ’854 and ’577 patents, and (2) affirm the FID’s finding that those claims are invalid as obvious over Minato in combination with Uemura.

**(b) A Molding Comprising a Phosphor (Claim 1 of the ’854 and ’557 Patents)**

The FID finds that Minato discloses the “phosphor” limitation. The FID strikes Complainant’s arguments as to this limitation and refers back to its findings in connection with the ’529 patent. *See* FID at 172, 172 n.25, 194.

In its petition, Complainant levels the same criticism with respect to the “phosphor” limitation as it does in connection with the ’529 and ’464 patents. *See* Complainant’s Pet. at 35. Complainant, however, failed to identify this limitation as a disputed issue in its pre-hearing brief. Respondents, on the other hand, provided claim charts and explained that Complainant’s own expert (Dr. Schubert) admitted in deposition that “Minato discloses using a phosphor as part of the molded resin body that encapsulates the LED chips and the sapphire plate.” *See* RPB at 203-04 (citations omitted).

Thus, as discussed *supra* at section III(A)(4)(iii)(b), the FID properly determines that Minato discloses the “phosphor” limitation. Accordingly, the Commission has determined to affirm the FID’s findings as to this limitation.

**(c) Sapphire Growth Substrate (Claim 1 of the ’854 Patent)**

The FID makes no specific finding as to whether Minato discloses the “sapphire growth substrate” limitation but strikes Complainant’s arguments that Minato does not disclose that limitation for failure to raise them in the pre-hearing brief. *See* FID at 172 n.25; *see also* Order No. 42 at G.R. 11.2.

Complainant contends that “Dr. Lebby’s demonstrative admitted that Minato does not disclose a sapphire growth substrate, and Respondents reproduced that slide in their post-hearing

brief." Complainant's Pet. at 34 (citing RDX-3.51). The slide at issue (RDX-3.51), however, indicates that the "sapphire growth substrate" limitation is undisputedly obvious over Minato. Complainant was on notice of Respondents' obviousness contentions and evidence but failed to challenge that limitation. Instead, Complainant chose to dispute only certain limitations (cathode/anode) but not others (phosphor and sapphire growth substrate) in its pre-hearing brief.

The Commission finds that Respondents' pre-hearing contentions that Minato discloses the "sapphire growth substrate" limitation are sufficient and undisputed. *See* RPB at 208 (stating that "it was obvious to use LED chips that included a sapphire growth substrate as the 'known' blue LEDs"); *see also* RPB, Ex. D at 12-13, 15-16; *accord* Respondents' Resp. at 28; IA's Resp. at 26. On the other hand, Complainant waived any argument that the "sapphire growth substrate" limitation is not obvious over Minato based on Complainant's failure to raise the issue in its pre-hearing brief. *See* Order No. 42 (G.R. 11.2).

Thus, the Commission finds that Respondents satisfied their burden as to whether the "sapphire growth substrate" limitation is obvious over Minato. Accordingly, the Commission has determined to affirm and supplement the FID's obviousness findings over Minato as discussed above.

**(d) <u>Minato Conclusion</u>**

The Commission has determined to affirm with the supplemental analysis discussed above the FID's finding that the asserted claims of the '854 and '557 patents are obvious over Minato in combination with Uemura. As discussed *infra* section III(C), the Commission also finds that the secondary considerations of non-obviousness do not outweigh the findings of obviousness over Minato. The Commission, however, reverses the FID's finding that the asserted claims of the '854 and '557 patents are anticipated by Minato.

**PUBLIC VERSION**

**(iii) <u>Uemura or Tamaoki</u>**

The FID determines that Uemura does not anticipate claim 1 of the ’854 patent but that “Uemura renders claim 1 of the ’557 patent obvious, either alone or in combination with Minato.” FID at 173, 195. The FID also finds that Tamaoki anticipates claim 1 of the ’854 patent. *See id.* at 174. The Commission has determined to take no position with respect to the FID’s invalidity findings over Uemura (as to the ’557 patent) or Tamaoki (as to the ’854 patent). *See Beloit*, 742 F.2d at 1423.

**(iv) <u>Invalidity Conclusion</u>**

As explained above, the Commission has determined to affirm with modification the FID’s finding that asserted claims of the ’854 and ’557 patents are obvious over Yamazaki or Minato, but to reverse the FID’s finding that those claims are anticipated by Minato, and to take no position on the FID’s finding on invalidity over Uemura and Tamaoki.

**C. <u>Secondary Considerations</u>**

Secondary considerations of non-obviousness include “commercial success, long felt but unresolved needs, failure of others, etc.” *See KSR*, 550 U.S. at 406 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012) (“[E]vidence rising out of the so-called ‘secondary considerations' must always when present be considered en route to a determination of obviousness.”).[45] As explained below, the Commission has determined to affirm and

[45] *See also Transocean*, 699 F.3d at 1348-49 (“The establishment of a prima facie case . . . is *not* a conclusion on the ultimate issue of obviousness. . . . A party is also free to introduce evidence relevant to the fourth *Graham* factor, objective evidence of non-obviousness, which may be sufficient to disprove or rebut a prima facie case of obviousness.”) (citations omitted) (emphasis in original).

supplement the FID's findings as to secondary considerations. *See* FID at 30-34, 95, 98-99, 106, 108.

### 1. <u>Commercial Success</u>

The FID finds that "Complainant presented some evidence of the success of the Licensee Domestic Industry Products, and [the FID] give[s] th[e] [commercial success] factor weight commensurate with that evidence." FID at 30-31. Complainant does not dispute the FID's findings as to this factor but argues that they are wrongly premised on the FID's finding that the Accused Products and the Licensee DI Products are not covered by the asserted claims. *See* Complainant's Pet. at 56. Because the Commission agrees with and affirms with modification the FID's findings with respect to infringement and the technical prong of the domestic industry requirement, the Commission finds that this factor carries limited weight in favor of non-obviousness.

### 2. <u>Skepticism</u>

As to the skepticism of experts, the FID notes that the testimony of Dr. DenBaars shows that "at least some individuals in the field expressed skepticism," but the FID finds that his "testimony is uncorroborated, self-serving" and "give[s] it little weight." *See* FID at 31-32. Complainant argues that the FID errs in assigning little weight to the inventor's testimony, contending that the FID's finding is based on an erroneous interpretation of the case law. *See* Complainant's Pet. at 54-55.

The Commission disagrees with Complainant. The FID recognizes that "testimony from named inventors regarding skepticism from industry experts [has] supported a conclusion of nonobviousness." *See* FID at 31-32 (citing *Transocean*, 699 F.3d at 1352-53). In addition, while the FID notes that uncorroborated, self-serving testimony of an inventor must be treated

with skepticism, the FID does not find that uncorroborated testimony is *per se* insufficient. *See id.* (citing *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 968 (Fed. Cir. 2014)). Rather, the FID makes a credibility determination, and the Commission discerns no error in such determination. Thus, the Commission agrees that this factor carries limited weight in favor of non-obviousness.

**3. <u>Licensing</u>**

As to licensing, the FID finds that "Complainant's licensing evidence is of limited use in demonstrating non-obviousness," and "will be given moderate weight." FID at 32-33. The FID explains that "the bulk of the licenses appear to either directly or indirectly be a result of Complainant's enforcement campaign, instead of uncoerced interest in the Asserted Patents and their technology." *Id.* In addition, the FID notes that "the domestic industry licensees were making the Licensee Domestic Industry Products before they executed a license with Complainant." *Id.* at 32.

Complainant argues that the FID ignores the fact most of "the licensees have not been parties in any investigation nor otherwise been sued by Complainant for infringement." Complainant's Pet. at 54. As the FID finds, however, "most of the licenses were entered into after the enforcement campaign commenced." *See* FID at 32. Complainant also admits that its main licensee, "[ ]." *Id.* at 54; *accord* Respondents' Resp. at 45-46; IA's Resp. at 38.

The Commission finds that substantial evidence supports the FID's finding as to licensing revenues, and the Commission therefore agrees with the FID that this factor carries "moderate weight" in favor of non-obviousness.

### 4. <u>Simultaneous Invention</u>

As to simultaneous invention, the FID gives this factor some weight against non-obviousness. *See* FID at 33-34. Specifically, Respondents argued that the application leading to the Tanda[46] patent, which discloses all the features of the asserted claims of the '854 and '557 patents, was filed nearly a year before the earliest filing date of those patents. *Id*. at 33. Accordingly, Respondents argued, "this constitutes evidence that the steps needed to make the purported invention were within the ability of a [POSITA], and weighs in favor of a finding of obviousness with respect to those two patents." *Id*. The FID notes that "Complainant did not contest th[e] evidence of simultaneous invention ahead of or during the hearing." *Id.* Complainant does not deny its failure to contest the evidence as to Tanda but argues that the FID errs in giving this factor any weight. *See* Complainant's Pet. at 55.

The Commission finds that the record evidence supports the FID's finding that this factor should be given some weight against non-obviousness.

### 5. <u>Conclusion</u>

The Commission finds that the secondary consideration factors relating to commercial success, skepticism, and licensing weigh somewhat in favor of non-obviousness, but that simultaneous invention weighs somewhat against non-obviousness. On balance, the Commission finds that the secondary consideration factors do not outweigh the obviousness findings over Yamazaki or Minato alone or in combination with other prior art. *See Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1368 (Fed. Cir. 2008) ("Secondary considerations of nonobviousness . . . simply cannot overcome this strong *prima facie* case of obviousness."); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir.

---

[46] U.S. Patent Application Publication 2007/0139949 ("Tanda") (RX-850).

**PUBLIC VERSION**

2007) (finding substantial evidence of commercial success, industry praise, and long-felt need insufficient to overcome strong evidence of *prima facie* obviousness).

### D. Domestic Industry - Economic Prong

As stated *supra* note 29, the FID correctly notes that because the patent claims that Complainant relies upon for the technical prong are invalid, the domestic industry products are not protected by their respective patents, and therefore, Complainant cannot satisfy the domestic industry requirement. *See* FID at 201. However, the ID provides findings on the economic prong of the domestic industry requirement in case the Commission finds relevant patent claims valid and the technical prong satisfied. *See id.* The Commission has determined to review the FID's findings that Complainant has satisfied the economic prong of the domestic industry requirement, and on review, to take no position on those findings. *See Beloit*, 742 F.2d at 1423.

## IV. CONCLUSION

For the reasons set forth herein, the Commission has determined that Complainant has not established a violation of section 337 by the Respondents with respect to any asserted claim of the Asserted Patents. Accordingly, the investigation is terminated with a finding of no violation of section 337.

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: March 8, 2022

**CERTIFICATE OF SERVICE**

I, Lisa R. Barton, hereby certify that the attached document has been served via EDIS upon the Commission OUII Investigative Attorney and the following parties as indicated, upon the date listed below.

| Document | Security | Document Type | Official Rec'd Date | Title |
|---|---|---|---|---|
| 764894 | Public | Opinion, Commission | 03/08/2022 04:57 PM | Commission Opinion |

Service Date: March 09, 2022

/s/

Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

**CERTIFICATE OF SERVICE**

---

**On behalf of U.S. International Trade Commission :**

Jennifer Dienes
**OUII Investigative Attorney**
500 E Street, S.W.
Washington, D.C. 20436
Internal Service

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN FILAMENT LIGHT-EMITTING DIODES AND PRODUCTS CONTAINING SAME (II)** | **Investigation No. 337-TA-1220** |

**NOTICE OF COMMISSION DECISION TO REVIEW IN PART A FINAL INITIAL DETERMINATION; COMMISSION FINAL DETERMINATION FINDING NO VIOLATION OF SECTION 337; TERMINATION OF INVESTIGATION**

**AGENCY**: U.S. International Trade Commission.

**ACTION**: Notice.

**SUMMARY**: Notice is hereby given that the U.S. International Trade Commission has determined to review in part a final initial determination ("FID") of the presiding Acting Chief Administrative Law Judge ("ALJ"). On review, the Commission finds no violation of section 337 of the Tariff Act of 1930 ("section 337"), as amended, in this investigation. The investigation is terminated.

**FOR FURTHER INFORMATION CONTACT**: Houda Morad, Office of the General Counsel, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 708-4716. Copies of non-confidential documents filed in connection with this investigation may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov* . For help accessing EDIS, please email *EDIS3Help@usitc.gov*. General information concerning the Commission may also be obtained by accessing its Internet server at *https://www.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.

**SUPPLEMENTARY INFORMATION**: On October 5, 2020, the Commission instituted this investigation under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337 ("section 337"), based on a complaint filed by The Regents of the University of California ("Complainant"). *See* 85 FR 62761-62 (Oct. 5, 2020). The complaint, as supplemented, alleges a violation of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain filament light-emitting diodes and products containing the same by reason of infringement of certain claims of U.S. Patent Nos. 9,240,529 ("the '529 patent"); 9,859,464 ("the '464 patent"); 10,593,854 ("the '854 patent"); 10,644,213 ("the '213 patent"); and 10,658,557 ("the '557 patent") (collectively, "the Asserted Patents"). *See id.* The notice of investigation names the following respondents (collectively, "Respondents"): Home Depot Product Authority, LLC; Home Depot U.S.A., Inc.; and The Home Depot, Inc. of Atlanta, Georgia; General Electric Company of

Boston, Massachusetts; Consumer Lighting (U.S.) LLC, d/b/a GE Lighting of Cleveland, Ohio; Savant Systems, Inc. of Hyannis, Massachusetts ("Savant Systems"); Feit Electric Company, Inc. ("Feit") of Pico Rivera, California; Satco Products, Inc. of Brentwood, New York; IKEA Supply AG of Pratteln, Switzerland; IKEA U.S. Retail LLC of Conshohocken, Pennsylvania; and IKEA of Sweden AB of Almhult, Sweden (collectively, "IKEA"). *See id.* The Office of Unfair Import Investigations ("OUII") is also a party to the investigation. *See id.*

On November 5, 2020, the ALJ granted non-party Signify North America Corp.'s motion to intervene in this investigation. *See* Order No. 14 (Nov. 5, 2020), *unreviewed by* Comm'n Notice (Nov. 30, 2020). On November 16, 2020, the ALJ granted non-party Global Value Lighting LLC's motion to intervene in this investigation. *See* Order No. 15 (Nov. 16, 2020), *unreviewed by* Comm'n Notice (Dec. 8, 2020).

On June 29, 2021, the Commission terminated the investigation as to the '213 patent in its entirety; claim 9 of the '529 patent; claim 10 of the '464 patent; claims 2 and 6 of the '854 patent; and claim 2 of the '557 patent. *See* Order No. 37 (June 15, 2021), *unreviewed by* Comm'n Notice (June 29, 2021).

On September 16, 2021, the Commission terminated respondent Savant Systems from the investigation. *See* Order No. 47 (Aug. 27, 2021), *unreviewed by* Comm'n Notice (Sept. 16, 2021).

On November 19, 2021, the ALJ issued the FID finding no violation of section 337. Specifically, the FID finds that Complainant failed to establish infringement of the asserted claims of the remaining Asserted Patents by the Respondents. The FID also finds the asserted claims of the remaining Asserted Patents to be invalid. The ALJ further finds that the economic prong of the domestic industry requirement is satisfied as to all remaining Asserted Patents, but that the technical prong is not satisfied with respect to the '854 and '557 patents.

On December 3, 2021, Complainant filed a petition for Commission review of the FID. Complainant petitions for Commission review of the FID's findings, including, with respect to: (1) claim construction; (2) infringement; (3) invalidity for anticipation and/or obviousness under 35 U.S.C. § 102 or 103, respectively; and (4) the technical prong of the domestic industry requirement. On the same day, Feit, the other respondents, and OUII each filed contingent petitions for review of the FID, including, with respect to the economic prong of the domestic industry requirement. On December 13, 2021, the parties filed responses to each other's petition.

Having examined the record of this investigation, including the FID and the parties' submissions, the Commission has determined to review in part, and upon review, to affirm the FID's determination of no violation of section 337. Specifically, as explained in the Commission Opinion issued concurrently herewith, the Commission has determined to review and, on review, to: (1) affirm with modification the FID's claim construction findings with respect to the term "sapphire"; (2) affirm with modification the FID's non-infringement findings as to all remaining Asserted Patents; (3) affirm with modification the FID's findings on the technical prong of the domestic industry requirement as to all remaining Asserted Patents; (4) affirm with modification the FID's invalidity findings over Yamazaki (Japanese Patent Application Publication No. 2003-

249692 (RX-828)) or Minato (Japanese Patent No. JP 2001-126515 (RX-723)) as to all remaining Asserted Patents, except that the Commission has determined to reverse the FID's finding that the asserted claims of the '854 and '557 patents are anticipated by Minato; (5) take no position with respect to the FID's invalidity findings over Okamoto (Japanese Patent No. JP 2000-277808 (RX-720)), Uemura (U.S. Patent No. 6,310,364 (RX-779)) as a primary reference, and Tamaoki (U.S. Patent No. 6,961,190 (RX-724)); and (6) take no position as to the economic prong of the domestic industry requirement. The Commission adopts all findings in the FID that are not inconsistent with the Commission's determination.

The Commission's vote for this determination took place on February 16, 2022.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. 1337), and in part 210 of the Commission's Rules of Practice and Procedure (19 CFR part 210).

By order of the Commission.

Lisa R. Barton
Secretary to the Commission

Issued: February 16, 2022

**PUBLIC VERSION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN FILAMENT LIGHT-EMITTING DIODES AND PRODUCTS CONTAINING SAME (II)** | **INV. NO. 337-TA-1220** |

# INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND

Administrative Law Judge Clark S. Cheney

(November 19, 2021)

**Appearances:**

*For Complainant The Regents of the University of California:*

Evan H. Langdon and Joshua Rodriguez of Nixon Peabody LLP, of Washington, D.C.

Seth D. Ley, Shawn G. Hansen, Staci J. Riordan, and Vincent C. Capati of Nixon Peabody LLP, of Los Angeles, CA

Angelo J. Christopher and Paulina M. Starostka of Nixon Peabody LLP, of Chicago, IL

*For Respondent IKEA Supply AG, IKEA U.S. Retail LLC, and IKEA of Sweden AB:*

David F. Nickel, Susan Koegel, and Matthew N. Duescher of Foster, Murphy, Altman & Nickel, PC, of Washington, D.C.

Michael J. Bonella, Joseph R. Klinicki, Ross E. Alexander, Ryan Peddle, Aakash Patel, and Benjamin Chalfin, of Flaster Greenberg PC, of Philadelphia, PA

Kenneth E. Keller and Christopher E. Stretch of Pillsbury Winthrop Shaw Pitman LLP, of San Francisco, CA

Kecia J. Reynolds of Pillsbury Winthrop Shaw Pitman LLP, of Washington, D.C.

**PUBLIC VERSION**

*For Respondents The Home Depot, Inc., Home Depot U.S.A., Inc., and Home Depot Product Authority, LLC:*

Ryan K. Walsh and Partha H. Matalia of Jones Day, of Atlanta, GA

Rita J. Yoon and Jeffrey S. Messing of Jones Day, of Chicago, IL

Vishal V. Khatri and Yury Kalish of Jones Day, of Washington, D.C.

*For Respondents Feit Electric Company, Inc.:*

Jay H. Reiziss and Alexander P. Ott of McDermott Will & Emery LLP, of Washington, D.C.

Charles M. McMahon, Thomas M. DaMario, Colin J. Stalter, and Ewa A. Wojciechowska of McDermott Will & Emery LLP, of Chicago, IL

Kal K. Shah and Simeon Papacostas of Benesch, Friedlander, Coplan & Aronoff LLP, of Chicago, IL

*For Respondents General Electric Company and Savant Technologies LLC:*

Patrick J. McCarthy of Goodwin Procter LLP, of Washington, D.C.

Elain Herrmann Blais, Douglas J. Kline, Lana Shiferman, Christie Larochelle, Andrew McDonough, and Harrison Gunn of Goodwin Procter LLP, of Boston, MA

Autumn Soucy of Goodwin Procter LLP, of New York, NY

*For Respondent Satco Products, Inc.:*

Scott J. Bornstein, Joshua L. Raskin, Allan A. Kassenoff, Brian Prew, Giancarlo L. Scaccia, Jade Li-Yu Chen, and Kathryn E. Albanese of Greenberg Traurig, LLP, of New York, NY

Nicholas A. Brown of Greeneberg Traurig, LLP, of San Francisco, CA

Cyrus T. Frelinghuysen of Greenberg Traurig, LLP, of Washington, D.C.

Robert P. Lynn, Jr. of Lynn Gartner Dunne, LLP, of Mineola, NY

*For Intervenor Signify North America Corporation:*

Adam D. Swain of Alston & Bird LLP, of Washington, D.C.

Ross R. Barton and Karlee Wroblewski of Alston & Bird LLP, of Charlotte, NC

Darlena Subashi of Alston & Bird LLP, of New York, NY

**PUBLIC VERSION**

*For Intervenor Global Value Lighting LLC:*

Eric D. Hayes, P.C., Jay Emerick, Adam M. Janes, and Mario Avaldi of Kirkland & Ellis LLP, of Chicago, IL

Abigali Lauer Litow of Kirkland & Ellis LLP, of Washington, D.C.

Tiffany M. Knapp of Kirkland & Ellis LLP, of Boston, MA

**PUBLIC VERSION**

Table of Contents

I. Introduction ..... 2
A. Procedural History ..... 2
B. The Private Parties ..... 5
1. Complainant ..... 5
2. Respondents ..... 5
3. Intervenors ..... 6
C. The Asserted Patents ..... 7
1. U.S. Patent No. 9,240,529 ..... 7
2. U.S. Patent No. 9,859,464 ..... 8
3. U.S. Patent No. 10,593,854 ..... 8
4. U.S. Patent No. 10,658,557 ..... 9
D. The Technologies at Issue ..... 10
E. The Accused Products ..... 10
1. Representative Accused Products ..... 10
2. Metal Filament Products Do Not Infringe Any Asserted Patent ..... 21
F. The Domestic Industry Products ..... 22
1. SSLEEC Domestic Industry Products ..... 22
2. Licensee Domestic Industry Products ..... 23
II. Jurisdiction & Importation ..... 26
A. Subject Matter Jurisdiction ..... 26
B. Personal Jurisdiction ..... 26
C. Importation ..... 27
D. *In Rem* Jurisdiction ..... 29
E. Standing ..... 30
III. Level of Ordinary Skill in the Art ..... 30
IV. Secondary Considerations of Non-obviousness ..... 30
A. Commercial Success ..... 30
B. Skepticism of Experts ..... 31
C. Licensing ..... 32
D. Simultaneous Invention ..... 33
V. The '529 patent ..... 34
A. Claim Construction ..... 34

**PUBLIC VERSION**


B. Infringement ........ 34
1. Claim 1 ........ 34
2. Claim 6 ........ 56
3. Claim 8 ........ 59
C. Technical Prong of the Domestic Industry Requirement ........ 61
1. SSLEEC Domestic Industry Products ........ 62
2. Licensee Domestic Industry Products ........ 79
D. Validity ........ 86
1. Invalidity Arguments Based on the Prior Art ........ 86
2. Yamazaki (RX-0828) ........ 87
3. Minato (RX-0723) ........ 101
4. Okamoto (RX-0720) ........ 109
5. Uemura (RX-0779) ........ 118
VI. The ’464 patent ........ 123
A. Claim Construction ........ 123
B. Infringement ........ 123
1. Claim 1 ........ 123
2. Claim 7 ........ 124
3. Claim 9 ........ 126
C. Technical Prong of the Domestic Industry Requirement ........ 127
1. SSLEEC Domestic Industry Products ........ 127
2. Licensee’s Rigid Domestic Industry Products ........ 131
D. Validity ........ 138
VII. The ’854 patent ........ 139
A. Claim Construction ........ 139
B. Infringement ........ 139
1. Claim 1 ........ 139
C. Technical Prong of the Domestic Industry Requirement ........ 158
1. Rigid Domestic Industry Products ........ 159
2. Flexible Domestic Industry Products ........ 163
D. Validity ........ 167
1. Written Description ........ 167
2. Priority Date ........ 169
3. Yamazaki (RX-0828) ........ 170

4. Minato (RX-0723) ........ 172
5. Uemura (RX-0779) ........ 172
6. Tamaoki (RX-0724) ........ 173
7. Tanda (RX-0850) ........ 176
VIII. The ’557 patent ........ 178
A. Claim Construction ........ 178
B. Infringement ........ 178
1. Claim 1 ........ 179
C. Technical Prong of the Domestic Industry Requirement ........ 185
1. Claim 1 ........ 186
D. Validity ........ 190
1. Written Description ........ 190
2. Priority Date ........ 192
3. Yamazaki (RX-0828) ........ 192
4. Minato (RX-0723) ........ 194
5. Uemura (RX-0779) ........ 195
6. Tanda (RX-0850) ........ 196
IX. Public Trust (Feit) ........ 197
X. Patent Exhausion (IKEA) ........ 198
XI. Domestic Industry ........ 200
A. Effect of Invalidity Determinations ........ 201
B. Economic Prong of the Domestic Industry Requirement ........ 201
1. Findings of Fact Relating to the Domestic Industry ........ 202
2. Plant and Equipment ........ 207
3. Labor and Capital ........ 212
4. Engineering, Research and Development, and Licensing ........ 216
5. Allocation ........ 227
XII. Conclusions of Law ........ 230
XIII. Recommended Determination on Remedy and Bond ........ 231
A. Limited Exclusion Order ........ 232
B. Cease and Desist Order ........ 233
C. Bond During Presidential Review ........ 236
XIV. Initial Determination on Violation ........ 237

XV. Order .......... 238

**PUBLIC VERSION**

## Table of Abbreviations

| | |
|---|---|
| **CC Order** | Order No. 19 issued on March 31, 2021 |
| **CC Tr.** | Transcript of claim construction hearing held September 17, 2020 |
| **CDX** | Complainant's demonstrative exhibit |
| **CIB** | Complainant's initial post-hearing brief |
| **CPB** | Complainant's pre-hearing brief |
| **CPX** | Complainant's physical exhibit |
| **CRB** | Complainant's responsive post-hearing brief |
| **CX** | Complainant's exhibit |
| **Dep.** | Deposition |
| **JX** | Joint Exhibit |
| **LED** | Light-emitting diode |
| **RDX** | Respondents' demonstrative exhibit |
| **RIB** | Respondents' initial post-hearing brief |
| **RPB** | Respondents' pre-hearing brief |
| **RPX** | Respondents' physical exhibit |
| **RRB** | Respondents' responsive post-hearing brief |
| **RRP** | Reduced risk product |
| **RX** | Respondents' exhibit |
| **SSC** | Seoul Semiconductor |
| **SSLEEC** | UC Santa Barbara's Solid State Lighting and Energy Electronic Center |
| **Stip.** | Stipulation of the parties |
| **TIA** | UCSB Office of Technology and Industry Alliances |
| **Tr.** | Transcript |

**PUBLIC VERSION**

| | |
|---|---|
| **UCSB** | University of California, Santa Barbara |

**PUBLIC VERSION**

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

| | |
|---|---|
| **In the Matter of**<br><br>**CERTAIN FILAMENT LIGHT-EMITTING DIODES AND PRODUCTS CONTAINING SAME (II)** | **INV. NO. 337-TA-1220** |

**INITIAL DETERMINATION ON VIOLATION OF SECTION 337 AND RECOMMENDED DETERMINATION ON REMEDY AND BOND**

Administrative Law Judge Clark S. Cheney

(November 19, 2021)

Pursuant to the Notice of Investigation, 85 Fed. Reg. 62761 (October 5, 2020), and 19 C.F.R. §§ 210.10(b), 210.42(a)(1)(i), this is the final initial determination in the matter of *Certain Filament Light-Emitting Diodes and Products Containing Same (II)*, Investigation No. 337-TA-1220.

For the reasons stated herein, I have determined that no violation of section 337 of the Tariff Act of 1930, as amended, has occurred in the importation into the United States and the sale within the United States after importation of certain light-emitting diodes and products containing the same based on infringement of U.S. Patent No. 9,240,529 (“the ’529 patent”); U.S. Patent No. 9,859,464 (“the ’464 patent”); U.S. Patent No. 10,593,854 (“the ’854 patent”); and U.S. Patent No. 10,658,557 (“the ’557 patent”).

**PUBLIC VERSION**

# I. INTRODUCTION

## A. Procedural History

On August 31, 2020, complainant The Regents of the University of California ("Complainant" or "The Regents") filed a complaint alleging violations of section 337 based on the importation into the United States, the sale for importation, and the sale within the United States after importation of certain light-emitting diodes and products containing the same. 85 Fed. Reg. 62761 (Oct. 5, 2020); *see* EDIS Doc. ID 718435.

On August 31, 2020, the Commission instituted Investigation No. 337-TA-1220 to determine:

> [W]hether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) infringement of one or more of claims 1, 6, 8, and 9 of the '529 patent; claims 1, 7, 9, and 10 of the '464 patent; claims 1, 2, and 6 of the '854 patent; claims 1 and 2 of the '213 patent; and claims 1 and 2 of the '557 patent; and whether an industry in the United States exists as required by subsection (a)(2) of section 337.

85 Fed. Reg. 62761 (October 10, 2020) ("Notice of Investigation").

The plain language description of the accused products is "light bulbs containing filament LEDs and lighting products containing filament LEDs." Notice of Investigation; *see also* 19 C.F.R. § 210.10(b)(1).

The Notice of Investigation named the following parties as respondents: General Electric Company, Consumer Lighting (U.S.) LLC, d/b/a GE Lighting ("GE"); Savant Systems, Inc.; Home Depot Product Authority, LLC, Home Depot U.S.A., Inc., The Home Depot, Inc. (collectively, "Home Depot"); Feit Electric Company, Inc. ("Feit"); Satco Products, Inc. ("Satco"); IKEA Supply AG, IKEA U.S. Retail LLC, IKEA of Sweden AB (collectively, "IKEA"). *Id.* at 62762. I subsequently terminated Savant Systems, Inc. from the investigation for good cause. *See* Order No. 47 (August 27, 2021), *not reviewed*, EDIS Doc. ID 751838.

Signify North America Corporation ("Signify") and Global Value Lighting LLC ("GVL"), suppliers to some of the named respondents, intervened in the investigation. *See* Order No. 14 (granting Signify's motion to intervene), *not reviewed* EDIS Doc. ID 726654; Order No. 15 (granting GVL's motion to intervene), *not reviewed* EDIS Doc. ID 727475.

The Commission Investigative Staff ("Staff") is a party to this investigation. *See* Notice of Investigation at 62762.

In accordance with the procedural schedule issued as Order No. 10 (Oct. 23, 2020), the parties submitted a joint chart of proposed claim constructions on February 11, 2021. Under the procedural schedule, the parties submitted opening claim construction briefs on February 25, 2021, and responsive claim construction briefs on March 11, 2021. On March 25, 2021, I convened a claim construction hearing. I subsequently issued Order No. 39 ("CC Order") on June 15, 2021, construing certain disputed claim terms.

On May 13, 2021, Respondents moved for summary determination on various grounds. Motion Docket Nos. 1220-027. That motion remains pending.

On June 15, 2021, I terminated this investigation in part based on withdrawal of the complaint with respect to the entirety of the '213 patent, claim 9 of the '529 patent; claim 10 of the '464 patent; claims 2 and 6 of the '854 patent; and claim 2 of the '577 patent. Order No. 37 (June 15, 2021), *not reviewed*, EDIS Doc. ID 745712 (June 29, 2021). The remaining patents and claims at issue are claims 1, 6, and 8 of the '529 patent; claims 1, 7, and 9 of the '464 patent; claim 1 of the '854 patent; and claim 1 of the '577 patent.

To narrow the issues for the evidentiary hearing, Complainant and various Respondents entered stipulations regarding undisputed facts. *See* JX-0016 (Joint Stipulation of Material Facts Relating to Importation and Inventory between Complainant and Respondent Satco) ("Satco

Import. Stip."); JX-0017 (Stipulation Between Complainant The Regents of the University of California and Respondent Satco Products, Inc. on Representative Products for Proof of Infringement) ("Satco Representative Products Stip."); JX-0018 (Joint Stipulation Relating to Signify's Importation, Inventory, and Sales to The Home Depot Respondents between The Regents and Signify) ("Signify Import. Stip."); JX-0019 (Joint Stipulation of Material Facts Relating to Importation and Inventory between The Regents and Feit) ("Feit Import. Stip."); JX0020 (Joint Stipulation Relating to Global Value Lighting LLC Importation and Inventory between The Regents and GVL) ("GVL Import. Stip."); JX-0021 (Joint Stipulation of Material Facts Relating to Importation and Inventory between The Regents and GE Lighting) ("GE Import. Stip."); JX-0022 (Joint Stipulation Between The Regents & Home Depot Regarding Authenticity) ("Home Depot Authenticity Stip."); JX-0023 (Joint Stipulation Regarding Non-Accused Products between The Regents and Feit)("Feit Non-Accused Products Stip."); JX-0044 (Joint Stipulation of Material Facts Relating to Licensed Products Between The Regents and Home Depot) ("Home Depot Fact Stip."); JX-0051 (Joint Stipulation of Material Facts Relating to Importation, Inventory, and Non-Accussed Products Between Home Depot & Regents) ("Home Depot. Import Stip.").

On July 2, 2021, I suspended the procedural schedule to postpone the evidentiary hearing at the request of Complainant due to exigent circumstances. Order No. 43. I held a prehearing conference on August 27, 2021, and convened the evidentiary hearing on August 30, 2021. The evidentiary hearing ended on September 3, 2021. *See* Tr. at 1-1361.

Because of the rescheduled hearing, I extended the target date for completion of the investigation to March 14, 2022. Order No. 48. I subsequently extended the target date for

completion of the investigation by one additional week to March 21, 2022, making this initial determination due no later than November 19, 2021. Order No. 50.

### B. The Private Parties

#### 1. Complainant

Complainant The Regents of the University of California ("the University") is a California constitutional corporation having an address of 1111 Franklin Street, Oakland, California 94607. CIB at 3; Complaint at ¶ 9. Complainant is the assignee and sole owner of the patents asserted in this investigation. *See* JX-0001 ("the '529 patent"), JX-0002 ("the '464 patent"), JX-0003 ("the '854 patent"), JX-0005 ("the '557 patent").

#### 2. Respondents

##### a) Feit

Respondent Feit Electric Company, Inc. ("Feit") is a corporation organized under the laws of California and maintains its principal place of business at 4901 Gregg Road, Pico Rivera, CA 90660. *See* Compl. ¶ 27 and Ex. 10.

##### b) Home Depot

Respondent Home Depot Product Authority, LLC, is a limited liability company organized under the laws of Georgia and maintains its principal place of business at 2455 Paces Ferry Road, Atlanta, GA 30339. Respondent Home Depot U.S.A., Inc., is a corporation organized under the laws of Delaware and maintains its principal place of business at 2455 Paces Ferry Road, Atlanta, Georgia 30339. Respondent The Home Depot, Inc., is a corporation organized under the laws of Delaware and maintains its principal place of business at 2455 Paces Ferry Road, Atlanta, Georgia 30339.

##### c) IKEA

Respondent IKEA Supply AG is a corporation organized under the laws of Switzerland and maintains its principal place of business at Griissenweg 15, CH-4133 Pratteln, Switzerland. Respondent IKEA U.S. Retail LLC is a limited liability company organized under the laws of Virginia and maintains its principal place of business at 420 Alan Wood Road, Conshohocken, Pennsylvania 19428. Respondent IKEA of Sweden AB is a corporation organized under the laws of Sweden. Ex. 25. IKEA of Sweden AB maintains its principal place of business at Tulpanvagen 8 Almhult, 343 34 Sweden.

#### d) GE

Respondent Consumer Lighting (U.S.) LLC d/b/a GE Lighting is a limited liability company organized under the laws of Delaware and maintains its principal place of business at 1975 Noble Road, East Cleveland, OH 44112. Respondent General Electric Company is a corporation organized under the laws of New York and maintains its principal place of business at 5 Necco Street, Boston, MA, 02210.

#### e) Satco

Respondent Satco Products, Inc. is a corporation organized under the laws of New York and maintains its principal place of business at 110 Heartland Boulevard, Brentwood, NY 11717.

### 3. Intervenors

Because the companies that intervened in this investigation are suppliers to some of the respondents and have aligned interests with their customers, the term "Respondents" in this final initial determination includes the following intervenors.

#### a) Signify

Signify North America Corp. is a corporation organized under the laws of Delaware and maintains its principal place of business at 200 Franklin Square Drive, Somerset, New Jersey, 08873. RPB at 7.

#### b) GVL

Global Value Lighting LLC is a corporation organized under the laws of Delaware and maintains its principal place of business at 1350 Division Road, Suite 204, West Warwick, RI, 02893. RPB at 6-7.

### C. The Asserted Patents

Complainant asserts four patents in this investigation: the ’529 patent, the ’464 patent, the ’854 patent, and the ’557 patent (collectively, the “Asserted Patents”).

#### 1. U.S. Patent No. 9,240,529

The ’529 patent, titled “Textured Phosphor Conversion Layer Light Emitting Diode” issued on January 19, 2016, and names Natalie Fellows DeMille, Steven P. DenBaars, and Shuji Nakamura as inventors. ’531 patent at Cover. The ’529 patent issued from Application No. 14/483,501, filed on September 11, 2014, and claims a priority date of November 15, 2006. *Id.* The’529 patent is assigned to Complainant. *Id*.

Complainant asserts claims 1, 6, and 8 of the ’529 patent, which are reproduced below.

1. A light emitting device, comprising:

    an LED chip emitting light at a first wavelength, wherein the emitted light is extracted from both front and back sides of the LED chip; a lead frame to which the LED chip is attached, wherein the LED chip resides on or above a transparent plate in the lead frame that allows the emitted light to be extracted out of the LED chip through the transparent plate in the lead frame; and a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength.

6. The device of claim 1, wherein the transparent plate is roughened, textured or patterned to increase light extraction from the LED chip through the transparent plate in the lead frame.

8. The device of claim 1, wherein the LED chip includes a transparent substrate and the transparent substrate is adjacent the transparent plate.

’529 patent at claims 1, 6, 8.

### 2. U.S. Patent No. 9,859,464

The ’464 patent, titled “Lighting [sic] Emitting Diode With Light Extracted From Front And Back Sides Of A Lead Frame,” issued on January 2, 2018, and names Natalie Fellows DeMille, Steven P. DenBaars, and Shuji Nakamura as inventors. ’464 patent at Cover. The ’464 patent issued from Application No. 14/757,937, filed on December 23, 2015, which is a continuation of Application No. 14/483,501, filed on September 11, 2014, which issued as the ’529 patent. *Id.* The ’464 patent claims priority to November 15, 2006. *Id.* The ’464 patent is assigned to Complainant. *Id.*

Complainant asserts claims 1, 7, and 9 of the ’464 patent, which are reproduced below.

1. A light emitting device, comprising:

    a lead frame including a transparent plate; and

    an LED chip, attached to the lead frame, for emitting light;

    wherein the LED chip resides on or above the transparent plate and at least some of the light emitted by the LED chip is transmitted through the transparent plate; and

    wherein at least a portion of the light emitted by the LED chip is extracted from a front side of the lead frame and another portion of the light emitted by the LED chip is extracted from a back side of the lead frame.

7. The device of claim 1, wherein the transparent plate is roughened, textured or patterned to increase transmission of the light through the transparent plate.

9. The device of claim 1, wherein the LED chip includes a transparent substrate positioned adjacent the transparent plate.

’464 patent at claims 1, 7, 9.

### 3. U.S. Patent No. 10,593,854

The ’854 patent, titled “Transparent Light Emitting Device with Light Emitting Diodes,” issued on March 17, 2020, and names Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu as inventors. ’854 patent at Cover. The ’854 patent issued from a series of continuation

applications stretching back to U.S. Provisional Application No. 60/869,447 ("the '447 provisional"), which was filed on December 11, 2007. *Id.* The '854 patent is assigned to Complainant. *Id*.

Complainant asserts claim 1 of the '854 patent, which is reproduced below.

> 1. A light emitting device, comprising:
>
> a transparent surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;
>
> at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and
>
> a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

'854 patent at claim 1.

#### 4. U.S. Patent No. 10,658,557

The '557 patent, titled "Transparent Light Emitting Device with Light Emitting Diodes," issued on May 19, 2020, and names Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu as inventors. '557 patent at Cover. The '557 patent issued from a series of continuation applications stretching back to the '447 provisional, which was filed on December 11, 2007. *Id.* The '557 patent is assigned to Complainant. *Id*.

Complainant asserts claim 1 of the '557 patent, which is reproduced below.

> 1. A light emitting device, comprising:
>
> a sapphire plate, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical

> connection between the light emitting device and a structure outside the light emitting device;
>
> a plurality of III-nitride light emitting diode (LED) comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate; and
>
> a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

’854 patent at claim 1.

### D. The Technologies at Issue

The Asserted Patents are from two different patent families, which correspond to two different case numbers used internally at the University of California: case number 2007-270 comprises the ’529 and ’464 patents and case number 2007-282 comprises the ’557 and ’854 patents. Tr. (DenBaars) at 104:9-105:1; *see also id*. (Englander) at 401:23-402:3. Both patent families relate to transparent LED technology. Tr. (DenBaars) at 101:24-102:12. The Asserted Patents generally disclose placing a transparent LED chip on a transparent plate or surface that has been optimized for light extraction. *Id*. at 108:14-109:6.

### E. The Accused Products

The Accused Products are filament LEDs with ceramic submounts, *see* CX-2213C.0001 (“Accused Rigid Products”), and filament LEDs with flexible (polyimide) surfaces, *see* CX-2213C.0004, (“Accused Flexible Products”). CIB at 8.

#### 1. Representative Accused Products

Complainant has accused more than 3,000 LED bulb models of infringement in this investigation. RRB at 10. Complaint’s evidence at the hearing, however, compared only a little over a dozen accused models to each element of the asserted patent claims. Complainant argues

that the models it analyzed at the hearing are representative of the other Accused Products and that the hearing evidence is sufficient to conclude that all accused models infringe. CIB at 8-9.

The following are Complainant's purportedly representative Accused Products:

| Accused Rigid Product Name | Supporting Exhibits |
|---|---|
| **Feit** | |
| Feit Vintage ST19 | CX-0203 (Report), CPX-0008 (Specimen) |
| Feit T8 | CX-0764 (Report), CPX-0011 (Specimen) |
| Feit A15 | CX-0765 (Report), CPX-0010 (Specimen) |
| [redacted] Filament LED | CX-0766C (Report), CPX-0012C (Specimen) |
| **GE** | |
| GE Refresh | CX-0200 (Report), CPX-0001 (Specimen) |
| GE Relax | CX-0693 (Report), CPX-0005 (Specimen) |
| GE Basic | CX-0694 (Report), CPX-0003 (Specimen) |
| Great Value | CX-0768 (Report), CPX-0004 (Specimen) |
| **Home Depot/GVL/Signify** | |
| Ecosmart ST19/ GVL/ '737 SKU | CX-0202 (Report), CPX-0006 (Specimen) |
| Philips ST19 | CX-0179 (Report), CPX-0013 (Specimen) |
| **IKEA** | |
| IKEA SILLBO LED 370 lm | CX-0767C (Report), CPX-0022 (Specimen) |
| IKEA SILLBO LED 140 lm | CX-0205 (Report), CPX-0020 (Specimen) |
| IKEA Ryet | CX-0206 (Report), CPX-0021 (Specimen) |
| **Satco** | |
| Satco S29876 (representative of Satco S11361 and S11353) | CX-0207 (Report), CPX-0015 (Specimen) |

Tr. (Schubert) at 611:4-19; CX-2213C.001.

| Accused Flexible Product Name | Supporting Exhibits |
|---|---|
| **Feit** | |
| Feit Vintage ST19 Dimmable | CX-0201 (Report), CPX-0009 (Specimen) |
| **GE** | |
| GE Vintage A19 | CX-0208 (Report), CPX-0002 (Specimen) |
| **Home Depot/GVL/Signify** | |
| Philips A50 | CX-0210 (Report), CPX-0014 (Specimen) |
| **Satco** | |
| Satco S9966 (representative of Satco S22433) | CX-0207 (Report), CPX-0015 (Specimen) |

Tr. (Schubert) at 615:9-17; CX-2213C.0004. Complainant's expert witness Dr. Schubert showed slides describing the larger product groups that these examples purportedly represent. CX-2213C.006-.019.

To meet its burden of proving infringement, Complainant must show by a preponderance of evidence that the products it examined and specifically compared to the claims are representative of other products. *Certain Semiconductor Devices, Semiconductor Device Packages, and Products Containing Same*, Inv. No. 337-TA-1010, Order No. 77 at 9 (March 15, 2017) (EDIS Doc. No. 609297), *affirmed with modifications to citations*, Notice (April 14, 2017) (EDIS ID 608676).

Complainant's expert Dr. Schubert opined that the products listed in the slides above were representative of other unanalyzed products under two theories: (1) a commodity theory, and (2) a supplier theory. Tr. (Schubert) at 746:5-9, 789:19-25. As explained below, the evidence does not support a conclusion that all accused products have materially identical structures as the purportedly representative products Complainant discussed at the hearing.

**a. Commodity Theory**

Complainant's commodity theory argues that filament LED bulbs are commodities that are identical in all respects material to this investigation. Under this theory, any rigid filament product is representative of any other rigid filament product and any flexible filament product is representative of any other flexible filament product, regardless of filament supplier. Tr. (Schubert) at 880:12-881:3. Complainant cites four categories of evidence to support this conclusion, which I evaluate in turn below.

**i. Satco Stipulation**

Satco entered into a stipulation with Complainant during the discovery phase of this investigation to avoid certain discovery. *See* JX-0017. The Satco stipulation stipulates that "one

specific Satco product is representative of all Satco products that have a rigid filament, no matter who makes those filament products" and that all Satco flexible filament products are represented by one specific flexible Satco product. Tr. (Schubert) at 746:11-14, 753:3-10, 792:6-10.

Complainant's expert Dr. Schubert opined that the Satco stipulation is evidence of a truism across the filament LED industry that "one product is representative for all products *made by different manufacturers*." *Id.* at 746:14-17 (emphasis added). The weakness of such a conclusion is apparent on its face. Satco made no representation in the stipulation that any LED filament made by any manufacturer has the same structure as the LED filaments Satco buys for its products. *See* JX-0017; Tr. (Schubert) at 865:17-866:18 (Satco stipulation does not mention any other Respondent or Intervenor). At best, the stipulation indicates that Satco obtains filaments that have certain similar characteristics that suit Satco's purposes. It does not logically flow from that fact that all filament LEDs made by Satco's suppliers are the same, let alone that all filaments in the industry are the same. If anything, the Satco stipulation cuts against a presumption that LED filament structures are the same regardless of the supplier because the stipulation itself admits that Satco products use two different kinds of filaments—rigid and flexible—that are not representative of each other. *See* JX-0017 (noting that flexible and rigid products are not representative of one another).

**ii. Uniformity of Design**

Complainant next argues that "great similarities" among a "large number of light bulbs" show that the products discussed at the hearing are representative of the thousands of other filament LEDs accused in this investigation.[1] Tr. (Schubert) at 746:18-20. Complainant's expert witness

[1] Differences between the products were observed but deemed irrelevant to claim features. Tr. (Schubert) at 751:2-19.

**PUBLIC VERSION**

Dr. Schubert testified he examined more than 200 filament LED products, and in his opinion they all had a transparent plate or surface, or a sapphire plate. CX-2082; Tr. (Schubert) at 616:3-617:10, 750:3-21, 808:7-16. He also opined that each examined product had an LED chip; a lead frame; an anode and cathode; a roughened, textured, or patterned transparent plate; and a molding comprising a phosphor. Tr. at 750:3-21. Dr. Schubert further testified that the products he examined emit light at a first wavelength; emit light towards the front and back sides of the LED chip; extract light from the front and back side of the LED; and extract light through the transparent plate or surface, or through the sapphire plate. *Id.* Dr. Schubert concluded from these observations that the Accused Products are commodities with no differences relevant to the asserted claims. *Id*. at 750:22-751:1.

The main evidence cited in support of Dr. Schubert's testimony is a chart containing comments about 200-plus filament LED products, shown in CX-2082. CIB at 10; Tr. (Schubert) at 616:3-617:10, 808:7-16. The chart describes characteristics like uniformity of light intensity, uniformity of color, and color temperature, but it does not address many structural characteristics recited in the asserted claims. *Id*. at 616:12-23. For example, Dr. Schubert observes that in the products he examined, "Light is emitted from the populated side (front side) as well as the unpopulated side (back side)." While a structure having a "transparent plate" might emit light from both sides, so also might a non-sapphire semi-opaque plate. The later would not satisfy any claims asserted in this investigation.

Other structures required by the claims make no appearance in CX-2082, including the location of a transparent plate in a "lead frame" ('529 patent claim 1; '464 patent claim 1), a "phosphor" ('529 patent claim 1; '854 patent claim 1; '557 patent claim 1), a "roughened, textured or patterned" surface ('529 patent claim 6; '464 patent claim 7); a transparent substrate positioned

adjacent the transparent plate ('464 patent claim 9); and an LED in mechanical communication with the transparent surface ('854 patent claim 1);

Dr. Schubert's methods leading to CX-2082 could not have identified these and other features critical to the asserted claims. No model-specific specifications or diagrams of the Accused Products in CX-2082 exist in the record. Dr. Schubert did not take apart the devices in CX-2082, so he could not know the characteristics of the LED chips, details about the anode and the cathode, whether the plate was sapphire, and whether the plate was roughened, textured, or patterned. Tr. (Schubert) at 806:15-23, 807:13-21, 808:17-21, 886:1-888:13.

In sum, Dr. Schubert's observations in CX-2082 do not show that the products he analyzed are uniform with respect to features relevant to the asserted claims. And they certainly do not show that thousands of other products that Dr. Schubert never saw or analyzed necessarily have the same features material to the asserted claims.

#### iii. Corporate Testimony

Complainant also relies on testimony from employees of GE, Feit, IKEA, Home Depot, Signify, and GVL to show that the products Complainant discussed at the hearing are representative of other Accused Products. CIB at 10-12. As discussed below, this testimony tends to show only that certain light output characteristics have some degree of commoditization, not that the structures relevant to infringement have been commoditized.

First, Complainant argues that each "tech lamp" number in GE's product line can include filament LEDs from multiple suppliers that are expected to *perform* the same regardless of source. CIB at 10. Complainant extrapolates from this that any filament assigned the same tech lamp number by GE has the same relevant structure as any other in the same group. *Id*. But this evidence actually shows that the specific *structural* features claimed in the Asserted Patents are not considered by GE to be material. Indeed, GE's witness explained that GE categorizes devices by

the bulb's outer dimensions, the type of bulb base, whether the bulb is clear or coated, wattage consumed, light output, color of the light output, and life rating. JX-0029, 65:18-16. Notably, Complainant failed to demonstrate how any of these characteristics are in any way tied to the claimed structures. *See id.* at 72:16–73:14.

Next, Complainant continues on in the same, wrong, direction, by noting that Feit does not know the identity of its filament LED suppliers. CIB at 11. However, as with GE, Feit "normally purchase[s] a product for the product, not for the components." JX-0024, 61:20-3. Feit has specifications "on the package, you know, lumens, watts"— the characteristics relevant to the performance of the bulb. *Id*. So long as the filament LED can meet these specifications, it does not matter to Feit what structural configuration it has. The Feit evidence does not show that all filament LEDs have a commoditized *structure*.

Complainant repeats this logical error with respect to Home Depot ("What matters is 'the performance of the bulb[,] not [the] individual components"), GVL ("Price, performance, and aesthetics matter… Performance is tested at the level of the finished product, not the filament LED level"), and Signify ("Signify 'doesn't specify any components or supply chain of the components'… it 'specifies at the … performance level'"). CIB at 11. Complainant similarly argues that IKEA expects its products to perform the same, regardless of the source of the filament and has its vendors certify its products at the bulb, not the filament level. CIB at 11-12.

While this testimony shows that filament LEDs may be commoditized for purposes of the end product's *performance* or light output, Complainant has presented no evidence that common performance characteristics necessarily result from common structural configurations, and specifically from the unique structural arrangements recited in the asserted claims.

### iv. Dr. Schubert's Inconsistent Testimony Undermines His Commodity Theory

When questioned by Complainant's counsel, Dr. Schubert testified that, based on his commodity theory, "any rigid filament product would be representative of any other rigid filament product . . . regardless of the LED filament supplier." Tr. at 880:12-19; *see also id.* at 746:3-17. But on cross-examination, Dr. Schubert was confronted with two different passages from his prior deposition testimony in which he declined to draw such a sweeping conclusion:[2]

```
      Q.    Okay.  If we could pull up that deposition at
page 395, lines 19 through 23, you were asked:  "Is it your
opinion that filaments made by one filament manufacturer
are representative of filaments made by a different
filament manufacturer?"
            And you answered:  "No."
            Isn't that right?
      A.    Correct.
```

*Id.* at 867:9-20.

```
      Q.    Sir, you were deposed -- let's go back to your
deposition, page 372.  This is your May 11th, 2021
deposition.  If we could go to page 372, lines 19 through
24.
            You were asked:  "Is it your position that
because you have concluded let's say one GE product or one
Satco product infringes, that demonstrates infringement as
against all Respondents and Intervenors?"
            And did you testify in response to that
question:  "Answer:  No."
      A.    That is correct.
```

[2] Dr. Schubert's testimony that the [redacted] filament LEDs are interchangeable only with respect to Feit products also contradicts his commodity theory. Tr. (Schubert) at 882:21-883:21.

*Id*. at 868:4-14.

Dr. Schubert's equivocal testimony undermines the credibility of his opinion that the LED filaments in this investigation are commodities that can be treated similarly for all purposes material to the patent infringement analysis. I therefore give Dr. Schubert's opinion on this point little weight.

**v. Conclusion**

In sum, Complainant's commodity theory stretches the Satco stipulation and the scant record evidence too far, without logical and factual basis. Complainant has not met its burden to show that the products Dr. Schubert described at the hearing are commodities representative of all Accused Products in all material ways. *See Spansion, Inc.*, 629 F.3d at 1350 (complainant bears the burden of showing that its representative product grouping is justified).

**b. Supplier Theory**

Complainant also argues that any filament from one supplier is materially identical to all other filaments from the same supplier. CIB at 12-16. Complainant's supplier theory of representativeness is based on the "analysis of documents received from suppliers" who were not named as respondents in this investigation, including a Samsung document (CX-2031C), a Bridgelux exhibit (CX-1678C), and various documents from suppliers Refond, Intematix, [redacted] [redacted], and [redacted].[3] *Id*. As discussed below, these documents do not support the sweeping conclusions advanced by Complainant.

[3] Complainant also cites to a handful of purported OSRAM documents as proof that all OSRAM filaments in Accused Products are the same. *See* CIB 12-14 (citing CX-1589, CX-1590, and CX-1591). However, the documents Complainant cites were never admitted into the evidentiary record and I decline to consider them.

With respect to the Samsung document, Complainant's expert witness Dr. Schubert reasoned that because "[t]here was only one type of filament LED" in that document, "all Samsung products" in the Accused Products are the same. CIB at 12 (citing CX-2031C and Tr. (Schubert) at 746:23-747:3). However, Dr. Schubert did not consider that other portions of the same Samsung document describe significant variations in Samsung filament structures, including the option to have a ceramic substrate, a sapphire substrate, a linear filament, a flexible filament, and varying filament lengths. *Compare* CX-2031C *with* Tr. (Schubert) at 883:23-884:2. At least five times the document says Samsung makes "customized designs" of filaments "per customer request" or "based on customer bulb designs." *See, e.g.*, CX-2031C.0003. In view of this record, I find Complainant has not shown that all Accused Products known to have a Samsung filament have the same relevant structure.

Dr. Schubert cursorily testified that the Bridgelux exhibit "revealed the same" conclusion as the Samsung exhibit, namely that all Bridgelux filaments in the Accused Products have the same structure. Tr. (Schubert) at 747:12-13; *see* CX-1678C. However, the exhibit itself tells a different story. The exhibit appears to be a conglomeration of different data sheets for different products, including a .7 W filament, a 1.1 W filament, a 1.5 W filament, a 1.4 W filament, and a 1.26 W filament. CX-1678C at footers. The exhibit demonstrates that filaments within the same "Product Family" can have different components to produce different color temperatures of light. CX-1678C.0039. The data sheets also explain the labeling convention Bridgelux uses for its filaments. According to that convention, products can also have different structures as indicated by different "Length" and different "Version" attributes. *Compare, e.g.*, CX-1678C.0036 *with id.* .0051. Some products have 24 "chips," some 25, some as few as 13, some as many as 50. *See,*

*e.g.*, *id*. at .0011, .0027, .0043, .0058. Dr. Schubert's one sentence conclusion of similarity cannot be justified in light of these disclosures in the exhibit.

Complainant cites two Refond data sheets, but no witness discussed them at the trial. CIB at 15 (citing CX-1647C; CX-1712C). The images of the two Refond filaments in those documents are not the same. *Compare, e.g.*, CX-1647C.0004, Fig. 1-2 (no layers), *with* CX-1712C.0004, Fig. 1-2 (layers). And neither data sheet shows the same structural details as are shown for the part Complainant x-rayed. *Compare id*. *with* CX-0693, slides 9 and 10. Like the Bridgelux data sheets, the Refond data sheets do not show how LEDs are positioned in relation to a plate, nor do they show that all Refond filaments in the Accused Products are materially identical.

With respect to Intematix, [redacted] [redacted], and [redacted], Complainant again argues that any Accused Product filament from one of those suppliers is materially identical to any other from the same company. CIB at 15-16. But again, none of the cited documents support that conclusion, and no witness testified to that effect.

Complainant's supplier theory also fails to account for Respondents' affirmative evidence of differences in products from a single supplier. For instance, Feit adduced evidence showing its products have differing: (1) LED reflective layers, which are material to the limitations about "extract[ing]" light found in all asserted claims (Tr. 1129:1–14; CX-0764.28; CX-0765.28); (2) submount compositions, which are material to the "transparent" and "sapphire" limitations found in all asserted claims (Tr. 1129:15–24; CX-0203.33; CX-0766.33); (3) phosphor applications, which are material to the "molding" limitations in the '854 and '557 patent claims (Tr. 1129:25–1130:12; RPX-0015–16; RX-0598); and (4) electrical lead connections, which are material to the limitations in the '854 and '557 patent claims requiring a cathode and an anode on

the "end" of the transparent plate or sapphire plate (Tr. 1130:13–21; CX-0203.48; CX-0764.48). Complainant addresses none of these variations.

In sum, Complainant has failed to persuasively show that any filament from a given supplier is identical to any other filament from that supplier in all respects relevant to the asserted claims. *See Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1350 (Fed Cir. 2010) (complainant bears the burden of showing that its representative product grouping is justified).

#### c. Factual Findings Apply Only to Products Specifically Compared to the Claims at the Hearing

Because Complainant has failed to meet its burden to show the specific Accused Products it compared to the claims at the evidentiary hearing are identical in all material respects to the purportedly corresponding groups of Accused Products, my infringement findings herein apply only to those Accused Products specifically discussed at the hearing, which are listed here at I.E.1. The only exception is for the Satco Accused Products, because Satco stipulated that each of its accused models is represented for all relevant purposes by the Satco models Complainant compared to the claims at the hearing. JX-0017. All other Accused Products have not been shown to infringe any asserted claims.

### 2. Metal Filament Products Do Not Infringe Any Asserted Patent

IKEA and Home Depot have imported some products that contain filament LEDs with a metal submount. Complainant has conceded that "filament LEDs with metal submount ***do not infringe.***" CIB at 1. This concession is corroborated by the record: Dr. Eden, an expert retained by some Respondents, deconstructed certain metal filament products and determined that the metal submounts were opaque. Tr. (Eden) at 947:5-948:3. Likewise, Complainant's expert Dr. Schubert admitted that "[m]etal plates are not transparent." Tr. (Schubert) at 747:17-748:8. Accordingly, I find that filament LED products with metal submounts do not infringe the Asserted Patents. *See*

MSD Ex. G-1, Eden Rpt. at ¶¶ 79, 86-87; MSD Ex. G-2 at IKEA-ITC-1220-000202205-2210 (non-infringing IKEA metal filament products); MSD Ex. G-1, Eden Rpt. ¶¶ 228-230; MSD Ex. G-3, CREE LIGHTING-337-TA-1220-00000093; CREE LIGHTING_337-TA-1220-00000091; THD-1220-00018731; THD-1220-00018737; THD-1220-00018745, MSD Ex. U, THD-1220-00006308, and Ex. V, THD-1220-00006310 (non-infringing Home Depot metal filament products). In view of this finding, the pending motion for summary determination on this point, Motion Docket No. 1220-027, is denied as moot.

**F. The Domestic Industry Products**

As discussed in more detail later, Complainant's domestic industry theory involves the activities of an entity called the Solid State Lighting & Energy Electronics Center (SSLEEC) at University of California Santa Barbara. SSLEEC's "main research focus" is making highly efficient LED lighting. Tr. (DenBaars) at 105:2-8. Patents on technology developed by SSLEEC are licensed to others. *See* Tr. (Englander) at 404:12-405:3; CX-0708C, CX-0710C, CX-0711C, 712C, 714C, 722C, and 735C. Complainant identifies the domestic industry products relevant to this investigation as (1) certain filament LED articles that were developed by researchers at SSLEEC ("SSLEEC Domestic Industry Products"), and (2) licensed filament LED products ("Licensee Domestic Industry Products"). Tr. (Schubert) at 614:3-615:8; CIB at 17-18.

**1. SSLEEC Domestic Industry Products**

The SSLEEC Domestic Industry Products include prototype LED devices made at SSLEEC by researchers Abdulla Alhassan, Sang Ho Oh, Ezzah Azimah, and Matthew Wong. *See* CPX-0034 (Alhassan FY2016 (no phosphor)); CPX-0035 (Alhassan FY2016 (with phosphor); CPX-0037 (Oh FY2017 (no phosphor)); CPX-0038 (Oh FY2017 (phosphor)); CPX-0044 (Azimah FY2018); CPX-0046 (Wong FY2021 (phosphor)); CPX-0047 (Wong FY2021 (2) (no phosphor)). Complainant also points to what it calls "Additional SSLEEC DI Samples" which it did not

compare to the patent claims. *See* CPX-0036 (Alhassan Additional Samples –Sample Box 1 of 1); CPX-0039 through CPX-0043 (Oh Additional Samples –Sample Boxes 1 through 5); CPX-0045 (Azimah Additional Sample); CPX-0048 (Wong Additional Samples –Sample Box 1 of 1); CPX-0049 and CPX-0050 (Pan Additional Samples -Sample Boxes 1 and 2); CPX-0051 (Zhao and Vampola Additional Samples –Sample Box 1 of 1); *see also* CX-2213C.0003; Tr. (Schubert) at 614:20-615:8. Complainant also relies on publications describing LED structures developed at SSLEEC, some of which are shown in CX-2213C.0003.

Complainant contends the SSLEEC Domestic Industry Products each practice at least one claim of the ’464 and ’529 patents. Tr. (Schubert) at 614:3-615:8; CIB, 17-18.

### 2. Licensee Domestic Industry Products

In addition to the SSLEEC Domestic Industry Products, Complainant also relies upon products made by entities who have licensed the Asserted Patents (“Licensee Domestic Industry Products”). Complainant identifies two categories of such products, those with ceramic plates and those with flexible filaments.

**PUBLIC VERSION**

The licensed filaments with ceramic plates ("Rigid Domestic Industry Products") are as follows:

| Licensee Product Name | Related Exhibits | Asserted Claims |
|---|---|---|
| Acclaim Tamarac * (single-crystal sapphire plate) | CX-0198 (Report)<br>CPX-0026 (Specimen) | '529 patent, claims 1 and 8<br>'464 patent, claims 1 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |
| NewHouse Lighting | CX-0196 (Report)<br>CPX-0029 (Specimen) | '529 patent, claims 1, 6, and 8<br>'464 patent, claims 1, 7 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |
| Luminance | CX-0197 (Report)<br>CPX-0028 (Specimen) | '529 patent, claims 1, 6, and 8<br>'464 patent, claims 1, 7 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |
| GE Relax G16.5 (sold by Licensee Lamps Plus) | CX-0199 (Report)<br>CPX-0027(Specimen) | '529 patent, claims 1, 6, and 8<br>'464 patent, claims 1, 7 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |
| Sunlite | CX-0212 (Report)<br>CPX-0023 (Specimen) | '529 patent, claims 1, 6, and 8<br>'464 patent, claims 1, 7 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |
| Sylvania | CX-0213 (Report)<br>CPX-0025(Specimen) | '529 patent, claims 1, 6, and 8<br>'464 patent, claims 1, 7 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |
| Great Value (supplied by Licensee Elong) | CX-0214 (Report)<br>CPX-0030(Specimen) | '529 patent, claims 1, 6, and 8<br>'464 patent, claims 1, 7 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |
| SSC Filament LED | CX-0215 (Report)<br>CPX-0032C (Specimen) | '529 patent, claims 1, 6, and 8<br>'464 patent, claims 1, 7 and 9<br>'854 patent, claim 1<br>'557 patent, claim 1 |

Tr. (Schubert) at 614:3-18; CX-2213C.002. The Acclaim Tamarac product ("Acclaim Domestic Industry Product") noted in the list above with an asterisk has a single crystal sapphire plate, whereas the other products have ceramic alumina plates ("Ceramic Domestic Industry Products").

PUBLIC VERSION

Tr. (Schubert) at 614:14-18. The Ceramic Domestic Industry Products and Acclaim Tamarac product are collectively referred to as the "Rigid Domestic Industry Products."

The licensed products with flexible filaments ("Flexible Domestic Industry Products") are as follows:

| Licensee Product Name | Supporting Exhibits | Asserted Claims |
|---|---|---|
| Globe Electric B10 | CX-0209 (Report)<br>CPX-0024 (Specimen) | '854 patent, claim 1<br>'557 patent, claim 1 |
| Bullbrite 776512 | CX-0195 (Report)<br>CPX-0031 (Specimen) | '854 patent, claim 1<br>'557 patent, claim 1 |
| SSC Filament LED | CX-0216 (Report)<br>CPX-0033C (Specimen) | '854 patent, claim 1<br>'557 patent, claim 1 |

Tr. (Schubert) at 615:19-23; CX-2213C.0005.

Complainant contends the Licensee Domestic Industry Products practice claims in all Asserted Patents. Tr. (Schubert) at 614:3-615:8; Tr. (Thomas) at 520:18-521:1; CIB at 17-18. Complainant contends the Ceramic Domestic Industry Products infringe claims 1, 6, and 8 of the '529 patent, claims 1, 7 and 9 of the '464 patent, claim 1 of the '854 patent, and claim 1 of the '557 patent. CIB at 55-62 ('529 patent), 71-76 ('464 patent), 97-101 ('854 patent), 109-113 ('557 patent). Complainant contends the Acclaim Domestic Industry Product infringes all of those claims other than claim 6 of the '529 patent and claim 7 of the '464 patent. *ID.*at 55-62 (not presenting evidence of infringement for of claim 6 of the '529 patent), CIB at 71-76 (not presenting evidence for infringement of claim 7 of the '464), 97-101 ('854 patent), 109-113 ('557 patent); Tr. (Schubert) at 694:10-14. And Complainant contends the Flexible Domestic Industry Products infringe claim 1 of the '854 patent and claim 1 of the '557 patent. CIB at 101-104 ('854 patent), 109-113 ('557 patent).

## II. JURISDICTION & IMPORTATION

### A. Subject Matter Jurisdiction

Section 337 of the Tariff Act prohibits the importation, the sale for importation, or the sale after importation of articles that infringe a valid and enforceable patent if an industry exists in the United States relating to articles protected by the patent. 19 U.S.C. §§ 1337(a)(1)–(2). Complainant's Amended Complaint states a cause of action under section 337 by alleging that Respondents import and sell after importation certain filament LED products that infringe the Asserted Patents. *See* Compl. at ¶¶ 1-3, 87-156. Respondents do not contest that the Commission has subject matter jurisdiction over this Investigation. RPB at 9.

I conclude the Commission has subject matter jurisdiction over this investigation.

### B. Personal Jurisdiction

By filing a complaint and amended complaint and participating in the investigation, Complainant has consented to personal jurisdiction at the Commission. *See Certain Toner Cartridges, Components Thereof, and Systems Containing the Same*, 337-TA-1174, Initial Determination at 35, *not reviewed*, Comm'n Determination Not to Review an Initial Determination Granting Complainants' Motion for Summary Determination of a Violation of Section 337, EDIS Doc. ID 728235 (Dec. 17, 2020). By appearing and participating in this investigation and not contesting the Commission's jurisdiction over it, Respondents have each consented to personal jurisdiction at the Commission. *See* RPB at 9. I therefore conclude that the Commission has personal jurisdiction over all parties. *See, e.g.*, *Certain Strontium-Rubidium Radioisotope Infusion Systems, and Components Thereof Including Generators*, Inv. No. 337-TA-1110, Initial Determination at 9, USITC Pub. No. 5025 (Feb. 2021), *not reviewed in pertinent part*, EDIS Doc. ID 689653 ("*Radioisotope Infusion Systems*").

### C. Importation

A violation of section 337 based on patent infringement requires "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee" of infringing products. 19 U.S.C. §§ 1337(a)(1)(A)–(B). All Respondents other than IKEA have each stipulated that they have imported the Accused Products into the United States, imported, sold for importation, or sold after importation at least one Accused Product. JX-0016C; JX-0018C; JX-0019C; JX-0020C; JX-0021C; JX-0051C. IKEA does not dispute that IKEA Supply AG and IKEA US Retail LLC satisfy the importation requirement with respect to IKEA Accused Products. RPB at 140; RRB at 5-6. IKEA alleges IKEA of Sweden AB is not a proper party to this investigation because it does not import, sell for importation, or sell after importation the IKEA Accused Products. RPB at 140-41; RRB at 5-6.

To determine whether the importation requirement is satisfied as to a particular respondent, the Commission applies a fact-intensive inquiry as to the extent of a respondent's conduct in causing infringing articles to enter the United States. *See Certain Apparatus for the Continuous Prod. of Copper Rod*, Inv. No. 337-TA-052, Initial Determination, 1979 WL 61155, at *13-14 (Aug. 13, 1979) (concluding that a respondent was an importer where it purchased equipment that it was aware was produced in Germany and the evidence on balance established that the respondent "put in motion the importation" of those articles), *not reviewed*, Comm'n Determination & Order, USITC Pub. No. 1017 (Nov. 23, 1979); *Certain Large Video Matrix Display Sys. & Components Thereof*, Inv. No. 337-TA-075, Order No. 14, 1980 WL 140805, at *1-2 (June 30, 1980) (considering the "degree" of involvement in causing a scoreboard to enter the country, and concluding that the "direct nature of the involvement of the Brewers and the magnitude of their purchase" showed that the team was an "importer"), *not reviewed*, Comm'n Op. (June 19, 1981); *Certain Plastic-Capped Decorative Emblems*, Inv. No. 337-TA-121 (Oct. 1, 1982), Order No. 11,

1982 WL 213041, at *1-2 (finding a respondent to be an importer where it purchased articles from a Canadian corporation "f.o.b. Buffalo"), *not reviewed*, Comm'n Action & Order (Dec. 1, 1982); *Certain Salinomycin Biomass & Preparations Containing Same*, Inv. No. 337-TA-370, Order No. 19, 1995 WL 945787, at *1-3 (Sept. 18, 1995) (concluding, based on the evidence presented, that respondent Merck was not an importer because of the lack of its involvement in causing the goods to enter the country), not reviewed, Notice (Feb. 9, 1996); *Certain Cigarettes & Packaging Thereof*, Inv. No. 337-TA-643, Comm'n Op., 2009 WL 6751505, at *4-6 (Oct. 1, 2009) (concluding, based on the evidence adduced at trial, that the respondent was an importer where its acts were "integral to the importation"); *Certain Digital Set-Top Boxes & Components Thereof*, Inv. No. 337-TA-712, Initial Determination, 2011 WL 2567284, at *10-12 (May 20, 2011) (concluding, based on the record evidence, that "Cablevision was sufficiently involved in the manufacture and importation of the Cisco STBs to meet the importation requirement"), *not reviewed*, Notice (July 21, 2011).

IKEA contends that because IKEA of Sweden AB does not manufacture, import, maintain any inventory of, or sell any Accused Product in the United States, it cannot be found to have satisfied the importation requirement. *See* RRB at 5-6; Tr. (Rodin) at 906:2-14. IKEA further argues that because IKEA of Sweden AB never owned the Accused Products, Complainant has failed to show that IKEA of Sweden places any accused product "into the stream of commerce" or "brought the Accused Products to market." RRB at 6.

As Complainant notes, however, the record reflects that IKEA of Sweden AB designed the IKEA Accused Products; contracts with IKEA's suppliers for manufacture of the IKEA Accused Products; directs that the IKEA Accused Products be sold in the United States; and selects the filament vendors a lamp manufacture can use in IKEA products destined for the United States.

JX-0030C at 59:3-6, 70:20-74:17, 77:7-78:22, 87:1-89:3, 91:2-92:8, 96:1-21, 98:7-99:16, 121:16-122:4. The name "IKEA of Sweden AB" also appears on the packaging of the imported IKEA bulbs. JX-0030C at 89:15-90:1; 95:2-12; Tr. (Rodin) 911:12-15.

Based on these facts, I find that IKEA of Sweden AB, in its role as corporate parent of IKEA Supply AG and IKEA US Retail LLC, was materially involved in the design, manufacture, importation, and sale of the IKEA Accused Products in the United States. IKEA of Sweden AB also coordinated the marketing of these products in the United States and held itself out as directly responsible for them by marking the products with its corporate name. *See* JX-0030C at 89:15-90:1; 95:2-12; Tr. (Rodin) 911:12-15. Such conduct strongly indicates that IKEA of Sweden AB was responsible for placing the IKEA Accused Products into the stream of commerce. Accordingly, I find that IKEA of Sweden AB caused the IKEA Accused Products to be imported into the United States and sold in the United States within the meaning of 19 U.S.C. § 1337(a)(1)(B).

I therefore find that the importation requirement of section 337 has been satisfied as to all Respondents. *See Certain Subsea Telecommunications Systems & Components Thereof*, Inv. No. 337-TA-1098, Initial Determination at 11-15 (April. 26, 2019) (EDIS ID 675837), *not reviewed in pertinent part*, EDIS Doc. ID 682999.

### D. *In Rem* Jurisdiction

Respondents do not dispute that the Commission has *in rem* jurisdiction over the accused products. RPB at 9. I therefore find the Commission has *in rem* jurisdiction over the Accused Products in this investigation. *See Sealed Air Corp. v. Int'l Trade Comm'n*, 645 F.2d 976, 985–86 (C.C.P.A. 1981) (noting the Commission has jurisdiction over imported goods).

### E. Standing

Respondents do not dispute Complainant's ownership of the Asserted Patents. The record demonstrates that Complainant has standing in this investigation due to its ownership of the Asserted Patents. *See* '529 patent at Cover; '464 patent at Cover; '854 patent at Cover; '557 patent at Cover.

## III. LEVEL OF ORDINARY SKILL IN THE ART

The parties have agreed that a person of ordinary skill in the art at the time of the alleged invention of the Asserted Patents would have had (1) a bachelor of science degree in electrical engineering, physics, or a comparable field of study, and (2) at least three years of professional experience with semiconductor optoelectronic devices and packaging. This description is approximate, and a higher level of education or skill might make up for less experience, and additional experience could make up for a lower education level (for example, a master of science degree in any of the above fields and two years of practical experience would suffice).

For the purposes of this final initial determination, I adopt the agreed level of skill as the appropriate standard for the hypothetical ordinary artisan.

## IV. SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

Complainant provides several arguments directed to secondary considerations bearing on the obviousness of the asserted claims. CRB at 61-66. Though I have considered the proffered evidence and arguments in considering each claim of each assert patent's obviousness, I address each category proffered by Complainant in turn here in order to simplify the structure and readability of this determination.

### A. Commercial Success

"There is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention

disclosed and claimed in the patent." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016).

Because I find that the Acclaim Domestic Industry product practices claims 1 and 8 of the '529 and claims 1 and 9 of the '464 patent, *see infra* parts VI-IX, Complainant is entitled to the presumption of nexus between the secondary considerations tied to their products and the novel aspects of those claims. They are not, however, entitled to that presumption for licensees for whom no evidence has been entered to show that the licensed products embody the Asserted Patents. Nor can Complainant rely on the commercial success of the Accused Products, as none of those products have been shown to embody the Asserted Patents. *See infra* parts V-VII.D.1.

Complainant presented some evidence of the success of the Licensee Domestic Industry Products, and I give this factor weight commensurate with that evidence.

**B. Skepticism of Experts**

SSLEEC's inventions were met with skepticism, including by SSLEEC's member companies. Tr. (DenBaars) at 111:15-25. Of the ten SSLEEC member companies that were initially invited to take a license, all but one turned down the opportunity due to fears that the inventions would not effectively dissipate and disburse heat. *Id.*; *Pressure Prod. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (the fact that "companies initially turned down the opportunity to license . . . because they did not believe that the invention would work" supported finding that claims were not obvious).

As another example, Cree Lighting's general manager thought the inventions were "a bad idea," among other reasons, because he thought the light emitting devices would "get too hot." Tr. (DenBaars)111:15-112:17; *Transocean*, 699 F.3d at 1352-53 (testimony from named inventors regarding skepticism from industry experts supported conclusion of nonobviousness); *but see Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 968 (Fed. Cir. 2014) ("[T]he oral testimony of an

inventor…must [be] treat[ed] with skepticism due to the possibility of an inventor's self-interest in obtaining or maintaining an existing patent.").

This testimony shows that at least some individuals in the field expressed skepticism with respect to whether the inventions claimed in the Asserted Patents would work for their intended purposes. The testimony is uncorroborated, self-serving testimony of an inventor, however, and so I give it little weight.

### C. Licensing

Complainant contends that its licenses to the Asserted Patents show non-obviousness. CRB at 65-66. Complainant's licenses to the filament LED portfolio have generated approximately [redacted] revenue from 2012 through 2020, from 23 non-exclusive license agreements. Tr. (Englander) at 417:14-408:16, 409:23-410:2, 417:5-20. Much of that revenue, however, is attributable to an enforcement campaign involving litigation ("new licensing program") that began in June 2019. Tr. (Englander) at 406:15-24; RX-0087. Indeed, most of the licenses were entered into after the enforcement campaign commenced. RIB at 73. Additionally, the domestic industry licensees were making the Licensee Domestic Industry Products before they executed a license with Complainant. Tr. (Thomas) at 522:5-14.

Moreover, SSC converted its license from an exclusive to a non-exclusive license to enable Complainant to begin its enforcement campaign. Tr. (Englander) at 418:10-22. In its new non-exclusive license, [redacted] CX-0712C.0024. [redacted] Tr. (Englander) at 441:23-442:3.

The foregoing shows that Complainant's licenses are potentially valuable, but not as valuable as Complainant contends. Additionally, the bulk of the licenses appear to either directly

or indirectly be a result of Complainant's enforcement campaign, instead of uncoerced interest in the Asserted Patents and their technology. *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1352 (Fed. Cir. 2010) (giving no weight to "coercive licensing agreements that had more to do with avoiding the costs of litigation than with the novelty of the patent."); *Bosch Automotive Service Solutions, LLC v. Matal*, 878 F.3d 1027, 1037-38 (Fed. Cir. 2017) ("There is no evidence in the record that these agreements arose out of a recognition and acceptance of the merits of the claimed invention, rather than solely to avoid the costs of defending against further litigation."). For these reasons, Complainant's licensing evidence is of limited use in demonstrating non-obviousness, and will be given moderate weight.

### D. Simultaneous Invention

Simultaneous invention can "supply 'indicia of obviousness.'" *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010). Respondents contend that the Tanda reference, discussed *infra* part f, discloses all the features of the asserted claims of the '854 and '557 patents. *See* RIB at 61-63; RDX-0003.077. The application that led to the Tanda reference was filed in Japan on December 16, 2005, almost a year before the earliest filing date claimed by the '854 and '557 patents (*i.e.*, December 11, 2006). RX-0850; Tr. at 1267:4-1268:10. The Tanda reference discloses work done by Nichia Corporation independent of any work done by Complainant. RX-0850. To the extent Tanda in fact discloses each element of the '854 and '557 patents, this constitutes evidence that the steps needed to make the purported invention were within the ability of a person of ordinary skill, and weighs in favor of a finding of obviousness with respect to those two patents.

Complainant did not contest this evidence of simultaneous invention ahead of or during the hearing, but now challenges that Respondents failed to meet their burden of showing that Tanda discloses all of the required limitations. CPB at 420-431; Tr. at 1269:24-1270:3, 1330:8-1335:21.

Tanda is in the record, and is teachings speak for themselves. RX-0850. Respondents' expert Dr. Lebby gave competent, if cursory, testimony that he understood Tanda to meet all limitations of the '854 and '557 patents. I give this factor some weight.

## V. THE '529 PATENT

### A. Claim Construction

I construed the disputed terms "transparent," "lead frame," and "roughened, textured, or patterned" in Order No. 39. *See* CC Order at 8–16. I hereby incorporate the discussion of those terms on pages 8-16 of Order No. 39 as part of this initial determination.

### B. Infringement

I find that Complainant has failed to demonstrate any of the asserted claims of the '529 patent are infringed by any Accused Products.[4] My reasoning follows.

#### 1. Claim 1

I find that the Accused Rigid Products have not been shown to infringe claim 1 of the '529 patent.

##### a. "A light emitting device, comprising:"

The parties agreed that the preamble of claim 1 is not limiting. JX-0015 at 2. In light of the parties' agreement and the presumption that preambles are not limiting, I find that the preamble is not limiting.

[4] As noted above, *supra* part I.E.1, Complainant has failed to meet its burden to prove the products it selected as representative products are materially identical to all Accused Products in the respective categories identified by Complainant. My findings about the structure of the Accused Products in this section are therefore limited to those products Complainant actually compared to the patent claims at the hearing, which are listed at I.E. The only exception is for the Satco Accused Products, because Satco stipulated that each of its accused models is represented for all relevant purposes by the Satco models Complainant compared to the claims at the hearing.

**PUBLIC VERSION**

**i. "an LED chip emitting light at a first wavelength,"**

I find that the Accused Products have multiple LED chips that emit light at the blue wavelength. Tr. (Schubert) at 644:14-645:4, 646:3-22. For example, the accused Satco S29876 filament has a series of LED chips, as shown below:




CX-0207 at .0017 (left) (annotated x-ray of Satco S29876 depicting LEDs on submount), .0047 (right) (annotated photograph of decapsulated LEDs). These LEDs emit light at a blue wavelength.



CX-0207 at .0052 (depicting decapsulated Satco S29876 emitting light). The other Accused Products likewise have LEDs that emit light, as shown in materially identical evidence in the record for each product.




*See* CDX-0002C.0060.

The Accused Products therefore satisfy this limitation.

**ii. "wherein the emitted light is extracted from both front and back sides of the LED chip"**

I find that most of the Accused Rigid Products satisfy this limitation based on photographs of the decapsulated filaments, CDX-0002C above, showing blue light emission from the front and back sides of the LED chip. Tr. (Schubert) at 645:5-17, 646:3-10.

The only exceptions to this finding involve two Feit products, the Feit Rigid – T8C/CL/VG/CA/LED and the Feit Rigid – [redacted] 2700K. Complainant hired a contractor named EAG to analyze these products. *See, e.g.*, CX-0766 (EAG analysis of [redacted] 2700k). The evidence shows that during its analysis EAG removed the silicone coating or encapsulant and

**CONFIDENTIAL MATERIAL IN THE UNDERLYING INVESTIGATION IS REDACTED FROM THIS PAGE**

**PUBLIC VERSION**

damaged the structure of the devices in the process. Tr. (Shanfield) at 1098:4-1099:25. Specifically, a chemical used by EAG to decapsulate the filament of the [redacted] 2700K filament removed a metal coating on the top LED submount, as shown by a comparison of the before (RX-0593C.3) and after photographs (CX-0766) reproduced below:[5]



Before Decapsulation
RX-0593C.3



After Decapsulation
CX-0766.45-47

*See also* Tr. (Shanfield) at 1098:11-1099:25.

EAG's own reports admitted that its decapsulation process also lifted the LED chain off the submount for the [redacted] 2700K:

> Note: The LED chain lifted off the submount during decapsulation. It was re-attached to the submount using adhesive (Loctite Superglue 1775409).

CX-0766C.0046 (excerpted); *see* CX-0764.0046 (same); *see also* Tr. (Shanfield) at 1099:6-10, 1178:6-1179:3.

The evidence above shows that Complainant's decapsulation process materially altered the Feit Rigid – T8C/CL/VG/CA/LED and Feit Rigid – [redacted] 2700K samples. Thus, EAG in effect analyzed a structure made by EAG, not structures imported and sold by Feit. I therefore decline to credit Complainant's infringement analysis of those two Feit models.

[5] Feit's expert Dr. Shanfield credibly testified that the product shown in RX 0593C was likely the same product tested by EAG in CX-0766 based on an inspection of the physical sample. Tr. (Shanfield) at 1153:9-1155:7.

Feit raises separate noninfringement arguments based on the layering found in some Feit models. Feit's expert Dr. Shanfield testified that he saw evidence of a reflective metal layer at the interface between the bottom of the LED chip and the submount in the EAG micrographs of some Feit products. Tr. (Shanfield) at 1144:3-18. For example, in the micrograph of the [redacted] 2700K filament below (CX-0766, slide 28), the bright white line indicates the presence of a thin metal layer on top of the submount beneath the LED. *Id.* at 1098:18-1099:3; 1144:3-18 (explaining that metal layers appear as bright white line due to electrons generated by conduction when exposed to SEM imaging).



CX-0766.028.

Dr. Shanfield opined that this reflective metal layer would prevent emitted light from being extracted from the back side of the chip. Tr. (Shanfield) at 1145:16-23 ("light coming from the light-emitting region of the LED is going to be blocked. It's not going to reach the back side.").

Additionally, Dr. Shanfield testified he saw layers in some of Feit's Rigid Filament LED chips that were consistent with a Distributed Bragg Reflector or DBR.[6] Tr. (Shanfield) at 1141:15-1144:2. Dr. Shanfield explained that a Distributed Bragg Reflector is made by alternating layers of material having a high refractive index with material having a low refractive index. *Id*. at

[6] As will be discussed more later in connection with the '854 patent, Dr. Shanfield also opined that the Feit Accused Flexible Products had layering consistent with a Distributed Bragg Reflector. Tr. (Shanfield) at 1143:1-21.

1141:24-1142:14. Each time light crosses from material of one index to material of another, some of the light is reflected. *Id.* at 1142:1-14. Dr. Shanfiled testified that a Distributed Bragg Reflector can be designed to block light from the LED. Tr. (Shanfield) at 1141:17-1146:13; RRB at 14-18.

According to Feit, the layering evidence observed by Dr. Shanfield indicates that the Feit Accused Products do not extract light from the back side of the LED chip because light from the LED does not reach the back side. *Id*. at 1145:16-23. I reject Feit's conclusion on this point. Even if some Feit products have the metal layer or the Distributed Bragg Reflector that Dr. Shanfield identified, other evidence shows that those layers do not prevent all light from being transmitted through the back side of the submount. Instead, the record shows some light is extracted from both sides of the LED chip. *See* CX-0765.0044, .0052 (LUX plots and photographs showing light emitted out back of submounts of accused FEIT products that Dr. Shanfield identified as having a DBR and/or metallic layer); CX-0764.0044, .0052 (same); CX-0766.0044, .0052 (same). I find that some light is extracted from the back of the LED chips in the Feit devices that Dr. Shanfield identified as having a metal reflecting layer or a Distributed Braff Reflector.

In sum, I find that Complainant has shown, with the exception of the Feit Rigid – T8C/CL/VG/CA/LED and the Feit Rigid – [redacted] 2700K, that light is extracted from both front and back sides of the LED chip in all Feit Accused Products.

**iii. "a lead frame to which the LED chip is attached, wherein the LED chip resides on or above a transparent plate in the lead frame that allows the light to be extracted out of the LED chip through the transparent plate in the lead frame"**

I find that the Accused Rigid Products satisfy the "lead frame" part of this claim language, but that the plates in the Accused Rigid Products are not the "transparent."

**PUBLIC VERSION**

*(a) "lead frame"*

All Accused Products have an LED chip on or above a plate in a lead frame. The accused Satco S29876 product is illustrative:




Figure 33

CX-0207, slide 17, Fig. 33; *see also id.* Figs. 17, 23, 72; CDX-0002C.0050.

The other Accused Rigid Products have a plate[7] in the lead frame, as shown in magnified images of the filaments in the Accused Products. Tr. (Schubert) at 636:5-637:2, 650:1-651:7, 652:4-10, 652:12-21, 652:24-653:11. The Accused Rigid Products all have an LED chip attached to the lead frame, and the chip resides on or above the plate in the lead frame. CDX-0002C.0050; RRB at 19 (Respondents concede the Accused Rigid Products satisfy this limitation other than "transparent plate"). These features are present in all of the Accused Rigid Products, as shown in

[7] The transparency of the plate in each Accused Rigid Product is considered in detail in the next section. *Infra* part I.A.1.a)(1)(b).

analysis reports by EAG. *See* CDX-0002C.0065 (listing EAG analysis reports depicting lead frames in the Accused Rigid Products).

For these reasons, I find that the Accused Rigid Products satisfy the "lead frame" limitation.

*(b) "transparent plate"*

The Accused Rigid Products do not satisfy the "transparent" limitation under its plain and ordinary meaning. The parties do not appear to dispute that to measure transparency, one shines light on a material and determines if the light comes out the other side, at least in a basic sense. Tr. (Speck) at 283:19-23; Tr. (Schubert) at 890:2-12 (a "person of skill at the time of the invention would have tested if these filaments let light pass through" to determine whether they are transparent). Accordingly, the testing data most relevant to a determination of whether the Accused Rigid Products (or any other Accused Product) are transparent is light transmission data.

Complainant contends that so long as *any* light passes through a material, it is transparent as I have construed the term. But the plain and ordinary meaning of "transparent" is not simply any material that lets some light through. As was discussed at various points in the trial, sheets of paper, human ears, and white clothing all allow the transmission of *some* light, but no reasonable fact finder would say those items are "transparent." On the other end of the spectrum, Respondents and Staff contend that to be transparent, a material must transmit at least 80% of the light incident on it. *See* SIB at 3-4 (citing Tr. (Eden) at 1056:11-14, 1056:22-1057:5, 1057:13-25); RRB at 20-25. That may be true, but I do not need to set a specific numerical threshold for light transmission to resolve the factual infringement inquiry.

The following evidence supports my factual finding that the Accused Rigid Products do not have a transparent plate. Complainant's witness Mr. Wong testified that older technologies

used in the field of LEDs used metal contact layers described as "semi-transparent," which had transmissivity of "about 40 percent compared to" more modern contact materials that are considered transparent, like indium tin oxide (ITO), Gallium Nitride (GaN), and tunnel junctions, which have transmissivity of "at least 85 percent", "95 percent" and "95 percent," respectively. Tr. (Wong) at 349:9-17. This testimony aligns with the testimony of Dr. Speck from the 1172 investigation that "transparent" means "low" light loss, which means "maybe 1 to 10 percent" loss, that is, 99 to 90 percent transmissivity. Tr. (Speck) at 280:2-282:21.

The record is clear, based on evidence from both Respondents *and* Complainant that all of the Accused Rigid Products have transmissivity below about 60 percent of light incident on their submounts, as discussed in detail below. That evidence indicates that the submounts in those products are not "transparent."

*(i) Transmission Testing*

Complainant's expert Dr. Schubert had EAG perform measurements of the 360-degree light intensity of certain Accused Rigid Products' filaments (angularly resolved intensity distribution measurements ("LUX plots")).[8] Tr. (Schubert) at 604:22-605:13, *see also id.* at 618:13-619:6. Dr. Schubert described these measurements as showing "the angular intensity" of the light "around the equator" if you "think of the filament as going from the north pole to the

---

[8] Dr. Schubert also had photographs taken of the populated and unpopulated sides of encapsulated and decapsulated filaments emitting light to purportedly show that the submounts are transparent. Tr. (Schubert) at 617:13-618:12. However, these photographs are of little probative value because it is difficult to determine from them the amount of light passing through the submount. Moreover, as Respondents' expert Dr. Shanfield explained, the images of the populated sides were saturated—as evident by the fact that the blue LEDs appear white—and thus result in a misleading comparison with the non-saturated unpopulated-side images. Tr. (Shanfield) 1126:3-1128:16; RDX-0002.6.

south pole of the earth." *Id*. at 820:9-17.[9] Because the testing measured light on the backside of the submount when the LED on the front of the submount was emitting, the test plots are evidence of the amount of light that passes through the submount in the Accused Rigid Products.

Respondent's expert Dr. Eden also conducted several light transmission tests: Transmission Test 1, where he measured transmission of light from the native LEDs through a decapsulated submount ("intact filament" test); Transmission Test 2, where he tested transmission of light of the same wavelength as the native LEDs from an LED or laser supplied by another manufacturer through a decapsulated submount ("non-native LED" testing); and, finally, he tested transmission with the silicone still on the filament.[10] Tr. (Eden) at 951:10-952:11, 952:14-958:1, 958:15-969:1, 969:14-973:23, 975:24-979:20. Dr. Eden conducted tests with the silicone coating intact to compare his testing procedure and results to those obtained by Dr. Schubert/EAG. *Id*. at 970:7-21.

The table below compares Complainant's LUX plots, Respondents' Transmission Test 1 (without silicone), and Respondents' transmission testing with silicone.

[9] In addition to providing LUX plots, EAG provided plots of the data on a logarithmic scale. *Id*. 605:14-22. According to Complainant, the logarithmic plots show the "realistic intensity distribution of the filament" because under the Weber-Fechner law the human eye perceives light intensity on a logarithmic scale. *Id*. Changing the scale of test results does not mean more light passed through a material. To appropriate the familiar conundrum, the amount of light passing through a leaf in a forest is the same whether or not someone sees it. Human-perceived luminosity is a different parameter than transparency, so I give evidence about luminosity less weight.

[10] Respondents' experts Dr. Eden and Dr. Shanfield also performed visual inspections of decapsulated submounts from Accused Rigid Products and they concluded that the submounts were opaque. Tr. (Eden) at 944:13-945:17, 973:24-975:23, RX-2616.0005, RX-0547.0002, RX-0550.0003; Tr. (Shanfield) at 1134:7-1135:22. In contrast, Dr. Eden concluded from a visual inspection that the alleged domestic industry Acclaim filament has a transparent submount. *Id*. at 948:17-950:9; RX-193.0005; RX-173.0052-56. I give this subjective evidence less weight.

| Transmission Testing Data | | | |
|---|---|---|---|
| **Product** | **Respondents' Testing (without silicone)** | **Respondents' Testing (with silicone)** | **Complainant's Testing** |
| **Feit** | | | |
| Feit Vintage ST19 | None. | None. |  CX-0203.044 |
| Feit T8 | None. | None. |  CX-0764.044 |
| Feit A15 | None. | None. |  CX-0765.044 |
| [redacted] Filament LED | None. | None. |  CX-0766.044 |

**PUBLIC VERSION**

| Transmission Testing Data | | | |
|---|---|---|---|
| **Product** | **Respondents' Testing (without silicone)** | **Respondents' Testing (with silicone)** | **Complainant's Testing** |
| **GE** | | | |
| GE Refresh | None. | None. |  CX-0200.044 |
| GE Relax |  RX-0177.0044 |  RX-0177.0044 |  CX-0693.044 |
| GE Basic |  RX-0177.0012 |  RX-0177.0013 |  CX-0694.044 |
| Great Value | None. | None. |  CX-0768.044 |

**PUBLIC VERSION**

| Transmission Testing Data | | | |
|---|---|---|---|
| **Product** | **Respondents' Testing (without silicone)** | **Respondents' Testing (with silicone)** | **Complainant's Testing** |
| **Home Depot/GVL/Signify** | | | |
| Eco-smart ST19/ GVL/ '737 SKU |   RX-0176.0012. |   RX-0176.013 |   CX-0202.044 |
| Philips ST19 | RDX-001.039, RX-0547.0007; RX-0547.0009; Tr. (Eden) 977:3-978:9. | None. |   CX-0179.044 |
| Eco-smart 1002 459 555 |   RX-0175.0012 |   RX-0175.013 | None. |
| Eco-smart 1002 459 562 |   RX-0175.0041 |   RX-0175.0042 | None. |
| Eco-smart 309 672 273 |   RX-0175.0063 |   RX-0175.0064. | None. |

**PUBLIC VERSION**

| Transmission Testing Data | | | |
|---|---|---|---|
| **Product** | **Respondents' Testing (without silicone)** | **Respondents' Testing (with silicone)** | **Complainant's Testing** |
| **IKEA** | | | |
| IKEA Sillbo 140 lm (104.501.82 ) | None. | None. |  CX-0767C.044 |
| IKEA Sillbo 140 lm (104.501.82 ) | | |  CX-205.0044 |
| IKEA Ryet | | |  CX-206.0044 |
| IKEA Lunnom (104.164.66 ) |  RX-0173.0045 |  RX-0173.0046 | None. |
| IKEA Lunnom (203.821.83 ) |  RX-0174.0018 | None. | None. |

| Transmission Testing Data | | | |
|---|---|---|---|
| **Product** | **Respondents' Testing (without silicone)** | **Respondents' Testing (with silicone)** | **Complainant's Testing** |
| **Satco** | | | |
| Satco S29876 (representative of S11361 and S11353) |   RX-0178.0012 |   RX-0178.0013 |   CX-0207.0044 |

The test results in the table above show that the submounts in the Accused Rigid Products substantially inhibit the transmission of light therethrough. Tr. (Eden) at 965:1-11. Indeed, Complainant's LUX plots show transmissivity for most accused products below even 40%, which Mr. Wong characterized as the lower end of what those in the field would call "semi-transparent." Tr. (Wong) at 349:9-17. These results, adduced by *both* Complainant and Respondents,[11] show no Accused Rigid Products with transmissivity beyond roughly 60%. Thus, the testing evidence shows that, for all the Accused Rigid Products, a significant portion of light produced by the LED in each device is not transmitted through the submount.

Complainant contends that Respondents' tests were flawed in various ways. *See* Tr. (Schubert) at 606:23-609:13, Tr. (Eden) at 1040:6-1045:9, 1045:10-1049:1. But Complainant's LUX plots correlate to Respondents' transmission testing data with the silicone intact,[12] which indicates the reliability and increased probative value of Respondents' findings. Tr. (Eden) at

[11] Because the evidence challenged in Complainant's motion to strike does not persuade me to reach a different conclusion, that motion is denied as moot. Motion Docket No. 1220-046.

[12] The differences between the capsulated and decapsulated test results stem in part from the silicon acting as "an optical wave guide that redistributes the light that is emitted out of the top of the chip and … spreads it around … to the back side." Tr. (Eden) at 973:14-23. Although the extent of this effect is not quantified in the record, the variance between decapsulated and encapsulated results does not persuade me to conclude that the submounts are transparent.

**PUBLIC VERSION**

971:15-972:21. Every test has its limitations, but Respondents' results are, ultimately, still reliable evidence, particularly given that they largely correlate with Complainant's own measurements. *See* CIB at 28 (non-scaled LUX plots are on the left of each figure).

Notably none of the products measured transmittance anywhere near the 80 or even 90% transmission rates of materials the parties and experts agree *are* transparent, such as single crystal sapphire, glass, quartz, ITO, and others.







*See, e.g.*, CX-0205 at slide 44 (left) (an exemplary LUX plot of the IKEA Saibo accused product); CX-0198 at slide 44 (right) (LUX plot of Acclaim Domestic Industry Product; Acclaim product has a sapphire substrate which the parties agree is transparent).

*(ii) Supplier Documents*

Complainant also relies on an excerpt from a Samsung document, which labels part of a cartoon as "Transparent substrate (Ceramic or Sapphire)," as proof that *all* Accused Rigid Products with ceramic substrates meet this limitation. The excerpt is reproduced below:

[redacted]

CX-2031C.0004. Complainant concluded that "Samsung considers the ceramic submounts to be transparent" and that the document describes *all* filaments made by Samsung. Tr. (Schubert) at 621:7-622:9; *see also* infra part b.

In what is a recurring theme, Complainant points to no evidence that this document describes *all* Samsung rigid LED filaments, nor is there any evidence tying the filament depicted in the cartoon to any Accused Rigid Product. Of particular note is the absence of any evidence indicating the sort of ceramic used by Samsung has equivalent optical properties to those used in the Accused Rigid Products, or even that the Samsung document, which appears to be a marketing document, accurately describes the specific optical properties of any product. Without those critical pieces of additional evidence, the Samsung document does not support a conclusion that any Accused Rigid Product contains a "transparent" filament, even for those Accused Rigid Products containing a Samsung filament.

**PUBLIC VERSION**

Complainant makes similar arguments with respect to an OSRAM document, CIB at 29-30 (citing CX-0044.0006), but those arguments fail for the same reasons. Moreover, as with Complainant's own LUX plots, the transmission characteristics plotted in the OSRAM document in fact show that, while the OSRAM submount depicted transmits *some* light, the submount does not constitute the claimed "transparent plate:"

Figure 8: DURIS® L38 radiation characteristic




As the flux is asymmetric distributed over all angles, an optimal arrangement is necessary in order to achieve a homogeneous bulb emission. An optimized arrangement is shown in Figure 9 and Figure 10 as an example.

CX-0044 at 6 (showing transmission through the submount of slightly below 50%).

*(iii) RAT = 1 Analysis*

Complainant disputes the accuracy of certain light measurements put forward by Respondents' expert Dr. Eden. *See* Tr. (Schubert) at 599:11-25. Dr. Eden reviewed testing of certain Accused Rigid Products done by a company called Covalent Metrology, which were used to calculate the transmittance ("T"), reflection ("R"), and absorption ("A") of light in the submounts of certain Accused Rigid Products:

**PUBLIC VERSION**

## Covalent Metrology's Results

| Brand | Bulb | Exhibit | Type | T | R | A |
|---|---|---|---|---|---|---|
| Tamarac (licensed) | G16.5 | RX-0193.0012-14 | sapphire | 78.7 | 4.9 | 16.4 |
| GE | Refresh (SKU 93122167) | RX-0192.0006-11 | ceramic | 24.1 | 26.6 | **49.4** |
| | Basic (SKU 48368) | RX-0187.0007-12 | ceramic | 1.8 | 31.7 | **66.5** |
| | Relax (SKU 47957) | RX-0188.0007-12 | ceramic | 1.7 | 22.3 | **76.0** |
| GVL | '737 SKU | RX-0186.0012-14 | ceramic | 2.8 | 21.6 | **75.6** |
| IKEA | Sillbo (104.501.82) | RX-0185.0011-13 | ceramic | 24.6 | 14.2 | **61.2** |
| | Sillbo (404.165.49) | RX-0184.0014-16 | ceramic | 12.6 | 19.1 | **68.4** |
| | Ryet (404.468.67) | RX-0183.0014-16 | ceramic | 12.4 | 17.8 | **69.9** |
| Satco | S29876 | RX-1470.0011-13 | ceramic | 20.8 | 34.6 | **44.6** |
| GE | Vintage A19 (SKU 33574) | RX-0191.0006-11 | flexible | 38.6 | 5.9 | **55.6** |
| Satco | S9966 | RX-1480.0012-14 | flexible | 45.6 | 10.3 | **44.1** |

RDX-0001.046; Tr. (Eden) at 979:22-989:11.

Complainant disputes the accuracy of these measurements, contending they substantially overstate the absorption and understate transmission. *See* CIB at 35; Tr. (Schubert) at 606:23-609:13; *but see* Tr. (Eden) at 1035:25-1040:5. Specifically, Complainant's point to Dr. Schubert's testimony that the absorption values were too high, and "contrary to common sense." Tr. (Schubert) at 607:2-11. Complainant contends that the "absorption" number is inflated by failing to account for purportedly "forward-scattered" light that should, they claim, be included in the transmission readings. *Id.*

While there could be some lack of precision or accuracy with respect to these tests, I find they are sufficiently reliable evidence to inform my conclusion that no Accused Rigid Products have transparent submounts. I note specifically that I did not find credible Dr. Schubert's testimony criticizing the configuration of the integration sphere used in Respondents' testing setup. Dr. Schubert admitted he had never measured transmissivity in the way he thought Respondents should have performed their tests. *See* Tr. at 608:13-19, 831:25-834:5. In contrast, I find the testimony of Respondents' experts on their test setup to be credible, and I find the methodology

used in Respondents' testing meets with industry standards. *See* Tr. at 981:5-982:8, 983:8-984:2; 984:3-11; 1036:11-16; 1039:23-1040:5; RDX-001.041.

In the end, Respondents' evidence is sufficiently reliable to confirm that none of the Accused Rigid Products contain a "transparent" plate as required by claim 1 of the '529 patent. Their testing shows that a transparent material, such as sapphire, has a transmission of about 80% (78.7%), which is what would be expected for a transparent material. Tr. (Eden) at 989:6-11. This is only slightly below the results recorded on the same sapphire product by Complainant's methodology:




*See, e.g.*, CX-0198 at slide 44 (LUX plot of Acclaim Domestic Industry Product). Respondents' testing also shows that the Accused Rigid Products have a light transmission of much less than 80%, and indeed none transmit more than 50%[13], with some transmitting as little as 1.7% of incident light. These results also corroborate Dr. Eden's transmission testing results discussed above. *Id*. at 989:19-990:5.

---

[13] This is largely in accord with Complainant's LUX plots that show a maximum transmittance of around 60% among the Accused Rigid Products). *See supra* part V.B.1.iii.(b).(i).

*(iv) Grains, Pores, and Boundaries*

Although only circumstantial evidence of transparency, SEM testing showed the presence of grains, pores, and grain boundaries in the submounts of the Accused Rigid Products. Tr. (Eden) at 993:9-994:13, 995:7-13. The presence of grain boundaries and pores cause the material to be "highly absorbing and scattering," indicating that the submounts are opaque. *Id.* at 994:11-13, 994:24-995:6, Tr. (Shanfield) at 1192:25-1193:5. In contrast, the same analysis of the licensed Acclaim product, which has a sapphire submount, shows no pores, grains, or grain boundaries. *Id.* at 994:14-23.

Accused Ceramic Product (Satco S29876)




(RX-0178.0029)

Licensed Sapphire Submount (Tamarac)




(CX-0198.0021)

This evidence further confirms my finding that the Accused Rigid Products do not satisfy the "transparent plate" limitation.

*(v) Doctrine of Equivalents Analysis*

To the extent that the "transparent" limitation is not literally present in the Accused Rigid Products, Complainant argues infringement under the doctrine of equivalents. CIB at 30-31; Tr. (Schubert) at 624:16-625:3. I find that the Accused Rigid Products do not satisfy the "transparent" limitation under the doctrine of equivalents.

Complainant purportedly provides a function-way-result analysis to demonstrate that the Accused Rigid Products satisfy this limitation. However, Complainant's analysis reduces to a variation of its claim construction argument that the term "transparent" means "allows light to pass through." *See* Order No. 39, 8; Tr. (Schubert) at 625:4-626:22. Putting aside the attempt to circumvent an adverse claim construction, the all-limitations rule precludes Complainant's argument. *Freedman Seating Co. v. American Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1347 (Fed. Cir. 2001). Finding something that is not transparent to be equivalent to something that is transparent would entirely vitiate the "transparent" limitation. The doctrine of equivalents is not so capacious. *Freedman Seating Co.*, 420 F.3d at 1358 ("an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation").

*(vi) "Transparent" Conclusion*

For all of the reasons above, I find, as a factual matter, that Complainant has not shown by a preponderance of the evidence that any Accused Rigid Products comprise a "transparent plate" as required by claim 1 of the '529 patent.

**iv. "and a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength."**

I find that the Accused Rigid Products meet this limitation, as shown by the following: (1) micrographs of the products' glob tops showing white phosphor particles; (2) elemental analysis of glob top particles showing that they contain elements typical for a phosphor; and (3) the conversion of a first wavelength of blue light to a second wavelength of white light, as shown by the photographs of the decapsulated (blue light) and capsulated filaments (white light). Tr. (Schubert) at 656:1-657:2, 658:4-659:1.

**PUBLIC VERSION**




CDX-0002C.0073 (depicting Satco S29876). All of the Accused Products have comparable evidence supporting this finding. *See* CDX-0002C.0074-76 (excerpting analysis showing satisfaction of this limitation for each Accused Product).

**2. Claim 6**

I find that the Accused Rigid Products do not satisfy claim 6 of the ’529 patent. My reasoning follows.

**a. “The device of claim 1”**

For the reasons discussed above, *supra* part V.B.1 I find that the Accused Rigid Products have not been shown to infringe claim 1 of the ’529 patent. The Accused Rigid Products have not been shown to infringe dependent claim 6 for at least that reason.

#### b. "wherein the transparent plate is roughened, textured or patterned to increase light extraction from the LED chip through the transparent plate in the lead frame."

There is no evidence showing that the submounts in the Accused Rigid Products are "roughened, textured or patterned *to increase light extraction*," as required by the claims.

Complainant relies on the following to show infringement: (1) microscopy, optical profilometry, and visual inspection, such as the white color of the submount, allegedly showing that Accused Rigid Products' submounts have a roughened surface; (2) the quantification of the roughening, around 0.31 micrometers, which is on the order of the wavelength of light and would cause the type of scattering beneficial to light extraction; and (3) a visual inspection purportedly showing the plates are roughened to increase light extraction. CIB at 44-47; Tr. (Schubert) at 637:23-638:11, 638:16-639:11, 661:25-662:12, 664:4-21; *see* CDX-0002C.0080-.0083 (excerpting relevant figures from analysis reports of Accused Products). Respondents[14] argue this evidence is insufficient to show that the surface is "roughened," pointing in particular to Professor Shanfield's analysis that the submount surfaces are substantially smooth as compared to the roughening contemplated in the specification. RRB at 65.

[14] Ikea did not join this argument.

**PUBLIC VERSION**




Respondents also contend that the term "roughened, textured, or patterned" is an indefinite term of degree not explained in the specification, relying on *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

Respondents' indefiniteness argument ignores the full context of the term, which is "roughened, textured, or patterned *to increase light extraction*." As the record makes clear, this required purpose gives objective criteria by which a person of skill in the art would be able to ascertain whether the limitation is met. *See* Tr. (Schubert) 662:22-663:7, 690:25-691:11; Tr. (DenBaars) 155:13-21, 233:18-234:17 (roughening on the order of 0.1-0.2 µm or greater increases light extraction);CX-0207 (Ra=0.315), CX-0694 (Ra=0.417), CX-0765 (Ra=0.369), CX-0696 (Ra=0.354), CX-0206 (Ra=0.315), CX-0768 (Ra=0.408), CX-0692 (Ra=0.488), CX-0205 (Ra=0.305), CX-0767C (Ra=0.400), CX-0202 (Ra=0.341), CX-0203 (Ra=0.398), CX-0764 (Ra=0.291), CX-0693 (Ra=0.355), CX-0179 (Ra=0.442), CX-0200 (Ra=0.319), CX-0766

(Ra=0.412); see also Tr. (Eden) 994:4-13 (grains with dimensions "on the order of the wavelength of blue light" cause scattering); Tr. (Lebby) 1211:10-13, 1212:20-1213:4.

Complainant failed, however, to demonstrate that roughening present on the Accused Products—if any—will "increase light extraction." Dr. Schubert testified that the roughness of at least one Accused Rigid Product was *sufficient* to cause the type of light scattering that improves light extraction, but he did not show that the alleged roughening does, in fact, increase light extraction given the underlying characteristics of the substrate material. Tr. (Eden) at 1007:15-1008:11.

To the contrary, Dr. Speck testified that, in order to determine whether a surface was roughened "to improve light extraction" would require a comparison of light extraction efficiency between the same material in roughened and not roughened states. Tr. (Speck) at 296:23-297:18. Dr. Eden testified similarly. Tr. (Eden) at 1059:2-22. As did Dr. DenBaars. Tr. (DenBaars) at 189:21-191:17. For example, if a structure already scatters light, roughening its surface would not necessarily "increase light extraction." *See* Tr. 1053:22-1054:9, 1133:17-1134:6, 604:8-20, 986:22-987:12, RDX-0001.045; CDX-0002C.0027.

I find Complainant has not shown a transparent plate in the Accused Rigid Products that is roughened, textured, or patterned to increase light extraction. I therefore find that none of the Accused Rigid Products infringe claim 6 for this additional reason.

**3. Claim 8**

I find that the Accused Products have not been shown to infringe claim 8 of the '529 patent.

**a. "The device of claim 1"**

For the reasons discussed above, *supra* part V.B.1, I find that the Accused Products have not been shown to infringe claim 1 of the '529 patent. The Accused Rigid Products have not been shown to infringe dependent claim 8 for at least that reason.

**b. "wherein the LED chip includes a transparent substrate and the transparent substrate is adjacent the transparent plate."**

I find that the Accused Rigid Products—other than the Feit Accused Products discussed below—satisfy this limitation. Respondents other than Feit admit this limitation is satisfied with respect to their Accused Rigid Products. RRB at 67-68. The LED chips in the Accused Rigid Products have a single crystal sapphire growth substrate, as confirmed by elemental analysis.[15] Tr. (Schubert) at 668:16-669:2. All parties agree that single crystal sapphire is transparent. CIB at 1, 2 (parties agree single-crystal sapphire is transparent); RRB at 20 ("sapphire is transparent"); Tr. (Shanfield) at 1131:23-25. Further, microscopic images show that the growth substrate of the LED is adjacent to the submount. *Id.* at 669:2-670:11. Thus, I find that at least the non-Feit Accused Rigid Products satisfy this limitation. *See* CDX-002C.0086.

Feit argues that the presence of reflective metal or a Distributed Bragg Reflector between the LED growth substrate and the submount in its Accused Rigid Products prevents the substrate from being adjacent to the transparent plate, as shown below. Tr. (Shanfield) at 1145:24-1146:13.




RDX-0002.20.

[15] Respondents' expert Dr. Eden does not dispute that the Accused Rigid Products have transparent sapphire growth substrates. Tr. (Eden) at 1052:25-1053:6.

**PUBLIC VERSION**

I find that those of Feit's Accused Products that have been shown to have a DBR or metal layer in between the LED chip substrate and submount do not meet this limitation of claim 8. *See* Tr. (Shanfield) at 1098:11-1099:3, 1141:15–1144:18, CX-0201.24; CX-0764.28; CX-0765.28; CX-0766.28; RDX-0002.17–18; RDX-0002.19; RX-0593C.3.

#### c. Conclusion

For the foregoing reasons, I find that no Accused Products have been shown to infringe claim 8.

### C. Technical Prong of the Domestic Industry Requirement

The technical prong of the domestic industry requirement is satisfied when the complainant in a patent-based section 337 investigation establishes that it is practicing or exploiting the patents at issue. *See* 19 U.S.C. § 1337(a)(2) and (3); *Certain Microsphere Adhesives, Process for Making Same and Prods. Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 8, USITC Pub. No. 2949 (Jan. 1996). "The test for satisfying the 'technical prong' of the industry requirement is essentially [the] same as that for infringement, *i.e.*, a comparison of domestic products to the asserted claims." *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003). To prevail, the patentee must establish by a preponderance of the evidence that the domestic product practices one or more valid claims of the patent. *See id.*; *Spansion*, 629 F.3d at 1349; *Certain Vision-Based Driver Assistance System Cameras and Components Thereof*, Inv. No. 337-TA-907, Comm'n Op. at 36, USITC Pub. No. 4866 (Feb. 2019).

Complainant relies on two sets of products to satisfy the domestic industry requirement: its own internal prototypes (SSLEEC Domestic Industry Products), and commercial products made under licenses to the Asserted Patents (Licensee Domestic Industry Products). I address each group separately below.

**PUBLIC VERSION**

### 1. SSLEEC Domestic Industry Products

Complainant asserts that a number of SSLEEC Domestic Industry Products practice the asserted claims of the ’529 patent. These prototypes are named for the researcher who made them in the SSLEEC lab. *See* CPX-0034 (Alhassan FY2016 without phosphor); CPX-0035 (Alhassan FY2016 with phosphor); CPX-0037 (Oh FY2017 with phosphor); CPX-0038 (Oh FY2017 with phosphor); CPX-0044 (Azimah FY2018); CPX-0046 (Wong FY2021 with phosphor); CPX-0047 (Wong FY2021 (2) without phosphor).

For the reasons discussed below, I find that only the Wong FY2021 prototype (CPX-0046) has been shown to practice claims 1 and 8 of the ’529 patent. All other SSLEEC Domestic Industry Products have not been shown to have a lead frame with a transparent plate.

#### a. Claim 1

I find that only Wong FY2021 (CPX-0046) practices claim 1 of the ’529 patent.

##### i. “A light emitting device, comprising:”

The preamble of claim 1 is not limiting. *See supra* part V.B.1.

##### ii. “an LED chip emitting light at a first wavelength, wherein the emitted light is extracted from both front and back sides of the LED chip”

Respondents do not contest that this limitation is met in the SSLEEC Domestic Industry Products. Dr. Schubert testified that the SSLEEC Domestic Industry Products “have LED chips” that “emit light at a first wavelength … through-- to the front side as well as the back side of the device.” Tr. (Schubert) at 649:6-12, 23-25. I therefore find that each of the SSLEEC Domestic Industry Products meet this limitation.

**PUBLIC VERSION**

**iii. "a lead frame to which the LED chip is attached, wherein the LED chip resides on or above a transparent plate in the lead frame that allows the emitted light to be extracted out of the LED chip through the transparent plate in the lead frame"**

The parties dispute whether the SSLEEC Domestic Industry Products practice the "lead frame" and "transparent plate" limitations.

Dr. Schubert testified that the SSLEEC Domestic Industry Products satisfy this limitation because they have LED chips mounted on a transparent plate where light is emitted to the front and back sides of the lead frame. Tr. (Schubert) at 654:25-655:5. Dr. Schubert explained that he believes the lead frame includes "a transparent substrate that is vertically oriented" together with metal parts of "a so-called TO package." *Id*. at 655:6-10. The photographs on which Dr. Schubert relied include the following:




CDX-0002C.0072.

As can be seen, the photographs do not discernibly show that the SSLEEC Domestic Industry Products have a lead frame or a transparent plate. Further, no quantitative testing was done on the SSLEEC Domestic Industry Products to determine whether the materials used for the submounts are "transparent," and the photographs are not amenable to such a determination on their own.

Additionally, to practice the "lead frame" limitation, the SSLEEC Domestic Industry Products must be shown to have a support structure providing an interface to a semiconductor die. Dr. Schubert states that there is a "TO package" but does not explain how it provides an interface to a semiconductor die, and Complainant points to nothing in the record providing that information. Such conclusory testimony is insufficient to establish the technical prong for domestic industry. *Certain Static Random Access Memories and Products Containing Same*, Inv. No. 337-TA-792, Comm'n Op. at 17 (June 28, 2013) (EDIS Doc ID 512305) (upholding finding that complainant failed to establish the technical prong where the expert "offered conclusory and failed to explain how the demonstrative evidence he relied on referred back to the actual evidence in the record" (internal quotes omitted)).

I address further failures of proof with the purportedly representative products below.

*(a) Alhassan FY2016 (CPX-0034)*

Dr. DenBaars testified that Alhassan FY2016 has an LED mounted on a roughened sapphire plate in a vertical configuration, shown below. Tr. (DenBaars) at 183:12-22.




Dr. DenBaars, however, does not discuss whether this product has a lead frame, and the structure is not sufficiently visible from the photograph to ascertain whether the sapphire plate and bond wires satisfy that limitation. Thus, I find that Complainant has not shown that Alhassan FY2016 practices this limitation.

*(b) Oh FY2017 (CPX-0037)*

Dr. DenBaars testified that Oh FY2017 prototype (CPX-0037) is a 1-millimeter chip mounted on a roughened sapphire transparent plate in a vertical configuration where "blue light is transmitted through the roughened sapphire plate." Tr. (DenBaars) at 159:1-16. The picture below is of the back side of the LED. *Id*. at 160:3-12.

**PUBLIC VERSION**




Dr. DenBaars explained that one can see "blue light being transmitted out the back surface through the transparent plate" and also "the reflection of that blue light on the silver reflector" on the right side." Tr. (DenBaars) at 159:13-16.

However, it is unclear why Dr. DenBaars believes that the plate is sapphire. Dr. Sang Ho Oh, who created this sample, testified at his deposition that the sample corresponded to an article that was published in 2016, "Semipolar III-nitride light-emitting diodes with negligible efficiency droop up to 1 W," admitted here as RX-0124. JX-0038 at 41:22-42:17, 45:6-46:9. Dr. Oh stated the device in the article was made of "zinc oxide," but he had "tried many other transparent materials such as sapphire, transparent sapphire, or the patterned sapphire." RX-0123C at 53:16-19; *see also* JX-0038 at 66:17-22. Dr. Oh testified that he was not sure what substrate was used in the Oh FY2017 prototype, and he could not determine whether zinc oxide or sapphire was used. JX-0038 at 66:7-67:20.

Dr. Oh's testimony calls into question the accuracy of Dr. DenBaars' testimony, particularly since Dr. DenBaars personally did not create the SSLEEC Domestic Industry Products about which he was testifying. Because of this and because it is unclear what, if anything, would constitute a lead frame in the device, I find that Complainant has failed to meet its burden of showing that Oh FY2017 meets this limitation.

*(c) Azimah FY2018 (CPX-0044)*

Azimah FY2018 (CPX-0044) has a GaN chip on a roughened GaN substrate that has been placed on a patterned sapphire submount and surrounded with a roughened phosphor matrix. Tr. (DenBaars) at 179:20-180:7. However, testing documented in the photograph below showed "[t]he majority of the white light is demonstrated on the front surface" (downward below the rectangle in the photo) with only 20% to 40% of the light transmitting through the back surface (upward above the rectangle in the photo):



**PUBLIC VERSION**

CDX-0006.0015; Tr. at 180:3-24, 226:21-25, 227:1-17; *see also id*. at 226:4-20. The paucity of light passing through the back surface suggests that the submount is not transparent. Further, there is no evidence that Azimah FY2018 has a lead frame.

For these reasons, I find that Complainant has failed to meet its burden of proving that Azimah FY2018 practices this limitation.

*(d) Wong FY2021 (CPX-0046) and Wong FY2021 (CPX-0047)*

Wong FY2021 (CPX-0047) is a "micro-LED sample on a transparent plate." Tr. (DenBaars) at 173:10-13. Dr. Wong testified that CPX-0047 is the world record micro-LED that he fabricated at UCSB using transparent packaging. Tr. (Wong) at 315:19-24. He also testified that CPX-0047 is the device that is described in his paper, CX-2208, "Enhanced external quantum efficiency of III-nitride micro-light-emitting diodes using vertical and transparent package." *Id*. at 316:14-22.

Dr. DenBaars described Wong FY2021 (CPX-0047) as a micro-LED on a double polished sapphire surface that is completely transparent, as shown below. Tr. (DenBaars) at 173:10-21.




Dr. DenBaars describes a "blue light exiting out the back surface of the sapphire and hitting that silver post there on the right side," as shown below. Tr. (DenBaars) at 174:5-15.




Thus, I find that Wong FY2021 has a transparent plate.

**PUBLIC VERSION**

Concerning the "lead frame" limitation, Dr. Wong's paper, discussed above, includes the following diagram of the Wong FY2021 device:




CX-2208.

This figure shows a support structure providing an interface to a semiconductor die, as required by the proper construction of "lead frame." The figure also shows a transparent plate in the lead frame. In light of the foregoing, I find that Wong FY2021 practices this limitation.

As explained in more detail in connection with the "phosphor" limitation below, Wong FY2021 is embodied in two samples, CPX-0047 and CPX-0046. Dr. Wong specifically and persuasively testified that CPX-0046 and CPX-0047 have "the same" transparent plate packaging and that "the only difference" is that the 46 sample has phosphor on it, whereas the 47 sample does not. *See* Tr. (Wong) at 318:4-8. I therefore find that CPX-0046 and CPX-0047 meet this limitation.

No other SSLEEC Domestic Industry Products have been shown to meet this limitation.

**iv. "and a phosphor for converting the light emitted by the LED chip at the first wavelength to a second**

**wavelength"**

Dr. Schubert testified that each of the SSLEEC Domestic Industry Products emit a first wavelength of light that is converted to a second wavelength, such as a yellow light wavelength. Tr. (Schubert) at 660:14-20. But for most of those products, Dr. Schubert's evidence of a phosphor in the *same* device in which he identified other limitations is lacking. Dr. Schubert cited two different samples for each of Alhassan FY2016, Oh FY2017, and Wong FY2021. For some of those products, Dr. Schubert appears to rely on two *different* samples in order to compile every limitation of claim 1, as explained below. Such analysis does not satisfy the technical prong of the domestic industry requirement.

The only SSLEEC sample persuasively shown to have all elements of claim 1 in the same device is the Wong FY2021 (CPX-0046) sample.

*(a) Alhassan FY2016 (CPX-0035)*

To show that the "phosphor" limitation is met, Complainant relies on a *different* Alhassan sample (CPX-0035) from the one discussed above (CPX-0034) with respect to the limitation requiring a transparent plate in a lead frame. Dr. DenBaars testified that CPX-0035 is a transparent *blue* LED on a roughened sapphire plate that he believes was made by Abdullah Alhassan, shown below. Tr. (DenBaars) at 184:16-185:1. However, Dr. DenBaars testified that CPX-0034 is a *green* LED. *Id*. at 183:12-22.




Dr. DenBaars described this photograph as showing that the "plate lights up completely blue" meaning that "blue light is being passed out all surfaces of that sapphire plate." *Id*. at 185:4-6. He explained that he could tell light was coming out of all sides because you can see that there is some light coming out of the gray rectangle in the photograph above. *Id*. at 231:4-18. Given that this LED is a *blue* LED and CPX-0034 is a *green* LED, there is no evidence that the two samples have the same structure. Thus, I find that Complainant has failed to demonstrate that Alhassan FY2016 (CPX-0034) practices the phosphor limitation, and conversely that Complainant has failed to demonstrate that Alhassan FY2016 (CPX-0035) practices limitation requiring a transparent plate in a lead frame.

*(b) Oh FY207 (CPX-0038)*

Dr. DenBaars discussed sample CPX-0038 and stated that it was similar to CPX-0037 cited above but CPX-0038 has "a white phosphor and a molding," as shown below. Tr. (DenBaars) at 160:16-21.




Dr. DenBaars applied current to CPX-0038 at the hearing and testified, "you can see that the blue light is being emitted from the chip from all directions and it's now giving a nice 360-degree . . . emission output of white light." Tr. (DenBaars) at 160:22-25. A picture of CPX-0038 while turned on is below.




CDX-0006.0005. However, as I noted at the time, this testimony did not reflect my own perception at the time, as I could not perceive light emission from all sides. *See id*. at 161:1-2.

There is no evidence other than Dr. DenBaars's testimony that CPX-0038 is the same device as CPX-0037. To the contrary, Dr. Oh testified that the two devices shown below were made as part of two different research projects. JX-0038 at 66:7-16.




RX-0123C.0009 (corresponds to Ex. 4 at Oh Dep.). Thus, there does not appear to be any evidence that CPX-0038, containing the phosphor, is the same as or has the same features as CPX-0037. Accordingly, I find that Complainant has not shown that Oh FY2017 (CPX-0037) practices this

limitation. Conversely, I find that Complainant has failed to demonstrate that Oh FY2017 (CPX-0038) practices limitation requiring a transparent plate in a lead frame.

*(c) Wong FY2021 (CPX-0046)*

Dr. DenBaars relied on Wong FY2021 (CPX-0046) during his discussion of the "phosphor" limitation. He described Wong FY2021 (CPX-0046) as showing "true white light generation using the micro-LED technology on the transparent plate." Tr. (DenBaars) at 175:11-20. Dr. DenBaars testified that, in this sample, the filament extends into the board and is "surrounded by a roughened phosphor matrix in addition to being on the transparent plate." *Id*. at 175:21-25.




CDX-0006.0011. The phosphor matrix in Wong FY2021 (CPX-0046) converts light emitted from the LED chip to a different wavelength, such as a yellow light wavelength. *See* Tr. (Schubert) at 660:14-20. .

I therefore find that Wong FY2021 (CPX-0046) meets the "phosphor" limitation and has all other limitations of claim 1 of the '529 patent in the same device. Accordingly, I find that Wong FY2021 (CPX-0046) is an article protected by claim 1 of the '529 patent in accordance with 19 U.S.C. § 1337(a)(3). No other SSLEEC Domestic Industry Products have been persuasively shown to practice claim 1 of the '529 patent.

#### b. Claim 6

I find that none of the SSLEEC Domestic Industry Products practice claim 6 of the '529 patent.

##### i. "The device of claim 1"

For the reasons discussed above, only Wong FY2021 (CPX-0046) practices claim 1 of the '529 patent.

##### ii. "wherein the transparent plate is roughened, textured or patterned to increase light extraction from the LED chip through the transparent plate in the lead frame."

Dr. Schubert testified that the Alhassan FY2016, Oh FY2017, Wong FY2021 (CPX-0046) and Wong FY2021 (CPX-0047) devices practice this limitation. Tr. (Schubert) at 666:18-667:5; CDX-0002C.0084. Dr. Schubert did not offer an opinion regarding whether the Azimah FY2018 sample practices this limitation. *Id.* at 667:6-13.

Dr. Schubert's conclusion appears to rely on SSLEEC publications, since only publications are shown in the slide he referenced during his testimony (CDX-0002C.0084). But Dr. Schubert did not discuss the content of any of the publications during his testimony. Additionally, no percipient fact witnesses like Drs. Wong and DenBaars connected the descriptions in these papers to the SSLEEC Domestic Industry Products introduced at trial. Although Dr. DenBaars testified

that several of the SSLEEC Domestic Industry Products have roughened submounts, the basis for his testimony is not clear.

Further, even if some SSLEEC Domestic Industry Products have roughened submounts, the record lacks persuasive evidence that structures in question have a roughened surface "to increase light extraction," as required by claim 6. Dr. DenBaars testified that not all roughening, texturing, or patterning will increase light extraction because "[i]t has to be the right size features." Tr. (DenBaars) at 189:21-24. Indeed, the wrong pattern, shape, or size can decrease light extraction through a material. *Id*. at 190:18-18. Complainant's most pertinent, though still deficient, evidence on this point is discussed below.

*(a) Alhassan FY2016*

Dr. DenBaars testified that Alhassan FY2016 has a roughened sapphire plate. Tr. (DenBaars) at 183:12-22. Dr. DenBaars showed the following photograph to prove the back side of the sample is roughened:



CDX-0006.0017A; Tr. at 184:1-9. When I told Dr. DenBaars at the hearing that I could not determine from this evidence that the device had a roughened surface, he testified that he could tell with his eye that the plate was roughened because it appears white, and that greater magnification would show roughening. Tr. (DenBaars) at 228:22-230:4. No such magnification appears in the record, which inhibits my ability to find this limitation is satisfied.

Even if Dr. DenBaars' testimony were to be accepted that Alhassan FY2016 has a roughened surface, however, there is no evidence that the roughening is "to increase light extraction" as required by claim 6. I therefore find that Complainant has failed to meet its burden of showing Alhassan FY2016 meets this limitation.

*(b) Wong FY2021*

Dr. Wong testified that the transparent submount in his device is a double-sided "polished" sapphire plate. Tr. (Wong) at 117:8-16; *id.* (Schubert) at 667:14-668:1. Dr. DenBaars distinguished a "polished" surface from a "patterned" surface, such as is recited in claim 6. Tr. (DenBaars) at 224:18-225:1. The polished surface is "pretty clear and so it doesn't have that much scattering in it" as compared to a patterned surface. *Id.* This testimony undercuts a conclusion that the Wong FY2021 device is roughened to increase light extraction.

Perhaps to overcome this contrary evidence, Complainant's expert Dr. Schubert noted that Dr. Wong's publication describing the device, CX-2208, states that "[f]urther enhancements in light extraction can be achieved by surface roughening of the transparent submount." *See* CX-2208; Tr. (Schubert) at 667:14-668:1. But that suggestion of a technique to pursue in future experiments does not show that the Wong FY2021 device in the record here has a roughened, textured, or patterned transparent plate. To the contrary, CX-2208 states that the "work

**PUBLIC VERSION**

investigated" in the publication, consistent with Dr. Wong's testimony, was polished. *See* CX-2208.0004.

I find that Wong FY2021 has not been persuasively shown to meet this limitation.

**c. Claim 8**

I find that that the only SSLEEC Domestic Industry Product that practices claim 8 of the '529 patent is Wong FY2021 (CPX-0046).

**i. "The device of claim 1"**

For the reasons discussed above, only Wong FY2021 (CPX-0046), practices claim 1 of the '529 patent.

**ii. "wherein the LED chip includes a transparent substrate and the transparent substrate is adjacent the transparent plate."**

Respondents do not dispute that the SSLEEC Domestic Industry Products practice this limitation. Dr. Schubert testified that the four charted SSLEEC Domestic Industry Products have a transparent sapphire growth substrate that is positioned adjacent to the transparent plate. Tr. (Schubert) at 671:11-20; *see also*, Tr. (Wong) at 317:6-17. I therefore determine that Wong FY2021 (CPX-0046) is an article protected by claim 8 of the '529 patent in accordance with 19 U.S.C. § 1337(a)(3). No other SSLEEC Domestic Industry Products have been persuasively shown to practice claim 8 of the '529 patent.

**2. Licensee Domestic Industry Products**

Complainant asserts that the following Licensee Domestic Industry Products (also called "Rigid Domestic Industry Products") practice the asserted claims of the '529 patent:

PUBLIC VERSION

| Licensee Product Name | Supporting Exhibits |
|---|---|
| NewHouse Lighting | CX-0196 (Report)<br>CPX-0029 (Specimen) |
| Luminance | CX-0197 (Report)<br>CPX-0028 (Specimen) |
| Acclaim Tamarac<br>(single-crystal sapphire plate) | CX-0198 (Report)<br>CPX-0026 (Specimen) |
| GE Relax G16.5<br>(sold by Licensee Lamps Plus) | CX-0199 (Report)<br>CPX-0027(Specimen) |
| Sunlite | CX-0212 (Report)<br>CPX-0023 (Specimen) |
| Sylvania | CX-0213 (Report)<br>CPX-0025(Specimen) |
| Great Value<br>(supplied by Licensee Elong) | CX-0214 (Report)<br>CPX-0030(Specimen) |
| SSC Filament LED model number<br>[redacted] | CX-0215 (Report)<br>CPX-0032C (Specimen) |

Tr. (Schubert) at 614:3-18.

Of the devices listed above, only the Acclaim Tamarac product (also referred to as the Acclaim Domestic Industry Product), has been shown to have a single crystal sapphire transparent plate. I refer to the remaining products on the list as the Ceramic Domestic Industry Products.

For the reasons discussed below, I find that that the Ceramic Domestic Industry Products have not been shown to practice claims 1, 6, or 8 of the '529 patent. I do find, however, that the Acclaim Domestic Industry Product, is an article protected by the '529 patent.

#### d. Claim 1

The Ceramic Domestic Industry Products do not practice claim 1 of the '529 patent. However, the Acclaim Domestic Industry Product does.

##### i. "A light emitting device, comprising:"

The parties agreed that the preamble of claim 1 is not limiting. JX-0015 at 2. In light of the parties' agreement and the presumption that preambles are not limiting, I find that the preamble is not limiting.

**ii. "an LED chip emitting light at a first wavelength, wherein the emitted light is extracted from both front and back sides of the LED chip"**

Dr. Schubert testified that LED chips in the Rigid Domestic Industry Products emit blue light from the front and back sides. Tr. (Schubert) at 648:3-649:3. Respondents do not contest that this limitation is practiced. I therefore find the Rigid Domestic Industry Products satisfy this limitation.

**iii. "a lead frame to which the LED chip is attached, wherein the LED chip resides on or above a transparent plate in the lead frame that allows the emitted light to be extracted out of the LED chip through the transparent plate in the lead frame"**

The parties do not dispute that the Rigid Domestic Industry Products have a "lead frame," but dispute that Ceramic Domestic Industry Products have a "transparent plate."

*(a) "lead frame"*

Dr. Schubert testified that the Rigid Domestic Industry Products satisfy this limitation. Tr. (Schubert) at 654:3-22. No party disputes that opinion. I find the Rigid Domestic Industry Products satisfy the "lead frame" limitation.

*(b) "transparent plate"*

Complainant relies on photographs to show that the Ceramic Domestic Industry Products have a "transparent plate":

**PUBLIC VERSION**




CDX-0002C.0071; Tr. (Schubert) at 654:3-22. While the photographs do appear to show that some light is passing through the submount plate in these devices, I previously determined in my infringement analysis that photographs are not sufficient evidence to persuasively show a filament submount is transparent.

Turning to other evidence, Complainant's own LUX plots confirm that the Ceramic Domestic Industry Products have levels of transmissivity similar to the non-transparent Accused Products. Three such LUX plots exist in the record:




GE Relax G16.5
CX-0199.0044




Sunlite
CX-0212.0044




Acclaim DI Product
CX-0198.0044

Test results for the GE Relax and Sunlite (plotted above left and center) show the submounts in those devices are not transparent because only around half of light is being transmitted through the back of the submount. Analysis reports of the other Ceramic Domestic Industry Products conspicuously omitted this LUX plot testing entirely. CX-0196; CX-0197; CX-0213; CX-0214; CX-0215. I therefore find Complainant has failed to meet its burden of showing that the Ceramic Domestic Industry Products practice this limitation.[16]

In contrast, test results for the Acclaim Domestic Industry Product (plotted above right) show transparency. The Acclaim test results are consistent with the known structure of the Acclaim product, which includes a sapphire plate. Tr. (Schubert) at 614:14-18, 819:13-15. I therefore find the Acclaim Domestic Industry Product meets this limitation.

**iv. "and a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength."**

Dr. Schubert testified, based on microscopy and elemental analysis, that the devices include a phosphor that converts light from a first wavelength to a second wavelength. Tr. (Schubert) at 659:4-10, 660:4-11; CDX-0002C.0077. I find the Rigid Domestic Industry Products practice this limitation.

[16] Complainant does not appear to assert that the Licensee Domestic Industry Products practice the "transparent plate" limitation under the doctrine of equivalents, but incorporates the entirety of its infringement argument by reference. CIB at 56. To the extent this incorporation is intended to include an argument that the Licensee Domestic Industry Products meet this limitation under the doctrine of equivalents, that argument fails for lack of development (*see* Ground Rule 11.2) and for the same reasons discussed with respect to infringement.

**PUBLIC VERSION**

**e. Claim 6**

The Acclaim Domestic Industry Product is not alleged to practice claim 6 of the '529 patent. I find that that the Ceramic Domestic Industry Products do not practice claim 6 of the '529 patent.

**i. "The device of claim 1"**

Claim 6 depends from claim 1. For the reasons discussed above, I find that the Ceramic Domestic Industry Products have not been shown to practice claim 1 of the '529 patent. Such products are not protected by claim 6 of the '529 patent for at least that reason.

**ii. "wherein the transparent plate is roughened, textured or patterned to increase light extraction from the LED chip through the transparent plate in the lead frame."**

The parties do not appear to dispute that the Ceramic Domestic Industry Products have a "roughened, textured or patterned" transparent plate. Dr. Schubert testified that the Ceramic Domestic Industry Products practice this limitation based on the following microscopic evidence:



CDX-0002C.0083; Tr. (Schubert) at 666:7-12.

However, Respondents dispute whether the plate in the Ceramic Domestic Industry Products is roughened, textured or patterned "to increase light extraction" from the LED chip, as required by claim 6. None of the information cited by Complainant shows features roughened to *increase* light transmission. *See* Tr. (Speck) at 296:23-297:18; *see supra* part V.B.2.b Accordingly, I find that the Ceramic Domestic Industry Products have not been persuasively shown to practice this limitation.

**f. Claim 8**

I find that that the Ceramic Domestic Industry Products do not practice claim 8 of the '529 patent, but the Acclaim Domestic Industry Product does.

**i. "The device of claim 1"**

Claim 8 depends from claim 1. For the reasons discussed above, I find that the Ceramic Domestic Industry Products have not been shown to practice claim 1 of the '529 patent. Such products are not protected by claim 8 of the '529 patent for at least that reason. In contrast, I previously determined the Acclaim Domestic Industry Product has been shown to meet all of the limitations of claim 1.

**ii. "wherein the LED chip includes a transparent substrate and the transparent substrate is adjacent the transparent plate."**

Dr. Schubert testified that the Ceramic Domestic Industry Products as well as the Acclaim Domestic Industry Product have a transparent sapphire growth substrate that is adjacent to the transparent plate. Tr. (Schubert) at 671:3-10. The parties do not dispute that opinion. I find that the Ceramic Domestic Industry Products as well as the Acclaim Domestic Industry Product practice this limitation.

### D. Validity

#### 1. Invalidity Arguments Based on the Prior Art

Respondents contend several prior art references, alone and in combination, render the asserted claims of the '529 patent invalid.

##### a. Anticipation

A prior art reference anticipates when it discloses or contains all the claimed limitations "arranged or combined in the same way as in the claim." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1361 (Fed. Cir. 2012). However, the reference "need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

Respondents contend claims 1, 6, and 8 of the '529 patent are anticipated by each of four references: Yamazaki, Minato, Okamoto, and Uemura.

##### b. Obviousness

A patent may be found invalid as obvious if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (pre-AIA). Because obviousness is determined at the time of invention, rather than the date of litigation, "[t]he great challenge of the obviousness judgment is proceeding without any hint of hindsight." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011).

The critical inquiry in determining the differences between the claimed invention and the prior art is whether there is an apparent reason to combine the known elements in the fashion claimed by the patent at issue, and a reasonable expectation of success in doing so. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417-418 (2007). Though rare, "in appropriate circumstances, a patent can be obvious in light of a single prior art reference if it would have been obvious to

modify that reference to arrive at the patented invention." *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016). Obviousness is a determination of law based on underlying determinations of fact. *Star Scientific*, 655 F.3d at 1374.

Respondents contend claims 1, 6, and 8 of the '529 patent are rendered obvious by combinations of Yamazaki, Minato, Okamoto,[17] or Uemura with other, secondary references addressed below.

**2. Yamazaki (RX-0828)**

The asserted claims of the '529 patent are invalid based on Japanese Patent Application Publication No. 2003-249692 ("Yamazaki") (RX-0828).

Complainant disputes whether Yamazaki discloses the "lead frame" and "phosphor" recited in claim 1 and the "roughened, textured or patterned transparent plate" recited in claim 6. CRB at 15-19; CPB. 195-196; Tr. (Lebby) at 1207:14-1208:6, RDX-0003.0012.

**a. Overview of Yamazaki**

Japanese Patent Application Publication No. 2003-249692 ("Yamazaki") was published on September 5, 2003, and thus constitutes § 102(b) prior art to all Asserted Patents.

Yamazaki describes an LED package that "emits light in a plurality of directions through a simple structure." Tr. at 1205:7-16; RX-0828 at [0008], [0039]. It was designed for applications where light emits from both sides of the package, for example "backlighting in a doublesided display device." Tr. at 1205:7-16; RX-0828 at [0034], [0038].

[17] On September 15, 2021, the Patent Trial and Appeal Board ("PTAB") issued a final written decision finding claims 1 and 8 (among others) of the '529 patent unpatentable in response to a petition for inter partes review filed by Satco. RPB at 3 (citing IPR2020-00695). The petition and the PTAB decision relied on the Okamoto, Shimizu, and Miyahara references raised by Respondents here plus two additional references that were withdrawn from this investigation. *Id.* Satco's inter partes petition did not involve claim 6 of the '529 patent.

**PUBLIC VERSION**




RX-0828 (Yamazaki Fig. 1, annotated).

Yamazaki's Figure 1 shows an LED chip (12) die-bonded to a transparent plate (11), which is "a flat chip substrate made from a transparent material, such as, for example, transparent glass, sapphire, SIC, or the like." RX-0828 at [0026]; Tr. at 1205:17-1206:17; RDX-0003.011. The LED chip is attached to the glass/sapphire plate with "a transparent adhesive agent 11b." RX-0828 at [0025]; Tr. at 1205:17-1206:17.

The electric connection to the LED chip is provided by "conductive pattern 11a" and "gold wires 15." RX-0828 at [0026]; Tr. 1205:17-1206:17; 1209:5-24. The LED chip is encased in a "first resin molding portion 13" and a "second resin molding 14." RX-0828 at [0025]; Tr. 1205:17-1206:17. When blue light from the LED strikes the resin molding "into which a fluorescent material has been mixed, white light is produced by the fluorescent material." RX-0828 at [0013]-[0015], [0028], [0032]; Tr. 1205:17-1206:8. These resin moldings are "thermally curable epoxy" that "is molded through an arbitrary molding method." RX-0828 at [0028], [0029]. Yamazaki discloses finishing the moldings "to be roughened surface, so as to prevent internal reflections." Tr. at 1210:4-1211:13; RX-0828 at [0025].

Complainant disputes only three limitations of Yamazaki, as highlighted below:

1. A light emitting device, comprising:

   an LED chip emitting light at a first wavelength, wherein the emitted light is extracted from both front and back sides of the LED chip; a lead frame to which the LED chip is attached, wherein the LED chip resides on or above a transparent plate in the lead frame that allows the emitted light to be extracted out of the LED chip through the transparent plate in the lead frame; and a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength.

6. The device of claim 1, wherein the transparent plate is roughened, textured or patterned to increase light extraction from the LED chip through the transparent plate in the lead frame.

8. The device of claim 1, wherein the LED chip includes a transparent substrate and the transparent substrate is adjacent the transparent plate.

’529 patent at claims 1, 6, 8 (emphasis added); *see* RDX-0003.012; CPB at 195-197; CRB at 14-24; Tr. (Lebby) at 1205:1-1206:17.

**b. Claim 1**

Respondents and Staff assert that Yamazaki discloses all limitations of claim 1. RIB at 49; SIB at 74. Complainant contends Yamazaki does not disclose a “lead frame” and a “phosphor.” CRB at 15-19.

**i. “lead frame”**

Claim 1 of the ’529 patent requires “a lead frame to which the LED chip is attached,” with “a transparent plate in the lead frame.” As shown in the annotated figure above, the lead frame disclosed in Yamazaki is the transparent substrate 11 (light blue) together with electrical leads 11a (purple) and wire bonds 15. RX-0828 at [0026]; Tr. at 1208:9-24. The leads 11a are metallic electrodes wire bonded to the anode and the cathode of the LED chip. Tr. at 1209:5-24. As shown in Figure 1, leads 11a are at end of the transparent plate 11. Thus, just as recited in claim 1 of the

’529 patent, the transparent plate of Yamazaki is “in the lead frame,” in other words, it is part of the overall structure that provides support and electrical connection to the LED chip.

Complainant argues that the electrically conductive portions 11a in Yamazaki are thin metallizations that cannot be a lead frame because they do not provide structural support. CRB at 15-16; Tr. (Schubert Reb.) at 1331:18-1332:8. Complainant’s argument lacks merit. The relevant element of claim 1 recites a “lead *frame*,” not just electrical “leads.” There is no requirement in claim 1, or in the ’529 patent, that any individual portion of the electrical conductive path in a lead frame must independently provide structural support to the LED chip. As properly construed, the lead frame, as a whole, must provide some degree of structural support, and Yamazaki’s lead frame does that. Yamazaki discloses that an LED chip can be “pressed against the surface of” of transparent substrate 11, and electrically conductive portions 11a are provided on that surface. RX-0828 at [0026], [0031]. That teaching is evidence that elements 11 and 11a together provide structural support to the LED. I find Yamazaki discloses a “lead frame.”

**ii. “phosphor”**

Claim 1 of the ’529 patent requires “a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength.” Yamazaki discloses molding portion 13 made from “a transparent resin into which a fluorescent material has been mixed.” *See, e.g.*, RX-0828 at [0015], [0028], [0032]. When blue light emitted from the LED is incident to the molding, “white light is produced by the fluorescent material.” *Id.*

In its responsive post-hearing brief, Complainant provides a one-sentence argument that “the word ‘phosphor’ does not appear in Yamazaki.” CRB at 15. Respondents moved to strike this sentence because Complainant’s prehearing brief provided no notice that Complainant would criticize Yamazaki for failing to disclose a phosphor. *See* Motion Docket No. 1220-047. In response, Complainant argues that it “could not have included such arguments in its Pre-Hearing

Brief because it could not have known" that Respondents' expert witness would focus his trial testimony on disputed elements without parroting all claim elements in each prior art reference. Complainant's Response in Opposition to Respondent's Motion to Strike (EDIS Doc. ID 754926) at 2, 5. Complainant also argues that striking its argument about the Yamazaki phosphor is tantamount to shifting the burden on validity proof to Complainant.

Ground Rule 11.2 provides that each party's pre-hearing brief "shall set forth a party's contentions on every issue the party intends to address at hearing." Order No. 42, G.R. 11.2. "Any contentions not set forth in detail in the pre-hearing brief shall be deemed abandoned or withdrawn, except for contentions of which a party is not aware and could not be aware in the exercise of reasonable diligence at the time of filing the pre-hearing brief." *Id*.

Complainant knew Respondents were relying upon Yamazaki for anticipation, as evidenced by arguments in Complainant's pre-hearing brief contesting anticipation by Yamazaki. CPB at 195. If Complainant thought Yamazaki had no phosphor, it was obligated to say so in its pre-hearing brief to allow an orderly trial on that point. Complainant does not contest that its pre-hearing brief lacks any argument about whether Yamazaki discloses a "phosphor." Because Complainant did not give proper notice of its novel phosphor argument, the motion to strike is granted.

This ruling does not shift the burden from Respondents to prove invalidity. Respondents carried their burden by adducing evidence at trial that claim 1 is anticipated. That evidence is the Yamazaki reference, an exhibit Respondents sponsored as indicated by its RX designation. Respondents were not necessarily obligated to do any more. *See Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1177 (Fed. Cir. 2020) ("Expert testimony is not always required for a district court to determine how a skilled artisan would understand a patent's disclosure and

claimed invention."). But Respondents also elicited testimony from the perspective of a person of ordinary skill in the art that the fluorescent material in the Yamazaki resin is a phosphor. *See* Tr. at 1206:5-6 (in Yamazaki, it is "resin molding portions 13 and 14 that contain phosphor"). That testimony is unrebutted, a fact Complainant fails to mention.

Even if I were to consider on the merits Complainant's passing argument that "the word 'phosphor' does not appear in Yamazaki," I would find it lacks merit. A reference "need not satisfy an *ipsissimis verbis* test" to demonstrate anticipation, meaning it need not use exactly the same words of the claim. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). The "fluorescent material" in Yamazaki is a phosphor, even if the English translation of Yamazaki does not use that word. That fact is certain because Yamazaki teaches that the fluorescent material will emit white light when "excited by the blue light," just like the phosphor recited in claim 1. RX-0828 at [0028]; *see also id*. [0036] (white light from the fluorescent material is "excitation light"), [0039] (when light from the LED strikes the fluorescent material, it will produce "a color that is different from the color of light emission by the light-emitting chip"). Thus, even after considering Complainant's argument, I would still find Yamazaki discloses the phosphor of claim 1.

#### iii. Anticipation

Based on the evidence recounted above, I find the Yamazaki reference discloses every element of claim 1, arranged as in the claim. Yamazaki is clear and convincing evidence that claim 1 of the '529 patent is invalid as anticipated.

#### iv. Obviousness

In the alternative, if Yamazaki does not teach the "lead frame" limitation, I determine an invention with the claimed lead frame would have been obvious in view of Yamazaki, U.S. Patent No. 6,310,364 ("Uemura") (RX-0779), and the state of the art represented by U.S. Patent No. 5,998,925 ("Shimizu") (RX-0784).

**PUBLIC VERSION**

As Respondents' expert Dr. Lebby explained, by the mid-1990s people in the art knew of two interchangeable alternatives for LED packaging: through-pin packages and surface-mount J-lead packages, or SMJs. Tr. (Lebby) at 1203:7-1204:3, 1226:6-15. The Shimizu reference confirms the state of the art at that time, namely that through-pin packaging and SMJ packaging was interchangeable. Shimizu shows the same LED packaged both ways:




RDX-0003.0028. As shown in Fig. 1 above, the through-pin leads provide structural support to the device.

If "there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). So here. At the time of the invention disclosed in the '529 patent, there were two well-known, interchangeable options for packaging LEDs: using through-pins or using SMJs. Because both were within the "technical grasp" of an ordinary artisan at the time of the invention, such a person would have had, in the words of *KSR*, "good reason to pursue" either. *See* Tr. (Lebby) at 1227:1-18; 550 U.S. at 421.

**PUBLIC VERSION**

The Uemura reference (RX-0779) provides specific motivation to pursue through-pin lead frame packaging with an LED mounted on a transparent plate. Like Yamazaki, Uemura teaches mounting an LED on a transparent plate, which is labeled 10 and annotated in light blue below:




RX-0779 at Fig. 1 (annotated), 4:24 ("The transparent base 10 is not particularly limited . . ."); RDX-0003.0029. Uemura places the transparent plate 10 in a lead frame with through-pins 50a and 50b. RX-0779 at 5:54-55. Uemura teaches that the disclosed arrangement allows for "less demand for the working precision of lead frames and the easy attachment to the lead frames." RX-0779 at 3:38-50; Tr. at 1232:4-13. As Respondents' expert Dr. Lebby testified, a person of skill would understand Uemura's approach, which requires less manufacturing precision, would "lower the manufacturing cost" of packaging LEDs. *See* Tr. at 1231:14-1232:13. I therefore find that Uemura provides motivation to pursue the transparent plate configuration of Yamazaki in a package with a through-pin lead frame.

**PUBLIC VERSION**

Once motivated, the results of packaging Yamazaki in a lead frame with through-pins would be predictable, as Dr. Lebby described and illustrated. *Id*. at 1227:19-1228:11. [18]




After considering the teachings of the prior above, together with the record evidence relating to secondary considerations, I determine that it would have been obvious at the time of the invention to modify Yamazaki’s package to use through-pin leads that provide structural support. Such an arrangement would have a “lead frame” as required by claim 1. Claim 1 is therefore invalid under 35 U.S.C. § 103.

**c. Claim 6 - “roughened, textured or patterned”**

Claim 6 of the ’529 patent depends from claim 1 and adds the additional limitation that “the transparent plate is roughened, textured or patterned to increase light extraction.” Above I found that Yamazaki discloses every element of claim 1. For the reasons discussed below, I

[18] Complainant suggests that, because Dr. Lebby did not explicitly say his testimony concerning Yamazaki teaching a “lead frame” applied to the ’529 patent, Respondents have met with a failure of proof. But the “lead frame” of the ’529 patent is identical to that of the related ’464 patent; Dr. Lebby’s testimony applies to one as much as the other, and in any event, the proof of invalidity is the reference itself, not the expert’s testimony, the primary function of which is to assist me in understanding the underlying evidence.

additionally find that the LED package disclosed in Yamazaki describes a transparent plate that is "roughened, textured or patterned," as required by claim 6. Tr. (Lebby) at 1210:1-1212:10.

As discussed above, Yamazaki discloses an LED chip attached to a "chip substrate 11" made of glass, sapphire, or other transparent material. RX-0828 at [0026]; Tr. (Lebby) at 1205:1-1206:17. Paragraph 37 of Yamazaki also discloses "the surface of the chip substrate 12 is a roughened surface." RX-0828 at [0037]. Complainant contends that this paragraph 37 disclosure does not demonstrate that "chip substrate <u>11</u>" is roughened, as element number <u>12</u> in Yamazaki is the LED chip itself, not the transparent substrate the chip is mounted on. CRB at 23-24.

Complainant's argument is not persuasive. Dr. Lebby opined that a person of skill in the art would understand that the number 12 in paragraph 37 of Yamazaki was a typographical error and that it should read "chip substrate 11." Tr. (Lebby) at 1212:7-10. I find there is good reason to credit Dr. Lebby's testimony. Yamazaki uses the phrase "chip substrate 11" at least 17 times and in the section titled "Explanation of Reference Symbols" defines symbol 11 as "Chip Substrate." *See, e.g.*, RX-0828 at [0025]-[0026], [0031]-[0034]. In contrast, the phrase "chip substrate 12" appears in Yamazaki only once, in the disputed paragraph 37. RX-0828 at [0037]. Moreover, Yamazaki never uses the word "surface" in connection with LED "chip 12" but repeatedly uses it in connection with "chip substrate 11." *See, e.g.*, RX-0828 at [0025] ("to cover the light-emitting chip 12 and also the entirety of the *surface* of the chip substrate 11" (emphasis added)). And the "Explanation of Reference Symbols" defines symbol 12 as "Light-Emitting Chip," not as the chip substrate. These disclosures together provide strong evidence that the number 12 in paragraph 37 is a typographical error and the paragraph should read "the surface of the chip substrate 11 is a roughened surface."

Such an interpretation of paragraph 37 is entirely consistent with the other teachings of Yamazaki. For example, Yamazaki teaches that when a component is "finished with roughened surfaces, internal reflections at the surfaces . . . are reduced, improving the efficiency with which light is produced to the outside" of the component. RX-0828 at [0017] (in the context of roughening molded resin surfaces). As Dr. Lebby testified, the same would be true when chip substrate 11 is roughened. Tr. (Lebby) at 1210:18-1211:13. Yamazaki also teaches that in the disclosed configuration, light "is not blocked from exiting to the other side of the chip substrate." RX-0828 at [0019]. Roughening the surface of chip substrate 11 would reduce internal reflection at the surface of the transparent plate and allow light to exit the chip substrate, consistent with Yamazaki's other disclosures.

Complainant presented no testimony or other evidence rebutting Dr. Lebby's interpretation of paragraph 37. I find, based on my review of Yamazaki as a whole and Dr. Lebby's credible, unrebutted testimony, that a person of ordinary skill in the art would understand Yamazaki to disclose a roughened transparent plate arranged as required by claim 6 of the '529 patent. I therefore determine that Yamazaki anticipates claim 6 of the '529 patent.

**i. Obviousness**

Alternatively, I find that the invention of claim 6 would have been obvious in view of Yamazaki alone or in combination with Japanese Application Publication No. 2004-4158557 ("Hakujin") (RX-0830).

Yamazaki motivates an artisan to roughen the disclosed transparent plate 11. Yamazaki teaches that light from the LED should not be "blocked from exiting to the other side of" the transparent plate. RX-0828 at [0019]. Yamazaki also suggests a technique useful in solving that problem: when a component is "finished with roughened surfaces, internal reflections at the surfaces . . . are reduced, improving the efficiency with which light is produced to the outside" of

the component. RX-0828 at [0017] (in the context of roughening molded resin surfaces). Respondents' expert Dr. Lebby testified that this roughening technique was well known in the art for decades prior to the invention. Tr. (Lebby) at 1212:11-1214:19. Thus, the teachings of Yamazaki alone would motivate a person of ordinary skill to roughen Yamazaki's transparent plate 11 and arrive at the claimed invention.

As a second alternative, the teachings of Yamazaki in view of Hakujin would have rendered the invention of claim 6 obvious. As noted above, Yamazaki would motivate a person of skill in the art to roughen the transparent plate upon which an LED light is mounted to increase light extraction. The Hakujin reference contains the same motivation. It discloses roughened plates 413 and 513 to reduce total internal reflection, as shown below:




RX-0830 at [0018], Figs. 5, 7 (due to "the design of this rough surface 413, the emission intensity . . . is enhanced"). Respondents' expert Dr. Lebby provided unrebutted testimony that roughening the transparent plate would have been obvious and "totally predictable." Tr. (Lebby) at 1216:20-1217:24.

In sum, after considering the teachings of the prior above, together with the record evidence relating to secondary considerations, I determine that it would have been obvious at the time of

the invention to roughen transparent plate 11 in Yamazaki. Such an arrangement would have all of the elements required by claim 6. Claim 6 is therefore invalid under 35 U.S.C. § 103.

**d. Claim 8**

Claim 8 depends from claim 1 and adds the additional limitation that the LED chip has "a transparent substrate," and the chip is oriented with that substrate "adjacent the transparent plate." Figure 1 of Yamazaki shows LED chip 12 adjacent to transparent substrate 11. RX-0828. Yamazaki states light is emitted though both sides of LED chip 12, which means the side of chip 12 adjacent to chip substrate 11 is transparent. *Id.* at [0016]. Thus, Yamazaki discloses the invention of claim 8.

Complainant argues that Respondents failed to adduce evidence at the hearing that Yamazaki discloses an LED chip having a transparent substrate as required by claim 8. CRB at 14. Additionally, Complainant argues "LEDs can be grown on opaque substrates like silicon." *Id*. Respondents moved to strike this argument from Complainant's post-hearing reply brief because Complainant's prehearing brief provided no contention that the LED chip of Yamazaki did not have a transparent substrate. *See* Motion Docket No. 1220-047. In response, Complainant argues that it "could not have included such arguments in its Pre-Hearing Brief because it could not have known" that Respondents' expert witness would focus his trial testimony on disputed elements without parroting all claim elements in each prior art reference. Complainant's Response in Opposition to Respondent's Motion to Strike (EDIS Doc. ID 754926) at 2, 5. Complainant also argues that striking its argument about the arrangement of claim 8 in Yamazaki is tantamount to shifting the burden on validity proof to Complainant.

Ground Rule 11.2 provides that each party's pre-hearing brief "shall set forth a party's contentions on every issue the party intends to address at hearing." Order No. 42, G.R. 11.2. "Any contentions not set forth in detail in the pre-hearing brief shall be deemed abandoned or withdrawn,

except for contentions of which a party is not aware and could not be aware in the exercise of reasonable diligence at the time of filing the pre-hearing brief." *Id*.

Complainant knew Respondents were relying upon Yamazaki for anticipation of claim 8, as evidenced by arguments in Complainant's pre-hearing brief contesting anticipation by Yamazaki. CPB at 195. If Complainant thought the LED chip of Yamazaki had no transparent substrate as required by claim 8, it was obligated to say so in its pre-hearing brief to allow an orderly trial on that point. Because Complainant did not give proper notice of its novel argument relating to claim 8, the motion to strike is granted.

This ruling does not shift the burden from Respondents to prove invalidity. Respondents carried their burden by adducing evidence at trial that claim 8 is anticipated. That evidence is the Yamazaki reference, an exhibit Respondents sponsored as indicated by its RX designation. Respondents were not obligated to do any more. *See Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1177 (Fed. Cir. 2020) ("Expert testimony is not always required for a district court to determine how a skilled artisan would understand a patent's disclosure and claimed invention."). When Dr. Lebby testified that the only features of Yamazaki in dispute were the "lead frame" and a "roughened" transparent plate, Complainant did not object or offer counter evidence. Tr. (Lebby) at 1207:14-1208:6. The record evidence indicates that the LED chip 12 of Yamazaki has a transparent substrate adjacent to a transparent plate. I therefore find that Yamazaki anticipates claim 8 of the '529 patent.

Even if I were to consider on the merits Complainant's argument that LEDs can be grown on opaque substrates, I would find it irrelevant. The LED chip disclosed by Yamazaki plainly does not have an opaque substrate, as demonstrated by the express teaching that light is emitted though both sides of LED chip 12, including the side of chip 12 adjacent to transparent plate 11.

RX-0282 at [0016]. Thus, even after considering Complainant's argument, I would still find Yamazaki anticipates claim 8.

Alternatively, if Yamazaki does not disclose that LED chip 12 has a transparent substrate adjacent to transparent plate 11, I would find that such an arrangement would have been obvious at the time of the invention for the same reasons articulated below with respect to Okamoto.

### 3. Minato (RX-0723)

Asserted claims 1 and 8 of the '529 patent are invalid as anticipated by Japanese Patent Application Publication No. 2001-126515 ("Minato"). Tr. (Lebby) at 1241:11-1246:5. Additionally, I find that claim 6 is rendered obvious by Minato, either alone or in combination with certain other prior art references.

As with Yamazaki, Complainant disputes whether Minato discloses the "lead frame" and a "phosphor" as recited in claim 1, as well as the "roughened, textured or patterned transparent plate" limitation recited in claim 6.[19] CRB at 31-34.

I find that Minato anticipates or renders claims 1 and 8 of the '529 patent obvious. Minato also renders claim 6 obvious alone or in combination with Yamazaki or Hakujin.

#### a. Overview of Minato

Japanese Patent No. JP 2001-126515 ("Minato") published on May 11, 2001. It is undisputedly § 102(b) prior art to all Asserted Patents.

[19] Respondents' motion to strike Complainant's argument concerning lack of disclosure of "phosphor" and LED chip with "a transparent substrate" is granted for the same reasons described above in connection with Complainant's arguments relating to the Yamazaki reference. *See* Motion Docket No. 1220-047. At the time of the filing of its prehearing brief, Complainant was aware of Respondents' contention that Minato anticipates claims 1 and 8 of the '529 patent but did not dispute that Minato teaches a "phosphor" or a "growth substrate." CPB at 253-256. Under Ground Rule 11.2, arguments not raised in the pre-hearing brief are waived. The motion is likewise granted with respect to the purported issue of conflicting translations of Minato, for the same reason.

Minato describes an LED package "for radiating light in all directions, that is, 360º of directions." RX-0723 at [0005], [0015]; Tr. 1241:17-1242:2. Minato explains that this improves on conventional LED packages "where light is radiated in only one direction." RX-0723 at [0003]-[0004].

Minato's Figure 2 shows three LED chips (25, 26, 27) that are "mounted on a transparent substrate." RX-0723, [0015]; Tr. 1242:6-19. The transparent substrate may be "sapphire." RX-0723 at [0016]; Tr. 1242:6-19.




RDX-0003.046.

The electric connection is provided by having the LED chips "mounted on first to third conductor parts 22, 23, and 24," and by wires 28, 29, and 31 "such that the three LED chips are connected in series." RX-0723 at [0011]; Tr. 1244:7-19. Minato explains that "a transparent conductor can be used as the conductor part, or it can be formed from a normal conductor having a narrow width, insofar as it does not interfere with light radiation." RX-0723 at [0011].

The conductor parts are electrically connected in turn to "leads 32 and 33," which provide the electrical connection from the package to the outside. RX-0723 at [0011]; Tr. 1244:7-19. The LED chips are encased in "an oblong transparent or translucent resin body 34 having a lens effect." RX-0723 at [0011]; Tr. at 1242:6-19. This "transparent or translucent resin body 34" can be "a material containing a fluorescent material." RX-0723 at [0016]; Tr. 1242:6-19.

**b. Claim 1**

**i. "lead frame"**

Respondents and Staff assert that Minato discloses all limitations of claim 1. RIB at 49; SIB at 80. Complainant contends that Minato fails to disclose a "lead frame." RIB at 22; CRB at 31-34.

Claim 1 of the '529 patent requires "a lead frame to which the LED chip is attached," with "a transparent plate in the lead frame." Minato discloses a lead frame composed of transparent sapphire substrate 21, along with electrical leads 32 and 33, which are connected to the LED chip through wire bonds 28, 29, and 31. RX-0723 at [0011], Fig. 2; Tr. at 1244:8-19. As with Yamazaki, this combination of elements provides support and electrical connection to the LEDs and constitutes the claimed "lead frame."

Complainant's expert witness Dr. Schubert testified that pull out leads 32 and 33 are very thin and do not provide structural support. Tr. (Schubert Reb.) at 1332:11-20. But as discussed above with respect to Yamazaki, there is no requirement in claim 1, or in the '529 patent, that any individual portion of the electrical conductive path must independently provide structural support to the LED chip. Minato's plate and leads together provide a support structure and an electrical interface to the LED chip, which is all that is required. I find that Minato discloses a lead frame.

#### ii. "phosphor"

Claim 1 of the '529 patent requires "a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength." Minato discloses encasing the LED chip in a "transparent . . . resin body" having "fluorescent material." RX-0723 at [0016]. As shown in Figure 2, light radiates from the LED chip through the resin containing fluorescent material, which necessarily would convert some of the light to another wavelength. *Id*. at Fig. 2.

In its responsive post-hearing brief, Complainant provides a one-sentence argument that "Minato does not use the word 'phosphor'." CRB at 31. As has been noted at n.19 *supra*, Complainant's argument is untimely and I decline to consider it. Even if I were to consider Complainant's argument on the merits, however, I would find it lacks merit. A reference "need not satisfy an *ipsissimis verbis* test" to demonstrate anticipation, meaning it need not use exactly the same words of the claim. *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009). The "fluorescent material" in Minato is a phosphor, even if the English translation of Yamazaki does not use that word. As a principle of physics, when light of a first wavelength encounters the fluorescent material it will be converted to a second wavelength, as explained above in connection with Yamazaki. Thus, even after considering Complainant's argument, I would still find Minato discloses the phosphor of claim 1.

#### iii. Anticipation

Based on the evidence recounted above, I find the Minato reference discloses every element of claim 1, arranged as in the claim. Minato is clear and convincing evidence that claim 1 of the '529 patent is invalid as anticipated.

#### iv. Obviousness

In the alternative, if Minato does not teach the "lead frame" limitation, I determine an invention with a lead frame would have been obvious in view of Minato alone or in combination

with Uemura, and the state of the art represented by Shimizu, for the same reasons described above in connection with Yamazaki. Dr. Lebby testified to the same effect. Tr. (Lebby) at 1248:21-1252:1.

Complainant argues Respondents failed to meet their burden to show invalidity based on Minato because Dr. Lebby testified about Minato's lead frame in the context of certain claims of the '854 patent and '557 patent, which require a "cathode and anode provide structural support to the transparent surface" instead of a "lead frame." *See, e.g*. CRB at 33. Complainant's argument lacks merit. Respondents carried their burden by adducing evidence at trial that would support a conclusion that claim 1 of the '529 patent would have been obvious in view of the prior art at the time of the invention. That evidence includes the Minato, Uemura, and Shimizu references, all of which are exhibits sponsored by Respondents. Respondents were not necessarily obligated to do any more. *See Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1177 (Fed. Cir. 2020) ("Expert testimony is not always required for a district court to determine how a skilled artisan would understand a patent's disclosure and claimed invention."). But Respondents also elicited testimony from the perspective of a person of ordinary skill in the art about the scope and content of these references, how an artisan would be motivated to combine them, and what the expected result would be. *See* Tr. at 1247:10-1252:1. That testimony is unrebutted, a fact Complainant fails to mention.

I have compared the prior art, including Minato, Uemeda, and Shimizu, to the invention described in claim 1 of the '529 patent. I have also considered Dr. Lebby's opinions about what a person of skill would have gathered from those references, as well as the record evidence relating to secondary considerations. I determine that the same motivations I articulated above in connection with Yamazaki would motivate an artisan to pursue through-pin lead frame packaging

with an LED mounted on a transparent plate. *See supra* part V.D.2.b.iv. If "there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). So here. At the time of the invention disclosed in the '529 patent, there were two well-known, interchangeable options for packaging LEDs: using through-pins or using SMJs. Because both were within the "technical grasp" of an ordinary artisan at the time of the invention, such a person would have had, in the words of *KSR*, "good reason to pursue" either. *See* 550 U.S. at 421; Tr. at 1248:21-1249:18.

After considering the teachings of the prior art above, together with the record evidence relating to secondary considerations, I determine that it would have been obvious at the time of the invention to modify Minato's package to use through-pin leads that provide structural support. Such an arrangement would have a "lead frame" as required by claim 1. Claim 1 is therefore invalid under 35 U.S.C. § 103.

#### c. Claim 6 - "roughened, textured or patterned"

Claim 6 of the '529 patent depends from claim 1 and adds the additional limitation that "the transparent plate is roughened, textured or patterned to increase light extraction." Above I found that Minato discloses every element of claim 1. For the reasons discussed below, I additionally find that it would have been obvious at the time of the invention to make the transparent plate in Minato "roughened, textured or patterned," as required by claim 6.

The parties agree Minato does not expressly disclose a "roughened, textured or patterned" transparent plate. Respondents argue that, in view of Minato alone, or in combination with Hakujin or Yamazaki, it would have been obvious to modify Minato's LED package to use a roughened transparent plate. RIB at 27; Tr. (Lebby) at 1244:17-1246:5.

In the relevant art, roughening a transparent plate is common knowledge dating back 50 years. Tr. (Lebby) at 1244:23-1245:17. Additionally, both the Yamazaki and Hakujin references disclose roughened transparent plates holding LEDs. *Id.*

Minato provides a motivation for using a roughened transparent plate to support its disclosed LED chips. Minato discloses that prior art LED chips had the disadvantage of only radiating light in one direction; specifically, they did not radiate light out of the bottom of the chip. RX-0723 at [0004]. Minato teaches that it is desirable to use an LED chip that can radiate light "from the upper face" and "from the rear face," but that the light from both sides should "be effectively used." *Id*. at [0010]. As Dr. Lebby explained, the ordinary artisan at the time of the invention would know that roughening the transparent plate would increase light extraction, which would advance Minato's goal of using the light "effectively." Tr. at 1246:1-5.

Yamazaki also motivates an artisan to roughen the disclosed transparent plate 11. Yamazaki teaches that light from the LED should not be "blocked from exiting to the other side of" the transparent plate. RX-0828 at [0019]. Yamazaki also suggests a technique useful in solving that problem: when a component is "finished with roughened surfaces, internal reflections at the surfaces . . . are reduced, improving the efficiency with which light is produced to the outside" of the component. RX-0828 at [0017] (in the context of roughening molded resin surfaces).

The figures below show how one would roughen the transparent plate in Minato by performing a simple substitution of Minato's sapphire plate for a roughened plate from Hakujin or Yamazaki. *Id*. at 1245:13-1246:5.

**PUBLIC VERSION**




Roughening the sapphire plate in Minato would not have required modification to any of its other components and the result of increasing light extraction would have been predictable. Tr. (Lebby) at 1245:18-1246:5.

After considering the teachings of the prior art above, together with the record evidence relating to secondary considerations, I determine that it would have been obvious at the time of the invention to roughen the transparent plate of Minato. Such an arrangement would result in a configuration having every element of claim 6. Claim 6 is therefore invalid under 35 U.S.C. § 103.

**d. Claim 8 – "transparent substrate"**

Claim 8 depends from claim 1 and adds the additional limitation that the LED chip has "a transparent substrate," and the chip is oriented with that substrate "adjacent the transparent plate." Figure 2 of Minato shows LED chips 25, 26, and 27 adjacent to transparent substrate 21. RX-0723 at [0011], Fig. 2. Minato teaches the LED chips can radiate light "from the upper face" and "from the rear face," which means the side of chips 25, 26, and 27 adjacent to substrate 21 is transparent. *Id*. at [0010], [0017]. Thus, Minato discloses the invention of claim 8.

In a single sentence in its post-hearing responsive brief, Complainant argues that "Dr. Lebby never once addressed the transparent substrate in claim 8." CRB at 31. The criticism carries

no weight. Respondents adduced evidence of anticipation by sponsoring the Minato exhibit. RX-0723. It was not necessary for Dr. Lebby to parrot every teaching in Minato for Respondents to meet their burden to prove invalidity. *See Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1177 (Fed. Cir. 2020) ("Expert testimony is not always required for a district court to determine how a skilled artisan would understand a patent's disclosure and claimed invention.").

I determine that Minato discloses each element of claim 8 of the '529 patent. Accordingly, Minato is clear and convincing evidence that claim 8 is invalid as anticipated.

Alternatively, if Minato does not disclose that LED chips 25, 26, and 27 have a transparent substrate adjacent to transparent plate 21, I would find that such an arrangement would have been obvious at the time of the invention for the same reasons articulated below with respect to Okamoto.

#### 4. Okamoto (RX-0720)

Asserted claims 1, 6 and 8 of the '529 patent are invalid as obvious over Japanese Patent No. JP 2000-277808 ("Okamoto") in combination with the other references discussed below. Tr. (Lebby) at 1252:7-1260:12.

##### a. Overview of Okamoto

Okamoto is a Japanese Patent Application published October 6, 2000, titled "Light Source Device and Manufacturing Method of the Same." RX-0720 at [43], [54]. Okamoto describes providing a light source device with "LED elements 3 and 4 having light distribution characteristics for emitting in all directions" on a "light-transmissive substrate 2." *Id*. at [57]. Okamoto teaches that "the LED elements… are an example of light-emitting element chips having a semiconductor light-emitting layer such as an active layer formed on a light-transmissive substrate such a[s], for example, a sapphire substrate." RX-0720 at [0031].

**PUBLIC VERSION**

Figure 1 of Okamoto is reproduced below:

[FIG. 1]




Figure 1 of Okamoto shows "a frontal view illustrating a configuration of a light source device." *Id. at* [26]. The device may include a GaN blue LED labeled 3, a GaN green LED labeled 4, and a GaAs red LED labeled 5a, all three of which are "disposed in a row on a front face of a light-transmissive glass substrate 2." *Id.* at [27]. The device may also include a GaAs red LED element 5b (not shown). *Id.* And the device can be implemented with a single colored LED, "for example, for only blue," in which case "the configuration of the light source device is simplified." *Id.* at [42].

Wiring path 6 is on glass substrate 2 and is fixed to back-side LED electrodes with a conductive epoxy resin adhesive and electrically connected to upper-side LED electrodes with gold wire 7. *Id.* at [28]–[29]. Lead frame 8 is attached to wiring pattern 6 with solder material 9. *Id.* at [29].

**PUBLIC VERSION**

Figure 6 of Okamoto is reproduced below:

[FIG. 6]




Figure 6 of Okamoto shows "a manufacturing method of the light source device 1." *Id*. at [32]. "LED elements 3, 4, 5a, and 5b are integrally molded with the light-transmissive substrate 10 . . . on top of the light-transmissive resin 11 together with the glass substrate 2 having the lead frame 8 attached thereto." *Id*. at [34].

Figures 8 and 9 of Okamoto are reproduced below:

[FIG. 8]




[FIG. 9]




Figures 8 and 9 of Okamoto show "perspective views of signal lights having the light source 1 of FIG. 1 incorporated therein." *Id*. at [41].

**PUBLIC VERSION**

**b. Overview of Shimizu**

As described above in connection with Yamazaki, the Shimizu reference (RX-0784) illustrates the known interchangability of through-pin packaging and SMJ packaging at the time of the invention.

Shimizu also explains that the prior art approach of combing light from three different colored LEDs, such as red, green, and blue, had several problems. RX-0784 at 1:21-41. It was difficult to product "white light of the desired tone" due to variations in the tone, luminance and other characteristics of the separate LEDs. *Id*. Also, different colored LEDs require different drive power, "which leads to [a] complex drive circuit." *Id*. at 1:41-46. Moreover, the different semiconductor materials in different colored LEDs react differently to temperature and environment, which can result in uneven color mixing over time. *Id*. at 1:46-52.

To overcome these problems, Shimizu teaches that it is desirable to convert light from "a single light emitting diode" to white light "by means of a fluorescent material." RX-0784 at 1:52-65, 21:64-22:1. Shimizu specifically teaches "using a light emitting component capable of emitting blue light and molding the light emitting component with a resin including a fluorescent material that absorbs the light emitted by the blue light emitting diode and emits yellowish light." *Id*. at 2:8-14.

**c. Claim 1**

Respondents and Staff assert that Okamoto discloses all limitations of claim 1 except the claimed "phosphor," and rely on Shimizu for teaching the "phosphor." RIB at 49; SIB at 85. Complainant disputes that Okamoto discloses the claimed "lead frame" and whether it would be obvious to use Shimizu's "phosphor" with the structure in Okamoto. CRB at 35-39.

**PUBLIC VERSION**

[FIG. 1]




Claim 1 of the ’529 patent requires “a lead frame to which the LED chip is attached,” with “a transparent plate in the lead frame.” As shown in Okamoto’s Fig. 1 (reproduced above), Okamoto describes LEDs “having light distribution characteristics for emitting in all directions” on a “light-transmissive substrate 2.” *Id*. at [57]. The LED’s “are integrally molded with the light-transmissive substrate” on “top of the light-transmissive resin . . . together with the glass substrate 2 having the lead frame 8 attached thereto.” *Id*. at [34]. Okamoto thus discloses a “lead frame” and all of the other limitations of claim 1 except a “phosphor.” *See* ’529 patent at claim 1; RDX-00003.060; Tr. (Lebby) at 1252:8-1253:5; RX-0720 at [0034].

Claim 1 also requires “a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength.” Shimizu discloses a phosphor for converting light from a single blue LED to a yellowish wavelength. RX-0784 at 2:8-14.

I address the particularly disputed terms below.

**i. “lead frame”**

Complainant disputes that Okamoto discloses the claimed “lead frame.” CRB at 35. As noted above, however, Okamato expressly discloses a “lead frame” in the specification, teaching,

**PUBLIC VERSION**

"A lead frame 8 is attached to the wiring pattern 6 drawn around an end of the glass substrate 2 with a solder material 9." RX-0720 at [28]-[29]; RDX-0003.0063; Tr. (Lebby) at 1254:11-1255:9. Additionally, as shown in Okamoto Figure 8, the through-pins of the lead frame penetrate the printed circuit board card and are self-supporting in the same way a stick supports the round candy of a lollipop. Tr. (Lebby) at 1255:1-9. Thus, glass substrate 2 and leads 8 provide support. *Id*. at 1255:12-19. Wire bonds 7 provide an interface to the semiconductor die and are connected to metallic or conductive tracks on glass substrate 2 that connect to the pins. *Id*. at 1255:20-25.

In Okamoto, the through pins or leads 8 are attached to the wiring pattern at the end of the glass plate. Tr. (Schubert) at 1331:3-10. Complainant's expert Dr. Schubert testified that the metallizations are minute or fine and when such metallizations are soldered to a glass plate, they do not provide structural support and rigidity. Tr. (Schubert Reb.) at 1332:23-1333:11. This testimony is inconsistent with the figures of Okamoto, which illustrate the leads providing support to the LED:

[FIG. 1]




[FIG. 8]




[FIG. 9]




Even if Complainant was correct that the lead frame wires of Okamoto did not provide support in isolation, such an argument is irrelevant. Okamoto's plate and leads together provide a

support structure that provides an interface to the LED chip. As discussed above concerning Yamazaki, there is no requirement in claim 1, or in the '529 patent, that any individual portion of the electrical conductive path in a lead frame must independently provide structural support to the LED chip. As properly construed, the lead frame, as a whole, must provide some degree of structural support, and Okomoto's lead frame does that. Thus, I find that Okamoto discloses the "lead frame" limitation.

**ii. "phosphor"**

Complainant contends that it would not be obvious to modify Okamoto to use the phosphor of Shimizu. CRB at 37. The record shows otherwise.

Okamoto discloses methods of creating white light by blending the light from red, green, and blue LEDs. RX-0784 at [27]-[30]. Shimizu expressly disparages such blending techniques in favor of using a phosphor to convert light from a single blue LED. RX-0784 at 1:31-56, 2:8-14. Okamoto similarly teaches that using a single blue LED instead of mixing light from multiple LEDs would "simplif[y]" the device configuration. RX-0720 at [42]. These teachings would motivate a person of skill to start with a single blue LED with through-pin packaging, as disclosed in both Okamoto and Shimizu. RX-0720 at [42], RX-0784 at 2:8-14. Shimizu would then guide the artisan to use a phosphor to color-shift the blue light, RX-0784 at 2:8-14, and Okamoto would guide the artisan to use a lead frame with a transparent plate "for emitting in all directions," RX-0720 at [57].

Other record evidence confirms this obvious combination. Respondent's expert Dr. Lebby testified that a person of ordinary skill in the mid-2000s would have been familiar with phosphor conversion LEDs and could have purchased them in the marketplace. Tr. (Lebby) at 1256:1-1258:1. This supports a conclusion that a person of ordinary skill would look to the well-known phosphor conversion technique for creating white light to address the problems described in

**PUBLIC VERSION**

Shimizu. *See In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1380 (Fed. Cir. 2007) ("One skilled in the art would naturally look to prior art addressing the same problem as the invention at hand.").

Further, if a person of skill wanted to use phosphor in the Okamoto package, it would not require modification of any of Okamoto's other components and would yield a predictable outcome:

Fig. 1




RX-0784 (Shimizu) at FIG. 1.

【図6】




RX-0720 (Okamoto) at FIG. 6

RDX-0003.067; Tr. (Lebby) at 1258:22-1259:18.

After considering the teachings of the prior art above, together with the record evidence relating to secondary considerations, I determine that it would have been obvious at the time of the invention to incorporate a phosphor into the molding of Okamoto. Such an arrangement would result in a configuration having every element of claim 1. Claim 1 is therefore invalid under 35 U.S.C. § 103.

**d. Claim 6 - "roughened, textured or patterned"**

Claim 6 of the '529 patent depends from claim 1 and adds the additional limitation that "the transparent plate is roughened, textured or patterned to increase light extraction." Above I found that Okamoto in combination with Shimizu renders obvious every element of claim 1. For

the reasons discussed below, I additionally find that a person of skill would find it obvious to make Okamoto's transparent plate "roughened, textured or patterned to increase light extraction" as required by claim 6. Tr. (Lebby) at 1210:1-1212:10.

Dr. Lebby testified that this limitation would be obvious for the same reasons such modifications to Yamazaki and Minato would have been obvious: Yamazaki and Hakujin teach that a transparent plate in an LED package can be roughened to "enhance" light extraction from the package. *Id*. at 1259:22-1260:12. Complainant did not present evidence to rebut this argument at the hearing.

The simple substitution of one known element for another or the predictable use of prior art elements according to their established functions is sufficient to show obviousness. *Robotic Vacuums*, Comm'n Op. at 31 (finding that it would have been obvious to replace a removable bin with a removeable bag). The substitution of the transparent plate of Okamoto for the roughened plates in Yamazaki or Hakujin for the known and predictable purpose of increased light extraction would have been obvious.

After considering the teachings of the prior art above, together with the record evidence relating to secondary considerations, I determine that it would have been obvious at the time of the invention to combine the teachings of Okamoto with Yamazaki or Hakujin to arrive at the claimed invention. For this reason and the reasons discussed above concerning claim 1, I find that Okamoto in combination with Yamazaki or Hakujin renders claim 6 invalid as obvious.

**e. Claim 8 – "transparent substrate"**

Claim 8 depends from claim 1 and adds the additional limitation that the LED chip has "a transparent substrate," and the chip is oriented with that substrate "adjacent the transparent plate." Complainant does not dispute that this limitation is met by Okamoto, but disputes that the

independent claim is met. *See* Tr. (Lebby) at 1207:14-1208:6. Above I found that Okamoto renders obvious every element of claim 1, either alone or in combination with Shimizu.

I additionally find that Okamoto discloses "a semiconductor light-emitting layer on a light-transmissive substrate." RX-0720 at [Claim 1], [0031] ("the LED elements… are an example of light-emitting element chips having a semiconductor light-emitting layer such as an active layer formed on a light-transmissive substrate such a[s], for example, a sapphire substrate."). I find this disclosure satisfies the additional limitation of claim 8.

After considering the teachings of the prior art in this section and in the section relating to claim 1 above, together with the record evidence relating to secondary considerations, I determine that the teachings of Okamoto and Shimizu show that the invention described claim 8 of the '529 patent would have been obvious and is therefore invalid under 35 U.S.C. § 103.

#### 5. Uemura (RX-0779)

The asserted claims of the '529 patent are invalid based on U.S. Patent No. 6,310,364 ("Uemura") (RX-0779).

Complainant only disputes whether Uemura discloses light "extracted from a back side of the lead frame" recited in claim 1 and the "roughened, textured or patterned transparent plate" recited in claim 6, as shown in emphasis below. CRB at 27-31; Tr. (Lebby) at 1233:20-1234:9.

1. A light emitting device, comprising:

    an LED chip emitting light at a first wavelength, <u>wherein the emitted light is extracted from both front and back sides of the LED chip</u>; a lead frame to which the LED chip is attached, wherein the LED chip resides on or above a transparent plate in the lead frame that allows the emitted light to be extracted out of the LED chip through the transparent plate in the lead frame; and a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength.

6. The device of claim 1, wherein the <u>transparent plate is roughened, textured or patterned to increase light extraction from the LED chip through the transparent plate</u> in the lead frame.

8. The device of claim 1, wherein the LED chip includes a transparent substrate and the transparent substrate is adjacent the transparent plate.

’529 patent at claims 1, 6, 8 (emphasis added).

**a. Overview of Uemura**

Uemura was published on October 30, 2001, and it is undisputed that it is § 102(b) prior art to all Asserted Patents. RX-0779.

Unlike the Yamazaki, Minato, and Okamoto, which intentionally emit light in all directions, Uemura describes an LED package having a “dominant light-emitting direction.” RX-0779 at 5:7. Uemura teaches a through-pin LED package that mounts the LED chip on a transparent plate with dual goals of easier manufacturing and of reducing thermal damage to the resin molding. RX-0779 at 1:55-65, 2:56-65, 3:5-27, 6:7-12; Tr. at 1231:14-1232:13. The transparent plate in Uemura conducts heat away from part of the molding that is located in the dominant light-emitting direction, which preserves a stable color emission from the molding. *Id.*




RX-0779, Fig. 1 (annotated); RDX-0003.034.

Uemura uses a III-nitride (GaN) LED with a sapphire growth substrate (dark blue) attached to a transparent plate made of sapphire or glass (light blue). RX-0779 at 4:61-65. The ends of the

transparent plate are supported by through-pin lead frames (purple), with the cathode attached to one end of the plate and the anode attached to the other. *Id.* at 2:32-38, 5:51-6:12, FIG. 1. The dominant light-emitting direction is up from the LED chip, through the sapphire plate. *See, e.g.*, *id.* at 5:2-9. The LED chip is surrounded by a sealing resin (yellow) with phosphor in the resin as a layer on the transparent base 10. *See* RX-0779 at 3:57-64; Tr. at 1232:14-25.

**b. Claim 1 - "portion of the light emitted by the LED chip is extracted from a back side of the lead frame"**

Respondents and Staff assert that Uemura discloses all limitations of claim 1. RIB at 51-52; SIB at 90. Complainant disputes that Uemura discloses that a "portion of the light emitted by the LED chip is extracted from a back side of the lead frame." CRB at 27-31.

Claim 1 of the '529 patent requires "a lead frame to which the LED chip is attached," with "a transparent plate in the lead frame." '529 patent, claim 1. Uemura discloses a through-pin LED package that supports the transparent base, which allows most light to be emitted upwards. (Lebby) at 1231:16-1232:25. However, some light will come out of the top of the LED chip, as shown by the red arrows in the annotated figures below, because the preferably reflective electrodes do not fully cover the chip. Tr. (Lebby) at 1234:10-1237:20. Indeed, despite the statement in Uemura that electrodes "cover the entire surface" of the semiconducting layer, RX-0779 at 3:8-15, the electrodes 26 and 27 cannot cover the whole area of the LED because they would short circuit if made to contact one another.

**PUBLIC VERSION**

FIG. 1




FIG. 3




RX-0779 (red annotations added)

RDX-0003.0037. As a result, at least some of the LED light would escape past the reflective electrodes (both from the sides of the chip and from the uncovered parts of the bottom), and some would be reflected downwards by the resin molding because of total internal reflection. Tr. (Lebby) at 1234:15-1235:15, 1240:20-1241:9; 1234:10-1235:15; 1293:22-1294:18; 1285:16-1287:1.

This understanding is confirmed by Uemura itself: "*most* of the light generated in the LE layer of the Light-emitting device 20 … is, either directly o[r] after being reflected on the electrodes, transmitted through the transparent base 10 and emitted outside." RX-0779, 5:21-25 (emphasis added). While some of the emitted light is necessarily absorbed by the transparent plate, some of it must be emitted down, away from the plate. *See also id.* at 3:12-15 (resin below the transparent plate and adjacent to the LED chip is only "substantially out of the light transmission path," which means the light passes through some resin below the plate).

The fact that Uemura has a dominant light direction does not mean that light is not transmitted out of the bottom of the device, as explained above. I find that Uemura discloses each limitation of, and therefore anticipates, claim 1.

#### c. Claim 6 - "roughened, textured or patterned"

Claim 6 of the '529 patent depends from claim 1 and adds the additional limitation that "the transparent plate is roughened, textured or patterned to increase light extraction." Above I found that Uemura anticipates claim 1. For the reasons discussed below, I additionally find that the LED package disclosed in Uemura describes a transparent plate that a person of skill would find it obvious to modify to be "roughened, textured or patterned," as required by claim 6. Tr. (Lebby) at 1210:1-1212:10.

Uemura, alone or in combination with Hakujin or Yamazaki, renders the "roughened" limitation obvious for the same reasons discussed with respect to Minato and Yamazaki. *Supra* parts V.D.2 and V.D.3; *see* Tr. (Lebby) at 1237:24-1239:8. Roughening to enhance light extraction was common knowledge in the pertinent field, and could be accomplished with simple modifications amounting to little more than a design choice.

Thus, I find that Uemura alone or in combination with Yamazaki or Hakujin discloses the "roughened" limitation. For this reason and the reasons discussed above concerning claim 1, I find that Uemura in combination with Yamazaki or Hakujin renders claim 6 obvious.

#### d. Claim 8

Claim 8 depends from claim 1 and adds the additional limitation that the LED chip has "a transparent substrate," and the chip is oriented with that substrate "adjacent the transparent plate." Complainant does not dispute that this limitation is met by Uemura.

Uemura discloses a "transparent substrate of the semiconductor Light-emitting device." RX-0779 at 2:38-39, 4:64-65 ("The substrate 21 can be made of any transparent material, such as sapphire."); *see also id.* at 1:14-15 ("a general light-emitting diode uses an insulating sapphire substrate"). Uemura thus discloses the additional limitation of claim 8 that the LED chip has a "transparent substrate."

For these reasons and those discussed above with respect to claim 1, I find that Uemura anticipates claim 8 of the ’529 patent.

## VI. THE ’464 PATENT

### A. Claim Construction

I construed the disputed terms “transparent,” “lead frame,” and “roughened, textured, or patterned” as part of the claim construction order issued as Order No. 39. *See* CC Order at 8–16. I hereby incorporate the discussion of those terms on pages 8-16 of Order No. 39 as part of this initial determination.

### B. Infringement

I find that Complainant has failed to demonstrate infringement of each of the asserted claims of the ’464 patent by any Accused Products. My reasoning follows.

#### 1. Claim 1

For the reasons discussed below, I find that the Accused Products have not been shown to infringe claim 1 of the ’464 patent.

##### a. “A light emitting device, comprising:”

The parties agreed that the preamble of claim 1 is not limiting. JX-0015 at 2. In light of the parties’ agreement and the presumption that preambles are not limiting, I find that the preamble is not limiting.

##### b. “a lead frame including a transparent plate”

I find that the Accused Products satisfy the “lead frame” limitation for the same reasons discussed *supra* part V.B.1.iii.(a), but do not satisfy the “transparent plate” limitation for the same reasons discussed *supra* part V.B.1.iii.(b). *See* Tr. (Schubert) at 675:13-676:8, 681:3-23; CDX-0002C.0094-95.

**PUBLIC VERSION**

**c. "an LED chip, attached to the lead frame, for emitting light; wherein the LED chip resides on or above the transparent plate and at least some of the light emitted by the LED chip is transmitted through the transparent plate"**

Respondents do not dispute that this limitation, other than with respect to "transparent plate," is satisfied by the Accused Products. RRB at 81.

I find that the Accused Products satisfy this limitation other than with respect to "transparent plate" for the same reasons discussed with respect to claim 1 of the '529 patent. Tr. (Schubert) at 676:2-20, 681:17-23, 682:1-17, CDX-0002C.0094, 96-98; *supra* part V.B.1.

**d. "and wherein at least a portion of the light emitted by the LED chip is extracted from a front side of the lead frame and another portion of the light emitted by the LED chip is extracted from a back side of the lead frame."**

Respondents also do not dispute that this limitation is satisfied by their respective Accused Products. RRB at 81.

I find that that the Accused Products satisfy this limitation because light is emitted to the front side and back sides of the lead frame, as shown below. Tr. (Schubert) at 685:7-686:2, 687:3-21.




CDX-0002C.0103 (depicting Satco S29876); CDX-0002C.0104 (other Accused Products).

**2. Claim 7**

I find that the Accused Rigid Products do not practice claim 7 of the '464 patent.

**PUBLIC VERSION**

**a. "The device of claim 1"**

For the reasons discussed above, *supra* part VI.B.1, I find that the Accused Products have not been shown to infringe claim 1 of the '464 patent.

**b. "wherein the transparent plate is roughened, textured or patterned to increase transmission of the light through the transparent plate."**

For substantially the same reasons discussed concerning claim 6 of the '529 patent, I find that none of the Accused Rigid Products satisfy this limitation. *See supra* part V.B.2.

Complainant has failed to show that the Accused Rigid Products are "roughened, textured or patterned *to increase light extraction*." Dr. Schubert testified that the Accused Rigid Products satisfy this limitation because microscopic evidence, as discussed previously, shows the roughness of the plate. Tr. (Schubert) at 690:15-24, 692:3-10.


Figure 43

CDX-0002C.0109 (depicting Satco S29876); CDX-0002C.0110 (other Accused Products).

Additionally, Dr. Schubert relied on optical profilometry that quantifies roughness and shows that the average roughness is on the order of the wavelength of light, which he summarily stated "enhances light extraction." Tr. (Schubert) at 690:25-11, 692:12-19.

**PUBLIC VERSION**



Figure 80

CDX-0002C.0109 (depicting Satco S29876); *see also* CDX-00002C.0111 (compiling similar analysis excerpts for other Accused Products).

However, for the same reasons discussed above in connection with claim 6 of the '529 patent *supra* part V.B.2, I find that the Accused Products do not satisfy this limitation. *See* Tr. (Eden) at 1008:12-23.

**3. Claim 9**

I find that the Accused Products have not been shown to infringe claim 9 of the '464 patent.

**a. "The device of claim 1"**

For the reasons discussed above, *supra* part VI.B.1, I find that the Accused Products have not been shown to infringe claim 1 of the '464 patent.

**b. "wherein the LED chip includes a transparent substrate positioned adjacent the transparent plate."**

For substantially the same reasons discussed concerning claim 8 of the '529 patent, I find that none of the Accused Products satisfy this limitation. *See* supra part V.B.3. As with that claim, only Feit specifically contests this limitation. RRB at 81.

Dr. Schubert testified that the Accused Rigid Products satisfy this limitation because the transparent growth substrate, which is single crystal sapphire, is adjacent to the transparent plate,

as shown in the micrographs below that "give essentially the same result."[20] Tr. (Schubert) at 695:20-696:4, 697:3-9.



Figure 48 Figure 49

CDX-0002C.0114, CX-207 (depicting Satco S29876); CDX-002C.0115 (other Accused Products).

For the reasons discussed in relation to Claim 8 of the '529 patent, *supra* part V.B.3, I find that Feit's Accused Products that have metal layers or DBRs also do not satisfy this additional limitation.

I therefore find none of the Accused Products infringe claim 9.

### C. Technical Prong of the Domestic Industry Requirement

#### 1. SSLEEC Domestic Industry Products

For the reasons discussed below, I find that Complainant has shown only that Wong FY2021 (CPX-0046) practices claims 1 and 9 of the '464 patent.

##### a. Claim 1

I find that Complainant has only shown that Wong FY2021 (CPX-0046) practices claim 1 of the '464 patent.

---

[20] Dr. Eden does not dispute that the Accused Products have transparent sapphire growth substrates. Tr. (Eden) at 1052:25-1053:6.

**PUBLIC VERSION**

**i. "A light emitting device, comprising:"**

The preamble of claim 1 is not limiting. *See* supra part VI.B.1.a.

**ii. "a lead frame including a transparent plate"**

Dr. Schubert testified generally that the five SSLEEC Domestic Industry Products practice this limitation. Tr. (Schubert) at 684:7-15.




CDX-0002C.0102. For the same reasons discussed *supra* part V.C.1.a, I find that Complainant has shown only that Wong FY2021 (CPX-0046) practices this limitation.

**iii. "and wherein at least a portion of the light emitted by the LED chip is extracted from a front side of the lead frame and another portion of the light emitted by the LED chip is extracted from a back side of the lead frame."**

Dr. Schubert testified that the SSLEEC Domestic Industry Products, Alhassan FY2016, Oh FY2017, Azimah FY2018, and Wong FY2021, practice this limitation because the photographs

below show that light is emitted toward the front and back directions. Tr. (Schubert) at 689:18-25.




For substantially the same reasons discussed *supra* part V.C.1.a, I find that Complainant has shown only that Wong FY2021 (CPX-0046) practices this limitation.

**b. Claim 7**

I find that the SSLEEC Domestic Industry Products do not practice claim 7 of the ’464 patent.

**i. “The device of claim 1”**

For the reasons discussed above, I find that the SSLEEC Domestic Industry Products do not practice claim 1 of the ’464 patent.

**PUBLIC VERSION**

**ii. "wherein the transparent plate is roughened, textured or patterned to increase transmission of the light through the transparent plate."**

Dr. Schubert testified that the SSLEEC Domestic Industry Products practice this limitation based on the roughness shown in the micrographs below, *i.e.* the same reasons discussed with respect to claim 6 of the '529 patent. Tr. (Schubert) at 694:16-695:3.




I find that the SSLEEC Domestic Industry Products do not practice this limitation for the same reasons discussed *supra* part V.C.b.

**c. Claim 9**

For the same reasons discussed above with respect to claim 1, I find that only Wong FY2021 (CPX-0046) practices claim 9 of the '464 patent.

**iii. "The device of claim 1"**

For the reasons discussed above, I find that only Wong FY2021 (CPX-0046) practices claim 1 of the '464 patent.

**PUBLIC VERSION**

**iv. "wherein the LED chip includes a transparent substrate positioned adjacent the transparent plate."**

Respondents do not dispute that the SSLEEC Domestic Industry Products practice this limitation. Dr. Schubert testified that the SSLEEC Domestic Industry Products practice this claim limitation because they use a sapphire substrate adjacent to the transparent plate. Tr. (Schubert) at 699:3-9.




For the reasons discussed *supra* part V.C.1.a, I find that Complainant has failed to meet their burden of showing any of the SSLEEC Domestic Industry Products other than Wong FY2021 (CPX-0046) have the requisite transparent plate, and thus only Wong FY2021 (CPX-0046) has been shown to practice claim 9.

**2. Licensee's Rigid Domestic Industry Products**

For the reasons discussed below, I find that only the Acclaim Domestic Industry Product practices claims 1 and 9 of the asserted claims. I find that the Ceramic Domestic Industry Products do not practice claims 1, 7, or 9 of the '464 patent.

#### a. Claim 1

I find the Ceramic Domestic Industry Products do not practice claim 1 of the ’464 patent, and that the Acclaim Domestic Industry Product does.

##### i. “A light bulb, comprising at least one light emitting device, the at least one light emitting device each further comprising:”

The preamble of claim 1 is not limiting. *See supra* part VI.B.1.a.

##### ii. “a lead frame including a transparent plate”

Complainant relies on the testimony of Dr. Schubert that the Rigid Domestic Industry Products practice this limitation for the same reasons discussed with respect to the Accused Rigid Products because “the devices are the same in that respect.” Tr. (Schubert) at 683:3-10. However, Dr. Schubert has not shown that the Rigid Domestic Industry Products are identical to the Accused Products, including for the reasons discussed *supra* part I.E.1, and his testimony is therefore insufficient. *See Certain Memory Modules and Components Thereof*, Inv. No. 337-TA-1089, Comm’n Op. at 24 (April 21, 2020) (EDIS ID 708499) (finding the technical prong not satisfied where expert’s analysis was based on conclusion without explanation that the accused and domestic industry products were identical).

**PUBLIC VERSION**




CDX-0002C.0099. The parties do not appear to dispute whether the Rigid Domestic Industry Products have a "lead frame," but dispute whether Ceramic Domestic Industry Products have a "transparent plate."

I find that the Ceramic Domestic Industry Products do not practice the "transparent plate" limitation, but the Acclaim Domestic Industry Product does, for the same reasons discussed *supra* part V.C.2.

**iii. "an LED chip, attached to the lead frame, for emitting light; wherein the LED chip resides on or above the transparent plate and at least some of the light emitted by the LED chip is transmitted through the transparent plate"**

I find that the Ceramic Domestic Industry Products do not meet this limitation with respect to "transparent" for the reasons discussed above.

Dr. Schubert testified that "based on the similarity of the products and based on the photographs or micrographs shown [in CDX-0002C.0100], I have concluded that this claim limitation … is met." Tr. (Schubert) at 683:12-19; CDX-0002C.0100.

**PUBLIC VERSION**

Dr. Schubert also testified that the photographs in CDX-0002C.0101 "show light emitted through the transparent plate" and therefore concluded that the limitation is met. *Id.* at 683:21-684:5.

However, for the reasons discussed above, *supra* part V.C.2, with respect to "transparent plate," I find that the Ceramic Domestic Industry Products do not practice this limitation.

**iv. "and wherein at least a portion of the light emitted by the LED chip is extracted from a front side of the lead frame and another portion of the light emitted by the LED chip is extracted from a back side of the lead frame."**

The parties do not dispute whether this limitation is met by the Rigid Domestic Industry Products. Complainant contends that this limitation is practiced by the Rigid Domestic Industry Products because light is emitted to the front side and back side of the lead frame, as shown by the photographs below. *See* Tr. (Schubert) at 689:3-16.




CDX-0002C.0106.

**PUBLIC VERSION**




CDX-0002C.0107.

I find that all of the Rigid Domestic Industry Products satisfy this limitation.

**b. Claim 7**

I find that the Ceramic Domestic Industry Products do not practice claim 7 of the '464 patent.

**i. "The device of claim 1"**

For the reasons discussed above, I find that the Ceramic Domestic Industry Products do not practice claim 1 of the '464 patent.

**ii. "wherein the transparent plate is roughened, textured or patterned to increase transmission of the light through the transparent plate."**

Complainant contends that the Ceramic Domestic Industry Products practice this limitation based on the following microscope images, which show that the plates are roughened. Tr. (Schubert) at 694:3-9.

**PUBLIC VERSION**




CDX-0002C.0112.

The parties do not dispute whether the Ceramic Domestic Industry Products have a "roughened, textured or patterned" transparent plate. Respondents do dispute whether the Ceramic Domestic Industry Products have a plate that is roughened, textured or patterned to increase transmission of the light through the plate.

For the same reasons discussed above, *supra* part V.C.2.e, I find that Complainant has failed to meet its burden of showing that the Ceramic Domestic Industry Products practice this limitation.

**c. Claim 9**

I find that the Ceramic Domestic Industry Products do not practice claim 9 of the '464 patent, but the Acclaim Domestic Industry Product does.

**i. "The device of claim 1"**

For the reasons discussed above, I find that the Ceramic Domestic Industry Products do not practice claim 1 of the '464 patent, but the Acclaim Domestic Industry Product does.

**PUBLIC VERSION**

**ii. "wherein the LED chip includes a transparent substrate positioned adjacent the transparent plate."**

Respondents do not dispute that the Licensee Domestic Industry Products practice this limitation. Dr. Schubert testified that the Rigid Domestic Industry Products practice this limitation "based on the similarity of the products and based on the microscopic images" submitted into evidence and reproduced below. Tr. (Schubert) at 697:11-17.




CDX-0002C.0116.

I find that the Licensee Domestic Industry Products practice this limitation.

### D. Validity

Respondents and Staff contend claims 1, 7, and 9 of the ’464 patent are anticipated or rendered obvious by each of the Yamazaki, Minato, Okamoto[21], and Uemura references. RIB at 5-45; SIB at 128.

Respondents state that the disputed issues for Yamazaki, Minato, Okamoto, and Uemura are the same for the ’464 patent as they are for the ’529 patent, except that the ’464 patent claims do not require a phosphor. RIB at 49, 52.

I find that Yamazaki anticipates or renders claims 1, 7, and 9 of the ’464 patent obvious for the same reasons discussed in part V.D.2 above.

I find that Minato anticipates or renders claims 1 and 9 of the ’464 patent obvious for the same reasons discussed *supra* part V.D.3. Minato also renders claim 7 obvious alone or in combination with Yamazaki or Hakujin for the same reasons discussed *supra* part V.D.3.

I find that Okamoto renders claims 1, 7, and 9 of the ’464 patent obvious for the reasons discussed in *supra* part V.D.4.

I find that Uemura anticipates claims 1 and 9 of the ’464 patent for the same reasons discussed *supra* part V.D.5. Uemura alone or in combination with Yamazaki or Hakujin renders claim 7 of the ’464 patent obvious for the same reasons discussed *supra* part V.D.5.

[21] On October 19, 2021, the PTAB issued a final written decision finding claims 1 and 9 (among others) of the ’464 patent unpatentable in response to a petition for inter partes review filed by Satco. *See* EDIS Doc. ID 754899 (citing IPR2020-00813). The petition and PTAB decision relied on the Okamoto, Shimizu, and Miyahara references raised by Respondents here plus two additional references that were withdrawn from this Investigation. *Id*. Satco’s inter partes petition did not involve claim 7 of the ’464 patent.

**PUBLIC VERSION**

## VII. THE ’854 PATENT

### A. Claim Construction

I construed the disputed terms “transparent,” “sapphire/sapphire plate/sapphire growth substrate,” and “a molding” as part of the claim construction order issued as Order No. 39. *See* CC Order at 8–16. I hereby incorporate the discussion of those terms on pages 8-16 of Order No. 39 as part of this initial determination.

### B. Infringement

I find that Complainant has failed to demonstrate infringement of the sole asserted claim of the ’854 patent by any Accused Products. My reasoning follows.

#### 1. Claim 1

I find that the Accused Products have not been shown to infringe claim 1 of the ’854 patent.

##### a. “A light emitting device, comprising:”

The parties agreed that the preamble of claim 1 is not limiting. JX-0015 at 2. In light of the parties’ agreement and the presumption that preambles are not limiting, I find that the preamble is not limiting.

##### b. “a transparent surface”

I find that the non-Feit Accused Products and the Feit Accused Rigid Products do not satisfy this limitation. However, the analyzed Feit Flexible Accused Product satisfies this limitation.

###### i. Accused Rigid Products

For substantially the same reasons discussed concerning claim 1 of the ’529 patent, *supra* part V.B.1., the Accused Rigid Products do not satisfy this limitation. *See* Tr. (Eden) at 1010:6-10 (same analysis applies).

**PUBLIC VERSION**

### ii. Accused Flexible Products

The Accused Flexible Products have flexible submounts made of polyimide (hereinafter "Accused Flexible Products").[22] Tr. (Schubert) at 633:1-2, 764:3-14. Dr. Schubert testified that the polyimide material is transparent, based on "photographic evidence and based on the images shown … particularly … the chemical analysis" shown on CDX-0002C.189. Tr. (Schubert) at 764:3-14, 767:17-24.




*See, e.g.,* CDX-0002C.0189 (depicting Satco S9966).

As discussed *supra* part V.B.1.iii.(b), the transmission testing results are the most relevant evidence available, because they show how much light is being transmitted, which is critical to determining whether a material is "transparent." Dr. Schubert's LUX plots and Dr. Eden's

[22] Complainant did not submit evidence of infringement of this limitation for any IKEA flexible product, and Complainant has therefore failed to meet its burden with respect to those products.

transmission testing results are shown below. *See* Tr. (Schubert) at 631:13-632:16; (Eden) at 967:18-970:3.[23]

| **Transmission Testing Data** | | | |
|---|---|---|---|
| **Product** | **Respondents' Testing (without silicone)** | **Respondents' Testing (with silicone)** | **Complainant's Testing** |
| **Feit** | | | |
| Feit Vintage ST19 Dimmable | None. | None. |  CX-0201.044. |
| **GE** | | | |
| GE Vintage A19 |  RX-0177.0088. |  RX-0177.0089. |  CX-0208.043. |
| **Home Depot/GVL/Signify** | | | |
| Philips A50 |  | None. |  CX-0210.043. |

[23] Dr. Eden and Dr. Shanfield also performed visual inspections of decapsulated submounts from some of the Accused Flexible Products from which they concluded that the submounts were opaque. Tr. (Eden) at 945:18-947:4, 1017:15-1018:2, RX-2616.0006; Tr. (Shanfield) at 1135:23-1136:11. However, this inspection did not quantify how much light is being transmitted through the submount, so I give this subjective evidence less weight.

**PUBLIC VERSION**

| Transmission Testing Data | | | |
|---|---|---|---|
| **Product** | **Respondents' Testing (without silicone)** | **Respondents' Testing (with silicone)** | **Complainant's Testing** |
| | RX-0550.010 (measurement with Shimadzu device); Tr. (Eden) at 978:13-979:4 (1% transmissive at 450 nm).<br><br>RX-0550.0012 (measurement with Craic-Micro);<br>Tr. (Eden) at 975:5-20 (10-35% transmissive at 450 nm); 1062:17-1064:22 (difference in results due to variation in region of the surface being tested). | | |
| **Satco** | | | |
| Satco S9966 (representative of Satco S22433) | <br>RX-0178.0047. | <br>RX-0178.0048. | <br>CX-0211.043. |

Based on LUX plots taken by EAG and his visual inspection, Dr. Schubert concluded that the Accused Flexible Products' submounts have transparent surfaces. Tr. (Schubert) at 631:13-632:16. However, for the same reasons discussed *supra* part V.B.1.iii.(b) with respect to the Accused Rigid Products, these analyses in fact show that the submounts in the Accused Flexible Products, with the exception of the Feit Accused Flexible Product discussed below, are not "transparent" and therefore do not satisfy this limitation. *See* Tr. (Eden) at 1018:3-16, 969:19-24 (relative light intensity of about 6000 from "front" side of Satco S9966 compared to only 500 from

"back" side), 969:19-24 (relative light intensity of about 15033 from "front" side of GE Lighting Vintage (SKU 33574) compared to only 417 from "back" side); RX-01178.0047; RX-0177.0088.




Satco S9966, RX-0178.0047




GE Lighting Vintage (SKU 33574), RX-0177.0088

The testing, however, shows that the Feit Accused Flexible Product allows nearly the same amount of light to be transmitted through the back surface as is emitted from the front surface, indicating that its submount is transparent:




Figure. 71 Plot of angular distribution of light intensity, LUX (scaled to 100)

CX-0201.44 (LUX plot of Feit Vintage ST19 Dimmable, the Feit Accused Flexible Product). Feit argues that this test result is demonstrably erroneous, pointing not only to Professor Shanfield's

**PUBLIC VERSION**

analysis that the submount is not transparent, but also to Complainant's own photographs showing that more light was reflected off backing paper than came through the submount. RRB at 89-91; Tr. (Shanfield) at 1134:7-1135:1; RDX-0002.10; CX-0201.46.



CX-0201, slide 46




CX-0201, slides 50, 51

RDX-0002.12 (excerpt).

Feit argues this shows the fundamental flaw of the LUX plots being measurements with the phosphor encapsulant intact. *See* RRB at 53; Tr. (Eden) at 972:22-973:23; 1097:14-1098:3; RDX-0002.4. Nevertheless, the LUX plots, even if imperfect, alongside the physical evidence and

the photographs of the operating, decapsulated filament, persuasively show that the Feit Vintage ST19 Dimmable meets the "transparent surface" limitation.

#### iii. Doctrine of Equivalents

For substantially the same reasons discussed *supra* part V.B.1.iii.(b) with respect to the '529 patent, the Accused Rigid Products do not satisfy this limitation under the doctrine of equivalents.

Complainant contends that the Accused Flexible Products satisfy the "transparent surface" limitation under the doctrine of equivalents. CIB at 79; Tr. (Schubert) at 632:19-633:5. Dr. Schubert provided a function-way-result analysis:

- The purported function of the claimed transparent surface is to structurally support the LEDs and to allow light to be extracted through. Tr. (Schubert) at 632:6-10. Complainant contends the polyimide submount performs the same or substantially the same function by structurally supporting the LEDs and allowing light to be transmitted through. *Id*. 633:10-14.
- The purported way the claimed transparent surface performs its function is by providing a surface suitable for supporting LEDs and transmitting light; Complainant contends the polyimide submounts perform the function in the same or substantially the same way. *Id*. 633:15-25.
- Complainant contends the purported result of the claimed transparent surface and the polyimide submount are the same or substantially the same: they result in a surface that structurally supports the LEDs and allows light to be extracted through the surface. *Id*. 634:1-8.

For the substantially the same reasons *supra* part V.B.1.iii.(b).(v), has not persuasively shown that the Accused Flexible Products satisfy this limitation under the doctrine of equivalents. *See* Tr. (Eden) at 1023:7-22.

**c. "a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and the anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device"**

I find that the Accused Rigid Products and the Accused Flexible Products both meet this limitation.

**i. Accused Rigid Products**

The Accused Products meet this limitation because they have electrodes on the left and right of the images below, one of which is a cathode and the other is an anode, each of which is positioned at the end of the transparent surface, and which are connected to the LED chips via bond wires. Tr. (Schubert) at 702:22-703:7, 703:17-704:2, 706:16-22, 707:5-15.



Figure 72

CDX-0002C.0122 (depicting Satco S29876); CDX-0002C.0123 (other Accused Products). The anode and cathode also provide support to the transparent surface and to the LED chips. Tr. (Schubert) at 703:8-16, 706:23-707:4; CDX-0002C.0124.

There is no dispute that this limitation is met with respect to the Accused Rigid Products. *See* RRB at 94-98.

**PUBLIC VERSION**

### ii. Accused Flexible Products

The Accused Flexible Products all have anodes and cathodes with the requisite power connections as required by this limitation.







CX-0211 (FIGS. 24-26) (above); CDX-0002C.0189 (below); Tr. (Schubert) at 764:15-765:25, 767:25-768:22; CX-0208, CX-0201, CX-0769, CX-0210 (FIGS. 24-26); CDX-0002C.0190.

**PUBLIC VERSION**

(a) *"provide structural support"*

"Structural support" in the '854 patent means "both the cathode and the anode provide structural support to the" submount. *See* EDIS Doc. ID 733864, Appendix 1 at 1 (agreed claim terms).

Respondents contend, on the basis of their experts' testimony, that the Accused Flexible Products do not meet this limitation because wires projecting out from a central post are what provide the structural support to the filament, rather than the cathode and anode as required. Tr. (Eden) at 1021:21-1023:2; Tr. (Shanfield)at 1183:4-17. Respondents contend the test shown below demonstrates that the Accused Flexible Products do not have an anode and cathode that provide structural support to the transparent surface. Tr. (Eden) at 1021:21-1023:2.

"wherein the cathode and anode provide structural support to the transparent surface..."



(RX-0563.0001) (RX-0562.0001) RDX-0001.083

RDX-0001.083. Respondents note that when one clips the wires radiating out from the central post seen in RX-0563.0001, the filament collapses, which in their view demonstrates that the anode and cathode provide "little or no support." Tr. (Eden) at 1022:8-1023:2; Tr. (Shanfield) 1183:4-17 (anode and cathode are not "supplying *substantial* structural support").

**PUBLIC VERSION**




**Signify Philips A50 ("Flexible")**
**(RX-0563) (annotated)**

But the claim does not require any specific quantum of support, be it "substantial" or some other amount; it requires only that the cathode and anode provide *some* support. As is plainly seen in RX-0562.0001, even with the axial support wires cut, the filament juts horizontally into space, showing that the anode provides support. Likewise, the cathode is shown providing support in RX-0563.0001, as the filament does not droop directly down.

Feit alone argues that the cathode and anode of their Accused Flexible Product are not each "on" a respective "end" of the transparent filament. RRB at 97-98. Feit contends that the anode and cathode are actually only *near* the ends. *Id.*; Tr. (Shanfield) at 1130:13-21; CX-0203.48; CX-0764.48;RDX-0002.7. This argument lacks merit. Even in the exhibits relied on by Feit, the anode and cathode visibly overlap the ends of the filament.

I find that all of the Accused Flexible Products meet this limitation.

**d. "at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface"**

Respondents do not dispute that their products contain the required III-nitride LEDs with sapphire growth substrates. RRB at 99-102. Nor do they dispute that, if the submounts are transparent, the LED is in mechanical communication with it. *Id.* These areas of agreement are supported by competent evidence, and I find accordingly. *See* Tr. (Schubert) at 634:25-635:11.

The only areas of dispute are (1) whether the submounts constitute the claimed "transparent surface" and (2) whether the LED and that surface are "configured to extract light emitted by the LED through" that transparent surface.

As discussed above, I find that none of the Accused Products, with the exception of the Feit ST-19 Accused Flexible Product, comprise a transparent surface. *See supra* part VII.B.1.b.

I do find, however, that those products are configured to extract light through the disputed transparent surface (i.e., the submounts). Although the submounts are not transmissive enough to be transparent, for many of the products, not-insubstantial amounts of light pass through the submounts. *Id.* Regardless of whether the surfaces are transparent, the Accused Rigid Products are configured to extract light from them. *See, e..g.*, Tr. (Schubert) at 709:10-711:2, 712:3-713:16.

Respondents contend that many of the Accused Products do not meet the "configured for" limitation because the submounts have various features that inhibit the passage of light through the submounts. These features include metallic layers and DBRs on certain products that are meant to reflect light back to the emitter side of the filament. *See* Tr. (Shanfield) at 1098:11-1099:3, 1141:15–1144:18; Tr. (Eden) 1020:1-1021:17; CX-0201.24; CX-0764.28; CX-0765.28; CX-

0766.28; RDX-0002.17–18; RDX-0002.19; RX-0593C.3; RDX-0001.081.. They also include, in the case of the Accused Flexible Products, the electrical traces and solder that generally inhibit light flow. Tr. (Eden) at 1019:16-25.




RDX-0001.080.



| Element Atomic % | Sample 6 |
|---|---|
| C | 23.6 |
| O | 41.1 |
| Si | 11.0 |
| Al | 12.3 |
| Ti | 10.4 |
| K | 1.4 |
| Cu | 0.2 |

(RX-0182.0010)

RDX-0001.081.

While these components indicate that the Accused Products that possess them are designed to extract more light from the emitter side of the submounts, as noted above, quantitative measurement of the light transmitted through many of the products indicate that light *was* extracted from both sides of each product.

For the reasons discussed above, I find that the Accused Products, except the Feit Rigid - T8C/CL/VG/CA/LED and the Feit Rigid – [redacted] 2700K, which Complainant's testing materially altered, *see supra* part V.B.1.a.ii , satisfy this limitation.

**e. "and a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device."**

I find that the Accused Products do not satisfy the "molding" limitation.

I previously construed "molding" to mean "a component formed by or as if by a mold." Order No. 39 at 17. Complainant contends that the Accused Rigid Products satisfy this limitation based on the following: 1) photographs which show a silicon surrounding the LEDs that includes a phosphor, which is confirmed by an elemental analysis; and 2) photographs showing that light is emitted from the front and back sides of the molding. Tr. (Schubert) at 715:8-716:21, 718:3-720:5.

**PUBLIC VERSION**




CDX-0002C.0132 (depicting Satco S29876); CDX-0002C.0133-.0137.

Complainant contends that the Accused Products literally satisfy the "molding" limitation. CIB at 88-96; Tr. (Schubert) at 640:12-19. Dr. Schubert testified that the "molding" in the Accused Products is the yellow material that extends along the length of the filament and has an "approximately circular" cross-section. Tr. (Schubert) at 639:22-640:7. According to Dr. Schubert, because the purported molding's shape is consistent or constant along the length of the filament it is formed as if by a mold. *Id*. at 640:8-11. Complainant relies on similar evidence to argue that the Accused Flexible Products also satisfy this limitation. Tr. (Schubert) at 781:14-782:18, 784:7-785:22.

PUBLIC VERSION




CDX-0002C.0203 (depicting Satco S9966 analysis); CDX-0002C.0204-.0207.

**i. "molding"**

There is no evidence that the accused moldings, the yellow silicone/phosphor covering on each filament, are formed by molds. To the contrary, the only evidence suggests that these coatings are deposited onto the filaments from an extruder in a process known in the industry as "glob top." *See* Tr. (Shanfield) at 1150:5-25 (testifying he could tell "right away" that the product was deposited in a glob top process and that in such a process "there's no mold, there's nothing like a mold.").



RDX-0002.23 (glob top deposition of silicone/phosophor coating on LED filaments). Thus, the sole question is whether Complainant has shown the accused moldings were formed "as if by a mold." I find that they have not.

Dr. Shanfield credibly and directly addressed this question, testifying that a person of ordinary skill would "absolutely not" consider a phosphor coat deposited by glob top to be a component formed by or as if by a mold. Tr. (Shanfield) at 1151:1-5. As he put it, this is because "there's no mold. There's nothing resembling a mold involved." *Id.*

Complainant attacks Dr. Shanfield's testimony, claiming it misapplies the construction as focusing on the process, rather than the resulting object. CIB at 92. But the dissimilarity of the accused products, apparently made via the glob-top process, from objects made "as if by a mold" are readily apparent: the yellow silicone coating has random irregularities and an uneven surface, as shown below. Such surface characteristics are not compatible with a finding of being formed "as if by a mold." *See* Tr. (Eden) at 1011:5-23; 1012:19-23. Indeed, the '464 and '529 patents both disparage "non-uniform and typically smooth" phosphor layers that are made "by placing a gel or other liquid form of material onto the chip, and allowing the phosphor to cure" because this process "does not take into account several factors that can be used to increase the efficiency of the LED." '464 patent at 5:42-45; '529 patent at 5:27-30. Those factors include using a "molding . . . which acts as a lens" to assist light extraction. '529 patent at 10:40-41.

**PUBLIC VERSION**



IKEA (RX-0179.0007)



Satco (CX-0207.0009)



GE Lighting (RX-0177.0061)



GVL (RX-0176.0005)



Signify (RX-0547.0002)



Home Depot (RX-0175.0006)

RDX-0001.069.



CX-0203, slide 17

Tr. (Shanfield) at 1150:2-16 (rigid filament).




CX-0201.0017, Tr. (Shanfield) at 1183:19-1185:8 (flexible filament).

For these reasons, I find that the Accused Products do not satisfy the "molding" limitation.

**PUBLIC VERSION**

**ii. "surrounding"**

Respondents dispute that the "surrounding" limitation is satisfied with respect to certain products because the accused molding does not surround the LED on all sides. Dr. Eden testified that certain Home Depot, Signify, and GVL Accused Rigid Products, and the Signify Accused Flexible Products do not satisfy the "surrounding the LED" limitation because the submounts are not fully surrounded by the silicone coating, as shown below. Tr. (Eden) at 1015:7-1016:11, 1016:24-1017:5.

| Respondent/Product | Exhibit |
|---|---|
| Home Depot Ecosmart 1005 421 841 | RX-0175-0080-81; RX-2391 |
| Home Depot King of Fans 1003 939 639 | RX-0175-0085-86; RX-2390 |
| Home Depot Air Cool Fan 1003 880 454 | RX-0175-0089-90; RX-2393 |
| Signify ST19 | RX-0547.0002 |



Home Depot Ecosmart '841 (RX-2391.0001)

LED Chip



Signify ST19 (RX-0547.0002)



GVL '737 SKU

RDX-0001.074. Respondents contend that the gaps on the sides of these product allow blue light to escape from the LEDs without encountering the phosphor, thereby defeating the "core concept" of 360 white light emission that they contend is the purpose of this limitation. RRB at 108-109; Tr. at 175:12-25.

Respondents' argument creates a limitation not present in the text of the claim. Though such a requirement may be a *better* embodiment of the improvements of the invention, Respondents citing nothing but the extrinsic testimony of one inventor, Professor DenBaars, to impose that limitation on the broader scope of the language. Respondents point to nothing in the

intrinsic record to suggest their proposed understanding of the term "surrounding" comports with how a person of ordinary skill would understand the term.

I find that all of the Accused Products satisfy this limitation, as shown in the images above: each Accused Product's LED are, in fact, surrounded by the phosphor coating. The fact that the phosphor coating does not *completely* surround the submount/transparent surface does not mean that it does not surround the LED, which is all that is required by this claim. Accordingly, I find that that the Accused Products meet the "surrounding" limitation.

#### f. Conclusion

For the foregoing reasons, I find none of the Accused Products has been shown to infringe the '854 patent.

### C. Technical Prong of the Domestic Industry Requirement

For the '854 patent, Complainant only asserts that the Licensee Domestic Industry Products practice the asserted claim.

In addition to the Ceramic Domestic Industry Products and Acclaim Domestic Industry Product, discussed above, Complainant also relies on certain Licensee Domestic Industry Products that have a flexible submount.

| Licensee Product Name | Supporting Exhibits |
|---|---|
| Globe Electric B10 | CX-0209 (Report)<br>CPX-0024 (Specimen) |
| Bullbrite 776512 | CX-0195 (Report)<br>CPX-0031 (Specimen) |
| SSC Filament LED | CX-0216 (Report)<br>CPX-0033C (Specimen) |

CX-2213C.0005. Accordingly, the following Licensee Domestic Industry Products are the "Flexible Domestic Industry Products": the Bulbrite product; the Globe Electric product; and the

SSC filament having model number SFW8F24A-01. These products are only alleged to practice claim 1 of the ’854 patent.

#### 1. Rigid Domestic Industry Products

##### a. Claim 1

I find that the Rigid Domestic Industry Products do not practice claim 1 of the ’854 patent.

###### i. “A light emitting device, comprising:”

The preamble is not limiting. *See supra* part VII.B.1.a.

###### ii. “a transparent surface”

Complainant relies on the testimony of Dr. Schubert that the Rigid Domestic Industry Products practice this limitation due to the similarity of the products and for the same reasons he discussed previously. Tr. (Schubert) at 708:3-10. Complainant cites to its infringement analysis for the ’854 patent as support. CIB at 97.

Complainant did not provide competent evidence that the Rigid Domestic Industry Products are identical to the Accused Rigid Products, including for the reasons discussed *supra* part I.E.1. *Certain Memory Modules and Components Thereof*, Inv. No. 337-TA-1089, Comm’n Op. at 24 (April 21, 2020) (EDIS ID 708499) (finding the technical prong not satisfied where expert’s analysis was based on conclusion without explanation that the accused and domestic industry products were identical). Dr. Schubert’s testimony is therefore insufficient.

**PUBLIC VERSION**




For the same reasons discussed *supra* part V.C.2.I.A.1.a)(1)(b) with respect to "transparent plate," I find that the Ceramic Domestic Industry Products do not practice this limitation, but the Acclaim Domestic Industry Product does.

**iii.** "a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and the anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device"

Respondents do not dispute that the Rigid Domestic Industry Products practice this limitation. I find that the Rigid Domestic Industry Products practice this limitation for substantially the same reasons discussed *supra* part VII.B.1.c. Tr. (Schubert) at 708:11-709:9.

**iv.** "at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface"

Complainant relies on the testimony of Dr. Schubert that the Rigid Domestic Industry Products practice this limitation due to the similarity of the products and for the reasons discussed earlier. Tr. (Schubert) at 714:3-10; *see also id*. at 634:25-635:11. Dr. Schubert also testified that the LED die is rigidly connected to the transparent surface and therefore the two are in mechanical communication. Tr. (Schubert) at 714:11-20.




The photographs shown below also indicate that light is transmitted through the submount. Tr. (Schubert) at 714:21-715:7.

**PUBLIC VERSION**




The Ceramic Domestic Industry Products do not practice this limitation for the same reasons discussed *supra* part V.C.2.I.A.1.a)(1)(b) with respect to "transparent plate." Respondents do not dispute that the Acclaim Domestic Industry Product practices this limitation, and I find that the Acclaim Domestic Industry Product practices this limitation for the same reasons discussed *supra* part V.C.2.I.A.1.a)(1)(b) with respect to "transparent plate."

**v. "and a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device."**

Complainant once again relies on Dr. Schubert's testimony that the Rigid Domestic Industry Products practice this limitation based on the similarity of the products and for the reasons discussed earlier to satisfy this limitation. Tr. (Schubert) at 721:3-723:9; CDX-0002C.0138-.0142.

As with the Accused Products, the Rigid Domestic Industry Products' yellow silicone coating appears to have random irregularities/an uneven surface, as shown below, and therefore it

is not a component formed by or as if by a mold. *See supra* part VII.B.1.e. i. These irregularities can be seen clearly in the images below.



Newhouse Lighting
CX-0196.0011



Luminance
CX-197.0011



GE Relax G16.5
CX-0199.0017



Acclaim DI Product
CX-0198.0017



Sunlite
CX-0212.0017



Sylvania
CX-0213.0008



Great Value
CX-0214.0011



SSC Filament LED
CX-0215

Accordingly, I find the Rigid Domestic Industry Products do not practice the "molding" limitation.

### 2. Flexible Domestic Industry Products

#### a. Claim 1

I find that the Flexible Domestic Industry Products do not practice claim 1 of the '854 patent.

##### i. "A light emitting device, comprising:"

The preamble is not limiting. *See supra* part VII.B.1.a..

##### ii. "a transparent surface"

I find that the Flexible Domestic Industry Products do not satisfy the "transparent surface" limitation. Complainant relies on Dr. Schubert's testimony that the Flexible Domestic Industry Products practice this limitation "[b]ased on the type of transparent surface, polyimide." Tr. (Schubert) at 769:1-9.

**PUBLIC VERSION**

Respondents argue that the Flexible Domestic Industry Products have an opaque surface based on a visual inspection. RRB at 110.

As discussed supra part V.B.1.iii.(b), transmission testing results are the most relevant evidence of a materials transmissivity, because they show how much light is being transmitted, which is critical to determining whether a material is "transparent." The sole quantitative transmission analysis Complainant presented for these products, a LUX plot for the Globe Electric Flexible Domestic Industry Product, shows that it does not have a transparent surface, transmitting only about 60% of the light incident on it through.




Figure. 71 Plot of angular distribution of light intensity, LUX (scaled to 100)

CX-0209.0043.

Accordingly, I find that the Flexible Domestic Industry Products do not meet the "transparent surface" limitation.

**PUBLIC VERSION**

**iii.** "a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and the anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device"

Complainant contends that the Flexible Domestic Industry Products practice this limitation based on the following: 1) photographic evidence shown below and the same reasoning discussed earlier, and 2) the similarity of the products. CIB at 102-104. Respondents do not dispute this limitation. RRB at 109-110. I find that this limitation is met for substantially the same reasons discussed *supra* part VII.B.1.c.ii.I.A.1.a)(1)(a) as well as the images below and Dr. Schubert's testimony. Tr. (Schubert) at 769:10-25, 771:3-11.




CDX-0002C.0192.

**PUBLIC VERSION**

**iv.** "at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface"

Complainant again relies on the testimony of Dr. Schubert to show satisfaction of this limitation. Dr. Schubert testified that the Flexible Domestic Industry Products practice this limitation based on the following: 1) the similarity of the products; 2) the same reasons discussed earlier; 3) photographic evidence showing light being emitted out of the back side of the filament. Tr. (Schubert) at 780:3-781:11; CDX-0002C.0200-.0202. Respondent does not appear to contest this limitation is satisfied by the Flexible Domestic Industry Products apart from the requirement of a transparent surface. *See* RRB at 109-110.

For the same reasons discussed supra *part* VII.B.1.d, I find that the Flexible Domestic Industry Products practice this limitation.

**v. "and a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device."**

Dr. Schubert testified that the Flexible Domestic Industry Products practice this limitation based on the following: 1) the similarity of the products, 2) the same reasons discussed earlier, 3) microscopic and chemical analysis showing the presence of phosphor in the molding; and 4) photographs of the back side of the filament. Tr. (Schubert) at 787:9-789:6; CDX-0002C.0208-.0211.

For the same reasons discussed *supra* part *See supra* part VII.B.1.e. i, I find that the Flexible Domestic Industry Products do not practice the molding limitation.

**PUBLIC VERSION**

### D. Validity

Respondents contend claim 1 of the '854 patent is anticipated by each of the Yamazaki, Minato, Uemura, Tamaoki, and Tanda references.[24] Alternatively, Respondents contend claim 1 of the '854 patent is rendered obvious by combinations of each of their presented primary purportedly anticipatory references with other, secondary references addressed below.

In addition to the previously discussed prior art, Respondents also challenge the '854 patent as lacking sufficient written description under 35 U.S.C. § 112, First Paragraph. RIB at 64.

My analysis of each ground for invalidity follows.

#### 1. Written Description

Respondents contend that the limitation requiring "a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface" is not supported by adequate written description, thereby rendering claim 1 invalid. Complainant and Staff disagree. SIB at 174; CRB at 53.

Section 112 of the Patent Act (Pre-AIA) requires that a patent specification "shall contain a written description of the invention . . . in . . . full, clear, concise, and exact terms." 35 U.S.C. § 112, First Paragraph. The written description requirement has several policy objectives. One purpose is to convey to the public what the applicant claims as the invention. *See Regents of the Univ. of Cal. v. Eli Lilly*, 119 F.3d 1559, 1566 (Fed. Cir. 1997), *cert. denied*, 523 U.S. 1089 (1998). Another objective is to "ensure that the inventor had possession, as of the filing date of the

[24] On November 10, 2021, the PTAB issued a discretionary denial of a petition for *inter partes* review filed by Satco that relied on some of the same references. EDIS Doc. ID at 756410 (citing IPR2021-00794). Among other factors, the board relied on the imminence of determination in this investigation to deny review. *See id.* at 29-30.

application relied on, of the specific subject matter later claimed." *Application of Wertheim*, 541 F.2d 257, 262 (C.C.P.A. 1976); *Billups-Rothenberg, Inc. v. Associated Reg'l & Univ. Pathologists, Inc.*, 642 F.3d 1031, 1036 (Fed. Cir. 2011) ("[t]he written description requirement exists to ensure that inventors do not attempt to preempt the future before it has arrived").

When evaluating a written description defense, the Commission conducts "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art" to determine whether "the inventor actually invented the invention claimed." *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1319 (Fed. Cir. 2017) (quoting Ariad, 598 F.3d at 1351). To satisfy the statute, an applicant need not describe "every conceivable and possible future embodiment" of the invention. *Cords Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003). Whether a specification complies with the written description requirement of § 112(a) is a question of fact. *Rivera*, 857 F.3d at 1319. When raising a written description defense, the accused party "must show a lack of written description by clear and convincing evidence." *Id*.

The terms "anode" and "cathode" do not appear in the '854 patents' specification. Tr. (Lebby) at 1273:10-15. Respondents note that Figs. 22A and 22B, the only figures depicting a cathode, the cathode is not connected to the transparent surface/sapphire plate. Tr. (Lebby) at 1272:11-1273:9.




As Dr. Schubert persuasively testified, however, a person of ordinary skill would understand that a lead frame can have a variety of shapes and would not be limited to the specific shape shown in those figures. Tr. (Schubert Reb.) at 1340:3-14. As the Federal Circuit has repeatedly instructed, an applicant need not describe "every conceivable and possible future embodiment" of the invention to satisfy the written description requirement. *Cords Corp.*, 339 F.3d at 1365.

I find that Respondents have failed to meet their burden of showing that the '854 patent lacks adequate written description.

**2. Priority Date**

The family of the '854 and '557 patents claim priority to the '447 Provisional application, which was filed on December 11, 2006. According to Respondents, the '447 Provisional does not describe the anode/cathode limitation discussed above for reasons closely tracking their arguments for lack of written description. RIB at 65.

When the anode/cathode limitation first appeared during prosecution of application number 16/422,323 ("'323 application"), filed on May 24, 2019 and issued as U.S. Patent No. 10,454,010 ("'010 patent"), the Examiner rejected the language for lack of written description support. RX-

0011.0001-9. During a telephonic interview with the Examiner, the Applicant discussed anode/cathode disclosures that could be found in Figure 22 of the ’447 Provisional and Figure 5 of an unrelated provisional, the ’454 Provisional. *Id*. at .0011.

After the telephonic conference with the Examiner, an amendment of the description of Figs. 22A and 22B successfully overcame the Examiner’s rejection. *Id.* at .0011.13-15. The Examiner acknowledged that the ’447 Provisional provided sufficient support for the anode/cathode limitation without introducing any new matter and allowed the ’323 application, which issued as the ’010 patent. *Id*. The allowance of the ’323 application in view of the above-referenced amendment undermines Respondents’ arguments.

The Examiner’s remarks indicate that a person of ordinary skill would find that the ’447 Provisional was sufficient by itself to provide adequate written description support for the anode/cathode limitation. Thus, whether the unrelated ’454 Provisional was or was not properly incorporated under Rule 1.57, as argued by Respondents, *see* RIB at 65, is moot.

Based on the foregoing, I find that the ’854 patent is entitled to its claimed priority date.

### 3. Yamazaki (RX-0828)

Respondents and Staff argue that the asserted claim of the ’854 patent is invalid based on Yamazaki. RIB at 52-54; 170-171; Tr. (Lebby) at 1220:10-1228:11. Complainant only affirmatively disputes that Yamazaki discloses “wherein the cathode and anode provide structural support to the transparent surface.” CPB at 326; CRB at 43.

1. A light emitting device, comprising:

> A transparent surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

> At least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and
>
> A molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

’854 patent at claim 1 (emphasis added).

Respondent contends that Yamazaki satisfies all of the limitations of claim 1 of the ’854 patent for substantially the same reasons as it satisfies claim 1 of the ’464 patent. RIB at 52-54; *see* Tr. 1220:13-19.

For substantially the same reasons discussed *supra* part VI.B.1, I find that Yamazaki teaches most of the limitations of claim 1 of the ’854 patent. Yamazaki’s Figure 1 shows a surface-mount LED package whose leads are wrapped around the ends of the glass/sapphire plate. A person of ordinary skill would understand that these leads are a cathode and an anode, and that they provide structural support to the plate at each end. Tr. at 1221:20-1222:17; RDX-0003.025. Additionally, these leads are used to mount the package onto a circuit board, providing both the physical and electrical connection between the package and the board. Tr. at 1225:10-21. Thus, they provide structural support because they are how the LED package is physically attached to the circuit board. *Id*.

The parties agree, however, that the sapphire growth substrate is not expressly disclosed, but Respondents contend that limitation is obvious. Complainant disputes that Respondents have presented sufficient evidence of such obviousness, and indeed, the record appears to be devoid of any evidence of such obviousness. CRB at 42-43. I find that Respondents have failed to show that Yamazaki discloses the required sapphire growth substrate limitation and therefore does not anticipate the ’854 patent.

Alternatively, for the same reasons discussed *supra* part VI.B.1, I find that Yamazaki renders claim 1 of the ’854 patent obvious in combination with Uemura. Uemura expressly teaches that its LEDs are blue GaN-based LEDs and is grown on a sapphire substrate. RX-0779 at 4:63-65, 7:6-9, 7:33-40, Table 1. Uemura also discloses a cathode and anode providing support, as required. *Supra* part VI.B.1.

**4. Minato (RX-0723)**

Respondents and Staff argue that the asserted claim of the ’854 patent is invalid based on Minato (RX-0723). RIB at 52-54; SIB at 171-173; Tr. (Lebby) at 1246:6-13. Complainant only affirmatively disputes that Minato discloses “wherein the cathode and anode provide structural support to the transparent surface.” CRB at 46-47; CPB at 324-326.[25]

For substantially the same reasons discussed *supra* part V.D.3, I find that Minato either anticipates, or alternatively renders obvious in combination with Uemura, claim 1 of the ’854 patent.

**5. Uemura (RX-0779)**

Respondents and Staff argue that the asserted claim of the ’854 patent is anticipated by Uemura (RX-0779) if the ’854 patent claims are interpreted according to the Complainant. RIB 54-56; SIB at 173-174.

For substantially the same reasons discussed *supra* part V.D.5, I find that Uemura satisfies all of the non-disputed limitations. Tr. at 1239:11-23.

[25] Respondents’ motion to strike Complainant’s arguments concerning “III-nitride LED comprising a sapphire growth substrate” and “molding comprising a phosphor” limitations is granted. *See* Motion Docket No. 1220-047. Arguments that could have been timely raised in pre-hearing briefs but were not so raised are waived.

**PUBLIC VERSION**

I find, however, that Uemura does not satisfy the sole disputed limitation, having a "molding configured to extract light from both a front side … and a back side." Unlike the '464 patent, which requires only that light in fact escape both sides and that there be a molding, Uemura's molding is not *configured* to extract light from both the front and back sides of the light emitting device. Though the molding may *permit* some light to escape from both sides, the shape of the molding is explicitly *configured* to extract light preferentially from the back side of the light emitting device. *See* RX-0779, FIG. 1, 3:8-13, 5:1-25.

### 6. Tamaoki (RX-0724)

Asserted claim 1 of the '854 patent is invalid as anticipated by U.S. Patent No. 6,961,190 ("Tamaoki"). Respondents and Staff contend Tamaoki anticipates the '854 patent. RIB at 56-61; SIB at 171-176. For the reasons that follow, I agree.

#### a. Overview of Tamaoki

U.S. Patent No. 6,961,190 ("Tamaoki") was published on November 1, 2005, and it is undisputed that it is § 102(b) prior art to all the Asserted Patents.

Tamaoki has GaN (III-nitride) LEDs 81, 82, 83, and 84 (green below) with a sapphire growth substrate. *See, e.g.*, RX-0724 at 24:45-48. Those LEDs are on a transparent surface 33 (blue), which is supported by a cathode and anode 11 and 12 (purple) on its opposing ends. RX-0724 at 25:35-36, 24:48-57, RDX-0003.069; Tr. 1260:22-1261:8. The LED chips mounted on the transparent film substrate are surrounded by a formed lens 25 (yellow) made of resin and optionally containing "luminescence material," which I find a person of ordinary skill would understand to include phosphor. *See* RX-0724 at 21:14-21; FIGS. 20, 22.

**PUBLIC VERSION**




RDX-0003.069 (annotated version of Tamaoki Fig. 20). Tamaoki teaches that if the "film substrate" for the LEDs (33 in the above diagram) is "formed into the bullet-shaped, by transparent material, . . . luminescene from plural disc-shaped LEDs . . . propagates to the rea surface direction (in FIG. 20, to the right direction)." RX-0724 at 25:32-38.

**b. Claim 1**

Respondents and Staff contend Tamaoki anticipates the '854 patent. RIB at 56-61; SIB at 171-176. For the reasons that follow, I agree, and find that Tamaoki discloses all the elements of claim 1 of the '854 patent.

**PUBLIC VERSION**




Complainant did not dispute that Tamaoki met all the limitations of claim 1 of the '854 patent except for the "extract light from both sides" limitation in its prehearing brief. CPB at 330-332.[26] Complainant argues only that Tamaoki's molding is not configured to extract light from both a front and back side of the LED. CRB at 47-52.

Tamaoki discloses an LED package with a dominant direction of light, shown below, a flexible, transparent submount to which LED chips 81, 82, 83, 84, are attached, and electric pins 11 and 12, which are similar to the through-pins discussed above with respect to Shimizu. Tr. (Lebby) at 1260:22-1261:8. The submount and LED chips are surrounded by a lens made of resin

[26] Respondents' motion to strike Complainant's argument concerning lack of disclosure of the word "phosphor" in Tamaoki is granted. *See* Motion Docket No. 1220-047. Complainant was aware of the content of Tamaoki at the time of the filing of its prehearing brief but did not dispute that Tamaoki teaches a phosphor at that time. Arguments not raised in the pre-hearing brief are waived.

and optionally containing luminescence material, RX-0724 at 21:14-18, 36:45-51, 62:28-33, which a person of ordinary skill would understand to be phosphor.




RX-0724, Fig. 20

RDX-0003.069.

Tamaoki is express that in certain embodiments, "outside geometry of bulk-shaped lens 20-29 are not always required to be optically flat, but also small irregularity can be implemented on the surface like a crystal glass." RX-0724 at 65:65-66:3. In such embodiments, "*the output lights emit in **all** directions.*" *Id.* at 66:1-2. Tamaoki thus explicitly discloses a molding configured to extract light from both the front and back sides (whatever those may be).

I find that Tamaoki anticipates claim 1 of the '854 patent.

**7. Tanda (RX-0850)**

Tanda was published on June 21, 2007 and is § 102(a), (b) and (e) prior art to the '854 patent only if Complainant is not entitled to claim priority to the '447 provisional. *See supra* part IV.D; RIB at 61.

Tanda describes an LED device that includes an LED, packaged on a transparent plate so that light is "uniformly radiate[d]…in all directions." RX-0850 at [0044]; *see also id.* at FIGS. 1, 4, 6, 8, 10, [0008], [0028]-[0029], [0042], [0044]-[0045], [0050]-[0051]; Tr. at 1268:11-1269:6.

It was designed "to provide a light emitting device that has high reliability and can provide broad light emission." RX-0850 at [0004]; RDX-0003.076; Tr. at 1268:11-1269:6.




RDX-0003.076.

Tanda's Figures 1, 8 and 14, annotated above, show a GaN LED chip 10 disposed on a "transparent board 20" by a die-bonding process. RX-0850 at [0044]; Tr. at 1268:11-1269:6. The "transparent board 20" can be made of sapphire. RX-0850 at [0029]; RDX-0003.075; Tr. at 1268:11-1269:6. Light is extracted from the front side of the blue LED by passing through "wavelength conversion member 50," and light is extracted from the back side by passing through the "transparent board 20." RX- 0850 at [0029], [0044]-[0046]; Tr. at 1268:11-1269:6.

Tanda's LED is electrically connected through wire lines 44 to metal plates 30, which connected to transparent board 20, and is then encased in transparent member 40 and/or wavelength converter 50. RX-0850 at [0043]; RDX-0003.075; Tr. at 1268:11-1269:6. Tanda discloses "transparent member 40," which "can be formed in any curved optical lens shape by transfer molding or the like." RX-0850 at [0044]; Tr. 1268:11-1269:6. These resin moldings are

"thermally curable epoxy" that "is molded through an arbitrary molding method." RX-0850 at [0028], [0029]; Tr. 1268:11-1269:6. Further, "a phosphor 48 can be mixed into an epoxy resin as the transparent member 40C so that the transparent member 40C serves as a wavelength conversion member." RX-0850 at [0047], Tr. 1268:11-1269:6. The wavelength conversion member 50 is a "resin film…containing a phosphor." RX-0850 at [0045]; Tr. at 1268:11-1269:6.

Tanda also discloses that its device can be packaged in a light bulb with the use of simple support leads. RX-0850, FIG. 8; RDX-0003.075; Tr. 1268:11-1269:6. In the figures above, Tanda also discloses that multiple LEDs can be used. RX-0850 at FIG. 14; *see also id*., FIG. 16; RDX-0003.076; Tr. 1268:11-1269:6.

I find that Tanda teaches each element of claim 1 of the '854 patent. Because Tanda is not prior art, however, *see supra* part VII.D.2, I do not find that it invalidates the '854 patent.

## VIII. THE '557 PATENT

### A. Claim Construction

I construed the disputed terms "sapphire/sapphire plate/sapphire growth substrate," and "a molding" as part of the claim construction order issued as Order No. 39. *See* CC Order at 8–16. I hereby incorporate the discussion of those terms on pages 8-16 of Order No. 39 as part of this initial determination.

### B. Infringement

For the reasons that follow, I find that Complainant has failed to demonstrate infringement of each of the asserted claims of the '557 patent by any Accused Products.

Complainant accuses all of the Accused Rigid Products of infringing claim 1 of the '557 patent.

**PUBLIC VERSION**

**1. Claim 1**

I find that the Accused Rigid Products have not been shown to infringe claim 1 of the ’557 patent.

**a. “A light emitting device, comprising:”**

The parties agreed that the preamble of claim 1 is not limiting. JX-0015 at 2. In light of the parties’ agreement and the presumption that preambles are not limiting, I find that the preamble is not limiting.

**b. “a sapphire plate”**

Despite the parties’ agreement that the Accused Rigid Products submounts are polycrystalline aluminum oxide, Complainant contends that they literally meet the “sapphire” limitation under my construction of that term. CIB at 105 (citing 626:24-627:19, 726:7-18; CX-0207 (FIGS. 45, 50-51); CX-2198.0012 (“in the polycrystal each grain is single-crystalline”); CDX-0002C.0043; Tr. (Eden) 1050:25-1051:2. Complainant’s argument is inconsistent with the language of the claim. Their expert, Dr. Schubert, opined that, because the submounts “consist of” grains of single crystal aluminum oxide, they “include[] or comprise[] single crystal aluminum oxide.” Tr. (Schubert) at 626:24-627:24. Relying on *Crystal Semiconductor Corp. v. TriTech Microelectronics Int’l, Inc*., 246 F.3d 1336, 1348 (Fed. Cir. 2001) for the proposition that the patent “transition ‘comprising’ creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements,” Complainant argues that “a light emitting device, comprising a sapphire plate” is equivalent to “a light emitting device comprising a plate comprising sapphire.” This sort of sophistry has been rejected soundly and repeatedly by the Federal Circuit. *See Dippin’ Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007) (“the term ‘comprising’ does not reach into each of the six steps to render every word and

phrase therein open-ended”); *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379–80 (Fed. Cir. 1998) (“‘Comprising’ is not a weasel word with which to abrogate claim limitations.”).

Claim 1 of the ’557 patent does not recite a plate “comprising sapphire” or a plate “including sapphire.” Instead, the claim recites “***a*** sapphire plate.” Thus, the claim is directed to “a sapphire plate,” not a plate comprised of sapphire crystals. There is no indication that a single crystal aluminum oxide plate includes a plate containing grains of single crystal sapphire. Whether the grains in polycrystalline aluminum oxide are, in fact, considered to be “sapphire”—and there is good reason to doubt that—the ceramic submount/plate of the accused products is not itself “a” single crystal aluminum oxide plate.

For these reasons, I find that the Accused Rigid Products do not literally infringe this limitation. *See* Tr. (Eden) at 1025:12-1026:1 (Accused Rigid Products not sapphire).

#### i. Doctrine of Equivalents

For substantially the same reasons discussed *supra* part VII.B.1.b.iii with respect to the ’854 patent, the Accused Rigid Products do not satisfy this limitation under the doctrine of equivalents.

Complainant contends that the Accused Rigid Products satisfy the “sapphire plate” limitation under the doctrine of equivalents. CIB at 107; Tr. (Schubert) at 628:1-8; *see also id.* at 726:8-18, 729:13-24. Put another way, Complainant argues that “a sapphire plate” is equivalent to “a plate composed of polycrystalline alumina.” *But see* Tr. (Eden) at 1026:7-14 (testifying that the ceramic submounts are substantially different with respect to visual testing, transmission testing, SEM analysis, and integrating sphere testing from the claimed “sapphire” plates described in the patent).

Dr. Schubert provided the following function-way-result analysis:

- The purported function of the claimed sapphire plate is to structurally support the LEDs and extract light through the sapphire plate. Tr. (Schubert) at 628:9-15. Complainant contends the ceramic submount performs the same or substantially the same function by structurally supporting the LEDs and allowing light to be transmitted through. *Id.*
- The purported way the claimed sapphire plate performs its function is by providing a surface "that is sufficiently sturdy to support the LED die and is suitable for LED packaging." *Id*. at 628:16-22. Complainant contends the Accused Rigid Products' ceramic submounts perform the function in the same or substantially the same way. *Id*. at 628:23-629:2.
- Complainant contends the purported result of the claimed sapphire plate and the ceramic submount are the same or substantially the same: they result in a surface that structurally supports the LEDs and allows light to be extracted through the surface. *Id*. at 629:3-9.

CIB at 107.

For substantially the same reasons regarding "transparent," *supra* part V.B.1.iii.(b).(v), Complainant's doctrine of equivalents argument lacks sufficient support. Unlike Dr. Schubert's testimony, which was made without reference to the specification, Dr. Eden's testimony was persuasive and clearly tied to the teachings of the patent. *Id.* He provided a more appropriate function-way-result analysis, showing that the Accused Rigid Products do not satisfy this limitation under the doctrine of equivalents. Dr. Eden testified that the function of the sapphire plate is to effectively extract light, the way this function is performed is by the plate being a transparent material, and the result is the effective extraction of light. Tr. (Eden) at 1026:24-

1028:7. The Accused Rigid Products' plates have a comparatively poor ability to extract light and thus do not achieve or practice substantially the same function, in substantially the same way, to substantially achieve the same result. *Id*.

Additionally, I find that the term "sapphire plate" is inherently narrow, which limits the scope of its equivalents. *Moore USA Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) ("If our case law on the doctrine of equivalents makes anything clear, it is that all claim limitations are not entitled to an equal scope of equivalents," including as a result of "the inherent narrowness of the claim language.") The Federal Circuit has explained that "for a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly." *Sage Prod., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997). Complainant chose to narrowly claim a "sapphire plate." It could have (and did in other patents) more broadly claimed this plate, or even could have claimed a different material, but chose not to. As a result, Complainant is not now allowed to extend the scope of "sapphire" to encompass a ceramic material, polycrystalline aluminum oxide, simply because it shares the same elemental composition.

I find that the sintered polycrystalline aluminum oxide plate in the Accused Rigid Products does not perform substantially the same function as the sapphire plate in the same way to achieve the same result because they do not effectively transmit light due in part to the presence of grains, pores, and grain boundaries, which absorb, reflect, and scatter light. *See* Tr. (Eden) at 992:16-995:6, 1000:13-25; RDX-0001.049, .057.

I therefore find that Accused Rigid Products do not satisfy the "sapphire plate" limitation under the doctrine of equivalents.[27]

**c. "a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and the anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device"**

The Accused Products meet this limitation because they have electrodes on the left and right of the images below, one of which is a cathode and the other is an anode, each of which is positioned at the end of the transparent surface, and which are connected to the LED chips via bond wires.

I find that the Accused Rigid Products satisfy this limitation based on the photographs below which show the following: 1) a cathode on one end of the transparent plate and an anode on the other end; 2) the anode and cathode providing support to the transparent plate; and 3) the anode and cathode providing a connection to the structure outside of the filament LED. Tr. (Schubert) at 726:19-727:21, 729:25-730:23.

[27] Because Complainant's argument fails on the merits, I need not reach the question of estoppel raised in Respondents' motion for summary determination, Motion Docket No. 1220-027, which is denied as moot.

**PUBLIC VERSION**




CDX-0002C.0147 (depicting Satco S29876); CDX-0002C.0148 (other Accused Products).

Respondents other than Feit do not dispute that their products satisfy this limitation, and Feit raises the same arguments it did with respect to claim 1 of the ’854 patent. RRB at 116. I reject Feit’s argument for the reasons stated in relation to that claim. *See supra* part VII.B.1. For the same reasons discussed *supra* part VII.B.1, I find that the Accused Rigid Products satisfy the “cathode on a first end” and “anode on a second end” limitations.

**d. “a plurality of III-nitride light emitting diodes (LEDs), each comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LED through the sapphire plate”**

I find that the Accused Products satisfy this limitation as to “plurality of III-nitride light emitting diodes,” “sapphire growth substrate,” “mechanical communication” and “configured to extract light” limitations for substantially the same reasons discussed concerning claim 1 of the

’854 patent. *See supra* part VII.B.1.d. I likewise find the Accused Products do not satisfy the “sapphire plate” limitations” for the reasons discussed *supra* part f.C.1.b. *See* Tr. (Schubert) at 733:9-734:15, 735:3-736:16; *see also id.* at 634:25-635:11 (discussing sapphire growth substrate).




CDX-0002C.0153 (depicting Satco S29876); *see* CDX-0002C.0154 -.0156.

**e. “and a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.”**

I find The Accused Rigid Products do not satisfy the “molding” limitation for the same reasons discussed *supra* part VII.B.1.e above. *See* Tr. (Eden) at 1024:14-21. I find that the Accused Rigid Products satisfy the “surrounding” limitation for the same reasons discussed in section VII.A.1.e.ii. *See* Tr. (Eden) at 1025:1-6.

### C. Technical Prong of the Domestic Industry Requirement

Complainant only asserted that the Rigid Domestic Industry Products practice claim 1 of the ’557 patent.

**PUBLIC VERSION**

### 1. Claim 1

I find that the Rigid Domestic Industry Products do not practice claim 1 of the '557 Patent.

#### a. "A light emitting device, comprising"

The preamble is not limiting. *See supra* part VIII.B.1.a.

#### b. "a sapphire plate"

The Ceramic Domestic Industry Products do not practice this limitation. Dr. Schubert testified that the Rigid Domestic Industry Products practice this limitation "due to the similarity of the products and for the reasons I discussed earlier." Tr. (Schubert) at 731:1-8.




Dr. Schubert also testified that the same analysis with respect to literal infringement and the doctrine of equivalents applies to the Rigid Domestic Industry Products. *Id.* at 732:3-8.

For substantially the reasons discussed above I find that the Ceramic Domestic Industry Products do not practice this limitation literally or under the doctrine of equivalents, but the Acclaim Domestic Industry Product does. *See supra* parts VII.C.1.a.ii (Rigid Domestic Industry Products lack a molding, and Rigid Domestic Industry Products other than Acclaim Domestic

Industry Products have not been shown to be transparent) and VIII.B.1.b (polycrystalline alumina plates do not meet sapphire plate limitation).

**c. "a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;"**

The Rigid Domestic Industry Products practice this limitation. Dr. Schubert testified that the Rigid Domestic Industry Products practice this claim limitation due to the similarity of the products and for the same reasons he provided earlier. Tr. (Schubert) at 732:9-733:7. Respondents do not dispute that the Rigid Domestic Industry Products practice this limitation.

For substantially the reasons discussed above, I find that the Rigid Domestic Industry Products practice this limitation. *See supra* part VII.C.1.a.iii (Rigid Domestic Industry Products meet cathode/anode limitation).

**d. "a plurality of III-nitride light emitting diodes (LEDs), each comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate;"**

Dr. Schubert testified that the Rigid Domestic Industry Products practice this claim limitation based on the reasons provided earlier and due to the similarity of the products. Tr. (Schubert) at 737:3-738:5.

**PUBLIC VERSION**







Respondents dispute whether the Ceramic Domestic Industry Products are "configured to extract light emitted by the LED through the transparent surface." RIB at 117. I find that the Rigid Domestic Industry Products practice the "configured to extract light" limitation for substantially the same reasons discussed in above with respect to the Accused Products. *See supra* part VII.B.1.d.

I further find that the Ceramic Domestic Industry Products do not practice the "sapphire" limitation literally or under the doctrine of equivalents. *Id.* at VIII.B.1.b. Respondents do not dispute that the Acclaim Domestic Industry Product, which includes a sapphire plate, practices this limitation. RIB at 117. I find that the Acclaim Domestic Industry Product practices this limitation for substantially the reasons discussed *supra* part VII.B.1.d (Acclaim Domestic Industry Product is configured to extract light from both sides); *see* CX-0198 (Scanning Electron Microscope imaging and X-ray spectroscopy confirming single crystal sapphire substrate).

**e. "and a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device."**

The Rigid Domestic Industry Products do not satisfy this limitation. Dr. Schubert testified that the Rigid Domestic Industry Products practice this limitation due to the similarity of the products and for the reasons discussed earlier. Tr. (Schubert) at 743:4-744:16; CDX-0002C.0165-.0169.

Respondents assert that the Rigid Domestic Industry Products do not satisfy the "molding" limitation for the same reasons the Accused Products do not satisfy the limitation. RRB at 117.

For substantially the reasons discussed *supra* part VIII.B.1.e, I find that the Rigid Domestic Industry Products do not meet the molding limitation.

### D. Validity

Respondents contend claim 1 of the ’557 patent is anticipated by each of the Yamazaki, Minato, Okamoto, and Uemura references.[28] Alternatively, Respondents contend claim 1 of the ’557 patent is rendered obvious by combinations of each of their presented primary purportedly anticipatory references with other, secondary references addressed below.

#### 1. Written Description

Respondents argue that the ’557 patent and the priority documents for the ’557 patent lack written description support for the cathode/anode limitation for the same reasons discussed with respect to the written description of the ’854 patent, *supra* part VII.D.1. For the same reasons discussed in part VII.D.1, I find that the ’557 patent and its priority document have sufficient written description support.

Respondents also argue that the ’557 patent lacks written description support for “a plurality of III-nitride light emitting diodes (LEDs).” RIB at 69-70. To that point, Dr. Lebby testified that neither the specification nor the figures in the ’557 patent show a plurality of LEDs. Tr. (Lebby) at 1270:20-1271:15. Complainant does not dispute that there is no express disclosure of a plurality of LEDs; instead, they argue that the number of LEDs on a device would be a design choice, a point Dr. Lebby himself admitted. CRB at 59-60; Tr. (Lebby) at 1230:20-1231:2; Tr. (Schubert Reb.) 1340:20-23. Complainant’s response to this is unavailing: while it might be true that using multiple LEDs would be *obvious*, *see* Tr. (Lebby) at 1271:18-1272:4, a “description which renders obvious a claimed invention is not sufficient to satisfy the written description

[28] On November 8, 2021, the PTAB issued a discretionary denial of a petition for *inter partes* review filed by Satco that relied on some of the same references. EDIS Doc. ID at 756192 (citing IPR2021-00661). Among other factors, the board relied on the imminence of determination in this investigation to deny review. *See id.* at 29.

**PUBLIC VERSION**

requirement of that invention." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1567 (Fed. Cir. 1997) (citations omitted).

Complainant also relies, however, on Fig. 25A of U.S. Patent No. 7,781,789 (the "'789 patent"), which the '557 patent incorporates by reference, and which indisputably discloses a plurality of LEDs. CRB at 60-61; Tr. (Lebby) 1288:17-21 (admitting FIG. 25A of the '789 patent discloses a plurality of LEDs).




FIG. 25A

CX-0488

37 C.F.R. § 1.57(b)-(c) expressly allow for such incorporation by reference, even of essential materials, when the document being incorporated is a patent. *See* 37 C.F.R. § 1.57(d). The '557 patent expressly incorporates the '789 patent by reference. JX-0005 at 7:10-21, 8:4-5. Respondents do not address this argument. RIB at 69-70. I find that the '557 patent has adequate written description support for the plurality of LED limitation as incorporated by reference from the '789 patent.

Thus, I find that that the '557 patent has adequate written description support.

**2. Priority Date**

I find that the ’557 patent is entitled to its claimed priority date for the same reasons discussed with respect to the ’854 patent, *see supra* part IX.D.2.

**3. Yamazaki (RX-0828)**

Respondents and Staff argue that the asserted claim of the ’557 patent is rendered obvious by Yamazaki for largely the same reasons discussed with respect to claim 1 of the ’557 patent, with the sole difference being the ’557 patent’s requirement of a “plurality” of LEDs as compared to the ’854’s requirement only of “at least one” LED. RIB at 66; SIB at 204..

Complainant only disputes that Yamazaki discloses “wherein the cathode and anode provide structural support to the transparent surface” and a “plurality of LEDs.” CRB at 58.

I find that, for the reasons below, Yamazaki renders claim 1 of the ’557 patent obvious, either alone or in combination with Minato.

**a. “wherein the cathode and anode provide structural support to the sapphire plate”**

Respondents’ invalidity arguments with respect to this limitation are the same as those raised with respect to the “anode/cathode” limitation in claim 1 of the ’854 patent. *See* RIB at 66. Complainant agrees the issues are identical. *See* CRB at 58.

For the reasons discussed concerning that limitation, *supra* part VII.D.3, I find that Yamazaki discloses or renders obvious this limitation.

**b. “plurality of LEDs”**

Respondents argue that it would be obvious to modify Yamazaki to meet the “plurality of LEDs” limitation. RIB at 67-69. To that end, Dr. Lebby testified that adding another LED to increase the brightness of the LED package would be simple for a person of ordinary skill. *Id*. at 1229:22-1230:4.

**PUBLIC VERSION**

Additionally, Minato shows how to add an LED chip to a package only containing one LED, as shown by the two figures below. *Id*. at 1230:5-19.




RDX-0003.031. Dr. Lebby testified that modifying Yamazaki to contain multiple LEDs would not require changing any components' functionality and would be a "simple design choice" for a person of ordinary skill. Tr. (Lebby) at 1230:20-1231:2. The predictable result would be an increase in the amount of light. *Id*. at 1231:3-13; *see KSR* at 421 (rearranging known elements in known configurations for known results constitutes an obvious design choice)

Complainant argues only that Yamazaki does not disclose a plurality of LEDs, but does not specifically dispute that such a modification would be obvious. Indeed, they explicitly argue that "a [person of ordinary skill] would understand selecting the number of LEDs in a given package" is a "simple design choice." CRB at 60.

I find that Yamazaki, either alone or in combination with Minato, renders obvious the plurality of LEDs limitation. Accordingly, I find that claim 1 of the '557 is invalid as obvious in light of Yamazaki, either alone or in combination with Minato.

**PUBLIC VERSION**

#### 4. Minato (RX-0723)

Respondents and Staff argue that claim 1 of the ’557 patent is either anticipated or rendered obvious by Minato for the same reasons discussed with respect to claim 1 of the ’854 patent. RIB at 66; SIB at 206. Complainant only disputes that Minato discloses “wherein the cathode and anode provide structural support to the transparent surface.” *Id.* at 67; CRB at 59. As shown in the figure below, there can be no dispute that Minato discloses a plurality of LEDs. *See* RX-0723, FIG. 2. For the reasons discussed above concerning claim 1 of the ’854 patent, *supra* part VII.D.4, I find that Minato either anticipates, or renders obvious in view of Uemura or Shimizu, claim 1 of the ’557 patent.




RDX-0003.046.

### 5. Uemura (RX-0779)

Respondents and Staff argue that claim 1 of the '557 patent is invalid in light of Uemura for the same reasons discussed with respect to the '854 patent. RIB at 67-69; SIB at 206; Tr. (Lebby) at 1239:9-1241:0.

As with Yamazaki, *supra* part VIII.D.3, Uemura does not disclose a plurality of LEDs. RIB at 67.[29] But as with Yamazaki, it would have been obvious to modify Uemura to include a plurality of LEDs for the same reasons discussed above. *See supra* part VIII.D.3.




RDX-0003.031.

For those reasons, I find that Uemura renders claim 1 of the '557 patent obvious, either alone or in combination with Minato.

[29] Respondents' motion to strike Complainant's argument concerning lack of disclosure of a "plurality of III-nitride light emitting diodes" is granted. *See* Motion Docket No. 1220-047. Complainant was aware of the content of Uemura at the time of the filing of its prehearing brief but did not dispute that Uemura teaches that limitation at that time. Arguments not raised in the pre-hearing brief are waived.

**PUBLIC VERSION**

### 6. Tanda (RX-0850)

I find that Tanda satisfies all of the limitations of claim 1 of the '557 patent for substantially the same reasons discussed above concerning the '854 patent. *See supra* part VII.D.7. As shown below, Tanda teaches the use of a sapphire plate and a plurality of III-nitride light emitting diodes.




RDX-0003.076 (citing RX-0850 (Tanda), FIGS. 1, 14, and 18).

However, Tanda is only prior art if the '557 patents is not entitled to its priority dates. Because the '557 patent is entitled to its priority date, *see supra* part VIII.D.2, Tanda is not prior art and cannot invalidate claim 1 of the '557 patent.

## IX. PUBLIC TRUST (FEIT)

Feit argues that Complainant's assertions against Feit are barred because Feit is a California corporation,[30] and the University of California constitutes a public trust administered by Complainant for the benefit of California corporate citizens like Feit. RIB at 75.

Feit's argument appears novel: it has presented no evidence or legal authority that Complainant's status as a public trust renders the Asserted Patents unenforceable against California entities. The only cases cited—one from 137 years ago—pertain to substantially different resources, such as riparian rights. *See People v. Davis*, 3 Cal. App. 5th 708, 713-14, 208 Cal. Rptr. 3d 39, 43 (Ct. App. 2016).

Based on this case law, it appears the public trust doctrine narrowly encompasses authority and control over the state's navigable waters and underlying lands, as well as wildlife and natural resources. *See Nat'l Audubon Soc'y v. Superior Court,* 33 Cal. 3d 419, 425, 658 P.2d 709, 712 (1983); *Ctr. for Biological Diversity, Inc. v. FPL Grp., Inc.,* 166 Cal. App. 4th 1349, 1363, 83 Cal. Rptr. 3d 588, 599 (2008), *as modified on denial of reh'g*, (Oct. 9, 2008). Feit has not identified any authority holding that IP rights are subject to the public trust doctrine in any jurisdiction, let alone in California. Such a holding would be contrary to the body of the common law to date, as courts have held California residents liable for infringing patent rights held by the University of California. *See, e.g., Regents of Univ. of Cal. v. Actagro,* CVF 02-6530 AWI DLB, 2003 U.S. Dist. LEXIS 29275 (E.D. Cal. Jan. 13, 2003); *Regents of Univ. of Cal. v. Hansen,* No. CIV S98-0715 WBS PAN, 1999 WL 33268423, at *11 (E.D. Cal. Nov. 8, 1999).

I reject Feit's defense based on the public trust doctrine.

---

[30] Complainant contends that Feit has presented no evidence of its status as a California corporation, CRB at 66, but Complainant admitted that status in its complaint and exhibits thereto. *See* Compl. ¶ 27 and Ex. 10.

## X. PATENT EXHAUSION (IKEA)

Seoul Semiconductor ("SSC") holds a license to the Asserted Patents, and thus products containing filament LEDs supplied by SSC have never been accused in this investigation. CX-0712C; RX-0074C; Complaint (EDIS Doc. ID 718435) ¶89. IKEA argues that a "majority" of its imported Accused Products utilize licensed filament LEDs from SSC. RIB at 75-77. Thus, the burden rests on IKEA to prove the license defense. *See Certain Digital Video Receivers & Hardware & Software,* Inv. No. 337-TA-1001, Comm'n Op. at 11 (Dec. 6, 2017).

IKEA relies on CX-0920C, a spreadsheet provided by its supplier, Keetat, to determine the source of filament LEDs in its Accused Products. Tr. (Rodin) at 903:16-904:3, 908:7-909:4. Mr. Rodin testified that IKEA relies on this spreadsheet *and* the date stamp applied to the products by Keetat to determine which products contain SSC filament LEDs. *Id.* at 904:20-905:1, 912:15-23, 912:25-913:20. According to Mr. Rodin, adjacent the date stamp on each bulb, Keetat marks products containing [redacted] filament LEDs with an "O" stamp. *Id. at* 908:11-909:8, 911:16-912:23; CPX-0020.0004.

IKEA's claim that it only imports products with licensed SSC filaments is contradicted by other record evidence. For example, IKEA does not dispute that Accused Product 104.501.82 was stamped by Keetat with an "O" (indicating [redacted] filament LEDs) and a date stamp that, according to Keetat's spreadsheet at CX-0920C, indicates this same product contains *SSC* filament LEDs.




| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | IKEA Article Number | Type Number | Production date | Date stamp | Apply qty | LED Manufacturer |
| 471 | 10450182 | LED1806G2 | 3/29/2019 | 201913 | 883 | SSC Filament |
| 472 | 10450182 | LED1806G2 | 3/29/2019 | 201913 | 2,301 | SSC Filament |
| 473 | 10450182 | LED1806G2 | 3/29/2019 | 201913 | 16 | SSC Filament |

Tr. (Rodin) at 911:16-914:9; CPX-0020.0004; CX-0920C.

IKEA suggests that "only one bulb" with markings that conflict with the Keetat tracking document does not undermine the credibility of Keetat's documentation and stamping system. RIB at 75-76. But the inference IKEA asks me to draw—that a production line made only a *single* erroneously marked bulb—strains credulity. IKEA presents no evidence supporting this inference other than Mr. Rodin's belief that the marking was erroneous. IKEA also argues that because the stamp on the bulb indicating filament manufacturer is not required by IKEA it is somehow less reliable than the date stamp and documentation that IKEA *does* require. RIB at 76; Tr. (Rodin) 909:9-910:15. But IKEA does not explain why Keetat's internal controls for its own benefit would be any less accurate than those for the benefit of its customers.

The mostly likely inference to be drawn from the record evidence as a whole is that IKEA has imported bulbs with unlicensed [redacted] filaments. I therefore find that IKEA has not met its

burden that all of its Accused Products are licensed. Accordingly, IKEA's patent exhaustion defense fails.

## XI. DOMESTIC INDUSTRY

For a patent-based complaint, a violation of section 337 can be found "only if an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established." 19 U.S.C. § 1337(a)(2). The complainant bears the burden of establishing that the domestic industry requirement is satisfied. *John Mezzalingua Assocs., Inc. v. Int'l Trade Comm'n*, 660 F.3d 1322, 1331 (Fed. Cir. 2011). The domestic industry requirement of section 337 is often described as having an economic prong and a technical prong. *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 707 F.3d 1295, 1298 (Fed. Cir. 2013); *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586, Comm'n Op. at 12–14, USITC Pub. No. 4120 (Dec. 2009). "The technical prong concerns whether complainant practices at least one claim of the asserted patents. The economic prong concerns domestic activities with respect to the patent or patented article." *Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 25, USITC Pub. No. 4289 (Nov. 2011) ("*Certain Printing and Imaging Devices*").

Section 337(a)(3) sets forth the following economic criteria for determining whether the economic prong of the domestic industry requirement is satisfied in such investigations:

> [A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned –
>
> (A) significant investment in plant and equipment;
>
> (B) significant employment of labor or capital; or
>
> (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

19 U.S.C. § 1337(a)(3). Given that these criteria are listed in the disjunctive, satisfaction of any one of them will be sufficient to meet the economic prong of the domestic industry requirement. *See Certain Printing and Imaging Devices*, Comm'n Op. at 26.

### A. Effect of Invalidity Determinations

Because I find that the claims of the '529, '464, '854, and '557 patents that Complainant relies upon for its technical prong showing are invalid, *see, e.g., supra* parts V.D ('529 patent), VI.D ('464 patent), VII.D ('854 patent), VIII.D ('557 patent), I find that the alleged '529, '464, '854, and '557 domestic industry products are not protected by their respective patents. *See Certain Child Carriers and Components Thereof, and Products Containing the Same*, Inv. No. 337-TA-1154, Final IDRD (April 7, 2020) (EDIS Doc. ID 707158) at 172 ("Because I find the patents are invalid and unenforceable, the patents protect no articles and . . . cannot satisfy the domestic industry requirement"), *not reviewed in pertinent part,* 85 Fed. Reg. 29484 (May. 15, 2020) (EDIS Doc. ID 710444 85). As a result, I find that Complainant cannot satisfy the domestic industry requirement.

I have further determined, as an alternative holding, that if the relevant claims of the '529, '464, '854, and '557 patents were not invalid, Complainant would satisfy the technical prong of the domestic industry requirement with respect to those patents, as addressed above, *supra* parts VI.C, VII.C, VIII.C, and IX.C.

Below I provide findings concerning the economic prong of the domestic industry requirement in the event that the relevant patent claims are not invalid and are practiced by Complainant or by an authorized article.

### B. Economic Prong of the Domestic Industry Requirement

Complainant claims the following expenditures demonstrate a domestic industry in articles protected by the Asserted Patents:

**PUBLIC VERSION**

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Total |
|---|---|---|---|---|---|---|
| **SSLEEC Labor** | $1,126,130 | $1,103,749 | $1,097,943 | $1,150,842 | $1,004,777 | **$5,483,442** |
| **SSLEEC Plant & Equipment** | $ 416,566 | $ 260,152 | $ 372,039 | $ 411,274 | $ 392,790 | **$1,852,822** |
| **Total SSLEEC R&D** | $1,542,697 | $1,363,901 | $1,469,983 | $1,562,116 | $1,397,568 | **$7,336,264** |

CIB at 114.

For the reasons that follow, I find that Complainant satisfies the economic prong of the domestic industry requirement.

**1. Findings of Fact Relating to the Domestic Industry**

The findings of fact below concern the economic prong of the domestic industry requirement.

**a. Engineering, Research, and Development at SSCLEEC**

Complainant operates the Solid State Lighting & Energy Electronics Center ("SSLEEC") at University of California Santa Barbara ("UCSB"). SSLEEC is a research institute "that is funded primarily by industrial contributions from member companies." Tr. (DenBaars) at 105:2-8. SSLEEC's "main research focus" is making highly efficient LED lighting. *Id*. SSLEEC is the only research center of its kind focused on improving light efficiency technology through transparent LED technology. *Id*. at 105:9-15; Tr. (Schubert) 599:4-9. The research leading to the technology disclosed in the Asserted Patents occured at SSLEEC, and SSLEEC continues to use that technology today. Tr. (DenBaars) at 137:5-15.

SSLEEC employees include highly skilled faculty, Ph.D. students, researchers visiting from industry member companies, and development engineers. Tr. (DenBaars) at 137:18-139:6. Professor Steven DenBaars, with Professors Shuji Nakamura, Jim Speck, and Umesh Mishra, are

primarily responsible for overseeing SSLEEC's research and providing strategic direction. *Id*. 138:11-139:2. Students and visiting researchers perform most of SSLEEC's ER&D activities related to transparent LED technology. *Id*. 137:18-138:10.

SSLEEC makes hundreds of LEDs in the course of its research into transparent substrates, lead frames, phosphors, and light extraction. CX-2214; Tr. (DenBaars) at 108:14-109:6, 137:5-15, 201:7-16; *id*. (Englander) at 403:18-22. As Professor DenBaars testified, SSLEEC's LED research includes three subjects involved in the production of the transparent filament LEDs: epitaxial growth, chip fabrication, and transparent packaging. *Id*. 108:6-13, 113:5-25. It takes six hours to grow an LED by epitaxial growth, another month to fabricate it, and then another week to package it. *Id*. at 116:23-25. Each of these activities is described below.

**i. Epitaxial Growth**

Epitaxial growth in the context of this investigation refers to depositing gallium and nitrogen atom on crystalline substrates to "grow" LED chips and other components. Tr. (DenBaars) at 115:18-116:25. SSLEEC's epitaxial growth research is aimed at making LEDs with layers that are more transparent and more efficient. Tr. (DenBaars) at 115:18-116:25, 121:9-122:8; Tr. (Englander) 401:23-402:3. For example, SSLEEC's epitaxial growth research develops quantum wells and tunnel junctions that allow more light to escape from a transparent LED. Tr. (DenBaars) at 117:1-121:8; CX-1297.002, CX-1301.002, CX-1340.004, CX-1352.004, CX-1365.003, CX-1389.002.

Improvements in epitaxial and bulk crystal growth discovered at SSLEEC have resulted in the development of brighter LEDs with less efficiency droop and that require less heat sinking. Tr. (DenBaars) at 115:15-116:25. This in turn encourages the use of lead frames with a transparent plate instead of conventional packaging because transparently packaged devices are less likely to

fail from overheating. *Id*. 123:11-124:21, 129:11-130:14, 135:19-136:7. *Id*. 121:9-122:3; 123:11-124:2.

**ii. Chip Fabrication**

SSLEEC's chip fabrication research involves research into transparent materials and films that improve light extraction from the chip and improve the chip's efficiency. Tr. (DenBaars) at 124:3-21, 129:11-130:14; CX-1328.002, CX-1369.001-.002, CX-1428.005, CX-1346.004, CX-1406.003, CX-1359.004, CX-1438.005. SSLEEC's improvements in chip fabrication would not result in more efficient light extraction without placing the fabricated chips in transparent packaging. Tr. (DenBaars) at 129:11-130:14.

**iii. LED Transparent Packaging**

SSLEEC's LED packaging research involves experiments with different transparent substrates, different phosphors, and different molding to produce more efficient LEDs. Tr. (DenBaars) at 130:15-136:7. Transparent LED technology has been a major area of research at SSLEEC for the last 20 years. *Id*. at 107:13-108:13, 109:12-111:4; Tr. (Wong) at 323:1-324:11. SSLEEC publications demonstrate SSLEEC's continued use of transparent packaging to achieve SSLEEC's best LED results. Tr. (DenBaars) at 137:5-15; CX-1485.001, CX-1337.001-.002, CX-1377.008, CX-1531.003, CX-2208.002.

**b. Licensing Infrastructure**

UCSB also has an Office of Technology and Industry Alliances ("TIA"). Tr. (Englander) at 384:1-5. TIA manages intellectual property development and licensing. *Id*. at 384:6-21. Specifically, TIA's main responsibilities are (1) managing the intellectual property developed through UCSB research, including licensing, and (2) managing UCSB's agreements with industry partners. RX-0073 at ¶ 3.

### c. Facilities and Equipment

SSLEEC occupies four buildings on UCSB's campus where it performs the research described above related to the patented technology: Engineering II, Engineering Science Building ("ESB"), Materials Research Lab ("MRL"), and Elings Hall. Tr. (DenBaars) at 143:15-23; Tr. (Owens) at 358:21-359:2. In addition to those buildings, SSLEEC acquired a 1,000 square-foot lab in Henley Hall to expand its transparent packaging lab. Tr. (DenBaars) 143:15-23; Tr. (Owens) 359:3-8, 367:20-368:1; CX-0585. Each of these facilities is discussed below.

#### i. Engineering II

The Engineering II building at UCSB is SSLEEC's headquarters and houses SSLEEC faculty and staff, most offices, conference room space, and epitaxial growth labs containing seven metal organic chemical vapor deposition (MOCVD) machines. Tr. (DenBaars) at 144:1-145:12; CX-0759.007-.0012; CX-0513; CX-0515; CX-0522-0524. SSLEEC uses the Engineering II building and equipment contained there for research related to the technology in the Asserted Patents and to create SSLEEC Domestic Industry Products. Tr. (DenBaars) at 145:13-146:9; CX-0448; Tr. (Owens) at 371:1-372:3 (SSLEEC purchases the equipment and residual value vests with SSLEEC). For example, the MOCVD machines are used to perform epitaxial growth and put down transparent layers to create LEDs used in the SSLEEC Domestic Industry Products. Tr. (DenBaars) at 144:11-15; CX-0759.007, .012, .013, .014, .029, CX-0515.

#### ii. Engineering Science Building

The Engineering Science Building houses the nanofabrication facility (clean room) and LED transparent packaging labs where researchers perform LED chip fabrication, extraction, transparent packaging, and measuring and testing of gallium nitride-based LEDs. Tr. (DenBaars) 146:10-149:10; CX-0759, CX-0503-512, CX-0514; CX-0519. SSLEEC uses the Engineering Science Building and equipment contained there for research related to the technology described

in the Asserted Patents and to create SSLEEC Domestic Industry Products. Tr. (DenBaars) 148:25-149:10; CX-0448; CX-0525 (nanofabrication tool list).

By way of illustration, SSLEEC's nanofabrication lab is used to put down metal contacts, leads, and structures on top of LEDs, and researchers clean and dice those LEDs for use in the SSLEEC Domestic Industry Products. Tr. (DenBaars) at 146:10-149:10. This facility also contains photolithography bays where researchers write contact pads and metallization with a mask aligner. *Id.*; CX-0759.017, .019, .021, .025, and .027. Other activities in this facility include E-Beam metal deposition, reactive ion etching, and oxide chemical vapor deposition. *See* CX-0525.001-.003. The nanofabrication lab has a vacuum oven, residual gas analyzer, UV ozone reactor, chemical-mechanical polisher, tube furnace, dicing saw, optical microscopes, and other equipment. *See id*. SSLEEC is charged a recharge rate for use of this equipment. Tr. (DenBaars) at 148:16-24.

The Engineering Science Building also houses the packaging lab, which includes an integrating sphere for measuring light output and an atomic layer deposition tool to make transparent side walls. CX-0514; Tr. (DenBaars) at 146:24-147:7, 148:18-149:10. The Engineering Science Building packaging and characterization laboratory contains equipment necessary to dice, grind, fabricate, and wire bond LED structures and encapsulate them in epoxy and silicones with phosphors. CX-0525.001-.003. The same laboratory has equipment for testing the electrical and optical spectral characteristics of LEDs. *See id*.

**iii. Materials Research Lab and Elings Hall**

The Materials Research Lab houses material for preparation of phosphors and oxides and characterization equipment used for creation of phosphors. SSLEEC uses the Materials Research Lab and equipment contained there for research related to the Asserted Patent and to create SSLEEC Domestic Industry Products. Tr. (DenBaars) at 149:11-150:6. The Materials Research

Lab has a centering furnace used to center phosphors and spectrometer used to measure their optical properties. *See* CX-0520, CX-0521.

Elings Hall houses microscope and characterization tools to analyze LED structures, such as a double crystal x-ray machine to analyze crystal quality of the layers, atomic force microscopes, atom probe microscope, transmission electron microscopes (TEM), scanning electronc miscroscopes (SEM), and secondary ion mass spectroscopy (SIMS). Tr. (DenBaars) at 150:9-20; CX-0516; CX-0517.

#### 2. Plant and Equipment

Complainant alleges that from FY2016 through FY2020, domestic plant and equipment investments related to the SSLEEC Domestic Industry Products practicing the '529 and '464 patents totaled $1,852,822. Tr. (Thomas) at 460:4-11, 481:22-23, 482:11-13; CDX-0001C.0009.

##### a. SSLEEC's Plant and Equipment Investments

SSLEEC separates its plant and equipment into office space expenses, lab space expenses, and laboratory and equipment expenses. Tr. (Thomas) at 466:24-467:10, 476:4-8. Facility expenses include maintenance, utilities, repairs, insurance, and depreciation, as well as modifications or updates to preexisting facilities specific to SSLEEC's requirements. Tr. (Owens) at 359:12-16, 367:6-368:1. Equipment expenses include equipment costs and lab recharge rates. *Id.* at 368:19-371:6. Complainant's economic expert, Mr. Thomas, calculated SSLEEC's plant and equipment expenditures related to the SSLEEC Domestic Industry Products that practice the '464 and '529 patents and described his results at the hearing, summarized as follows:

**PUBLIC VERSION**

| **Plant & Equipment<br>'529 & '464 Patents<br>Total (FY 2016 – FY 2020)** | |
|---|---|
| **Office** | |
| Maintenance & utilities (Office) | $81,216 |
| Building Depreciation (Office) | $88,597 |
| **Lab** | |
| Maintenance & Utilities (Lab) | $120,516 |
| Building Depreciation (Lab) | $128,078 |
| Equipment and Lab Expenditures | $1,434,415 |
| **Total** | **$1,852,822** |

Tr. (Thomas) at 460:4-11; CDX-0001C.0009.

Mr. Thomas provided comprehensive details on how he calculated each of these totals, including his method of allocating costs to the '529 and '464 patents. CIB at 132-140. For Office expenses, Mr. Thomas relied on the testimony of Ms. Owens, an employee of Complainant, to calculate costs for office space and lab space used by SSLEEC in total, and then further allocated those calculated costs based on Dr. DenBaars' estimates of the percentage of SSLEEC labor hours incurred related to the '529 and '464 patents, excluding visiting researchers. Tr. (Thomas) at 467:3-470:3, 473:13-475:15; Tr. (Owens) at 368:2-18; CX-0244; CX-0245.

For laboratory expenditures, Mr. Thomas calculated the costs of SSLEEC's lab space in the same manner as he did for office space, utilizing standard depreciation, utility, and maintenance metrics. Mr. Thomas then allocated those costs based on Dr. DenBaars' estimation that at least 40% of the lab costs were attributable to research related to the technology in the '529 and '464 patents and SSLEEC Domestic Industry Products practicing those patents. Tr. (Thomas) at 480:1-16; CX-0244; CX-0245. Dr. DenBaar's proportional assessment was based on his personal experience overseeing SSLEEC and extensive review of SSLEEC's publications during the

relevant period. Tr (DenBaars) at 101:8-23; 139:15-143:12 (spent "hundreds and hundreds of hours poring through" SSLEEC's research output to come to allocation percentage), 153:6-154:23 (estimating 40% of lab costs are attributable to the patented technology), 205:10-16. For equipment, Mr. Thomas relied on Ms. Owens' methodology for calculating SSLEEC's equipment expenses, laboratory fees and recharge rate expenses. Tr. (Owens) at 369:2-371:6; Tr. (Thomas) at 478:14-479:25. Mr. Thomas then allocated those costs using Dr. DenBaars' estimate of time used related to the SSLEEC Domestic Industry Products that practice the '529 and '464 patents. Tr. (Thomas) at 480:1-4; CX-0247; CX-0248; CX-0254; CX-0256; CX-0477–CX-0484; CX-0755; CX-0756.

I find that these allocations and cost estimates are reasonable. Mr. Thomas calculated these expenses based on reliable inputs with conservative methodology. Respondents and Staff criticize these calculations, contending that they include expenses tied to articles that have not been shown to practice the Asserted Patents and that the claimed expenses were related to the technology in the Asserted Patents generally, rather than to particular products. RRB at 118-121, SIB at 229-231. But as I address below, *infra* part XI.B.5, Respondents' and Staff's criticisms do not overcome Dr. DenBaars' credible testimony that provides the basis for Mr. Thomas' calculations, and Respondents and Staff provide no substantive criticism of the methodology beyond that foundational attack.

I find that Complainant has demonstrated $1,822,822 in plant and equipment expenses with respect to articles protected by the '529 and '464 patents.

**b. SSLEEC's Plant and Equipment Investments Are Significant**

I find that Complainant's investments in plant and equipment are significant under 19 U.SC. § 1337(a)(3)(A).

To establish a domestic industry, a complainant need not eclipse some "minimum monetary expenditure." *Certain Stringed Musical Instruments*, Inv. No. 337-TA-586, Comm'n Op. at 25-26 (May 16, 2008). Nor does a complainant need "to define the industry itself in absolute mathematical terms." *Id*. A complainant need only establish that its activities are significant by showing how those activities are important to the articles protected by the patent in the context of the company's operations, the marketplace, or the industry in question. *See Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27-30 (February 17, 2011); *Certain Male Prophylactic Devices*, Inv. No. 337-TA-546, Comm'n Op. at 39 (August 1, 2007). This substantiality must be demonstrated both qualitatively and quantitatively. *Lelo v. Int'l Trade Comm'n*, 786 F.3d 879, 885 (Fed. Cir. 2015).

All of Complainant's claimed plant and equipment expenses are for facilities in the United States used to make articles protected by the '529 and '464 patents. Tr. (Thomas) at 483:17-20, 485:1-21; Tr. (DenBaars) at 104:2-22; Tr. (Owens) at 357:19-24. When domestic industry products are both "developed in the United States and . . . made in the United States," the result is "a 'value added' ratio of nearly 100%." *Certain Wearable Monitoring Devices*, Inv. No. 337-TA-1190, Order No. 34 at 31 (Oct. 1. 2020)*, affirmed in pertinent part*, Comm'n Op. at 39 (May 5, 2021) (EDIS Doc. ID 741594). In such circumstances, the investment is qualitatively significant.

Respondents and Staff criticize the various comparisons Complainant provided to demonstrate the substantiality of its industry. *Compare* RRB at 123-124, SIB at 229-232; Tr. (Bakewell) at 1320:13-25, 1321:2-13 *with* CIB at 144. These critiques lack merit, as discussed below.

First, Respondents argue "Complainant's comparison of SSLEEC to itself is improper." RRB at123. That phraseology ignores both the substance of Complainant's comparisons and

Commission precedent. When Complainant compared SSLEEC's investments in plant and equipment "to itself," it compared investments directed to articles practicing the '529 and '464 patents to SSLEEC's total plant and equipment investments, among other comparisons. CIB at 147-148. The record evidence shows that from FY2016 through FY2020 an average of 36.2% of SSLEEC's total plant and equipment investments related to the SSLEEC Domestic Industry Products that practice the '529 and '464 patents, and that is significant. Tr. (Thomas) 484:5-25; CDX-0001C.0028. The Commission has often found significance based on such comparisons. *See, e.g., Certain Pocket Lighters*, 337-TA-1142, Comm'n Op. at 11-13 (June 22, 2020) (EDIS Doc. ID 714450) (affirming finding of significance under sub-prongs (A) and (B) based on percentage of domestic activities devoted to protected articles as compared to overall operations); *Certain Toner Cartridges,* 337-TA-1174, Initial Determination at 117-118 (July 23, 2020) (EDIS Doc. ID 716848) (finding domestic investments significant by comparing those investments to total domestic investments), *not reviewed*, Notice of Comm'n Det. Not To Review a Final Initial Determination (EDIS Doc. ID 719096).

Next, Respondents contend Complainant should have compared SSLEEC's investments to expenditures of other university research institutions. RRB at 123-124. The Commission has never stated a *per se* requirement that a complainant's domestic industry investments must be compared to outlays of other industry participants. Indeed, the Commission has found a significant domestic industry in many investigations without consideration of other players in the market beyond the complainant. *See, e.g.*, *Certain Pocket Lighters*, 337-TA-1142, Comm'n Op. at 11-13.

Finally, Respondents assert Complainant put forward "inconsistent" opinions from multiple experts and therefore those opinions are "unreliable." RRB at 124. Respondents mischaracterize the record in making the argument. Mr. Thomas did not testify, as Respondents

state in their brief, that Dr. Seth's comparison of "licensing revenue from the filament LED portfolio containing the Asserted Patents with licensing revenue from all of UCSB" "wouldn't be a relevant comparison." *Id*. (citing Tr. 490:15-23). Rather, Mr. Thomas quite reasonably testified that "comparing SSLEEC's activities and expenses to the entire UC Santa Barbara campus," including "for example, athletics," would not meaningfully inform the significance of SSLEEC's investments relating to the patented technology. Tr. 490:15-23.

Complainant put forward credible evidence that the $1,852,8221 it invested in plant and equipment constituted an average of 36.2% of its total expenses for plant and equipment during that time period. Tr. (Thomas) at 484:5-25; CDX-0001C.0028. These facilities and machines were necessary to produce the SSLEEC Domestic Industry Products protected by the '529 and '464 patents. I find that this investment is significant in the context of SSLEEC's operations, both quantitatively and qualitatively. *See* Tr. (Thomas) at 484:5-25.

### 3. Labor and Capital

Complainant alleges that from FY2016 through FY2020, labor expenditures related to the SSLEEC Domestic Industry Products practicing the '529 and '464 patents totaled $5,483,442. Tr. (Thomas) at 461:22-462: 24, 481:20-22, 482:11-13.

#### a. SSLEEC's Labor and Capital Investments

SSLEEC claims a total of $5,483,442 in labor expenses from 2016 to 2020. Tr. (Thomas) at 462:25-465:5; CDX-0007.; CDX-0001C.0009. Mr. Thomas calculated SSLEEC's labor investments related to the SSLEEC Domestic Industry Products that practice the '529 and '464 patents by gathering payroll and benefits information for SSLEEC employees maintained in the ordinary course of business and allocating labor expenditures based on time spent on ER&D activities attributable to the technology in the Asserted Patents, relying on the knowledge of Dr. DenBaars for that allocation. Tr. (Thomas) at 460:4-11, 461:22-462:15, 463:5-24, 464:18-465:4;

**PUBLIC VERSION**

Tr. (Owens) at 357:2-5, 360:25-361:5, 372:4-11.7; Tr. (DenBaars) at 139:7-14; CX-0148–CX-0153; CX-0243; CX-0251; CX-243; CX-0249–CX-0251; CX-0751–CX-0754. Dr. DenBaars made those determinations based on his personal knowledge and review of the academic papers produced by SSLEEC during that period, which he testified were the best record of how SSLEEC researchers spent their time. Tr. (DenBaars) at 101:8-23, 139:15-143:12, 205:10-16; CX-2079 (DenBaars time estimates). Based on these inputs, Mr. Thomas calculated the relevant labor expenditures as follows:

| | **FY 2016** | **FY 2017** | **FY 2018** | **FY 2019** | **FY 2020** | **Total** |
|---|---|---|---|---|---|---|
| SSLEEC Labor, ’529 & ’464 Patents | $1,126,130 | $1,103,749 | $1,097,943 | $1,150,842 | $1,004,777 | **$5,483,442** |
| Total SSLEEC ER&D Labor | $5,869,665 | $6,142,184 | $6,149,429 | $6,332,135 | $5,426,245 | **$29,919,659** |
| **% of Total ER&D Labor** | 19.2% | 18.0% | 17.9% | 18.2% | 18.5% | **18.3%** |

CDX-0001C.0027 (citing CX-0148-0153, -251, -243, -249, -250, -751-754, and -2079); Tr. (Thomas) at 482:21-483:16 (calculation was deliberately conservative), 483:21-484:4 (same); *see also* CX-0537-CX-0544; CX-0736-CX-0740; *see also* Tr. (Thomas) at 460:4-11 (presenting alternative calculation of 26%); CDX-0001C.0009. This calculation excludes the productivity of visiting researchers, who are not paid a salary from SSLEEC. *See* Tr. (Owens) at 377:24-378:2; Tr. (Thomas) at 465:19-466:8.

I find that these allocations and cost estimates are reasonable given the facts of this investigation. Mr. Thomas calculated these expenses based on reliable inputs with conservative methodology. Respondents and Staff criticize these calculations, contending that they include expenses tied to articles that have not been shown to practice the Asserted Patents and that the claimed expenses were related to the technology in the Asserted Patents generally, rather than to

particular products. RRB at 124-126 (criticizing allocation as overinclusive), 126 (criticizing allocation for same reasons discussed concerning subprong (A)), SIB at 232 (incorporating arguments concerning subprong (A)). But as I address below, *infra* part XI.B.5, Respondents' and Staff's criticisms do not overcome Dr. DenBaars' credible testimony that provides the basis for Mr. Thomas' calculations, and Respondents and Staff provide no substantive criticism of the methodology beyond that foundational attack.

Respondents specifically challenge the inclusion of labor costs for researchers they contend "did no work related to the SSLEEC [Domestic Industry] Products or even transparent packaging." RRB at 125 (citing Tr. (Speck) 289:14-294:24). This argument mischaracterizes the record. The very passage of testimony that Respondents cite for this argument, Tr. 289:14-294:24, demonstrates just the opposite. Professor Speck, who has personal knowledge from his work at SSLEEC, testified Dr. Alhassan, Dr. Li, Dr. Almogbel, and Dr. Young worked on epitaxial growth. Tr. (Speck) 289:14-294:24. Professor Speck also testified Dr. Wu researches transmission electromicroscopy techniques for imaging microstructures. *Id*. Drs. DenBaars and Speck explained at length how epitaxy research and characterization of structures through microscopy relate to the patented technology. Tr. (DenBaars) at 107:13-108:13, 109:12-111:4, 115:15-116:25, 117:1-121:8, 121:9-122:3, 123:11-125:21, 129:11-130:14, 135:19-136:7, 137:5-15, 150:7-151:1, 201:7-16; *id.* (Speck) at 295:8-14, 297:1-18. Complainant provided credible evidence that all of the labor included in the relevant total was for an industry "relat[ed] to the articles protected by the patent[s]" in question. *See* 19 U.S.C. § 1337(a)(2).

I find that Complainant has demonstrated $5,483,442 in labor expenses with respect to articles protected by the '529 and '464 patents.

#### b. SSLEEC's Labor and Capital Investments Are Significant

I find that Complainant's investments in labor and capital are significant under 19 U.S.C. § 1337(a)(1)(B).

All of Complainant's claimed labor and capital expenses occur in the United States at SSLEEC, which makes articles protected by the '529 and '464 patents. Tr. (Thomas) at 483:17-20, 485:1-21; Tr. (DenBaars) at 104:2-22; Tr. (Owens) at 357:19-24. When domestic industry products are both "developed in the United States and . . . made in the United States," the result is "a 'value added' ratio of nearly 100%." *Certain Wearable Monitoring Devices*, Inv. No. 337-TA-1190, Order No. 34 at 31 (Oct. 1. 2020), *affirmed in pertinent part*, Comm'n Op. at 39 (May 5, 2021) (EDIS Doc. ID 741594). In such circumstances, the investment is qualitatively significant.

Moreover, Complainant's investments in labor and capital are significant when compared to SSLEEC's total labor expenses. From FY2016 through FY2020, Mr. Thomas conservatively calculated that an average of 18.3% of SSLEEC's total labor expenses related to the SSLEEC Domestic Industry Products protected by the '529 and '464 patents. Tr. (Thomas) at 482:21-483:16; CDX-0001C.0027. Viewed another way, 21% of SSLEEC's full-time employee equivalents were dedicated to transparent LED research related to the'529 and '464 patents from FY2016 through FY2020. Tr. (Thomas) at 485:22-486:24; CDX-0001C.0030. I find that this labor and capital investment of $5,483,442 is significant in the context of SSLEEC's operations, both quantitatively and qualitatively. *See* Tr. (Thomas) at 484:5-25.

Respondents and Staff invoke the same arguments criticizing Complainant's showing of significance under sub-prong (B) as they did for sub-prong (A). RRB at 127, SIB at 232. For the same reasons discussed above, *supra* part XI.B.2.b, I reject those challenges.

**PUBLIC VERSION**

I find Complainant's labor and capital investment of $5,483,442 in articles protected by the '529 and '464 patent is significant in the context of SSLEEC's operations, both quantitatively and qualitatively. *See* Tr. (Thomas) at 484:5-25.

**4. Engineering, Research and Development, and Licensing**

Complainant relies on investments in engineering, research, and development ("ER&D"), along with investments associated with licensing efforts, to show a domestic industry exists with respect to all four Asserted Patents under 19 U.S.C. § 1337(C). Tr. (Thomas) at 519:25-520:12 (investments from prongs A & B), 494:1-4 (investments in licensing). The total amount Complainant claims for ER&D and licensing from FY2016 through FY2020 is $7,336,264. Tr. (Thomas) at 485:11-18.

Under sub-prong (C) of the statute, "the Commission requires that the complainant establish a nexus between the asserted patent and the U.S. investment in its exploitation." *Certain Integrated Circuit Chips & Prod. Containing the Same* ("*Integrated Circuit Chips*"), Inv. No. 337-TA-859, Comm'n Op. at 38, USITC Pub. No. 4849 (Nov. 2018).

**a. ER&D Investments in the SSLEEC Domestic Industry Products**

Complainant argues that there is a direct nexus between SSLEEC's ER&D activities and the Asserted Patents, relying on the testimony of Dr. DenBaars and numerous publications from SSLEEC. CIB at 142-143. Dr. DenBaars testified that SSLEEC's ER&D activities are documented by its peer-reviewed publications and the presentations that are given at its annual conference. Tr. (DenBaars) at 114:1-10. According to Dr. DenBaars, roughly 40% of SSLEEC's papers "directly relate to the success and the implementation of transparent LED technology." *Id.* at 114:21-115:4; *see also* Tr. (DenBaars) 115:5-14, 206:5-10, CX-2045 (summary of SSLEEC publications since 2005). As discussed in more detail below, SSLEEC's research into epitaxial

growth, chip fabrication, and transparent packaging exploits the Asserted Patents. Tr. (DenBaars) at 108:6-13.

**i. Epitaxial Growth**

Dr. DenBaars testified that researchers at SSLEEC develop quantum wells in epitaxially grown layers that are more transparent and let more light escape from an LED. *Id*. at 116:3-8. Dr. DenBaars also testified that SSLEEC worked on the following: changing the orientation of the crystal to semi-polar orientation, tunnel junction technology, light extraction by patterning sapphire growth substrates, and improving efficiency. *Id*. at 116:9-17, 116:18-25. As Dr. DenBaars testified, all of these areas of research help further the patented technology. *See id.* at 136:8-23.

Dr. DenBaars also discussed papers that relate to SSLEEC's work on epitaxial growth. Tr. (DenBaars) at 117:1-121:8, CX-1297, CX-1301, CX-1340, CX-1352, CX-1365, CX-1389. According to Dr. DenBaars, this research relates to the Asserted Patents because it is directed to layers that are more efficient and more transparent. *Id*. at 121:9-122:8. Further, he testified that there would not have been such "large improvements" in epitaxial growth without the inventions claimed in the Asserted Patents. *Id*. at 123:23-124:2.

Although SSLEEC's epitaxy research has led to other patents beyond the Asserted Patents at issue here, *see* Tr. (Speck) at 277:23-278:7, that does not negate the fact that the research exploits the patented technology. Research can, and often does, touch on more than one invention. *See Certain Microlithographic Machines,* Inv. No. 337-TA-468, ID at 365 (Jan. 29, 2003) ("particular R&D projects can contribute to the development of multiple models, and therefore, when looking at any one model, it is appropriate to count the full amount of R&D expenditures that contributed to the development of that model."), *not reviewed*, EDIS Doc. ID 179530. Technologies that enable the practice of a claimed invention, even if not specifically covered by a claim in an asserted

patent, can still be related to and exploit the patented technology. *Integrated Circuit Chips*, Inv. No. 337-TA-859, Comm'n Op. at 25 (Aug. 22, 2014) (a domestic industry under sub-prong (C) does not freeze at the point at which the patented technology is reduced to practice).

I find that Complainant has demonstrated a nexus between the claimed research in epitaxial growth and exploitation of the patented technology.

**ii. Chip Fabrication**

Dr. DenBaars also testified that SSLEEC's chip fabrication research improves the light extraction efficiency of the chip, which gets a "better boost" when combined with transparent packaging. Tr. (DenBaars) at 124:3-21, 129:11-20. As with epitaxial growth, Dr. DenBaars discussed publications describing SSLEEC research related to chip fabrication. Tr. (DenBaars) at 124:22-129:10, CX-1328, CX-1346, CX-1359, CX-1369, CX-1406, CX-1428, CX-1438.

Dr. DenBaars testified that he could not divide the research on chip fabrication between the two Asserted Patent case numbers because the research contributes "to the efficiency improvements and transparency improvements equally in the [A]sserted [P]atents." *Id*. at 129:21-130:1. Dr. DenBaars also testified that the improvements in chip fabrication discussed above would not be possible without the inventions disclosed in the Asserted Patents because the LED chip has to be put in a transparent package to see the improvement. *Id*. at 130:2-10. He further concluded that the improvements in light extraction and roughening would also not be possible without the inventions disclosed in the Asserted Patents. *Id*. at 130:11-14.

As with epitaxial growth, I find that Complainant has demonstrated a nexus between the claimed research in chip fabrication and exploitation of the patented technology.

**iii. Transparent Packaging**

Dr. DenBaars also discussed publications relating to SSLEEC's research in transparent packaging. Tr. (DenBaars) at 130:15-135:18, CX-1485, CX-1337, CX-1377, CX-1531, CX-2208.

Dr. DenBaars testified that transparent packaging research is aimed at packaging that provides light in 360-degrees and that improves light extraction using a roughened transparent plate. Tr. (DenBaars) at 135:19-136:7.

Although Dr. Lebby testified that one of the papers Dr. DenBaars highlighted, CX-1377, is about technology incompatible with the Asserted Patents, Tr. (Lebby) at 1280:9-1281:13, Dr. DenBaars' testimony about the transparent packaging research conducted at SSLEEC was still, as a whole, credible and reliable with respect to the connection between SSLEEC's research into transparent packaging and the Asserted Patents. *See, e.g.*, XI.B.1.

I find that Complainant has demonstrated a nexus between the claimed research in transparent packing and exploitation of the patented technology.

#### iv. Nexus Between Research, Products, and the Asserted Patents

Where the research and development efforts in articles that practice the asserted patents are "inextricably linked" to the asserted patents themselves, the nexus required by sub-prong (C) may be inferred. *Integrated Circuit Chips*, Inv. No. 337-TA-859, Comm'n Op. at 25. As found above in part XI.B.1.a, SSLEEC's research into epitaxial growth, chip fabrication, and transparent packaging relates to articles protected by the Asserted Patents. Tr. (DenBaars) at 108:6-13. Dr. DenBaars testified that SSLEEC's improvements in epitaxial growth, chip fabrication, and transparent packaging have advanced the entire filament LED industry. Tr. (DenBaars) at 136:8-23. Further, Dr. DenBaars testified that SSLEEC continues its research efforts related to transparent LED technology and that all of SSLEEC's best LED results are in transparent LED packages. Tr. (DenBaars) at 137:5-15.

Investments in research are not always easily traceable to specific engineering feats or particular products. *See Certain Microlithographic Machines,* Inv. No. 337-TA-468, ID at 365

(Jan. 29, 2003) ("particular R&D projects can contribute to the development of multiple models, and therefore, when looking at any one model, it is appropriate to count the full amount of R&D expenditures that contributed to the development of that model."), *not reviewed*, EDIS Doc. ID 179530. Nevertheless, when Congress amended section 337 in 1988 to add section 337(a)(3), it intended that universities making substantial domestic research investments could pursue claims under the statute. *Certain Non-Volatile Memory Devices & Prod. Containing the Same*, Inv. No. 337-TA-1046, 2018 WL 6012622, Comm'n Op. at 26 (Oct. 26, 2018) (citing S. Rep. No. 100-71, at 129 (June 21, 1987); H. Rep. No. 100-40, Pt. 1, at 157 (Apr. 6, 1987) (domestic industry definition was added to "encompass universities," among others). This record presents a "classic case" of such investments. *See Certain Marine Sonar Imaging Devices, Incl. Downscan & Sidescan Devices, Prods. Containing the Same, & Components Thereof*, Inv. No. 337-TA-921, Comm'n Op. at 65-66 (Jan. 6, 2016) (quoting *InterDigital*, 707 F.3d at 1298-99).

I find Complainant has shown a nexus between its ER&D expenditures and exploitation of the Asserted Patents.

**v. Substantiality of ER&D Investments**

Complainant has demonstrated the substantiality of its ER&D investments in various ways. Using the methodology laid out above with respect to sub-prong (B), 18.3% of SSLEEC's total labor expenses are related to the SSLEEC Domestic Industry Products and exploitation of the '529 and '464 patents:

**PUBLIC VERSION**

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Total |
|---|---|---|---|---|---|---|
| SSLEEC Labor, ’529 & ’464 Patents | $1,126,130 | $1,103,749 | $1,097,943 | $1,150,842 | $1,004,777 | **$5,483,442** |
| Total SSLEEC ER&D Labor | $5,869,665 | $6,142,184 | $6,149,429 | $6,332,135 | $5,426,245 | **$29,919,659** |
| **% of Total ER&D Labor** | 19.2% | 18.0% | 17.9% | 18.2% | 18.5% | **18.3%** |

CDX-0001C.0027 (citing CX-0148-0153, -251, -243, -249, -250, -751-754, and -2079); Tr. (Thomas) at 482:21-483:16 (calculation was deliberately conservative), 483:21-484:4 (same); *see also* CX-0537-CX-0544; CX-0736-CX-0740. A comparable percentage of SSLEEC’s full-time equivalent employees’ work was related to the ’529 and ’464 patents, with 21% of full-time equivalents at SSLEEC devoted to those areas:

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Total |
|---|---|---|---|---|---|---|
| FTEs ’529 & ’464 Patents | 17.65 | 17.95 | 17.55 | 16.45 | 10.36 | 79.96 |
| Total SSLEEC FTEs | 76 | 80 | 84 | 76 | 61 | 377 |
| **% of Total FTEs** | 23.2% | 22.4% | 20.9% | 21.6% | 17.0% | 21.2% |

CDX-0001C.0030; Tr. (Thomas) 485:22-486:24; CX-2079; CX-0148–CX-0153; CX-0243; CX-0249–CX-0251; CX-0751–CX-0754.

Similarly, more than a third of SSLEEC’s total investments in plant and equipment are related to the SSLEEC Domestic Industry Products and exploitation of the’529 and ’464 patents, as described above in connection with sub-prong (A):

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Total |
|---|---|---|---|---|---|---|
| SSLEEC Plant & Equipment ’529 & ’464 Patents | $416,566 | $260,152 | $372,039 | $411,274 | $392,790 | **$1,852,822** |
| Total SSLEEC Plant & Equipment Expenditures | $1,134,628 | $751,312 | $1,033,571 | $1,130,970 | $1,074,620 | **$5,125,102** |
| **% of Total Plant & Equipment** | 36.7% | 34.6% | 36.0% | 36.4% | 36.6% | **36.2%** |

CDX-0001C.0028; Tr. (Thomas) 484:5-25.

From FY2016 to FY2020, an average of 20.9% of SSLEEC’s total labor, plant, and equipment expenses are related to engineering, research, and development activities having a nexus to the Asserted Patents:

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | Total |
|---|---|---|---|---|---|---|
| SSLEEC ER&D All Asserted Patents | $1,542,697 | $1,363,901 | $1,469,983 | $1,562,116 | $1,397,568 | **$7,336,264** |
| Total SSLEEC ER&D | $7,004,294 | $6,893,497 | $7,183,001 | $7,463,105 | $6,500,865 | **$35,044,762** |
| **% of Total SSLEEC ER&D** | 22.0% | 19.8% | 20.5% | 20.9% | 21.5% | **20.9%** |

CDX-0001C.0029; Tr. (Thomas) at 484:5-21.

Respondents contend Complainant draws the contextual analysis too narrowly by failing to compare SSLEEC’s outlays to that of private industry or another university research center. *See* RRB at 123-124; Tr. (Bakewell) at 1320:13-25, 1321:2-13. As discussed above in parts XI.B.2.b and XI.B.3.b, there is no hard and fast rule that requires comparison to other participants in the same or related industries, particularly where, as here, the investments are in the millions of dollars.

Moreover, where “substantially all of the research and development and engineering for the [domestic industry] was conducted in the United Sates,” the industry is “a ‘classic case’ for the application of subparagraph (C).” *Certain Marine Sonar Imaging Devices, Incl. Downscan &*

*Sidescan Devices, Prods. Containing the Same, & Components Thereof*, Inv. No. 337-TA-921, Comm'n Op. at 65-66 (Jan. 6, 2016) (quoting *InterDigital*, 707 F.3d at 1298-99). Here, all of the research and development directed to the Asserted Patents and the SSLEEC Domestic Industry Products is conducted in the United States. Tr. (Thomas) at 483:17-20; 485:1-21; Tr. (DenBaars); Tr. (Owens) at 357:19-24.

Based on the record's fulsome contextual evidence, I find that Complainant's investment of $7,336,264 in ER&D related to exploitation of the '529 and '464 patents is substantial, both qualitatively and quantitatively.

**b. Licensing Industry Investments**

Investments made in pursuit of patent licensing can contribute to a domestic industry. *Certain Computers and Computer Peripheral Devices, and Components Thereof, and Products Containing Same*, Inv. No. 337-TA-841, Comm'n Op. at 27 (January 9, 2014). Here, Complainant has demonstrated that from FY2018 through FY2020, it made a $116,334 investment of labor and capital to license the Asserted Patents and other patents, consisting of $110,112 in domestic licensing labor investments and $6,222 in capital investments. Tr. (Thomas) at 493:16-494:4, 496:9-25. Complainant has shown those licensing efforts resulted in licensing revenue from 2012 through 2020 of approximately [redacted]. Tr. (Englander) at 417:14-20.

**i. Nexus to the Asserted Patents**

The Commission has explained that complainants "who seek to satisfy the domestic industry requirement by their investments in patent licensing must establish that their asserted investment activities satisfy three requirements of section 337(a)(3)(C)": (1) the investment must exploit the asserted patent, (2) the investment must relate to licensing, and (3) the investment must occur in the United States *Certain Multimedia Display & Navigation Devices & Sys., Components Thereof, & Prod. Containing Same*, Inv. No. 337-TA-694, Comm'n Op. at 7-8 (Aug. 8, 2011)

("*Navigation Devices*"). The licensing investments Complainant claims are for its "filament LED portfolio," which contains 13 patents. Tr. (Englander) at 400:7-11, 407:6-13. Where licensing activities are associated with both asserted and unasserted patents, a key issue is the strength of the nexus between the activities and the asserted patents. *Id.* at 8. The Commission may consider the following *Navigation Devices* factors to determine the "relative importance or value of the asserted patent within the portfolio:"[31]

> (a) the number of patents in the portfolio,
> (b) the relative value contributed by the asserted patent to the portfolio,
> (c) the prominence of the asserted patent in licensing discussions, negotiations and any resulting license agreement, and
> (d) the scope of technology covered by the portfolio compared to the scope of the asserted patent.

*Id*.

I find the following with respect to the *Navigation Devices* factors:

(a) The SSLEEC portfolio being licensed had only 13 patents. Tr. (Englander) at 400:4-11. Given that the portfolio is relatively small, and the Asserted Patents represent roughly a third of the portfolio, this factor slightly favors a finding of nexus, particularly as there is evidence that all of the patents address the same "core concept." Tr. (DenBaars) at 108:14-109:11 ("Q: And is this core concept present in the asserted patents and the other 13 patents in the SSLEEC filament LED portfolio? A: Yes"). This factor weighs in favor of a finding of nexus.

(b) The evidence on the relative value contributed by the Asserted Patents to the licensing effort is equivocal, including little or no evidence for most of the six

[31] The Commission has stated that "for example, if a licensee's product is an 'article protected by' the patent, then the license is by definition connected to that patent." *Navigation Devices*, 337-TA-694, Comm'n Op., 2011 WL 13383706, *6.

subfactors the Commission has identified as informative on this point. *See Navigation Devices*, 337-TA-694, Comm'n Op., 2011 WL 13383706 at *6.

(c) There is no evidence indicating that the Asserted Patents were particularly prominent in licensing discussions. But neither is there evidence showing the Asserted Patents were unimportant to licensing. This factor is neutral.

(d) The Asserted Patents and the other patents in the SSLEEC filament LED portfolio all practice the same "core concepts," namely, the use of a transparent LED chip with a transparent plate, where the surface of the transparent plate has been optimized by roughening or patterning, configured in a lead frame to allow light to escape in a 360-degree fashion. Tr. (DenBaars) at 108:14-109:11. Dr. DenBaars and Ms. Englander determined that "the filament LED portfolio was both closely related and covered similar products, and that would be the filament LED lighting." Tr. (Englander) at 400:20-25. This factor weighs in favor of finding a nexus to the Asserted Patents.

In light of the above, I find that Complainant's licensing expenses have the requisite nexus to the Asserted Patents.

**ii. Substantiality of Licensing Expenses**

The *Navigation Devices* factors were articulated by the Commission in a context where the complainant relied exclusively on patent portfolio licensing investments to prove a domestic industry exists. *Navigation Devices*, Comm'n Op. at 24 (complainant admitted it had "no other 'exploitation' or license-related ancillary activities in the United States."). The factors are particularly informative in that context, where the complainant seeks to "satisfy the domestic industry requirement *by* their investments in patent licensing" alone. *See Navigation Devices*, Comm'n Op. at 7 (emphasis added). The factors address the congressional concern that mere

ownership of a patent should not create a domestic industry. *See* S. Rep. No. 71, 100th Cong., 1st Session at 130 (1987) ("[M]ere ownership of a patent . . . would not be sufficient to satisfy" the domestic industry requirement.). But when licensing investments are only one category within a body of evidence showing other types of domestic investments, they must be considered in that fuller context. *See, e.g.*, *Navigation Devices*, Comm'n Op. at 16, 23 (evaluating the complainant's activities "as a whole" and noting that "the existence of other types of 'exploitation' of the asserted *Navigation Devices* patent such as research, development, or engineering" would inform the substantiality of the industry); *see also Certain Printing and Imaging Devices and Components Thereof*, Inv. No. 337-TA-690, Comm'n Op. at 27-28 (February 17, 2011) (the economic prong examines the facts in each investigation, the articles practicing the patent, and the realities of the marketplace).

Although Complainant's investment of $116,334 in licensing is a comparatively small amount in isolation, both in absolute quantitative terms and in comparison to SSLEEC or TIA's operating budget, assessing those expenses in isolation is contrary to the Commission's precedent that domestic industry investments must be understood in the full context of a Complainant's operations. *See Certain Printing and Imaging Devices*, Comm'n Op. at 27-30; *Radioisotope Infusion Systems*, Inv. No. 337 TA-1110, Initial Determination at 147 n. 11 (cautioning again "losing sight of the domestic industry forest by concentrating on each line item tree."), *affirmed in pertinent part*, Comm'n Op. at 41-42, USITC Pub. No. 5025 (Feb. 2021).

I find that Complainant's investment of $7,452,598, which includes licensing investments together with Complainant's investments in ER&D, constitutes a substantial investment under sub-prong (C), for the largely the same reasons discussed *supra* part XI.B.4.

### 5. Allocation

Complainant contends that all of its investments in epitaxial growth, chip fabrication, and LED transparent packaging relate to articles that practice the '529 and '464 patents and did not allocate those investments among particular prototypes. *Id*. at 116-123. Similarly, Complainant contends those same investments, along with licensing investments, show exploitation of all Asserted Patents. CIB at 128-140.

Respondents and Staff contend that Complainant has failed to show that its claimed domestic industry expenses are appropriately allocated "with respect to" articles protected by the Asserted Patents under sub-prongs (A) and (B) and that Complainant has included investments beyond those that "exploit" the Asserted Patents under sub-prong (C). RRB at 118; SIB at 217-225. As explained below, those arguments lack merit.

First, Respondents and Staff criticize the fact Complainant did not specifically compare some prototypes produced at SSLEEC to the patent claims but nevertheless counted expenses to produce those prototypes as part of its industry. Respondents and Staff contend that Complainant's failure to allocate costs appropriately only for prototypes that practice every element of an Asserted Patent claim is fatal. SIB at 221-228, RRB at 118-122.

The allocation standard urged by Respondents and Staff is not consistent with the text and history of the domestic industry requirement in section 337. Expenses for making prototypes of products that are refined to eventually practice a patent claim have been found to satisfy the statutory requirement of an industry "relating to the articles protected by the patent." *See* 19 U.S.C. § 1337(a)(2); *Certain Automated Teller Machines, ATM Modules, Components Thereof and Products Containing Same*, Inv. No. 337-TA-972, Initial Determination at 196-198 (Feb. 1, 2017), *not reviewed in pertinent part*, Notice of Comm'n Determ. to Review in Part a Final Initial

Determination (Jan. 30, 2017) (USITC Pub. No. 4927) ("*Automated Teller Machines*"), *affirmed sub nom. Hyosung TNS Inc. v. Int'l Trade Comm'n*, 926 F.3d 1353, 1362 (Fed. Cir. 2019).

Through publications and the testimony of Drs. Wong and DenBaars, Complainant showed its prototypes and research relate to the Domestic Industry Products and the Asserted Patents. Complainant did not claim *all* SSLEEC expenses contributed to the domestic industry but instead provided reasonable estimates of the percentage of SSLEEC's activities, equipment, and laboratory use that related to the SSLEEC Domestic Industry Products and ER&D relating to the Asserted Patents. CIB at 137.

Next, Staff criticizes the inclusion of experimental control devices among the prototypes, pointing out that such controls necessarily lack the patented elements being tested (e.g., transparent submounts). SIB at 222-223. But as Complainant notes, such controls with "conventional packaging" are "integral to the ongoing research of transparent packaging technologies" to provide a baseline for comparison, and because they "contain LED chips from the same crystal epitaxial growth layers and are fabricated in the same way as those in their transparent packaged counterparts." CIB at 17 (citing Tr. (DenBaars) at 108:6-13, 172:4-173:6, 179:7-19; *id.* (Wong) at 326:18-327:3.

No more detailed allocation is necessary on this record because Complainant has shown "SSLEEC's transparent LED research and investments 'contribute equally' to all Asserted Patents" and cannot be divided. CIB at 140-141 (*citing Certain Microlithographic Machines and Component Thereof*, Inv. No. 337-TA-468, Initial Determination at 365 (Jan. 29, 2003)). The Commission has found investments in articles that do not themselves practice the patent can contribute to the domestic industry where those investments were "central to enabling" exploitation of the article covered by the patented claims. *See, e.g.*, *Certain Magnetic Tape*

*Cartridges and Components Thereof*, Inv. No. 337-TA-1058, Comm'n Op. at 47-57, USITC Pub. No. 4980 (Sept. 2019) (investments in unpatented drives necessary to exploit patented tapes contributed to a domestic industry)*; see also Automated Teller Machines*, Initial Determination at 196-197 (crediting investments in research and development of features that were "required for the product to be commercially viable" as "investments that are closely related to and enable exploitation of the patented technology"). The economic prong does not require "precise numerical allocation"; a "qualitative discussion of the relationship between the patented invention and the domestic investment can suffice." *Certain Marine Sonar Imaging Devices, Including Downscan and Sidescan Devices, Products Containing the Same, and Components Thereof*, Inv. No. 337-TA-921, Comm'n Op. at 64-65 (Jan. 7, 2016) (EDIS Doc. ID 571940).

Dr. DenBaars testified that all of the SSLEEC research areas he counted were necessary for the achievements described in each of the Asserted Patents, and that testimony is largely unrebutted. Dr. DenBaars spent "hundreds and hundreds of hours poring through the papers," reviewing annual review presentations, and talking with SSLEEC faculty and graduate students regarding their estimates to come to this understanding. Tr. (DenBaars) 140:19-141:11, 142:10-16.

Dr. Lebby's conclusory testimony criticizing Dr. DenBaars' testimony was not persuasive, particularly given he admitted he had not "read all the words" of each paper to conclude Dr. DenBaars' testimony was inaccurate. Tr. (Lebby) at 1278:3-4. Nor does Mr. Bakewell's economic criticism of these allocations, Tr. (Bakewell) at 1304:18-1305:15, overcome the weight of the evidence as a whole, which shows a material connection between the SSLEEC research and the claimed inventions. As explained above, the path of research is rarely a straight line, and often meanders. While lines could be drawn to further divide the costs of research among its fruits,

subdivisions of this record beyond the categories identified by Complainant would largely be arbitrary. Dr. DenBaars testified that all of the research he allocated was necessary to reach the resulting patented articles and patent technology; the fact that the total investment for "exploitation" of all four Asserted Patents is roughly the same as SSLEEC's plant, equipment, labor, and capital investment with respect to articles protected by the '529 and '464 patents represents the economic reality of research and is supported by the record.

Because the record establishes that the research efforts of SSLEEC across the three areas of inquiry "contributed equally" to all of the Asserted Patents, I find has reasonably allocated its domestic industry investments to the respective articles and patents.

## XII. CONCLUSIONS OF LAW

1. The Commission has subject matter, personal, and *in rem* jurisdiction in this investigation.

2. The importation requirement has been satisfied.

3. Claims 1, 6, and 8 of the '529 patent have not been shown to be infringed.

4. Claims 1, 7, and 9 of the '464 patent have not been shown to be infringed.

5. Claim 1 of the '854 patent has not been shown to be infringed.

6. Claim 1 of the '557 patent has not been shown to be infringed.

7. Claims 1, 6, and 8 of the '529 patent have been shown invalid as anticipated by the prior art under 35 U.S.C. § 102(b).

8. Claims 1, 6, and 8 of the '529 patent have been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

9. Claims 1, 7, and 9 of the '464 have been shown invalid as anticipated by the prior art under 35 U.S.C. § 102(b).

10. Claims 1, 7, and 9 of the ’464 have been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

11. Claim 1 of the ’854 patent has been shown been shown invalid as anticipated by the prior art under 35 U.S.C. § 102(b).

12. Claim 1 of the ’854 patent has been shown been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

13. Claim 1 of the ’557 patent has been shown invalid as anticipated by the prior art under 35 U.S.C. § 102(b).

14. Claim 1 of the ’557 patent has been shown invalid as obvious in view of the prior art under 35 U.S.C. § 103.

15. The technical prong of the domestic industry requirement has been satisfied with respect to the ’529 and ’464 patents if those patent are not invalid, but the technical prong of the domestic industry requirement has not been satisfied with respect to the ’854, and ’557 patents.

16. The economic prong of the domestic industry requirement has been satisfied with respect to all Asserted Patents if those patents are not invalid and if any of the Domestic Industry Products practice those patents.

## XIII. RECOMMENDED DETERMINATION ON REMEDY AND BOND

The Commission’s Rules provide that the administrative law judge shall issue a recommended determination concerning the appropriate remedy in the event that the Commission finds a violation of section 337 and concerning the amount of bond to be posted by respondents during Presidential review of the Commission action under section 337(j). *See* 19 C.F.R. § 210.42(a)(l)(ii).

### A. Limited Exclusion Order

The Commission has broad discretion in selecting the form, scope, and extent of the remedy in a section 337 proceeding. *Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986). A limited exclusion order directed to a respondent's infringing products is among the remedies that the Commission may impose. *See* 19 U.S.C. § 1337(d).

Because I have determined that there has been no violation of section 337, I recommend the Commission not issue a limited exclusion order.

Should the Commission determine that a violation did occur, I recommend entry of a limited exclusion order against the Accused Products found to infringe.

Respondents contend any limited exclusion order should "expressly carve out products outside the scope of this Investigation (*e.g.* metal submounts, licensed products . . . and un-adjudicated products) and non-infringing products." RRB at 137 (citing *Certain Robotic Vaccuum Cleaning Devices*, Inv. No. 337-TA-1057, Comm'n Op. at 55-56 (Nov. 30, 2018). Respondents also request a certification provision. *Id.* (citing *Certain Access Control Sys.*, Inv. No. 337-TA-1016, Comm'n Op. at 35 (Aug. 21, 2018). Complaint agrees any LEO should exclude licensed products, and should include a certification provision. CIB at 161. Staff agrees that a certification provision is appropriate, that a carve out for any non-accused product adjudicated as non-infringing would be appropriate, but opposes a carve out for all products falling outside the scope of this investigation. SIB at 246-247.

I recommend the inclusion of a certification provision in any exclusion order entered in this investigation. Respondents sell a variety of goods, including light bulbs, that are not accused in this investigation. A certification provision is appropriate in these circumstances. *Certain Dental Implants*, Inv. No. 337-TA-934, Comm'n Op. at 48, USITC Pub. No. 4905 (July, 2019).

The certification provision will reduce the burden of U.S. Customs in enforcing the exclusion order. *Id.*.

With respect to Respondents' request for a carve out for all products supposedly falling outside of the scope of this Investigation, I do not recommend that the Commission include such a carve out. The standard language in exclusion orders effectuates the result Respondents seek by excluding only articles that infringe except under license or authority of the patent holder, or with the permission of the patent owner. *See Certain Electric Skin Care Devices, Brushes and Charges Therefor, and Kits Containing the Same*, Inv. No. 337-TA-959, Comm'n Op. at 19 (Feb. 13, 2017) (EDIS ID 603444).

I do recommend the inclusion of a carve out for IKEA and Home Depot's metal filament products, which I have affirmatively found do not infringe the Asserted Patents. *See Certain Powered Cover Plates*, Inv. No. 337-TA-1124, Comm'n Op. at 19-20 (July 10, 2020) (EDIS ID 714335) (excluding redesigns found to be non-infringing from the scope of the GEO); *Oligosaccharides*, Inv. No. 337-TA-1120, Comm'n Op. at 18-28 (June 8, 2020) (EDIS ID 712205); *Certain Road Construction Machines and Components Thereof*, Inv. No. 337-TA-1088, Comm'n Op. at 47 (July 15, 2019) (EDIS ID 681394) (including carve out in LEO for machines found to be non-infringing).

### B. Cease and Desist Order

Section 337 provides that in addition to, or in lieu of, the issuance of an exclusion order, the Commission may issue a cease and desist order as a remedy for a violation of section 337. 19 U.S.C. § 1337(f)(1). The Commission may issue a cease and desist order when it has personal jurisdiction over the party against whom the order is directed. *Gamut Trading Co. v. U.S. Int'l Trade Comm'n*, 200 F.3d 775, 784 (Fed. Cir. 1999).

Under Commission precedent, "[c]ease and desist orders are generally issued when, with respect to the imported infringing products, respondents maintain commercially significant inventories in the United States or have significant domestic operations that could undercut the remedy provided by an exclusion order." *Certain Air Mattress Systems, Components Thereof, and Methods of Using the Same*, Inv. No. 337-TA-971, Comm'n Op. at 49 (May 17, 2017) (citations and footnote omitted).

Because I find there has been no violation, I do not recommend entry of a cease and desist order. In the alternative, however, I make the following recommendation.

The following table summarizes the inventory for all respondents other than Ikea:

| **Inventory of Respondents that Entered into Stipulation** | | | |
|---|---|---|---|
| **Respondent** | **Units** | **Value** | **Source** |
| Feit (Oct. 20, 2020) | [redacted] | [redacted] | JX-0019C |
| GE Lighting (Feb. 5, 2021) | [redacted] | [redacted] | JX-0021C |
| Satco (Jan. 6, 20201) | [redacted] | *See note*[32] | JX-0016C |
| Home Depot (Aug. 29, 2021) | [redacted] | *Not stated* | JX-0051C, CX-1628C |
| GVL (Intervenor) | Does not dispute commercial significant inventory | | JX-0020C |
| Signify (Intervenor) | Does not dispute commercial significant inventory | | JX-00018C |

Tr. (Thomas) at 503:13-504:9; CDX-0001C.0043.

[32] CDX-001C.0043 provides that Satco's commercial inventory has a value of [redacted], the same as that of GE Lighting's, despite GE having roughly 15x the total units in inventory. This appears to be an error, and no total was otherwise provided. *See* Tr. (Thomas) at 503:13-504:9 (referencing CDX-0001C.0043 rather than providing oral testimony with respect to Satco).

With respect to IKEA, Mr. Thomas testified that in October 2020, it had [redacted] units and in March 2021, it had around [redacted] units of Accused Products in inventory. Tr. (Thomas) at 504:10-18. He acknowledged that IKEA asserts that some of its inventory is licensed but claimed that he had no way of determining what was and was not licensed. *Id*. at 504:19-23. However, Mr. Thomas discussed alternative inventory amounts if IKEA products with components from SSLEEC licensee Seoul Semiconductor ("SSC") are removed from the count. *Id*. at 505:6-12, CDX-013C, CDX-014C. With that adjustment, IKEA had a domestic inventory of [redacted] units as of Oct. 29, 2020, and of [redacted] units as of March 2021.

Based on the inventory numbers above and Respondents' ability to stockpile, Mr. Thomas concluded that each Respondent has a commercially significant inventory. Tr. (Thomas) at 503:6-11, 504:24-505:5.

In contrast to Mr. Thomas' opinion evidence, IKEA's fact witness Mr. Rodin testified that IKEA only has [redacted] to [redacted] light bulbs in inventory in the U.S. containing filament LEDs sourced from non-SSC suppliers; he did not believe there would be any such light bulbs in the U.S. in three months. Tr. (Rodin) at 898:11-19, 903:4-15. He also testified that IKEA of Sweden AB does not maintain any inventory of light bulbs in the U.S. *Id*. at 906:12-14. Mr. Rodin testified that any new lighting products that would be imported into the U.S. in the future would contain licensed SSC filaments. *Id*. at 923:9-12.

I find that that Respondents and Intervenors, except for IKEA, have commercially significant inventories of the Accused Products in the United States and therefore cease and desist orders are appropriate.

Accordingly, I recommend that, should the Commission find a violation, the Commission order each Respondent other than IKEA to cease and desist domestic sale and distribution of the

infringing accused products. The cease and desist order should include the same exceptions discussed above concerning the limited exclusion order. *See supra* part XIII.A.

### C. Bond During Presidential Review

Pursuant to section 337(j)(3), the administrative law judge and the Commission must determine the amount of bond to be required of a respondent during the 60-day Presidential review period following the issuance of permanent relief. The purpose of the bond is to protect the complainant from any injury. 19 U.S.C. § 1337(j)(3); 19 C.F.R. §§ 210.42(a)(1)(ii), 210.50(a)(3).

When reliable price information is available, the Commission has often set the bond by eliminating the differential in sales prices between the domestic product and the imported, infringing product. *Certain Microsphere Adhesives, Process for Making Same, and Products Containing Same, Including Self-Stick Repositionable Notes*, Inv. No. 337-TA-366, Comm'n Op. at 24, USITC Pub. No. 2949 (1995). In other cases, the Commission has turned to alternative approaches, especially when the level of a reasonable royalty rate could be ascertained. *See Certain Integrated Circuit Telecommunication Chips and Products Containing Same, Including Dialing Apparatus*, Inv. No. 337-TA-337, Comm'n Op. at 41–43, USITC Pub. No. 2670 (1995).

Complainant has presented comprehensive evidence of royalty rates it receives from its numerous licensees and seeks a bond set based those rates. CIB at 163-164. Mr. Thomas testified that the appropriate bond rate should be set differently for retailers and suppliers. Tr. (Thomas) at 506:10-507:13. For retailers that rate is [redacted], and for suppliers it is [redacted]. *Id.* In the alternative, Mr. Thomas acknowledged that the median rates for each category, [redacted], respectively, would also be appropriate. *Id.*

[redacted]

For their part, Respondents do not address bonding in their responsive brief.

In light of the evidence and argument presented, should the Commission determine to enter a remedy, I recommend a bond of 5.0% for all Respondents, which is sufficiently high to protect Complainant from "any injury." *See* 19 U.S.C. § 1337(j)(3); 19 C.F.R. §§ 210.42(a)(1)(ii), 210.50(a)(3).

**XIV. INITIAL DETERMINATION ON VIOLATION**

For the reasons set forth herein, it is my initial determination that no violation of section 337 of the Tariff Act, as amended, has occurred in the importation into the United States and the sale within the United States after importation of certain light-emitting diodes and products containing the same based on infringement of U.S. Patent No. 9,240,529 ("the '529 patent"); U.S. Patent No. 9,859,464 ("the '464 patent"); U.S. Patent No. 10,593,854 ("the '854 patent"); and U.S. Patent No. 10,658,557 ("the '557 patent").

I hereby certify to the Commission this initial determination and the recommended determination. The Secretary shall serve the confidential version of this initial determination upon

counsel who are signatories to the Protective Order (Order No. 1) issued in this investigation. A public version will be served at a later date upon all parties of record.

Pursuant to 19 C.F.R. § 210.42(h), this initial determination shall become the determination of the Commission unless a party files a petition for review pursuant to 19 C.F.R. § 210.43(a) or the Commission, pursuant to 19 C.F.R. § 210.44, orders on its own motion a review of the initial determination or certain issues therein.

## XV. ORDER

Within seven days of the date of this document, the parties shall jointly submit a single proposed public version with any proposed redactions indicated in red. If the parties submit excessive redactions, they may be required to provide declarations from individuals with personal knowledge, justifying each proposed redaction and specifically explaining why the information sought to be redacted meets the definition for confidential business information set forth in 19 C.F.R. § 201.6(a). To the extent possible, the proposed redactions should be made electronically, in a single PDF file using the "Redact Tool" within Adobe Acrobat. The proposed redactions should be submitted as "marked" but not yet "applied." The proposed redactions should be submitted via email to Cheney337@usitc.gov and not filed on EDIS.

All pending motions not otherwise disposed of in this order are denied as moot.

**SO ORDERED**.

Clark S. Cheney
Clark S. Cheney
Administrative Law Judge

## CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached document has been served via EDIS upon the Commission OUII Investigative Attorney and the following parties as indicated, upon the date listed below.

| Document | Security | Document Type | Official Rec'd Date | Title |
|---|---|---|---|---|
| 759036 | Public | ID/RD - Final on Violation | 12/21/2021 03:00 PM | Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond |

Service Date: December 21, 2021

/s/

Lisa R. Barton
U.S. International Trade Commission
500 E Street, S.W.
Suite 112
Washington, D.C. 20436

**CERTIFICATE OF SERVICE**

**On behalf of Complainant The Regents of the University of California:**

Evan Langdon
**Nixon Peabody LLP**
799 9th Street, NW
Suite 500
Washington, District of Columbia 20001-5327, United States
Electronic Service

**On behalf of Respondent IKEA Supply AG;IKEA U.S. Retail LLC;IKEA of Sweden AB:**

David F. Nickel
**Foster, Murphy, Altman & Nickel, PC**
1899 L Street, NW
Suite 1150
Washington, District of Columbia 20036, United States
Electronic Service

**On behalf of Respondent Consumer Lighting (U.S.) LLC d/b/a GE Lighting;General Electric Company:**

Patrick McCarthy
**Goodwin Procter LLP**
1900 N Street, NW
Washington, District of Columbia 20036, United States
Electronic Service

**On behalf of Respondent Satco Products, Inc.:**

Scott Joseph Bornstein
**Greenberg Traurig, LLP**
The MetLife Building, 38th Floor
200 Park Avenue
New York, New York 10166, United States
Electronic Service

**On behalf of Respondent Home Depot Product Authority, LLC;Home Depot U.S.A., Inc.;The Home Depot, Inc.:**

Ryan K. Walsh
**Jones Day**
1420 Peachtree Street NE Suite 800
Atlanta, Georgia 30309, United States
Electronic Service

**On behalf of Respondent Feit Electric Company, Inc.:**

Jay Reiziss
**McDermott Will & Emery**
500 N Capitol Street
Washington, District of Columbia 20001, United States
Electronic Service

**On behalf of Intervenor Signify North America Corporation f/k/a Philips Lighting North America Corporation:**

Adam D. Swain
**Alston & Bird LLP**
950 F St. NW
Washington, District of Columbia 20004, United States
Electronic Service

**On behalf of Intervenor Global Value Lighting, LLC:**

Jay Emerick
**Kirkland and Ellis**
300 N LaSalle
Chicago, Illinois 60654, United States
Electronic Service

**CERTIFICATE OF SERVICE**

---

**On behalf of U.S. International Trade Commission :**

Jennifer Dienes
**OUII Investigative Attorney**
500 E Street, S.W.
Washington, D.C. 20436
Internal Service

**UNITED STATES INTERNATIONAL TRADE COMMISSION**

**Washington, D.C.**

**In the Matter of**

**CERTAIN FILAMENT LIGHT-EMITTING DIODE AND PRODUCTS CONTAINING SAME (II)**

**INV. NO. 337-TA-1220**

**ORDER NO. 39: CONSTRUING CERTAIN CLAIMS**

(June 15, 2021)

**TABLE OF CONTENTS**


I. Introduction ........................................ 1

II. Relevant Law ........................................ 3

III. The Asserted Patents ........................................ 5

A. U.S. Patent No. 9,240,529 ........................................ 5

B. U.S. Patent No. 9,859,464 ........................................ 5

C. U.S. Patent No. 10,593,854 ........................................ 6

D. U.S. Patent No. 10,658,557 ........................................ 7

IV. Level of Ordinary Skill in the Art ........................................ 8

V. Construction of Disputed Claim Terms ........................................ 8

A. "transparent" ('529, '464, and '854 patents) ........................................ 8

B. "sapphire" / "sapphire plate" / "sapphire growth substrate" ('854 and '557 patents) ....... 9

C. "lead frame" ('529 and '464 patents) ........................................ 11

D. "roughened, textured, or patterned" ('529 and '464 patents) ........................................ 14

E. "a molding" ('854 and '557 patents) ........................................ 16

## I. INTRODUCTION

The Commission instituted this investigation to determine whether certain imported light emitting diodes and products containing the same infringe United States Patent Nos. 9,240,529 ("the '529 patent"); 9,859,464 ("the '464 patent"); 10,593,854 ("the '854 patent"); 10,644,213 ("the '213 patent"); and 10,658,557 ("the '557 patent"). *See* 85 Fed. Reg. 62761 ("Notice of Investigation") (October 5, 2020). As set forth in the Notice of Investigation, the plain language description of the accused products is "light bulbs containing filament LEDs and lighting products containing filament LEDs." Notice of Investigation at 62762.

The complainant is The Regents of the University of California ("The Regents"). *Id.* The respondents are General Electric Company; Savant Technologies LLC; Savant Systems, Inc.; IKEA Supply AG; IKEA U.S. Retail LLC; IKEA of Sweden AB; The Home Depot, Inc.; Home Depot U.S.A., Inc; Home Depot Product Authority, LLC; Feit Electric Company, Inc.; and Satco Products, Inc. *Id.* On November 5, 2020, I granted the motion of Signify North America Corp. to intervene. Order No. 14, *not reviewed*, EDIS Doc. ID 727475. On November 16, 2020, I granted the motion of Global Value Lighting LLC to intervene. Order No. 15, *not reviewed*, EDIS Doc. ID 728021.[1] The Commission Investigative Staff ("Staff") is a party to this investigation. Notice of Investigation at 62762.

In accordance with the procedural schedule issued as Order No. 10 (Oct. 23, 2020), the parties submitted a joint chart of proposed claim constructions on February 11, 2021. The parties submitted opening claim construction briefs on February 25, 2021, and responsive claim

[1] The respondents and intervenors will be collectively referred to as "Respondents."

construction briefs on March 11, 2020.[2] On March 25, 2021, I convened a claim construction hearing.[3]

On May 24, 2021, The Regents filed an unopposed motion seeking to terminate this investigation in part based on withdrawal of the complaint with respect to asserted claim 2 of the ’213 patent. Motion Docket No. 1220-030. On June 9, 2021, The Regents filed a separate unopposed motion seeking to terminate this investigation in part based on withdrawal of the complaint with respect to claim 1 of the ’213 patent; claim 9 of the ’529 patent; claim 10 of the ’464 patent; claims 2 and 6 of the ’854 patent; and claim 2 of the ’577 patent. Motion Docket No. 1220-034. In Order No. 37, I granted those motions and terminated claims 1 and 2 of the ’213 patent; claim 9 of the ’529 patent; claim 10 of the ’464 patent; claims 2 and 6 of the ’854 patent; and claim 2 of the ’577 patent. Order No. 37 at 2.

This order addresses disputed terms in the claims remaining at issue in this investigation, as identified in briefing and discussed during oral argument.

---

[2] For convenience, the materials submitted by the parties shall be referred to as:

| | |
|---|---|
| COB | Complainants’ Opening Claim Construction Brief |
| CRB | Complainants’ Responsive Claim Construction Brief |
| JCCC | Amended Joint Disclosure of Proposed Claim Constructions |
| ROB | Respondents’ Opening Claim Construction Brief |
| RRB | Respondents’ Responsive Claim Construction Brief |
| SOB | Staff’s Opening Claim Construction Brief |
| SRB | Staff’s Responsive Claim Construction Brief |

[3] The transcript of the claim construction hearing is available as EDIS Doc. ID 738068 and is hereinafter referred to as “CC Tr.”

## II. RELEVANT LAW

"An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*) (internal citations omitted), *aff'd*, 517 U.S. 370 (1996). Claim construction resolves legal disputes between the parties regarding claim scope. *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016).

Evidence intrinsic to the application, prosecution, and issuance of a patent is the most significant source of the legally operative meaning of disputed claim language. *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*); *see also Markman*, 52 F.3d at 979. As the Federal Circuit explained in *Phillips*, courts examine the intrinsic evidence to determine the "ordinary and customary meaning of a claim term" as understood by a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313.

"[T]he claims themselves provide substantial guidance as to the meaning of particular claims terms." *Id.* at 1314; *see Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001) ("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'"). The context in which a term is used in an asserted claim can be "highly

instructive." *Phillips*, 415 F.3d at 1314. Additionally, other claims in the same patent, asserted or un-asserted, may also provide guidance as to the meaning of a claim term. *Id.*

The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Id.* at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id*. As a general rule, however, the particular examples or embodiments discussed in the specification are not to be read into the claims as limitations. *Id.* at 1323. In the end, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be . . . the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Only when the evidence intrinsic to the patent record does not establish the meaning of a claim may extrinsic evidence like treatises, inventor testimony, or expert testimony be considered. *Phillips*, 415 F.3d at 1317. Extrinsic evidence is generally viewed as less reliable than the patent itself and its prosecution history in determining how to define claim terms. *Id.* "The court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999).

## III. THE ASSERTED PATENTS

### A. U.S. Patent No. 9,240,529

The ’529 patent, titled “Textured Phosphor Conversion Layer Light Emitting Diode,” issued on January 19, 2016, and names Natalie Fellows DeMille, Steven P. DenBaars, and Shuji Nakamura as inventors. ’529 patent at cover page. The ’529 patent issued from application 14/483,501, filed on September 11, 2014. *Id.* The Regents assert claims 1, 6, and 8 of the ’529 patent. *See* Notice of Investigation; Order No. 37.

The disputed ’529 patent claim terms are shown in context below with emphasis:

> 1. A light emitting device, comprising:
>
> > an LED chip emitting light at a first wavelength, wherein the emitted light is extracted from both front and back sides of the LED chip;
> >
> > a **lead frame** to which the LED chip is attached, wherein the LED chip resides on or above a **transparent** plate in the lead frame that allows the emitted light to be extracted out of the LED chip through the transparent plate in the lead frame; and
> >
> > a phosphor for converting the light emitted by the LED chip at the first wavelength to a second wavelength.
>
> 6. The device of claim 1, wherein the **transparent** plate is **roughened, textured or patterned** to increase light extraction from the LED chip through the **transparent** plate in the **lead frame**.
>
> 8. The device of claim 1, wherein the LED chip includes a **transparent** substrate and the **transparent** substrate is adjacent to the **transparent** plat**e**.

’529 patent at claims 1, 6, and 8 (emphasis added).

### B. U.S. Patent No. 9,859,464

The ’464 patent, titled “Light Emitting Diode with Light Extracted from Front and Back Sides of a Lead Frame” issued on January 2, 2018, and names Natalie Fellows DeMille, Steven P. DenBaars, and Shuji Nakamura as inventors as inventors. ’464 patent at cover page. The ’464

patent issued from application 14/757,937, filed on December 23, 2015. *Id.* The Regents assert claims 1, 7, and 9 of the '464 patent. *See* Notice of Investigation; Order No. 37.

The disputed '464 patent claim terms are shown in context below with emphasis:

> 1. A light emitting device, comprising:
>
> a lead frame including a **transparent** plate; and
>
> an LED chip, attached to the **lead frame**, for emitting light;
>
> wherein the LED chip resides on or above the **transparent** plate and at least some of the light emitted by the LED chip is transmitted through the **transparent** plate; and
>
> wherein at least a portion of light emitted by the LED chip is extracted from a front side of the **lead frame** and another portion of the light emitted by the LED chip is extracted from a back side of the **lead frame**.
>
> 7. The device of claim 1, wherein the **transparent** plate is **roughened, textured or patterned** to increase transmission of the light through the **transparent** plate.
>
> 9. The device of claim 1, wherein the LED chip includes a **transparent** substrate positioned adjacent the **transparent** plate.

'464 patent at claims 1, 7, 9 (emphasis added).

C. **U.S. Patent No. 10,593,854**

The '854 patent, titled "Lighting Device and Method of Lighting," issued on March 17, 2020, and names Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu as inventors. '854 patent at cover page. The '854 patent issued from application 16/570,754, filed on September 13, 2019. *Id.* The Regents assert claim 1 of the '854 patent. *See* Notice of Investigation; Order No. 37.

The disputed '854 patent claim terms are shown in context below with emphasis:

> 1. A light emitting device, comprising:
>
> a **transparent** surface, a cathode on a first end of the **transparent** surface and an anode on a second end of the **transparent** surface, wherein the cathode and anode

> provide structural support to the **transparent** surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;
>
> at least one III-nitride light emitting diode (LED) comprising a **sapphire** growth substrate, the LED in mechanical communication with the **transparent** surface, and the LED and **transparent** surface configured to extract light emitted by the LED through the **transparent** surface; and
>
> a **molding** comprising a phosphor and surrounding the LED, the **molding** configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

’854 patent at claim 1 (emphasis added).

D. **U.S. Patent No. 10,658,557**

The ’557 patent, titled “Filament LED Light Bulb,” issued on May 5, 2020, and names Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu as inventors. ’557 patent at cover page. The ’557 patent issued from application 16/569,120, filed on September 12, 2019. *Id.* The Regents assert claim 1 of the ’557 patent. *See* Notice of Investigation; Order No. 37.

The disputed ’557 patent claim terms are shown in context below with emphasis:

> 1. A light emitting device:
>
> a **sapphire** plate, a cathode on a first end of the **sapphire** plate and an anode on a second end of the **sapphire** plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;
>
> at least one III-nitride light emitting diode (LED) comprising a **sapphire** growth substrate, the **sapphire** growth substrate in mechanical communication with the **sapphire** plate, and the LED and **sapphire** plate configured to extract light emitted by the LED through the **sapphire** plate; and
>
> a **molding** comprising a phosphor and surrounding the LED, the **molding** configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

’557 patent at claim 1 (emphasis added).

## IV. LEVEL OF ORDINARY SKILL IN THE ART

The parties have agreed that a person of ordinary skill in the art at the time of the alleged invention of the asserted patents would have had (1) a Bachelor's degree in electrical engineering, physics, or a comparable field of study, and (2) at least three years of professional experience with semiconductor optoelectronic devices and packaging. This description is approximate, and a higher level of education or skill might make up for less experience, and additional experience could make up for a lower education level (for example, an M.S. in any of the above fields and two years of practical experience would qualify one as a POSITA).

In light of the agreement of the parties, for the purposes of this order, I adopt that level of skill for the hypothetical ordinary artisan.

## V. CONSTRUCTION OF DISPUTED CLAIM TERMS

### A. "transparent" ('529, '464, and '854 patents)

The term "transparent" appears in claims 1, 6, and 8 of the '529 patent, claims 1, 7, and 9 of the '464 patent, and claim 1 of the '854 patent. The parties have proposed the following constructions for this phrase:

| Complainants' Construction | Respondents' Construction | Staff's Construction |
|---|---|---|
| "allows light to pass through" | Feit Electric: "transmits light without scattering so that objects can be clearly seen"; otherwise indefinite<br><br>All other Respondents: "permitting the passage of light without significant deviation/scattering or absorption"; otherwise indefinite | "permitting the passage of light without significant deviation/scattering or absorption" |

*See* JCCC at 4.

As can be seen in the proposed constructions, the parties agree that transparent at least means allowing light to pass through. Beyond that, the parties' dispute is about how much light can be scattered by a transparent plate or a transparent surface. That is a factual question.

Respondents have not shown clear and convincing evidence that the term is indefinite. A person of ordinary skill in the art would understand that the '854, '529, and '464 patent claims use the term "transparent" in its ordinary sense, and accordingly, I will construe the term "transparent" as having its plain and ordinary meaning. *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (the term "melting" required no construction because its usage did not depart from its ordinary meaning and the issue in dispute was a factual question of infringement).

B. **"sapphire" / "sapphire plate" / "sapphire growth substrate" ('854 and '557 patents)**

The term "sapphire" (alone or as "sapphire plate," or "sapphire growth substrate") appears in asserted claim 1 of the '854 patent and claim 1 of the '557 patent. The parties have proposed the following constructions:

| Complainants' Construction | Respondent's Construction | Staff's Construction |
|---|---|---|
| "crystalline aluminum oxide (Al2O3) [plate / growth substrate]" | "single-crystal Al2O3, transparent [plate / growth substrate]" | "a plate of single crystal aluminum oxide (Al2O3)" /<br>"a growth substrate of single crystal aluminum oxide (Al2O3)"/ |

*See* JCCC at 4.

As can be seen from the proposed constructions, the parties agree that "sapphire" is a form of crystalline aluminum oxide ($Al_2O_3$). The central dispute is whether "sapphire" would be understood by a person of skill in the art to mean only a single crystal form of aluminum oxide or would also encompass polycrystalline forms.

The Regents proffered testimony from two different witnesses in Investigation No. 337-TA-1172 that polycrystalline aluminum oxide is not sapphire. *See* ROB at 17 (citing RXM-016C.04, 271:2-12 and RXM-017C.04, 190:19-191:5). The Regents did not provide any explanation, either in briefing or at oral argument, why that testimony should be ignored when considering how a person of ordinary skill would interpret the same term here.

Indeed, the parties agree that in the context of "sapphire growth substrate," sapphire must mean single crystal structures. *See* CC Tr. at 87:23-88:2; CRB at 8 (The Regents conceding "a substrate currently requires single crystallinity"). The Regents, for the first time in reply, argues that the recitation of the more specific phrase "sapphire growth substrate" in the claims in question indicates that "sapphire" may take a *broader* meaning without the subsequent "growth substrate," relying on *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). *See* CRB at 8. First, I note The Regents did not raise this argument in their opening brief. Second, the reasoning from *Phillips* is inapposite. The disputed claim in *Phillips* referred to "steel baffles," and the court explained that, given the recitation of "steel" as a modifier of "baffles," the term "baffles" alone presumably "does not inherently mean objects made of steel." *Phillips* at 1314. But the dispute here—over the modifier "sapphire"— is akin to a dispute over the scope of "steel," not "baffles." *Phillips* draws no conclusions about the scope of the term "steel." At best, The Regents' argument is that a "growth substrate" must be a single crystal structure, but that does not compel a conclusion that the term "sapphire" includes both polycrystalline and single crystalline aluminum oxide.

The normal rule is that terms are to be given the same meaning throughout the claims. *Phillips* at 1314 ("claim terms are normally used consistently throughout the patent"). And because The Regents conceded "sapphire" must be a single crystal structure in the context of a "growth substrate," the term should be so understood consistently throughout the claims, particularly where there is no disclosure in the patents that "sapphire" might include polycrystalline structures.

Accordingly, I will construe "sapphire" according to its plain and ordinary meaning, which is single crystal aluminum oxide.

### C. "lead frame" ('529 and '464 patents)

The claim term "lead frame" is a limitation in asserted claims 1, 6, and 8 of the '529 patent and claims 1, 7, and 9 of the '464 patent. The parties have proposed the following constructions:

| Complainants' Construction | Respondent's Construction | Staff's Construction |
|---|---|---|
| Plain and ordinary meaning, which is "a support structure formed by leads providing an interface to a semiconductor die." | Feit Electric, Home Depot, GVL, Signify: "conductive structure that supports around the edges of the LED chip and connects externally"<br><br>IKEA, GE Lighting, Satco: "a support structure providing an interface to a semiconductor die" | "a support structure providing an interface to a semiconductor die" |

*See* JCCC at 4.

All proposed constructions concede the lead frame is a structure that provides support and that provides an electrical interface to a semiconductor die. The primary disputes between the various constructions are (1) whether something non-conductive, such as the claimed "transparent

plate," can be part of the lead frame, and (2) whether conductive components of the lead frame must provide structural support to the LED chip (as The Regents contends) or whether it is sufficient for the lead frame structure as a whole to support the LED (as IKEA, GE Lighting, Satco, and the Staff urge).

Claim 1 of the '464 patent explicitly recites "a lead frame *including* a transparent plate." '464 patent, claim 1 (emphasis added). Claim 1 of the '529 patent explicitly recites "a transparent plate *in* the lead frame." '529 patent, claim 1 (emphasis added). The plain text of the claims thus mandates that the lead frame of the invention encompasses the non-conductive transparent plate.

The relationship of the LED chip to the lead frame in the claimed invention also corroborates this understanding. The same claims specifying "a lead frame including a transparent plate" also require the LED chip to be "attached" to the "lead frame." *See, e.g.*, '464 patent, claim 1; '529 patent, claim 1. The only drawing in the specification that illustrates a "transparent plate"—Figure 19A—shows an LED chip 1502 and a transparent plate 1902:



FIG. 19A

’464 patent, Fig. 19A.

In describing this arrangement, the specification states the LED chip 1502 “is attached *to the lead frame* using epoxy 1904.” *Id.* at 13:45-49 (emphasis added). If epoxy 1904 attaches LED chip 1502 “to the lead frame,” then transparent plate 1902 must be part of the lead frame, as the figure shows epoxy 1904 connecting chip 1502 to plate 1902. This interpretation of Figure 19A is consistent with other specification text stating “lead frame 1522 . . . uses a transparent plate such as glass, quartz, and other materials.” *Id*.

Given that claim 1 of both the ’464 and ’529 patents require the LED chip to be “attached” to the “lead frame,” the embodiment shown in Figure 19A would be excluded from the scope of those claims if the lead frame excluded nonconductive elements like the transparent plate. *See* ’464 patent, claim 1; ’529 patent, claim 1. Absent disclaimer, courts “normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification.” *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008). Thus, the embodiment illustrated in Figure 19A cuts against the “conductive” requirement advanced by Feit Electric, Home Depot, GVL, and Signify.

Additionally, nothing in the claims or specification requires support to be provided only by conductive components. To the contrary, Figure 19A illustrates LED chip 1502 supported by a nonconductive transparent plate 1902. *See, e.g.*, ’464 patent, Fig. 19A. As has been explained above, the nonconductive transparent plate providing support in Figure 19A is described by the inventors as part of the lead frame in that embodiment. *See id*. at 13:45-49 (LED chip 1502 “is attached to the lead frame” which “uses a transparent plate”).

Finally, I note that the Patent Trial and Appeal Board ("PTAB") concluded there is "no reason that a lead frame should be limited to only conductive structures" when it interpreted the '529 patent claims to institute an *inter partes* review of those claims. Staff Markman Exhibit 17 ('529 patent IPR Institution Decision) at 10.

For the foregoing reasons, I will construe "lead frame" as "a support structure providing an interface to a semiconductor die."

D. **"roughened, textured, or patterned" ('529 and '464 patents)**

The claim term "roughened, textured, or patterned" appears in claim 6 of the '529 patent and claim 7 of the '464 patent. The parties have proposed the following constructions:

| Complainants' Construction | Respondent's Construction | Staff's Construction |
|---|---|---|
| "having a surface that is rough, textured, or patterned" / "having a surface that is patterned" | "shaped by a roughening, texturing, or patterning process"; otherwise indefinite / "shaped by a patterning process"; otherwise indefinite | "to have been made rough, given a particular texture, or to have been made, adapted, or fashioned according to a pattern" / "to have been made, adapted, or fashioned according to a pattern" |

*See* JCCC at 5.

The patent claims in question use the phrase "roughened, textured, or patterned" as a modifier for terms like "transparent plate" and "transparent substrate." *See, e.g.*, '529 patent, claim 6; '464 patent, claim 7. The main dispute between the parties is whether the "roughened, textured, or patterned" characteristics recited in the claims must come about as a result of a process applied to a pre-existing object or whether an object that innately has one of those characteristics will satisfy the claims.

The meanings ordinarily applied to the terms "roughened," "textured," and "patterned" are each broad enough to describe an object having the characteristic innately as well as an object

given the characteristic through some process. Nothing in the intrinsic record clearly limits the claims to one or the other meaning. A person of ordinary skill in the art would understand the meaning of these terms with reasonable certainty, and Respondents have not shown clear and convincing evidence that the terms are indefinite.

The specifications of the ’529 and ’464 patents confirm this understanding. The specification teaches a surface of the phosphor layer “is roughened to increase the converted light extraction 110 from the phosphor layer 104.” ’529 patent at 8:51-53. It further teaches that at least “a portion of surface 108, rather than being completely planar, is roughened, textured, patterned, or otherwise made not normal to the light 112 emitted from the LED.” *Id.* at 8:53-55. Critically, the specification is express that this “irregular surface 108 *may* be generated through additional processing of phosphor layer 104, *or may occur as the phosphor layer 104 is applied to LED 100, without departing from the scope of the present invention*.” *Id.* at 8:56-60 (emphasis added). The specification of the ’529 is thus express that a “roughened, textured, or patterned” surface may be the result of processing applied to a surface or may be a characteristic innate to a surface from the time of its creation. *See also* ’464 patent at 9:4-13 (same).

A comparison of the asserted claims with other claims supports the same conclusion. For example, unasserted method claim 17 of the ’464 patent specifically requires a process to bring about the claimed characteristics. *See* ’464 patent at claim 17 (depending from claim 11). It requires a “method of fabricating a light emitting device” “wherein. . . the transparent plate is roughened, textured, or patterned to increase transmission of the light through the transparent plate.” *Id*. In contrast, the context of the “roughened, textured, or patterned” language in the apparatus claims asserted here has no such restriction. The fact that the patentees used different language to expressly claim processes elsewhere suggests that the language at issue here should

be interpreted differently. Nothing in the claims at issue here limits the terms to a particular facet of their broad, ordinarily understood meanings.

Accordingly, I find that "roughened, textured, or patterned" and "patterned" should be interpreted according to their broad, ordinarily understood meanings. That ordinary understanding encompasses characteristics that come about as a result of a process applied to an object as well as characteristics innate to an object.

### E. **"a molding" ('854 and '557 patents)**

The term "a molding" appears in claim 1 of the '854 patent and claim 1 of the '557 patent. The parties have proposed the following constructions:

| Complainants' Construction | Respondent's Construction | Staff's Construction |
|---|---|---|
| "formed component" | "component made by a molding process" | "formed component" |

*See* JCCC at 5.

The central dispute with respect to "a molding" is whether the term is limited to an object formed by a mold.

"Molding," in its ordinary usage, encompasses the forming of an object out of any malleable substance by any means. *See* RXM-038 (Webster's New Explorer Dictionary, "molding *n* . . . 2: an object produced by molding"; "mold *vb* . . . 2: to form or become formed in ***or as if in*** a mold") (emphasis added). As Staff notes, "[t]here is no evidence that any process step is essential to the 'molding' claim term[s], or even that a process is required to produce a molding." SRB at 20.

Respondents assert that "a molding" can only be an object made by using a mold. *See, e.g.*, ROB at 33-88. To support this proposition, Respondents rely on prosecution history from U.S. Patent App. No. 12/275,136, an application related to U.S. Patent App. No. 11/940,872, which was itself incorporated by reference into the '854 and '557 patent specifications. ROB at 36 n. 18. But the term at issue in the passage cited by Respondents is "injection molding," a term of art for a process. Here, the disputed term is "a molding," which all parties agree is an object, not a process. The prosecution history cited by Respondents therefore is not probative of the present dispute, even if properly considered part of the intrinsic record.

I will construe the term "a molding" as "a component formed by or as if by a mold."

**SO ORDERED.**

Clark S. Cheney
Clark S. Cheney
Administrative Law Judge

**CERTAIN FILAMENT LIGHT-EMITTING DIODES AND PRODUCTS CONTAINING SAME (II)** **Inv. No. 337-TA-1220**

**PUBLIC CERTIFICATE OF SERVICE**

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served via EDIS upon the Commission Investigative Attorney, **Jennifer Dienes, Esq.**, and the following parties as indicated, on **June 15, 2021.**

Lisa R. Barton, Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC 20436

**On Behalf of Complainant The Regents of the University of California:**

Evan H. Langdon, Esq.
**Nixon Peabody LLP**
799 9th Street NW, Suite 500
Washington, DC 20001
Email: elangdon@nixonpeabody.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**On Behalf of Respondents General Electric Company, Consumer Lighting (US) LLC d/b/a GE Lighting, and Savant Systems, Inc.:**

Patrick J. McCarthy, Esq.
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Email: PMcCarthy@goodwinlaw.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**On Behalf of Respondents IKEA Supply AG, IKEA U.S. Retail LLC, and IKEA of Sweden AP:**

David F. Nickel, Esq.
**FOSTER, MURPHY, ALTMAN & NICKEL, PC**
1150 18th Street NW, Suite 775
Washington, DC 20036
Email: dnickel@fostermurphy.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**On Behalf of Respondent Satco Products, Inc.:**

Scott J. Bornstein, Esq.
**GREENBERG TRAURIG, LLP**
MetLife Building
200 Park Avenue, 38th Floor
New York, NY 10166
Email: bornsteins@gtlaw.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**<u>On Behalf of Respondent Feit Electric Company, Inc.:</u>**

Jay H. Reiziss, Esq.
**MCDERMOTT WILL & EMERY LLP**
500 North Capitol Street, NW
Washington, DC 20001
Email: jreiziss@mwe.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**<u>On Behalf of Respondents Home Depot Product Authority, LLC, Home Depot U.S.A., Inc., and The Home Depot, Inc.:</u>**

Ryan K. Walsh, Esq.
**JONES DAY**
1420 Peachtree Street, NE
Suite 800
Atlanta, GA 30309
Email: rkwalsh@jonesday.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**<u>On Behalf of Intervenor Signify North America Corporation:</u>**

Adam D. Swain, Esq.
**ALSTON & BIRD LLP**
950 F Street, NW
Washington, DC 20004
Email: adam.swain@alston.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

**<u>On Behalf of Intervenor Global Value Lighting LLC:</u>**

Jay Emerick, Esq.
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
Email: jay.emerick@kirkland.com

☐ Via Hand Delivery
☐ Via Express Delivery
☐ Via First Class Mail
☒ Other: Email Notification of Availability for Download

U 8056757

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

August 05, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *10,593,854*
ISSUE DATE: *March 17, 2020*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. TARVER
Certifying Officer

US010593854B1

(12) **United States Patent**
**Nakamura et al.**

(10) **Patent No.: US 10,593,854 B1**
(45) **Date of Patent: *Mar. 17, 2020**

(54) **TRANSPARENT LIGHT EMITTING DEVICE WITH LIGHT EMITTING DIODES**

(71) Applicant: **The Regents of the University of California**, Oakland, CA (US)

(72) Inventors: **Shuji Nakamura**, Santa Barbara, CA (US); **Steven P. DenBaars**, Goleta, CA (US); **Hirokuni Asamizu**, Goleta, CA (US)

(73) Assignee: **The Regents of the University of California**, Oakland, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/570,754**

(22) Filed: **Sep. 13, 2019**

**Related U.S. Application Data**

(63) Continuation of application No. 16/569,120, filed on Sep. 12, 2019, which is a continuation of application
(Continued)

(51) **Int. Cl.**
***H01L 33/62*** (2010.01)
***H01L 33/54*** (2010.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***H01L 33/62*** (2013.01); ***G02B 19/0028*** (2013.01); ***G02B 19/0061*** (2013.01); ***H01L 33/22*** (2013.01); ***H01L 33/54*** (2013.01); ***H01L 33/58*** (2013.01); *H01L 33/387* (2013.01); *H01L 33/60* (2013.01); *H01L 2224/0554* (2013.01); *H01L 2224/05568* (2013.01);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,607,463 A 9/1971 Kinoshita et al.
3,938,177 A 2/1976 Hansen et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU 754353 B2 11/2002
AU 756072 B2 1/2003
(Continued)

OTHER PUBLICATIONS

PCT/US2007/025343 International Search Report and Written Opinion dated Mar. 10, 2008.
(Continued)

*Primary Examiner* — Michelle Mandala
(74) *Attorney, Agent, or Firm* — Gates & Cooper LLP

(57) **ABSTRACT**

A transparent light emitting diode (LED) includes a plurality of III-nitride layers, including an active region that emits light, wherein all of the layers except for the active region are transparent for an emission wavelength of the light, such that the light is extracted effectively through all of the layers and in multiple directions through the layers. Moreover, the surface of one or more of the III-nitride layers may be roughened, textured, patterned or shaped to enhance light extraction.

**6 Claims, 14 Drawing Sheets**



**Related U.S. Application Data**

No. 16/567,275, filed on Sep. 11, 2019, which is a continuation of application No. 16/422,323, filed on May 24, 2019, now Pat. No. 10,454,010, which is a continuation of application No. 16/238,736, filed on Jan. 3, 2019, which is a continuation of application No. 14/461,151, filed on Aug. 15, 2014, now Pat. No. 10,217,916, which is a continuation of application No. 13/622,884, filed on Sep. 19, 2012, now Pat. No. 8,835,959, which is a continuation of application No. 11/954,154, filed on Dec. 11, 2007, now Pat. No. 8,294,166.

(60) Provisional application No. 60/869,447, filed on Dec. 11, 2006.

(51) **Int. Cl.**

***H01L 33/58*** (2010.01)
***G02B 19/00*** (2006.01)
***H01L 33/22*** (2010.01)
*H01L 33/60* (2010.01)
*H01L 33/38* (2010.01)

(52) **U.S. Cl.**

CPC ............... *H01L 2224/05573* (2013.01); *H01L 2224/16245* (2013.01); *H01L 2224/48247* (2013.01); *H01L 2224/48257* (2013.01); *H01L 2224/49107* (2013.01); *H01L 2224/73265* (2013.01); *H01L 2924/00014* (2013.01); *H01L 2924/1815* (2013.01); *H01L 2933/0091* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


3,999,280 A 12/1976 Hansen et al.
4,026,692 A 5/1977 Bartholomew
4,346,275 A 8/1982 Iwakiri et al.
4,497,974 A 2/1985 Deckman et al.
5,087,949 A 2/1992 Haltz
5,376,580 A 12/1994 Kish et al.
5,416,870 A 5/1995 Chun et al.
5,696,389 A 12/1997 Ishikawa et al.
5,705,834 A 1/1998 Egalon et al.
5,708,280 A 1/1998 Lebby et al.
5,775,792 A 7/1998 Wiese
5,779,924 A 7/1998 Krames et al.
5,780,867 A 7/1998 Fritz et al.
5,905,275 A 5/1999 Nunoue et al.
5,932,048 A 8/1999 Furukawa et al.
5,952,681 A 9/1999 Chen
6,015,719 A 1/2000 Kish, Jr. et al.
6,022,760 A 2/2000 Lebby et al.
6,133,589 A 10/2000 Krames
6,155,699 A 12/2000 Miller et al.
6,229,160 B1 5/2001 Krames et al.
6,294,800 B1 9/2001 Duggal et al.
6,310,364 B1 10/2001 Uemura
6,331,063 B1 12/2001 Kamada et al.
6,331,356 B1 12/2001 Angelopoulos et al.
6,335,548 B1 1/2002 Roberts et al.
6,357,889 B1 3/2002 Duggal et al.
6,373,188 B1 4/2002 Johnson et al.
6,376,851 B1 4/2002 Worley
6,396,082 B1 5/2002 Fukasawa et al.
6,417,019 B1 7/2002 Mueller et al.
6,429,462 B1 8/2002 Shveykin
6,452,217 B1 9/2002 Wojnarkowski et al.
6,482,664 B1 11/2002 Lee et al.
6,483,196 B1 11/2002 Wojnarowski et al.
6,486,499 B1 11/2002 Krames et al.
6,509,584 B2 1/2003 Suzuki
6,514,782 B1 2/2003 Wierer et al.
6,515,308 B1 2/2003 Kneissl et al.
6,525,335 B1 2/2003 Krames
6,525,464 B1 2/2003 Chin
6,547,423 B2 4/2003 Marshall et al.
6,548,956 B2 4/2003 Forrest et al.
6,550,953 B1 4/2003 Ichikawa et al.
6,569,544 B1 5/2003 Alain et al.
6,573,530 B1 6/2003 Sargent et al.
6,573,537 B1 6/2003 Steigerwald et al.
6,576,488 B2 6/2003 Collins, III et al.
6,586,882 B1 7/2003 Harbers
6,607,286 B2 8/2003 West et al.
6,607,931 B2 8/2003 Streubel
6,608,333 B1 8/2003 Lee et al.
6,608,439 B1 8/2003 Sokolik et al.
6,614,058 B2 9/2003 Lin et al.
6,635,902 B1 10/2003 Lin
6,649,939 B1 11/2003 Wirth
6,657,767 B2 12/2003 Bonardi et al.
6,674,096 B2 1/2004 Sommers
6,677,610 B2 1/2004 Choi et al.
6,682,950 B2 1/2004 Yang et al.
6,686,218 B2 2/2004 Lin et al.
6,686,676 B2 2/2004 McNulty et al.
6,700,137 B2 3/2004 Horiuchi et al.
6,717,362 B1 4/2004 Lee et al.
6,719,936 B2 4/2004 Carlton et al.
6,729,746 B2 5/2004 Suehiro et al.
6,730,939 B2 5/2004 Eisert et al.
6,737,532 B2 5/2004 Chen et al.
6,746,295 B2 6/2004 Sorg
6,759,804 B2 7/2004 Ellens et al.
6,765,236 B2 7/2004 Sakurai
6,774,401 B2 8/2004 Nakada et al.
6,777,871 B2 8/2004 Duggal et al.
6,784,460 B2 8/2004 Ng et al.
6,791,116 B2 9/2004 Takahashi et al.
6,791,119 B2 9/2004 Slater et al.
6,794,685 B2 9/2004 Hata et al.
6,798,136 B2 9/2004 Sommers
6,803,607 B1 10/2004 Chan et al.
6,809,345 B2 10/2004 Watanabe
6,841,934 B2 1/2005 Wang et al.
6,844,572 B2 1/2005 Sawaki et al.
6,870,311 B2 3/2005 Mueller et al.
6,874,910 B2 4/2005 Sugimoto et al.
6,876,149 B2 4/2005 Miyashita
6,893,890 B2 5/2005 Takekuma et al.
6,903,376 B2 6/2005 Shen et al.
6,903,381 B2 6/2005 Lin et al.
6,909,108 B2 6/2005 Tang et al.
6,914,267 B2 7/2005 Fukasawa et al.
6,914,268 B2 7/2005 Shei et al.
6,917,057 B2 7/2005 Stokes et al.
6,921,927 B2 7/2005 Ng et al.
6,922,424 B2 7/2005 Weigert et al.
6,936,761 B2 8/2005 Pichler
6,936,859 B1 8/2005 Uemura et al.
6,936,864 B2 8/2005 Kondo
6,940,704 B2 9/2005 Stalions
6,955,985 B2 10/2005 Narayan
6,961,190 B1 11/2005 Tamaoki et al.
6,964,877 B2 11/2005 Chen et al.
6,969,874 B1 11/2005 Gee et al.
6,969,946 B2 11/2005 Steranka et al.
6,972,208 B2 12/2005 Hsieh et al.
6,972,212 B2 12/2005 Eisert et al.
6,980,710 B2 12/2005 Farahi et al.
6,982,522 B2 1/2006 Omoto
6,987,613 B2 1/2006 Pocius et al.
6,989,555 B2 1/2006 Goetz et al.
6,997,580 B2 2/2006 Wong
6,998,281 B2 2/2006 Taskar et al.
7,008,858 B2 3/2006 Liu et al.
7,009,213 B2 3/2006 Camras et al.
7,009,217 B2 3/2006 Liu et al.
7,009,220 B2 3/2006 Oohata
7,015,514 B2 3/2006 Baur et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS


7,018,859 B2 3/2006 Liao et al.
7,019,456 B2 3/2006 Yasukawa et al.
7,026,261 B2 4/2006 Hirose et al.
7,026,657 B2 4/2006 Bogner et al.
7,048,412 B2 5/2006 Martin et al.
7,053,419 B1 5/2006 Camras et al.
7,064,355 B2 6/2006 Camras et al.
7,067,849 B2 6/2006 Yoo
7,070,304 B2 7/2006 Imai
7,070,312 B2 7/2006 Tatsukawa
7,071,034 B2 7/2006 Ueda et al.
7,072,096 B2 7/2006 Holman et al.
7,084,435 B2 8/2006 Sugimoto et al.
7,091,653 B2 8/2006 Ouderkirk et al.
7,091,661 B2 8/2006 Ouderkirk et al.
7,098,589 B2 8/2006 Erchak et al.
7,105,860 B2 9/2006 Shei et al.
7,112,916 B2 9/2006 Goh et al.
7,119,271 B2 10/2006 King et al.
7,126,159 B2 10/2006 Itai et al.
7,129,635 B2 10/2006 Tsujimura
7,135,709 B1 11/2006 Wirth et al.
7,148,514 B2 12/2006 Seo et al.
7,157,745 B2 1/2007 Blonder et al.
7,161,189 B2 1/2007 Wu
7,169,632 B2 1/2007 Baur et al.
7,170,100 B2 * 1/2007 Erchak ................ H01L 25/0753 257/88
7,188,981 B2 3/2007 Barros et al.
7,195,991 B2 3/2007 Kamutsch et al.
7,199,520 B2 4/2007 Fujii et al.
7,210,806 B2 5/2007 Holman et al.
7,217,004 B2 5/2007 Park et al.
7,223,620 B2 5/2007 Jäger et al.
7,223,998 B2 5/2007 Schwach et al.
7,227,304 B2 6/2007 Tsujimura et al.
7,235,817 B2 6/2007 Yano et al.
7,250,728 B2 7/2007 Chen et al.
7,253,447 B2 8/2007 Oishi et al.
7,253,448 B2 8/2007 Roberts et al.
7,262,440 B2 8/2007 Choi et al.
7,264,378 B2 9/2007 Loh
7,268,371 B2 9/2007 Krames et al.
7,273,291 B2 9/2007 Kim et al.
7,281,818 B2 10/2007 You et al.
7,282,853 B2 10/2007 Yano et al.
7,286,296 B2 10/2007 Chaves et al.
7,291,864 B2 11/2007 Weisbuch et al.
7,306,351 B2 12/2007 Chao et al.
7,309,882 B2 12/2007 Chen
7,312,573 B2 12/2007 Chang et al.
7,314,291 B2 1/2008 Tain et al.
7,317,210 B2 1/2008 Brabec et al.
7,319,246 B2 1/2008 Soules et al.
7,323,704 B2 1/2008 Itai
7,329,982 B2 2/2008 Conner et al.
7,332,747 B2 2/2008 Uemura et al.
7,344,902 B2 3/2008 Basin et al.
7,344,958 B2 3/2008 Murai et al.
7,345,298 B2 3/2008 Weisbuch et al.
7,352,006 B2 4/2008 Beeson et al.
7,358,537 B2 4/2008 Yeh et al.
7,358,539 B2 4/2008 Venugopalan et al.
7,374,958 B2 5/2008 Pan et al.
7,380,962 B2 6/2008 Chaves et al.
7,390,117 B2 6/2008 Leatherdale et al.
7,391,153 B2 6/2008 Suehiro et al.
7,397,177 B2 7/2008 Takahashi et al.
7,400,439 B2 7/2008 Holman
7,408,204 B2 8/2008 Tung
7,414,270 B2 8/2008 Kim et al.
7,423,297 B2 9/2008 Leatherdale et al.
7,427,145 B2 9/2008 Jang et al.
7,431,477 B2 10/2008 Chou et al.
7,439,551 B2 10/2008 Hata
7,449,789 B2 11/2008 Chen
7,463,419 B2 12/2008 Weber
7,465,962 B2 12/2008 Kametani et al.
7,479,662 B2 1/2009 Soules et al.
7,479,664 B2 1/2009 Williams
7,489,075 B2 2/2009 Lee
7,498,734 B2 3/2009 Suehiro et al.
7,504,671 B2 3/2009 Ishidu et al.
7,509,012 B2 3/2009 Zoorob et al.
7,510,289 B2 3/2009 Takekuma
7,518,149 B2 4/2009 Maaskant et al.
7,521,782 B2 4/2009 Ishii
7,525,126 B2 4/2009 Leatherdale et al.
7,531,835 B2 5/2009 Heeger et al.
7,534,634 B2 5/2009 Jäger et al.
7,541,610 B2 6/2009 Haase
7,545,042 B2 6/2009 Yang
7,579,629 B2 8/2009 Inoguchi
7,582,910 B2 9/2009 David et al.
7,585,083 B2 9/2009 Kim et al.
7,586,127 B2 9/2009 Nomura et al.
7,602,118 B2 10/2009 Cok et al.
7,633,092 B2 12/2009 Ng et al.
7,646,146 B2 1/2010 Cok
7,670,872 B2 3/2010 Yan
7,679,283 B2 3/2010 Nimura
7,687,813 B2 3/2010 Nakamura et al.
7,687,815 B2 3/2010 Kim
7,692,205 B2 4/2010 Wang et al.
7,693,360 B2 4/2010 Shimizu et al.
7,704,763 B2 4/2010 Fujii et al.
7,717,589 B2 5/2010 Nishioka et al.
7,719,020 B2 5/2010 Murai et al.
7,719,182 B2 5/2010 Cok et al.
7,733,011 B2 6/2010 Cina et al.
7,742,677 B2 6/2010 Eberhard et al.
7,745,986 B2 6/2010 Ito et al.
7,748,879 B2 7/2010 Koike et al.
7,755,096 B2 7/2010 Weisbuch et al.
7,766,508 B2 8/2010 Villard et al.
7,772,597 B2 8/2010 Inoue
7,781,787 B2 8/2010 Suehiro et al.
7,781,789 B2 8/2010 Denbaars et al.
7,847,302 B2 12/2010 Basin et al.
7,851,815 B2 12/2010 Diamantidis
7,860,356 B2 12/2010 Montfort et al.
7,868,341 B2 1/2011 Diana et al.
7,872,275 B2 1/2011 Diamantidis
7,932,111 B2 4/2011 Edmond
7,950,831 B2 5/2011 Moon
7,956,371 B2 6/2011 Denbaars et al.
RE42,636 E 8/2011 Chen et al.
7,994,527 B2 8/2011 Denbaars et al.
8,022,423 B2 9/2011 Nakamura et al.
8,035,117 B2 10/2011 DenBaars et al.
8,071,997 B2 12/2011 Scotch et al.
8,109,635 B2 2/2012 Allon et al.
8,124,991 B2 2/2012 Iso et al.
8,158,987 B2 4/2012 Nabekura et al.
8,162,493 B2 4/2012 Skiver et al.
8,212,262 B2 7/2012 Emerson et al.
8,258,519 B2 9/2012 Hsu
8,294,166 B2 10/2012 Nakamura et al.
8,334,151 B2 12/2012 Murai et al.
8,368,109 B2 2/2013 Iso et al.
8,378,368 B2 2/2013 Hsu et al.
8,395,167 B2 3/2013 Kang et al.
8,405,307 B2 3/2013 Yano et al.
8,455,909 B2 6/2013 Negley
8,541,788 B2 9/2013 DenBaars et al.
8,558,446 B2 10/2013 Miki et al.
8,637,892 B2 1/2014 Egoshi et al.
8,710,535 B2 4/2014 Jo et al.
8,835,959 B2 9/2014 Nakamura et al.
8,860,051 B2 10/2014 Fellows et al.
8,882,290 B2 11/2014 Hsieh et al.
8,889,440 B2 11/2014 Chen et al.
9,240,529 B2 1/2016 Fellows Demille et al.
9,276,156 B2 3/2016 King et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 9,705,059 | B2 | 7/2017 | Park |
| 9,859,464 | B2 | 1/2018 | Fellows Demille et al. |
| 10,103,306 | B2 | 10/2018 | Kim |
| 10,217,916 | B2 | 2/2019 | Nakamura et al. |
| 10,312,422 | B2 | 6/2019 | Camras et al. |
| 10,374,003 | B2 | 8/2019 | Choi et al. |
| 10,454,010 | B1 * | 10/2019 | Nakamura ......... G02B 19/0028 |
| 2001/0002049 | A1 | 5/2001 | Reeh et al. |
| 2001/0033135 | A1 | 10/2001 | Duggal et al. |
| 2002/0006040 | A1 | 1/2002 | Kamada et al. |
| 2002/0085601 | A1 | 7/2002 | Wang et al. |
| 2002/0117103 | A1 | 8/2002 | Hooper et al. |
| 2002/0121637 | A1 | 9/2002 | Ito |
| 2002/0123204 | A1 | 9/2002 | Torvik et al. |
| 2002/0130327 | A1 | 9/2002 | Wu et al. |
| 2002/0131726 | A1 | 9/2002 | Lin et al. |
| 2002/0141006 | A1 | 10/2002 | Pocius et al. |
| 2002/0158578 | A1 | 10/2002 | Eliashevich et al. |
| 2002/0171087 | A1 | 11/2002 | Krames et al. |
| 2003/0010975 | A1 | 1/2003 | Gibb |
| 2003/0015959 | A1 | 1/2003 | Tomoda et al. |
| 2003/0039119 | A1 | 2/2003 | Cao |
| 2003/0075723 | A1 | 4/2003 | Heremans et al. |
| 2003/0100140 | A1 | 5/2003 | Lin et al. |
| 2003/0124754 | A1 | 7/2003 | Farahi et al. |
| 2003/0141506 | A1 | 7/2003 | Sano |
| 2003/0145885 | A1 | 8/2003 | Kang et al. |
| 2003/0213969 | A1 | 11/2003 | Wang et al. |
| 2003/0215766 | A1 | 11/2003 | Fischer et al. |
| 2004/0004434 | A1 | 1/2004 | Nishi et al. |
| 2004/0007709 | A1 | 1/2004 | Kondo |
| 2004/0012027 | A1 | 1/2004 | Keller et al. |
| 2004/0012958 | A1 | 1/2004 | Hashimoto et al. |
| 2004/0036074 | A1 | 2/2004 | Kondo |
| 2004/0046179 | A1 | 3/2004 | Johannes et al. |
| 2004/0070014 | A1 | 4/2004 | Lin |
| 2004/0079408 | A1 | 4/2004 | Fetzer et al. |
| 2004/0089868 | A1 | 5/2004 | Hon et al. |
| 2004/0094772 | A1 | 5/2004 | Hon et al. |
| 2004/0095502 | A1 | 5/2004 | Losehand |
| 2004/0155565 | A1 | 8/2004 | Holder |
| 2004/0164311 | A1 | 8/2004 | Uemura |
| 2004/0173810 | A1 | 9/2004 | Lin |
| 2004/0184495 | A1 | 9/2004 | Kondo |
| 2004/0188689 | A1 | 9/2004 | Shono et al. |
| 2004/0188700 | A1 | 9/2004 | Fukasawa et al. |
| 2004/0188791 | A1 | 9/2004 | Horng et al. |
| 2004/0211970 | A1 | 10/2004 | Hayashimoto et al. |
| 2004/0227148 | A1 | 11/2004 | Camras et al. |
| 2004/0239611 | A1 | 12/2004 | Huang et al. |
| 2004/0245531 | A1 | 12/2004 | Fuii et al. |
| 2004/0257797 | A1 | 12/2004 | Suehiro et al. |
| 2004/0263064 | A1 | 12/2004 | Huang |
| 2005/0029528 | A1 | 2/2005 | Ishikawa |
| 2005/0032257 | A1 | 2/2005 | Camras et al. |
| 2005/0035354 | A1 | 2/2005 | Lin et al. |
| 2005/0040410 | A1 | 2/2005 | Ledentsov et al. |
| 2005/0062830 | A1 | 3/2005 | Taki et al. |
| 2005/0077532 | A1 | 4/2005 | Ota et al. |
| 2005/0082562 | A1 | 4/2005 | Ou et al. |
| 2005/0093008 | A1 | 5/2005 | Suehiro et al. |
| 2005/0110032 | A1 | 5/2005 | Saito et al. |
| 2005/0111240 | A1 | 5/2005 | Yonekubo |
| 2005/0121688 | A1 | 6/2005 | Nagai et al. |
| 2005/0133810 | A1 | 6/2005 | Roberts et al. |
| 2005/0145864 | A1 | 7/2005 | Sugiyama et al. |
| 2005/0145865 | A1 | 7/2005 | Okuyama et al. |
| 2005/0156510 | A1 | 7/2005 | Chua et al. |
| 2005/0161779 | A1 | 7/2005 | Peng et al. |
| 2005/0184300 | A1 | 8/2005 | Tazima et al. |
| 2005/0189551 | A1 | 9/2005 | Peng et al. |
| 2005/0189555 | A1 | 9/2005 | Lin et al. |
| 2005/0194598 | A1 | 9/2005 | Kim et al. |
| 2005/0196887 | A1 | 9/2005 | Liu |
| 2005/0205884 | A1 | 9/2005 | Kim et al. |
| 2005/0205887 | A1 | 9/2005 | Shei |
| 2005/0211997 | A1 | 9/2005 | Suehiro et al. |
| 2005/0212002 | A1 | 9/2005 | Sanga et al. |
| 2005/0218790 | A1 | 10/2005 | Blumel |
| 2005/0224830 | A1 | 10/2005 | Blonder et al. |
| 2005/0243570 | A1 | 11/2005 | Chaves et al. |
| 2005/0248271 | A1 | 11/2005 | Ng et al. |
| 2005/0265404 | A1 | 12/2005 | Ashdown |
| 2005/0274956 | A1 | 12/2005 | Bhat |
| 2005/0274970 | A1 | 12/2005 | Ludowise |
| 2006/0000964 | A1 | 1/2006 | Ye et al. |
| 2006/0001035 | A1 | 1/2006 | Suehiro et al. |
| 2006/0001036 | A1 | 1/2006 | Jacob et al. |
| 2006/0006408 | A1 | 1/2006 | Suehiro et al. |
| 2006/0008941 | A1 | 1/2006 | Haskell et al. |
| 2006/0009006 | A1 | 1/2006 | Murai et al. |
| 2006/0012299 | A1 | 1/2006 | Suehiro et al. |
| 2006/0017055 | A1 | 1/2006 | Cropper et al. |
| 2006/0022214 | A1 | 2/2006 | Morgan et al. |
| 2006/0038187 | A1 | 2/2006 | Ueno |
| 2006/0043399 | A1 | 3/2006 | Miyagaki et al. |
| 2006/0054905 | A1 | 3/2006 | Schwach et al. |
| 2006/0063028 | A1 | 3/2006 | Leurs |
| 2006/0091376 | A1 | 5/2006 | Kim et al. |
| 2006/0091788 | A1 | 5/2006 | Yan |
| 2006/0125385 | A1 | 6/2006 | Lu et al. |
| 2006/0138439 | A1 | 6/2006 | Bogner et al. |
| 2006/0145170 | A1 | 7/2006 | Cho |
| 2006/0154392 | A1 | 7/2006 | Tran et al. |
| 2006/0163586 | A1 | 7/2006 | Denbaars et al. |
| 2006/0163601 | A1 | 7/2006 | Harle et al. |
| 2006/0164836 | A1 | 7/2006 | Suehiro |
| 2006/0171152 | A1 | 8/2006 | Suehiro et al. |
| 2006/0175624 | A1 | 8/2006 | Sharma et al. |
| 2006/0175625 | A1 | 8/2006 | Yokotani et al. |
| 2006/0186418 | A1 | 8/2006 | Edmond et al. |
| 2006/0186424 | A1 | 8/2006 | Fujimoto et al. |
| 2006/0189026 | A1 | 8/2006 | Cropper et al. |
| 2006/0192217 | A1 | 8/2006 | David et al. |
| 2006/0194359 | A1 | 8/2006 | Weisbuch et al. |
| 2006/0194363 | A1 | 8/2006 | Giesberg et al. |
| 2006/0202219 | A1 | 9/2006 | Ohashi et al. |
| 2006/0202226 | A1 | 9/2006 | Weisbuch et al. |
| 2006/0233969 | A1 | 10/2006 | White et al. |
| 2006/0234486 | A1 | 10/2006 | Speck et al. |
| 2006/0237732 | A1 | 10/2006 | Nagai et al. |
| 2006/0239006 | A1 | 10/2006 | Chaves et al. |
| 2006/0243993 | A1 | 11/2006 | Yu |
| 2006/0246722 | A1 | 11/2006 | Speck et al. |
| 2006/0267026 | A1 | 11/2006 | Kim et al. |
| 2006/0273336 | A1 | 12/2006 | Fujikura et al. |
| 2006/0273343 | A1 | 12/2006 | Nakahata et al. |
| 2006/0289892 | A1 | 12/2006 | Lee |
| 2007/0001185 | A1 | 1/2007 | Lu et al. |
| 2007/0001186 | A1 | 1/2007 | Murai et al. |
| 2007/0001591 | A1 | 1/2007 | Tanaka |
| 2007/0012931 | A1 | 1/2007 | Lee et al. |
| 2007/0012940 | A1 | 1/2007 | Suh et al. |
| 2007/0019409 | A1 | 1/2007 | Nawashiro et al. |
| 2007/0029560 | A1 | 2/2007 | Su |
| 2007/0057624 | A1 | 3/2007 | Angelopoulos et al. |
| 2007/0065960 | A1 | 3/2007 | Fukshima et al. |
| 2007/0072324 | A1 | 3/2007 | Krames et al. |
| 2007/0085075 | A1 | 4/2007 | Yamazaki et al. |
| 2007/0085100 | A1 | 4/2007 | Diana et al. |
| 2007/0102721 | A1 | 5/2007 | Denbaars et al. |
| 2007/0114549 | A1 | 5/2007 | Yu |
| 2007/0120135 | A1 | 5/2007 | Soules et al. |
| 2007/0121690 | A1 | 5/2007 | Fujii et al. |
| 2007/0125995 | A1 | 6/2007 | Weisbuch et al. |
| 2007/0139949 | A1 | 6/2007 | Tanda et al. |
| 2007/0145397 | A1 | 6/2007 | Denbaars et al. |
| 2007/0147072 | A1 | 6/2007 | Scobbo et al. |
| 2007/0189013 | A1 | 8/2007 | Ford |
| 2007/0252164 | A1 | 11/2007 | Zhong et al. |
| 2007/0257267 | A1 | 11/2007 | Leatherdale |
| 2007/0257271 | A1 | 11/2007 | Ouderkirk |
| 2007/0284603 | A1 | 12/2007 | Haase |
| 2007/0290224 | A1 | 12/2007 | Ogawa |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0012034 A1 | 1/2008 | Thielen et al. |
| 2008/0030691 A1 | 2/2008 | Godo |
| 2008/0030974 A1 | 2/2008 | Abu-Ageel |
| 2008/0087900 A1 | 4/2008 | Yang |
| 2008/0101086 A1 | 5/2008 | Lee |
| 2008/0111146 A1 | 5/2008 | Nakamura |
| 2008/0121918 A1 | 5/2008 | Denbaars et al. |
| 2008/0128730 A1 | 6/2008 | Fellows et al. |
| 2008/0128731 A1 | 6/2008 | Denbaars et al. |
| 2008/0135864 A1 | 6/2008 | David et al. |
| 2008/0149949 A1 | 6/2008 | Nakamura et al. |
| 2008/0149959 A1 | 6/2008 | Nakamura et al. |
| 2008/0169752 A1 | 7/2008 | Hattori et al. |
| 2008/0182420 A1 | 7/2008 | Hu et al. |
| 2008/0191191 A1 | 8/2008 | Kim |
| 2008/0191224 A1 | 8/2008 | Emerson et al. |
| 2008/0245949 A1 | 10/2008 | Morimoto et al. |
| 2008/0251809 A1 | 10/2008 | Wolf et al. |
| 2009/0039267 A1 | 2/2009 | Iso et al. |
| 2009/0039762 A1 | 2/2009 | Park et al. |
| 2009/0078951 A1 | 3/2009 | Miki et al. |
| 2009/0114928 A1 | 5/2009 | Messere et al. |
| 2009/0121250 A1 | 5/2009 | Denbaars et al. |
| 2009/0140630 A1 | 6/2009 | Kijima et al. |
| 2009/0146170 A1 | 6/2009 | Zhong et al. |
| 2009/0315055 A1 | 12/2009 | Tamboli et al. |
| 2010/0059787 A1 | 3/2010 | Hoshina et al. |
| 2010/0090240 A1 | 4/2010 | Tamboli et al. |
| 2010/0187555 A1 | 7/2010 | Murai et al. |
| 2010/0264434 A1 | 10/2010 | Pioessl et al. |
| 2010/0283078 A1 | 11/2010 | Denbaars et al. |
| 2010/0289043 A1 | 11/2010 | Aurelien et al. |
| 2011/0079806 A1 | 4/2011 | Hsu et al. |
| 2011/0089455 A1 | 4/2011 | Diana et al. |
| 2011/0193061 A1 | 8/2011 | Hsu |
| 2012/0043568 A1 | 2/2012 | Yan |
| 2012/0056158 A1 | 3/2012 | Iso et al. |
| 2012/0161180 A1 | 6/2012 | Komatsu et al. |
| 2013/0020602 A1 | 1/2013 | Nakamura et al. |
| 2014/0252396 A1 | 9/2014 | Fujii et al. |
| 2014/0292618 A1 | 10/2014 | Yamazaki et al. |
| 2014/0353707 A1 | 12/2014 | Nakamura et al. |
| 2015/0014732 A1 | 1/2015 | Fellows Demille et al. |
| 2015/0102378 A1 | 4/2015 | Huang et al. |
| 2015/0270444 A1 | 9/2015 | Liu |
| 2016/0133790 A1 | 5/2016 | Fellows Demille et al. |
| 2018/0190888 A1 | 7/2018 | Kim |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 2010257325 B2 | 12/2011 |
| DE | 19807758 | 12/1998 |
| DE | 10245932 B3 | 2/2004 |
| DE | 10361801 A1 | 8/2005 |
| DE | 102004028143 B4 | 12/2006 |
| DE | 19807758 B4 | 8/2008 |
| DE | 112007000313 T5 | 7/2009 |
| EP | 1081771 | 3/2001 |
| EP | 1213773 | 6/2002 |
| EP | 1213773 A1 | 6/2002 |
| EP | 1416543 | 5/2004 |
| EP | 1536487 | 6/2005 |
| EP | 2087563 | 8/2009 |
| EP | 2174351 | 4/2010 |
| EP | 1081771 B1 | 6/2011 |
| EP | 2843716 | 3/2015 |
| FR | 2858859 A1 | 2/2005 |
| GB | 2371679 A | 7/2002 |
| GB | 2413698 A | 11/2005 |
| JP | 53024300 | 3/1978 |
| JP | S5324300 A | 3/1978 |
| JP | 09018057 | 1/1997 |
| JP | 09027642 | 1/1997 |
| JP | H0927642 A | 1/1997 |
| JP | 09055540 | 2/1997 |
| JP | H0955540 A | 2/1997 |
| JP | 10200165 | 7/1998 |
| JP | H10200165 A | 7/1998 |
| JP | H11-17223 | 1/1999 |
| JP | 2000277808 | 10/2000 |
| JP | 2000277808 A | 10/2000 |
| JP | 2001024223 | 1/2001 |
| JP | 2001044491 | 2/2001 |
| JP | 2001068731 | 3/2001 |
| JP | 2001068731 A | 3/2001 |
| JP | 2001111112 | 4/2001 |
| JP | 3172947 | 5/2001 |
| JP | 2001126515 | 5/2001 |
| JP | 2001126515 A | 5/2001 |
| JP | 2002084002 A | 3/2002 |
| JP | 2002008735 | 7/2002 |
| JP | 2002208735 A | 7/2002 |
| JP | 2002232020 | 8/2002 |
| JP | 2002280614 | 9/2002 |
| JP | 2002280614 A | 9/2002 |
| JP | 2002314152 | 10/2002 |
| JP | 2002319708 | 10/2002 |
| JP | 2003011417 A | 1/2003 |
| JP | 2003016808 | 1/2003 |
| JP | 2003017740 | 1/2003 |
| JP | 2003069085 | 3/2003 |
| JP | 2003069085 A | 3/2003 |
| JP | 2003249692 | 9/2003 |
| JP | 2003249692 A | 9/2003 |
| JP | 2003264317 | 9/2003 |
| JP | 2003318441 | 11/2003 |
| JP | 2003318441 A | 11/2003 |
| JP | 2003347586 | 12/2003 |
| JP | 2004111981 | 4/2004 |
| JP | 2004111981 A | 4/2004 |
| JP | 2004158557 | 6/2004 |
| JP | 2004521498 | 7/2004 |
| JP | 2004296999 A | 10/2004 |
| JP | 2005056922 | 3/2005 |
| JP | 2005057310 | 3/2005 |
| JP | 2005093102 | 4/2005 |
| JP | 2005093102 A | 4/2005 |
| JP | 2005117006 | 4/2005 |
| JP | 2005150261 | 6/2005 |
| JP | 2005191197 | 7/2005 |
| JP | 2005191197 A | 7/2005 |
| JP | 2005191514 | 7/2005 |
| JP | 2005191514 A | 7/2005 |
| JP | 2005267926 | 9/2005 |
| JP | 2005267926 A | 9/2005 |
| JP | 2005268323 | 9/2005 |
| JP | 2005326757 | 11/2005 |
| JP | 2005347677 | 12/2005 |
| JP | 2005347677 A | 12/2005 |
| JP | 2005353816 | 12/2005 |
| JP | 2006012916 | 1/2006 |
| JP | 2006024615 A | 1/2006 |
| JP | 2006024616 | 1/2006 |
| JP | 2006032387 | 2/2006 |
| JP | 2006032387 A | 2/2006 |
| JP | 2006041479 | 2/2006 |
| JP | 2006041479 A | 2/2006 |
| JP | 2006060034 A | 3/2006 |
| JP | 2006073618 | 3/2006 |
| JP | 2006128227 | 5/2006 |
| JP | 2006156590 | 6/2006 |
| JP | 2006165326 | 6/2006 |
| JP | 2006191103 | 7/2006 |
| JP | 2006210824 | 8/2006 |
| JP | 2006229259 | 8/2006 |
| JP | 2006237264 | 9/2006 |
| JP | 2006237264 A | 9/2006 |
| JP | 2006261688 A | 9/2006 |
| JP | 2006287113 | 10/2006 |
| JP | 2006294907 | 10/2006 |
| JP | 2006303258 | 11/2006 |
| JP | 2007165811 | 6/2007 |
| JP | 2007324220 | 12/2007 |
| JP | 2010510659 | 4/2010 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2010512662 | | 4/2010 |
| JP | 2010534943 | | 11/2010 |
| JP | 2014187397 | | 10/2014 |
| KR | 200403690 | Y1 | 12/2005 |
| KR | 100619441 | B1 | 9/2006 |
| KR | 100626365 | | 9/2006 |
| KR | 100626365 | B1 | 9/2006 |
| KR | 100643582 | B1 | 11/2006 |
| KR | 100715580 | B1 | 5/2007 |
| KR | 100733903 | B1 | 7/2007 |
| KR | 100786798 | B1 | 12/2007 |
| KR | 100796670 | B1 | 1/2008 |
| KR | 100808705 | B1 | 2/2008 |
| KR | 100828174 | B1 | 5/2008 |
| KR | 100840637 | B1 | 6/2008 |
| KR | 20100059820 | | 6/2010 |
| SG | 100618 | A1 | 12/2003 |
| TW | 586096 | B | 5/2004 |
| TW | M293524 | | 7/2006 |
| TW | 200830593 | | 7/2008 |
| TW | 200843144 | | 11/2008 |
| TW | 200924239 | | 6/2009 |
| TW | I460881 | | 11/2014 |
| TW | 201448263 | | 12/2014 |
| WO | 2002090825 | A1 | 11/2002 |
| WO | WO 2002090825 | | 11/2002 |
| WO | WO 2004061969 | | 7/2004 |
| WO | 2005064666 | A1 | 7/2005 |
| WO | WO 2005064666 | | 7/2005 |
| WO | WO 2005083037 | | 9/2005 |
| WO | 2006098545 | A2 | 9/2006 |
| WO | WO 2007036198 | | 4/2007 |
| WO | WO 2007067758 | | 6/2007 |
| WO | WO 2008060586 | | 5/2008 |
| WO | WO 2008060615 | | 5/2008 |
| WO | WO 2008073400 | | 6/2008 |
| WO | WO 2009015386 | | 1/2009 |

OTHER PUBLICATIONS

Jasinski, J. et al., "Microstructure of GaAs/GaN interfaces produced by direct wafer fusion," Appl. Phys. Lett., Oct. 21, 2002, pp. 3152-3154, vol. 81, No. 17.
Kish, F.A. et al., "Very high-efficiency semiconductor wafer-bonded transparent-substrate (AlxGz1-x)0.5In0.5P/GaP light-emitting diodes," Appl. Phys. Lett., 23 May 1994, pp. 2839-2841, vol. 64, No. 21.
Liau, Z.L. et al., "Wafer fusion: A novel technique for optoelectronic device fabrication and monolithic integration," Appl. Phys. Lett., Feb. 19, 1990, pp. 737-739, vol. 56, No. 8.
Murai, A. et al., "Wafer Bonding of GaN and ZnSSe for Optoelectronic Applications," Jpn. J. Appl. Phys., 2004, pp. L1275-L1277, vol. 43, No. 10A.
Nakahara, K. et al., "Improved External Efficiency InGaN-Based Light-Emitting Diodes with Transparent Conductive Ga-Doped Zn0 as p-Electrodes," Jpn. J. Appl. Phys., 2004, pp. L180-L182, vol. 43, No. 2A.
Nakamura, S. et al., "High-Brightness InGaN Blue, Green and Yellow Light-Emitting Diodes with Quantum Well Structures," Jpn. J. Appl. Phys., Jul. 1, 1995, pp. L797-L799, vol. 34, Part 2, No. 7A.
Narukawa, Y. et al., "Ultra-High Efficiency White Light Emitting Diodes," Jpn. J. Appl. Phys., 2006, pp. L1084-L1086, vol. 45, No. 41.
PCT/US2006/023588 International Search Report and Written Opinion dated Jun. 16, 2006.
PCT/US2006/043317 International Search Report and Written Opinion dated Nov. 6, 2006.
PCT/US2007/025278 International Search Report and Written Opinion dated Apr. 3, 2008.
PCT/US2007/024062 International Search Report and Written Opinion dated Apr. 22, 2008.
PCT/US2007/023972 International Search Report and Written Opinion dated May 23, 2008.
PCT/US2008/071362 International Search Report and Written Opinion dated Sep. 22, 2008.
EP 06837048.5 Extended Search Report dated Dec. 1, 2010.
EP 07862038.2 Extended Search Report dated Jan. 6, 2012.
EP 14177879.5 Extended Search Report dated Mar. 27, 2015.
Carlin et al., High Quality AllnN for High Index Contrast Bragg Mirrors Lattice Matched to GaN, Applied Physics Letters, 2003, vol. 83(4).
Kawakami et al., Dimensionality of Excitons in InGaN-Based Light Emitting Devices, Phys, Stat. Sol., (a), 2000, vol. 178, pp. 331-336.
Murai et al., Hexagonal Pyramid shaped light-emitting diodes based on ZnO and GaN direct wafer bonding, Applied Physics Letters, 2006, vol. 89(17) pp. 17116-1-17116-3.
Nishida et al., Efficient and High-Power AIGaN-Based Ultraviolet Light-Emitting Diode Grown on Bulk GaN, Appl. Phys., Lett., 2001, vol. 79(6) pp. 711-712.
Oshima et al., Growth of the 2-in-Size Bulk ZnO Single Crystals by the Hydrothermal Method, J. of Crystal Growth, 2004, vol. 260, pp. 166-170.
Sink et al., Cleaved GaN Facets by Wafer Fusion of GaN to InP, Applied Physics Letter, 1996, vol. 68(15).
Smathers et al., Nanometer Scale Surface Clustering on ZnSe Epilayers, Applied Physics Letters, 1998, vol. 72(10).
Someya et al., High Reflective GaN/AI0.34Ga0.66N Quarter-Wave Reflectors Grown by Metal Organic Chemical Vapor Deposition, Applied Physics Letter, 1998, vol. 73(25).
A.A. Bergh and P.J. Dean. Light-emitting diodes. Clarendon Press—Oxford. 1976.
Adachi S. "Properties of Gallium Arsenide" EMIS Data review Ser. 2 513 INSPEC (IEEE New York 1990).
Fujii, T. et al. Increase in the extraction efficiency of GaN-based light-emitting diodes via surface roughening. Appl. Phys. Lett., Feb. 9, 2004, pp. 855-857, vol. 84, No. 6.
Hoefler G. E., Vanderwater D. A., DeFevere D. C., Kish F. A., Camras M. D., Steranka F M., and Tan I.-H. (1996) "Wafer bonding of 50-mm diameter GaP to AlGaInP—GaP light-emitting diode wafers" Appl. Phys. Lett. 69, 803.
Kish F. A., Steranka F. M., DeFevere D. C., Vanderwater D. A., Park K. G., Kuo C. P., Osentowski T. D., Peanasky M. J., Yu J. G., Fletcher R. M., Steigerwald D. A., Craford M. G., and Robbins V. M. "Very high-efficiency semiconductor wafer-bonded transparent substrate (AlxGa1—x)0.5In0.5P/GaP light-emitting diodes" Appl. Phys. Lett. 64, 2839 (1994).
Kish F. A., Vanderwater D. A., Peanasky M. J., Ludowise M. J., Hummel S. G., and Rosner S. J. "Low-resistance ohmic conduction across compound semiconductor wafer-bonded interfaces" Appl. Phys. Lett. 67, 2060 (1995).
Nakahara, K. et al., "Improved External Efficiency InGaN-Based Light-Emitting Diodes with Transparent Conductive Ga-Doped Zn0 as p-Electrodes," Jpn. J. Appl. Phys., 2004, pp. L180-L182, vol. 43.
Narukawa, Y. et al., "Ultra-High Efficiency White Light Emitting Diodes," Jpn. J. Appl. Phys., 2006, pp. L1084-L1086, vol. 45.
Noctron seeks Chinese partners to make innovative LED products (Aug. 2006)—News—LEDs Magazine.
Orita, S. Tamura, T. Takizawa, T. Ueda, M. Yuri, S. Takigawa, D. Ueda, Jpn. J. Appl. Phys. 43, 5809 (2004).
Tadatomo, H. Okagawa, Y. Ohuchi, T. Tsunekawa, T. Jyouichi, Y. Imada, M. Kato, H. Kudo, T. Taguchi, Phys. Status Solidi A 188, 121-125 (2001).
Yamada, T. Mitani, Y. Narukawa, S. Shioji, I. Niki, S. Sonobe, K. Deguchi, M. Sano, T. Mukai, Jpn. J. Appl. Phys. 41, L1431 (2002).
"Noctron seeks Chinese partners to make innovative LED products," LEDs Magazine, Aug. 2006, https://web.archive.org/web/20061017131530/http://ledsmagazine.com/articles/news/3/8/23/1, pp. 1-2.
Han, D-S., et al., "Improvement of Light Extraction Efficiency of Flip-Chip Light-Emitting Diode by Texturing the Bottom Side Surface of Sapphire Substrate," IEEE Photonics Technology Letters, Jul. 1, 2006, pp. 1406-1408, vol. 18, No. 13.
Schubert, E.F., Light-Emitting Diodes, 2003, p. 149, Cambridge University Press.

(56) **References Cited**

OTHER PUBLICATIONS

Stringfellow, G.B., et al., High Brightness Light Emitting Diodes, Semiconductors and Semimetals, 1997, pp. 176-177, 338-339, vol. 48, Academic Press.
Pankove, J.I., et al., Gallium Nitride (GaN) II, Semiconductors and Semimetals, 1999, p. 339, vol. 57, Academic Press.
Cuong, T. V., et al., "Calculation of the external quantum efficiency of light emitting diodes with different chip designs," Phys. Stat. Sol. (c), 2004, pp. 2433-2437, vol. 1, No. 10.

* cited by examiner




FIG. 1
CONVENTIONAL LED




FIG. 2
CONVENTIONAL LED




FIG. 3
CONVENTIONAL LED


428
424
412
420
402
416
424
400
404
424
422
406
416
408
410
414
424
418
426
418

FIG. 4A


418

FIG. 4B



532
522
514
512
510
506
504
508
500
502
520
518
516
524
530


FIG. 5A



526
528


FIG. 5B



618
614
610
618
606
608
604
614
600
616
602
620
612


FIG. 6



720
712
716
710
706
706
708
716
704
700
718
702
722
714


FIG. 7




FIG. 8A




FIG. 8B




FIG. 9







FIG. 10A

FIG. 10B




FIG. 11




FIG. 12A




FIG. 12B


1328
1322
1314
1318
1306
1324
1310
1300
1304
1326
1302
1308
1312
1312
1320
1316
1330

FIG. 13


1420
1418
1426
1410
1422
1414
1406
1402
1400
1404
1408
1408
1418
1416
1412
1424
1420

FIG. 14




FIG. 15A




FIG. 15B


1626
1606
1622
1630
1614
1618
1610
1600
1604
1602
1622
1608
1612
1612
1628
1616
1620
1624

FIG. 16


1720
1726
1722
1718
1724
1710
1700
1714
1706
1702
1718
1704
1708
1708
1712
1716
1720

FIG. 17




FIG. 18A



FIG. 18B






FIG. 19B

FIG. 19A




FIG. 20B

FIG. 20A




FIG. 21B

FIG. 21A




FIG. 22A




FIG. 22B

# TRANSPARENT LIGHT EMITTING DEVICE WITH LIGHT EMITTING DIODES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 16/569,120, filed on Sep. 12, 2019, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DEVICE WITH LIGHT EMITTING DIODES," which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 16/567,275, filed on Sep. 11, 2019, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "FILAMENT LED LIGHT BULB," which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 16/422,323, filed on May 24, 2019, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES," now U.S. Pat. No. 10,454,010, issued Oct. 22, 2019, which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 16/238,736, filed on Jan. 3, 2019, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES," which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 14/461,151, filed on Aug. 15, 2014, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES," now U.S. Pat. No. 10,217,916, issued Feb. 26, 2019, which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 13/622,884, filed on Sep. 19, 2012, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES," now U.S. Pat. No. 8,835,959, issued Sep. 16, 2014, which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 11/954,154, filed on Dec. 11, 2007, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES," now U.S. Pat. No. 8,294,166, issued Oct. 23, 2012, which application claims the benefit under 35 U.S.C. Section 119(e) of:

U.S. Provisional Patent Application Ser. No. 60/869,447, filed on Dec. 11, 2006, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LEDS";

all of which applications are incorporated by reference herein.

This application is related to the following co-pending and commonly-assigned applications:

U.S. Utility application Ser. No. 10/581,940, filed on Jun. 7, 2006, by Tetsuo Fujii, Yan Gao, Evelyn. L. Hu, and Shuji Nakamura, entitled "HIGHLY EFFICIENT GALLIUM NITRIDE BASED LIGHT EMITTING DIODES VIA SURFACE ROUGHENING," now U.S. Pat. No. 7,704,763, issued Apr. 27, 2010, which application claims the benefit under 35 U.S.C Section 365(c) of PCT Application Serial No. US2003/03921, filed on Dec. 9, 2003, by Tetsuo Fujii, Yan Gao, Evelyn L. Hu, and Shuji Nakamura, entitled "HIGHLY EFFICIENT GALLIUM NITRIDE BASED LIGHT EMITTING DIODES VIA SURFACE ROUGHENING";



U.S. Utility application Ser. No. 11/054,271, filed on Feb. 9, 2005, by Rajat Sharma, P. Morgan Pattison, John F. Kaeding, and Shuji Nakamura, entitled "SEMICONDUCTOR LIGHT EMITTING DEVICE," now U.S. Pat. No. 8,227,820, issued Jul. 24, 2012;

U.S. Utility application Ser. No. 11/175,761, filed on Jul. 6, 2005, by Akihiko Murai, Lee McCarthy, Umesh K. Mishra and Steven P. DenBaars, entitled "METHOD FOR WAFER BONDING (Al, In, Ga)N and Zn(S, Se) FOR OPTOELECTRONICS APPLICATIONS," now U.S. Pat. No. 7,344,958, issued Mar. 18, 2008, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/585,673, filed Jul. 6, 2004, by Akihiko Murai, Lee McCarthy, Umesh K. Mishra and Steven P. DenBaars, entitled "METHOD FOR WAFER BONDING (Al, In, Ga)N and Zn(S, Se) FOR OPTOELECTRONICS APPLICATIONS";

U.S. Utility application Ser. No. 11/697,457, filed Apr. 6, 2007, by, Benjamin A. Haskell, Melvin B. McLaurin, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "GROWTH OF PLANAR REDUCED DISLOCATION DENSITY M-PLANE GALLIUM NITRIDE BY HYDRIDE VAPOR PHASE EPITAXY," now U.S. Pat. No. 7,956,360, issued Jun. 7, 2011, which application is a continuation of U.S. Utility application Ser. No. 11/140,893, filed May 31, 2005, by, Benjamin A. Haskell, Melvin B. McLaurin, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "GROWTH OF PLANAR REDUCED DISLOCATION DENSITY M-PLANE GALLIUM NITRIDE BY HYDRIDE VAPOR PHASE EPITAXY," now U.S. Pat. No. 7,208,393, issued Apr. 24, 2007, which application claims the benefit under 35 U.S.C. Section 119(e) of U.S. Provisional Application Ser. No. 60/576,685, filed Jun. 3, 2004, by Benjamin A. Haskell, Melvin B. McLaurin, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "GROWTH OF PLANAR REDUCED DISLOCATION DENSITY M-PLANE GALLIUM NITRIDE BY HYDRIDE VAPOR PHASE EPITAXY";

U.S. Utility application Ser. No. 11/067,957, filed Feb. 28, 2005, by Claude C. A. Weisbuch, Aurelien J. F. David, James S. Speck and Steven P. DenBaars, entitled "HORIZONTAL EMITTING, VERTICAL EMITTING, BEAM SHAPED, DISTRIBUTED FEEDBACK (DFB) LASERS BY GROWTH OVER A PATTERNED SUBSTRATE," now U.S. Pat. No. 7,723,745, issued May 25, 2010;

U.S. Utility application Ser. No. 11/923,414, filed Oct. 24, 2007, by Claude C. A. Weisbuch, Aurelien J. F. David, James S. Speck and Steven P. DenBaars, entitled "SINGLE OR MULTI-COLOR HIGH EFFICIENCY LIGHT EMITTING DIODE (LED) BY GROWTH OVER A PATTERNED SUBSTRATE," now U.S. Pat. No. 7,755,096, issued Jul. 13, 2010, which application is a continuation of U.S. Pat. No. 7,291,864, issued Nov. 6, 2007, to Claude C. A. Weisbuch, Aurelien J. F. David, James S. Speck and Steven P. DenBaars, entitled "SINGLE OR MULTI-COLOR HIGH EFFICIENCY LIGHT EMITTING DIODE (LED) BY GROWTH OVER A PATTERNED SUBSTRATE," now U.S. Pat. No. 7,291,864, issued Nov. 6, 2007;

U.S. Utility application Ser. No. 11/067,956, filed Feb. 28, 2005, by Aurelien J. F. David, Claude C. A Weisbuch and Steven P. DenBaars, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED) WITH OPTIMIZED PHOTONIC CRYSTAL EXTRACTOR," now U.S. Pat. No. 7,582,910, issued Sep. 1, 2009;

U.S. Utility application Ser. No. 11/621,482, filed Jan. 9, 2007, by Troy J. Baker, Benjamin A. Haskell, Paul T. Fini, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH OF PLANAR SEMI-POLAR GALLIUM NITRIDE," now U.S. Pat. No. 7,704,331, issued Apr. 27, 2010, which application is a continuation of U.S. Utility application Ser. No. 11/372,914, filed Mar. 10, 2006, by Troy J. Baker, Benjamin A. Haskell, Paul T. Fini, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH OF PLANAR SEMI-POLAR GALLIUM NITRIDE," now U.S. Pat. No. 7,220,324, issued May 22, 2007, which application claims the benefit under 35 U.S.C. Section 119(e) of U.S. Provisional Application Ser. No. 60/660,283, filed Mar. 10, 2005, by Troy J. Baker, Benjamin A. Haskell, Paul T. Fini, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH OF PLANAR SEMI-POLAR GALLIUM NITRIDE";

U.S. Utility application Ser. No. 11/403,624, filed Apr. 13, 2006, by James S. Speck, Troy J. Baker and Benjamin A. Haskell, entitled "WAFER SEPARATION TECHNIQUE FOR THE FABRICATION OF FREE-STANDING (AL, IN, GA)N WAFERS," which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/670,810, filed Apr. 13, 2005, by James S. Speck, Troy J. Baker and Benjamin A. Haskell, entitled "WAFER SEPARATION TECHNIQUE FOR THE FABRICATION OF FREE-STANDING (AL, IN, GA)N WAFERS";

U.S. Utility application Ser. No. 11/403,288, filed Apr. 13, 2006, by James S. Speck, Benjamin A. Haskell, P. Morgan Pattison and Troy J. Baker, entitled "ETCHING TECHNIQUE FOR THE FABRICATION OF THIN (AL, IN, GA)N LAYERS," now U.S. Pat. No. 7,795,146, issued Sep. 14, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/670,790, filed Apr. 13, 2005, by James S. Speck, Benjamin A. Haskell, P. Morgan Pattison and Troy J. Baker, entitled "ETCHING TECHNIQUE FOR THE FABRICATION OF THIN (AL, IN, GA)N LAYERS";

U.S. Utility application Ser. No. 11/454,691, filed on Jun. 16, 2006, by Akihiko Murai, Christina Ye Chen, Daniel B. Thompson, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al,Ga,In)N AND ZnO DIRECT WAFER BONDING STRUCTURE FOR OPTOELECTRONIC APPLICATIONS AND ITS FABRICATION METHOD," now U.S. Pat. No. 7,719,020, issued May 18, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/691,710, filed on Jun. 17, 2005, by Akihiko Murai, Christina Ye Chen, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al, Ga, In)N AND ZnO DIRECT WAFER BONDING STRUCTURE FOR OPTOELECTRONIC APPLICATIONS, AND ITS FABRICATION METHOD," U.S. Provisional Application Ser. No. 60/732,319, filed on Nov. 1, 2005, by Akihiko Murai, Christina Ye Chen, Daniel B. Thompson, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al, Ga, In)N AND ZnO DIRECT WAFER BONDED STRUCTURE FOR OPTOELECTRONIC APPLICATIONS, AND ITS FABRICATION METHOD," and U.S. Provisional Application Ser. No. 60/764,881, filed on Feb. 3, 2006, by Akihiko Murai, Christina Ye Chen, Daniel B. Thompson, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al,Ga,In)N AND ZnO DIRECT WAFER BONDED STRUCTURE FOR OPTOELECTRONIC APPLICATIONS AND ITS FABRICATION METHOD";



U.S. Utility application Ser. No. 11/444,084, filed May 31, 2006, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "DEFECT REDUCTION OF NON-POLAR GALLIUM NITRIDE WITH SINGLE-STEP SIDEWALL LATERAL EPITAXIAL OVERGROWTH," now U.S. Pat. No. 7,361,576, issued Apr. 22, 2008, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/685,952, filed on May 31, 2005, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "DEFECT REDUCTION OF NON-POLAR GALLIUM NITRIDE WITH SINGLE-STEP SIDEWALL LATERAL EPITAXIAL OVERGROWTH";

U.S. Utility application Ser. No. 11/870,115, filed Oct. 10, 2007, by Bilge M, Imer, James S. Speck, Steven P. DenBaars and Shuji Nakamura, entitled "GROWTH OF PLANAR NON-POLAR M-PLANE III-NITRIDE USING METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD)," now U.S. Pat. No. 8,097,481, issued Jan. 17, 2012, which application is a continuation of U.S. Utility application Ser. No. 11/444,946, filed May 31, 2006, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "GROWTH OF PLANAR NON-POLAR {1-100} M-PLANE GALLIUM NITRIDE WITH METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD)," now U.S. Pat. No. 7,338,828, issued Mar. 4, 2008, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/685,908, filed on May 31, 2005, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "GROWTH OF PLANAR NON-POLAR {1-100} M-PLANE GALLIUM NITRIDE WITH METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD)";

U.S. Utility application Ser. No. 11/444,946, filed Jun. 1, 2006, by Robert M. Farrell, Troy J. Baker, Arpan Chakraborty, Benjamin A. Haskell, P. Morgan Pattison, Rajat Sharma, Umesh K. Mishra, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH AND FABRICATION OF SEMIPOLAR (Ga, Al, In, B)N THIN FILMS, HETEROSTRUCTURES, AND DEVICES," now U.S. Pat. No. 7,846,757, issued Dec. 7, 2010, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/686,244, filed on Jun. 1, 2005, by Robert M. Farrell, Troy J. Baker, Arpan Chakraborty, Benjamin A. Haskell, P. Morgan Pattison, Rajat Sharma, Umesh K. Mishra, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH AND FABRICATION OF SEMIPOLAR (Ga, Al, In, B)N THIN FILMS, HETERO STRUCTURES, AND DEVICES";

U.S. Utility application Ser. No. 11/251,365 filed Oct. 14, 2005, by Frederic S. Diana, Aurelien J. F. David, Pierre M. Petroff, and Claude C. A. Weisbuch, entitled "PHOTONIC STRUCTURES FOR EFFICIENT LIGHT EXTRACTION AND CONVERSION IN MULTI-COLOR LIGHT EMITTING DEVICES," now U.S. Pat. No. 7,768,023, issued Aug. 3, 2010;

U.S. Utility application Ser. No. 11/633,148, filed Dec. 4, 2006, Claude C. A. Weisbuch and Shuji Nakamura, entitled "IMPROVED HORIZONTAL EMITTING, VERTICAL EMITTING, BEAM SHAPED, DISTRIBUTED FEEDBACK (DFB) LASERS FABRICATED BY GROWTH OVER A PATTERNED SUBSTRATE WITH MULTIPLE OVERGROWTH," now U.S. Pat. No. 7,768,024, issued Aug. 3, 2010, which application claims the benefit under 35

U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/741,935, filed Dec. 2, 2005, Claude C. A. Weisbuch and Shuji Nakamura, entitled "IMPROVED HORIZONTAL EMITTING, VERTICAL EMITTING, BEAM SHAPED, DFB LASERS FABRICATED BY GROWTH OVER PATTERNED SUBSTRATE WITH MULTIPLE OVERGROWTH";

U.S. Utility application Ser. No. 11/517,797, filed Sep. 8, 2006, by Michael Iza, Troy J. Baker, Benjamin A. Haskell, Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR ENHANCING GROWTH OF SEMIPOLAR (Al, In, Ga, B)N VIA METALORGANIC CHEMICAL VAPOR DEPOSITION," now U.S. Pat. No. 7,575,947, issued Aug. 18, 2009, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/715,491, filed on Sep. 9, 2005, by Michael Iza, Troy J. Baker, Benjamin A. Haskell, Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR ENHANCING GROWTH OF SEMIPOLAR (Al, In, Ga, B)N VIA METALORGANIC CHEMICAL VAPOR DEPOSITION";

U.S. Utility application Ser. No. 11/593,268, filed on Nov. 6, 2006, by Steven P. DenBaars, Shuji Nakamura, Hisashi Masui, Natalie N. Fellows, and Akihiko Murai, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED)," now U.S. Pat. No. 7,994,527, issued Aug. 9, 2011, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/734,040, filed on Nov. 4, 2005, by Steven P. DenBaars, Shuji Nakamura, Hisashi Masui, Natalie N. Fellows, and Akihiko Murai, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED)";

U.S. Utility application Ser. No. 11/608,439, filed on Dec. 8, 2006, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED)," now U.S. Pat. No. 7,956,371, issued Jun. 7, 2011, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/748,480, filed on Dec. 8, 2005, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED)," and U.S. Provisional Application Ser. No. 60/764,975, filed on Feb. 3, 2006, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED)";

U.S. Utility application Ser. No. 11/676,999, filed on Feb. 20, 2007, by Hong Zhong, John F. Kaeding, Rajat Sharma, James S. Speck, Steven P. DenBaars and Shuji Nakamura, entitled "METHOD FOR GROWTH OF SEMIPOLAR (Al, In,Ga,B)N OPTOELECTRONIC DEVICES," now U.S. Pat. No. 7,858,996, issued Dec. 28, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/774,467, filed on Feb. 17, 2006, by Hong Zhong, John F. Kaeding, Rajat Sharma, James S. Speck, Steven P. DenBaars and Shuji Nakamura, entitled "METHOD FOR GROWTH OF SEMIPOLAR (Al, In,Ga,B)N OPTOELECTRONIC DEVICES";

U.S. Utility patent application Ser. No. 11/840,057, filed on Aug. 16, 2007, by Michael Iza, Hitoshi Sato, Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR DEPOSITION OF MAGNESIUM DOPED (Al, In, Ga, B)N LAYERS," now U.S. Pat. No. 7,755,172, issued Jul. 13, 2010, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/822,600, filed on Aug. 16, 2006, by Michael Iza, Hitoshi Sato, Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR DEPOSITION OF MAGNESIUM DOPED (Al, In, Ga, B)N LAYERS";



U.S. Utility patent application Ser. No. 11/940,848, filed on Nov. 15, 2007, by Aurelien J. F. David, Claude C. A. Weisbuch and Steven P. DenBaars entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) THROUGH MULTIPLE EXTRACTORS," which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,014, filed on Nov. 15, 2006, by Aurelien J. F. David, Claude C. A. Weisbuch and Steven P. DenBaars entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) THROUGH MULTIPLE EXTRACTORS," and U.S. Provisional Patent Application Ser. No. 60/883,977, filed on Jan. 8, 2007, by Aurelien J. F. David, Claude C. A. Weisbuch and Steven P. DenBaars entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) THROUGH MULTIPLE EXTRACTORS";

U.S. Utility patent application Ser. No. 11/940,853, filed on Nov. 15, 2007, by Claude C. A. Weisbuch, James S. Speck and Steven P. DenBaars entitled "HIGH EFFICIENCY WHITE, SINGLE OR MULTI-COLOUR LIGHT EMITTING DIODES (LEDS) BY INDEX MATCHING STRUCTURES," which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,026, filed on Nov. 15, 2006, by Claude C. A. Weisbuch, James S. Speck and Steven P. DenBaars entitled "HIGH EFFICIENCY WHITE, SINGLE OR MULTI-COLOUR LED BY INDEX MATCHING STRUCTURES";

U.S. Utility patent application Ser. No. 11/940,866, filed on Nov. 15, 2007, by Aurelien J. F. David, Claude C. A. Weisbuch, Steven P. DenBaars and Stacia Keller, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) WITH EMITTERS WITHIN STRUCTURED MATERIALS," now U.S. Pat. No. 7,977,694, issued Jul. 12, 2011, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,015, filed on Nov. 15, 2006, by Aurelien J. F. David, Claude C. A. Weisbuch, Steven P. DenBaars and Stacia Keller, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LED WITH EMITTERS WITHIN STRUCTURED MATERIALS";

U.S. Utility patent application Ser. No. 11/940,876, filed on Nov. 15, 2007, by Evelyn L. Hu, Shuji Nakamura, Yong Seok Choi, Rajat Sharma and Chiou-Fu Wang, entitled "ION BEAM TREATMENT FOR THE STRUCTURAL INTEGRITY OF AIR-GAP III-NITRIDE DEVICES PRODUCED BY PHOTOELECTROCHEMICAL (PEC) ETCHING," which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,027, filed on Nov. 15, 2006, by Evelyn L. Hu, Shuji Nakamura, Yong Seok Choi, Rajat Sharma and Chiou-Fu Wang, entitled "ION BEAM TREATMENT FOR THE STRUCTURAL INTEGRITY OF AIR-GAP III-NITRIDE DEVICES PRODUCED BY PHOTOELECTROCHEMICAL (PEC) ETCHING";

U.S. Utility patent application Ser. No. 11/940,885, filed on Nov. 15, 2007, by Natalie N. Fellows, Steven P. DenBaars and Shuji Nakamura, entitled "TEXTURED PHOSPHOR CONVERSION LAYER LIGHT EMITTING DIODE," now U.S. Pat. No. 8,860,051, issued Oct. 14, 2014, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,024, filed on Nov. 15, 2006, by Natalie N. Fellows, Steven P. DenBaars and Shuji Nakamura, entitled

"TEXTURED PHOSPHOR CONVERSION LAYER LIGHT EMITTING DIODE";

U.S. Utility patent application Ser. No. 11/940,872, filed on Nov. 15, 2007, by Steven P. DenBaars, Shuji Nakamura and Hisashi Masui, entitled "HIGH LIGHT EXTRACTION EFFICIENCY SPHERE LED," which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,025, filed on Nov. 15, 2006, by Steven P. DenBaars, Shuji Nakamura and Hisashi Masui, entitled "HIGH LIGHT EXTRACTION EFFICIENCY SPHERE LED";

U.S. Utility patent application Ser. No. 11/940,883, filed on Nov. 15, 2007, by Shuji Nakamura and Steven P. DenBaars, entitled "STANDING TRANSPARENT MIRROR-LESS LIGHT EMITTING DIODE," now U.S. Pat. No. 7,687,813, issued Mar. 30, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,017, filed on Nov. 15, 2006, by Shuji Nakamura and Steven P. DenBaars, entitled "STANDING TRANSPARENT MIRROR-LESS (STML) LIGHT EMITTING DIODE";

U.S. Utility patent application Ser. No. 11/940,898, filed on Nov. 15, 2007, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "TRANSPARENT MIRROR-LESS LIGHT EMITTING DIODE," now U.S. Pat. No. 7,781,789, issued Aug. 24, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,023, filed on Nov. 15, 2006, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "TRANSPARENT MIRROR-LESS (TML) LIGHT EMITTING DIODE";

U.S. Utility patent application Ser. No. 11/954,163, filed on Dec. 11, 2007, by Steven P. DenBaars and Shuji Nakamura, entitled "LEAD FRAME FOR TRANSPARENT MIRRORLESS LIGHT EMITTING DIODE," which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,454, filed on Dec. 11, 2006, by Steven P. DenBaars and Shuji Nakamura, entitled "LEAD FRAME FOR TM-LED";

U.S. Utility patent application Ser. No. 12/001,286, filed on Dec. 11, 2007, by Mathew C. Schmidt, Kwang Choong Kim, Hitoshi Sato, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD) GROWTH OF HIGH PERFORMANCE NON-POLAR III-NITRIDE OPTICAL DEVICES," now U.S. Pat. No. 7,842,527, issued Nov. 30, 2010, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,535, filed on Dec. 11, 2006, by Mathew C. Schmidt, Kwang Choong Kim, Hitoshi Sato, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "MOCVD GROWTH OF HIGH PERFORMANCE M-PLANE GAN OPTICAL DEVICES";

U.S. Utility patent application Ser. No. 12/001,227, filed on Dec. 11, 2007, by Steven P. DenBaars, Mathew C. Schmidt, Kwang Choong Kim, James S. Speck, and Shuji Nakamura, entitled, "NON-POLAR AND SEMI-POLAR EMITTING DEVICES," now U.S. Pat. No. 9,130,119, issued Sep. 8, 2015, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,540, filed on Dec. 11, 2006, by Steven P. DenBaars, Mathew C. Schmidt, Kwang Choong Kim, James S. Speck, and Shuji Nakamura, entitled, "NON-POLAR (M-PLANE) AND SEMI-POLAR EMITTING DEVICES"; and

U.S. Utility patent application Ser. No. 11/954,172, filed on Dec. 11, 2007, by Kwang Choong Kim, Mathew C. Schmidt, Feng Wu, Asako Hirai, Melvin B. McLaurin, Steven P. DenBaars, Shuji Nakamura, and James S. Speck, entitled, "CRYSTAL GROWTH OF M-PLANE AND SEMIPOLAR PLANES OF (AL, IN, GA, B)N ON VARIOUS SUBSTRATES," which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,701, filed on Dec. 12, 2006, by Kwang Choong Kim, Mathew C. Schmidt, Feng Wu, Asako Hirai, Melvin B. McLaurin, Steven P. DenBaars, Shuji Nakamura, and James S. Speck, entitled, "CRYSTAL GROWTH OF M-PLANE AND SEMIPOLAR PLANES OF (AL, IN, GA, B)N ON VARIOUS SUBSTRATES";

all of which applications are incorporated by reference herein.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention is related to light extraction from light emitting diodes (LEDs).

### 2. Description of the Related Art

(Note: This application references a number of different publications as indicated throughout the specification. In addition, a list of a number of different publications can be found below in the section entitled "References." Each of these publications is incorporated by reference herein.)

In order to increase the light output power from the front side of a light emitting diode (LED), the emitted light is reflected by a mirror placed on the backside of the substrate or is reflected by a mirror coating on the lead frame, even if there are no mirrors on the backside of the substrate, if the bonding material is transparent on the emission wavelength. However, this reflected light is re-absorbed by the emitting layer (active layer), because the photon energy is almost same as the band-gap energy of the light emitting species, such as AlInGaN multiple quantum wells (MQWs). The efficiency or output power of the LEDs is decreased due to this re-absorption of the light by the emitting layer. See, for example, FIGS. **1**, **2** and **3**, which are described in more detail below. See also Jpn. J. Appl. Phys., 34, L797-99 (1995) and Jpn. J. Appl. Phys., 43, L180-82 (2004).

What is needed in the art are LED structures that more effectively extract light. The present invention satisfies that need.

## SUMMARY OF THE INVENTION

The present invention describes a transparent light emitting diode. Generally, the present invention describes a light emitting device comprised of a plurality of III-nitride layers, including an active region that emits light, wherein all of the layers except for the active region are transparent for an emission wavelength of the light, such that the light is extracted effectively through all of the layers and in multiple directions through the layers. Moreover, the surface of one or more of the III-nitride layers may be roughened, textured, patterned or shaped to enhance light extraction.

In one embodiment, the III-nitride layers reside on a transparent substrate or sub-mount, wherein the III-nitride layers are wafer bonded with the transparent substrate or sub-mount using a transparent glue, a transparent epoxy, or other transparent material, and light is extracted through the transparent substrate or sub-mount. The transparent sub-

strate or sub-mount are electrically conductive, as is the transparent glue, transparent epoxy, or other transparent material.

A lead frame supports the III-nitride layers (as well as the transparent substrate or sub-mount), which reside on a transparent plate in the lead frame. Thus, the light emitted from the III-nitride layers is transmitted through the transparent plate in the lead frame.

Moreover, the device may include one or more transparent conducting layers that are positioned to electrically connect the III-nitride layers, and one or more current spreading layers that are deposited on the III-nitride layers, wherein the transparent conducting layers are deposited on the current spreading layers. Mirrors or mirrored surfaces are eliminated from the device to minimize internal reflections in order to minimize re-absorption of the light by the active region.

In another embodiment, the III-nitride layers are embedded in or combined with a shaped optical element, and the light is extracted from more than one surface of the III-nitride layers before entering the shaped optical element and subsequently being extracted. Specifically, at least a portion of the light entering the shaped optical element lies within a critical angle and is extracted. Moreover, one or more surfaces of the shaped optical element may be roughened, textured, patterned or shaped to enhance light extraction. Further, the shaped optical element may include a phosphor layer, which may be roughened, textured, patterned or shaped to enhance light extraction. The shaped optical element may be an inverted cone shape, wherein the III-nitride layers are positioned within the inverted cone shape such that the light is reflected by sidewalls of the inverted cone shape.

In yet another embodiment, an insulating layer covering the III-nitride layers is partially removed, and a conductive layer is deposited within a hole or depression in the surface of the insulating layer to make electrical contact with the III-nitride layers.

## BRIEF DESCRIPTION OF THE DRAWINGS

Referring now to the drawings in which like reference numbers represent corresponding parts throughout:

FIGS. **1**, **2** and **3** are cross-sectional schematic illustrations of conventional LEDs.

FIGS. **4**A and **4**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **5**A and **5**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **6** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **7** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **8**A and **8**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **9** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **10**A and **10**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **11** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **12**A and **12**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **13** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **14** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **15**A and **15**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **16** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **17** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **18**A and **18**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **19**A and **19**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **20**A and **20**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **21**A and **21**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **22**A and **22**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

In the following description of the preferred embodiment, reference is made to the accompanying drawings which form a part hereof, and in which is shown by way of illustration a specific embodiment in which the invention may be practiced. It is to be understood that other embodiments may be utilized and structural changes may be made without departing from the scope of the present invention.

### Overview

In the following description of the figures, the details of the LED structures are not shown. Only the emitting layer (usually AlInGaN MQW), p-type GaN layer, n-type GaN layer and sapphire substrate are shown. Of course, there may be other layers in the LED structure, such as a p-AlGaN electron blocking layer, InGaN/GaN super lattices and others. In this invention, the most important aspects are the surfaces of the LED structure, because the light extraction efficiency is determined mainly by the surface layer or condition of the epitaxial wafers. Consequently, only some aspects (the surface layers) of the LED are shown in all of the figures.

### Conventional LED Structures

FIGS. **1**, **2** and **3** are schematic illustrations of conventional LEDs.

In conventional LEDs, in order to increase the light output power from the front side of the LED, the emitting light is reflected by the mirror on the backside of the sapphire substrate or the mirror coating on the lead frame even if

there is no mirrors on the backside of the sapphire substrate and if the bonding material is transparent on the emission wavelength. This reflected light is re-absorbed by the emitting layer (active layer) because the photon energy is almost same as the band-gap energy of the quantum well of AlInGaN multi-quantum well (MQW). Then, the efficiency or output power of the LEDs is decreased due to the re-absorption by the emitting layer.

In FIG. **1**, a conventional LED includes a sapphire substrate **100**, emitting layer **102** (active layer), and semi-transparent or transparent electrodes **104**, such as ITO or ZnO. The LED is die-bonded on a lead frame **106** with a clear epoxy molding **108** without any mirror on the back side of the sapphire substrate **100**. In this case, the coating material on the lead frame **106**, or the surface of the lead frame **106**, becomes a mirror **110**. If there is a mirror **110** on the back side of the substrate **100**, the LED chip is die-bonded using an Ag paste. The active layer **102** emits light **112** towards the substrate **100** and emits light **114** towards the electrodes **104**. The emitting light **112** is reflected by the mirror **110** towards the electrode **104**, becoming reflected light **116** which is transmitted by the electrode **104** to escape the LED. The LED is wire bonded **118** to the lead frame **106**.

In FIG. **2**, the conventional LED is similar to that shown in FIG. **1**, except that it is a flip-chip LED. The LED includes a sapphire substrate **200** and emitting layer **202** (active layer), and a highly reflective mirror **204**. The LED is die-bonded **206** onto a lead frame **208** and embedded in a clear epoxy molding **210**. The active layer **202** emits light **212** towards the substrate **200** and emits light **214** towards the highly reflective mirror **204**. The emitting light **214** is reflected by the mirror **204** towards the substrate **200**, becoming reflected light **216** which is transmitted by the substrate **200** to escape the LED.

In FIG. **3**, the conventional LED includes a conducting sub-mount **300**, high reflectivity mirror **302** (with Ag>94% reflectivity (R)), a transparent ITO layer **304**, a p-GaN layer **306**, an emitting or active layer **308**, and an n-GaN layer **310**. The LED is shown without the epoxy molding, although similar molding may be used. The emitting layer **308** emits LED emissions **312** towards the mirror **302** and emits LED emissions **314** towards the n-GaN layer **310**. The emission **312** of the emitting layer **308** is reflected by the mirror **302**, where the reflective light emissions **316** are re-absorbed by the emitting layer **308**. The efficiency of the LED is decreased due to this re-absorption. The n-GaN layer may be roughened **317** to enhance extraction **318** of LED emissions **314**.

Improved LED Structures

The present invention describes a transparent LED. Generally, the present invention describes a light emitting device comprised of a plurality of III-nitride layers, including an active region that emits light, wherein all of the layers except for the active region are transparent for an emission wavelength of the light, such that the light is extracted effectively through all of the layers and in multiple directions through the layers. The surface of one or more of the III-nitride layers may be roughened, textured, patterned or shaped to enhance light extraction.

FIG. **4**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **400**, an n-type GaN layer **402**, a p-type GaN layer **404**, a first ITO layer **406**, a second ITO layer **408**, and a glass layer **410**. The n-type GaN layer **402** may have surface **412** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface), and the glass layer **410** may have a surface **414** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface). The LED is wire bonded **416** to a lead frame **418** via bonding pads **420**, **422**. FIG. **4**B shows a top view of the lead frame **418**.

In FIG. **4**A, the LED structure is grown on a sapphire substrate, which is removed using a laser de-bonding technique. Thereafter, the first ITO layer **406** is deposited on the p-type GaN layer **404**. The LED structure is then attached to the glass layer **410**, which is coated by the second ITO layer **408**, using an epoxy as a glue. The LED structure is then wire bonded **416** to the lead frame **418**.

In FIG. **4**A, there are no intentional mirrors at the front or back sides of the LED. Instead, the lead frame **418** is designed to effectively extract light **424** from both sides of the LED, because the frame **418** does not obstruct the surfaces **412** and **414**, i.e., the back side **426** of the LED as well as the front side **428** of the LED. FIG. **4**B shows that the frame **418** supports the LED at the edges of the glass layer **410**, leaving the emitting surface of the glass layer **410** and LED unobstructed.

An ohmic contact may be placed below the bonding pad **420** on the n-GaN layer **402**, but is not shown in the figure for simplicity.

FIG. **5**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN multiple quantum well (MQW) layer as an emitting layer **500**, an n-type GaN layer **502**, a p-type GaN layer **504**, an ITO or ZnO layer **506**, a transparent insulating layer **508**, and transparent conductive glue **510** for bonding the ITO or ZnO layer **506** to a transparent conductive substrate **512**. The transparent conductive substrate **512** may have a surface **514** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface), and the n-GaN layer **504** may have a surface **516** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface). Preferably, the layers **500**, **502**, **504** and **506** have a combined thickness **518** of approximately 5 microns, and the substrate **512** and glue **510** have a combined thickness **520** of approximately 400 microns. Finally, ohmic electrode/bonding pads **522**, **524** are placed on the LED.

The LED structure may be grown on a sapphire substrate, which is removed using a laser de-bonding technique. The ITO layer **506** is then deposited on the p-type GaN layer **504**. Before deposition of the ITO layer **506**, the insulating layer **508**, which may comprise $SiO_2$ or SiN, is deposited as a current spreading layer. Without the current spreading layer **508**, the emission intensity of the LED becomes small due to non-uniform current flows. The transparent conductive substrate **512**, which may be ZnO, $Ga_2O_3$, or another material that is transparent at the desired wavelengths, is wafer bonded or glued to the ITO layer **506** using the transparent conductive glue **510**. Then, an n-GaN ohmic electrode/bonding pad **522** and an p-GaN ohmic electrode/bonding pad **524** are formed on both sides of the LED structure. Finally, the nitrogen-face (N-face) of the n-type GaN layer **502** is roughened, textured, patterned or shaped **516** to enhance light extraction, for example, using a wet etching, such as KOH or HCL, to form a cone-shaped surface **516**.

FIG. **5**B is a plan view of the LED of FIG. **5**A, and shows the LED placed on a transparent plate **526**, which resides on a lead frame **528**, both of which work to remove heat from the LED. The p-side of the LED (i.e., the side with the substrate **512**) is attached to the transparent plate **526**. Wire bonding is performed between the bonding pad **524** of the n-type GaN layer **502** and the lead frame **528**.

There are no intentional mirrors at the front **530** or back sides **532** of the LED. Instead, the lead frame **528** is designed to effectively extract light from both sides of the LED, i.e., the back side **532** of the LED as well as the front side **530** of the LED.

Finally, an ohmic contact may be placed below the bonding pad **524** of the n-GaN layer **502**. However, this ohmic contact is not shown in the figure for simplicity.

FIG. **6** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW active layer **600**, an n-GaN layer **602**, a p-GaN layer **604**, an epoxy layer **606** (which is approximately 400 microns thick **608**), a bonding pad **610**, an ohmic electrode/bonding pad **612**, and an ITO or ZnO layer **614**. The combined thickness **616** of the n-GaN layer **602**, active layer **600** and p-GaN layer **604** is approximately 5 microns.

FIG. **7** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW active layer **700**, an n-GaN layer **702**, a p-GaN layer **704**, an epoxy layer **706** (approximately 400 microns thick **708**), a narrow stripe Au connection **710**, a bonding pad **712**, an ohmic electrode/bonding pad **714**, and ITO or ZnO **716**. The thickness **718** of the n-GaN **702**, active layer **700** and p-GaN layer **704** is approximately 5 microns.

In both FIGS. **6** and **7**, a thick epoxy layer **606**, **706** is used, rather than the glass layer **410** shown in FIG. **4**. To make electrical contact, the epoxy insulating layers **606**, **706** are partially removed, and the ITO layer **614**, which is a transparent metal oxide, or a narrow stripe of Au or other metal layer **710**, are deposited on the epoxy layers **606**, **706**, as well as within a hole or depression **618**, **720** in the surface of the epoxy layers **606**, **706**, to make electrical; contact with the p-GaN layer **604**, **704**.

In addition, both FIGS. **6** and **7** show that roughened, textured, patterned or shaped surfaces **620**, **722** are formed on the nitrogen face (N-face) of the n-type GaN layers **602**, **702**. These roughened, textured, patterned or shaped surfaces **620**, **722** enhance light extraction.

Note that, if a GaN substrate is used instead of a sapphire substrate, laser de-bonding would not be required and, a result, the sub-mounts **606**, **706** would not be required. Moreover, if the LED structure is created on a GaN substrate, the ITO layer **614** would be deposited on the p-type GaN layer **604** and the backside of the GaN substrate, which is an N-face GaN, could be etched using a wet etching, such as KOH and HCL in order to form surfaces **620**, **722** that are roughened, textured, patterned or shaped on the n-type GaN layers **602**, **702**.

Note also that, if the surface of the ITO layer **614** is roughened, textured, patterned or shaped, light extraction is increased through the ITO layer **614**. Even without the ITO layer **614** on the p-type GaN layer **604**, the roughening, texturing, patterning or shaping of the surface of the p-type GaN layer **604** is effective to increase the light extraction through the p-type GaN layer **604**.

Finally, an ohmic contact for the n-type GaN layer **612**, and the ITO or ZnO layer **614** may be used after the surface **620** roughening, texturing, patterning or shaping of the n-type GaN layer **602**. The ITO or ZnO layer **614** has a similar refractive index as GaN and, as a result, the light reflection at the interface between the ITO, ZnO and GaN is minimized.

FIG. **8**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **800**, an n-type GaN layer **802**, a p-type GaN layer **804**, a first ITO layer **806**, a second ITO layer **808**, and a glass layer **810**. The n-type GaN layer **802** has a surface **812** that is roughened, textured, patterned or shaped (e.g., a cone shape surface), and the glass layer **810** has a surface **814** that is roughened, textured, patterned or shaped (e.g., a cone shape surface). The LED is wire bonded **816** to a lead frame or sub-mount **818** using the bonding pads **820**, **822**.

The LED may be embedded with or contained in a molding or shaped optical element **824**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **824** may include a phosphor layer **826**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **824**. In this embodiment, the emitting layer **800** emits light **828** towards the surfaces **812** and **814**, where the light can be extracted **830**.

In this embodiment, because the shaped optical element **824** is a sphere, the LED structure can be considered a small spot light source, because the direction of all of the light emitted from the LED is substantially normal to the interface between air and the sphere **824**, and the light therefrom is effectively extracted to air through the interface between air and the sphere **824**.

In addition, if the phosphor layer **826** is placed on or near the outer surface of the shaped optical element, the conversion efficiency, for example, from blue light to white light, is increased due to reduced re-absorption of the light **828** resulting from reduced back scattering of the light **828** by the phosphor layer **826**. Moreover, if the surface **834** of the phosphor layer **826** is roughened, textured, patterned or shaped, light extraction is again increased.

Finally, FIG. **8**B is a top view of the device in FIG. **8**A, illustrating the lead frame **818**.

FIG. **9** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW emitting layer **900**, an n-type GaN layer **902**, a p-type GaN layer **904**, an ITO layer **906** having a surface **908** that is roughened, textured, patterned or shaped, a bonding pad **910**, an ohmic contact/bonding pad **912**, a surface **914** of the n-type GaN layer **902** that is roughened, textured, patterned or shaped, and an epoxy layer **916** that is deposited on the **908**. The LED may be embedded with or contained in a molding or shaped optical element **918**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **918** may include a phosphor layer **920**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **918**.

In FIG. **9**, the ITO or ZnO layer **906** is roughened, textured, patterned or shaped to improve light extraction through the ITO or ZnO layer **906**. In addition, the epoxy **918** is sub-mounted. Otherwise, the structure of FIG. **9** is the same as that shown in FIGS. **6**-**8**.

FIG. **10**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW emitting layer **1000**, an n-type GaN layer **1002**, a p-type GaN layer **1004**, an ITO layer **1006**, a bonding pad **1008**, an ohmic contact/bonding pad **1010**, a surface **1012** of the ITO layer **1006** that is roughened, textured, patterned or shaped, a surface **1014** of the

n-type GaN layer **1002** that is roughened, textured, patterned or shaped, and an epoxy layer **1016** that is deposited on the surface **1012**.

The LED may be embedded with or contained in a molding or shaped optical element **1018**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **1018** may include a phosphor layer **1020**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **1018**.

The LED may also include a current spreading layer **1022**, which may comprise SiN, $SiO_2$, or some other insulating material, for example, is deposited before the ITO or ZnO layer **1006** to flow the current uniformly through the p-type GaN layer **1004**.

Finally, the LED is wire bonded **1024** to a lead frame **1026**. FIG. **10**B shows a top view of the lead frame **1026**.

FIG. **11** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW emitting layer **1100**, an n-type GaN layer **1102**, a p-type GaN layer **1104**, an ITO layer **1106**, a bonding pad **1108**, an ohmic contact/bonding pad **1110**, a surface **1112** of the ITO layer **1106** that is roughened, textured, patterned or shaped, a surface **1114** of the p-type GaN layer **1102** that is roughened, textured, patterned or shaped, and an epoxy layer **1116** that is deposited on the surface **1112**.

The LED may be embedded with or contained in a molding or shaped optical element **1118**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **1118** may include a phosphor layer **1120**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **1118**.

The LED may also include a current spreading layer **1122**, which may comprise SiN, $SiO_2$, or some other insulating material, for example, that is deposited before the ITO or ZnO layer **1106** to flow the current uniformly through the p-type GaN layer **1104**.

Finally, the LED is wire bonded **1124** to a lead frame **1126**. FIG. **11**B shows a top view of the lead frame **1126**.

In the embodiment of FIG. **11**, a mirror **1128** is placed outside of the shaped optical element **1118**, in order to obtain more light from a front side **1130** of the device. The shape of the mirror is designed to prevent reflected light from reaching the LED, in order to reduce re-absorption of the light by the LED.

FIG. **12**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **1200**, an n-type GaN layer **1202**, a p-type GaN layer **1204**, an ITO or ZnO layer **1206**, and a substrate **1208**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS). The LED is wire bonded **1210** to a lead frame **1212**, and embedded in or combined with moldings or shaped optical elements **1214**, **1216**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1214**, **1216** are formed on opposite sides, e.g., the top/front and bottom/back sides of the LED, wherein the emitting layer **1200** emits light **1222** that is extracted from both the top/front and bottom/back sides of the LED.

The LED is electrically connected to the lead frame **1218** via bonding pads **1224**, **1226**. The bonding pad **1224** is deposited on the ITO or ZnO layer **1206**, and the ohmic contact/bonding pad **1226** is deposited on the n-type GaN layer **1202** after the n-type GaN **1202** layer is exposed by a selective etch through the p-type GaN layer **1204**.

As noted above, the LED may be combined with epoxy or glass and molded as an inverted cone-shapes **1214**, **1216** for both the front **1218** and back sides **1220**, wherein the inverted cone molding shape **1214**, **1216** provides enhanced light extraction. Specifically, most of the light entering the inverted cone shapes **1214**, **1216** lies within a critical angle and is extracted. The light is reflected to a top or emitting surface of the inverted cone shape **1214** by the side walls of the inverted cone shape **1214** for emission through the top surface of the inverted cone shape **1214**, and similarly, the light is reflected to a bottom or emitting surface of the inverted cone shape **1216** by the side walls of the inverted cone shape **1216** for emission through the bottom surface of the inverted cone shape **1214**.

Finally, note that a patterned sapphire substrate (PSS) **1208** improves the light extraction efficiency through the interface **1228** between the n-GaN layer **1202** and the substrate **1208**. In addition, the backside **1230** of the sapphire substrate **1208** may be roughened, textured, patterned or shaped (e.g., a cone shaped surface) to increase the light extraction efficiency.

FIG. **12**B shows a top view of the lead frame **1212**.

FIG. **13** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **1300**, an n-type GaN layer **1302**, a p-type GaN layer **1304**, an ITO or ZnO layer **1306**, and a substrate **1308**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS). The LED is wire bonded **1310** to a lead frame **1312**, and embedded in or combined with moldings or shaped optical elements **1314**, **1316**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1314**, **1316** are formed on opposite sides, e.g., the top/front and bottom/back sides of the LED, wherein the emitting layer **1300** emits light **1322** that is extracted from both the top/front and bottom/back sides of the LED.

The LED is electrically connected to the lead frame **1318** via bonding pads **1324**, **1326**. The bonding pad **1324** is deposited on the ITO or ZnO layer **1306**, and the ohmic contact/bonding pad **1326** is deposited on the n-type GaN layer **1302** after the n-type GaN **1302** layer is exposed by a selective etch through the p-type GaN layer **1304**.

As noted above, the LED may be combined with epoxy or glass and molded as an inverted cone-shapes **1314**, **1316** for both the front **1318** and back sides **1320**, wherein the inverted cone molding shape **1314**, **1316** provides enhanced light extraction. Specifically, most of the light entering the inverted cone shapes **1314**, **1316** lies within a critical angle and is extracted. The light is reflected to a top or emitting surface of the inverted cone shape **1314** by the side walls of the inverted cone shape **1314** for emission through the top surface of the inverted cone shape **1314**, and similarly, the light is reflected to a bottom or emitting surface of the inverted cone shape **1316** by the side walls of the inverted cone shape **1316** for emission through the bottom surface of the inverted cone shape **1314**. Moreover, the top/front surface **1328** of the shaped optical elements **1314**, and the bottom/back surface **1330** of the shaped optical element **1316** may be roughened, textured, patterned, or shaped to increase the light extraction through the elements **1314**, **1316**.

FIG. **14** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1400** includes an emitting layer **1402** and a substrate **1404** (as well as other layers), and the substrate **1404** is a flat or patterned sapphire substrate. The LED **1400** is wire bonded **1406** to a lead frame **1408**, and embedded in or combined with moldings or shaped optical elements **1410**, **1412**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1410**, **1412** are formed on opposite sides, e.g., the top/front side **1414** and bottom/back side **1416** of the LED **1400**, wherein the emitting layer **1402** emits light **1418** that is extracted from both the top/front side **1414** and bottom/back side **1416** of the LED **1400**.

In FIG. **14**, phosphor layers **1420** may be placed near the top/front surface **1422** of the shaped optical element **1410** and the bottom/back surface **1424** of the shaped optical element **1412**. Preferably, the phosphor layers **1420** should be positioned as far away as possible from the LED **1400**. In this case, the conversion efficiency of the blue light to white light is increased, due to reduced re-absorption of the emitted light by the LED **1400** resulting from reduced back-scattering of the light by the phosphor layers **1420** to the LED **1400**. Moreover, the surfaces **1426** of the phosphor layers **1420** may be roughened, textured, patterned or shaped to improve light extraction.

FIG. **15**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1500** comprises an emitting layer **1502**, an n-type GaN layer **1504**, a p-type GaN layer **1506**, an ITO or ZnO layer **1508**, and a substrate **1510**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS).

The LED **1500** is wire bonded **1512** to a lead frame **1514**, wherein FIG. **15**B is a schematic illustration showing the top view of the lead frame **1514**.

In this embodiment, the LED **1500** is embedded in or combined with moldings or shaped optical elements **1516**, **1518**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. The shaped optical elements **1516**, **1518** are formed on opposite sides, e.g., the top/front side **1520** and bottom/back side **1522** of the LED **1500**, wherein the emitting layer **1502** emits light **1524** that is extracted from both the top/front side **1520** and bottom/back side **1522** of the LED **1500**.

A mirror **1526** may be placed inside the shaped optical element **1518** to increase the light output to the front side **1528** of the LED **1500**. Moreover, the shape of the mirror **1526** is designed to prevent reflections of the light **1530** emitted from the LED **1500** from being re-absorbed by the LED **1500**, which would reduce the output power or the efficiency of the LED. Instead, the mirror **1526** guides the reflected light **1530** away from the LED **1500**.

In addition, the mirror **1526** is only partially attached (or not attached at all) to the LED **1500** or the substrate **1510**. This differs from conventional LEDs, where mirrors are attached to the entire surface of the LED, for example, as shown in FIGS. **1**-**3**.

FIG. **16** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **1600**, an n-type GaN layer **1602**, a p-type GaN layer **1604**, an ITO or ZnO layer **1606**, and a substrate **1608**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS). The LED is wire bonded **1610** to a lead frame **1612**.



In this embodiment, the LED is embedded in or combined with moldings or shaped optical elements **1614**, **1616**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. The shaped optical elements **1614**, **1616** are formed on opposite sides, e.g., the top/front side **1618** and bottom/back side **1620** of the LED, wherein the emitting layer **1602** emits light **1622** that is extracted from both the top/front side **1618** and bottom/back side **1620** of the LED.

A mirror **1624** may be placed inside the shaped optical element **1616** to increase the light output to the front side **1626** of the LED. Moreover, the shape of the mirror **1624** is designed to prevent reflections of the light **1628** emitted from the LED from being re-absorbed by the LED, which would reduce the output power or the efficiency of the LED. Instead, the mirror **1624** guides the reflected light **1628** away from the LED.

In addition, the mirror **1624** is only partially attached (or not attached at all) to the LED or the substrate **1608**. This differs from conventional LEDs, where mirrors are attached to the entire surface of the LED, for example, as shown in FIGS. **1**-**3**.

Finally, the top/front surface **1630** of the shaped optical element **1614** is roughened, textured, patterned or shaped to improve light extraction efficiency.

FIG. **17** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1700** includes an emitting layer **1702** and a substrate **1704** (as well as other layers), and the substrate **1704** is a flat or patterned sapphire substrate. The LED **1700** is wire bonded **1706** to a lead frame **1708**, and embedded in or combined with moldings or shaped optical elements **1710**, **1712**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1710**, **1712** are formed on opposite sides, e.g., the top/front side **1714** and bottom/back side **1716** of the LED **1700**, wherein the emitting layer **1702** emits light **1718** that is extracted from both the top/front side **1714** and bottom/back side **1716** of the LED **1700**.

In FIG. **17**, a mirror **1720** may be placed inside the shaped optical element **1712** to increase the light output directed to the front side **1720** of the LED **1700**. Moreover, a phosphor layer **1722** may be placed near the top surface **1724** of the shaped optical element **1710**. Preferably, the phosphor layer **1722** is positioned as far away as possible from the LED **1700**. In this case, the conversion efficiency of the blue light to white light is increased, due to reduced re-absorption of the light **1718** emitted from the LED **1700** resulting from reduced back-scattering by the phosphor layer **1722**. In addition, the surface **1726** of the phosphor layer **1722** may be roughened, textured, patterned or shaped to improve light extraction through the phosphor layer **1722**.

FIG. **18**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1800** includes an emitting layer **1802** and a substrate **1804** (as well as other layers). The LED **1800** is wire bonded **1806** to a lead frame **1808**, wherein FIG. **18**B is an illustration showing the top view of the lead frame **1808**.

In this embodiment, the LED **1800** is embedded in or combined with a molding or shaped optical element **1810**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Light **1812** emitted by the emitting layer **1802** is reflected by mirrors **1814** positioned within the shaped optical element **1810**, towards the front side **1816** of the shaped optical element **1810**, away from the

back side **1818** of the shaped optical element **1810**, wherein the reflected light **1820** is output from the shaped optical element **1810**.

FIG. **19**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1900** includes an emitting layer **1902** and a substrate **1904** (as well as other layers). The LED **1900** is wire bonded **1906** to a lead frame **1908**, wherein FIG. **19**B is an illustration showing the top view of the lead frame **1908**.

In this embodiment, the LED **1900** is embedded in or combined with a molding or shaped optical element **1910**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Light **1912** emitted by the emitting layer **1902** is reflected by the sidewalls **1914** of the shaped optical element **1910**, towards the front side **1916** of the shaped optical element **1910**, wherein the reflected light **1918** is output from the shaped optical element **1910**, and away from the back side **1920** of the shaped optical element **1910**.

Preferably, the LED **1900** is positioned within the shaped optical element **1910** such that the light **1912** emitted by the LED is reflected by mirrored surfaces **1922** of the sidewalls **1914**, wherein the mirrored surfaces **1922** are deposited or attached to the sidewalls **1914**. The angle **1924** of the sidewalls **1914** relative to the base **1920** of the shaped optical element **1910** is a critical angle that reflects the light **1912** emitted from the LED **1900** to the front side **1916** of the shaped optical element **1910**. For example, the refractive index of epoxy is $n_2=1.5$, the refractive index of the air is $n_1=1$, and, as a result, the critical angle of the reflection is $\sin^{-1}$ (1/1.5). Therefore, the angle **1924** of the sidewalls **1914** should be more than $\sin^{-1}$ (1/1.5). This results in the reflected light **1912** from the LED **1900** being effectively extracted from the top surface **1928** of the shaped optical element in the direction labeled by **1926**.

FIG. **20**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure includes an emitting layer **2000** and a substrate **2002** (as well as other layers). The LED is wire bonded **2004** to a lead frame **2006**, wherein FIG. **20**B is a top view of the lead frame **2006**.

In this embodiment, the LED is embedded in or combined with a molding or shaped optical element **2008**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Light **2010** emitted by the emitting layer **2002** is reflected by the sidewalls **2012** of the shaped optical element **2008**, towards the front side **2014** of the shaped optical element **2008**, wherein the reflected light **2016** is output from the shaped optical element **2008**, and away from the back side **2018** of the shaped optical element **2008**.

Preferably, the LED is positioned within the shaped optical element **2008** such that the light **2010** emitted by the LED is reflected by the sidewalls **2012**. Moreover, the front or top surface **2020** of the shaped optical element **2008** is roughened, textured, patterned or shaped to increase light extraction.

The angle **2022** of the sidewalls **2012** relative to the base **2018** of the shaped optical element **2008** is a critical angle that reflects the **2010** emitted from the LED to the front side **2014** of the shaped optical element **2008**. For example, the refractive index of epoxy is $n_2=1.5$, the refractive index of the air is $n_1=1$, and, as a result, the critical angle of the reflection is $\sin^{-1}$ (1/1.5). Therefore, the angle **2022** of the sidewalls **2012** should be more than $\sin^{-1}$ (1/1.5). This results in the reflected light **2010** from the LED being effectively extracted from the front surface **2020** of the shaped optical element **2008**.

FIG. **21**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **2100** includes an emitting layer **2102** and a substrate **2104** (as well as other layers). The LED **2100** is wire bonded **2106** to a lead frame **2108**, wherein FIG. **21**B shows a top view of the lead frame **2108**.

In this embodiment, the LED **2100** is embedded in or combined with a molding or shaped optical element **2110**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Preferably, the LED **2100** is positioned within the shaped optical element **2110** such that the light **2112** emitted by the LED is reflected by the sidewalls **2114** of the shaped optical element **2110**, towards the front side **2116** of the shaped optical element **2110**, wherein the reflected light **2118** is output from the shaped optical element **2110**, and away from the back side **2120** of the shaped optical element **2110**.

A phosphor layer **2122** may be placed on or near the front or top surface **2124** of the shaped optical element **2110**. Preferably, the phosphor layer **2122** is placed as far away as possible from the LED **2100**. In this example, the conversion efficiency of blue light to white light is increased due to reduced re-absorption of the light **2112** by the LED **2100** resulting from reduced back-scattering by the phosphor layer **2122**. In addition, the surface **2126** of the phosphor layer **2122** may be roughened, textured, patterned or shaped to increase light extraction.

FIG. **22**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **2200** includes an emitting layer **2202** and a substrate **2204** (as well as other layers). The LED **2200** is wire bonded **2206** to a lead frame **2208**, wherein FIG. **22**B shows a top view of the lead frame **2208**.

The LED **2200** is embedded in or combined with moldings or shaped optical elements **2210**, **2212**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **2210**, **2212** are formed on opposite sides, e.g., the top/front side **2214** and bottom/back side **2216** of the LED **2200**, wherein the emitting layer **2200** emits light **2218** that is extracted from both the top/front side **2214** and bottom/back side **2216** of the LED **2200**.

The lead frame **2208** includes a transparent plate **2220**, wherein the LED **2200** is bonded to the transparent plate **2220** using a transparent/clear epoxy **2222** as a die-bonding material. The transparent plate **2220** may be comprised of glass, quartz, sapphire, diamond or other material transparent for the desired emission wavelength, wherein the transparent glass plate **2220** effectively extracts the light **2218** emitted from the LED **2200** to the shaped optical element **2212**.

Advantages and Improvements

One advantage of the present invention is that all of the layers of the LED are transparent for the emission wavelength, except for the emitting layer, such that the light is extracted effectively through all of the layers.

Moreover, by avoiding the use of intentional mirrors with the LED, re-absorption of light by the LED is minimized, light extraction efficiency is increased, and light output power is increased.

The combination of a transparent electrode with roughened, textured, patterned or shaped surfaces, with the LED embedded within a shaped optical element or lens, results in increased light extraction.

## REFERENCES

The following references are incorporated by reference herein:


1. Appl. Phys. Lett., 56, 737-39 (1990).
2. Appl. Phys. Lett., 64, 2839-41 (1994).
3. Appl. Phys. Lett., 81, 3152-54 (2002).
4. Jpn. J. Appl. Phys., 43, L1275-77 (2004).
5. Jpn. J. Appl. Phys., 45, L1084-L1086 (2006).
6. Jpn. J. Appl. Phys., 34, L797-99 (1995).
7. Jpn. J. Appl. Phys., 43, L180-82 (2004).
8. Fujii T., Gao Y., Sharma R., Hu E. L., DenBaars S. P., Nakamura S., "Increase in the extraction efficiency of GaN-based light-emitting diodes via surface roughening," Applied Physics Letters, vol. 84, no. 6, 9 Feb. 2004, pp. 855-7.


## CONCLUSION

This concludes the description of the preferred embodiment of the present invention. The foregoing description of one or more embodiments of the invention has been presented for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

What is claimed is:

**1**. A light emitting device, comprising:

a transparent surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and

a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

**2**. The light emitting device of claim **1**, wherein the sapphire growth substrate is a patterned sapphire substrate (PSS).

**3**. The light emitting device of claim **1**, wherein the transparent surface comprises glass.

**4**. The light emitting device of claim **1**, wherein the transparent surface comprises quartz.

**5**. The light emitting device of claim **1**, wherein the transparent surface comprises diamond.

**6**. The light emitting device of claim **1**, wherein the transparent surface comprises a material transparent for an emission wavelength.

* * * * *

U 8056757

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

August 05, 2020

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *10,658,557*
ISSUE DATE: *May 19, 2020*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

M. TARVER
Certifying Officer

UNITED STATES PATENT AND TRADEMARK OFFICE
DEPARTMENT OF COMMERCE

US010658557B1

(12) **United States Patent**
**Nakamura et al.**

(10) **Patent No.: US 10,658,557 B1**
(45) **Date of Patent: *May 19, 2020**

(54) **TRANSPARENT LIGHT EMITTING DEVICE WITH LIGHT EMITTING DIODES**

(71) Applicant: **The Regents of the University of California**, Oakland, CA (US)

(72) Inventors: **Shuji Nakamura**, Santa Barbara, CA (US); **Steven P. DenBaars**, Goleta, CA (US); **Hirokuni Asamizu**, Goleta, CA (US)

(73) Assignee: **THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**, Oakland, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/569,120**

(22) Filed: **Sep. 12, 2019**

**Related U.S. Application Data**

(63) Continuation of application No. 16/567,275, filed on Sep. 11, 2019, which is a continuation of application

(Continued)

(51) **Int. Cl.**
***H01L 33/62*** (2010.01)
***H01L 33/58*** (2010.01)

(Continued)

(52) **U.S. Cl.**
CPC .......... ***H01L 33/62*** (2013.01); ***G02B 19/0028*** (2013.01); ***G02B 19/0061*** (2013.01); ***H01L 33/22*** (2013.01); ***H01L 33/54*** (2013.01); ***H01L 33/58*** (2013.01); *H01L 33/387* (2013.01); *H01L 33/60* (2013.01); *H01L 2224/0554* (2013.01);

(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,607,463 A 9/1971 Kinoshita et al.
3,938,177 A 2/1976 Hansen et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU 754353 B2 11/2002
AU 756072 B2 1/2003

(Continued)

OTHER PUBLICATIONS

PCT/US2006/023588 International Search Report and Written Opinion dated Jun. 16, 2006.

(Continued)

*Primary Examiner* — Michelle Mandala

(74) *Attorney, Agent, or Firm* — Gates & Cooper LLP

(57) **ABSTRACT**

A transparent light emitting diode (LED) includes a plurality of III-nitride layers, including an active region that emits light, wherein all of the layers except for the active region are transparent for an emission wavelength of the light, such that the light is extracted effectively through all of the layers and in multiple directions through the layers. Moreover, the surface of one or more of the III-nitride layers may be roughened, textured, patterned or shaped to enhance light extraction.

**2 Claims, 14 Drawing Sheets**



**Related U.S. Application Data**

No. 16/422,323, filed on May 24, 2019, now Pat. No. 10,454,010, which is a continuation of application No. 16/238,736, filed on Jan. 3, 2019, which is a continuation of application No. 14/461,151, filed on Aug. 15, 2014, now Pat. No. 10,217,916, which is a continuation of application No. 13/622,884, filed on Sep. 19, 2012, now Pat. No. 8,835,959, which is a continuation of application No. 11/954,154, filed on Dec. 11, 2007, now Pat. No. 8,294,166.

(60) Provisional application No. 60/869,447, filed on Dec. 11, 2006.

(51) **Int. Cl.**

| | |
|---|---|
| ***H01L 33/22*** | (2010.01) |
| ***G02B 19/00*** | (2006.01) |
| ***H01L 33/54*** | (2010.01) |
| *H01L 33/38* | (2010.01) |
| *H01L 33/60* | (2010.01) |

(52) **U.S. Cl.**

CPC .............. *H01L 2224/05568* (2013.01); *H01L 2224/05573* (2013.01); *H01L 2224/16245* (2013.01); *H01L 2224/48247* (2013.01); *H01L 2224/48257* (2013.01); *H01L 2224/49107* (2013.01); *H01L 2224/73265* (2013.01); *H01L 2924/00014* (2013.01); *H01L 2924/1815* (2013.01); *H01L 2933/0091* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


3,999,280 A 12/1976 Hansen et al.
4,026,692 A 5/1977 Bartholomew
4,346,275 A 8/1982 Iwakiri et al.
4,497,974 A 2/1985 Deckman et al.
5,087,949 A 2/1992 Haltz
5,376,580 A 12/1994 Kish et al.
5,416,870 A 5/1995 Chun et al.
5,696,389 A 12/1997 Ishikawa et al.
5,705,834 A 1/1998 Egalon et al.
5,708,280 A 1/1998 Lebby et al.
5,775,792 A 7/1998 Wiese
5,779,924 A 7/1998 Krames et al.
5,780,867 A 7/1998 Fritz et al.
5,905,275 A 5/1999 Nunoue et al.
5,932,048 A 8/1999 Furukawa et al.
5,952,681 A 9/1999 Chen
6,015,719 A 1/2000 Kish, Jr. et al.
6,022,760 A 2/2000 Lebby et al.
6,133,589 A 10/2000 Krames
6,155,699 A 12/2000 Miller et al.
6,229,160 B1 5/2001 Krames et al.
6,294,800 B1 9/2001 Duggal et al.
6,310,364 B1 10/2001 Uemura
6,331,063 B1 12/2001 Kamada et al.
6,331,356 B1 12/2001 Angelopoulos et al.
6,335,548 B1 1/2002 Roberts et al.
6,357,889 B1 3/2002 Duggal et al.
6,373,188 B1 4/2002 Johnson et al.
6,376,851 B1 4/2002 Worley
6,396,082 B1 5/2002 Fukasawa et al.
6,417,019 B1 7/2002 Mueller et al.
6,429,462 B1 8/2002 Shveykin
6,452,217 B1 9/2002 Wojnarkowski et al.
6,482,664 B1 11/2002 Lee et al.
6,483,196 B1 11/2002 Wojnarowski et al.
6,486,499 B1 11/2002 Krames et al.
6,509,584 B2 1/2003 Suzuki
6,514,782 B1 2/2003 Wierer et al.
6,515,308 B1 2/2003 Kneissl et al.
6,525,335 B1 2/2003 Krames
6,525,464 B1 2/2003 Chin
6,547,423 B2 4/2003 Marshall et al.
6,548,956 B2 4/2003 Forrest et al.
6,550,953 B1 4/2003 Ichikawa et al.
6,569,544 B1 5/2003 Alain et al.
6,573,530 B1 6/2003 Sargent et al.
6,573,537 B1 6/2003 Steigerwald et al.
6,576,488 B2 6/2003 Collins, III et al.
6,586,882 B1 7/2003 Harbers
6,607,286 B2 8/2003 West et al.
6,607,931 B2 8/2003 Streubel
6,608,333 B1 8/2003 Lee et al.
6,608,439 B1 8/2003 Sokolik et al.
6,614,058 B2 9/2003 Lin et al.
6,635,902 B1 10/2003 Lin
6,649,939 B1 11/2003 Wirth
6,657,767 B2 12/2003 Bonardi et al.
6,674,096 B2 1/2004 Sommers
6,677,610 B2 1/2004 Choi et al.
6,682,950 B2 1/2004 Yang et al.
6,686,218 B2 2/2004 Lin et al.
6,686,676 B2 2/2004 McNulty et al.
6,700,137 B2 3/2004 Horiuchi et al.
6,717,362 B1 4/2004 Lee et al.
6,719,936 B2 4/2004 Carlton et al.
6,729,746 B2 5/2004 Suehiro et al.
6,730,939 B2 5/2004 Eisert et al.
6,737,532 B2 5/2004 Chen et al.
6,746,295 B2 6/2004 Sorg
6,759,804 B2 7/2004 Ellens et al.
6,765,236 B2 7/2004 Sakurai
6,774,401 B2 8/2004 Nakada et al.
6,777,871 B2 8/2004 Duggal et al.
6,784,460 B2 8/2004 Ng et al.
6,791,116 B2 9/2004 Takahashi et al.
6,791,119 B2 9/2004 Slater et al.
6,794,685 B2 9/2004 Hata et al.
6,798,136 B2 9/2004 Sommers
6,803,607 B1 10/2004 Chan et al.
6,809,345 B2 10/2004 Watanabe
6,841,934 B2 1/2005 Wang et al.
6,844,572 B2 1/2005 Sawaki et al.
6,870,311 B2 3/2005 Mueller et al.
6,874,910 B2 4/2005 Sugimoto et al.
6,876,149 B2 4/2005 Miyashita
6,893,890 B2 5/2005 Takekuma et al.
6,903,376 B2 6/2005 Shen et al.
6,903,381 B2 6/2005 Lin et al.
6,909,108 B2 6/2005 Tang et al.
6,914,267 B2 7/2005 Fukasawa et al.
6,914,268 B2 7/2005 Shei et al.
6,917,057 B2 7/2005 Stokes et al.
6,921,927 B2 7/2005 Ng et al.
6,922,424 B2 7/2005 Weigert et al.
6,936,761 B2 8/2005 Pichler
6,936,859 B1 8/2005 Uemura et al.
6,936,864 B2 8/2005 Kondo
6,940,704 B2 9/2005 Stalions
6,955,985 B2 10/2005 Narayan
6,961,190 B1 11/2005 Tamaoki et al.
6,964,877 B2 11/2005 Chen et al.
6,969,874 B1 11/2005 Gee et al.
6,969,946 B2 11/2005 Steranka et al.
6,972,208 B2 12/2005 Hsieh et al.
6,972,212 B2 12/2005 Eisert et al.
6,980,710 B2 12/2005 Farahi et al.
6,982,522 B2 1/2006 Omoto
6,987,613 B2 1/2006 Pocius et al.
6,989,555 B2 1/2006 Goetz et al.
6,997,580 B2 2/2006 Wong
6,998,281 B2 2/2006 Taskar et al.
7,008,858 B2 3/2006 Liu et al.
7,009,213 B2 3/2006 Camras et al.
7,009,217 B2 3/2006 Liu et al.
7,009,220 B2 3/2006 Oohata
7,015,514 B2 3/2006 Baur et al.
7,018,859 B2 3/2006 Liao et al.
7,019,456 B2 3/2006 Yasukawa et al.
7,026,261 B2 4/2006 Hirose et al.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 7,026,657 | B2 | 4/2006 | Bogner et al. |
| 7,048,412 | B2 | 5/2006 | Martin et al. |
| 7,053,419 | B1 | 5/2006 | Camras et al. |
| 7,064,355 | B2 | 6/2006 | Camras et al. |
| 7,067,849 | B2 | 6/2006 | Yoo |
| 7,070,304 | B2 | 7/2006 | Imai |
| 7,070,312 | B2 | 7/2006 | Tatsukawa |
| 7,071,034 | B2 | 7/2006 | Ueda et al. |
| 7,072,096 | B2 | 7/2006 | Holman et al. |
| 7,084,435 | B2 | 8/2006 | Sugimoto et al. |
| 7,091,653 | B2 | 8/2006 | Ouderkirk et al. |
| 7,091,661 | B2 | 8/2006 | Ouderkirk et al. |
| 7,098,589 | B2 | 8/2006 | Erchak et al. |
| 7,105,860 | B2 | 9/2006 | Shei et al. |
| 7,112,916 | B2 | 9/2006 | Goh et al. |
| 7,119,271 | B2 | 10/2006 | King et al. |
| 7,126,159 | B2 | 10/2006 | Itai et al. |
| 7,129,635 | B2 | 10/2006 | Tsujimura |
| 7,135,709 | B1 | 11/2006 | Wirth et al. |
| 7,148,514 | B2 | 12/2006 | Seo et al. |
| 7,157,745 | B2 | 1/2007 | Blonder et al. |
| 7,161,189 | B2 | 1/2007 | Wu |
| 7,169,632 | B2 | 1/2007 | Baur et al. |
| 7,188,981 | B2 | 3/2007 | Barros et al. |
| 7,195,991 | B2 | 3/2007 | Kamutsch et al. |
| 7,199,520 | B2 | 4/2007 | Fujii et al. |
| 7,210,806 | B2 | 5/2007 | Holman et al. |
| 7,217,004 | B2 | 5/2007 | Park et al. |
| 7,223,620 | B2 | 5/2007 | Jäger et al. |
| 7,223,998 | B2 | 5/2007 | Schwach et al. |
| 7,227,304 | B2 | 6/2007 | Tsujimura et al. |
| 7,235,817 | B2 | 6/2007 | Yano et al. |
| 7,250,728 | B2 | 7/2007 | Chen et al. |
| 7,253,447 | B2 | 8/2007 | Oishi et al. |
| 7,253,448 | B2 | 8/2007 | Roberts et al. |
| 7,262,440 | B2 | 8/2007 | Choi et al. |
| 7,264,378 | B2 | 9/2007 | Loh |
| 7,268,371 | B2 | 9/2007 | Krames et al. |
| 7,273,291 | B2 | 9/2007 | Kim et al. |
| 7,281,818 | B2 | 10/2007 | You et al. |
| 7,282,853 | B2 | 10/2007 | Yano et al. |
| 7,286,296 | B2 | 10/2007 | Chaves et al. |
| 7,291,864 | B2 | 11/2007 | Weisbuch et al. |
| 7,306,351 | B2 | 12/2007 | Chao et al. |
| 7,309,882 | B2 | 12/2007 | Chen |
| 7,312,573 | B2 | 12/2007 | Chang et al. |
| 7,314,291 | B2 | 1/2008 | Tain et al. |
| 7,317,210 | B2 | 1/2008 | Brabec et al. |
| 7,319,246 | B2 | 1/2008 | Soules et al. |
| 7,323,704 | B2 | 1/2008 | Itai |
| 7,329,982 | B2 | 2/2008 | Conner et al. |
| 7,332,747 | B2 | 2/2008 | Uemura et al. |
| 7,344,902 | B2 | 3/2008 | Basin et al. |
| 7,344,958 | B2 | 3/2008 | Murai et al. |
| 7,345,298 | B2 | 3/2008 | Weisbuch et al. |
| 7,352,006 | B2 | 4/2008 | Beeson et al. |
| 7,358,537 | B2 | 4/2008 | Yeh et al. |
| 7,358,539 | B2 | 4/2008 | Venugopalan et al. |
| 7,374,958 | B2 | 5/2008 | Pan et al. |
| 7,380,962 | B2 | 6/2008 | Chaves et al. |
| 7,390,117 | B2 | 6/2008 | Leatherdale et al. |
| 7,391,153 | B2 | 6/2008 | Suehiro et al. |
| 7,397,177 | B2 | 7/2008 | Takahashi et al. |
| 7,400,439 | B2 | 7/2008 | Holman |
| 7,408,204 | B2 | 8/2008 | Tung |
| 7,414,270 | B2 | 8/2008 | Kim et al. |
| 7,423,297 | B2 | 9/2008 | Leatherdale et al. |
| 7,427,145 | B2 | 9/2008 | Jang et al. |
| 7,431,477 | B2 | 10/2008 | Chou et al. |
| 7,439,551 | B2 | 10/2008 | Hata |
| 7,449,789 | B2 | 11/2008 | Chen |
| 7,463,419 | B2 | 12/2008 | Weber |
| 7,465,962 | B2 | 12/2008 | Kametani et al. |
| 7,479,662 | B2 | 1/2009 | Soules et al. |
| 7,479,664 | B2 | 1/2009 | Williams |
| 7,489,075 | B2 | 2/2009 | Lee |
| 7,498,734 | B2 | 3/2009 | Suehiro et al. |
| 7,504,671 | B2 | 3/2009 | Ishidu et al. |
| 7,509,012 | B2 | 3/2009 | Zoorob et al. |
| 7,510,289 | B2 | 3/2009 | Takekuma |
| 7,518,149 | B2 | 4/2009 | Maaskant et al. |
| 7,521,782 | B2 | 4/2009 | Ishii |
| 7,525,126 | B2 | 4/2009 | Leatherdale et al. |
| 7,531,835 | B2 | 5/2009 | Heeger et al. |
| 7,534,634 | B2 | 5/2009 | Jäger et al. |
| 7,541,610 | B2 | 6/2009 | Haase |
| 7,545,042 | B2 | 6/2009 | Yang |
| 7,579,629 | B2 | 8/2009 | Inoguchi |
| 7,582,910 | B2 | 9/2009 | David et al. |
| 7,585,083 | B2 | 9/2009 | Kim et al. |
| 7,586,127 | B2 | 9/2009 | Nomura et al. |
| 7,602,118 | B2 | 10/2009 | Cok et al. |
| 7,633,092 | B2 | 12/2009 | Ng et al. |
| 7,646,146 | B2 | 1/2010 | Cok |
| 7,670,872 | B2 | 3/2010 | Yan |
| 7,679,283 | B2 | 3/2010 | Nimura |
| 7,687,813 | B2 | 3/2010 | Nakamura et al. |
| 7,687,815 | B2 | 3/2010 | Kim |
| 7,692,205 | B2 | 4/2010 | Wang et al. |
| 7,693,360 | B2 | 4/2010 | Shimizu et al. |
| 7,704,763 | B2 | 4/2010 | Fujii et al. |
| 7,717,589 | B2 | 5/2010 | Nishioka et al. |
| 7,719,020 | B2 | 5/2010 | Murai et al. |
| 7,719,182 | B2 | 5/2010 | Cok et al. |
| 7,733,011 | B2 | 6/2010 | Cina et al. |
| 7,742,677 | B2 | 6/2010 | Eberhard et al. |
| 7,745,986 | B2 | 6/2010 | Ito et al. |
| 7,748,879 | B2 | 7/2010 | Koike et al. |
| 7,755,096 | B2 | 7/2010 | Weisbuch et al. |
| 7,766,508 | B2 | 8/2010 | Villard et al. |
| 7,772,597 | B2 | 8/2010 | Inoue |
| 7,781,787 | B2 | 8/2010 | Suehiro et al. |
| 7,781,789 | B2 | 8/2010 | Denbaars et al. |
| 7,847,302 | B2 | 12/2010 | Basin et al. |
| 7,851,815 | B2 | 12/2010 | Diamantidis |
| 7,860,356 | B2 | 12/2010 | Montfort et al. |
| 7,868,341 | B2 | 1/2011 | Diana et al. |
| 7,872,275 | B2 | 1/2011 | Diamantidis |
| 7,932,111 | B2 | 4/2011 | Edmond |
| 7,950,831 | B2 | 5/2011 | Moon |
| 7,956,371 | B2 | 6/2011 | Denbaars et al. |
| RE42,636 | E | 8/2011 | Chen et al. |
| 7,994,527 | B2 | 8/2011 | Denbaars et al. |
| 8,022,423 | B2 | 9/2011 | Nakamura et al. |
| 8,035,117 | B2 | 10/2011 | DenBaars et al. |
| 8,071,997 | B2 | 12/2011 | Scotch et al. |
| 8,109,635 | B2 | 2/2012 | Allon et al. |
| 8,124,991 | B2 | 2/2012 | Iso et al. |
| 8,158,987 | B2 | 4/2012 | Nabekura et al. |
| 8,162,493 | B2 | 4/2012 | Skiver et al. |
| 8,212,262 | B2 | 7/2012 | Emerson et al. |
| 8,258,519 | B2 | 9/2012 | Hsu |
| 8,294,166 | B2 | 10/2012 | Nakamura et al. |
| 8,334,151 | B2 | 12/2012 | Murai et al. |
| 8,368,109 | B2 | 2/2013 | Iso et al. |
| 8,378,368 | B2 | 2/2013 | Hsu et al. |
| 8,395,167 | B2 | 3/2013 | Kang et al. |
| 8,405,307 | B2 | 3/2013 | Yano et al. |
| 8,455,909 | B2 | 6/2013 | Negley |
| 8,541,788 | B2 | 9/2013 | DenBaars et al. |
| 8,558,446 | B2 | 10/2013 | Miki et al. |
| 8,637,892 | B2 | 1/2014 | Egoshi et al. |
| 8,710,535 | B2 | 4/2014 | Jo et al. |
| 8,835,959 | B2 | 9/2014 | Nakamura et al. |
| 8,860,051 | B2 | 10/2014 | Fellows et al. |
| 8,882,290 | B2 | 11/2014 | Hsieh et al. |
| 8,889,440 | B2 | 11/2014 | Chen et al. |
| 9,240,529 | B2 | 1/2016 | Fellows Demille et al. |
| 9,276,156 | B2 | 3/2016 | King et al. |
| 9,705,059 | B2 | 7/2017 | Park |
| 9,859,464 | B2 | 1/2018 | Fellows Demille et al. |
| 10,103,306 | B2 | 10/2018 | Kim |
| 10,217,916 | B2 | 2/2019 | Nakamura et al. |
| 10,312,422 | B2 | 6/2019 | Camras et al. |

(56) **References Cited**

U.S. PATENT DOCUMENTS


10,374,003 B2 8/2019 Choi et al.
10,454,010 B1 * 10/2019 Nakamura ......... G02B 19/0028
2001/0002049 A1 5/2001 Reeh et al.
2001/0033135 A1 10/2001 Duggal et al.
2002/0006040 A1 1/2002 Kamada et al.
2002/0085601 A1 7/2002 Wang et al.
2002/0117103 A1 8/2002 Hooper
2002/0121637 A1 9/2002 Ito
2002/0123204 A1 9/2002 Torvik et al.
2002/0130327 A1 9/2002 Wu et al.
2002/0131726 A1 9/2002 Lin et al.
2002/0141006 A1 10/2002 Pocius et al.
2002/0158578 A1 10/2002 Eliashevich et al.
2002/0171087 A1 11/2002 Krames et al.
2003/0010975 A1 1/2003 Gibb
2003/0015959 A1 1/2003 Tomoda et al.
2003/0039119 A1 2/2003 Cao
2003/0075723 A1 4/2003 Heremans et al.
2003/0100140 A1 5/2003 Lin et al.
2003/0124754 A1 7/2003 Farahi et al.
2003/0141506 A1 7/2003 Sano
2003/0145885 A1 8/2003 Kang et al.
2003/0213969 A1 11/2003 Wang et al.
2003/0215766 A1 11/2003 Fischer et al.
2004/0004434 A1 1/2004 Nishi et al.
2004/0007709 A1 1/2004 Kondo
2004/0012027 A1 1/2004 Keller et al.
2004/0012958 A1 1/2004 Hashimoto et al.
2004/0036074 A1 2/2004 Kondo
2004/0046179 A1 3/2004 Johannes et al.
2004/0070014 A1 4/2004 Lin
2004/0079408 A1 4/2004 Fetzer et al.
2004/0089868 A1 5/2004 Hon et al.
2004/0094772 A1 5/2004 Hon et al.
2004/0095502 A1 5/2004 Losehand
2004/0155565 A1 8/2004 Holder
2004/0164311 A1 8/2004 Uemura
2004/0173810 A1 9/2004 Lin
2004/0184495 A1 9/2004 Kondo
2004/0188689 A1 9/2004 Shono et al.
2004/0188700 A1 9/2004 Fukasawa et al.
2004/0188791 A1 9/2004 Horng et al.
2004/0211970 A1 10/2004 Hayashimoto et al.
2004/0227148 A1 11/2004 Camras et al.
2004/0239611 A1 12/2004 Huang et al.
2004/0245531 A1 12/2004 Fuii et al.
2004/0257797 A1 12/2004 Suehiro et al.
2004/0263064 A1 12/2004 Huang
2005/0029528 A1 2/2005 Ishikawa
2005/0032257 A1 2/2005 Camras et al.
2005/0035354 A1 2/2005 Lin et al.
2005/0040410 A1 2/2005 Ledentsov et al.
2005/0062830 A1 3/2005 Taki et al.
2005/0077532 A1 4/2005 Ota et al.
2005/0082562 A1 4/2005 Ou et al.
2005/0093008 A1 5/2005 Suehiro et al.
2005/0110032 A1 5/2005 Saito et al.
2005/0111240 A1 5/2005 Yonekubo
2005/0121688 A1 6/2005 Nagai et al.
2005/0133810 A1 6/2005 Roberts et al.
2005/0145864 A1 7/2005 Sugiyama et al.
2005/0145865 A1 7/2005 Okuyama et al.
2005/0156510 A1 7/2005 Chua et al.
2005/0161779 A1 7/2005 Peng et al.
2005/0184300 A1 8/2005 Tazima et al.
2005/0189551 A1 9/2005 Peng et al.
2005/0189555 A1 9/2005 Lin et al.
2005/0194598 A1 9/2005 Kim et al.
2005/0196887 A1 9/2005 Liu
2005/0205884 A1 9/2005 Kim et al.
2005/0205887 A1 9/2005 Shei
2005/0211997 A1 9/2005 Suehiro et al.
2005/0212002 A1 9/2005 Sanga et al.
2005/0218790 A1 10/2005 Blumel
2005/0224830 A1 10/2005 Blonder et al.
2005/0243570 A1 11/2005 Chaves et al.
2005/0248271 A1 11/2005 Ng et al.
2005/0265404 A1 12/2005 Ashdown
2005/0274956 A1 12/2005 Bhat
2005/0274970 A1 12/2005 Ludowise
2006/0000964 A1 1/2006 Ye et al.
2006/0001035 A1 1/2006 Suehiro et al.
2006/0001036 A1 1/2006 Jacob et al.
2006/0006408 A1 1/2006 Suehiro et al.
2006/0008941 A1 1/2006 Haskell et al.
2006/0009006 A1 1/2006 Murai et al.
2006/0012299 A1 1/2006 Suehiro et al.
2006/0017055 A1 1/2006 Cropper et al.
2006/0022214 A1 2/2006 Morgan et al.
2006/0038187 A1 2/2006 Ueno
2006/0043399 A1 3/2006 Miyagaki et al.
2006/0054905 A1 3/2006 Schwach et al.
2006/0063028 A1 3/2006 Leurs
2006/0091376 A1 5/2006 Kim et al.
2006/0091788 A1 5/2006 Yan
2006/0125385 A1 6/2006 Lu et al.
2006/0138439 A1 6/2006 Bogner et al.
2006/0145170 A1 7/2006 Cho
2006/0154392 A1 7/2006 Tran et al.
2006/0163586 A1 7/2006 Denbaars et al.
2006/0163601 A1 7/2006 Harle et al.
2006/0164836 A1 7/2006 Suehiro
2006/0171152 A1 8/2006 Suehiro et al.
2006/0175624 A1 8/2006 Sharma et al.
2006/0175625 A1 8/2006 Yokotani et al.
2006/0186418 A1 8/2006 Edmond et al.
2006/0186424 A1 8/2006 Fujimoto et al.
2006/0189026 A1 8/2006 Cropper et al.
2006/0192217 A1 8/2006 David et al.
2006/0194359 A1 8/2006 Weisbuch et al.
2006/0194363 A1 8/2006 Giesberg et al.
2006/0202219 A1 9/2006 Ohashi et al.
2006/0202226 A1 9/2006 Weisbuch et al.
2006/0233969 A1 10/2006 White et al.
2006/0234486 A1 10/2006 Speck et al.
2006/0237732 A1 10/2006 Nagai et al.
2006/0239006 A1 10/2006 Chaves et al.
2006/0243993 A1 11/2006 Yu
2006/0246722 A1 11/2006 Speck et al.
2006/0267026 A1 11/2006 Kim et al.
2006/0273336 A1 12/2006 Fujikura et al.
2006/0273343 A1 12/2006 Nakahata et al.
2006/0289892 A1 12/2006 Lee
2007/0001185 A1 1/2007 Lu et al.
2007/0001186 A1 1/2007 Murai et al.
2007/0001591 A1 1/2007 Tanaka
2007/0012931 A1 1/2007 Lee et al.
2007/0012940 A1 1/2007 Suh et al.
2007/0019409 A1 1/2007 Nawashiro et al.
2007/0029560 A1 2/2007 Su
2007/0057624 A1 3/2007 Angelopoulos et al.
2007/0065960 A1 3/2007 Fukshima et al.
2007/0072324 A1 3/2007 Krames et al.
2007/0085075 A1 4/2007 Yamazaki et al.
2007/0085100 A1 4/2007 Diana et al.
2007/0102721 A1 5/2007 Denbaars et al.
2007/0114549 A1 5/2007 Yu
2007/0120135 A1 5/2007 Soules et al.
2007/0121690 A1 5/2007 Fujii et al.
2007/0125995 A1 6/2007 Weisbuch et al.
2007/0139949 A1 6/2007 Tanda et al.
2007/0145397 A1 6/2007 Denbaars et al.
2007/0147072 A1 6/2007 Scobbo et al.
2007/0189013 A1 8/2007 Ford
2007/0252164 A1 11/2007 Zhong et al.
2007/0257267 A1 11/2007 Leatherdale
2007/0257271 A1 11/2007 Ouderkirk
2007/0284603 A1 12/2007 Haase
2007/0290224 A1 12/2007 Ogawa
2008/0012034 A1 1/2008 Thielen et al.
2008/0030691 A1 2/2008 Godo
2008/0030974 A1 2/2008 Abu-Ageel
2008/0087900 A1 4/2008 Yang
2008/0101086 A1 5/2008 Lee

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0111146 A1 | 5/2008 | Nakamura | |
| 2008/0121918 A1 | 5/2008 | Denbaars et al. | |
| 2008/0128730 A1 | 6/2008 | Fellows et al. | |
| 2008/0128731 A1 | 6/2008 | Denbaars et al. | |
| 2008/0135864 A1 | 6/2008 | David et al. | |
| 2008/0149949 A1 | 6/2008 | Nakamura et al. | |
| 2008/0149959 A1 | 6/2008 | Nakamura et al. | |
| 2008/0169752 A1 | 7/2008 | Hattori et al. | |
| 2008/0182420 A1 | 7/2008 | Hu et al. | |
| 2008/0191191 A1 | 8/2008 | Kim | |
| 2008/0191224 A1 | 8/2008 | Emerson et al. | |
| 2008/0245949 A1 | 10/2008 | Morimoto et al. | |
| 2008/0251809 A1 | 10/2008 | Wolf et al. | |
| 2009/0039267 A1 | 2/2009 | Iso et al. | |
| 2009/0039762 A1 | 2/2009 | Park et al. | |
| 2009/0078951 A1 | 3/2009 | Miki et al. | |
| 2009/0114928 A1 | 5/2009 | Messere et al. | |
| 2009/0121250 A1 | 5/2009 | Denbaars et al. | |
| 2009/0140630 A1 | 6/2009 | Kijima et al. | |
| 2009/0146170 A1 | 6/2009 | Zhong et al. | |
| 2009/0315055 A1 | 12/2009 | Tamboli et al. | |
| 2010/0059787 A1 | 3/2010 | Hoshina et al. | |
| 2010/0090240 A1 | 4/2010 | Tamboli et al. | |
| 2010/0187555 A1 | 7/2010 | Murai et al. | |
| 2010/0264434 A1 | 10/2010 | Pioessl et al. | |
| 2010/0283078 A1 | 11/2010 | Denbaars et al. | |
| 2010/0289043 A1 | 11/2010 | Aurelien et al. | |
| 2011/0079806 A1 | 4/2011 | Hsu et al. | |
| 2011/0089455 A1 | 4/2011 | Diana et al. | |
| 2011/0193061 A1 | 8/2011 | Hsu | |
| 2012/0043568 A1 | 2/2012 | Yan | |
| 2012/0056158 A1 | 3/2012 | Iso et al. | |
| 2012/0161180 A1 | 6/2012 | Komatsu et al. | |
| 2013/0020602 A1 | 1/2013 | Nakamura et al. | |
| 2014/0252396 A1 | 9/2014 | Fujii et al. | |
| 2014/0292618 A1 | 10/2014 | Yamazaki et al. | |
| 2014/0353707 A1 | 12/2014 | Nakamura et al. | |
| 2015/0014732 A1 | 1/2015 | Fellows Demille et al. | |
| 2015/0102378 A1 | 4/2015 | Huang et al. | |
| 2015/0270444 A1 | 9/2015 | Liu | |
| 2016/0133790 A1 | 5/2016 | Fellows Demille et al. | |
| 2018/0190888 A1 | 7/2018 | Kim | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| AU | 2010257325 | B2 | 12/2011 |
| DE | 19807758 | | 12/1998 |
| DE | 10245932 | B3 | 2/2004 |
| DE | 10361801 | A1 | 8/2005 |
| DE | 102004028143 | B4 | 12/2006 |
| DE | 19807758 | B4 | 8/2008 |
| DE | 112007000313 | T5 | 7/2009 |
| EP | 1081771 | | 3/2001 |
| EP | 1213773 | | 6/2002 |
| EP | 1213773 | A1 | 6/2002 |
| EP | 1416543 | | 5/2004 |
| EP | 1536487 | | 6/2005 |
| EP | 2087563 | | 8/2009 |
| EP | 2174351 | | 4/2010 |
| EP | 1081771 | B1 | 6/2011 |
| EP | 2843716 | | 3/2015 |
| FR | 2858859 | A1 | 2/2005 |
| GB | 2371679 | A | 7/2002 |
| GB | 2413698 | A | 11/2005 |
| JP | 53024300 | | 3/1978 |
| JP | S5324300 | A | 3/1978 |
| JP | 09018057 | | 1/1997 |
| JP | 09027642 | | 1/1997 |
| JP | H0927642 | A | 1/1997 |
| JP | 09055540 | | 2/1997 |
| JP | H0955540 | A | 2/1997 |
| JP | 10200165 | | 7/1998 |
| JP | H10200165 | A | 7/1998 |
| JP | H11-17223 | | 1/1999 |
| JP | 2000277808 | | 10/2000 |
| JP | 2000277808 | A | 10/2000 |
| JP | 2001024223 | | 1/2001 |
| JP | 2001044491 | | 2/2001 |
| JP | 2001068731 | | 3/2001 |
| JP | 2001068731 | A | 3/2001 |
| JP | 2001111112 | | 4/2001 |
| JP | 3172947 | | 5/2001 |
| JP | 2001126515 | | 5/2001 |
| JP | 2001126515 | A | 5/2001 |
| JP | 2002084002 | A | 3/2002 |
| JP | 2002008735 | | 7/2002 |
| JP | 2002208735 | A | 7/2002 |
| JP | 2002232020 | | 8/2002 |
| JP | 2002280614 | | 9/2002 |
| JP | 2002280614 | A | 9/2002 |
| JP | 2002314152 | | 10/2002 |
| JP | 2002319708 | | 10/2002 |
| JP | 2003011417 | A | 1/2003 |
| JP | 2003016808 | | 1/2003 |
| JP | 2003017740 | | 1/2003 |
| JP | 2003069085 | | 3/2003 |
| JP | 2003069085 | A | 3/2003 |
| JP | 2003249692 | | 9/2003 |
| JP | 2003249692 | A | 9/2003 |
| JP | 2003264317 | | 9/2003 |
| JP | 2003318441 | | 11/2003 |
| JP | 2003318441 | A | 11/2003 |
| JP | 2003347586 | | 12/2003 |
| JP | 2004111981 | | 4/2004 |
| JP | 2004111981 | A | 4/2004 |
| JP | 2004158557 | | 6/2004 |
| JP | 2004521498 | | 7/2004 |
| JP | 2004296999 | A | 10/2004 |
| JP | 2005056922 | | 3/2005 |
| JP | 2005057310 | | 3/2005 |
| JP | 2005093102 | | 4/2005 |
| JP | 2005093102 | A | 4/2005 |
| JP | 2005117006 | | 4/2005 |
| JP | 2005150261 | | 6/2005 |
| JP | 2005191197 | | 7/2005 |
| JP | 2005191197 | A | 7/2005 |
| JP | 2005191514 | | 7/2005 |
| JP | 2005191514 | A | 7/2005 |
| JP | 2005267926 | | 9/2005 |
| JP | 2005267926 | A | 9/2005 |
| JP | 2005268323 | | 9/2005 |
| JP | 2005326757 | | 11/2005 |
| JP | 2005347677 | | 12/2005 |
| JP | 2005347677 | A | 12/2005 |
| JP | 2005353816 | | 12/2005 |
| JP | 2006012916 | | 1/2006 |
| JP | 2006024615 | A | 1/2006 |
| JP | 2006024616 | | 1/2006 |
| JP | 2006032387 | | 2/2006 |
| JP | 2006032387 | A | 2/2006 |
| JP | 2006041479 | | 2/2006 |
| JP | 2006041479 | A | 2/2006 |
| JP | 2006060034 | A | 3/2006 |
| JP | 2006073618 | | 3/2006 |
| JP | 2006128227 | | 5/2006 |
| JP | 2006156590 | | 6/2006 |
| JP | 2006165326 | | 6/2006 |
| JP | 2006191103 | | 7/2006 |
| JP | 2006210824 | | 8/2006 |
| JP | 2006229259 | | 8/2006 |
| JP | 2006237264 | | 9/2006 |
| JP | 2006237264 | A | 9/2006 |
| JP | 2006261688 | A | 9/2006 |
| JP | 2006287113 | | 10/2006 |
| JP | 2006294907 | | 10/2006 |
| JP | 2006303258 | | 11/2006 |
| JP | 2007165811 | | 6/2007 |
| JP | 2007324220 | | 12/2007 |
| JP | 2010510659 | | 4/2010 |
| JP | 2010512662 | | 4/2010 |
| JP | 2010534943 | | 11/2010 |
| JP | 2014187397 | | 10/2014 |
| KR | 200403690 | Y1 | 12/2005 |
| KR | 100619441 | B1 | 9/2006 |

(56) **References Cited**

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| KR | 100626365 | 9/2006 |
| KR | 100626365 B1 | 9/2006 |
| KR | 100643582 B1 | 11/2006 |
| KR | 100715580 B1 | 5/2007 |
| KR | 100733903 B1 | 7/2007 |
| KR | 100786798 B1 | 12/2007 |
| KR | 100796670 B1 | 1/2008 |
| KR | 100808705 B1 | 2/2008 |
| KR | 100828174 B1 | 5/2008 |
| KR | 100840637 B1 | 6/2008 |
| KR | 20100059820 | 6/2010 |
| SG | 100618 A1 | 12/2003 |
| TW | 586096 B | 5/2004 |
| TW | M293524 | 7/2006 |
| TW | 200830593 | 7/2008 |
| TW | 200843144 | 11/2008 |
| TW | 200924239 | 6/2009 |
| TW | I460881 | 11/2014 |
| TW | 201448263 | 12/2014 |
| WO | 2002090825 A1 | 11/2002 |
| WO | WO 2002090825 | 11/2002 |
| WO | WO 2004061969 | 7/2004 |
| WO | 2005064666 A1 | 7/2005 |
| WO | WO 2005064666 | 7/2005 |
| WO | WO 2005083037 | 9/2005 |
| WO | 2006098545 A2 | 9/2006 |
| WO | WO 2007036198 | 4/2007 |
| WO | WO 2007067758 | 6/2007 |
| WO | WO 2008060586 | 5/2008 |
| WO | WO 2008060615 | 5/2008 |
| WO | WO 2008073400 | 6/2008 |
| WO | WO 2009015386 | 1/2009 |

OTHER PUBLICATIONS

PCT/US2006/043317 International Search Report and Written Opinion dated Nov. 6, 2006.
PCT/US2007/025278 International Search Report and Written Opinion dated Apr. 3, 2008.
PCT/US2007/024062 International Search Report and Written Opinion dated Apr. 22, 2008.
PCT/US2007/023972 International Search Report and Written Opinion dated May 23, 2008.
PCT/US2008/071362 International Search Report and Written Opinion dated Sep. 22, 2008.
EP 06837048.5 Extended Search Report dated Dec. 1, 2010.
EP 07862038.2 Extended Search Report dated Jan. 6, 2012.
EP 14177879.5 Extended Search Report dated Mar. 27, 2015.
Carlin et al., High Quality AlInN for High Index Contrast Bragg Mirrors Lattice Matched to GaN, Applied Physics Letters, 2003, vol. 83(4).
Kawakami et al., Dimensionality of Excitons in InGaN-Based Light Emitting Devices, Phys, Stat. Sol., (a), 2000, vol. 178, pp. 331-336.
Murai et al., Hexagonal Pyramid shaped light-emitting diodes based on ZnO and GaN direct wafer bonding, Applied Physics Letters, 2006, vol. 89(17) pp. 17116-1-17116-3.
Nishida et al., Efficient and High-Power AlGaN-Based Ultraviolet Light-Emitting Diode Grown on Bulk GaN, Appl. Phys., Lett., 2001, vol. 79(6) pp. 711-712.
Oshima et al., Growth of the 2-in-Size Bulk Zn0 Single Crystals by the Hydrothermal Method, J. of Crystal Growth, 2004, vol. 260, pp. 166-170.
Sink et al., Cleaved GaN Facets by Wafer Fusion of GaN to InP, Applied Physics Letter, 1996, vol. 68(15).
Smathers et al., Nanometer Scale Surface Clustering on ZnSe Epilayers, Applied Physics Letters, 1998, vol. 72(10).
Someya et al., High Reflective GaN/AI0.34Ga0.66N Quarter-Wave Reflectors Grown by Metal Organic Chemical Vapor Deposition, Applied Physics Letter, 1998, vol. 73(25).
PCT/US2007/025343 International Search Report and Written Opinion dated Mar. 10, 2008.
Jasinski, J. et al., "Microstructure of GaAs/GaN interfaces produced by direct wafer fusion," Appl. Phys. Lett., Oct. 21, 2002, pp. 3152-3154, vol. 81, No. 17.
Kish, F.A. et al., "Very high-efficiency semiconductor wafer-bonded transparent-substrate (AlxGz1-x)0.5In0.5P/GaP light-emitting diodes," Appl. Phys. Lett., 23 May 1994, pp. 2839-2841, vol. 64, No. 21.
Liau, Z.L. et al., "Wafer fusion: A novel technique for optoelectronic device fabrication and monolithic integration," Appl. Phys. Lett., Feb. 19, 1990, pp. 737-739, vol. 56, No. 8.
Murai, A. et al., "Wafer Bonding of GaN and ZnSSe for Optoelectronic Applications," Jpn. J. Appl. Phys., 2004, pp. L1275-L1277, vol. 43, No. 10A.
Nakahara, K. et al., "Improved External Efficiency InGaN-Based Light-Emitting Diodes with Transparent Conductive Ga-Doped Zn0 as p-Electrodes," Jpn. J. Appl. Phys., 2004, pp. L180-L182, vol. 43, No. 2A.
Nakamura, S. et al., "High-Brightness InGaN Blue, Green and Yellow Light-Emitting Diodes with Quantum Well Structures," Jpn. J. Appl. Phys., Jul. 1, 1995, pp. L797-L799, vol. 34, Part 2, No. 7A.
Narukawa, Y. et al., "Ultra-High Efficiency White Light Emitting Diodes," Jpn. J. Appl. Phys., 2006, pp. L1084-L1086, vol. 45, No. 41.
A.A. Bergh and P.J. Dean. Light-emitting diodes. Clarendon Press—Oxford. 1976.
Adachi S. "Properties of Gallium Arsenide" EMIS Data review Ser. 2 513 INSPEC (IEEE New York 1990).
Fujii, T. et al. Increase in the extraction efficiency of GaN-based light-emitting diodes via surface roughening. Appl. Phys. Lett., Feb. 9, 2004, pp. 855-857, vol. 84, No. 6.
Hoefler G. E., Vanderwater D. A., DeFevere D. C., Kish F. A., Camras M. D., Steranka F. M., and Tan I.-H. (1996) "Wafer bonding of 50-mm diameter GaP to AlGaInP—GaP light-emitting diode wafers" Appl. Phys. Lett. 69, 803.
Kish F. A., Steranka F. M., DeFevere D. C., Vanderwater D. A., Park K. G., Kuo C. P., Osentowski T. D., Peanasky M. J., Yu J. G., Fletcher R. M., Steigerwald D. A., Craford M. G., and Robbins V. M. "Very high-efficiency semiconductor wafer-bonded transparent substrate (AlxGa1-x)0.5In0.5P/GaP light emitting diodes" Appl. Phys. Lett. 64, 2839 (1994).
Kish F. A., Vanderwater D. A., Peanasky M. J., Ludowise M. J., Hummel S. G., and Rosner S. J. "Low-resistance ohmic conduction across compound semiconductor wafer-bonded interfaces" Appl. Phys. Lett. 67, 2060 (1995).
Nakahara, K. et al., "Improved External Efficiency InGaN-Based Light-Emitting Diodes with Transparent Conductive Ga-Doped Zn0 as p-Electrodes," Jpn. J. Appl. Phys., 2004, pp. L180-L182, vol. 43.
Narukawa, Y. et al., "Ultra-High Efficiency White Light Emitting Diodes," Jpn. J. Appl. Phys., 2006, pp. L1084-L1086, vol. 45.
Noctron seeks Chinese partners to make innovative LED products (Aug. 2006)—News—LEDs Magazine.
Orita, S. Tamura, T. Takizawa, T. Ueda, M. Yuri, S. Takigawa, D. Ueda, Jpn. J. Appl. Phys. 43, 5809 (2004).
Tadatomo, H. Okagawa, Y. Ohuchi, T. Tsunekawa, T. Jyouichi, Y. Imada, M. Kato, H. Kudo, T. Taguchi, Phys. Status Solidi A 188, 121-125 (2001).
Yamada, T. Mitani, Y. Narukawa, S. Shioji, I. Niki, S. Sonobe, K. Deguchi, M. Sano, T. Mukai, Jpn. J. Appl. Phys. 41, L1431 (2002).
"Noctron seeks Chinese partners to make innovative LED products," LEDs Magazine, Aug. 2006, https://web.archive.org/web/20061017131530/http://ledsmagazine.com/articles/news/3/8/23/1, pp. 1-2.
Han, D-S., ct al., "Improvcmcnt of Light Extraction Efficiency of Flip-Chip Light-Emitting Diode by Texturing the Bottom Side Surface of Sapphire Substrate," IEEE Photonics Technology Letters, Jul. 1, 2006, pp. 1406-1408, vol. 18, No. 13.
Schubert, E.F., Light-Emitting Diodes, 2003, p. 149, Cambridge University Press.
Stringfellow, G.B., et al., High Brightness Light Emitting Diodes, Semiconductors and Semimetals, 1997, pp. 176-177, 338-339, vol. 48, Academic Press.
Pankove, J.I., et al., Gallium Nitride (GaN) II, Semiconductors and Semimetals, 1999, p. 339, vol. 57, Academic Press.

(56) **References Cited**

OTHER PUBLICATIONS

Cuong, T. V., et al., "Calculation of the external quantum efficiency of light emitting diodes with different chip designs," Phys. Stat. Sol. (c), 2004, pp. 2433-2437, vol. 1, No. 10.

* cited by examiner




FIG. 1
CONVENTIONAL LED




FIG. 2
CONVENTIONAL LED




FIG. 3
CONVENTIONAL LED


428
424
412
420
402
416
424
400
404
424
422
406
416
408
410
424
414
418
426
418

FIG. 4A


418

FIG. 4B


532
522
514
512
510
506
504
508
500
502
520
518
516
524
530

FIG. 5A


526
528

FIG. 5B



618
614
610
618
606
608
604
614
600
616
602
620
612


FIG. 6



720
712
716
710
706
706
708
716
704
700
718
702
722
714


FIG. 7




FIG. 8A




FIG. 8B




FIG. 9




FIG. 10A




FIG. 10B




FIG. 11

REGENTS_1220_00005584



JX-0005.0015




FIG. 12A




FIG. 12B


1328
1322
1314
1318
1306
1324
1310
1300
1304
1326
1302
1308
1312
1312
1320
1316
1330

FIG. 13


1420
1418
1426
1410
1422
1414
1406
1402
1400
1404
1408
1408
1418
1416
1424
1412
1420

FIG. 14




FIG. 15A




FIG. 15B


1626
1630
1606
1622
1614
1618
1610
1600
1604
1602
1622
1608
1612
1612
1628
1620
1616
1624

FIG. 16


1720
1726
1722
1718
1724
1710
1700
1714
1706
1702
1718
1704
1708
1708
1716
1712
1720

FIG. 17




FIG. 18A




FIG. 18B







FIG. 19B

FIG. 19A




FIG. 20B FIG. 20A




FIG. 21B FIG. 21A




FIG. 22A




FIG. 22B

# TRANSPARENT LIGHT EMITTING DEVICE WITH LIGHT EMITTING DIODES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 16/567,275, filed on Sep. 11, 2019, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "FILAMENT LED LIGHT BULB,", which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 16/422,323, filed on May 24, 2019, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES,", now U.S. Pat. No. 10,454,010, issued Oct. 22, 2019, which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 16/238,736, filed on Jan. 3, 2019, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES,", which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 14/461,151, filed on Aug. 15, 2014, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES,", now U.S. Pat. No. 10,217,916, issued Feb. 26, 2019, which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 13/622,884, filed on Sep. 19, 2012, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES,", now U.S. Pat. No. 8,835,959, issued Sep. 16, 2014, which application is a continuation under 35 U.S.C. § 120 of:

U.S. Utility patent application Ser. No. 11/954,154, filed on Dec. 11, 2007, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LIGHT EMITTING DIODES,", now U.S. Pat. No. 8,294,166, issued Oct. 23, 2012, which application claims the benefit under 35 U.S.C. Section 119(e) of:

U.S. Provisional Patent Application Ser. No. 60/869,447, filed on Dec. 11, 2006, by Shuji Nakamura, Steven P. DenBaars, and Hirokuni Asamizu, entitled, "TRANSPARENT LEDS,";

all of which applications are incorporated by reference herein.

This application is related to the following co-pending and commonly-assigned applications:

U.S. Utility application Ser. No. 10/581,940, filed on Jun. 7, 2006, by Tetsuo Fujii, Yan Gao, Evelyn. L. Hu, and Shuji Nakamura, entitled "HIGHLY EFFICIENT GALLIUM NITRIDE BASED LIGHT EMITTING DIODES VIA SURFACE ROUGHENING," now U.S. Pat. No. 7,704,763, issued Apr. 27, 2010, which application claims the benefit under 35 U.S.C Section 365(c) of PCT Application Serial No. US2003/03921, filed on Dec. 9, 2003, by Tetsuo Fujii, Yan Gao, Evelyn L. Hu, and Shuji Nakamura, entitled "HIGHLY EFFICIENT GALLIUM NITRIDE BASED LIGHT EMITTING DIODES VIA SURFACE ROUGHENING,";

U.S. Utility application Ser. No. 11/054,271, filed on Feb. 9, 2005, by Rajat Sharma, P. Morgan Pattison, John F. Kaeding, and Shuji Nakamura, entitled "SEMICONDUCTOR LIGHT EMITTING DEVICE," now U.S. Pat. No. 8,227,820, issued Jul. 24, 2012; U.S. Utility application Ser. No. 11/175,761, filed on Jul. 6, 2005, by Akihiko Murai, Lee McCarthy, Umesh K. Mishra and Steven P. DenBaars, entitled "METHOD FOR WAFER BONDING (Al, In, Ga)N and Zn(S, Se) FOR OPTOELECTRONICS APPLICATIONS," now U.S. Pat. No. 7,344,958, issued Mar. 18, 2008, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/585,673, filed Jul. 6, 2004, by Akihiko Murai, Lee McCarthy, Umesh K. Mishra and Steven P. DenBaars, entitled "METHOD FOR WAFER BONDING (Al, In, Ga)N and Zn(S, Se) FOR OPTOELECTRONICS APPLICATIONS,";

U.S. Utility application Ser. No. 11/697,457, filed Apr. 6, 2007, by, Benjamin A. Haskell, Melvin B. McLaurin, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "GROWTH OF PLANAR REDUCED DISLOCATION DENSITY M-PLANE GALLIUM NITRIDE BY HYDRIDE VAPOR PHASE EPITAXY," now U.S. Pat. No. 7,956,360, issued Jun. 7, 2011, which application is a continuation of U.S. Utility application Ser. No. 11/140,893, filed May 31, 2005, by, Benjamin A. Haskell, Melvin B. McLaurin, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "GROWTH OF PLANAR REDUCED DISLOCATION DENSITY M-PLANE GALLIUM NITRIDE BY HYDRIDE VAPOR PHASE EPITAXY," now U.S. Pat. No. 7,208,393, issued Apr. 24, 2007, which application claims the benefit under 35 U.S.C. Section 119(e) of U.S. Provisional Application Ser. No. 60/576,685, filed Jun. 3, 2004, by Benjamin A. Haskell, Melvin B. McLaurin, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "GROWTH OF PLANAR REDUCED DISLOCATION DENSITY M-PLANE GALLIUM NITRIDE BY HYDRIDE VAPOR PHASE EPITAXY,";

U.S. Utility application Ser. No. 11/067,957, filed Feb. 28, 2005, by Claude C. A. Weisbuch, Aurelien J. F. David, James S. Speck and Steven P. DenBaars, entitled "HORIZONTAL EMITTING, VERITCAL EMITTING, BEAM SHAPED, DISTRIBUTED FEEDBACK (DFB) LASERS BY GROWTH OVER A PATTERNED SUBSTRATE," now U.S. Pat. No. 7,723,745, issued May 25, 2010;

U.S. Utility application Ser. No. 11/923,414, filed Oct. 24, 2007, by Claude C. A. Weisbuch, Aurelien J. F. David, James S. Speck and Steven P. DenBaars, entitled "SINGLE OR MULTI-COLOR HIGH EFFICIENCY LIGHT EMITTING DIODE (LED) BY GROWTH OVER A PATTERNED SUBSTRATE," now U.S. Pat. No. 7,755,096, issued Jul. 13, 2010, which application is a continuation of U.S. Pat. No. 7,291,864, issued Nov. 6, 2007, to Claude C. A. Weisbuch, Aurelien J. F. David, James S. Speck and Steven P. DenBaars, entitled "SINGLE OR MULTI-COLOR HIGH EFFICIENCY LIGHT EMITTING DIODE (LED) BY GROWTH OVER A PATTERNED SUBSTRATE," now U.S. Pat. No. 7,291,864, issued Nov. 6, 2007;

U.S. Utility application Ser. No. 11/067,956, filed Feb. 28, 2005, by Aurelien J. F. David, Claude C. A Weisbuch and Steven P. DenBaars, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED) WITH OPTIMIZED PHOTONIC CRYSTAL EXTRACTOR," now U.S. Pat. No. 7,582,910, issued Sep. 1, 2009;

U.S. Utility application Ser. No. 11/621,482, filed Jan. 9, 2007, by Troy J. Baker, Benjamin A. Haskell, Paul T. Fini, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH OF PLANAR SEMI-POLAR GALLIUM NITRIDE," now U.S. Pat. No. 7,704,331, issued Apr. 27, 2010, which application is a continuation of U.S. Utility application Ser. No. 11/372,914, filed Mar. 10, 2006, by Troy J. Baker, Benjamin A. Haskell,

Paul T. Fini, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH OF PLANAR SEMI-POLAR GALLIUM NITRIDE," now U.S. Pat. No. 7,220,324, issued May 22, 2007, which application claims the benefit under 35 U.S.C. Section 119(e) of U.S. Provisional Application Ser. No. 60/660,283, filed Mar. 10, 2005, by Troy J. Baker, Benjamin A. Haskell, Paul T. Fini, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH OF PLANAR SEMI-POLAR GALLIUM NITRIDE,";

U.S. Utility application Ser. No. 11/403,624, filed Apr. 13, 2006, by James S. Speck, Troy J. Baker and Benjamin A. Haskell, entitled "WAFER SEPARATION TECHNIQUE FOR THE FABRICATION OF FREE-STANDING (AL, IN, GA)N WAFERS,", which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/670,810, filed Apr. 13, 2005, by James S. Speck, Troy J. Baker and Benjamin A. Haskell, entitled "WAFER SEPARATION TECHNIQUE FOR THE FABRICATION OF FREE-STANDING (AL, IN, GA)N WAFERS, ";

U.S. Utility application Ser. No. 11/403,288, filed Apr. 13, 2006, by James S. Speck, Benjamin A. Haskell, P. Morgan Pattison and Troy J. Baker, entitled "ETCHING TECHNIQUE FOR THE FABRICATION OF THIN (AL, IN, GA)N LAYERS," now U.S. Pat. No. 7,795,146, issued Sep. 14, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/670,790, filed Apr. 13, 2005, by James S. Speck, Benjamin A. Haskell, P. Morgan Pattison and Troy J. Baker, entitled "ETCHING TECHNIQUE FOR THE FABRICATION OF THIN (AL, IN, GA)N LAYERS,";

U.S. Utility application Ser. No. 11/454,691, filed on Jun. 16, 2006, by Akihiko Murai, Christina Ye Chen, Daniel B. Thompson, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al,Ga,In)N AND ZnO DIRECT WAFER BONDING STRUCTURE FOR OPTOELECTRONIC APPLICATIONS AND ITS FABRICATION METHOD," now U.S. Pat. No. 7,719,020, issued May 18, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/691,710, filed on Jun. 17, 2005, by Akihiko Murai, Christina Ye Chen, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al, Ga, In)N AND ZnO DIRECT WAFER BONDING STRUCTURE FOR OPTOELECTRONIC APPLICATIONS, AND ITS FABRICATION METHOD,", U.S. Provisional Application Ser. No. 60/732,319, filed on Nov. 1, 2005, by Akihiko Murai, Christina Ye Chen, Daniel B. Thompson, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al, Ga, In)N AND ZnO DIRECT WAFER BONDED STRUCTURE FOR OPTOELECTRONIC APPLICATIONS, AND ITS FABRICATION METHOD,", and U.S. Provisional Application Ser. No. 60/764,881, filed on Feb. 3, 2006, by Akihiko Murai, Christina Ye Chen, Daniel B. Thompson, Lee S. McCarthy, Steven P. DenBaars, Shuji Nakamura, and Umesh K. Mishra, entitled "(Al,Ga,In)N AND ZnO DIRECT WAFER BONDED STRUCTURE FOR OPTOELECTRONIC APPLICATIONS AND ITS FABRICATION METHOD,";

U.S. Utility application Ser. No. 11/444,084, filed May 31, 2006, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "DEFECT REDUCTION OF NON-POLAR GALLIUM NITRIDE WITH SINGLE-STEP SIDEWALL LATERAL EPITAXIAL OVERGROWTH," now U.S. Pat. No. 7,361,576, issued Apr. 22, 2008, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/685,952, filed on May 31, 2005, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "DEFECT REDUCTION OF NON-POLAR GALLIUM NITRIDE WITH SINGLE-STEP SIDEWALL LATERAL EPITAXIAL OVERGROWTH,";

U.S. Utility application Ser. No. 11/870,115, filed Oct. 10, 2007, by Bilge M, Imer, James S. Speck, Steven P. DenBaars and Shuji Nakamura, entitled "GROWTH OF PLANAR NON-POLAR M-PLANE III-NITRIDE USING METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD)," now U.S. Pat. No. 8,097,481, issued Jan. 17, 2012, which application is a continuation of U.S. Utility application Ser. No. 11/444,946, filed May 31, 2006, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "GROWTH OF PLANAR NON-POLAR {1-100} M-PLANE GALLIUM NITRIDE WITH METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD)," now U.S. Pat. No. 7,338,828, issued Mar. 4, 2008, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/685,908, filed on May 31, 2005, by Bilge M, Imer, James S. Speck, and Steven P. DenBaars, entitled "GROWTH OF PLANAR NON-POLAR {1-100} M-PLANE GALLIUM NITRIDE WITH METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD),";

U.S. Utility application Ser. No. 11/444,946, filed Jun. 1, 2006, by Robert M. Farrell, Troy J. Baker, Arpan Chakraborty, Benjamin A. Haskell, P. Morgan Pattison, Rajat Sharma, Umesh K. Mishra, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH AND FABRICATION OF SEMIPOLAR (Ga, Al, In, B)N THIN FILMS, HETEROSTRUCTURES, AND DEVICES," now U.S. Pat. No. 7,846,757, issued Dec. 7, 2010, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/686,244, filed on Jun. 1, 2005, by Robert M. Farrell, Troy J. Baker, Arpan Chakraborty, Benjamin A. Haskell, P. Morgan Pattison, Rajat Sharma, Umesh K. Mishra, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "TECHNIQUE FOR THE GROWTH AND FABRICATION OF SEMIPOLAR (Ga, Al, In, B)N THIN FILMS, HETERO STRUCTURES, AND DEVICES,";

U.S. Utility application Ser. No. 11/251,365 filed Oct. 14, 2005, by Frederic S. Diana, Aurelien J. F. David, Pierre M. Petroff, and Claude C. A. Weisbuch, entitled "PHOTONIC STRUCTURES FOR EFFICIENT LIGHT EXTRACTION AND CONVERSION IN MULTI-COLOR LIGHT EMITTING DEVICES," now U.S. Pat. No. 7,768,023, issued Aug. 3, 2010;

U.S. Utility application Ser. No. 11/633,148, filed Dec. 4, 2006, Claude C. A. Weisbuch and Shuji Nakamura, entitled "IMPROVED HORIZONTAL EMITTING, VERTICAL EMITTING, BEAM SHAPED, DISTRIBUTED FEEDBACK (DFB) LASERS FABRICATED BY GROWTH OVER A PATTERNED SUBSTRATE WITH MULTIPLE OVERGROWTH," now U.S. Pat. No. 7,768,024, issued Aug. 3, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/741,935, filed Dec. 2, 2005, Claude C. A. Weisbuch and Shuji Nakamura, entitled "IMPROVED HORIZONTAL EMITTING, VERTICAL EMITTING, BEAM SHAPED, DFB LASERS FABRICATED BY GROWTH OVER PATTERNED SUBSTRATE WITH MULTIPLE OVERGROWTH,";

U.S. Utility application Ser. No. 11/517,797, filed Sep. 8, 2006, by Michael Iza, Troy J. Baker, Benjamin A. Haskell,

Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR ENHANCING GROWTH OF SEMIPOLAR (Al, In, Ga, B)N VIA METALORGANIC CHEMICAL VAPOR DEPOSITION," now U.S. Pat. No. 7,575,947, issued Aug. 18, 2009, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Application Ser. No. 60/715,491, filed on Sep. 9, 2005, by Michael Iza, Troy J. Baker, Benjamin A. Haskell, Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR ENHANCING GROWTH OF SEMIPOLAR (Al, In, Ga, B)N VIA METALORGANIC CHEMICAL VAPOR DEPOSITION,";

U.S. Utility application Ser. No. 11/593,268, filed on Nov. 6, 2006, by Steven P. DenBaars, Shuji Nakamura, Hisashi Masui, Natalie N. Fellows, and Akihiko Murai, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED)," now U.S. Pat. No. 7,994,527, issued Aug. 9, 2011, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/734,040, filed on Nov. 4, 2005, by Steven P. DenBaars, Shuji Nakamura, Hisashi Masui, Natalie N. Fellows, and Akihiko Murai, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED),";

U.S. Utility application Ser. No. 11/608,439, filed on Dec. 8, 2006, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED)," now U.S. Pat. No. 7,956,371, issued Jun. 7, 2011, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/748,480, filed on Dec. 8, 2005, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED),", and U.S. Provisional Application Ser. No. 60/764,975, filed on Feb. 3, 2006, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "HIGH EFFICIENCY LIGHT EMITTING DIODE (LED),";

U.S. Utility application Ser. No. 11/676,999, filed on Feb. 20, 2007, by Hong Zhong, John F. Kaeding, Rajat Sharma, James S. Speck, Steven P. DenBaars and Shuji Nakamura, entitled "METHOD FOR GROWTH OF SEMIPOLAR (Al, In,Ga,B)N OPTOELECTRONIC DEVICES," now U.S. Pat. No. 7,858,996, issued Dec. 28, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Application Ser. No. 60/774,467, filed on Feb. 17, 2006, by Hong Zhong, John F. Kaeding, Rajat Sharma, James S. Speck, Steven P. DenBaars and Shuji Nakamura, entitled "METHOD FOR GROWTH OF SEMIPOLAR (Al, In,Ga,B)N OPTOELECTRONIC DEVICES,";

U.S. Utility patent application Ser. No. 11/840,057, filed on Aug. 16, 2007, by Michael Iza, Hitoshi Sato, Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR DEPOSITION OF MAGNESIUM DOPED (Al, In, Ga, B)N LAYERS," now U.S. Pat. No. 7,755,172, issued Jul. 13, 2010, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/822,600, filed on Aug. 16, 2006, by Michael Iza, Hitoshi Sato, Steven P. DenBaars, and Shuji Nakamura, entitled "METHOD FOR DEPOSITION OF MAGNESIUM DOPED (Al, In, Ga, B)N LAYERS,";

U.S. Utility patent application Ser. No. 11/940,848, filed on Nov. 15, 2007, by Aurelien J. F. David, Claude C. A. Weisbuch and Steven P. DenBaars entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) THROUGH MULTIPLE EXTRACTORS,", which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,014, filed on Nov. 15, 2006, by Aurelien J. F. David, Claude C. A. Weisbuch and Steven P. DenBaars entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) THROUGH MULTIPLE EXTRACTORS,", and U.S. Provisional Patent Application Ser. No. 60/883,977, filed on Jan. 8, 2007, by Aurelien J. F. David, Claude C. A. Weisbuch and Steven P. DenBaars entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) THROUGH MULTIPLE EXTRACTORS,";



U.S. Utility patent application Ser. No. 11/940,853, filed on Nov. 15, 2007, by Claude C. A. Weisbuch, James S. Speck and Steven P. DenBaars entitled "HIGH EFFICIENCY WHITE, SINGLE OR MULTI-COLOUR LIGHT EMITTING DIODES (LEDS) BY INDEX MATCHING STRUCTURES,", which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,026, filed on Nov. 15, 2006, by Claude C. A. Weisbuch, James S. Speck and Steven P. DenBaars entitled "HIGH EFFICIENCY WHITE, SINGLE OR MULTI-COLOUR LED BY INDEX MATCHING STRUCTURES,";

U.S. Utility patent application Ser. No. 11/940,866, filed on Nov. 15, 2007, by Aurelien J. F. David, Claude C. A. Weisbuch, Steven P. DenBaars and Stacia Keller, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LIGHT EMITTING DIODE (LED) WITH EMITTERS WITHIN STRUCTURED MATERIALS," now U.S. Pat. No. 7,977,694, issued Jul. 12, 2011, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,015, filed on Nov. 15, 2006, by Aurelien J. F. David, Claude C. A. Weisbuch, Steven P. DenBaars and Stacia Keller, entitled "HIGH LIGHT EXTRACTION EFFICIENCY LED WITH EMITTERS WITHIN STRUCTURED MATERIALS,";

U.S. Utility patent application Ser. No. 11/940,876, filed on Nov. 15, 2007, by Evelyn L. Hu, Shuji Nakamura, Yong Seok Choi, Rajat Sharma and Chiou-Fu Wang, entitled "ION BEAM TREATMENT FOR THE STRUCTURAL INTEGRITY OF AIR-GAP III-NITRIDE DEVICES PRODUCED BY PHOTOELECTROCHEMICAL (PEC) ETCHING,", which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,027, filed on Nov. 15, 2006, by Evelyn L. Hu, Shuji Nakamura, Yong Seok Choi, Rajat Sharma and Chiou-Fu Wang, entitled "ION BEAM TREATMENT FOR THE STRUCTURAL INTEGRITY OF AIR-GAP III-NITRIDE DEVICES PRODUCED BY PHOTOELECTROCHEMICAL (PEC) ETCHING,";

U.S. Utility patent application Ser. No. 11/940,885, filed on Nov. 15, 2007, by Natalie N. Fellows, Steven P. DenBaars and Shuji Nakamura, entitled "TEXTURED PHOSPHOR CONVERSION LAYER LIGHT EMITTING DIODE,", now U.S. Pat. No. 8,860,051, issued Oct. 14, 2014, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,024, filed on Nov. 15, 2006, by Natalie N. Fellows, Steven P. DenBaars and Shuji Nakamura, entitled "TEXTURED PHOSPHOR CONVERSION LAYER LIGHT EMITTING DIODE,";

U.S. Utility patent application Ser. No. 11/940,872, filed on Nov. 15, 2007, by Steven P. DenBaars, Shuji Nakamura and Hisashi Masui, entitled "HIGH LIGHT EXTRACTION EFFICIENCY SPHERE LED,", which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,025, filed on Nov. 15, 2006, by Steven P. DenBaars, Shuji Nakamura and Hisashi Masui, entitled "HIGH LIGHT EXTRACTION EFFICIENCY SPHERE LED,";

U.S. Utility patent application Ser. No. 11/940,883, filed on Nov. 15, 2007, by Shuji Nakamura and Steven P. DenBaars, entitled "STANDING TRANSPARENT MIRRORLESS LIGHT EMITTING DIODE," now U.S. Pat. No. 7,687,813, issued Mar. 30, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,017, filed on Nov. 15, 2006, by Shuji Nakamura and Steven P. DenBaars, entitled "STANDING TRANSPARENT MIRROR-LESS (STML) LIGHT EMITTING DIODE,"; U.S. Utility patent application Ser. No. 11/940,898, filed on Nov. 15, 2007, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "TRANSPARENT MIRRORLESS LIGHT EMITTING DIODE," now U.S. Pat. No. 7,781,789, issued Aug. 24, 2010, which application claims the benefit under 35 U.S.C Section 119(e) of U.S. Provisional Patent Application Ser. No. 60/866,023, filed on Nov. 15, 2006, by Steven P. DenBaars, Shuji Nakamura and James S. Speck, entitled "TRANSPARENT MIRROR-LESS (TML) LIGHT EMITTING DIODE,";

U.S. Utility patent application Ser. No. 11/954,163, filed on Dec. 11, 2007, by Steven P. DenBaars and Shuji Nakamura, entitled "LEAD FRAME FOR TRANSPARENT MIRRORLESS LIGHT EMITTING DIODE," which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,454, filed on Dec. 11, 2006, by Steven P. DenBaars and Shuji Nakamura, entitled "LEAD FRAME FOR TM-LED,";

U.S. Utility patent application Ser. No. 12/001,286, filed on Dec. 11, 2007, by Mathew C. Schmidt, Kwang Choong Kim, Hitoshi Sato, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "METALORGANIC CHEMICAL VAPOR DEPOSITION (MOCVD) GROWTH OF HIGH PERFORMANCE NON-POLAR III-NITRIDE OPTICAL DEVICES," now U.S. Pat. No. 7,842,527, issued Nov. 30, 2010, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,535, filed on Dec. 11, 2006, by Mathew C. Schmidt, Kwang Choong Kim, Hitoshi Sato, Steven P. DenBaars, James S. Speck, and Shuji Nakamura, entitled "MOCVD GROWTH OF HIGH PERFORMANCE M-PLANE GAN OPTICAL DEVICES,";

U.S. Utility patent application Ser. No. 12/001,227, filed on Dec. 11, 2007, by Steven P. DenBaars, Mathew C. Schmidt, Kwang Choong Kim, James S. Speck, and Shuji Nakamura, entitled, "NON-POLAR AND SEMI-POLAR EMITTING DEVICES," now U.S. Pat. No. 9,130,119, issued Sep. 8, 2015, which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,540, filed on Dec. 11, 2006, by Steven P. DenBaars, Mathew C. Schmidt, Kwang Choong Kim, James S. Speck, and Shuji Nakamura, entitled, "NON-POLAR (M-PLANE) AND SEMI-POLAR EMITTING DEVICES,"; and

U.S. Utility patent application Ser. No. 11/954,172, filed on Dec. 11, 2007, by Kwang Choong Kim, Mathew C. Schmidt, Feng Wu, Asako Hirai, Melvin B. McLaurin, Steven P. DenBaars, Shuji Nakamura, and James S. Speck, entitled, "CRYSTAL GROWTH OF M-PLANE AND SEMIPOLAR PLANES OF (AL, IN, GA, B)N ON VARIOUS SUBSTRATES,", which claims the benefit under 35 U.S.C. 119(e) of U.S. Provisional Patent Application Ser. No. 60/869,701, filed on Dec. 12, 2006, by Kwang Choong Kim, Mathew C. Schmidt, Feng Wu, Asako Hirai, Melvin B. McLaurin, Steven P. DenBaars, Shuji Nakamura, and James



S. Speck, entitled, "CRYSTAL GROWTH OF M-PLANE AND SEMIPOLAR PLANES OF (AL, IN, GA, B)N ON VARIOUS SUBSTRATES,";

all of which applications are incorporated by reference herein.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention is related to light extraction from light emitting diodes (LEDs).

### 2. Description of the Related Art

(Note: This application references a number of different publications as indicated throughout the specification. In addition, a list of a number of different publications can be found below in the section entitled "References." Each of these publications is incorporated by reference herein.)

In order to increase the light output power from the front side of a light emitting diode (LED), the emitted light is reflected by a mirror placed on the backside of the substrate or is reflected by a mirror coating on the lead frame, even if there are no mirrors on the backside of the substrate, if the bonding material is transparent on the emission wavelength. However, this reflected light is re-absorbed by the emitting layer (active layer), because the photon energy is almost same as the band-gap energy of the light emitting species, such as AlInGaN multiple quantum wells (MQWs). The efficiency or output power of the LEDs is decreased due to this re-absorption of the light by the emitting layer. See, for example, FIGS. **1**, **2** and **3**, which are described in more detail below. See also Jpn. J. Appl. Phys., 34, L797-99 (1995) and Jpn. J. Appl. Phys., 43, L180-82 (2004).

What is needed in the art are LED structures that more effectively extract light. The present invention satisfies that need.

## SUMMARY OF THE INVENTION

The present invention describes a transparent light emitting diode. Generally, the present invention describes a light emitting device comprised of a plurality of III-nitride layers, including an active region that emits light, wherein all of the layers except for the active region are transparent for an emission wavelength of the light, such that the light is extracted effectively through all of the layers and in multiple directions through the layers. Moreover, the surface of one or more of the III-nitride layers may be roughened, textured, patterned or shaped to enhance light extraction.

In one embodiment, the III-nitride layers reside on a transparent substrate or sub-mount, wherein the III-nitride layers are wafer bonded with the transparent substrate or sub-mount using a transparent glue, a transparent epoxy, or other transparent material, and light is extracted through the transparent substrate or sub-mount. The transparent substrate or sub-mount are electrically conductive, as is the transparent glue, transparent epoxy, or other transparent material.

A lead frame supports the III-nitride layers (as well as the transparent substrate or sub-mount), which reside on a transparent plate in the lead frame. Thus, the light emitted from the III-nitride layers is transmitted through the transparent plate in the lead frame. Moreover, the device may include one or more transparent conducting layers that are positioned to electrically connect the III-nitride layers, and

one or more current spreading layers that are deposited on the III-nitride layers, wherein the transparent conducting layers are deposited on the current spreading layers. Mirrors or mirrored surfaces are eliminated from the device to minimize internal reflections in order to minimize re-absorption of the light by the active region.

In another embodiment, the III-nitride layers are embedded in or combined with a shaped optical element, and the light is extracted from more than one surface of the III-nitride layers before entering the shaped optical element and subsequently being extracted. Specifically, at least a portion of the light entering the shaped optical element lies within a critical angle and is extracted. Moreover, one or more surfaces of the shaped optical element may be roughened, textured, patterned or shaped to enhance light extraction. Further, the shaped optical element may include a phosphor layer, which may be roughened, textured, patterned or shaped to enhance light extraction. The shaped optical element may be an inverted cone shape, wherein the III-nitride layers are positioned within the inverted cone shape such that the light is reflected by sidewalls of the inverted cone shape.

In yet another embodiment, an insulating layer covering the III-nitride layers is partially removed, and a conductive layer is deposited within a hole or depression in the surface of the insulating layer to make electrical contact with the III-nitride layers.

## BRIEF DESCRIPTION OF THE DRAWINGS

Referring now to the drawings in which like reference numbers represent corresponding parts throughout:

FIGS. **1**, **2** and **3** are cross-sectional schematic illustrations of conventional LEDs.

FIGS. **4**A and **4**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **5**A and **5**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **6** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **7** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **8**A and **8**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **9** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **10**A and **10**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **11** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **12**A and **12**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **13** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **14** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **15**A and **15**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **16** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIG. **17** is a schematic illustration of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **18**A and **18**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **19**A and **19**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **20**A and **20**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **21**A and **21**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

FIGS. **22**A and **22**B are schematic and plan view illustrations, respectively, of an improved LED structure according to the preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

In the following description of the preferred embodiment, reference is made to the accompanying drawings which form a part hereof, and in which is shown by way of illustration a specific embodiment in which the invention may be practiced. It is to be understood that other embodiments may be utilized and structural changes may be made without departing from the scope of the present invention.

Overview

In the following description of the figures, the details of the LED structures are not shown. Only the emitting layer (usually AlInGaN MQW), p-type GaN layer, n-type GaN layer and sapphire substrate are shown. Of course, there may be other layers in the LED structure, such as a p-AlGaN electron blocking layer, InGaN/GaN super lattices and others. In this invention, the most important aspects are the surfaces of the LED structure, because the light extraction efficiency is determined mainly by the surface layer or condition of the epitaxial wafers. Consequently, only some aspects (the surface layers) of the LED are shown in all of the figures.

Conventional LED Structures

FIGS. **1**, **2** and **3** are schematic illustrations of conventional LEDs.

In conventional LEDs, in order to increase the light output power from the front side of the LED, the emitting light is reflected by the mirror on the backside of the sapphire substrate or the mirror coating on the lead frame even if there is no mirrors on the backside of the sapphire substrate and if the bonding material is transparent on the emission wavelength. This reflected light is re-absorbed by the emitting layer (active layer) because the photon energy is almost same as the band-gap energy of the quantum well of AlInGaN multi-quantum well (MQW). Then, the efficiency or output power of the LEDs is decreased due to the re-absorption by the emitting layer.

In FIG. **1**, a conventional LED includes a sapphire substrate **100**, emitting layer **102** (active layer), and semi-transparent or transparent electrodes **104**, such as ITO or ZnO. The LED is die-bonded on a lead frame **106** with a

clear epoxy molding **108** without any mirror on the back side of the sapphire substrate **100**. In this case, the coating material on the lead frame **106**, or the surface of the lead frame **106**, becomes a mirror **110**. If there is a mirror **110** on the back side of the substrate **100**, the LED chip is die-bonded using an Ag paste. The active layer **102** emits light **112** towards the substrate **100** and emits light **114** towards the electrodes **104**. The emitting light **112** is reflected by the mirror **110** towards the electrode **104**, becoming reflected light **116** which is transmitted by the electrode **104** to escape the LED. The LED is wire bonded **118** to the lead frame **106**.

In FIG. **2**, the conventional LED is similar to that shown in FIG. **1**, except that it is a flip-chip LED. The LED includes a sapphire substrate **200** and emitting layer **202** (active layer), and a highly reflective mirror **204**. The LED is die-bonded **206** onto a lead frame **208** and embedded in a clear epoxy molding **210**. The active layer **202** emits light **212** towards the substrate **200** and emits light **214** towards the highly reflective mirror **204**. The emitting light **214** is reflected by the mirror **204** towards the substrate **200**, becoming reflected light **216** which is transmitted by the substrate **200** to escape the LED.

In FIG. **3**, the conventional LED includes a conducting sub-mount **300**, high reflectivity mirror **302** (with Ag>94% reflectivity (R)), a transparent ITO layer **304**, a p-GaN layer **306**, an emitting or active layer **308**, and an n-GaN layer **310**. The LED is shown without the epoxy molding, although similar molding may be used. The emitting layer **308** emits LED emissions **312** towards the mirror **302** and emits LED emissions **314** towards the n-GaN layer **310**. The emission **312** of the emitting layer **308** is reflected by the mirror **302**, where the reflective light emissions **316** are re-absorbed by the emitting layer **308**. The efficiency of the LED is decreased due to this re-absorption. The n-GaN layer may be roughened **317** to enhance extraction **318** of LED emissions **314**.

Improved LED Structures

The present invention describes a transparent LED. Generally, the present invention describes a light emitting device comprised of a plurality of III-nitride layers, including an active region that emits light, wherein all of the layers except for the active region are transparent for an emission wavelength of the light, such that the light is extracted effectively through all of the layers and in multiple directions through the layers. The surface of one or more of the III-nitride layers may be roughened, textured, patterned or shaped to enhance light extraction.

FIG. **4**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **400**, an n-type GaN layer **402**, a p-type GaN layer **404**, a first ITO layer **406**, a second ITO layer **408**, and a glass layer **410**. The n-type GaN layer **402** may have surface **412** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface), and the glass layer **410** may have a surface **414** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface). The LED is wire bonded **416** to a lead frame **418** via bonding pads **420**, **422**. FIG. **4**B shows a top view of the lead frame **418**.

In FIG. **4**A, the LED structure is grown on a sapphire substrate, which is removed using a laser de-bonding technique. Thereafter, the first ITO layer **406** is deposited on the p-type GaN layer **404**. The LED structure is then attached to the glass layer **410**, which is coated by the second ITO layer **408**, using an epoxy as a glue. The LED structure is then wire bonded **416** to the lead frame **418**.



In FIG. **4**A, there are no intentional mirrors at the front or back sides of the LED. Instead, the lead frame **418** is designed to effectively extract light **424** from both sides of the LED, because the frame **418** does not obstruct the surfaces **412** and **414**, i.e., the back side **426** of the LED as well as the front side **428** of the LED. FIG. **4**B shows that the frame **418** supports the LED at the edges of the glass layer **410**, leaving the emitting surface of the glass layer **410** and LED unobstructed.

An ohmic contact may be placed below the bonding pad **420** on the n-GaN layer **402**, but is not shown in the figure for simplicity.

FIG. **5**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN multiple quantum well (MQW) layer as an emitting layer **500**, an n-type GaN layer **502**, a p-type GaN layer **504**, an ITO or ZnO layer **506**, a transparent insulating layer **508**, and transparent conductive glue **510** for bonding the ITO or ZnO layer **506** to a transparent conductive substrate **512**. The transparent conductive substrate **512** may have a surface **514** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface), and the n-GaN layer **504** may have a surface **516** that is roughened, textured, patterned or shaped (e.g., a cone shaped surface). Preferably, the layers **500**, **502**, **504** and **506** have a combined thickness **518** of approximately 5 microns, and the substrate **512** and glue **510** have a combined thickness **520** of approximately 400 microns. Finally, ohmic electrode/bonding pads **522**, **524** are placed on the LED.

The LED structure may be grown on a sapphire substrate, which is removed using a laser de-bonding technique. The ITO layer **506** is then deposited on the p-type GaN layer **504**. Before deposition of the ITO layer **506**, the insulating layer **508**, which may comprise $SiO_2$ or SiN, is deposited as a current spreading layer. Without the current spreading layer **508**, the emission intensity of the LED becomes small due to non-uniform current flows. The transparent conductive substrate **512**, which may be ZnO, $Ga_2O_3$, or another material that is transparent at the desired wavelengths, is wafer bonded or glued to the ITO layer **506** using the transparent conductive glue **510**. Then, an n-GaN ohmic electrode/bonding pad **522** and an p-GaN ohmic electrode/bonding pad **524** are formed on both sides of the LED structure. Finally, the nitrogen-face (N-face) of the n-type GaN layer **502** is roughened, textured, patterned or shaped **516** to enhance light extraction, for example, using a wet etching, such as KOH or HCL, to form a cone-shaped surface **516**.

FIG. **5**B is a plan view of the LED of FIG. **5**A, and shows the LED placed on a transparent plate **526**, which resides on a lead frame **528**, both of which work to remove heat from the LED. The p-side of the LED (i.e., the side with the substrate **512**) is attached to the transparent plate **526**. Wire bonding is performed between the bonding pad **524** of the n-type GaN layer **502** and the lead frame **528**.

There are no intentional mirrors at the front **530** or back sides **532** of the LED. Instead, the lead frame **528** is designed to effectively extract light from both sides of the LED, i.e., the back side **532** of the LED as well as the front side **530** of the LED.

Finally, an ohmic contact may be placed below the bonding pad **524** of the n-GaN layer **502**. However, this ohmic contact is not shown in the figure for simplicity.

FIG. **6** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises

an InGaN MQW active layer **600**, an n-GaN layer **602**, a p-GaN layer **604**, an epoxy layer **606** (which is approximately 400 microns thick **608**), a bonding pad **610**, an ohmic electrode/bonding pad **612**, and an ITO or ZnO layer **614**. The combined thickness **616** of the n-GaN layer **602**, active layer **600** and p-GaN layer **604** is approximately 5 microns.

FIG. **7** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW active layer **700**, an n-GaN layer **702**, a p-GaN layer **704**, an epoxy layer **706** (approximately 400 microns thick **708**), a narrow stripe Au connection **710**, a bonding pad **712**, an ohmic electrode/bonding pad **714**, and ITO or ZnO **716**. The thickness **718** of the n-GaN **702**, active layer **700** and p-GaN layer **704** is approximately 5 microns.

In both FIGS. **6** and **7**, a thick epoxy layer **606**, **706** is used, rather than the glass layer **410** shown in FIG. **4**. To make electrical contact, the epoxy insulating layers **606**, **706** are partially removed, and the ITO layer **614**, which is a transparent metal oxide, or a narrow stripe of Au or other metal layer **710**, are deposited on the epoxy layers **606**, **706**, as well as within a hole or depression **618**, **720** in the surface of the epoxy layers **606**, **706**, to make electrical; contact with the p-GaN layer **604**, **704**.

In addition, both FIGS. **6** and **7** show that roughened, textured, patterned or shaped surfaces **620**, **722** are formed on the nitrogen face (N-face) of the n-type GaN layers **602**, **702**. These roughened, textured, patterned or shaped surfaces **620**, **722** enhance light extraction. Note that, if a GaN substrate is used instead of a sapphire substrate, laser de-bonding would not be required and, a result, the sub-mounts **606**, **706** would not be required. Moreover, if the LED structure is created on a GaN substrate, the ITO layer **614** would be deposited on the p-type GaN layer **604** and the backside of the GaN substrate, which is an N-face GaN, could be etched using a wet etching, such as KOH and HCL in order to form surfaces **620**, **722** that are roughened, textured, patterned or shaped on the n-type GaN layers **602**, **702**.

Note also that, if the surface of the ITO layer **614** is roughened, textured, patterned or shaped, light extraction is increased through the ITO layer **614**. Even without the ITO layer **614** on the p-type GaN layer **604**, the roughening, texturing, patterning or shaping of the surface of the p-type GaN layer **604** is effective to increase the light extraction through the p-type GaN layer **604**.

Finally, an ohmic contact for the n-type GaN layer **612**, and the ITO or ZnO layer **614** may be used after the surface **620** roughening, texturing, patterning or shaping of the n-type GaN layer **602**. The ITO or ZnO layer **614** has a similar refractive index as GaN and, as a result, the light reflection at the interface between the ITO, ZnO and GaN is minimized. FIG. **8**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **800**, an n-type GaN layer **802**, a p-type GaN layer **804**, a first ITO layer **806**, a second ITO layer **808**, and a glass layer **810**. The n-type GaN layer **802** has a surface **812** that is roughened, textured, patterned or shaped (e.g., a cone shape surface), and the glass layer **810** has a surface **814** that is roughened, textured, patterned or shaped (e.g., a cone shape surface). The LED is wire bonded **816** to a lead frame or sub-mount **818** using the bonding pads **820**, **822**.

The LED may be embedded with or contained in a molding or shaped optical element **824**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **824** may include a phosphor layer **826**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **824**. In this embodiment, the emitting layer **800** emits light **828** towards the surfaces **812** and **814**, where the light can be extracted **830**.



In this embodiment, because the shaped optical element **824** is a sphere, the LED structure can be considered a small spot light source, because the direction of all of the light emitted from the LED is substantially normal to the interface between air and the sphere **824**, and the light therefrom is effectively extracted to air through the interface between air and the sphere **824**.

In addition, if the phosphor layer **826** is placed on or near the outer surface of the shaped optical element, the conversion efficiency, for example, from blue light to white light, is increased due to reduced re-absorption of the light **828** resulting from reduced back scattering of the light **828** by the phosphor layer **826**. Moreover, if the surface **834** of the phosphor layer **826** is roughened, textured, patterned or shaped, light extraction is again increased.

Finally, FIG. **8**B is a top view of the device in FIG. **8**A, illustrating the lead frame **818**.

FIG. **9** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW emitting layer **900**, an n-type GaN layer **902**, a p-type GaN layer **904**, an ITO layer **906** having a surface **908** that is roughened, textured, patterned or shaped, a bonding pad **910**, an ohmic contact/bonding pad **912**, a surface **914** of the n-type GaN layer **902** that is roughened, textured, patterned or shaped, and an epoxy layer **916** that is deposited on the **908**. The LED may be embedded with or contained in a molding or shaped optical element **918**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **918** may include a phosphor layer **920**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **918**.

In FIG. **9**, the ITO or ZnO layer **906** is roughened, textured, patterned or shaped to improve light extraction through the ITO or ZnO layer **906**. In addition, the epoxy **918** is sub-mounted. Otherwise, the structure of FIG. **9** is the same as that shown in FIGS. **6-8**.

FIG. **10**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW emitting layer **1000**, an n-type GaN layer **1002**, a p-type GaN layer **1004**, an ITO layer **1006**, a bonding pad **1008**, an ohmic contact/bonding pad **1010**, a surface **1012** of the ITO layer **1006** that is roughened, textured, patterned or shaped, a surface **1014** of the n-type GaN layer **1002** that is roughened, textured, patterned or shaped, and an epoxy layer **1016** that is deposited on the surface **1012**.

The LED may be embedded with or contained in a molding or shaped optical element **1018**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **1018** may include a phosphor layer **1020**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **1018**.

The LED may also include a current spreading layer **1022**, which may comprise SiN, $SiO_2$, or some other insulating

material, for example, is deposited before the ITO or ZnO layer **1006** to flow the current uniformly through the p-type GaN layer **1004**.

Finally, the LED is wire bonded **1024** to a lead frame **1026**. FIG. **10**B shows a top view of the lead frame **1026**.

FIG. **11** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an InGaN MQW emitting layer **1100**, an n-type GaN layer **1102**, a p-type GaN layer **1104**, an ITO layer **1106**, a bonding pad **1108**, an ohmic contact/bonding pad **1110**, a surface **1112** of the ITO layer **1106** that is roughened, textured, patterned or shaped, a surface **1114** of the p-type GaN layer **1102** that is roughened, textured, patterned or shaped, and an epoxy layer **1116** that is deposited on the surface **1112**.

The LED may be embedded with or contained in a molding or shaped optical element **1118**, such as a sphere made of epoxy or glass, forming, for example, a lens. The shaped optical element **1118** may include a phosphor layer **1120**, which may be remote from the LED, that is roughened, textured, patterned or shaped, for example, on an outer surface of the shaped optical element **1118**.

The LED may also include a current spreading layer **1122**, which may comprise SiN, $SiO_2$, or some other insulating material, for example, that is deposited before the ITO or ZnO layer **1106** to flow the current uniformly through the p-type GaN layer **1104**.

Finally, the LED is wire bonded **1124** to a lead frame **1126**. FIG. **11**B shows a top view of the lead frame **1126**.

In the embodiment of FIG. **11**, a mirror **1128** is placed outside of the shaped optical element **1118**, in order to obtain more light from a front side **1130** of the device. The shape of the mirror is designed to prevent reflected light from reaching the LED, in order to reduce re-absorption of the light by the LED.

FIG. **12**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **1200**, an n-type GaN layer **1202**, a p-type GaN layer **1204**, an ITO or ZnO layer **1206**, and a substrate **1208**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS). The LED is wire bonded **1210** to a lead frame **1212**, and embedded in or combined with moldings or shaped optical elements **1214**, **1216**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1214**, **1216** are formed on opposite sides, e.g., the top/front and bottom/back sides of the LED, wherein the emitting layer **1200** emits light **1222** that is extracted from both the top/front and bottom/back sides of the LED.

The LED is electrically connected to the lead frame **1218** via bonding pads **1224**, **1226**. The bonding pad **1224** is deposited on the ITO or ZnO layer **1206**, and the ohmic contact/bonding pad **1226** is deposited on the n-type GaN layer **1202** after the n-type GaN **1202** layer is exposed by a selective etch through the p-type GaN layer **1204**.

As noted above, the LED may be combined with epoxy or glass and molded as an inverted cone-shapes **1214**, **1216** for both the front **1218** and back sides **1220**, wherein the inverted cone molding shape **1214**, **1216** provides enhanced light extraction. Specifically, most of the light entering the inverted cone shapes **1214**, **1216** lies within a critical angle and is extracted. The light is reflected to a top or emitting surface of the inverted cone shape **1214** by the side walls of the inverted cone shape **1214** for emission through the top surface of the inverted cone shape **1214**, and similarly, the light is reflected to a bottom or emitting surface of the inverted cone shape **1216** by the side walls of the inverted cone shape **1216** for emission through the bottom surface of the inverted cone shape **1214**.

Finally, note that a patterned sapphire substrate (PSS) **1208** improves the light extraction efficiency through the interface **1228** between the n-GaN layer **1202** and the substrate **1208**. In addition, the backside **1230** of the sapphire substrate **1208** may be roughened, textured, patterned or shaped (e.g., a cone shaped surface) to increase the light extraction efficiency.

FIG. **12**B shows a top view of the lead frame **1212**.

FIG. **13** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **1300**, an n-type GaN layer **1302**, a p-type GaN layer **1304**, an ITO or ZnO layer **1306**, and a substrate **1308**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS). The LED is wire bonded **1310** to a lead frame **1312**, and embedded in or combined with moldings or shaped optical elements **1314**, **1316**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1314**, **1316** are formed on opposite sides, e.g., the top/front and bottom/back sides of the LED, wherein the emitting layer **1300** emits light **1322** that is extracted from both the top/front and bottom/back sides of the LED.

The LED is electrically connected to the lead frame **1318** via bonding pads **1324**, **1326**. The bonding pad **1324** is deposited on the ITO or ZnO layer **1306**, and the ohmic contact/bonding pad **1326** is deposited on the n-type GaN layer **1302** after the n-type GaN **1302** layer is exposed by a selective etch through the p-type GaN layer **1304**.

As noted above, the LED may be combined with epoxy or glass and molded as an inverted cone-shapes **1314**, **1316** for both the front **1318** and back sides **1320**, wherein the inverted cone molding shape **1314**, **1316** provides enhanced light extraction. Specifically, most of the light entering the inverted cone shapes **1314**, **1316** lies within a critical angle and is extracted. The light is reflected to a top or emitting surface of the inverted cone shape **1314** by the side walls of the inverted cone shape **1314** for emission through the top surface of the inverted cone shape **1314**, and similarly, the light is reflected to a bottom or emitting surface of the inverted cone shape **1316** by the side walls of the inverted cone shape **1316** for emission through the bottom surface of the inverted cone shape **1314**. Moreover, the top/front surface **1328** of the shaped optical elements **1314**, and the bottom/back surface **1330** of the shaped optical element **1316** may be roughened, textured, patterned, or shaped to increase the light extraction through the elements **1314**, **1316**.

FIG. **14** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1400** includes an emitting layer **1402** and a substrate **1404** (as well as other layers), and the substrate **1404** is a flat or patterned sapphire substrate. The LED **1400** is wire bonded **1406** to a lead frame **1408**, and embedded in or combined with moldings or shaped optical elements **1410**, **1412**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1410**, **1412** are formed on opposite sides, e.g., the top/front side **1414** and bottom/back side **1416** of the LED **1400**, wherein the emitting layer **1402** emits light **1418** that

is extracted from both the top/front side **1414** and bottom/back side **1416** of the LED **1400**.

In FIG. **14**, phosphor layers **1420** may be placed near the top/front surface **1422** of the shaped optical element **1410** and the bottom/back surface **1424** of the shaped optical element **1412**. Preferably, the phosphor layers **1420** should be positioned as far away as possible from the LED **1400**. In this case, the conversion efficiency of the blue light to white light is increased, due to reduced re-absorption of the emitted light by the LED **1400** resulting from reduced back-scattering of the light by the phosphor layers **1420** to the LED **1400**. Moreover, the surfaces **1426** of the phosphor layers **1420** may be roughened, textured, patterned or shaped to improve light extraction.

FIG. **15**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1500** comprises an emitting layer **1502**, an n-type GaN layer **1504**, a p-type GaN layer **1506**, an ITO or ZnO layer **1508**, and a substrate **1510**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS).

The LED **1500** is wire bonded **1512** to a lead frame **1514**, wherein FIG. **15**B is a schematic illustration showing the top view of the lead frame **1514**.

In this embodiment, the LED **1500** is embedded in or combined with moldings or shaped optical elements **1516**, **1518**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. The shaped optical elements **1516**, **1518** are formed on opposite sides, e.g., the top/front side **1520** and bottom/back side **1522** of the LED **1500**, wherein the emitting layer **1502** emits light **1524** that is extracted from both the top/front side **1520** and bottom/back side **1522** of the LED **1500**.

A mirror **1526** may be placed inside the shaped optical element **1518** to increase the light output to the front side **1528** of the LED **1500**. Moreover, the shape of the mirror **1526** is designed to prevent reflections of the light **1530** emitted from the LED **1500** from being re-absorbed by the LED **1500**, which would reduce the output power or the efficiency of the LED. Instead, the mirror **1526** guides the reflected light **1530** away from the LED **1500**.

In addition, the mirror **1526** is only partially attached (or not attached at all) to the LED **1500** or the substrate **1510**. This differs from conventional LEDs, where mirrors are attached to the entire surface of the LED, for example, as shown in FIGS. **1-3**.

FIG. **16** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure comprises an emitting layer **1600**, an n-type GaN layer **1602**, a p-type GaN layer **1604**, an ITO or ZnO layer **1606**, and a substrate **1608**, which may be a flat sapphire substrate or a patterned sapphire substrate (PSS). The LED is wire bonded **1610** to a lead frame **1612**.

In this embodiment, the LED is embedded in or combined with moldings or shaped optical elements **1614**, **1616**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. The shaped optical elements **1614**, **1616** are formed on opposite sides, e.g., the top/front side **1618** and bottom/back side **1620** of the LED, wherein the emitting layer **1602** emits light **1622** that is extracted from both the top/front side **1618** and bottom/back side **1620** of the LED.

A mirror **1624** may be placed inside the shaped optical element **1616** to increase the light output to the front side **1626** of the LED. Moreover, the shape of the mirror **1624** is designed to prevent reflections of the light **1628** emitted from the LED from being re-absorbed by the LED, which would reduce the output power or the efficiency of the LED. Instead, the mirror **1624** guides the reflected light **1628** away from the LED.

In addition, the mirror **1624** is only partially attached (or not attached at all) to the LED or the substrate **1608**. This differs from conventional LEDs, where mirrors are attached to the entire surface of the LED, for example, as shown in FIGS. **1-3**.

Finally, the top/front surface **1630** of the shaped optical element **1614** is roughened, textured, patterned or shaped to improve light extraction efficiency.

FIG. **17** is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1700** includes an emitting layer **1702** and a substrate **1704** (as well as other layers), and the substrate **1704** is a flat or patterned sapphire substrate. The LED **1700** is wire bonded **1706** to a lead frame **1708**, and embedded in or combined with moldings or shaped optical elements **1710**, **1712**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **1710**, **1712** are formed on opposite sides, e.g., the top/front side **1714** and bottom/back side **1716** of the LED **1700**, wherein the emitting layer **1702** emits light **1718** that is extracted from both the top/front side **1714** and bottom/back side **1716** of the LED **1700**.

In FIG. **17**, a mirror **1720** may be placed inside the shaped optical element **1712** to increase the light output directed to the front side **1720** of the LED **1700**. Moreover, a phosphor layer **1722** may be placed near the top surface **1724** of the shaped optical element **1710**. Preferably, the phosphor layer **1722** is positioned as far away as possible from the LED **1700**. In this case, the conversion efficiency of the blue light to white light is increased, due to reduced re-absorption of the light **1718** emitted from the LED **1700** resulting from reduced back-scattering by the phosphor layer **1722**. In addition, the surface **1726** of the phosphor layer **1722** may be roughened, textured, patterned or shaped to improve light extraction through the phosphor layer **1722**.

FIG. **18**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1800** includes an emitting layer **1802** and a substrate **1804** (as well as other layers). The LED **1800** is wire bonded **1806** to a lead frame **1808**, wherein FIG. **18**B is an illustration showing the top view of the lead frame **1808**.

In this embodiment, the LED **1800** is embedded in or combined with a molding or shaped optical element **1810**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Light **1812** emitted by the emitting layer **1802** is reflected by mirrors **1814** positioned within the shaped optical element **1810**, towards the front side **1816** of the shaped optical element **1810**, away from the back side **1818** of the shaped optical element **1810**, wherein the reflected light **1820** is output from the shaped optical element **1810**.

FIG. **19**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **1900** includes an emitting layer **1902** and a substrate **1904** (as well as other layers). The LED **1900** is wire bonded **1906** to a lead frame **1908**, wherein FIG. **19**B is an illustration showing the top view of the lead frame **1908**.

In this embodiment, the LED **1900** is embedded in or combined with a molding or shaped optical element **1910**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Light **1912** emitted by the

emitting layer **1902** is reflected by the sidewalls **1914** of the shaped optical element **1910**, towards the front side **1916** of the shaped optical element **1910**, wherein the reflected light **1918** is output from the shaped optical element **1910**, and away from the back side **1920** of the shaped optical element **1910**.

Preferably, the LED **1900** is positioned within the shaped optical element **1910** such that the light **1912** emitted by the LED is reflected by mirrored surfaces **1922** of the sidewalls **1914**, wherein the mirrored surfaces **1922** are deposited or attached to the sidewalls **1914**. The angle **1924** of the sidewalls **1914** relative to the base **1920** of the shaped optical element **1910** is a critical angle that reflects the light **1912** emitted from the LED **1900** to the front side **1916** of the shaped optical element **1910**. For example, the refractive index of epoxy is $n_2=1.5$, the refractive index of the air is $n_1=1$, and, as a result, the critical angle of the reflection is $\sin^{-1}(1/1.5)$. Therefore, the angle **1924** of the sidewalls **1914** should be more than $\sin^{-1}(1/1.5)$. This results in the reflected light **1912** from the LED **1900** being effectively extracted from the top surface **1928** of the shaped optical element in the direction labeled by **1926**.

FIG. **20**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure includes an emitting layer **2000** and a substrate **2002** (as well as other layers). The LED is wire bonded **2004** to a lead frame **2006**, wherein FIG. **20**B is a top view of the lead frame **2006**.

In this embodiment, the LED is embedded in or combined with a molding or shaped optical element **2008**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Light **2010** emitted by the emitting layer **2002** is reflected by the sidewalls **2012** of the shaped optical element **2008**, towards the front side **2014** of the shaped optical element **2008**, wherein the reflected light **2016** is output from the shaped optical element **2008**, and away from the back side **2018** of the shaped optical element **2008**.

Preferably, the LED is positioned within the shaped optical element **2008** such that the light **2010** emitted by the LED is reflected by the sidewalls **2012**. Moreover, the front or top surface **2020** of the shaped optical element **2008** is roughened, textured, patterned or shaped to increase light extraction.

The angle **2022** of the sidewalls **2012** relative to the base **2018** of the shaped optical element **2008** is a critical angle that reflects the **2010** emitted from the LED to the front side **2014** of the shaped optical element **2008**. For example, the refractive index of epoxy is $n_2=1.5$, the refractive index of the air is $n_1=1$, and, as a result, the critical angle of the reflection is $\sin^{-1}(1/1.5)$. Therefore, the angle **2022** of the sidewalls **2012** should be more than $\sin^{-1}(1/1.5)$. This results in the reflected light **2010** from the LED being effectively extracted from the front surface **2020** of the shaped optical element **2008**.

FIG. **21**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **2100** includes an emitting layer **2102** and a substrate **2104** (as well as other layers). The LED **2100** is wire bonded **2106** to a lead frame **2108**, wherein FIG. **21**B shows a top view of the lead frame **2108**.

In this embodiment, the LED **2100** is embedded in or combined with a molding or shaped optical element **2110**, such as an inverted cone shape made of epoxy or glass, forming, for example, a lens. Preferably, the LED **2100** is positioned within the shaped optical element **2110** such that the light **2112** emitted by the LED is reflected by the sidewalls **2114** of the shaped optical element **2110**, towards the front side **2116** of the shaped optical element **2110**, wherein the reflected light **2118** is output from the shaped optical element **2110**, and away from the back side **2120** of the shaped optical element **2110**.

A phosphor layer **2122** may be placed on or near the front or top surface **2124** of the shaped optical element **2110**. Preferably, the phosphor layer **2122** is placed as far away as possible from the LED **2100**. In this example, the conversion efficiency of blue light to white light is increased due to reduced re-absorption of the light **2112** by the LED **2100** resulting from reduced back-scattering by the phosphor layer **2122**. In addition, the surface **2126** of the phosphor layer **2122** may be roughened, textured, patterned or shaped to increase light extraction.

FIG. **22**A is a schematic illustrating a specific improved LED structure according the preferred embodiment of the present invention, wherein the improved LED structure **2200** includes an emitting layer **2202** and a substrate **2204** (as well as other layers). The LED **2200** is wire bonded **2206** to a lead frame **2208**, wherein FIG. **22**B shows a top view of the lead frame **2208**.

The LED **2200** is embedded in or combined with moldings or shaped optical elements **2210**, **2212**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses. In this embodiment, the shaped optical elements **2210**, **2212** are formed on opposite sides, e.g., the top/front side **2214** and bottom/back side **2216** of the LED **2200**, wherein the emitting layer **2200** emits light **2218** that is extracted from both the top/front side **2214** and bottom/back side **2216** of the LED **2200**.

The lead frame **2208** includes a transparent plate **2220**, wherein the LED **2200** is bonded to the transparent plate **2220** using a transparent/clear epoxy **2222** as a die-bonding material. The transparent plate **2220** may be comprised of glass, quartz, sapphire, diamond or other material transparent for the desired emission wavelength, wherein the transparent glass plate **2220** effectively extracts the light **2218** emitted from the LED **2200** to the shaped optical element **2212**.

## Advantages and Improvements

One advantage of the present invention is that all of the layers of the LED are transparent for the emission wavelength, except for the emitting layer, such that the light is extracted effectively through all of the layers.

Moreover, by avoiding the use of intentional mirrors with the LED, re-absorption of light by the LED is minimized, light extraction efficiency is increased, and light output power is increased.

The combination of a transparent electrode with roughened, textured, patterned or shaped surfaces, with the LED embedded within a shaped optical element or lens, results in increased light extraction.

## REFERENCES

The following references are incorporated by reference herein:

1. Appl. Phys. Lett., 56, 737-39 (1990).
2. Appl. Phys. Lett., 64, 2839-41 (1994).
3. Appl. Phys. Lett., 81, 3152-54 (2002).
4. Jpn. J. Appl. Phys., 43, L1275-77 (2004).
5. Jpn. J. Appl. Phys., 45, L1084-L1086 (2006).
6. Jpn. J. Appl. Phys., 34, L797-99 (1995).

7. Jpn. J. Appl. Phys., 43, L180-82 (2004).
8. Fujii T., Gao Y., Sharma R., Hu E. L., DenBaars S. P., Nakamura S., "Increase in the extraction efficiency of GaN-based light-emitting diodes via surface roughening," Applied Physics Letters, vol. 84, no. 6, 9 Feb. 2004, pp. 855-7.

## CONCLUSION

This concludes the description of the preferred embodiment of the present invention. The foregoing description of one or more embodiments of the invention has been presented for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching.

What is claimed is:

**1**. A light emitting device, comprising:

a sapphire plate, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

a plurality of III-nitride light emitting diodes (LEDs), each comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate; and

a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

**2**. The light emitting device of claim **1**, wherein the sapphire growth substrate is a patterned sapphire substrate (PSS).

* * * * *

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3), I certify that the brief contained herein has a proportionally spaced 14-point font typeface and contains 13,991 words, based on the "Word Count" feature of Microsoft Word 2016, excluding the cover page, patent claims, Certificate of Interest, Tables of Contents and Authorities, Statement of Related Cases, signature block, Addendum, Certificate of Compliance, and Certificate of Service. Additionally, the "Word Count" also excludes the statement regarding the "Confidential Matter Omitted," submitted pursuant to FCR 25.1(e)(1)(B).

Date: August 2, 2022

*/s/ Shawn G. Hansen*

Shawn G. Hansen
**NIXON PEABODY LLP**
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

*Counsel for Appellant*
*The Regents of the University of California*

## CERTIFICATE OF SERVICE

I, Shawn G. Hansen, hereby certify that, on this 2nd day of August, 2022, I caused a copy of the foregoing **Corrected Public Opening Brief of Appellant** to be served on counsel of record via the Court's CM/ECF system.

Date: August 2, 2022

*/s/ Shawn G. Hansen*

Shawn G. Hansen
**NIXON PEABODY LLP**
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

*Counsel for Appellant*
*The Regents of the University of California*