No. 2022-1521

# United States Court of Appeals for the Federal Circuit

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
*Appellant,*

*v.*

UNITED STATES INTERNATIONAL TRADE COMMISSION
*Appellee,*

GENERAL ELECTRIC COMPANY, SAVANT TECHNOLOGIES LLC, HOME DEPOT PRODUCT AUTHORITY, LLC, HOME DEPOT U.S.A., INC., THE HOME DEPOT, INC., IKEA SUPPLY AG, IKEA U.S. RETAIL LLC, IKEA OF SWEDEN AB, SATCO PRODUCTS, INC., GLOBAL VALUE LIGHTING, LLC, SIGNIFY NORTH AMERICA CORPORATION, FEIT ELECTRIC COMPANY, INC.,
*Intervenors.*

Appeal from the United States International Trade Commission Investigation No. 337-TA-1220

## FEIT ELECTRIC COMPANY, INC.'S RESPONSE BRIEF

Jay Reiziss
Alexander P. Ott
McDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Phone: (202) 756-8000
Fax: (202) 756-8087

Kal K. Shah
Simeon Papacostas
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 212-4979
Fax: (312) 767-9192

**U.S. Patent No. 10,593,854**

1. A light emitting device, comprising:

a transparent surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and

a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

**U.S. Patent No. 10,658,557**

1. A light emitting device, comprising:

a sapphire plate, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

a plurality of III-nitride light emitting diodes (LEDs), each comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate; and

a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1521

**Short Case Caption** The Regents of the University of California v. ITC

**Filing Party/Entity** Feit Electric Company, Inc. (Intervenor)

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/31/2022

Signature: /s/ Jay Reiziss

Name: Jay Reiziss

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Feit Electric Co., Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| McDermott Will & Emery | Benesch Friedlander Coplan & Aronoff | Jay H. Reiziss |
| Alexander P. Ott | Kal K. Shah | Simeon G. Papacostas |
| Charles M. McMahon | Thomas M. DaMario | Colin J. Stalter |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| Regents of the University of California v. Satco Products, Inc., CAFC No. 22-1107 | Regents of the University of California v. Satco Products, Inc., CAFC No. 22-1109 | Satco Products, Inc. v. The Regents of the University of California, IPR No. 2020-00813 |
| Satco Products, Inc. v. The Regents of the University of California, IPR No. 2020-00695 | The Regents of the University of California v. The Home Depot, Inc. et al, CDCA No. 2:20-cv-07943 | The Regents of the University of California v. General Electric Company, CDCA No. 2:19-cv-10792 |
| Satco Products, Inc. v. The Regents of the University of California, EDNY No. 2:19-cv-06444 | The Regents of the University of California v. Walmart Inc., CDCA No. 2:19-cv-06570 | The Regents of the University of California v. Amazon.Com, Inc. et al, CDCA No. 2:19-cv-06571 |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives**

Ewa A. Wojciechowska
Gilbert T. Smolenski

**5. Related Cases**

The Regents of the University of California v. Target Corporation
CDCA No. 2:19-cv-06572

The Regents of the University of California v. Ikea of Sweden AB et al.
CDCA No. 2:19-cv-06573

# TABLE OF CONTENTS


TABLE OF AUTHORITIES .......... iii

I. STATEMENT OF RELATED CASES .......... 1

II. COUNTER-STATEMENT OF ISSUES .......... 2

III. STATEMENT OF THE CASE .......... 5

A. Background .......... 7

B. Overview of the Technology and Asserted Patents .......... 10

IV. SUMMARY OF THE ARGUMENTS .......... 12

V. ARGUMENTS .......... 20

A. Non-Infringement .......... 20

1. The Commission Correctly Found Both Patents Not Infringed Due to the "Molding" Limitation .......... 20

a) The Court Should Affirm the Commission's Construction of "Molding" .......... 21

b) The Accused Products Do Not Have a "Molding" .......... 24

2. The Commission Correctly Found the '854 Patent Also Not Infringed Due to the "Transparent" Limitation .......... 27

a) The Accused Products Do Not Have a "Transparent" Surface .......... 28

b) The Commission's Non-Infringement Finding Should Alternatively Be Affirmed Under the Correct Construction of "Transparent" .......... 30

c) The Commission Properly Rejected Regents' Doctrine of Equivalents Position .......... 40

d) Regents' Unreliable Third-Party Testing Evidence Should Have Been Excluded .......... 44

3. The Commission Correctly Found the '557 Patent Also Not Infringed Due to the "Sapphire Plate" Limitation .......... 49

B. Invalidity ........ 52

1. The Commission Correctly Found that Both Prior Art Combinations Satisfy the "Sapphire Growth Substrate" Limitation ........ 52

a) The Commission Properly Found Waiver by the Regents' Due to its Violation of the Ground Rules ........ 53

b) The "Sapphire Growth Substrate" Limitation Was Obvious Based on Yamazaki ........ 58

c) The "Sapphire Growth Substrate" Limitation Was Obvious Based on Minato ........ 61

2. The Commission Correctly Found that Both Prior Art Combinations Satisfy the "Structural Support" Limitation ........ 63

a) Yamazaki Discloses the "Structural Support" Limitation ........ 64

b) The "Structural Support" Limitation Was Obvious Based on Yamazaki in View of Uemura ........ 67

c) The "Structural Support" Limitation Was Obvious Based on Minato in View of Uemura ........ 71

3. The Commission's Invalidity Finding Should Alternatively Be Affirmed Because the Appealed Claims Lack Written Description Support ........ 72

II. CONCLUSION ........ 77

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ajinomoto Co., Inc. v. ITC*,
597 F.3d 1267 (Fed. Cir. 2010) ........ 75

*Apple Inc. v. Samsung Electronics Co., Ltd.*,
839 F.3d 1034 (Fed. Cir. 2016) ........ 16, 51, 52, 66

*AquaTex Industries, Inc. v. Techniche Solutions*,
479 F.3d 1320 (Fed. Cir. 2007) ........ 15, 16, 42, 50

*Archer Daniels Midland Co. v. U.S.*,
561 F.3d 1308 (Fed. Cir. 2009) ........ 34

*Ariad Pharms., Inc. v. Eli Lilly and Co.*,
598 F. 3d 1336 (Fed. Cir. 2010) ........ 74, 76

*Asyst Technologies, Inc. v. Emtrak, Inc.*,
544 F.3d 1310 (Fed. Cir. 2008) ........ 69

*Cordis Corp. v. Medtronic AVE, Inc.*,
339 F.3d 1352 (Fed. Cir. 2003) ........ 75, 76

*D Three Enters., LLC v. SunModo Corp.*,
890 F.3d 1042 (Fed. Cir. 2018) ........ 74

*Dickinson & Co. v. C.R. Bard, Inc.*,
922 F.2d 792 (Fed. Cir. 1990) ........ 15, 42

*Fischer & Porter Co. v. ITC*,
831 F.2d 1574 (Fed. Cir. 1987) ........ 15, 47, 48

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
750 F.3d 1304 (Fed. Cir. 2014) ........ 32

*High Tech Medical Instrumentation, Inc. v. New Image Ind., Inc.*,
49 F.3d 1551 (Fed. Cir. 1995) ........ 46

*In re Hyon*,
679 F.3d 1363 (Fed. Cir. 2012) ........ 65

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
757 F.App'x 974 (Fed. Cir. 2019)........................................ 60, 62

*KSR Intern. Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................ 18, 19

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997)........................................ 74, 76

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016)............................................ 57

*Organik Kimya, San. ve Tic. AS v. ITC*,
848 F.3d 994 (Fed. Cir. 2017).............................................. 48

*Planet Bingo, LLC v. GameTech Intern., Inc.*,
472 F.3d 1338 (Fed. Cir. 2006)............................................ 43

*Pope v. U.S. Postal Serv.*,
114 F.3d 1144 (Fed. Cir. 1997)............................................ 50

*Power Mosfet Techs., LLC v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004).................................. 23, 35, 36

*Rivera v. ITC*,
857 F.3d 1315 (Fed. Cir. 2017)........................... 19, 74, 75, 76

*Spectrum Intern., Inc. v. Sterilite Corp.*,
164 F.3d 1372 (Fed. Cir. 1998)............................................ 24

*Steadman v. SEC*,
450 U.S. 91 (1981).............................................................. 47

*Symbol Technologies, Inc. v. Opticon, Inc.*,
935 F.2d 1569 (Fed. Cir. 1991)...................................... 54, 56

*Teva Pharms USA v. Sandoz, Inc.*,
135 S.Ct. 831 (2015)..................................................... 13, 29, 30

*TQ Delta, LLC v. Cisco Systems, Inc.*,
942 F.3d 1352 (Fed. Cir. 2019)...................................... 56, 57

*Winbond Electronics Corp. v. ITC*,
262 F.3d 1363 (Fed. Cir. 2001)...................................... 47, 53

**Statutes**

5 U.S.C. § 554(b)(3) .......... 16, 53, 58, 60, 63
5 U.S.C. § 556(d) .......... 15, 47, 48
5 U.S.C. § 556(e) .......... 59, 62
5 U.S.C. § 706(2) .......... 48
19 U.S.C. § 1337(c) .......... 46, 53, 58

**Commission Rules**

19 C.F.R. § 210.37(b) .......... 47, 48
19 C.F.R. § 210.38(a) .......... 60, 62

## I. STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding in the United States International Trade Commission ("Commission") was previously before this or any other appellate court.

The following proceedings may directly affect or be directly affected by this Court's decision in this appeal: (1) *The Regents of the University of California v. Satco Products, Inc.*, 22-1106 (Fed. Cir.) (consolidating appeals 22-1106, 22-1107, 22-1108, and 22-1109); (2) *Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2021-00662 (PTAB); (3) *Satco Prods., Inc. v. The Regents of the Univ. of California*, 2:20-cv-04956 (E.D.N.Y.); (4) *Satco Prods., Inc. v. The Regents of the Univ. of California*, 2:19-cv-06444 (E.D.N.Y.); (5) *The Regents of the Univ. of California v. The Home Depot, Inc.*, 2:20-cv-07943 (C.D. Cal.); (6) *The Regents of the Univ. of California v. Gen. Elec. Co.*, 2:19-cv-10792 (C.D. Cal.); (7) *The Regents of the Univ. of California v. Walmart Inc.*, 2:19-cv-06570 (C.D. Cal.); (8) *The Regents of the Univ. of California v. Amazon.com, Inc.*, 2:19-cv-06571 (C.D. Cal.); (9) *The Regents of the Univ. of California v. Target Corp.*, 2:19-cv-06572 (C.D. Cal.); (10) *The Regents of the Univ. of California v. IKEA of Sweden AB*, 2:19-cv-06573 (C.D. Cal.).

## II. COUNTER-STATEMENT OF ISSUES

Appellant The Regents of the University of California ("Regents") appeals a final determination of the Commission finding no violation of Section 337, 19 U.S.C. § 1337, on multiple grounds of both non-infringement and invalidity. Regents' brief characterizes this appeal as only raising three issues, but this disguises the vast number of actual issues that would need to be addressed in order to reverse the Commission's comprehensive finding of no violation. Even though Regents has now unilaterally dropped two of the four patents it had asserted during the investigation, its appeal still raises over a dozen separate issues, which are listed below:

1. Whether the Commission correctly construed the term "molding" to mean "a component formed by or as if by a mold."

2. Whether substantial evidence supports the Commission's finding that the accused products lack the claimed "molding."

3. Whether substantial evidence supports the Commission's finding that the accused products lack the claimed "transparent" surface.

4. Whether the Commission's finding that the accused products lack the claimed "transparent" surface should be affirmed in any event under the proper construction of the term "transparent."

5. Whether substantial evidence supports the Commission's finding that the accused products lack the claimed "transparent" surface under the doctrine of equivalents.

6. Whether the Commission's finding that the accused products lack the claimed "transparent" surface should be affirmed in any event because the Regents' third-party testing evidence should have been excluded as unreliable.

7. Whether substantial evidence supports the Commission's finding that the accused products lack the claimed "sapphire plate" under the doctrine of equivalents.

8. Whether the Commission abused its discretion by finding waiver due to Regents' failure to timely disclose its invalidity rebuttal contentions regarding the "sapphire growth substrate."

9. Whether, regardless of Regents' waiver, substantial evidence supports the Commission's finding that the "sapphire growth substrate" was obvious based on Yamazaki.

10. Whether, regardless of Regents' waiver, substantial evidence supports the Commission's finding that the "sapphire growth substrate" was obvious based on Minato.

11. Whether substantial evidence supports the Commission's finding that the "structural support" limitation was disclosed by Yamazaki.

12. Whether substantial evidence supports the Commission's finding that the "structural support" limitation was rendered obvious by Yamazaki in view of Uemura.

13. Whether substantial evidence supports the Commission's finding that the "structural support" limitation was rendered obvious by Minato in view of Uemura.

14. Whether the Commission's invalidity finding should be affirmed in any event because the Commission erred by looking outside the four corners of the specification to find written description support for the claim limitation requiring both the cathode and anode to be "on" an end of the transparent surface or sapphire plate.

## III. STATEMENT OF THE CASE

Regents alleged infringement against an entire category of LED light bulbs referred to as "filament LED" bulbs (also known as "vintage" or "Edison" light bulbs), which contain a strip of LED chips that mimics the elongated appearance of the metal filament wire used in conventional incandescent light bulbs. The Commission concluded that there was no infringement and that Regents' patents are invalid.

On infringement, the Commission found that the accused products lack key claimed features that the asserted patents emphasize as crucial to the touted benefit of increased efficiency. Specifically, the Commission correctly found that the layer of yellow phosphor deposited over the strip of LED chips does not satisfy the "molding" limitation and that the opaque ceramic stick on which the LED chips are mounted does not satisfy the "transparent" or "sapphire" limitations. In response, Regents presents counter-arguments that effectively seek to read these key limitations out of the claims entirely. The Court should reject Regents' challenges, but if it decides to take up the Regents' request to reconstrue "transparent" then it should adopt the plain and ordinary meaning proposed by Feit Electric for that term, rather than Regents' unsupported

alternative. Alternatively, the Court should affirm the non-infringement finding because Regents third-party testing evidence was unreliable and should have been excluded.

On invalidity, the Commission held that the claims were rendered obvious by two different obviousness combinations. Regents raises two challenges to these findings, both which should be rejected. Regents first contends that satisfaction of the "sapphire growth substrate" limitation was not shown, but the patents themselves admit that this was found in conventional LEDs and, perhaps as a result, Regents never really contested this limitation below and was rightly found to have waived this issue. Regents next disputes satisfaction of the "structural support" portion of the "cathode/anode" limitation, which is taught by numerous prior art references. Alternatively, the Court should affirm the invalidity finding because there is no written description support for the "cathode/anode" limitation, which is not illustrated or discussed in the specification and was drafted into claims for the first time twelve years after the original application filing (and a few months before litigation began).

### A. Background

In July 2019, Regents filed a first complaint at the Commission requesting a Section 337 investigation based on alleged infringement of U.S. Patent Nos. 7,781,789, 9,240,529 ("the '529 patent"), 9,859,464 ("the '464 patent"), and 10,217,916 by filament LED light bulbs and naming as respondents retailers Target, Walmart, Amazon, IKEA, and Bed Bath & Beyond. On August 28, 2019, the Commission instituted Investigation No. 337-TA-1172. This first investigation did not go well for Regents, however, and it withdrew its complaint against four of the five respondents in February 2020 and followed that up by withdrawing its case against the remaining respondent in April 2020.

Meanwhile, in early 2020, a supplier of the accused LED light bulbs requested *inter partes* review (IPR) proceedings against all four patents asserted in that first ITC investigation.[1] Those IPRs ultimately resulted in final written decisions that found all challenged claims unpatentable

[1] The IPRs were filed by Satco Products, Inc., which was a respondent in the investigation below and is an intervenor in this appeal.

on multiple grounds. The final written decisions are currently on appeal to this Court.[2]

Undeterred, in August 2020, Regents filed a second complaint at the Commission requesting another Section 337 investigation against filament LED light bulbs, this time naming as respondents both retailers (IKEA and Home Depot) and suppliers (Feit Electric, Satco Products, and General Electric).[3] This second complaint again asserted the ’529 and ’464 patents, and added three related patents: U.S. Patent Nos. 10,593,854 (“the ’854 patent”), 10,644,213 (“the ’213 patent”)[4], and 10,658,557 (“the ’557 patent”). *See* Appx3625–3707. On September 29, 2020, the Commission instituted a second investigation, Investigation No. 337-TA-1220, which is the investigation below in this appeal.

This second investigation did not go any better than the first for Regents, although at least this time Regents stuck it out to the bitter end. On November 19, 2021, the ALJ issued an initial determination finding

---

[2] *See Regents of the University of California v. Satco Products, Inc.*, Appeal Nos. 22-1106–1109.

[3] Suppliers Global Value Lighting and Signify North America intervened in the second investigation and are intervenors in this appeal.

[4] Regents withdrew the ’213 patent during the investigation.

no violation of Section 337 due to multiple grounds of both non-infringement and invalidity of all asserted claims. Appx401–649. The ALJ also found that Regents failed to satisfy the technical prong of domestic industry, although he found that it met the economic prong. On February 16, 2022, the Commission reviewed the ALJ's initial determination and, in its final determination, affirmed the finding of no violation with supplemental reasoning. Appx75–148. The Commission largely agreed with and supplemented the ALJ's analysis on non-infringement and invalidity, except that it decided to take no position on two additional, independent invalidity grounds. Also, the Commission declined to adopt the ALJ's finding that Regents' had satisfied the economic prong after it received strenuous objections to that finding from both the respondents and the Commission's own Office of Unfair Import Investigations (OUII). Instead, the Commission took no position on that issue and concluded that it was moot in view of its finding of no violation.

Regents appealed the Commission's final determination. Feit Electric and the other respondents and intervenors below have intervened in this appeal. Feit Electric is largely in agreement with the Commission and the other intervenors in this appeal, but provides this

separate brief to address certain issues implicated by Regents' specific assertions against Feit Electric's accused products.

### B. Overview of the Technology and Asserted Patents

The products at-issue in this case are filament LED light bulbs. Filament LED bulbs contain a set of light-emitting diode (LED) chips that are mounted on a "submount," which is either a clear sapphire plate (in the licensed product, below left), a white ceramic stick (in the accused "rigid" products, below middle), or a brown polymer strip (in the accused "flexible" products, below right). Appx135320; Appx135324.



The mounted LEDs are then covered by a layer of silicone containing phosphor material that converts the blue light emitted by the LED chips into the white light for the light bulb. Appx135333.



The filament LED is enclosed in a light bulb and mimics the elongated appearance of the metal filament wire used in conventional incandescent light bulbs. *See* Appx10794.



The appealed claims are claim 1 of the ’854 patent and claim 1 of the ’557 patent. Claim 1 of the ’854 patent recites:

> A light emitting device, comprising:
>
> a transparent surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

> at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and
>
> a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

Appx749 (22:2–18).

Claim 1 of the ’557 patent is largely identical, except that it recites a “sapphire plate” instead of a “transparent surface,” and calls for a “plurality” of LEDs instead of “at least one.” Appx782 (21:18–22:15). The ’854 and ’557 patents issued from related applications that both claimed priority to the same parent application and share the same specification.

## IV. SUMMARY OF THE ARGUMENTS

1. The Commission’s construction of the term “molding” as meaning “a component formed by or as if by a mold” is supported by the intrinsic evidence. The specification describes a “molding” as the product of the verb “molded,” Appx746 (16:49–53), and denigrates the alternative of simply “placing a gel or other liquid form of material onto the chip” because the result is “non-uniform” and does not “increase the efficiency of the LED,” Appx688 (5:24–29). In contrast, Regents’ alternative

construction of "formed component" effectively reads the "molding" limitation out of the claims entirely.

2. The Commission's finding that the accused products lack the claimed "molding" is supported by substantial evidence, including Dr. Shanfield's unrebutted expert testimony that a person of ordinary skill would "absolutely not" consider the phosphor layer deposited by glob top to be a component formed by or as if by a mold, because "there's no mold. There's nothing resembling a mold involved." Appx564 (citing Appx3544 (1151:1–5)). In response, Regents offers only unsupported attorney argument.

3. The Commission's finding that the accused products lack the claimed "transparent" surface should be affirmed because it is based on the dispositive subsidiary factual finding that the "highly scattering" material of the submounts mean they are "opaque" and thus "not transparent." *Teva Pharms USA v. Sandoz, Inc.*, 135 S.Ct. 831, 841–42 (2015) ("Simply because a factual finding may be nearly dispositive does not render the subsidiary question a legal one."). This factual determination was based on substantial evidence, including the Commission's decision to credit the respondents' expert testimony,

Appx3479 (994:11–13; 994:24–995:6) and Appx3554 (1192:25–1193:5), and thereby reject Regent's contrary expert testimony, Appx3209 (248:16–19).

4. The Court should alternatively affirm the non-infringement finding by construing "transparent" to have its plain and ordinary meaning of "transmits light without scattering so that objects can be clearly seen." This meaning is supported by the intrinsic evidence where the specification uses the term "clear" interchangeably with "transparent," Appx748 (20:52), and only lists exemplary "transparent" materials—glass, quartz, sapphire, and diamond—that can be clearly seen through, Appx748 (20:53–55). This meaning is also found in dictionary definitions ranging from the highly technical (Appx6646) to the colloquial (Appx7635), and is how the inventors use the term "transparent" in their own scientific journal articles, Appx6600, Appx6615. Regents' alternative construction would render other claim language superfluous, is not supported by the intrinsic evidence, and relies on dictionary definitions that actually support Feit Electric's construction. Appx7909, Appx7914.

5. The Commission's finding that the accused products lack the claimed "transparent" surface under the doctrine of equivalents is supported by substantial evidence, including Dr. Shanfield's and Dr. Eden's particularized expert testimony based on the specification. Appx3541 (1138:12–1141:16); Appx748 (20:53–55); Appx135324. Regents fails to address the Commission's separate analysis on the merits and has therefore waived this issue. *Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990) ("[A]n issue not raised by an appellant in its opening brief ... is waived."). In addition, Regents' equivalents case is legally deficient because its expert's function, way, result analysis did not include the required "examination of the claim and the explanation of it found in the written description of the patent."' *AquaTex Industries, Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328–29 (Fed. Cir. 2007).

6. The Court should alternatively affirm the non-infringement findings because Regents' third-party testing evidence was unreliable and should have been excluded because it was the sort of "poor quality" evidence that Congress was seeking to eliminate from agency consideration by the Administrative Procedure Act. *See Fischer & Porter Co. v. ITC*, 831 F.2d 1574, 1581 (Fed. Cir. 1987); 5 U.S.C. § 556(d).

7. The Commission's finding that the accused products lack the claimed "sapphire plate" under the doctrine of equivalents is supported by substantial evidence, including Dr. Shanfield's and Dr. Eden's particularized expert testimony based on the specification. Appx590–91 (citing Appx3487 (1026:24–1028:7)). In addition, as with "transparent," Regents' equivalents case was legally deficient because it was not based on an analysis of the claims or specification. *AquaTex*, 479 F.3d at 1328–29. Regents' invocation of its counter-evidence for its losing equivalents position is irrelevant to this Court's review for substantial evidence. *Apple Inc. v. Samsung Electronics Co., Ltd.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) ("Our job is not to review whether Samsung's losing position was also supported by substantial evidence."). Finally, Regents admits that there is a difference in crystal structure and fails to show that this difference is insubstantial.

8. The Commission did not abuse its discretion when it found that Regents waived its rebuttal on the "sapphire growth substrate" limitation by failing to timely disclose any such contention in its pre-hearing brief as required by the Ground Rules and mandated by the Administrative Procedure Act. *See* Appx3728 (Ground Rule 11.2); 5

U.S.C. § 554(b)(3) ("other parties to the proceeding shall give prompt notice of issues controverted in fact or law").

9. The Commission's finding that the "sapphire growth substrate" was obvious based on Yamazaki is supported by substantial evidence, including the '854 patent's statement that a "conventional LED" includes a "sapphire substrate," Appx743–744 (10:64–11:2, 11:9–12, 11:12–14), and Yamazaki's disclosure of using conventional blue LEDs, Appx138584–85 (¶¶ [0014], [0027]). The Commission's finding is also independently supported by substantial evidence in the form of Dr. Lebby's unrebutted expert opinions.

10. The Commission's finding that the "sapphire growth substrate" was obvious based on Minato is supported by substantial evidence, including the '854 patent's statement that a "conventional LED" includes a "sapphire substrate," Appx743–744 (10:64–11:2, 11:9–12, 11:12–14), and Minato's disclosure of using "known" blue LEDs, Appx137823 at ¶ [0016]. The Commission's finding is also independently supported by substantial evidence in the form of Dr. Lebby's unrebutted expert opinions.

11. The Commission's finding that the "structural support" limitation was disclosed by Yamazaki is supported by substantial evidence, including Yamazaki's disclosure of anode and cathode leads that are wrapped around the ends of the sapphire plate, Appx138587, Appx3561–62 (1221:20–1222:17), and Dr. Lebby's expert testimony that Yamazaki's anode and cathode leads provide structural support, Appx3562 (1225:10–21)).

12. The Commission's finding that the "structural support" limitation was rendered obvious by Yamazaki in view of Uemura is supported by substantial evidence, including Dr. Lebby's testimony that Uemura's through-pins and Yamazaki's j-leads were interchangeable alternatives, Appx3557 (1203:7–1204:3), Appx3563 (1226:6–15), the Shimizu prior art illustrating that interchangeability, Appx138160, and Dr. Lebby's testimony showing how the combination was "predictable," Appx3563 (1227:19–1228:11). *See KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). This finding was independently supported by Dr. Lebby's testimony of a specific motivation to combine Yamazaki with Uemura because it would "lower the manufacturing cost" due to "less

demand for the working precision of the lead frames." Appx3564 (1231:14–1232:13).

13. The Commission's finding that the "structural support" limitation was rendered obvious by Minato in view of Uemura is supported by substantial evidence, including Dr. Lebby's unrebutted testimony from the perspective of a person of ordinary skill in the art about the scope of the Minato and Uemura references, how an artisan would be motivated to combine them, and what the expected result would be. Appx3568–69 (1247:10–1252:1). *See KSR*, 550 U.S. at 421.

14. The Commission's invalidity finding should alternatively be affirmed because the patents lack written description support for the claim requirement of a cathode and anode that are both "on" an end of the transparent surface (or sapphire plate). The ALJ acknowledged that this was not disclosed within the four corners of the specification, but improperly reached beyond the specification when it relied on Regents' expert testimony that "a person of ordinary skill would understand that a lead frame can have a variety of shapes and would not be limited to the specific shape shown in those figures," Appx577–578. *See Rivera v. ITC*, 857 F.3d 1315, 1322 (Fed. Cir. 2017) (knowledge of a person of skill in the

art "may be used to inform what is actually in the specification . . . but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification").

## V. ARGUMENTS

The Commission correctly found that Feit Electric did not violate Section 337 for multiple grounds of both non-infringement and invalidity.

### A. Non-Infringement

#### 1. The Commission Correctly Found Both Patents Not Infringed Due to the "Molding" Limitation

Both appealed claims require a "molding." Appx749 (22:15); Appx782 (22:12). The ALJ construed "molding" to mean "a component formed by or as if by a mold," Appx561, and found that the accused products do not have a "molding," Appx565. The Commission did not review these findings and thus adopted them. Appx151. On appeal, Regents challenges both the construction of "molding," Regents Br. at 40–42, and the finding that this limitation was not met, *id.* at 42–46. Both challenges should be rejected. The ALJ's construction of "molding" and finding of no infringement should both be affirmed.

#### a) The Court Should Affirm the Commission's Construction of "Molding"

The Commission's construction of "molding" as "a component formed by or as if by a mold" should be affirmed and Regents' alternative construction of "molding" as "formed component" should be rejected as not supported by the intrinsic or extrinsic evidence.

The Commission's construction of "molding" is supported by both the intrinsic and extrinsic evidence. The specification refers to the noun "molding" as the product of the verb "molded," where it states that an "LED may be combined with epoxy or glass and *molded* as an inverted cone-shapes 1214, 1216" and then refers to the resulting structures as "inverted cone *molding* shape 1214, 1216." Appx746 (16:49–53) (emphasis added). This specification usage aligns with the dictionary definition of the noun "molding" as "an object produced by molding" where the verb "mold" means "to form or become formed in or as if in a mold." Appx668.

The asserted patents' usage of this plain and ordinary meaning of "molding" is also shown by the fact that the intrinsic evidence distinguishes conventional structures that are *not* formed by, or as if by, a mold. Specifically, the specification of the '529 patent, which is part of

the intrinsic record for the ’854 and ’557 patents,[5] denigrates the prior art approach where the phosphor layer was simply deposited as a gel onto the LEDs, because that approach leads to a “non-uniform” application that does not increase the efficiency of the LED:

> Previous applications of the phosphor conversion layer are limited to *placing a gel or other liquid form of material onto the chip, and allowing the phosphor to cure*. This non-uniform and typically smooth application of the phosphor does not take into account several factors that can be used to increase the efficiency of the LED.

Appx688 (5:24–29) (emphasis added). In contrast to that prior art approach, the ’529 patent explains how a “molding” that is formed by being “molded” into a particular shape, such as a sphere or inverted cone, can increase the efficiency of the LED. Appx690 (10:39–42 (“molded with a sphere shaped molding 100” that “acts as a lens to assist the emitted light 532 to escape”); Appx691–92 (11:61–63; 12:60–13:4 (“molded as an inverted cone-shape” to form “molding 1508” where the angle of the cone

---

[5] The ’854 and ’557 patents both expressly incorporate-by-reference the ’529 patent’s parent application, U.S. App. No. 11/940,885, which has the same specification as the ’529 patent. *See* Appx741–742 (6:59–7:2, 8:14–15); Appx774–775 (6:48–58, 8:4–5). For convenience, the parties have cited to the passages by their location in the ’529 patent, because the ’529 patent was an asserted patent in the investigation but its parent was not.

is determined based on the refractive index such that "[t]hen the LED light 1604 is effectively extracted")).

Regents provides no basis to depart from the plain meaning of the term "molding" and its alternative construction of "formed component" effectively reads this limitation out of the claims entirely. Regents argues that "molding" should be defined based only on the "contextual claim language," Regents Br. at 40, but this argument is an attempt to require nothing more than what is already recited elsewhere in the claims and would render the term "molding" superfluous. *See Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004). Regents next argues that the '529 patent does not "disavow" a non-uniform phosphor layer, Regents Br. at 41, but the adopted construction was not based on a finding of disavowal and the Regents' invocation of that doctrine is a strawman argument. Finally, Regents argues that the transitional term "comprising" in the molding limitation means that the term "molding" does not exclude "random irregularities and an uneven surface." Regents Br. at 42. However, the ALJ never held that the phosphor layer in the accused products would have been a "molding" but for its uneven surface. Instead, he correctly found that the uneven surface shows that the layer

was not a "molding" in the first place. Appx564. In reality, Regents' "comprising" argument is just another attempt to eliminate any meaning at all from the term "molding." *See also Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379–80 (Fed. Cir. 1998) ("'Comprising' is not a weasel word with which to abrogate claim limitations.").)

#### b) The Accused Products Do Not Have a "Molding"

The ALJ's finding that the accused products lack a "molding" is supported by substantial evidence. Specifically, the ALJ credited the unrebutted testimony of Feit Electric's expert Dr. Shanfield that he could tell "right away" that the phosphor layer in the accused products was deposited in a glob top process and that in such a process "there's no mold, there's nothing like a mold." Appx563 (citing Appx3544 (1150:5–25)). The ALJ also found Dr. Shanfield to be credible when he testified that a person of ordinary skill would "absolutely not" consider a phosphor layer deposited by glob top to be a component formed by or as if by a mold, because "there's no mold. There's nothing resembling a mold involved." Appx564 (citing Appx3544 (1151:1–5)). The ALJ cited images presented by Dr. Shanfield showing the phosphor layer of filament LEDs being deposited by a glob top process. Appx564 (citing Appx135333 (below)).



The ALJ also pointed to the random irregularities and uneven surface of the phosphor layer in the accused products (yellow below) as evidence that they were not formed by or as if by a mold. Appx564–65 (citing Appx135333 (below)). Here, the ALJ noted that the ’529 patent disparages “non uniform and typically smooth” phosphor layers (such as those found in the accused products) that are made “by placing a gel or other liquid form of material onto the chip, and allowing the phosphor to cure” (such as was done in the glob top deposition process used to make the accused products). *See* Appx564.



CX-0203, slide 17

On appeal, Regents offers only unsupported attorney argument. Regents first argues that the non-infringement finding is "based solely on the presence of 'random irregularities and an uneven surface' in other regions that are not 'surrounding the LED.'" Regents at 43. But Regents' threshold assumption is incorrect, because the non-infringement finding was primarily based on the qualified expert testimony of Dr. Shanfield from the perspective of a person of ordinary skill in the art, which was unrebutted by Regents' expert and which the ALJ concluded was both credible and directly on point. Appx564. The irregular and uneven surface of the phosphor layer corroborated and supplemented Dr. Shanfield's testimony. Appx564–65. Regents next argues that the spout used in the glob top deposition process means that the phosphor layer was formed by "extrusion molding," Regents Br. at 45–46, but this is wholly unsupported attorney argument that is contradicted by Dr. Shanfield's unrebutted testimony that (1) a person of ordinary skill would "absolutely not" consider a phosphor layer deposited by glob top to be a component formed by or as if by a mold and (2) "there's no mold. There's nothing resembling a mold involved." Appx3544 (1151:1–5).

### 2. The Commission Correctly Found the ’854 Patent Also Not Infringed Due to the “Transparent” Limitation

The appealed claim of the ’854 patent requires a “transparent” surface. Appx749 (22:3). The ALJ construed “transparent” to have its plain and ordinary meaning, Appx661, found that all of the accused products except one do not literally have a “transparent” surface, Appx551–554, and rejected Regents’ doctrine of equivalents theory because it would vitiate the “transparent” limitation, Appx554–555, Appx464. The Commission provided supplemental analysis on the construction of “transparent,” Appx90–94, agreed with the ALJ’s finding of no literal infringement, Appx119–120, and provided supplemental analysis rejecting Regents’ doctrine of equivalents theory on the merits, Appx121–22.

On appeal, Regents challenges the construction of “transparent,” Regents Br. at 21–36, and the ALJ’s rejection of its equivalents theory based on vitiation, *id.* at 38–40. Both challenges should be rejected. The Commission’s non-infringement finding was based on its dispositive subsidiary factual finding, supported by substantial evidence in the form of expert testimony, that the light scattering in the accused products made them not transparent. *See* Appx92 (citing Appx3479 (994:11–13;

994:24–995:6); Appx3554 (1192:25–1193:5)). If the Court nevertheless chooses to further construe the term "transparent," then it should adopt Feit Electric's construction of "transparent" as meaning "transmits light without scattering so that objects can be clearly seen." As for equivalents, the Commission's finding is legally correct and supported by substantial evidence, and Regents fails to show otherwise. In fact, Regents neglects to even challenge the Commission's supplemental analysis on the merits and has thus waived this issue.

#### a) The Accused Products Do Not Have a "Transparent" Surface

The Commission's finding that the accused products lack a "transparent" surface is supported by substantial evidence and should be affirmed regardless of any further construction for the term "transparent."

The ALJ held that the submounts in the accused rigid products are not "transparent," because scanning electron microscope (SEM) testing "showed the presence of grains, pores, and grain boundaries in the submounts," which "cause the material to be 'highly absorbing and scattering,' indicating that the submounts are opaque." Appx463; *see also* Appx548 (finding that the analysis for "transparent" plate also applies

for "transparent" surface). The ALJ's conclusion that the submounts in the accused products are "opaque" was based on substantial evidence, including the expert testimony of Dr. Eden and Dr. Shanfield. *See* Appx463 (citing Appx3479 (994:11–13; 994:24–995:6); Appx3554 (1192:25–1193:5)). The Commission explicitly adopted the ALJ's conclusion. Appx92.

Regents did not dispute that the submounts in the accused products are "highly" scattering and instead only presented counter-evidence—which the Commission effectively rejected—seeking to prove that scattering was irrelevant to the "transparent" question. *See* Appx3209 (248:16–19).

Regents argues that the Commission erred by failing to resolve a claim construction dispute, Regents Br. at 21–22, but the Commission clearly resolved the dispute over the import of scattering to the "transparent" question by its conclusion that the scattering in the accused products showed that they are "not transparent." Appx92. Regents cites *Teva* for the proposition that the Commission was required to follow up its determination of this subsidiary factual question with a legal analysis, Regents Br. at 22, but *Teva* itself notes that "a factual

finding may be close to dispositive of the ultimate legal question of the proper meaning of the term in the context of the patent" and cautions that "[s]imply because a factual finding may be nearly dispositive does not render the subsidiary question a legal one." *Teva Pharms USA v. Sandoz, Inc.*, 135 S.Ct. 831, 841–42 (2015). In this case, the Commission's finding that a highly scattering material prevents it from being "transparent" was based on its resolution of dueling expert testimony and thus constituted a subsidiary factual finding that was dispositive to the ultimate legal question of the meaning of "transparent." *See* Appx3479 (994:11–13; 994:24–995:6); Appx3554 (1192:25–1193:5)) (respondents' experts' testimony); Appx3209 (248:16–19) (Regents' expert's testimony); Appx92 (Commission finding in favor of respondents' experts). Because the Commission's finding was supported by substantial evidence, the Court should affirm the conclusion that the accused rigid products do not satisfy the "transparent" surface limitation.

#### b) The Commission's Non-Infringement Finding Should Alternatively Be Affirmed Under the Correct Construction of "Transparent"

During the claim construction proceedings below, Feit Electric maintained that "transparent" means "transmits light without scattering

so that objects can be clearly seen." Appx660.[6] In the event the Court decides to further construe the term "transparent," it should adopt Feit Electric's construction because it is the plain and ordinary meaning for this term and is supported by both the intrinsic and extrinsic evidence.

*(1) Feit Electric's Construction Should be Adopted*

The plain meaning of "transparent" as something that is "clearly seen through" is not only the normal, everyday usage of this term but is also the meaning used by those working in the relevant field of semiconductor optoelectronic devices and packaging.[7] For example, the Illuminating Engineering Society of North America's NOMENCLATURE AND DEFINITIONS FOR ILLUMINATING ENGINEERING—a highly technical and field-specific reference—states that "[o]bjects may be *seen distinctly through* a medium which is transparent." Appx6646 (emphasis added). This same meaning is also found in more general technical references

---

[6] The other respondents and the Commission's OUII advanced a similar construction of "permitting the passage of light without significant deviation/scattering or absorption." *Id.*

[7] The ALJ approved the parties' agreed level-of-skill that specifies experience in the field of "semiconductor optoelectronic devices and packaging," which includes LEDs. Appx660.

such as THE MODERN DICTIONARY OF ELECTRONICS, which likewise defines "transparent" as "[i]mplying *clear and unimpeded transmit* of light." Appx6660 (emphasis added). Finally, of course, this is also the colloquial meaning found in general purpose dictionaries such as THE CAMBRIDGE DICTIONARY OF AMERICAN ENGLISH, which defines "transparent" as "allowing light so that objects can be *clearly seen through* it." Appx7635 (emphasis added).

This broadly-understood meaning of "transparent" is supported by the intrinsic evidence of the asserted patents. The specification of the '854 and '557 patents use the term "clear" interchangeably with "transparent" when they refer to a "transparent/clear epoxy." Appx748 (20:52); Appx781 (20:35). In addition, all of the exemplary "transparent" materials described in the specification—glass, quartz, sapphire, and diamond—can be clearly seen through. Appx748 (20:53–55); Appx781 (20:36–38); *see also* Appx3539 (1131:5–1132:11). Moreover, there is no lexicography or disavowal in the intrinsic record, which would be required to depart from the plain meaning of "transparent." *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)

("the specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal").

The construction proposed during the investigation by the other respondents and OUII—"permitting the passage of light without significant deviation/scattering or absorption," Appx660—actually supports Feit Electric's construction, because it is based on a dictionary with cross-referencing definitions of "transparent" and "translucent" explaining that light scattering (or "deviation") is what causes an object to not be clearly seen through and thus makes it not "transparent."

> **translucent** Permitting the passage of radiation but <u>not without some scattering</u> or diffusion. For example, frosted glass allows light to pass through it but <u>an object cannot be seen clearly through it because the light rays are scattered by it</u>. *Compare* **transparent**.
>
> * * *
>
> **transparent** Permitting the passage of radiation <u>without significant deviation or absorption</u>. *Compare* **translucent**.

Appx4809 (underlining added). This distinction between translucent materials that scatter light and transparent materials without scattering is confirmed by the inventors' own highly-technical scientific journal articles in the pertinent field of art. *See* Appx6600 ("grain *scattering* that

makes . . . this material *translucent* and *not transparent*") (emphasis added); Appx6615 (distinguishing "transparent Ce:YAG ceramics" from "translucent or scattering Ce:YAG ceramics").

*(2) Regents' Construction Should be Rejected*

Regents' alternative construction of "allows light to pass through" is unsupported by, and in fact contradicts, the intrinsic and extrinsic evidence.

Regents first points to the specification's listing of exemplary "transparent" materials and emphasizes its catch-all phrase of "or other material transparent for the desired emission wavelength." Regents Br. at 25 (citing Appx748 (20:50–57)). But this catch-all phrase actually supports Feit Electric's construction—under the standard interpretation rule of *ejusdem generis*, the things covered by the catch-all phrase's reference to other "transparent" materials is understood as referring to materials like those listed, *i.e.*, glass, quartz, sapphire, and diamond, all of which can be clearly seen through. *See Archer Daniels Midland Co. v. U.S.*, 561 F.3d 1308, 1313 (Fed. Cir. 2009) ("*ejusdem generis* . . . limits the additional [things] included by the general phrase 'etc.' to others of the types listed").

Regents next argues that the claim language surrounding the term "transparent" in the claims of the '464 patent, which requires that "at least some of the light emitted by the LED chip is transmitted through the transparent plate," supports its broad construction of "transparent." Regents Br. at 26. But the Commission rightly rejected this argument, Appx90, because it would render the term "transparent" superfluous by requiring nothing more than what is already recited by that surrounding claim language. *See Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored."). Regents responds by arguing that the Commission's position swallows the "at least some light" language. Regents Br. at 26–27. But the "at least some light" claim language simply accounts for the fact that the LED emits light both upward and downward, as shown below in Figure 22A, so only "at least some light" is emitted from the LED downward toward the transparent plate 2220 to be transmitted by it. *See* Appx738 (Fig.22A (reproduced below).)




FIG. 22A

The claims call for that "at least some light" (*i.e.*, the portion of emitted light directed downward toward the transparent plate 2220) to then be "transmitted through the transparent plate." Appx715. If "transparent" means only that it "allows light to pass through," as argued by Regents, then the claims would be no different if the word "transparent" was deleted entirely and instead recited "transmitted through the ~~transparent~~ plate." It is thus Regents' construction that is improper, because it renders the very claim term at issue superfluous. *See Power Mosfet Techs.*, 378 F.3d at 1410.

Regents also erroneously argues that "[s]cattering surfaces on transparent elements are described extensively in the specification."

Regents Br. at 27–28. This is incorrect. The specification only ever uses the word "scattering" to describe the phosphor layers and when doing so identifies the benefit of "reduced" scattering. *See* Appx745 (14:27–33); Appx747 (17:20–26; 18:47–50); Appx748 (20:26–30). While the specification does mention a transparent electrode with a "roughened, textured, patterned, or shaped surface," Appx749 (21:1–4), it does not say that this causes scattering that makes it so that objects cannot be clearly seen through the electrode, and Regents points to no record evidence showing otherwise. In contrast, Feit Electric presented unrebutted expert testimony from Dr. Shanfield showing that an object with a textured surface can in fact be clearly seen through and thus be "transparent." Appx3539–40 (1132:13–1134:6); Appx135319. Accordingly, there is no conflict between Feit Electric's construction and the preferred embodiments.

Regents next attempts to overcome its statement during the prosecution in a related patent that "there is a difference between transparent and allowing some light to be transmitted." Regents Br. at 28–30. In particular, Regents argues that this statement did not amount to prosecution disclaimer. *Id.* at 29. In doing so, Regents actually

disproves its own proposed construction—that is, because its prosecution statement was not meant to disavow some portion of a broader original scope for the term "transparent," it instead constitutes an admission by Regents as to the original, plain and ordinary meaning for the term "transparent." Regents' argument that "transparent" is *different* from "allowing some light to be transmitted" is therefore fatal to its proposed construction here that "transparent" means "allows light to pass through."

Regents next cites to an unrelated patent's description of a "transparent" element, Regents Br. at 30, and relies on claim construction orders construing "transparent" in yet another unrelated patent, Regents Br. at 31–32. The Commission correctly rejected all of this extrinsic evidence because "those cases involved different patents, different inventors, and different intrinsic or extrinsic records" and were therefore "not relevant." Appx93.

Finally, Regents invokes two dictionary definitions for "transparent" and argues that the Commission failed to explain why they do not support Regents' construction. Regents Br. at 32. But the Commission directly addressed both dictionaries and explained how they

contradict Regents' construction. Appx92–932. In particular, the Wiley dictionary cited by Regents defines "transparent" as a "body, material, or medium which *freely* passes radiant energy, such as light, or sound," and the Commission rightly concluded that "*freely* passes" is not the same as "allows light to pass through." Appx92 (citing Appx7909).[8] As for the McGraw-Hill dictionary, the Commission rightly noted that Regents mistakenly relies on the inapt physics definition ("PHYS"), whereas the applicable optics definition ("OPTICS")[9] in that dictionary defines a "transparent medium" as "[a] medium which has the property of transmitting light in such a way that the human eye may *see through the medium distinctly*." Appx93 (citing Appx7914) (emphasis added). Thus, even Regents own dictionary supports Feit Electric's construction of "transparent" as being clearly seen through. Consequently, in the event the Court decides to further construe the term "transparent," it should

---

[8] In its brief, Regents cites, without any explanation, to the fourth definition of "transparent" in the Wiley dictionary, which drops the word "freely" even though the first three definitions all include that modifier.

[9] As noted above, the field of art of the asserted patents is "semiconductor *opto*electronic devices and packaging." Appx660 (emphasis added).

reject Regents' construction and adopt Feit Electric's construction of "transmits light without scattering so that objects can be clearly seen."

##### *(3) The Non-Infringement Finding Should be Affirmed Based on Feit Electric's Construction*

As explained above, the Commission's finding that all accused Feit Electric products, except for one Feit Electric accused flexible product, fail to satisfy the "transparent" surface limitation, should be affirmed regardless of any further construction of "transparent." That finding should alternatively be affirmed based on the Court's adoption of Feit Electric's construction of "transparent," in view of the Commission's finding that the accused products are "highly" scattering. Appx463.

In addition, the Court should reverse the Commission's finding that one Feit Electric accused flexible product satisfies the "transparent" surface limitation, which was solely based on Regents' transmissivity testing that did not and could not show that it "transmits light without scattering so that objects can be clearly seen." *See* Appx552–554.

#### c) The Commission Properly Rejected Regents' Doctrine of Equivalents Position

Regents disputes the ALJ's finding that its doctrine of equivalents theory runs afoul of the vitiation doctrine. Regents Br. at 38–40. But

Regents fails to address the Commission's supplemental analysis rejecting Regents' equivalents position based on the function-way-result test. Appx94–95, Appx120–121. The Commission's finding of no equivalents both legally and on the merits was correct and supported by substantial evidence.

As a threshold matter, Regents' doctrine of equivalents position should be rejected because Regents failed to address the Commission's supplemental analysis on the merits applying the function-way-result test. Most glaringly, Regents does not appeal the Commission's conclusion that the accused products do not perform in the same "way" due to the "substantial structural differences . . . as evidenced by the SEM testing showing the presence of pores and grain boundaries." Appx95; Appx121. The Commission's finding on that issue is supported by substantial evidence—Dr. Shanfield presented particularized expert testimony describing the substantial structural differences, including the presence of pores and grain boundaries, and he explained how his analysis was rooted in the specification's description of exemplary "transparent" surfaces. Appx3541 (1138:12–1141:16); Appx748 (20:53–55); Appx135324. Because Regents' opening brief does not address the

Commission's dispositive finding of a substantially different "way," it has waived this issue. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990) ("[A]n issue not raised by an appellant in its opening brief . . . is waived.").

Regents' doctrine of equivalents position should also be rejected because it is legally deficient. In *AquaTex Industries, Inc. v. Techniche Solutions*, this Court made clear that a doctrine of equivalents case must be based on "particularized testimony of a person of ordinary skill in the art, typically a qualified expert" and that their "identification of the elements of the function, way, result test solely 'entails an examination of the claim and the explanation of it found in the written description of the patent.'" 479 F.3d 1320, 1328–29 (Fed. Cir. 2007). Here, Regents' expert provided conclusory opinions with no supporting rationale at all, much less the required examination of the claims or specification. *See* Appx3361 (624:16–626:22). Thus, Regents' equivalents theory must be rejected as deficient under *AquaTex*.

Finally, the ALJ's finding of vitiation should be affirmed because it is supported by substantial evidence. In particular, the ALJ appropriately credited the testimony of Dr. Eden and Dr. Shanfield that

the submounts in the accused products are opaque due to the presence of grain boundaries and pores that cause their material to be "highly absorbing and scattering." Appx463 (citing Appx3479 (994:11–13, 994:24–995:6); Appx3554 (1192:25–1193:5)). The ALJ further correctly found that the opaque submounts in the accused products differ from a "transparent" surface such as the sapphire submount in the licensed product, which has no pores or grain boundaries. Appx463 (citing Appx3479 (994:14–23). The ALJ was thus correct to conclude that vitiation bars equivalents, because an opaque submount is the "antithesis" of the claimed "transparent" surface. *Planet Bingo, LLC v. GameTech Intern., Inc.*, 472 F.3d 1338, 1345 (Fed. Cir. 2006). Regents argues that vitiation does not apply because the "the differences in transmissivity . . . are, in fact, relatively small differences of degree, not categorical differences in kind." Regents Br. at 39. But this is another strawman argument, because the ALJ's vitiation finding did not rely on "differences in transmissivity"—instead, it was based on the categorical difference between the opaque submounts in the accused products, *with* grain boundaries and pores that absorb and scatter light, and transparent submounts such as the sapphire submount in the licensed

product, *without* any grain boundaries or pores to absorb or scatter light. Appx463–464.

#### d) Regents' Unreliable Third-Party Testing Evidence Should Have Been Excluded

Regents' infringement case against Feit Electric was premised on five testing reports created by a third-party named EAG. Appx445. Prior to the evidentiary hearing, Feit Electric moved *in limine* to exclude all of these testing reports as nonprobative, unreliable, and lacking in foundation. Appx141436–59. As explained in Feit Electric's motion, the testing reports contained non-standard, unprofessional testing carried out by unidentified individuals with unknown qualifications using largely undisclosed test equipment. *See id.* Most egregiously, the testing improperly altered the accused products by using an unknown chemical solution to remove the phosphor layer, which also incidentally striped away metal layers and caused the chain of LEDs to lift off the submount—which EAG then exacerbated by remounting the LEDs using off-the-shelf superglue. Appx141445–48. The ALJ denied Feit Electric's motion *in limine* in a curt order that did not address the unreliability of the testing reports and instead only addressed Feit Electric's

foundational objection and a separate dispute related to the pixel resolution of the produced reports. Appx111761–62.

After refusing to exclude the test reports, however, the ALJ correctly found in his initial determination that "during its analysis EAG removed the silicone coating or encapsulant and damaged the structure of the devices in the process." Appx445–446. In particular, the ALJ agreed that, for at least one accused Feit Electric product, the chemical used by EAG had removed a metal coating on top of the submount, as shown by the before and after pictures below. Appx446 (images reproduced below).



Before Decapsulation
RX-0593C.3



After Decapsulation
CX-0766.45-47

The ALJ further noted that two of the test reports admitted that that same chemical had caused the LEDs to lift off the submount and that EAG had then superglued the LEDs back on. Appx446 (image reproduced below).

Note: The LED chain lifted off the submount during decapsulation. It was re-attached to the submount using adhesive (Loctite Superglue 1775409).

As a result, the ALJ properly concluded that EAG had "materially altered" the accused Feit Electric products and that "EAG in effect analyzed a structure made by EAG, not structures imported and sold by Feit." Appx446; *cf. High Tech Medical Instrumentation, Inc. v. New Image Ind., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995) (infringement cannot be shown by altering the accused device). Yet the ALJ still did not exclude the testing reports, and instead merely "decline[d] to credit" Regents' infringement analysis for the two products where EAG had explicitly admitted to altering the accused products by using superglue. *Id.* On review to the Commission, Feit Electric again asked that all five testing reports be excluded from evidence as unreliable and nonprobative. Appx141401–03. The Commission did not even address this issue, and in doing so abused its discretion.

Section 337(c) requires "a hearing in conformity with the provisions of subchapter II of chapter 5 of title 5," *i.e.*, the Administrative Procedure Act. 19 U.S.C. § 1337(c). That cited subchapter includes Section 556(d), which requires that "the agency as a matter of policy shall provide for the

exclusion of irrelevant, immaterial, or unduly repetitious evidence." 5 U.S.C. § 556(d). "[I]n enacting section 556(d) Congress was primarily attempting to *eliminate agency decisionmaking premised on evidence of poor quality (irrelevant, immaterial, unreliable, and nonprobative)* and of insufficient quantity (not substantial, i.e., not a preponderance)." *Fischer & Porter Co. v. ITC*, 831 F.2d 1574, 1581 (Fed. Cir. 1987) (emphasis added) (citing *Steadman v. SEC*, 450 U.S. 91, 102 (1981)). Pursuant to its statutory mandate under the Section 337 and the Administrative Procedure Act, the Commission promulgated Commission Rule 210.37(b), which unequivocally requires that "[i]rrelevant, immaterial, unreliable, or unduly repetitious evidence *shall be excluded*." 19 C.F.R. § 210.37(b) (emphasis added).

Evidentiary determinations of the Commission are reviewed for an abuse of discretion. *Winbond Electronics Corp. v. ITC*, 262 F.3d 1363, 1370 (Fed. Cir. 2001). An abuse of discretion occurs when the Commission's decision (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) follows from a record that contains no evidence on which the decision-making body could rationally base its

decision. *Organik Kimya, San. ve Tic. AS v. ITC*, 848 F.3d 994, 1001 (Fed. Cir. 2017); *see also* 5 U.S.C. § 706(2).

The third-party testing reports are the exact sort of "poor quality" evidence that Congress was seeking to eliminate from agency consideration by the Administrative Procedure Act, which the Commission recognized when it adopted Rule 210.37(b). *See Fischer & Porter Co. v. ITC*, 831 F.2d at 1581. The ALJ and Commission therefore acted arbitrarily and contrary to law in refusing to exclude the testing reports without providing any reasoned basis, particularly in view of the ultimate finding that EAG had altered the accused Feit Electric products during its testing. Appx445–46. The same unreliable testing methodology was used for all five testing reports and the Administrative Procedure Act and Commission Rules therefore mandated exclusion of all of these documents. *See* 5 U.S.C. § 556(d) ("shall provide for the exclusion"); 19 C.F.R. § 210.37(b) ("shall be excluded"). Because Regents' infringement case was based on these unreliable third-party testing reports that should have been excluded, the Court should affirm the finding of no infringement on this basis as well.

### 3. The Commission Correctly Found the ’557 Patent Also Not Infringed Due to the “Sapphire Plate” Limitation

The appealed claim of the ’557 patent requires a “sapphire plate.” Appx782 (21:19). The ALJ construed “sapphire” to have its plain and ordinary meaning of “single crystal aluminum oxide,” Appx663, found that all of the accused products do not literally have a “sapphire plate,” 588–589, and rejected Regents’ doctrine of equivalents theory both on the merits and based on a finding that the term “sapphire plate” is inherently narrow with a limited scope of equivalents, Appx589–591. The Commission agreed with, and provided supplemental analysis for, the ALJ’s findings of no literal infringement and no infringement under the doctrine of equivalents. Appx122–126. On appeal, Regents only challenges the rejection of its equivalents theory. Regents Br. at 46–48. The Commission’s finding is legally correct and supported by substantial evidence, and should therefore be affirmed.

As with “transparent” surface, Regents’ doctrine of equivalents position for “sapphire plate” should be rejected because it is legally deficient. As the Commission acknowledged, the testimony of Regents’ expert Dr. Schubert “was made without reference to the specification”

(Appx124)—in fact, it was made without reference to anything at all and was just unsupported, conclusory testimony. *See* Appx3362 (628:9–629:24). Accordingly, Regents equivalents theory for "sapphire plate" was deficient as a matter of law because it lacked the "examination of the claim and the explanation of it found in the written description of the patent" required by *AquaTex*. 479 F.3d at 1328.

The Commission's finding of no equivalents is also supported by substantial evidence. In particular, the Commission affirmed the ALJ's finding that Dr. Eden's testimony against equivalents was "persuasive," "clearly tied to the teachings of the patent," and "provided a more appropriate function-way-result" analysis than Dr. Shubert's testimony in favor of equivalents that, in contrast, "was made without reference to the specification." Appx590–91 (citing Appx3487 (1026:24–1028:7)). Dr. Eden's testimony constitutes substantial evidence, and Regents provides no reason to reevaluate the ALJ's conclusion that Dr. Eden's testimony was more credible than Dr. Schubert's. *See Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1149 (Fed. Cir. 1997) ("As an appellate court, we are not in [a] position to re-evaluate these credibility determinations, which are not inherently improbable or discredited by undisputed fact."). The ALJ also

accurately concluded that the ceramic submounts are substantially different from a sapphire plate due to "the presence of grains, pores, and grain boundaries, which absorb, reflect, and scatter light." Appx591 (citing Appx3478–79 (992:16–995:6); Appx3480 (1000:13–15); Appx135272; Appx135280).

In response, Regents cites to its expert's unsupported equivalents testimony (Regents Br. at 46–47, §VI.D.1), cites two documents that supposedly support equivalents (*id.* at 47, § VI.D.2), cites to a prior art reference that likewise supposedly supports equivalents (*id.* at 48, § VI.D.3), and argues that the differences between polycrystalline aluminum oxide and sapphire are "a matter of degree, not of kind" (*id.* at 48, § VI.D.4). None of these arguments are sufficient to overturn the Commission's well-founded rejection of Regents' doctrine of equivalents position. Regents' first three arguments in §§VI.D.1–3 are just its own counter-evidence for its losing position on equivalents and are therefore irrelevant to this Court's review for substantial evidence. *See Apple Inc. v. Samsung Electronics Co., Ltd.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) ("Our job is not to review whether Samsung's losing position was also supported by substantial evidence or to weigh the relative strength of

Samsung's evidence against Apple's evidence."); *see also id.* at 1062 ("it is beyond our role to reweigh the evidence").

Regents' fourth argument in §VI.D.4 admits that there is a difference in crystal structure between polycrystalline aluminum oxide and sapphire and only argues that this difference is a "matter of degree, not of kind." Regents Br. at 48. In doing so, Regents attacks a vitiation position that does not exist for this limitation and fails to rebut the Commission's finding on the merits that the different crystal structure is significant because it leads to the "the presence of grains, pores, and grain boundaries, which absorb, reflect, and scatter light." Appx591. Because Regents fails to show any error in that determination, the Court should affirm the finding of no infringement of the appealed claim of the '557 patent under the doctrine of equivalents.

### B. Invalidity

#### 1. The Commission Correctly Found that Both Prior Art Combinations Satisfy the "Sapphire Growth Substrate" Limitation

Both appealed claims recite an LED with a "sapphire growth substrate." Appx749 (22:11); Appx782 (22:7). The Commission found that this limitation was obvious based on each of Yamazaki and Minato independently, and that Regents had waived any arguments otherwise.

Appx136; Appx141. On appeal, Regents disputes these findings. Regents Br. at 49–58, 65–67. The Commission's findings should be affirmed.

#### a) The Commission Properly Found Waiver by the Regents' Due to its Violation of the Ground Rules

The Commission properly found that Regents waived any argument that Yamazaki or Minato did not render obvious the "sapphire growth substrate" limitation. Appx136; Appx141. Regents fails to show that the Commission abused its discretion in finding waiver. *See Winbond Electronics Corp. v. ITC*, 262 F.3d 1363, 1370 (Fed. Cir. 2001) (Commission findings of waiver are reviewed for an abuse of discretion).

The ALJ's Ground Rules required the parties' pre-hearing briefs to set forth their contentions on every issue, "no matter which party has the burden on the issue," and stated that any contentions "not set forth in detail in the pre-hearing brief shall be deemed abandoned or withdrawn." Appx3728 (Ground Rule 11.2). This Ground Rule arises from the Administrative Procedure Act's requirement that "other parties to the proceeding shall give prompt notice of issues controverted in fact or law." 5 U.S.C. § 554(b)(3); *see also* 19 U.S.C. § 1337(c) (determinations "shall be made on the record after notice and opportunity for a hearing in

conformity with the provisions of [the APA]"). This Ground Rule also has a sound foundation in law permitting tribunals to conduct trials efficiently. For example, Federal Rule of Evidence 705 "functions to abbreviate trials by permitting opinion testimony without factual foundation." *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1576 (Fed. Cir. 1991). Under Rule 705, an expert can provide an opinion on an ultimate issue—such as invalidity—and "the full burden of exploration of the facts and assumptions underlying [such] testimony" is on the opposing party. *Id.* at 1575–76. The "specific purpose behind Rule 705 is to avoid 'complex and time consuming' testimony," and "[p]atent cases, so often typified by lengthy testimony on complex technical issues, are particularly served by this purpose." *Id.* at 1576.

Regents' pre-hearing brief did not dispute that the "sapphire growth substrate" limitation was met for either the Yamazaki or Minato obviousness grounds. *See* Appx10543–46, Appx10627–31. Nor did Regents dispute this issue during the evidentiary hearing. Regents raised this dispute for the first time in its responsive post-hearing brief, and even then it only argued that there was an alleged "failure of proof" and still did not contend that the "sapphire growth substrate" limitation

was not actually met by the prior art. *See* Appx112525–26, Appx112528–30. Respondents moved to strike Regents untimely contentions regarding the "sapphire growth substrate" limitation, *see* Appx112610–11, and the Commission's OUII filed a response agreeing that Regents' belated arguments should be stricken, *see* Appx112644, Appx112650. The ALJ found that Regents had violated Ground Rule 11.2 and accordingly held that Regents had waived its arguments regarding the "sapphire growth substrate" limitation. Appx508–509, Appx510, Appx581. On review, the Commission likewise found that Regents had waived this argument. Appx136, Appx141.

Regents' argument on appeal is that applying the ALJ's Ground Rule to streamline a trial "improperly inverts the burden of proof." Regents' Br. at 54. Regents argues that, because its pre-trial brief included the generic contention that its claims would not be proven invalid, it was "not obligated" to go further in disputing respondents' invalidity contentions. *Id.* The Commission properly rejected this argument and pointed out that the purpose of the ALJ's rule "is to streamline and provide an orderly proceeding for the resolution of disputed issues." Appx104. The Commission explained that the ALJ

properly granted respondents' motion to strike Regents' new arguments because parties should not be allowed to "ignore the Ground Rules and then surprise the opponent with belated objections after that opponent no longer has an opportunity to develop the record." Appx104.

What happened here is exactly what is contemplated by the ALJ's Ground Rule. The respondents laid out their invalidity positions in detail in their pre-hearing brief (and prior to that, in their expert's report). *See* Appx136. After receiving Regents' pre-hearing brief, respondents identified the issues in dispute. Instead of wasting the ALJ's time with detailed testimony about undisputed issues, respondents presented summary opinion testimony from their expert for each prior art reference and each asserted claim, and then addressed the disputed issues in detail. *See* Appx3561, Appx135359. This does not mean that respondents failed to meet their burden of proof, because under these circumstances a party is permitted to carry its burden by resting its case on "summary testimony." *See Symbol Technologies*, 935 F.2d at 1576.

Regents tries to justify its decision to ignore the ALJ's Ground Rule by citing *TQ Delta, LLC v. Cisco Systems, Inc.*, 942 F.3d 1352 (Fed. Cir. 2019) for the proposition that conclusory expert testimony is insufficient

to support a finding of obviousness. Regents Br. at 50–51. But *TQ Delta* involved competing expert testimony on a disputed claim limitation, not unrebutted expert testimony on an undisputed claim limitation. 942 F.3d at 1356, 1357. Furthermore, Dr. Lebby's testimony was not conclusory—the basis for his conclusions that the "sapphire growth substrate" limitation was met were set forth in detail in respondents' pre-hearing brief. Appx140990, Appx141007–8.

Fundamentally, Regents' arguments should be rejected because accepting them would incentivize trial by ambush. If respondents had known that Regents would argue that using a sapphire growth substrate was not obvious, then respondents would have presented the evidence described in their pre-hearing brief and in their expert's report, and would have explained that evidence in their post-hearing brief. By raising its contentions about the "sapphire growth substrate" for the first time after the close of evidence, and after respondents had submitted their post-hearing brief on invalidity, Regents sought to improperly deny respondents the opportunity to respond to their argument. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("an administrative agency must base its decision on arguments that were

advanced by a party, and to which the opposing party was given a chance to respond"). The Commission rightly rejected Regents arguments and, in fact, the Commission could not have done otherwise because allowing Regents to pursue its untimely rebuttal contentions would have run afoul of the Administrative Procedure Act. *See* 5 U.S.C. § 554(b)(3); *see* 19 U.S.C. § 1337(c). Reversing the Commission's finding of waiver would thus not only be contrary to law, it would incentivize litigants to withhold their arguments until it is too late for their opponents to respond. The Court should refuse to do that.

#### b) The "Sapphire Growth Substrate" Limitation Was Obvious Based on Yamazaki

The Commission's finding that the "sapphire growth substrate" limitation was obvious based on Yamazaki is supported by substantial evidence. In particular, the Commission relied on the "extensive discussion" in respondents' pre-hearing brief establishing that Yamazaki renders the "sapphire growth substrate" limitation obvious. Appx136. That discussion, which the Commission included as a block quote in its opinion, cited to Yamazaki's use of conventional blue LEDs (*see* Appx138584–85 (¶¶ [0014], [0027])) and Dr. Lebby's expert opinion that a person of ordinary skill would have expected Yamazaki's blue LEDs to

include a "sapphire growth substrate." Appx136. The Commission's finding also came after it acknowledged the '854 patent's description of a "conventional LED" as including a "sapphire substrate." Appx112–13 (citing Appx743–744 (10:64–11:2, 11:9–12, 11:12–14)).

Regents argues that the Commission's obviousness finding was "unsupported by the record," Regents Br. at 53, but the Commission was entitled to rely on all of the items discussed above to reach its obviousness finding. The '854 patent and the Yamazaki prior art were both admitted into evidence. *See* Appx717 (Exhibit JX-003), Appx114889 (Exhibit RX-0828). Those two items alone constitute substantial evidence for the Commission's finding, because the '854 patent admits that "a conventional LED includes a sapphire substrate 100," Appx744 (11:9–10) (cited by the Commission at Appx112–13), and Yamazaki states that its LED chip "is of a publicly known structure," Appx138585 (¶[0027]) (cited by the Commission at Appx136).

The Commission was also entitled to rely on the description of Dr. Lebby's expert opinions in respondents' pre-hearing brief, because that brief formed part of the record under the APA and Commission Rules. 5 U.S.C. § 556(e) (the "record for decision" includes "all papers and requests

filed in the proceeding"); 19 C.F.R. § 210.38(a) (the record includes "all briefs and written statements, and other documents and things properly filed"). Dr. Lebby's expert opinions on this issue went unrebutted by Regents and were therefore independently sufficient to support the Commission's finding. *See Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 757 F.App'x 974, 979–80 (Fed. Cir. 2019) (reversing verdict contrary to uncontroverted expert testimony). Furthermore, Regents has no basis to complain that Dr. Lebby's expert opinions on this issue were not subjected to cross-examination at the hearing, because Regents failed to identify this as a controverted issue prior to the evidentiary hearing. *See* Appx3728 (Ground Rule 11.2); 5 U.S.C. § 554(b)(3) ("other parties to the proceeding shall give prompt notice of issues controverted in fact or law").

Finally, the Commission's obviousness finding is further supported by voluminous record evidence. For instance, one of the named inventors testified that that blue LEDs are "normally" grown on sapphire substrates. Appx134695–96. Another of Regents' fact witnesses testified that sapphire substrates are "widely used in the LED industry" for growing LEDs, Appx3251 (303:6–24), and that he "always" uses LEDs

"grown on patterned sapphire substrates" because "we know it's one of the highest light extraction structures" and a "very successful technology," Appx3251 (301:18–25). A contemporaneous textbook written by Regents' expert stated that sapphire growth substrates were "commonly used" for blue LEDs. Appx138393. And the use of sapphire growth substrates is taught by numerous prior art references. *See* Appx138185 (Shimizu); Appx138157 (Uemura); Appx137808 (Okamoto).

#### c) The "Sapphire Growth Substrate" Limitation Was Obvious Based on Minato

The Commission's finding that the "sapphire growth substrate" limitation was also obvious based on Minato is supported by substantial evidence. As with Yamazaki, the Commission relied on respondents' pre-hearing brief establishing that Minato renders the "sapphire growth substrate" limitation obvious, Appx141, and did so after acknowledging that the '854 patent describes a "conventional LED" as including a "sapphire substrate." Appx112–13. The pre-hearing brief discussion cited by the Commission referenced Minato's use of "known" blue LEDs, Appx141007 (citing Appx137823 at ¶ [0016]), and Dr. Lebby's expert opinion that it was obvious for a person of ordinary skill to use "known" blue LEDs having a "sapphire growth substrate," Appx141008.

Regents argues that the Commission failed to identify the evidentiary basis for its findings, Regents Br. at 66, but the Commission was entitled to (and did) rely on all of the items discussed above to reach its obviousness finding. The ’854 patent and the Minato prior art were both admitted into evidence. *See* Appx717 (Exhibit JX-003), Appx114877 (Exhibit CX-2210). Those two items alone constitute substantial evidence for the Commission’s finding, because the ’854 patent admits that “a conventional LED includes a sapphire substrate 100,” Appx744 (11:9–10) (cited by the Commission at Appx112–13), and Minato states that a “known” LED chip can be used, Appx137823 (¶[0016]) (quoted in respondents pre-hearing brief at Appx141007, which is cited by the Commission at Appx141).

The Commission was also entitled to rely on the description of Dr. Lebby’s expert opinions in respondents’ pre-hearing brief. *See* 5 U.S.C. § 556(e); 19 C.F.R. § 210.38(a). As with Yamazaki, Dr. Lebby’s expert opinions on this issue went unrebutted by Regents and were therefore independently sufficient to support the Commission’s finding. *See Imperium*, 757 F.App’x at 979–80. Furthermore, Regents has no basis to complain that Dr. Lebby’s expert opinions on this issue were not

subjected to cross-examination at the hearing, because Regents failed to identify this as a controverted issue prior to the evidentiary hearing. *See* Appx3728 (Ground Rule 11.2); 5 U.S.C. § 554(b)(3) ("other parties to the proceeding shall give prompt notice of issues controverted in fact or law").

Finally, as with Yamazaki, the Commission's obviousness finding based on Minato is further supported by voluminous record evidence. *See* Appx134695–96; Appx3251 (303:6–24, 301:18–25); Appx138393 Appx138185 (Shimizu); Appx138157 (Uemura); Appx137808 (Okamoto).

#### 2. The Commission Correctly Found that Both Prior Art Combinations Satisfy the "Structural Support" Limitation

Both appealed claims recite "wherein the cathode and anode provide structural support to the [transparent surface / sapphire plate]." Appx749 (22:3–6); Appx782 (21:19–22:2). The Commission found that this limitation (1) was disclosed by Yamazaki, (2) was obvious based on Yamazaki in combination with Uemura, and (3) was obvious based on Minato in combination with Uemura. Appx134; Appx139. On appeal, Regents disputes these findings. Regents Br. at 58–65, 67–68. The Commission's findings should be affirmed.

### a) Yamazaki Discloses the "Structural Support" Limitation

The Commission's finding that Yamazaki discloses the "structural support" limitation is supported by substantial evidence. In particular, the Commission found, based on Dr. Lebby's expert testimony and Yamazaki's Figure 1, that Yamazaki discloses a surface-mount LED package whose anode and cathode leads (purple below) are wrapped around the ends of the glass/sapphire plate (light blue below), and thus support that plate. Appx130–131 (citing Appx3561–62 (1221:20–1222:17), Appx135347 (reproduced below (citing Appx138587))).




The Commission also credited Dr. Lebby's expert testimony that Yamazaki's anode and cathode leads (purple) are used to mount the package onto a circuit board and thus provide structural support because they are how the LED package is physically attached to an external circuit board. Appx130–131 (citing Appx3562 (1225:10–21)).

Regents argues that the Yamazaki's Figure 1 does not constitute substantial evidence, because Figures 2 and 3 supposedly show that Yamazaki's leads do not "wrap around" the edges of the plate 11. Regents' Br. at 58–59. But Figure 1 unmistakably shows the "electrically conductive patterns 11a" (purple) wrapped around the edge of plate 11. Appx135347; *see also* Appx138581 (Fig. 1). Dr. Lebby's testimony confirmed that a person of ordinary skill would understand that Yamazaki's leads were wrapped around the plate. Appx3561–62 (1221:23–1225:21). Moreover, Regents' expert did not argue that Yamazaki's leads do not wrap around the edges of the plate 11 and only testified that the metallizations were "thin." Appx3589 (1331:18–1332:8). The Commission properly credited Dr. Lebby's unrebutted testimony in finding that the leads wrap around the plate, and properly rejected Regents' argument about Figures 2 and 3 as having no evidentiary support. Appx133–134. Regents' argument is also wrong as a matter of law, because nothing in Yamazaki disparages the disclosure of Figure 1, and the presence of other figures in Yamazaki does change the fact that Figure 1 is part of what the reference discloses. *In re Hyon*, 679 F.3d 1363, 1367 (Fed. Cir. 2012).

Regents next argues that the Commission failed to address its argument that "conductive pattern 11a is a thin metallization that does not provide structural support." Regents' Br. at 60. But the Commission expressly identified and rejected Regents' "thin metallization" argument. Appx133–34. Regents offers no evidence or explanation as to how being "thin" matters to whether the metal layer supports the plate and the Commission correctly rejected Regents' "conclusory attorney arguments." Appx133. Furthermore, Regents' "thin" argument is simply its own counter-evidence for its losing position and therefore irrelevant to this Court's review for substantial evidence. *See Apple*, 839 F.3d at 1052, 1062.

Regents finally argues that the Commission was wrong to rely on Dr. Lebby's testimony, because "Dr. Lebby could only 'guess' that Yamazaki would be connected to a circuit board with 'a solder bump or something like that.'" Regents' Br. at 61. But Dr. Lebby testified in detail about how the "surface-mount J-leads" of the Yamazaki package would be attached to a circuit board using solder balls, Appx3561–62 (1221:20–1225:21), and gave two examples of other prior art references that showed this attachment technique and concluded that "once that package

is surface mounted using a common technique like solder bump balls," then "structurally, it's going to be very strong," Appx3561–62 (1221:20-1225:21); *see also* Appx135361. The Commission properly credited this unrebutted testimony.

#### b) The "Structural Support" Limitation Was Obvious Based on Yamazaki in View of Uemura

The Commission's alternative finding that the "structural support" limitation was rendered obvious by Yamazaki in view of Uemura is also supported by substantial evidence. The Commission credited Dr. Lebby's testimony that by the mid-1990s those of ordinary skill knew that through-pin packages (like Uemura) and surface-mount J-lead packages (like Yamazaki) were interchangeable alternatives for LED packaging. Appx131 (citing Appx3557 (1203:7–1204:3), Appx3563 (1226:6–15)). The Commission noted that the Shimizu prior art showed that interchangeability by illustrating the same LED chip packaged both ways. Appx131–32 (citing Appx135364 (reproduced below) (citing Appx138160)).




The Commission concluded that it would have been obvious to use Uemura's through-pin leads with Yamazaki, because "both were within the 'technical grasp' of an ordinary artisan at the time of the invention." Appx132 (citing *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)). The Commission also found specific motivation to combine Uemura to use its through-pin packaging with an LED mounted on a transparent plate (such as in Yamazaki), by crediting Dr. Lebby's testimony that a person of ordinary skill in the art would understand that Uemura's approach would "lower the manufacturing cost" due to "less demand for the working precision of the lead frames." Appx132 (citing Appx3564 (1231:14–1232:13)). Finally, the Commission found that the combination would be "predictable" based on Dr. Lebby's testimony and

illustration showing the combination being made. Appx132 (citing Appx3563 (1227:19–1228:11), Appx135366 (reproduced below)).




Substituting Uemura’s through-pin configuration for Yamazaki’s surface-mount configuration

Regents argues that in *Asyst Technologies, Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1315 (Fed. Cir. 2008) the Court required “evidence of the circumstances in which one of ordinary skill would have selected one of the two devices over the other,” and that there is no such evidence in the record. Regents’ Br. at 62. But the passage from *Asyst Technologies* cited by Regents is merely a description of the particular evidence that was presented to the jury in that case, not a mandate by this Court as to what is required in every case. 544 F.3d at 1315. In any event, the record does contain the type of evidence described on *Asyst*—in particular, Dr. Lebby testified, based on his experience at Motorola in the 1990s, that j-lead packages had a smaller form factor and were better suited for Motorola’s

mobile phone products, whereas through-pin packages were used in larger, hifi equipment. Appx3556–57 (1203:7–1203:18).

Regents next argues that Uemura's lowered manufacturing cost does not supply motivation to use its through-pin leads. Regents' Br. at 62–63. But the Commission credited Dr. Lebby's testimony that Uemura's lowered manufacturing cost was due to "less demand for the working precision of the lead frames" and thus constituted specific motivation to use Uemura's through-pin leads (*i.e.*, its "lead frame"). Appx132 (citing Appx3564 (1232:8–11)). Regents' only attacks this expert testimony from Dr. Lebby with attorney argument, which should be rejected.

Regents also argues that Yamazaki's leads are "thin metallization" and not the j-lead alternatives to through-pin leads. Regents' Br. at 62–63. But the Commission explicitly cited to Dr. Lebby's testimony where he explains that Yamazaki's leads are in fact j-leads. Appx130 (citing Appx3562(1222:9–17)). In doing so, the Commission rejected Dr. Schubert's contrary testimony that Yamazaki's leads "are not j-leads." Appx3589 (1332:1–8) (referenced but not credited by the Commission in

Appx133). The Court should reject Regents request to reverse the Commission's credibility determination below.

#### c) The "Structural Support" Limitation Was Obvious Based on Minato in View of Uemura

The Commission's finding that the "structural support" limitation was rendered obvious by Minato in view of Uemura is supported by substantial evidence. In particular, the Commission credited Dr. Lebby's unrebutted testimony from the perspective of a person of ordinary skill in the art about the scope of the Minato and Uemura references, how an artisan would be motivated to combine them, and what the expected result would be." Appx139 (citing Appx3568–69 (1247:10–1252:1)). The Commission found motivation based on Dr. Lebby's testimony that through-pins and SMJs were "two well-known, interchangeable options for packaging LEDs" that were "within the 'technical grasp' of an ordinary artisan at the time of the invention." Appx139 (citing Appx3568 (1248:21–1249:18); *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)).

Regents argues that this finding should be reversed because Dr. Lebby supposedly failed to explain why a person of ordinary skill would

make this combination. Regent's Br. at 67. But the Commission expressly found that Dr. Lebby provided unrebutted testimony explaining the Minato and Uemura references and "how an artisan would be motivated to combine them." Appx139 (citing Appx3568–69 (1247:10–1252:1)). This cited passage includes Dr. Lebby's testimony that the through-pin leads such as those in Uemura were one of "two known alternative, common LED package scenarios or vehicles" and that they were "high-volume lead types" where there was "easier access to suppliers supplying these leads as they were popular and manufactured in the millions." Appx3568 (1249:5–18). Dr. Lebby's unrebutted testimony was more than substantial evidence for the Commission's obviousness finding.

#### 3. The Commission's Invalidity Finding Should Alternatively Be Affirmed Because the Appealed Claims Lack Written Description Support

Both appealed claims require "*a cathode on* a first end of the [transparent surface / sapphire plate] *and an anode on* a second end of the [transparent surface / sapphire plate], wherein the cathode and anode provide structural support to the [transparent surface / sapphire plate]." Appx749 (22:3–5); Appx782 (21:18–22:1) (emphasis added). This limitation appeared for the first time in a continuation application filed

by Regents on May 24, 2019, over twelve years after the filing date of the original patent application and a few months before Regents instigated the first ITC investigation in August of that year. *See* Appx135482. The specification—which is the same in the ’854 and ’557 patents—does not contain any disclosure or illustration of both the cathode and anode being on a transparent surface (or sapphire plate). In particular, the specification only discloses a different arrangement, shown below in Fig. 22A–B, where the anode (2208, red below) is on the transparent surface (2220, light blue below), but the cathode (unnumbered, purple below) is spaced apart from the transparent plate and thus *not* “on” the transparent plate. Appx135420 (reproduced below); *see also* Appx738; Appx771.



Accordingly, if the Court does not affirm the Commission's prior art-based invalidity findings, it should still find both appealed claims invalid on the alternative ground of lacking written description.

"Demonstrating adequate written description requires a precise definition of the invention." *D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1047 (Fed. Cir. 2018) (citations and quotations omitted). "[T]he test requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F. 3d 1336, 1351 (Fed. Cir. 2010); *see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997) ("It is the disclosures of the applications that count."). The knowledge of a person of skill in the art "may be used to inform what is actually in the specification . . . but not to teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Rivera v. ITC*, 857 F.3d 1315, 1322 (Fed. Cir. 2017). While compliance with the written description is a question of fact subject to review for substantial evidence, *Rivera*, 857 F.3d at 1319, here the Commission's written description decision errs in

its interpretation of the legal standard, which is reviewed *de novo*, *Ajinomoto Co., Inc. v. ITC*, 597 F.3d 1267, 1272 (Fed. Cir. 2010).

In the decision below, the ALJ acknowledged that the claimed arrangement—where the cathode and anode are both "on" the transparent surface (or sapphire plate)—is not disclosed in the specification, but nevertheless found the written description requirement satisfied based on Regents' experts' opinion that "a person of ordinary skill would understand that a lead frame can have a variety of shapes and would *not be limited* to the specific shape *shown in those figures*." Appx577–78 (emphasis added).[10] The ALJ thus did precisely what is barred by *Rivera*—he relied on the knowledge of a person of ordinary skill in the art to "teach limitations that are not in the specification." 857 F.3d at 1322. The ALJ's decision was premised on this Court's statement in *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) that a patent need not describe "every conceivable and possible future embodiment" of the invention to satisfy the written description requirement. Appx578. That is, the ALJ effectively held that *Cordis* had

[10] The Commission did not review the written description issue and therefore adopted the ALJ's findings. Appx151.

overruled the standard set forth in *Ariad* and *Lockwood* (and which was later reiterated after *Cordis* in *Rivera*), which requires the four corners of the specification to disclose the claim limitation at issue. But *Cordis* did no such thing. In *Cordis*, the Court considered a claim limitation ("plurality of slots") supported by a preferred embodiment *within* the scope of that limitation (*i.e.*, where the plurality of slots included alternating complete and half-slots), and this Court did nothing more than refuse to limit the claims to that preferred embodiment. 339 F.3d at 1364–65. Importantly, the claim limitation in *Cordis* satisfied the *Ariad* standard because that limitation was disclosed in the specification. Here, in contrast, the specification disclosure is all *outside* the scope of the claim limitation, since the specification only describes an example where the anode is on a transparent surface but the cathode is not on that surface. Appx135420; *see also* Appx738; Appx771. Nothing in *Cordis* sanctioned the ALJ's reach beyond the four corners of the specification to find written description support based on what "a person of ordinary skill would understand." Appx169.

Because the ALJ erred in his legal interpretation of the written description standard, and because the ALJ's underlying factual

determination was that there is no written description support to be found within the four corners of the specification itself, the Court should find the appealed claims invalid.

## II. CONCLUSION

For the foregoing reasons, Feit Electric respectfully requests that this Court affirm the Commission's finding of no violation of Section 337 on any or all of the grounds discussed above.

Dated: October 31, 2022

Respectfully submitted,

*/s/ Jay Reiziss*
Jay Reiziss
Alexander P. Ott
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
Phone: (202) 756-8000
Fax: (202) 756-8087

Kal K. Shah
Simeon Papacostas
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 212-4979
Fax: (312) 767-9192

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-1521

**Short Case Caption:** The Regents of the University of California v. ITC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 13,918 words.
- ☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- ☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 10/31/2022

Signature: /s/ Jay Reiziss

Name: /s/ Jay Reiziss