**No. 22-1521**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,**
*Appellant,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

**GENERAL ELECTRIC COMPANY, SAVANT TECHNOLOGIES LLC, HOME DEPOT PRODUCT AUTHORITY, LLC, HOME DEPOT U.S.A., INC., THE HOME DEPOT, INC., IKEA SUPPLY AG, IKEA U.S. RETAIL LLC, IKEA OF SWEDEN AB, SATCO PRODUCTS, INC., GLOBAL VALUE LIGHTING, LLC, SIGNIFY NORTH AMERICA CORPORATION, FEIT ELECTRIC COMPANY, INC.,**
*Intervenors.*

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-1220

# RESPONSE BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION

WAYNE W. HERRINGTON
Assistant General Counsel
Telephone (202) 205-3090

SIDNEY A. ROSENZWEIG
Acting Assistant General Counsel
Telephone (202) 708-2532

HOUDA MORAD
Attorney for Appellee
Office of the General Counsel
U.S. International Trade Commission
500 E Street SW, Suite 707
Washington, DC 20436
Telephone (202) 708-4716

Dated: October 31, 2022

# PATENT CLAIMS

**Claim 1 of U.S. Patent No. 10,593,854 (Appx749)**

1. A light emitting device, comprising:

a transparent surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and

a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

**Claim 1 of U.S. Patent No. 10,658,557 (Appx782)**

1. A light emitting device, comprising:

a sapphire plate, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

a plurality of III-nitride light emitting diodes (LEDs), each comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate; and

a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iv

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 3

I. The Asserted Patents ........ 3

II. Commission Proceedings ........ 7

A. Infringement ........ 7

1. Molding ('854 and '557 Patents) ........ 8

2. Transparent Surface ('854 Patent) ........ 9

3. Sapphire Plate ('557 Patent) ........ 12

B. Invalidity ........ 14

1. Sapphire Growth Substrate ........ 14

2. Cathode/Anode Providing Structural Support ........ 16

SUMMARY OF ARGUMENT ........ 17

ARGUMENT ........ 20

I. Standard of Review ........ 20

II. Substantial Evidence Supports the Commission's Non-Infringement Determinations. ........ 22

A. The Commission's Construction of "Molding" Is Correct, and the Commission's Non-Infringement Determination Is Supported by Substantial Evidence. ........ 22

1. The Commission Correctly Construed the Term "Molding." ........ 23

**TABLE OF CONTENTS (cont'd)**

**Page**


2. Substantial Evidence Supports the Commission's Finding that the Accused Products Do Not Include a "Molding." ....27

B. The Commission's Findings as to the "Transparent" Limitation Are Correct and Supported by Substantial Evidence. ....30

1. The Commission Properly Construed "Transparent" and Complied with All Procedural Requirements. ....31

2. Even if Treated as a Claim Construction Issue, Regents' Broad Construction for "Transparent" Is Inconsistent with the Intrinsic Evidence. ....34

3. The Extrinsic Evidence Does Not Support Regents' Broad Construction for "Transparent." ....38

4. Substantial Evidence Supports the Commission's Non-Infringement Determination as to "Transparent." ..41

C. Substantial Evidence Supports the Commission's Determination that the Accused Products Do Not Satisfy the "Sapphire Plate" Limitation Under the Doctrine of Equivalents. ....48

III. The Commission's Obviousness Determinations Are Legally Correct and Supported by Substantial Evidence, and Do Not Demonstrate an Abuse of Discretion. ....51

A. The Commission Correctly Found Obviousness as to the Sapphire Growth Substrate Limitation and Its Evidentiary Rulings Were Not an Abuse of Discretion. ....53

1. Regents Misconstrues the ALJ's Ground Rules. ....53

2. Intervenors Satisfied Their Burden on Invalidity and the Commission Did Not Shift the Burden to Regents. .58

**TABLE OF CONTENTS (cont'd)**

**Page**

B. The Commission Correctly Found Obviousness as to the "Cathode/Anode" Limitation. ....61

1. Yamazaki Alone. ....61

2. Yamazaki and Uemura. ....63

3. Minato and Uemura. ....67

C. The Secondary Considerations of Non-Obviousness Do Not Outweigh the Commission's Obviousness Determinations. ....69

CONCLUSION ....70

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajinomoto Co. v. ITC*,
597 F.3d 1267 (Fed. Cir. 2010) ....................53, 60

*Apple Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) (*en banc*) ....................21

*Augustine Med., Inc. v. Gaymar Indus., Inc.*,
181 F.3d 1291 (Fed. Cir. 1991) ....................36

*Centricut, LLC v. Esab Grp., Inc.*,
390 F.3d 1361 (Fed. Cir. 2004) ....................30

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*,
249 F.3d 1341 (Fed. Cir. 2001) ....................31

*Finnigan Corp. v. ITC*,
180 F.3d 1354 (Fed. Cir. 1999) ....................20, 40, 45

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ....................23

*Honeywell Int'l, Inc. v. ITC*,
341 F.3d 1332 (Fed. Cir. 2003) ....................20

*Kaufman v. Microsoft Corp.*,
34 F.4th 1360 (Fed. Cir. 2022) ....................33

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................65, 66, 69

*Linear Tech. Corp. v. ITC*,
566 F.3d 1049 (Fed. Cir. 2009) ....................20, 21

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007) ....................69, 70

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................25

**TABLE OF AUTHORITIES (cont'd)**

**Cases (cont'd) .................................................................................... Page(s)**

*Modine Mfg. Co. v. USITC*,
75 F.3d 1545 (Fed. Cir. 1996) ........................................................................32

*Neology, Inc. v. ITC*,
767 F. App'x 937 (Fed. Cir. 2019) ..................................................................21

*Nutrinova Nutrition Specialties & Food Ingredients GmbH v. ITC*,
224 F.3d 1356 (Fed. Cir. 2000) ...................................................21, 30, 49, 63

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ......................................................................32

*PPG Indus. v. Guardian Indus. Corp.*,
156 F.3d 1351 (Fed. Cir. 1998) ......................................................................32

*Sinorgchem Co., Shandong v. ITC*,
511 F.3d 1132 (Fed. Cir. 2007) ..............................................................18, 22, 52

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013) ......................................................................39

*Solomon Techs., Inc. v. ITC*,
524 F.3d 1310 (Fed. Cir. 2008) ..............................................................18, 22, 52

*Spansion, Inc. v. ITC*,
629 F.3d 1331 (Fed. Cir. 2010) ......................................................................21

*Sundance, Inc. v. DeMonte Fabricating Ltd.*.,
550 F.3d 1356 (Fed. Cir. 2008) ..................................................................69, 70

*Symbol Techs., Inc. v. Opticon, Inc.*,
935 F.2d 1569 (Fed. Cir. 1991) ..................................................................56, 60

*TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*,
920 F.3d 777 (Fed. Cir. 2019) ........................................................................23

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)..........................................................................................21

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)** ............................................................ **Page(s)**

*Thorner v. Sony Comput. Ent. Am., LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ............................................................26

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010) ............................................................26

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ............................................................38

*Vivid Techs., Inc. v. Am. Sci. and Eng'g., Inc.*,
200 F.3d 795 (Fed. Cir. 1999) ............................................................25

*Winbond Elecs. Corp. v. ITC*,
262 F.3d 1363 (Fed. Cir. 2001) ............................................................21

**Statutes**

5 U.S.C. § 557(b) ............................................................7

5 U.S.C. § 706 ............................................................20

19 U.S.C. § 1337 ............................................................*passim*

**Regulations**

19 C.F.R. Part 210 ............................................................53

19 C.F.R. § 210.38(a) ............................................................57

19 C.F.R. § 210.42(h) ............................................................7

19 C.F.R. § 210.43(b)(2) ............................................................40, 44

19 C.F.R. § 210.45(c) ............................................................7

## TABLE OF AUTHORITIES (cont'd)

**USITC Proceedings ........................................................................... Page(s)**

*Certain Integrated Circuits*, Inv. No. 337-TA-450, Comm'n Op., 2003 WL 22162514 (July 23, 2003)............................................................56, 60

*Certain Wireless Commc'n Devices*, Inv. No. 337-TA-745, Order No. 34, 2012 WL 1439182 (Apr. 24, 2012) ..............................................................54

**Rules**

Fed. R. Evid. 705 ..........................................................................................56

## STATEMENT OF RELATED CASES

Appellee, International Trade Commission ("the Commission"), is unaware of any related cases other than those identified by Appellant ("Regents") in its opening brief ("Blue-Br.").

## STATEMENT OF THE ISSUES

The issues in the present appeal are properly framed as follows:

(1) Whether the Commission correctly construed the term "molding" in both asserted patents (*i.e.*, U.S. Patent Nos. 10,593,854 ('854 patent) and 10,658,557 ('557 patent)) as a "component made by or as if by a mold," and properly rejected Regents' proposed construction of "molding" as *any* "formed component."

(2) Whether substantial evidence supports the Commission's non-infringement determination as to the "molding" limitation for both asserted patents, where the Commission relied on record evidence demonstrating that the structure of the accused products is inconsistent with products made by or as if by a mold.

(3) Whether the Commission correctly construed the term "transparent" ('854 patent only) in accordance with its plain and ordinary meaning, and properly rejected Regents' construction for that term as allowing *any* light (no matter how little) to pass through a material.

(4) Whether substantial evidence supports the Commission's non-infringement determination as to the "transparent" limitation ('854 patent), where the accused ceramic and polyimide submounts transmit substantially less light (as little as 1.7%) than transparent submounts (*e.g.*, sapphire, glass, or diamond).

(5) Whether substantial evidence supports the Commission's determination that the accused ceramic submounts do not satisfy the "sapphire plate" limitation ('557 patent only) under the doctrine of equivalents, where the accused products include polycrystalline aluminum oxide and are substantially distinct in structure and properties from single-crystal sapphire.

(6) Whether the Commission correctly found obviousness as to the "sapphire growth substrate" limitation (both asserted patents), where Regents raised validity contentions as to that limitation for the first time in its reply post-hearing brief, but failed to raise them in its pre-hearing brief or during the hearing, and the unrebutted summary testimony of Intervenors' expert was thus sufficient to satisfy Intervenors' burden as to that limitation.

(7) Whether substantial evidence supports the Commission's obviousness determinations where light emitting devices (LEDs) with a "cathode and anode provid[ing] structural support" (both asserted patents) were well-known and a person of ordinary skill in the art would have been motivated to pursue that cathode/anode configuration.

## STATEMENT OF THE CASE

The Commission provides this Statement of the Case because Regents' brief includes an incomplete description of the relevant facts and findings.

### I. The Asserted Patents

The '854 and '557 patents are related and share a common specification. The patents relate to transparent LEDs including a plurality of III-nitride layers and an active region that emits light, "wherein all of the layers except for the active region are transparent … such that the light is extracted effectively through all of the layers and in multiple directions." Appx718 (Abstract).

As set forth below, Regents asserts claim 1 of the '854 and '557 patents,[1] which recite the same relevant limitations (emphasized) except that the '854 patent recites a "transparent surface," while the '557 patent more narrowly recites a "sapphire plate":

| **Claim 1 of the '854 Patent** | **Claim 1 of the '557 Patent** |
|---|---|
| A light emitting device, comprising: | A light emitting device, comprising: |

[1] Regents also asserted certain claims of U.S. Patent Nos. 9,240,529 ('529 patent) and 9,859,464 ('464 patent) but those claims are not at issue on appeal.

| **Claim 1 of the ’854 Patent** | **Claim 1 of the ’557 Patent** |
|---|---|
| a **transparent surface**, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein **the cathode and anode provide structural support** to the **transparent surface** and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device; | a **sapphire plate**, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein **the cathode and anode provide structural support** to the **sapphire plate** and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device; |
| at least one III-nitride light emitting diode (LED) comprising a **sapphire growth substrate**, the LED in mechanical communication with the **transparent surface**, and the LED and **transparent surface** configured to extract light emitted by the LED through the **transparent surface**; and | a plurality of III-nitride light emitting diodes (LEDs), each comprising a **sapphire growth substrate** and each in mechanical communication with the **sapphire plate**, and the LEDs and **sapphire plate** configured to extract light emitted by the LEDs through the **sapphire plate**; and |
| a **molding** comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device. | a **molding** comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device. |

Appx749; Appx782.

The patent specifications explain that in conventional LEDs, to increase the light output from the front side, the emitting light is reflected by a mirror or a mirror coating on the backside. Appx743-744 (10:64-11:2). However, “[t]his reflected light is re-absorbed by the emitting layer (active layer)” and “the efficiency or output power of the LEDs is [thereby] decreased.” Appx744 (11:3-

8). Figure 1 (reproduced below) shows a conventional LED with "a sapphire substrate **100**, emitting layer **102** (active layer), and semi-transparent or transparent electrodes **104**." Appx744 (11:9-12). Critically, "the coating material on the lead[2] frame **106**, … becomes a mirror **110**," as illustrated by arrows of light bouncing up from surface **110**, Appx744 (11:12-16):




FIG. 1
CONVENTIONAL LED

Appx725. The claimed invention minimizes re-absorption by making all of the layers transparent (except for the active region) and eliminating the reflective layer or mirror from the backside of the LED. Appx744 (11:51-57); Appx748 (20:60-67). Thus, "light is extracted effectively through all of the layers and in multiple

[2] The term "lead" refers to an anode or cathode providing an electrical interface to the LED. Appx79 (n.3).

directions through the layers." Appx744 (11:51-57). The specification also describes an embodiment where the LED is embedded in a "molding" or a "shaped optical element," which acts as a lens that enhances light extraction. Appx745 (14:10-26); Appx749 (21:1-4).

In Figures 22A (plan view) and 22B (top view), for example, the LED includes an emitting layer **2202** (active layer), a substrate **2204**, and a lead frame **2208**, Appx748 (20:34-40):




FIG. 22A




FIG. 22B

Appx738. "[T]he emitting layer **2202** emits light **2218** that is extracted from both the top/front side **2214** and bottom/back side **2216**" of the LED. Appx748 (20:44-49). The bottom or backside of the LED includes a transparent plate (or submount) **2220** "comprised of glass, quartz, sapphire, diamond or other material transparent for the desired emission wavelength, wherein the transparent glass plate **2220** effectively extracts the light **2218** emitted from the LED **2200** to the shaped optical

element **2212**." Appx748 (20:50-58). Furthermore, "[t]he LED **2200** is embedded in or combined with moldings or shaped optical elements **2210**, **2212**, such as inverted cone shapes made of epoxy or glass, forming, for example, lenses." Appx748 (20:41-44).

## II. Commission Proceedings

The Commission[3] found no violation of section 337 of the Tariff Act, as amended, 19 U.S.C. § 1337 ("section 337"), based on non-infringement and invalidity of the asserted claims.[4]

### A. Infringement

Regents asserted claim 1 of the '854 patent against Intervenors' filament LEDs with ceramic (rigid) or polyimide (flexible) submounts. Appx81. Because claim 1 of the '557 patent recites a "sapphire plate," Regents asserted it against the accused rigid products only. Appx81. The Commission determined that the accused products do not infringe the asserted patents because they do not satisfy

---

[3] Unless indicated otherwise, the Commission affirmed and/or supplemented the findings of the Administrative Law Judge ("ALJ") in his final initial determination ("FID"). Appx75. Those findings have become those of the Commission under 5 U.S.C. § 557(b) and 19 C.F.R. §§ 210.42(h), 210.45(c). Except when necessary to distinguish the ALJ stage of proceedings from the Commission stage, this brief refers to the ALJ's findings as the Commission's own findings.

[4] The Commission's findings as to whether Regents' domestic industry articles are protected by the asserted patents, *see* 19 U.S.C. § 1337(a)(2)-(3), rise and fall with the Commission's non-infringement and invalidity determinations (Appx129), for which reason Regents does not separately address them in its brief (Blue-Br. 20).

the following limitations: "molding" (both asserted patents), "transparent surface" ('854 patent), and/or "sapphire plate" ('557 patent). Appx114-126.

### 1. Molding ('854 and '557 Patents)

#### a. Claim Construction

The Commission construed the term "molding" as "a component formed by or as if by a mold." Appx669. The Commission explained that the noun "molding" means "an object produced by molding" and the verb "mold" means "formed in *or as if in* a mold." Appx668 (emphasis in original).

The Commission declined to adopt the parties' proposed constructions for "molding." Appx668-669. Regents' construction for "molding" ("formed component") was extremely broad, essentially covering any article of manufacture. Appx668. On the other hand, Intervenors proposed a narrower construction ("component made by a molding process") but the Commission found that no particular process is required to produce a "molding." Appx668.

#### b. Infringement

The Commission determined that the accused products do not satisfy the molding limitation because they are not made by or as if by a mold. Appx563-565. To the contrary, the accused yellow silicone/phosphor coatings are deposited onto the filaments from an extruder in a "glob top" process, like squeezing toothpaste onto the filament. Appx563. The Commission found that Intervenors' expert, Dr.

Shanfield,[5] "credibly and directly … testif[ied] that a person of ordinary skill would 'absolutely not' consider a phosphor coat deposited by glob top to be a component formed by or as if by a mold." Appx564. The Commission explained that "the yellow silicone coating has random irregularities and an uneven surface," and "[s]uch surface characteristics are not compatible with a finding of being formed 'as if by a mold.'" Appx564.

### 2. Transparent Surface ('854 Patent)

#### a. Claim Construction

The Commission determined that the term "transparent" carries its plain and ordinary meaning. Appx660-661. The Commission did not adopt Regents' contention that "transparent" means "allows light to pass through," Appx660-661, *i.e.*, any material that allows "at least some light" to pass through, Appx90. The Commission recognized that "the parties' dispute is about how much light can be scattered" by a transparent surface. Appx660-661. The Commission, however, determined to resolve that factual issue in the context of infringement. Appx661.

The Commission explained that the intrinsic record describes transparent plates as glass, quartz, sapphire, diamond, and other materials that are used to extract light "effectively" through all layers of the LED including through the submount. Appx91; Appx748 (20:53-58). In addition, the Commission noted that

[5] Dr. Stanley Shanfield was one of Intervenors' technical experts on infringement.

"both the terms 'transparent' and 'semi-transparent' are used in the specification of the '854 patent, which shows that the inventors used, and distinguished those terms from each other, at the time of the invention." Appx91 (n.22) (citing Appx744 (11:9-12)). The Commission further found that semi-transparent materials have transmissivity of about 40 percent compared to materials that are recognized as transparent, "like indium tin oxide (ITO), Gallium Nitride (GaN), and tunnel junctions, which have transmissivity of 'at least 85 percent,' '95 percent' and '95 percent,' respectively." Appx91-92 (citing Appx3263 (349:9-17) (Wong[6]); Appx3245 (280:2-282:21) (Speck[7])).

Furthermore, during the prosecution of Application No. 11/954,154 ("the '154 application"), a parent of the asserted patents, the patentee distinguished a prior art reference disclosing a Distributed Bragg Reflector ("DBR") because "the DBR is primarily reflective and would not be considered transparent." Appx6547. The patentee expressly admitted that "*there is a difference between transparent and allowing some light to be transmitted*." Appx6547 (emphasis added).

Thus, the Commission found that Regents' application of "transparent" impermissibly encompasses any material that transmits even 1% of the incident

---

[6] Dr. Matthew Wong was one of Regents' fact witnesses.

[7] Dr. James Speck is one of Regents' fact witnesses.

light. Appx91 (citing Appx3195 (192:2-7) (DenBaars[8])). The Commission also explained that "although some materials like sheets of paper, human ears, and white clothing all allow the transmission of some light, … no reasonable fact finder would say those items are 'transparent.'" Appx90-91; Appx450.

**b. Infringement**

Based on transmission testing and scanning electron microscope (SEM) imaging, the Commission determined that the ceramic (rigid) or polyimide (flexible) submounts in the accused products (except Feit Vintage ST19 Dimmable, hereinafter "Feit-ST19") do not satisfy the "transparent surface" limitation literally or under the doctrine of equivalents. Appx119-122; Appx88-95; Appx548-555; Appx450-464. Indeed, none of the accused products (except Feit-ST19) "transmit more than 50%, with some transmitting as little as 1.7% of incident light" through the accused submounts, *i.e.*, nowhere "near the 80 or even 90% transmission rates of materials the parties and experts agree are transparent," including sapphire, glass, quartz, and ITO. Appx89; Appx91 (citing Appx3471 (962:1-19), Appx3480 (999:4-22) (Eden[9])).

---

[8] Dr. Steven DenBaars was one of Regents' fact witnesses and a named inventor of the asserted patents.

[9] Dr. Gary Eden was one of Intervenors' technical experts on infringement.

The Commission analyzed infringement under the doctrine of equivalents for all accused products, except Feit-ST19 (which literally infringed), and found "clear and substantial structural differences" between transparent materials and the accused products. Appx94-95. The Commission found that the accused products: "do not perform the same function as the claimed [sapphire] LED, which allows a significantly higher percentage of light to be extracted through the transparent plate"; "do not perform such function in the same way, given the substantial structural differences" between the accused products and the claimed LED; and "do not achieve the same result, given that the claimed LED results in a significantly higher percentage of light being extracted through the transparent plate." Appx95; Appx121-122.

### 3. <u>Sapphire Plate ('557 Patent)</u>

#### a. <u>Claim Construction and Literal Infringement</u>

Regents asserted the '557 patent against the accused rigid (ceramic) products, but not the flexible (polyimide) products, because claim 1 recites a "sapphire plate." Appx782 (21:19). The Commission construed the term "'sapphire' according to its plain and ordinary meaning, which is single crystal aluminum oxide." Appx661-663. On appeal, Regents does not challenge the Commission's claim construction. Blue-Br. 46-48. Nor does Regents challenge the Commission's determination that the accused ceramic submounts, which

include polycrystalline aluminum oxide, do not literally satisfy the "sapphire plate" limitation. Appx122-124.

#### b. Infringement Under the Doctrine of Equivalents

Under the doctrine of equivalents, the Commission found that "the ceramic submounts are substantially different with respect to visual testing, transmission testing, SEM analysis, and integrating sphere testing from the claimed 'sapphire' plates." Appx124. The Commission credited Intervenors' expert's testimony and found that "the function of the sapphire plate is to effectively extract light, the way this function is performed is by the plate being a transparent material, and the result is the effective extraction of light." Appx124-125. In contrast, the accused ceramic plates have "a comparatively poor ability to extract light." Appx125-126. The Commission found Dr. Eden's (Intervenors' expert) testimony persuasive and credible, unlike the testimony of Dr. Schubert[10] (Regents' expert). Appx124; Appx590.

The Commission also found "clear and substantial structural differences" between the accused ceramic submounts and sapphire plates, due to the presence in the accused submounts of grains, pores, and grain boundaries that "absorb" and "scatter" light, thereby inhibiting light transmission such that the ceramic materials are not transparent. Appx126.

[10] Dr. Fred Schubert was one of Regents' technical experts.

### B. Invalidity

The Commission determined that the asserted claims are obvious over: (1) Yamazaki Japanese Patent Publication No. 2003-249692 (Appx114889-Appx114901) alone; (2) Yamazaki in combination with Uemura U.S. Patent No. 6,310,364 (Appx138148-138158) and the state of the art represented by Shimizu U.S. Patent No. 5,998,925 (Appx138159-138200); and (3) Minato Japanese Patent No. 2001-126515 (Appx137815-137827) in combination with Uemura and the state of the art represented by Shimizu. Appx129-141. The Commission also found that "the secondary consideration factors do not outweigh the obviousness findings over Yamazaki or Minato alone or in combination with other prior art." Appx145-146.

On appeal, Regents disputes the Commission's obviousness determinations as to two claim limitations: "sapphire growth substrate" ("SGS") and "the cathode and anode provide structural support" ("cathode/anode").

#### 1. Sapphire Growth Substrate

The Commission found that each of Yamazaki and Minato teaches or suggests the SGS limitation. Appx135-137; Appx140-141. The Commission vacated the FID's findings that the limitation is obvious over Yamazaki in view of Uemura, noting that Intervenors "did not rely on the combination of Yamazaki and Uemura" for that limitation. Appx136-137.

The Commission determined that Intervenors satisfied their burden to show that the SGS limitation is obvious over Yamazaki or Minato. Appx136; Appx141. The Commission noted that Intervenors included extensive discussion in their pre-hearing brief with respect to the obviousness of the SGS limitation. Appx136; Appx141. On the other hand, Regents never contended during discovery (including its expert's rebuttal report), in its pre-hearing brief, or at the hearing that these references lacked the SGS limitation. Appx10543-10546; Appx10627-10631; Appx10981; Appx10994. At the hearing and in their post-hearing brief, Intervenors and their expert asserted that each limitation was obvious over Yamazaki or Minato and that the SGS limitation was "obvious [and] undisputed." Appx111823-111824, Appx111837; Appx3561 (1220:10-1221:2), Appx3568 (1246:6-20) (Lebby[11]); Appx135359; Appx135387. Regents said nothing during the hearing and did not cross-examine Dr. Lebby on the SGS limitation. Instead, Regents waited until its reply post-hearing brief (the last brief to be submitted before the ALJ) to challenge the SGS limitation for the first time. The ALJ struck Regents' belated validity contentions and the Commission properly found Regents' conduct to violate the ALJ's ground rules. Appx508-509; Appx581 (n.25); Appx136; Appx141; Appx111679 (¶ 11.2).

[11] Dr. Michael Lebby was Intervenors' technical expert on invalidity.

### 2. Cathode/Anode Providing Structural Support

#### a. Yamazaki Alone

The Commission found that "Yamazaki's Figure 1 shows a surface-mount LED package whose leads are wrapped around the ends of the glass/sapphire plate." Appx130; Appx580; Appx601; Appx114900. In addition, the Commission found, "[a] person of ordinary skill would understand that "these leads are a cathode and an anode, and that they provide structural support to the plate at each end." Appx130; Appx580. The Commission further found that "these leads are used to mount the package onto a circuit board, providing both the physical and electrical connection between the package and the board" and that the leads "provide structural support because they are how the LED package is physically attached to the circuit board." Appx130-131; Appx580.

#### b. Yamazaki and Uemura

The Commission also found the cathode/anode limitation obvious in view of Yamazaki, Uemura, and the state of the art represented by Shimizu. Appx131. The Commission explained that Uemura's "through-pin leads provide structural support to the device" and that Shimizu confirms that "by the mid-1990s people in the art knew of two interchangeable alternatives for LED packaging: through-pin packages [(as disclosed in Uemura)] and surface-mount J-lead packages" or SMJs (as disclosed in Yamazaki). Appx131-132.

The Commission also found that "Uemura provides specific motivation to pursue through-pin lead frame packaging with an LED mounted on a transparent plate." Appx132. The Commission explained that "a person of skill would understand Uemura's approach, which requires less manufacturing precision, would 'lower the manufacturing cost' of packaging LEDs." Appx132-133.

#### c. <u>Minato and Uemura</u>

The Commission also found the "cathode/anode" limitation obvious over Minato in view of Uemura and the state of the art represented by Shimizu. Appx513-514; Appx139-140. The Commission explained that "it would have been obvious at the time of the invention to modify Minato's package to use through-pin leads that provide structural support." Appx515. The Commission noted that Intervenors "elicited testimony from the perspective of a person of ordinary skill in the art about the scope and content of the[] [Minato, Uemura, and Shimizu] references, how an artisan would be motivated to combine them, and what the expected result would be," and "[t]hat testimony … is unrebutted." Appx139.

## SUMMARY OF ARGUMENT

The Commission's non-infringement determination as to "molding" covers all asserted claims and all accused products. If the Court affirms the Commission on that basis, it need not reach any of the other issues raised on appeal, including invalidity, which is an affirmative defense (not a counterclaim) in Commission

proceedings. *See Solomon Techs., Inc. v. ITC*, 524 F.3d 1310, 1319-20 (Fed. Cir. 2008); *Sinorgchem Co., Shandong v. ITC*, 511 F.3d 1132, 1141 (Fed. Cir. 2007).

The Commission correctly construed the term "molding" ('854 and '557 patents) as a "component made by or as if by a mold." Regents equates "molding" to any "formed component" and effectively treats it as a nonce word, in contradiction with the intrinsic and extrinsic records. Substantial evidence also supports the Commission's determination that the accused products do not include a "molding," including expert testimony demonstrating that the structure of the accused products is not compatible with a product made by or as if by a mold.

The Commission's other basis for non-infringement of the '854 patent—"transparent surface"—covers all but one accused product. The Commission correctly construed the term "transparent" in accordance with its plain and ordinary meaning, and substantial evidence supports the Commission's determination that the accused products (except Feit-ST19) do not include transparent submounts. As the Commission found, the accused submounts (except Feit-ST19) transmit substantially less light (as little as 1.7%) than transparent submounts (*e.g.*, sapphire, glass, or diamond as disclosed in the '854 patent). After acquiescing to the ALJ's plain and ordinary meaning construction and to the resolution of "transparent" in the context of infringement, Regents now impermissibly seeks a

broad construction that allows any light to pass through, in contradiction with the intrinsic and extrinsic records.

As to the ’557 patent, the asserted claim more narrowly recites a “sapphire plate” instead of “transparent surface,” and Regents asserts infringement against the accused ceramic (rigid) products under the doctrine of equivalents. Substantial evidence supports the Commission’s determination that the accused ceramic submounts, which include polycrystalline aluminum oxide, are substantially distinct in structure and properties from, and therefore not equivalent to, single-crystal sapphire.

As to invalidity, Intervenors asserted obviousness against both patents over Yamazaki alone and each of Yamazaki or Minato in view of Uemura and the state of the art represented by Shimizu. On appeal, and for each of the three obviousness combinations, Regents challenges the Commission’s findings as to two limitations: “sapphire growth substrate” (“SGS”) and “cathode and anode provid[ing] structural support” (“cathode/anode”). As to SGS, the Commission did not abuse its discretion in striking Regents’ arguments and finding them waived. Regents waited until its reply post-hearing brief to assert validity contentions as to that limitation, but failed to raise them in its expert’s rebuttal report, in its pre-hearing brief, or at the hearing. Indeed, at the hearing, after Intervenors’ expert summarily testified that all limitations were obvious over Yamazaki and Minato,

and his demonstratives expressly stated that the SGS limitation was "obvious [and] undisputed," Regents remained silent, failing to cross-examine Intervenors' expert, or even to inform the ALJ or Intervenors that the limitation was in fact disputed. Consequently, the unrebutted summary testimony of Intervenors' expert, as elicited during the hearing and discussed in Intervenors' post-hearing brief, was sufficient to satisfy Intervenors' burden as to obviousness of the SGS limitation over Yamazaki or Minato.

Substantial evidence also supports the Commission's obviousness findings as to the cathode/anode limitation, including expert testimony establishing that both Yamazaki and Uemura disclose a cathode and anode providing structural support and that a person of ordinary skill in the art would have been motivated to pursue that cathode/anode configuration.

## ARGUMENT

### I. Standard of Review

The Commission's final determinations are reviewed under the Administrative Procedure Act ("APA"). 5 U.S.C. § 706; *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). This Court reviews the Commission's legal determinations *de novo* and factual findings for substantial evidence. *See Finnigan Corp. v. ITC*, 180 F.3d 1354, 1361-62 (Fed. Cir. 1999); *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1060 (Fed. Cir. 2009). Under the substantial

evidence test, the Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *See Spansion, Inc. v. ITC*, 629 F.3d 1331, 1344 (Fed. Cir. 2010). In addition, the Court does not reweigh the evidence or reexamine the credibility of the witnesses. *Nutrinova Nutrition Specialties & Food Ingredients GmbH v. ITC*, 224 F.3d 1356, 1359 (Fed. Cir. 2000).

Claim construction is a question of law, but may depend on subsidiary factual findings based on extrinsic evidence, which are reviewed for substantial evidence. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015). Patent infringement is a question of fact, which the Court reviews for substantial evidence. *See Linear Tech.*, 566 F.3d at 1060. "Obviousness is a question of law based on underlying facts." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1047 (Fed. Cir. 2016) (*en banc*). In particular, "[w]hat a prior art reference teaches and whether a skilled artisan would have been motivated to combine references are questions of fact." *See id.* at 1051.

Furthermore, this Court reviews "'procedural and evidentiary determinations made by the Commission,' including 'waiver' determinations, for abuse of discretion." *Neology, Inc. v. ITC*, 767 F. App'x 937, 940 (Fed. Cir. 2019) (quoting *Winbond Elecs. Corp. v. ITC*, 262 F.3d 1363, 1370 (Fed. Cir. 2001)).

## II. Substantial Evidence Supports the Commission's Non-Infringement Determinations.

The Commission's finding that the accused products do not satisfy the "molding" limitation ('854 and '557 patents) is supported by substantial evidence. Affirming the Commission on that basis alone is sufficient for this Court to affirm the Commission's finding of no violation of section 337, and the Court can decline to reach all other issues raised by Regents, including invalidity. *See Solomon Techs.*, 524 F.3d at 1319-20; *Sinorgchem*, 511 F.3d at 1141. Nevertheless, substantial evidence also supports the Commission's finding that the accused products (except Feit-ST19) do not meet the "transparent surface" limitation of the '854 patent, and that the accused products do not meet the "sapphire plate" limitation of the '557 patent.

### A. The Commission's Construction of "Molding" Is Correct, and the Commission's Non-Infringement Determination Is Supported by Substantial Evidence.

The Commission correctly construed the term "molding" in the asserted claims as "a component formed by or as if by a mold," Appx669, and substantial evidence supports the Commission's determination that the accused products do not satisfy that term. Regents' proposed construction, "formed component," is impermissibly broad and inconsistent with the record. As to infringement, Regents misapprehends the Commission's findings as introducing a process requirement in the application of "molding."

### 1. **<u>The Commission Correctly Construed the Term "Molding."</u>**

Claim terms are presumed to have their plain and ordinary meaning and the patentee must demonstrate a "clear intent" to deviate from that plain meaning. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014). Claim 1 of the '854 and '557 patents recite "a molding comprising a phosphor and surrounding the LED[s], the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device." Appx749; Appx782. The parties disputed the meaning of that term in Commission proceedings. Regents argued that the term "molding" should mean a "formed component." Appx668. Regents' proposed construction was based neither on a plain meaning of the term, nor any argument that the term has a special meaning in the art. Appx7766-7768. Nor did Regents argue that the patentee acted as a lexicographer. Appx7766-7768. Instead, Regents merely relied on the surrounding claim language and treated "molding" as a word without independent meaning of its own. Appx7766-7768. Thus, Regents' construction effectively treats "molding" as a nonce word, *i.e.*, any article of manufacture that meets the other claim limitations. The Commission properly rejected that construction. Appx668-669; *see TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 786-87 (Fed. Cir. 2019) (rejecting argument that "conduit" is a nonce term in view of the intrinsic and extrinsic records).

On the other hand, Intervenors argued that "molding" should be construed to mean a "component made by a molding process." Appx668-669. While closer to the plain meaning, Intervenors' proposed construction was also properly rejected by the Commission. Instead, the Commission construed "molding" as "a component formed by *or as if* by a mold." Appx668-669 (emphasis added). The Commission found that the term does not require any particular process to produce a molding, but that the physical characteristics of the final product need to be consistent with a component formed by or as if by a mold. Appx668; Appx564. Regents' characterization of the Commission's construction as "impos[ing] a process for creating the molding" and "exclud[ing] the presence of 'random irregularities and an uneven surface,'" Blue-Br. 40, is the opposite of what the Commission did. Indeed, the Commission rejected Intervenors' proposed construction precisely because it imposes a particular process. Appx668-669.

The Commission's construction is consistent with both the intrinsic and extrinsic records. The Commission observed that the dictionary definition of a "molding" is "an object produced by molding" and that the verb "mold" means "formed in *or as if in* a mold." Appx668 (citing Appx7144) (emphasis in original). The patent specification uses the term "molding" multiple times, but does not expressly define that term. Rather, the specification refers to "molding" as a specific component, along with an alternative "shaped optical element," either of

which acts as a lens to enhance light extraction. Appx745 (14:10-26); Appx749 (21:1-4). The specification, therefore, cannot support the broad idea that a "molding" is any "formed component."

On appeal, Regents again equates "molding" to a nonce word, arguing that "[t]he contextual claim language makes clear that 'molding' comprises a phosphor, surrounds the LED, and is configured to extract light from the front and back sides of the device." Blue-Br. 40. As discussed above, this argument is inconsistent with the intrinsic and extrinsic records and effectively reads the word "molding" out of the claim. The canons of claim construction do not permit ignoring "molding" entirely and looking instead at the contextual claim language. *See Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Regents also relies on the claim term "a molding *comprising*," and suggests that "comprising" allows the accused apparatus to have components or features "in addition to those explicitly recited." Blue-Br. 42 (citing *Vivid Techs., Inc. v. Am. Sci. and Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999)). The cited case, *Vivid*, is an unexceptional case that involves the term "comprising" after the *claim's preamble*. *Vivid*, 200 F.3d at 804. But neither *Vivid* nor any other precedent suggests that a claim *limitation's* use of the term "comprising" erases the term

"molding" itself, as Regents suggests. *See* Blue-Br. 41-42. To the contrary, "[c]omprising is not a weasel word with which to abrogate claim limitations." *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1354 (Fed. Cir. 2010).

Furthermore, Regents asserts that the claims "define molding" (Blue-Br. 40) but Regents ignores the requirements for lexicography. In *Thorner*, which Regents cites but misapplies, Blue-Br. 41-42, the Court explained that "to act as its own lexicographer, a patentee *must clearly set forth a definition of the claim term* other than its plain and ordinary meaning," and "*must clearly express an intent* to redefine the term." *Thorner v. Sony Comput. Ent. Am., LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (emphasis added). The record in the present appeal falls far short of these requirements.

Lastly, Regents rejects the Commission's reliance on the '529 and '464 patents arguing that they are "legally unrelated" and do not establish disavowal. Blue-Br. 41. The Commission, however, relied on the '529 and '464 patents not to establish disavowal but to support the Commission's application of plain and ordinary meaning. The asserted patents incorporate by reference the specification of a parent application of the '529 and '464 patents, namely, Application No. 11/940,885. Appx741-742 (6:59-7:2, 8:14-15); Appx673; Appx696. Beyond that incorporation by reference, the '529 and '464 patents, which were asserted below but not on appeal, have two common inventors with the '854 and '557 patents and

nearly identical priority dates (November and December 2006). Appx564; Appx88 (n.17). In particular, the ’529 and ’464 patents distinguish a “molding” from phosphor layers obtained by “placing a gel or other liquid form of material onto the chip, and allowing the phosphor to cure,” such as Intervenors’ glob-top process. Appx710 (5:42 45); Appx688 (5:27-30). Such a process, according to the ’529 and ’464 patents, results in a “non-uniform” phosphor layer and “does not take into account several factors that can be used to increase the efficiency of the LED.” Appx688 (5:27-30); Appx710 (5:42 45). One such factor includes using a molding, which acts as a lens, to assist light extraction. Appx690 (10:39-42); Appx712 (10:59-62); Appx564. Thus, the ’529 and ’464 patents reiterate that a “molding” is not merely any formed component.

#### 2. <u>Substantial Evidence Supports the Commission’s Finding that the Accused Products Do Not Include a “Molding.”</u>

Substantial evidence supports the Commission’s determination that the accused products do not satisfy the “molding” limitation. Appx563-565. The Commission focused on the characteristics of the final product and did not require any particular process. Appx563-565.

The record demonstrated that the accused moldings, *i.e.*, “the yellow silicone/phosphor covering on each filament,” are not formed by or as if by a mold. Appx563. Rather, they are deposited onto the filaments from an extruder in a process known in the industry as “glob top,” which involves “no mold” and

"nothing like a mold." Appx563 (citing Appx3544 (1150:5-25) (Shanfield); Appx135333 (reproduced below)).



Appx135333. Dr. Shanfield explained that the glob top process involves a "triangular spout … [that] squeezes out the material" and "it is almost exactly like squeezing out toothpaste across the filament" and the resulting product is "uneven." Appx3544 (1150:17-25) (Shanfield). The Commission found that "the dissimilarity of the accused products … from objects made 'as if by a mold' are readily apparent: the yellow silicone coating has random irregularities and an uneven surface," and "[s]uch surface characteristics are not compatible with a finding of being formed 'as if by a mold.'" Appx564 (citing Appx3483 (1011:5-23, 1012:19-23) (Eden); Appx3544 (1150:2-16), Appx3552 (1183:19-1185:8) (Shanfield); Appx135292, Appx135333 (reproduced below)).



IKEA (RX-0179.0007)



Satco (CX-0207.0009)



GE Lighting (RX-0177.0061)



GVL (RX-0176.0005)



Signify (RX-0547.0002)



Home Depot (RX-0175.0006)

Appx135292.



Appx135333.

Regents argues, without support, that the extruding material from a triangular spout is effectively the same as extrusion molding and results in a molding. Blue-Br. 45-46. This is a bare attorney argument, and it is contradicted by the evidence. As the Commission found, Intervenors' expert "credibly and directly … testif[ied] that a person of ordinary skill would 'absolutely not' consider a phosphor coat deposited by glob top to be a component formed by or as if by a mold." Appx564 (quoting Appx3544 (1151:1-5) (Shanfield)).

Lastly, Regents focuses on portions of the silicone/phosphor coating and suggests, without support, that they do not include irregularities. Blue-Br. 42-46.

But Regents nowhere alleged in its post-hearing brief before the ALJ that a portion of the coating is sufficient to satisfy a "molding." Appx111959-111968. Rather, Regents devised this argument for the first time in its petition for Commission review (after it had already lost before the ALJ), Appx112885-112887, and Intervenors properly recognized the forfeiture, Appx113082-113084. *See also* Appx111688 (¶ 14.1). At the ALJ stage, Regents argued (but the ALJ disagreed) that the shape of the encapsulant (coating) was "consistent *along the length* of the filament." Appx111963 (emphasis added); Appx562. Beyond forfeiture, Regents' attorney arguments in its petition and on appeal are insufficient to satisfy its burden on infringement or to rebut Intervenors' expert testimony and the substantial evidence underlying the Commission's non-infringement determination. *See Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004).

The Commission properly declined to review (and therefore affirmed) the ALJ's findings as to "molding." Appx118 (n.35). The Court should reject Regents' invitation to reweigh the evidence. *See Nutrinova*, 224 F.3d at 1359.

### B. **The Commission's Findings as to the "Transparent" Limitation Are Correct and Supported by Substantial Evidence.**

The asserted patents are directed to improving light extraction from an LED by allowing light to be emitted effectively from both the front and backside of the LED, instead of just the front side. Appx744 (11:51-57). To that end, the patents disclose the use of a transparent submount on the backside, such as glass, sapphire,

or diamond. Appx748 (20:53-58). The accused products instead include ceramic or polyimide submounts that transmit as little as 1.7%. Appx89. The plain meaning of "transparent" does not reach so far.

The ALJ correctly construed the term "transparent" of the '854 patent in accordance with its plain and ordinary meaning, and substantial evidence supports the Commission's determination that the accused submounts (except Feit-ST19) do not satisfy that term. The Commission rejected Regents' proposed construction, which merely "allows light to pass through," as impermissibly broad and inconsistent with the intrinsic and extrinsic evidence. As to infringement, Regents improperly invites this Court to reweigh the evidence of record. Regents also manufactures an APA violation by improperly—and belatedly—characterizing the Commission's infringement findings as a claim construction dispute.

#### 1. **The Commission Properly Construed "Transparent" and Complied with All Procedural Requirements.**

The ALJ correctly determined that the term "transparent" carries its plain and ordinary meaning. Appx660-661. The ALJ also recognized that how much light is scattered (rather than transmitted) by a transparent surface was an important consideration. Appx660-661. The ALJ, however, properly determined to resolve that factual issue in the context of infringement. Appx661 (citing *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341,

1349 (Fed. Cir. 2001) (finding that "melting" required no construction and that the dispute was "a factual question of infringement")).

This Court has explained that as long as the patent claim meets the definiteness requirement, it is permissible for claims to be "drafted using terminology that is not as precise or specific as it might be." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("consisting essentially of"). That different fact-finders "could reach different conclusions regarding … whether [an accused] product infringes" is "a necessary consequence of treating infringement as a question of fact subject to deferential review. It does not mean that the claim was improperly construed as an initial matter." *Id.*; *see also Modine Mfg. Co. v. USITC*, 75 F.3d 1545, 1549 (Fed. Cir. 1996) ("relatively small"). The Commission was under no obligation to afford more precision to the term "transparent" than the claim language itself warranted. Notably, and unlike district court cases, there is no risk of misallocation of roles as between judge and jury, because there is no jury in Commission proceedings.

Regents argues that the Commission "should have resolved any subsidiary factual questions regarding claim construction before the hearing, but it did not," in violation of the APA and *O2 Micro*. Blue-Br. 12, 22 (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008)). But under *O2 Micro* and its progeny, it is incumbent on an aggrieved party in the proceedings

below to assert that a dispute has arisen that requires additional construction. *See Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1369 (Fed. Cir. 2022) ("[A] party must sufficiently request further construction of the relevant limitation to raise an actual dispute."). Regents *never* indicated to the ALJ before the evidentiary hearing that more construction for the term "transparent" was necessary, even after Intervenors' infringement theories were made clear in the pre-hearing briefs. And Regents remained silent about any alleged error in the claim construction process even after the ALJ's evidentiary hearing. Instead, Regents offered infringement theories under both its application of "transparent" ("allows light to pass through") and Intervenors' application ("permitting the passage of light without significant deviation/scattering or absorption"). Appx660; Appx10366; Appx10371 ("To the extent the submounts in the Accused Rigid Products are not literally 'transparent' (*e.g.*, if [Intervenors'] constructions are adopted), the Accused Rigid Products infringe under the doctrine of equivalents."); Appx10498-10499; Appx111901; Appx111948-111950. Thus, Regents acquiesced to the resolution of the factual issues relating to "transparent" in the context of infringement. And because Regents also argued infringement under Intervenors' construction, Regents was neither deprived of due process nor prejudiced.

After the ALJ ruled against Regents in his final determination, Regents petitioned for Commission review of the ALJ's findings, and argued that: "In the

Claim Construction Order, the ALJ correctly construed the term transparent as having its plain and ordinary meaning without imposing any testing or minimum transmission." Appx112860. But contrary to Regents' suggestion, the ALJ did not adopt Regents' proposed construction that merely allows some light to pass through, Appx661, and Regents' arguments below confirm that Regents recognized that a remaining factual dispute relating to scattering or absorption would be resolved in the context of infringement and after presentation of the evidence. Appx10371; Appx10498-10499; Appx111901; Appx111948-111950.

The ALJ did not alter his construction as Regents contends, Blue-Br. 22. Indeed, the ALJ expressly stated that he does "not need to set a specific numerical threshold for light transmission to resolve the factual infringement inquiry." Appx450. Thus, Regents misapprehends the ALJ's decision, and Regents' attempt to recast the infringement issue as one of claim construction comes far too late.

### 2. Even if Treated as a Claim Construction Issue, Regents' Broad Construction for "Transparent" Is Inconsistent with the Intrinsic Evidence.

As discussed above, the issue of whether a material is "transparent" is properly framed as an infringement (not claim construction) issue, and substantial evidence supports the Commission's findings as to non-infringement, as will be discussed *infra*, Part II.B.4. Even if the issue is treated as one of claim construction, Regents' proposed construction ("allows light to pass through") is

unsupportable as a matter of law, and the Commission properly rejected Regents' arguments below. Appx90-92.

Regents asserts that "transparent" is satisfied whenever any amount of light passes through a material. Blue-Br. 21. Indeed, some of the accused products allow as little as 1.7% of light to pass through the submounts. Appx89, Appx91, Appx462. The intrinsic record does not support Regents' broad construction for the term "transparent." Not a single embodiment in the specification supports Regents' proposed construction. Rather, as the Commission recognized, Regents' construction "is in direct contrast to the materials described as transparent in the specification (*e.g.*, glass, quartz, sapphire, and diamond), which transmit the large majority of light in order to effectively extract that light through the transparent material without significant scattering or absorption." Appx91 (citing Appx3471 (962:1-19), Appx3480 (999:4-22) (Eden)). The specification also describes "the present invention" not as allowing any light to pass through, but as a light emitting device wherein "light is extracted *effectively* through all of the layers and in multiple directions." Appx742 (8:46-59) (emphasis added); Appx748 (20:60-63).

The Commission also noted that "both the terms 'transparent' and 'semi-transparent' are used in the specification of the '854 patent, which shows that the inventors used, and distinguished those terms from each other, at the time of the invention." Appx91 (n.22) (citing Appx744 (11:9-12) (discussing "semi-

transparent" (*e.g.*, metal) and "transparent" electrodes (*e.g.*, ITO)). The Commission explained that the term "semi-transparent" had a transmissivity of about 40 percent, much lower than materials that are considered transparent, like ITO, GaN, and tunnel junctions, which have transmissivity of at least 85 percent, 95 percent, and 95 percent, respectively. Appx91-92. On appeal, Regents argues that "semi-transparent" is a species of "transparent," and not something less than transparent. Blue-Br. 33-34. Not only is that argument specious as a linguistic matter, but Regents' own witnesses confirmed that semi-transparent materials have a lower transmittance than transparent materials. Appx91-92 (citing Appx3263 (349:9-17) (Wong); Appx3245 (280:2-282:21) (Speck)). Regents argues that Dr. Wong is not a skilled artisan, Blue-Br. 34, but his testimony is consistent with Dr. Schubert's (Regents' expert) textbook, which explains that "[v]ery thin metal contacts are semi-transparent" and can have "a transmittance of approximately 50%." Appx6589.

The prosecution history of the parent '154 application also contradicts Regents' broad construction and is relevant here. *See Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999) ("[T]he prosecution history of a parent application may limit the scope of a later application using the same claim term."). The claim term at issue in the '154 application was "a transparent substrate or sub-mount." Appx6533 (claim 1). The patentee

distinguished a prior art reference on the basis that a Distributed Bragg Reflector (DBR) "is primarily reflective and would not be considered transparent." Appx6547; Appx91. More than that, the patentee expressly stated that "*there is a difference between transparent and allowing some light to be transmitted*." Appx6547 (emphasis added). That is the opposite of Regents' proposed construction and Regents' position on appeal. Contrary to Regents' contention, Blue-Br. 29, the patentee's statement is not limited to DBRs, but shows that the patentee understood the plain meaning of "transparent" to be distinct from merely allowing some light to pass through.

Regents argues that the surrounding claim language ("the LED and transparent surface configured to extract light emitted by the LED through the transparent surface") shows that the term "transparent" is broad. Blue-Br. 26 (citing Appx749 (claim 1)). But, as with the word "molding," *supra*, the surrounding claim language does not erase the term "transparent" itself. Appx90. Nor does the claim language define "transparent" or "recite a test to determine that the plate is transparent." Appx90.

Regents also argues that the specification shows that "scattering is consistent with the goal of improving extraction." Blue-Br. 27-28. But that argument conflates "[surface] roughening … [that] is on the order of the wavelength of light and [that] would cause the type of scattering beneficial to light extraction"

(Appx466 (citing Appx3364 (637:23-638:11, 638:16-639:11), Appx3370-3371 (661:25-662:12, 664:4-21) (Schubert); Appx115519-115522)) with the type of scattering in the bulk material that causes absorption, as observed in the context of the accused products. Appx89 (citing Appx3478-3479 (993:9-995:13) (Eden); Appx3554 (1192:25-1193:5) (Shanfield)); Appx111277.

Thus, even if "transparent" is treated as a claim construction issue on appeal, despite Regents' failure to preserve the issue before the ALJ, Regents' proposed construction is unsupported by the intrinsic record and unsupportable on appeal.

#### 3. **The Extrinsic Evidence Does Not Support Regents' Broad Construction for "Transparent."**

The extrinsic evidence does not help Regents, and, in any event, it cannot contradict the clear import of the intrinsic evidence. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

First, Regents selectively relies on a dictionary definition for "transparent" as "[p]ermitting passage of radiation or particles," Blue-Br. 32 (citing Appx7914; Appx7909), but Regents cherry-picks its definitions, ignoring other definitions in the same dictionaries which are consistent with the intrinsic record and at odds with Regents' position on appeal. Appx92 (citing Appx7909; Appx7914). For instance, "*freely* passes … light" requires "free[]" passage of light which is more than some light passing through. Appx7909 (emphasis added).

Second, Regents' reliance on two district court cases construing the term "transparent" in the context of an unrelated patent is misguided. Blue-Br. 30-32. As noted by the Commission, "those cases involved different patents, different inventors, and different intrinsic or extrinsic records." Appx93. There were, for example, no statements like those of the applicant here in the parent '154 application discussed above, much less distinction between transparent and semi-transparent materials. Moreover, the principal dispute in the District of Delaware was whether "one must also be able to see clearly and distinctly through the transparent element." Appx7895-7898; Appx8101. That is not at issue here. Such differences demonstrate the importance of the intrinsic and administrative records, as opposed to unrelated patents in unrelated proceedings.

Third, Regents relies on its expert's conclusory testimony to support its construction for "transparent." Regents argues that "Professor Schubert opined that the plain and ordinary meaning of the term 'transparent,' in view of the specification, to a [person of ordinary skill] in the field of LEDs in 2006 was, 'allows light to pass through.'" Blue-Br. 24. This Court, however, has cautioned against reliance on "conclusory, unsupported assertions by experts as to the definition of a claim term." *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013). Additionally, Regents failed to rely on this testimony in its petition for Commission review of the ALJ's claim construction and therefore

forfeited that argument on appeal. Appx112859-112871; 19 C.F.R. § 210.43(b)(2); *Finnigan*, 180 F.3d at 1362-63.

Regents also relies on Dr. Eden's (Intervenors' expert) testimony to support its position that no "minimum threshold of transmissivity [is] required for a material to be considered 'transparent.'" Blue-Br. 24. But Regents misapprehends Dr. Eden's testimony. Dr. Eden was asked if he "established a quantitative threshold that is required for [a] material to be considered transparent," and he answered in the negative. Appx3489 (1035:19-22) (Eden). Dr. Eden's testimony does not mean that the threshold for transparency is anything above zero, as Regents suggests. Rather, his testimony is consistent with the Commission's statement that it "do[es] not need to set a specific numerical threshold for light transmission to resolve the factual infringement inquiry." Appx450.

Lastly, Regents argues that "by relying on Miyahara, [Intervenors' expert,] Dr. Lebby implicitly adopted Miyahara's teaching that 'transparent' encompasses structures that transmit as little as 1% of light." Blue-Br. 33. Regents forfeited this argument by failing to raise before the Commission. *See* 19 C.F.R. § 210.43(b)(2); *Finnigan*, 180 F.3d at 1362-63; Appx112859-112871. Regents' argument is also specious because Dr. Lebby did not testify that materials transmitting as low as 1% are transparent. Rather, Intervenors relied on

Miyahara's disclosure of materials having a transmittance of more than 80%. Appx10961-10962 (citing Appx139131 (Figure 27)).

#### 4. Substantial Evidence Supports the Commission's Non-Infringement Determination as to "Transparent."

The Commission found that the ceramic (rigid) and polyimide (flexible) submounts of the accused products (except Feit-ST19) do not satisfy the "transparent surface" limitation either literally or under the doctrine of equivalents.

##### i. Literal Infringement

In reaching its non-infringement determination, the Commission credited Intervenors' evidence, including Dr. Eden's testimony and the integrating sphere testing conducted by Covalent Metrology. The Commission found that none of the accused products (except Feit-ST19) "transmit more than 50%, with some transmitting as little as 1.7% of incident light," *i.e.*, nowhere near the 80 or even 90% transmission rates of materials recognized as transparent in the intrinsic record, *e.g.*, sapphire, glass, quartz, and ITO. Appx89 (citing Appx135269 (showing a transmittance "T" between 1.7% and 45.6% for the accused products, as compared to a transmittance of 78.7% for the transparent sapphire product); Appx3475-3477 (979:22-989:11) (Eden)); Appx462. Thus, at best, the accused products (except Feit-ST19) had about the same transmittance as semi-transparent materials. Appx450-451; Appx6589. The Commission found Intervenors' evidence to be "sufficiently reliable" and "did not find credible Dr. Schubert's

testimony criticizing the configuration of the integration sphere used in [Intervenors'] testing." Appx461-462 (citing Appx3475-3476 (981:5-982:8, 983:8-984:11), Appx3489-3490 (1036:11-16, 1039:23-1040:5) (Eden)).

The Commission also relied on Intervenors' testing, conducted at the University of Illinois, which demonstrated that the accused submounts substantially inhibited the transmission of light therethrough. Appx452-457 (citing Appx3471 (965:1-11) (Eden); Appx551-552 (citing Appx3472 (969:19-24), Appx3485 (1018:3-16) (Eden)); Appx91; Appx119; *see also* Appx135250; Appx135255. In particular, Dr. Eden testified, with reference to Appx135278 (reproduced below), that the back side transmission (*i.e.*, through the submount) of the accused ceramic products is minimal compared to the Sylvania product which includes a sapphire plate. Appx3480 (999:4-22) (Eden).



Appx135278. Likewise, Dr. Eden testified with reference to Appx135300 (reproduced below), that "only a small amount of the light incident on the flexible submount is actually transmitted by that submount." Appx3485 (1018:3-16).




Satco (RX-0178.0047)




GE Lighting (RX-0177.0088)

Appx135300.

The Commission further considered Regents' LUX plots but nowhere found that the accused submounts (except Feit-ST19) exhibit over 60% and up to 80% transmittance, as Regents contends (Blue-Br. 23). Rather, the Commission found that the LUX plots exhibited up to 60% transmission. Appx457. In addition, the LUX plots were "imperfect" because they inflated the transmission data through the accused submounts. Appx457 (n.12); Appx553. Indeed, Regents' testing, which kept the silicone coating intact on the accused LED filaments, resulted in a higher light transmission through the back side (up to 60%) compared to Intervenors' testing (without silicone coating) (less than 50%). Appx457; Appx462; Appx3473 (972:22-973:13) (Eden) (testifying that "the fraction of light

that is transmitted by the [GVL-737] filament is almost a factor of 2 higher than that with the submount having its coating removed"); Appx455. The Commission explained that such differences "stem in part from the silicon[e] acting as 'an optical wave guide that redistributes the light that is emitted out of the top of the chip and … spreads it around … to the back side." Appx457 (n.12) (quoting Appx3473 (973:14-23) (Eden)).

Regents argues that it adduced unrebutted expert testimony that it is difficult for the human eye, which perceives differences on a logarithmic scale, to distinguish between the light intensity on the front and back sides of the accused filament LEDs. Blue-Br. 7, 23-24 (citing Appx3356 (604:22-606:21), Appx3452 (888:24-889:15) (Schubert)). The Commission, however, determined to give Regents' evidence "less weight" because "[h]uman-perceived luminosity is a different parameter than transparency." Appx452 (n.9); Appx450 (citing Appx3453 (890:2-12) (Schubert)). Regents' own expert confirmed that "[h]uman perception is helpful in that regard, but it should not be the only basis for a finding of transparency." Appx3452 (888:18-889:7) (Schubert).

Regents also makes several arguments in an attempt to undermine Intervenors' testing and the Commission's reliance thereon. Blue-Br. 37-38. But in its petition for Commission review, Regents failed to challenge the reliability of Intervenors' testing, and therefore waived such arguments on appeal. *See* 19

C.F.R. § 210.43(b)(2); *Finnigan*, 180 F.3d at 1362-63; Appx112871-112878; Appx90 ("[Regents] does not contest [Intervenors'] transmissivity data but argues that the FID erred in setting a transmissivity threshold at all."). Nor did Regents challenge the ALJ's findings as to the shortcomings of its own LUX plot testing. Furthermore, Regents' arguments are wrong on the merits. Dr. Eden did account for scattering (Appx3489-3490 (1037:23-1040:5)) and did not "underestimate[]" light transmission contrary to Regents' contention (Blue-Br. 37).

Lastly, Regents relies on photographs of the populated and unpopulated sides of the accused filaments. Blue-Br. 5-6. But as the Commission found, "these photographs are of little probative value because it is difficult to determine from them the amount of light passing through the submount." Appx451 (n.8). In addition, the Commission credited Intervenors' expert's testimony and found that "the images of the populated sides were saturated—as evident by the fact that the blue LEDs appear white—and thus result in a misleading comparison with the non-saturated unpopulated-side images." Appx451 (n.8) (citing Appx3538 (1126:3-1128:16) (Shanfield); Appx135316 (reproduced below)).




Appx135316.

### ii. <u>Doctrine of Equivalents</u>

Substantial evidence also supports the Commission's determination that there is no infringement under the doctrine of equivalents.[12] Appx94-95; Appx120-122. Regents addresses the ALJ's infringement findings under the doctrine of equivalents but fails to address (and therefore waived any challenge to) the Commission's supplemental findings as discussed below. Blue-Br. 38-40.

Specifically, the Commission found "clear and substantial structural differences between transparent materials and [the non-transparent accused products]." Appx94; Appx121. The Commission explained that "[t]he presence of grain boundaries and pores cause the [non-transparent accused submounts] to be

[12] The Commission found that Feit-ST19 satisfies the "transparent" limitation literally and did not reach the doctrine of equivalents. Appx121-122.

'highly absorbing and scattering,'" thereby inhibiting light transmission. Appx94-95 (citing Appx3479 (994:11-13, 994:24-995:6) (Eden); Appx3554 (1192:25-1193:5) (Shanfield)); Appx121 (citing Appx3479, Appx3485 (995:17-996:16, 1018:22-1019:5) (Eden); Appx135273 (reproduced below); Appx137060 (Satco-S9966); Appx137245, Appx137250 (IKEA-Rollsbo); Appx137000 (GE-Vintage)).




Satco S9966 (RX-0178.0059)

Appx135273. In contrast, the SEM analysis of the sapphire submount (Acclaim Tamarac) "shows no pores, grains, or grain boundaries." Appx95 (citing Appx3479 (994:14-23) (Eden)); *see also* Appx135272 (reproduced below).

<table>
<tr><th>Accused Ceramic Product (Satco S29876)</th><th>Licensed Sapphire Submount (Tamarac)</th></tr>
<tr><td>

(RX-0178.0029)</td><td>

(CX-0198.0021)</td></tr>
</table>

Appx135272.

The Commission also found that the non-transparent accused products (rigid and flexible):

> (1) do not perform the same function as the claimed LED, which allows a significantly higher percentage of light to be extracted through the transparent plate … , (2) do not perform such function in the same way, given the substantial structural differences between the [accused products] (as evidenced by the SEM testing showing the presence of pores and grain boundaries) and the claimed [sapphire] LED, and (3) do not achieve the same result, given that the claimed [sapphire] LED results in a significantly higher percentage of light being extracted through the transparent plate (as evidenced by the transmissivity data).

Appx95; Appx121-122.

Thus, contrary to Regents' contention, the non-transparent accused products and a transparent material do not merely have "small differences of degree," Blue-Br. 39, and substantial evidence supports the Commission's non-infringement findings under the doctrine of equivalents.

### C. Substantial Evidence Supports the Commission's Determination that the Accused Products Do Not Satisfy the "Sapphire Plate" Limitation Under the Doctrine of Equivalents.

The '557 patent recites a "sapphire plate" instead of the "transparent surface" limitation of the '854 patent. On appeal, Regents no longer disputes the Commission's claim construction for the term "sapphire," *i.e.*, "single crystal aluminum oxide." Blue-Br. 46-48. Nor does Regents dispute that the accused ceramic submounts, which include polycrystalline aluminum oxide, do not literally

infringe the "sapphire plate" limitation. *Id.* Instead, Regents challenges the Commission's non-infringement findings under the doctrine of equivalents. *Id.* Regents' arguments as to "sapphire" are even less persuasive than as to "transparent." As the patentee admitted (to overcome "rejections") during prosecution of the parent Application No. 16/422,323, the term "sapphire" is a "significant narrowing" compared to "transparent." Appx117 (citing Appx6673).

The Commission weighed the competing testimony of both sides' experts and found Dr. Eden "persuasive," unlike Dr. Schubert (Regents' expert). Appx590. Regents' arguments on appeal are nothing more than an impermissible request for the Court to reweigh the evidence of record and to reexamine the credibility of witnesses. *See Nutrinova*, 224 F.3d at 1359.

The Commission credited Dr. Eden's testimony and found that "the function of the sapphire plate is to effectively extract light, the way this function is performed is by the plate being a transparent material, and the result is the effective extraction of light," *i.e.*, about 80% transmittance. Appx590-591 (citing Appx3487 (1026:24-1028:7) (Eden)); Appx124-125; *see also* Appx461 (citing Appx135269). In contrast, the accused rigid products' plates have "a comparatively poor ability to extract light," *i.e.*, less than 50% transmittance. Appx591; *see also* Appx461 (citing Appx135269). In addition, the record demonstrated that the accused ceramic submounts, unlike sapphire, have "grains, pores, and grain boundaries,

which absorb, reflect, and scatter light," thereby inhibiting light transmission. Appx591 (citing Appx3478-3480 (992:16-995:6, 1000:13-25) (Eden)); Appx135272). The Commission thus found "clear and substantial structural differences between the [accused] ceramic submounts … and sapphire plates." Appx126 (citing Appx3479 (994:11-995:6) (Eden); Appx3554 (1192:25-1193:5) (Shanfield)).

Regents incorrectly argues that "the difference in crystalline structure between sapphire and polycrystalline aluminum oxide is a matter of degree, not of kind, as they are of the same elemental composition and exhibit similar properties." Blue-Br. 48 (citing Appx7372-7373 (Ballato[13] Decl., ¶ 25)). The elemental composition, however, is immaterial, just as graphite and diamond are not equivalent. Appx7368-7369 (¶ 17) (Ballato). Indeed, "despite sharing the same elemental composition [($Al_2O_3$)], the [accused] ceramic plates … have substantial differences in structure and properties compared to sapphire plates." Appx123 (citing Appx3479 (994:14-23) (Eden); Appx135272); Appx125 (citing Appx7370-7373 (¶¶ 19-20, 25) (Ballato)).

Regents' additional arguments lack merit. Regents argues that certain supplier documents from OSRAM and Samsung show that the accused ceramic submounts are equivalent to a sapphire plate. Blue-Br. 47. The Commission

[13] Dr. John Ballato was one of Intervenors' technical experts.

properly rejected that argument. Appx93. The test for equivalence is not whether an inferior substitute can nonetheless yield a commercially-viable product. Instead, the Commission properly focused on the function, way, and result of ceramic vs. sapphire submounts, and substantial evidence supports those findings.

Lastly, Regents argues that Miyahara shows "the desirable scattering functionality of polycrystalline ceramic submounts." Blue-Br. 48. As discussed *supra*, Part II.B.3, Regents' reliance on Miyahara is both waived and meritless. Even if surface scattering can be beneficial for light extraction, it does not negate that scattering in the bulk material can cause absorption and inhibit transmittance, as observed in the context of the accused products. Appx89; Appx96.

## III. <u>The Commission's Obviousness Determinations Are Legally Correct and Supported by Substantial Evidence, and Do Not Demonstrate an Abuse of Discretion.</u>

The Commission correctly determined that the asserted claims are obvious over: (1) Yamazaki alone; (2) Yamazaki in view of Uemura and the state of the art represented by Shimizu; and (3) Minato in view of Uemura and the state of the art represented by Shimizu. Each of these three obviousness findings is an independent basis for this Court to uphold the Commission's determination of no violation of section 337. Two claim limitations (recited in both asserted patents) remain at issue on appeal for each of the three obviousness combinations: "sapphire growth substrate" ("SGS") and a "cathode and anode [that] provide

structural support" to the transparent surface or sapphire plate ("cathode/anode"). The Court need not reach invalidity if the Court affirms the Commission's finding of no violation of section 337 based on non-infringement. *See Solomon Techs.*, 524 F.3d at 1319-20; *Sinorgchem*, 511 F.3d at 1141.

For the SGS limitation, and contrary to Regents' opening brief, the appeal does not involve shifting the burden of proving validity to the patentee, but the application of the Commission's rules and basic principles of fair play. In their pre-hearing brief, Intervenors contended that the SGS limitation was obvious over each of Yamazaki and Minato, while Regents said nothing. Consequently, at the hearing and in their post-hearing brief, Intervenors and their expert contended expressly and summarily that the SGS limitation was "undisputed" and "obvious" over Yamazaki or Minato. Regents neither cross-examined Intervenors' expert during the hearing nor indicated—*in any way*—to the presiding ALJ or to Intervenors that Regents was in fact disputing the SGS limitation as to Yamazaki and Minato. Instead, Regents waited until its reply post-hearing brief to dispute invalidity as to that limitation, thereby depriving Intervenors from any opportunity to respond. The Commission's decisions to strike Regents' belated invalidity arguments and to find them waived were not an abuse of discretion.

For the cathode/anode limitation, Regents merely asks the Court to reweigh the evidence of record as to the scope and content of Yamazaki, Minato, and

Uemura, and as to the motivation to combine Yamazaki or Minato with Uemura. These are questions of fact and the Commission's obviousness findings are supported by substantial evidence.

### A. The Commission Correctly Found Obviousness as to the Sapphire Growth Substrate Limitation and Its Evidentiary Rulings Were Not an Abuse of Discretion.

The Commission did not abuse its discretion in striking Regents' arguments as to the SGS limitation and finding them waived. Consequently, the unrebutted summary testimony of Intervenors' expert was sufficient to sustain their burden on obviousness as to that limitation over Yamazaki or Minato.

#### 1. Regents Misconstrues the ALJ's Ground Rules.

Commission investigations are governed by the Commission's rules of practice, 19 C.F.R. Part 210, and by the "Ground Rules" issued by ALJs in each investigation, which are like standing orders of district court judges. This Court has recognized that when a party does not comply with the Ground Rules, it can constitute forfeiture before the Commission and on appeal. *See Ajinomoto Co. v. ITC*, 597 F.3d 1267, 1277-78 (Fed. Cir. 2010). As the Commission explained, "[t]he purpose of the ALJ's Ground Rules is to streamline and provide an orderly proceeding for the resolution of disputed issues." Appx104.

On October 5, 2020, the ALJ issued his Ground Rules as Order No. 2, and later amended them as Order 42 (for unrelated reasons). Appx3708-3745;

Appx111658-111696. The Ground Rules, in relevant part, required each party to file a single pre-hearing brief that "set[s] forth a party's contentions on every issue the party intends to address at hearing, *no matter which party has the burden on the issue*." Appx111679 (¶ 11.2) (emphasis added). In addition, the rule provides that "[a]ny contentions not set forth in detail in the pre-hearing brief shall be deemed abandoned or withdrawn, except for contentions of which a party is not aware and could not be aware in the exercise of reasonable diligence at the time of filing the pre-hearing brief." Appx111679. These briefs are customary and important in Commission investigations. *See*, *e.g.*, *Certain Wireless Commc'n Devices*, Inv. No. 337-TA-745, Order No. 34, 2012 WL 1439182, *3 (Apr. 24, 2012) ("There are very important policies involved in insisting that Pre-Hearing Briefs be accurate and not misrepresent a party's intent. Specifically, parties rely upon them to prepare their cases and if something is not asserted in the pre-hearing brief it is normally waived under most judges' ground rules."). "A party cannot ignore the Ground Rules and then surprise the opponent with belated objections after that opponent no longer has an opportunity to develop the record." Appx104; Appx140929 (70:3-5) ("We don't have trial by ambush. So we're going to work out all the disputes because next week there will be no surprises.").

In the pre-hearing stage, including expert discovery and pre-hearing briefing, Intervenors contended that the SGS limitation was obvious over Yamazaki and

Minato. Appx10981; Appx10994; Appx140990; Appx140992-140993; Appx141007-141008; Appx141010-141011. Neither Regents' rebuttal expert report nor Regents' pre-hearing brief disputed Intervenors' contention. Appx10543-10546; Appx10627-10631; Appx10981; Appx10994. At the hearing and in their post-hearing brief, Intervenors presented extensive testimony from their expert on disputed limitations, but only summary testimony on undisputed limitations, including SGS. Appx111823-111824; Appx111837. In particular, Dr. Lebby (Intervenors' expert) testified that all the claim elements were obvious over Yamazaki or Minato, and Dr. Lebby's demonstratives, presented during his testimony, stated that the SGS limitation was "obvious [and] undisputed." Appx3561 (1220:10-1221:2), Appx3568 (1246:6-20) (Lebby); Appx135359; Appx135387. At no point during the hearing did Regents challenge Intervenors' and their expert's (Dr. Lebby) understanding that the SGS limitation was obvious and undisputed. Nor did Regents cross-examine Dr. Lebby as to that limitation. Appx3578 (1287:22-1289:12). Regents waited until its reply post-hearing brief to dispute the SGS limitation for the first time and to fault Intervenors for failing to present "a *prima facie* case" on that limitation. Appx112525-112526; Appx112528-112529.

Regents argues that "the [ground] rule does not constrain challenges to evidence admitted during the hearing, it only limits what parties may offer" and

that Regents "could not possibly have raised arguments about Dr. Lebby's hearing testimony (or in this case, the lack thereof) until after the hearing, so this argument fell squarely within the ground rule's exception." Blue-Br. 55, 66-67. But failing to address the SGS limitation in its pre-hearing brief, failing to disclose during the hearing that the limitation was disputed, and failing to cross-examine Dr. Lebby, have foreclosed Regents from challenging the sufficiency of Intervenors' invalidity case. *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1575-76 (Fed. Cir. 1991) (holding that patentee presented a *prima facie* case of infringement where its expert's "summary testimony" was unrebutted and not subjected to cross-examination); *id.* (stating that Rule 705 of the Federal Rules of Evidence "permit[s] opinion testimony without factual foundation" and "[t]he responsibility for challenging the factual underpinnings of the testimony [falls] squarely on [the opposing party] during cross-examination"); *Certain Integrated Circuits*, Inv. No. 337-TA-450, Comm'n Op., 2003 WL 22162514, **24-26 (July 23, 2003) (crediting respondents' expert's unrebutted summary testimony and finding complainant's arguments waived).[14]

---

[14] The Commission's ALJs are not constrained by the Federal Rules of Evidence (which apply in the district courts), but if summary testimony is permitted under the more restrictive Federal Rules, it is, *a fortiori*, permissible in administrative proceedings.

Regents' arguments as to the ALJ's ground rules are also incorrect because, at a minimum, Regents was served with Dr. Lebby's report and was thus aware of Intervenors' invalidity contentions even before the pre-hearing brief was filed.[15] Appx136. Regents does not contend otherwise. Thus, Regents' failure to raise the SGS limitation in its prehearing brief is not excused under the Ground Rule's exception, Appx111679 (requiring disclosure "except for contentions of which a party is not aware and could not be aware in the exercise of reasonable diligence at the time of filing the pre-hearing brief"). Simply put, Regents was required to set forth contentions as to the SGS limitation in its pre-hearing brief, it did not, and its arguments are therefore waived.

Inconsistent with its claims here, Regents' strategic choices in drafting its pre-hearing brief belie Regents' interpretation of the Ground Rules. Regents included in its pre-hearing brief several other issues on which it did not bear the burden of proof. Regents challenged the "cathode/anode" limitation with respect to Yamakazi and Minato. Appx10543-10546; Appx10627-10631. What's more, Regents challenged the SGS limitation itself with respect to Ichihara Japanese Patent No. 202-2232020, but not Yamakazi or Minato. Appx10553; Appx10636. Thus, Regents understood the Ground Rules and followed them as intended.

[15] The Commission did not directly rely on a non-admitted expert report (Blue-Br. 51) but on a pre-hearing brief that is part of the administrative record (Appx136; Appx141). *See* 19 C.F.R. § 210.38(a).

Lastly, Regents argues that "the pre-hearing brief ground rule does not have a similar provision [as the responsive post-hearing brief rule] about unaddressed contentions being 'deemed unopposed' or admitted." Blue-Br. 56. Regents ignores the difference between the pre-hearing and post-hearing briefs. Post-hearing briefs are in two rounds (an initial and a responsive brief), and initial briefs are limited to "issues upon which the party bears the burden of proof." Appx111688 (¶ 14.1). Accordingly, failure to respond to those initial contentions results in the contentions being "deemed unopposed." Appx111689 (Ground Rule 14.2). In contrast, the pre-hearing brief is a single brief which must set forth the parties' "contentions on every issue the party intends to address at hearing, no matter which party has the burden on the issue," otherwise, such contentions "shall be deemed abandoned or withdrawn." Appx111679.

#### 2. **Intervenors Satisfied Their Burden on Invalidity and the Commission Did Not Shift the Burden to Regents.**

Intervenors satisfied their burden to show that the SGS limitation is obvious over Yamazaki or Minato, and the Commission did not improperly shift the burden to Regents.[16] Appx136; Appx141. Intervenors included sufficient contentions in their pre-hearing brief stating that Yamazaki or Minato disclose blue LED chips

[16] Regents also argues error and an APA violation in connection with the ALJ's finding that "the SGS limitation obvious in view of Uemura." Blue-Br. 49-50. That finding was vacated by the Commission and is irrelevant on appeal. Appx136-137.

and that a person of ordinary skill in the art would know those blue LEDs are commonly grown on a sapphire growth substrate. Appx10981, Appx10994. Intervenors' pre-hearing brief also indicates—and Regents does not challenge—that Regents' expert (Dr. Schubert) did not dispute or contradict Intervenors' position with respect to the SGS limitation. Appx10981; Appx10994. And although Intervenors presented invalidity arguments and expert testimony in summary fashion during the hearing and in their post-hearing brief, they expressly stated that the SGS limitation was "obvious [and] undisputed" and that "Yamazaki and Minato each disclose or render obvious all the elements" of claim 1 of the '854 or '557 patents. Appx111823-111824; Appx111837; Appx135359; Appx135387; Appx3561 (1220:10-1221:2), Appx3568 (1246:6-20) (Lebby).

Regents argues that Dr. Lebby's demonstratives are not evidence. Blue-Br. 50-51 (citing Appx135359). Regents, however, did not object to the admission of those demonstratives into evidence (Appx3593-3594 (1349:24-1350:5)), and the demonstratives at issue were presented during the hearing and they summarized Dr. Lebby's opinion as to each claim limitation. Appx3561 (1220:10-1221:2) (Lebby); Appx3568 (1246:6-20). Regents also argues that Dr. Lebby's testimony was conclusory and insufficient. Blue-Br. 51-52. But the cases cited by Regents are inapposite and relate to contested, not uncontested, limitations. As to

undisputed limitations, Regents does not demonstrate that expert testimony is even required. Appx103-104.

Regents also improperly raises substantive arguments including that "there is no evidence why a skilled artisan would have modified Yamazaki to include an SGS—as opposed to a different growth substrate—or keep the SGS in the final device after fabrication." Blue-Br. 52-53. The ALJ granted Intervenors' motion to strike Regents' substantive arguments as to the SGS limitation, and the Commission found them waived. Appx135-137; Appx140-141; Appx508-509; Appx581 (n.25). While Regents notes that the Commission found waiver, Regents fails to address the ALJ's evidentiary ruling striking its substantive contentions, much less demonstrate an abuse of discretion. Regents' substantive arguments are therefore forfeited on appeal. *See Ajinomoto*, 597 F.3d at 1277-78.

Thus, Intervenors satisfied their invalidity burden as to the SGS limitation. *See Symbol*, 935 F.2d at 1575-76; *Certain Integrated Circuits*, 2003 WL 22162514, **24-26. This Court should not require more than summary showings where a claim limitation is undisputed. To find otherwise would invite parties like Regents to flout the Ground Rules, engage in gamesmanship, and waste the parties' and the tribunal's time and resources on unnecessary litigation.

## B. The Commission Correctly Found Obviousness as to the "Cathode/Anode" Limitation.

Substantial evidence supports the Commission's obviousness findings as to the cathode/anode limitation over Yamazaki alone, and over Yamazaki or Minato in view of Uemura and the state of the art represented by Shimizu. The Court need only affirm the Commission on any one of these three obviousness combinations, should the Court reach invalidity at all.

### 1. Yamazaki Alone

The Commission correctly found that Yamazaki discloses the "cathode/anode" limitation. The Commission relied on Yamazaki's Figure 1 which shows "a surface-mount LED package whose leads [**11a**] are wrapped around the ends of the glass/sapphire plate." Appx130; Appx580; Appx601; Appx135361 (Figure 1) (reproduced below).




Appx135361; Appx114900. In addition, the Commission found that "[a] person of ordinary skill would understand that these leads [**11a**] are a cathode and an anode,

and that they provide structural support to the plate at each end." Appx130; Appx580 (citing Appx3561-3562 (1221:20-1222:17) (Lebby); Appx135361). The Commission further found that "these leads are used to mount the package onto a circuit board, providing both the physical and electrical connection between the package and the board" and that the leads "provide structural support because they are how the LED package is physically attached to the circuit board." Appx130-131; Appx580 (citing Appx3562 (1225:10-21) (Lebby)).

Regents argues that the presence of a gap in Yamazaki's Figures 2 and 3 is "irreconcilable" with the Commission's finding that the leads wrap around the ends of the sapphire plate as shown in Figure 1. Blue-Br. 58-60. Intervenors' expert (Dr. Lebby), however, credibly testified, with reference to Appx135361, that Yamazaki's leads **11a** "go around the transparent plate and fold underneath" the sapphire plate **11**. Appx3561-3562 (1221:20-1222:17) (Lebby).

Furthermore, contrary to Regents' contention, the Commission did not fail to address Regents' argument that Yamazaki's lead does not provide structural support because it is a "thin metallization." Blue-Br. 60. The Commission considered Regents' argument, Appx133 (citing Appx3589 (1331:16-1332:8) (Schubert)), but the Commission credited Dr. Lebby's testimony that Yamazaki discloses surface-mount j-leads (SMJs) which provide "very strong" structural

support when the leads are physically attached to a circuit board. Appx3562 (1225:10-21) (Lebby); Appx130-131; Appx580.

Lastly, Regents incorrectly suggests that Yamazaki would not emit light from both sides if connected to a non-transparent surface such as a circuit board. Blue-Br. 61. To the contrary, Dr. Lebby testified that electrodes can be attached to a circuit board in a configuration that does not prevent light from being emitted in both directions. Appx3562 (1223:5-1224:17) (Lebby); Appx137849 (Figure 22).

Regents' arguments on appeal do not demonstrate that the Commission's determination lacks substantial evidence. Instead, Regents improperly requests that this Court reweigh the evidence of record. *See Nutrinova*, 224 F.3d at 1359.

#### 2. **Yamazaki and Uemura**

Even if Yamazaki alone does not disclose the "cathode/anode" limitation, the Commission alternatively relied on the combination of Yamazaki, Uemura, and the state of the art represented by Shimizu. Substantial evidence supports the Commission's determination that Uemura discloses the "cathode/anode" limitation and that there is motivation to combine Yamazaki and Uemura. Appx131.

Specifically, the Commission found that Uemura's "through-pin leads" are such a cathode and anode and that they provide structural support to the light emitting device. Appx131. The Commission credited Dr. Lebby's testimony and found that "by the mid-1990s people in the art knew of two interchangeable

alternatives for LED packaging: through-pin packages [(as disclosed in Uemura)] and surface-mount J-lead packages" or SMJs (as disclosed in Yamazaki). Appx131 (citing Appx3557 (1203:7-1204:3), Appx3563 (1226:6-15) (Lebby)). The Commission also found that "[t]he Shimizu reference confirms the state of the art at that time, namely that through-pin packaging and SMJ packaging [were] interchangeable." Appx131-132 (citing Appx135364 (reproduced below)); Appx3563 (1226:6-15) (Lebby) (testifying that Shimizu (Appx135364) shows "the common known alternatives for LED packaging in the 1980s and the 1990s").




Appx135364.

The Commission further found that "Uemura provides specific motivation to pursue through-pin lead frame packaging with an LED mounted on a transparent plate." Appx132. The Commission explained that "a person of skill would understand Uemura's approach, which requires less manufacturing precision,

would 'lower the manufacturing cost' of packaging LEDs." Appx132 (citing Appx3564 (1231:14-1232:13) (Lebby)). In addition, "packaging Yamazaki in a lead frame with through-pins would be predictable, as Dr. Lebby described and illustrated." Appx132-133 (citing Appx3563 (1227:19-1228:11) (Lebby); Appx135366 (reproduced below)).



Substituting Uemura's through-pin configuration for Yamazaki's surface-mount configuration

Appx135366. "[B]ecause both [configurations] were within the 'technical grasp' of an ordinary artisan at the time of the invention, such a person would have had, in the words of *KSR*, 'good reason to pursue' either." Appx132 (citing Appx3563 (1227:1-18) (Lebby); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007))).

Regents makes several unsupported arguments but fails to establish lack of substantial evidence. Regents first argues that "[t]here is no evidence in the record why a [skilled artisan] would select a through-pin lead package over a j-lead

package, or vice versa." Blue-Br. 62. To the contrary, as discussed above, Dr. Lebby testified that Uemura offers easier manufacturing and lower cost. Appx132 (citing Appx3564 (1231:14-1232:13) (Lebby)). In addition, Uemura's through-pin configuration is one of "a finite number of identified, predictable solutions" and "a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." Appx502 (citing *KSR*).

Second, Regents argues that "Yamazaki does not disclose j-leads" or SMJs (*i.e.*, surface-mount j-leads). Blue-Br. 63. But the Commission credited Dr. Lebby's testimony that Yamazaki discloses an SMJ packaging. Appx132-133 (citing Appx3563 (1227:19-1228:11) (Lebby); Appx135366). Dr. Lebby explained that Yamazaki's LED chip includes "an SMJ format of electrode" and the "leads go around the transparent plate and fold underneath." Appx3561-3562 (1221:20-1222:17) (Lebby); Appx130. This testimony is consistent with Figure 2 of Shimizu which depicts similarly folded electrodes as SMJs. *Compare* Appx135361 (Figure 1) *with* Appx135364 (Figure 2).

Third, Regents suggests that there is no evidence that Uemura's through-pin leads provide structural support and that the Commission relied only on Shimizu's Figure 1 to establish such structural support. Blue-Br. 64 (citing Appx132; Appx502). But Uemura, like Shimizu, also discloses through-pins that provide structural support. Appx503 (citing Appx135365) (reproduced below);

Appx138156 (Uemura, 5:51-52) ("The base **10** having the Light emitting device **20** adhered thereon is mounted on a pair of lead frames **50a** and **50b**."); Appx3564 (1231:14-1232:13) (Lebby) (testifying that in Uemura, "[t]here are two pins that support the LED package")); Appx529 ("Uemura discloses a through-pin LED package that supports the transparent base … .").

Lastly, Regents incorrectly suggests that the Commission required expert testimony on invalidity as a matter of law. Blue-Br. 64. Regents relies on a Commission statement that was made in connection with Intervenors' (not Regents') burden on invalidity. *Id.* (citing Appx103). As to Regents, the Commission found, as a matter of fact, that Regents' "conclusory attorney arguments are insufficient to counter the substantial evidence and expert testimony supporting the FID's obviousness findings over Yamazaki in combination with Uemura." Appx133-134.

### 3. **Minato and Uemura**

The Commission also found obviousness over the combination of Minato, Uemura, and the state of the art represented by Shimizu. As explained above, the Commission found that Uemura discloses a cathode and anode providing structural support. In addition, the Commission found that there is motivation to combine Minato and Uemura. Appx513-514; Appx139-140. The Commission explained that "it would have been obvious at the time of the invention to modify Minato's

package to use through-pin leads that provide structural support." Appx515. Specifically, the Commission found that Intervenors "elicited testimony from the perspective of a person of ordinary skill in the art about the scope and content of the[] [Minato, Uemura, and Shimizu] references, how an artisan would be motivated to combine them, and what the expected result would be," and "[t]hat testimony … is unrebutted." Appx139 (citing Appx3568-3569 (1247:10-1252:1) (Lebby)); Appx135393 (reproduced below).

Using Through-Pin Leads With Minato




Substituting Uemura's through-pin lead arrangement for Minato's lead arrangement

Appx135393. As to motivation to combine, the Commission relied on the same evidence and expert testimony as with the combination of Yamazaki and Uemura, *i.e.*, easier manufacturing and lower cost. Appx139; Appx514-515.

Regents argues that "there is no evidence that a [skilled artisan] would consider Uemura's 'through-pin' leads to be interchangeable with Minato's thin

pull-out leads." Blue-Br. 68. But that is not required to establish obviousness. As discussed above, the Commission credited Intervenors' "unrebutted" expert testimony establishing that a skilled artisan would be motivated to substitute Uemura's through-pin leads for Minato's pull-out leads. Appx139 (citing Appx3568-3569 (1247:10-1252:1) (Lebby)). In addition, the Commission explained that there were a "finite number" of design options for packaging LEDs at the time of the invention (*i.e.*, through-pins and SMJ packages). Appx515 (citing Appx3568 (1248:21-1249:18) (Lebby)). While Minato's pull-out lead configuration is not one those two options, it does not change that "a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." Appx515 (citing *KSR*).

### C. The Secondary Considerations of Non-Obviousness Do Not Outweigh the Commission's Obviousness Determinations.

Should this Court reverse the Commission's non-infringement findings, Regents asserts that the Commission should reweigh secondary considerations to account for changes to the commercial success factor. Blue-Br. 68-69. But the Commission recognized that secondary considerations do not outweigh a strong *prima facie* case of obviousness. Appx145-146 (citing *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1368 (Fed. Cir. 2008); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007)). The strength of the *prima facie* case of obviousness is not affected in any way by reversing non-

infringement. As in *Sundance* and *Leapfrog*, Regents fails to demonstrate on appeal that the secondary considerations could overcome a strong *prima facie* case of obviousness, as presented here by Intervenors, and the Commission believes that remanding secondary considerations would be futile and unnecessary.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court affirm the Commission's final determination.

Respectfully submitted,

*<u>/s/ Houda Morad</u>*
Wayne W. Herrington
Assistant General Counsel
Sidney A. Rosenzweig
Acting Assistant General Counsel
Houda Morad
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Tel: (202) 708-4716
Fax: (202) 205-3111
houda.morad@usitc.gov

Date: October 31, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure and Federal Circuit Rule 32(b)(3), I hereby certify that the attached brief complies with the type-volume limitation and typeface requirements Federal Rule of Appellate Procedure 32(a)(7) and Federal Circuit Rules 32(b)(1) and 32(b)(2). The brief has been prepared in a proportionally spaced typeface using Microsoft Office 365, in Times New Roman 14-point font. The brief contains a total of 13,939 words including 13,669 words obtained from the word-count function of the word-processing system, including all footnotes, annotations, and claim language, and a manual count of 270 words appearing in the graphics and figures.

*/s/ Houda Morad*
Houda Morad
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Tel: (202) 708-4716
Fax: (202) 205-3111
houda.morad@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

Dated: October 31, 2022