No. 22-1521

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
*Appellant*,

v.

UNITED STATES INTERNATIONAL TRADE COMMISSION,
*Appellee*,

GENERAL ELECTRIC COMPANY, SAVANT TECHNOLOGIES LLC, HOME DEPOT PRODUCT AUTHORITY, LLC, HOME DEPOT U.S.A., INC., THE HOME DEPOT, INC., IKEA SUPPLY AG, IKEA U.S. RETAIL LLC, IKEA OF SWEDEN AB, SATCO PRODUCTS, INC., GLOBAL VALUE LIGHTING LLC, SIGNIFY NORTH AMERICA CORPORATION, FEIT ELECTRIC COMPANY, INC.,
*Intervenors*.

Appeal from the United States International Trade Commission in Investigation No. 337-TA-1220

**CORRECTED NON-CONFIDENTIAL RESPONSE BRIEF OF INTERVENORS HOME DEPOT, IKEA, GE LIGHTING, SATCO, GVL, AND SIGNIFY**

(*continued on inside cover*)

Michael J. Bonella
Joseph R. Klinicki
Aakash Patel
Coraleine Kitt
**Flaster Greenberg PC**
1835 Market Street
Philadelphia, PA 19103
(215) 279-9393

E-Mail: FG-IKEA-1120@flastergreenberg.com

*Counsel for IKEA*

Scott J. Bornstein
Brian J. Prew
**Greenberg Traurig**
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

Nicholas A. Brown
**Greenberg Traurig**
101 Second Street
San Francisco, CA 94111
(415) 655-1271

E-Mail: Satco-ITC@gtlaw.com

Robert P. Lynn, Jr.
**Lynn Gartner Dunne & Frigenti, LLP**
330 Old Country Road,
Mineola, NY 11501
(516) 742-6200
rplynn@lgdlaw.com

*Counsel for Satco*

Ryan K. Walsh
Parth H. Matalia
**Jones Day**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
(404) 521-3939

Rita J. Yoon
**Jones Day**
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
(312) 782-3939

Email:HomeDepot-ITC-Service@jonesday.com

*Counsel for Home Depot*

Adam D. Swain
**Alston & Bird LLP**
950 F Street, NW
Washington, DC 20004
(202) 239-3622
adam.swain@alston.com

Ross R. Barton
Karlee Wroblewski
**Alston & Bird LLP**
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
(704) 444-1000
ross.barton@alston.com

*Counsel for Signify*

Elaine Herrmann Blais
Douglas J. Kline
Lana Shiferman
Kevin Martin
**Goodwin Procter LLP**
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Patrick J. McCarthy
**Goodwin Procter LLP**
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

E-Mail: DG-ConsumerLightingITC@goodwinlaw.com

*Counsel for GE Lighting:*

Eric D. Hayes, P.C.
Jay Emerick
**Kirkland & Ellis LLP**
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

Abigail Lauer Litow
**Kirkland & Ellis LLP**
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5164
abigail.litow@kirkland.com

*Counsel for GVL*

# PATENT CLAIMS

## Claim 1 of U.S. Patent No. 10,593,854 ("the '854 patent")

1. A light emitting device, comprising:

a transparent surface, a cathode on a first end of the transparent surface and an anode on a second end of the transparent surface, wherein the cathode and anode provide structural support to the transparent surface and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

at least one III-nitride light emitting diode (LED) comprising a sapphire growth substrate, the LED in mechanical communication with the transparent surface, and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface; and

a molding comprising a phosphor and surrounding the LED, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

## Claim 1 of U.S. Patent No. 10,658,557 (the "'557 patent")

1. A light emitting device, comprising:

a sapphire plate, a cathode on a first end of the sapphire plate and an anode on a second end of the sapphire plate, wherein the cathode and anode provide structural support to the sapphire plate and are adapted to provide an electrical connection between the light emitting device and a structure outside the light emitting device;

a plurality of III-nitride light emitting diodes (LEDs), each comprising a sapphire growth substrate and each in mechanical communication with the sapphire plate, and the LEDs and sapphire plate configured to extract light emitted by the LEDs through the sapphire plate; and

a molding comprising a phosphor and surrounding the LEDs, the molding configured to extract light from both a front side of the light emitting device and a back side of the light emitting device.

## CERTIFICATE OF INTEREST

Counsel for Intervenors Home Depot Product Authority, LLC; Home Depot U.S.A., Inc.; The Home Depot, Inc., Ryan K. Walsh, certifies the following:

1. **Represented Entities**, per Fed. Cir. R. 47.4(a)(1):

   Home Depot Product Authority, LLC; Home Depot U.S.A., Inc.; The Home Depot, Inc.

2. **Real Party in Interest**, per Fed. Cir. R. 47.4(a)(2):

   N/A

3. **Parent Corporations and Publicly-Held Stockholders Of 10% Or More**, per Fed. Cir. R. 47.4(a)(3):

   The Home Depot, Inc.

4. **Legal Representatives**, per Fed. Cir. R. 47.4(a)(4):

   Jones Day: Yury Kalish, Jeffrey Messing, Vishal Khatri

5. **Related Cases**, per Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b):

   *See* Intervenors' Joint List Of Related Cases below.

6. **Organizational Victims and Bankruptcy Cases**, per Fed. Cir. R. 47.4(a)(6):

   N/A

Date: October 31, 2022

/s/ *Ryan K. Walsh*
Ryan Walsh
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
Telephone: (404) 521-3939
Facsimile: (404) 581-8330
Email: rkwalsh@jonesday.com

## CERTIFICATE OF INTEREST

Counsel for Intervenors IKEA Supply AG, IKEA US Retail LLC, and IKEA of Sweden AB, Michael J. Bonella, certifies the following:

1. **Represented Entities**, per Fed. Cir. R. 47.4(a)(1):

   IKEA Supply AG; IKEA US Retail LLC; IKEA of Sweden AB

2. **Real Party in Interest**, per Fed. Cir. R. 47.4(a)(2):

   None/Not Applicable

3. **Parent Corporations and Publicly-Held Stockholders Of 10% Or More**, per Fed. Cir. R. 47.4(a)(3):

   IKEA Holding US, Inc.; IKEA Property, Inc.; Ingka Holding B.V.; Inter IKEA Systems B.V.; Stichting Ingka Foundation; INGKA Holding Overseas B.V.; Interogo Foundation

4. **Legal Representatives**, per Fed. Cir. R. 47.4(a)(4):

   **FLASTER GREENBERG PC**: Ross E. Alexander, Ryan Peddle, Benjamin Chalfin; **FOSTER, MURPHY, ALTMAN & NICKEL, PC**: David F. Nickel, Susan Koegel, Kandis C. Gibson, Matthew N. Duescher; **PILLSBURY WINTHROP SHAW PITMAN LLP**: Kenneth E. Keller, Christopher E. Stretch; **PAUL HASTINGS LLP**: Kecia J. Reynolds

5. **Related Cases**, per Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b):

   *See* Intervenors' Joint List Of Related Cases below,

6. **Organizational Victims and Bankruptcy Cases**, per Fed. Cir. R. 47.4(a)(6):

   None/Not Applicable

*/s/ Michael J. Bonella*
Michael J. Bonella
**FLASTER GREENBERG PC**
1717 Arch Street, Suite 3300
Philadelphia, PA 19103
Telephone: (215) 279-9393
E-Mail: FG-IKEA-1120@flastergreenberg.com

# CERTIFICATE OF INTEREST

Counsel for Intervenors General Electric Company and Savant Technologies LLC, Elaine Herrmann Blais, certifies the following:

1. **Represented Entities**, per Fed. Cir. R. 47.4(a)(1):

   General Electric Company; Savant Technologies LLC, aka GE Lighting, a Savant Company

2. **Real Party in Interest**, per Fed. Cir. R. 47.4(a)(2):

   N/A

3. **Parent Corporations and Publicly-Held Stockholders Of 10% Or More**, per Fed. Cir. R. 47.4(a)(3):

   General Electric Company; Savant Systems, Inc.

4. **Legal Representatives**, per Fed. Cir. R. 47.4(a)(4):

   GOODWIN PROCTER LLP: Christie Larochelle, Andrew McDonough, Harrison Gunn, Autumn Soucy

5. **Related Cases**, per Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b):

   *See* Intervenors' Joint List Of Related Cases below.

6. **Organizational Victims and Bankruptcy Cases**, per Fed. Cir. R. 47.4(a)(6):

   N/A

Date: October 31, 2022

/s/ *Elaine Herrmann Blais*
Elaine Herrmann Blais
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Telephone: (617) 570-1000
Facsimile: (617) 570-1231
Email: EBlais@goodwinlaw.com

## CERTIFICATE OF INTEREST

Counsel for Intervenor Satco Products, Inc., Nicholas A. Brown, certifies the following:

1. **Represented Entities**, per Fed. Cir. R. 47.4(a)(1):

   Satco Products, Inc.

2. **Real Party in Interest**, per Fed. Cir. R. 47.4(a)(2):

   None/Not Applicable

3. **Parent Corporations and Publicly-Held Stockholders Of 10% Or More**, per Fed. Cir. R. 47.4(a)(3):

   None/Not Applicable

4. **Legal Representatives**, per Fed. Cir. R. 47.4(a)(4):

   **GREENBERG TRAURIG:** Scott J. Bornstein, Joshua L Raskin, Allan A. Kassenoff, Brian Prew, Giancarlo L. Scaccia, Jade Li-Yu Chen, Kathryn E. Albanese, Nicholas A. Brown, and Cyrus T. Frelinghuysen
   **LYNN GARTNER DUNNE, LLP**: Robert P. Lynn, Jr., Tiffany D. Frigenti and Katharine S. Santos

5. **Related Cases**, per Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b):

   *See* Intervenors' Joint List Of Related Cases below.

6. **Organizational Victims and Bankruptcy Cases**, per Fed. Cir. R. 47.4(a)(6):

   None/Not Applicable

Date: 12/05/2022 Signature: */s/ Nicholas A Brown*
Nicholas A. Brown

## CERTIFICATE OF INTEREST

Counsel for Intervenor Global Value Lighting, LLC, Jay Emerick, certifies the following:

1. **Represented Entities**, per Fed. Cir. R. 47.4(a)(1):

   Global Value Lighting, LLC

2. **Real Party in Interest**, per Fed. Cir. R. 47.4(a)(2):

   N/A

3. **Parent Corporations and Publicly-Held Stockholders Of 10% Or More**, per Fed. Cir. R. 47.4(a)(3):

   Lighting Science Group Corp.

4. **Legal Representatives**, per Fed. Cir. R. 47.4(a)(4):

   Kirkland & Ellis LLP: Tiffany M. Knapp, Adam M. Janes, Mario Avaldi

5. **Related Cases**, per Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b):

   *See* Intervenors' Joint List Of Related Cases below.

6. **Organizational Victims and Bankruptcy Cases**, per Fed. Cir. R. 47.4(a)(6):

   N/A

Date: October 31, 2022

/s/ *Jay Emerick*
Jay Emerick
**KIRKLAND & ELLIS LLP**
300 N. LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: jay.emerick@kirkland.com

## CERTIFICATE OF INTEREST

Counsel for Intervenor Signify North America Corporation, Adam D. Swain, certifies the following:

1. **Represented Entities**, per Fed. Cir. R. 47.4(a)(1):

   Signify North America Company

2. **Real Party in Interest**, per Fed. Cir. R. 47.4(a)(2):

   N/A

3. **Parent Corporations and Publicly-Held Stockholders Of 10% Or More**, per Fed. Cir. R. 47.4(a)(3):

   Signify N.V.

4. **Legal Representatives**, per Fed. Cir. R. 47.4(a)(4):

   Alston & Bird LLP: Adam D. Swain, Ross R. Barton, Karlee N. Wroblewski, Darlena Subashi

5. **Related Cases**, per Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b):

   *See* Intervenors' Joint List Of Related Cases below.

6. **Organizational Victims and Bankruptcy Cases**, per Fed. Cir. R. 47.4(a)(6):

   N/A

Date: October 31, 2022

*/s/ Adam D. Swain*________

Adam D. Swain
**ALSTON & BIRD LLP**
950 F Street, NW
Washington, DC 20004
Telephone: (202) 239-3622
Facsimile: (202) 239-3333
Email: adam.swain@alston.com

## CERTIFICATE OF INTEREST (continued)
## INTERVENORS' JOINT LIST OF RELATED CASES

*The Regents of the Univ. of California v. IKEA of Sweden AB et al.*, No. 2:19-cv-06573 (C.D. Cal.)

*The Regents of the Univ. of California v. Target Corp.*, No. 2:19-cv-06572 (C.D. Cal.)

T*he Regents of the Univ. of California v. Amazon.com, Inc. et al.*, No. 2:19-cv-06571 (C.D. Cal.)

*The Regents of the Univ. of California v. Walmart Inc.*, No. 2:19-cv-06570

(C.D. Cal.)

*Satco Prods., Inc. v. The Regents of the Univ. of California*, No. 2:19-cv-06444 (E.D. N.Y.)

*The Regents of the Univ. of California v. General Electric Co.*, No. 2:19-cv-10792 (C.D. Cal.)

*Satco Products, Inc. v. The Regents of the University of California*, IPR2020-00579 (appealed in Fed. Cir. Case No. 22-1106, listed below)

*Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2020-00695 (PTAB) (appealed in Fed. Cir. Case No. 22-1107, listed below)

*Satco Products, Inc. v. The Regents of the University of California*, IPR2020-00780 (appealed in Fed. Cir. Case No. 22-1108, listed below)

*Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2020-00813 (PTAB) (appealed in Fed. Cir. Case No. 22-1109, listed below)

*Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2021-00794 (PTAB)

*Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2021-00661 (PTAB)

*Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2021-00662 (PTAB)

*General Electric Co. et al. v. The Regents of the Univ. of California*, IPR2020-01458 (PTAB)

*General Electric Co. et al. v. The Regents of the Univ. of California*, IPR2020-01457 (PTAB)

*The Regents of the Univ. of California v. The Home Depot, Inc. et al.*, No. 2:20-cv-07943 (C.D. Cal.)

*Satco Prods., Inc. v. The Regents of the Univ. of California*, No. 2:20-cv-04956 (E.D. N.Y.)

*The Regents of the University of California v. Satco Products, Inc.*, No. 22-1106 (Fed. Cir.)

*The Regents of the University of California v. Satco Prods., Inc.*, No. 22-1107 (Fed. Cir.)

*The Regents of the Univ. of California v. Satco Prods.*, Inc., No. 22-1108 (Fed. Cir.)

*The Regents of the Univ. of California v. Satco Prods., Inc.*, No. 22-1109 (Fed. Cir.)

## TABLE OF CONTENTS

**Page**


PATENT CLAIMS ....... 3
CERTIFICATE OF INTEREST ....... 4
TABLE OF CONTENTS ....... 12
TABLE OF AUTHORITIES ....... 15
TABLE OF ABBREVIATIONS ....... 18
STATEMENT OF RELATED CASES ....... 20
STATEMENT OF ISSUES ....... 22
INTRODUCTION ....... 23
STATEMENT OF THE CASE ....... 25
I. Background ....... 25
  A. LED Packaging ....... 25
  B. Regents' Patents ....... 26
  C. Intervenors' Accused Products ....... 29
  D. The Acclaim Licensed Product ....... 31
II. Proceedings Below ....... 32
  A. The ALJ's Claim Construction Order ....... 32
  B. The ALJ's Final Initial Determination ....... 32
  C. The Commission's Decision ....... 34
SUMMARY OF THE ARGUMENT ....... 35
ARGUMENT ....... 37
I. Standard Of Review ....... 37
II. Regents Did Not Appeal The Commission's Findings On Representativeness ....... 38
III. The Accused Submounts Are Not Transparent ....... 39
  A. The Commission's Claim Construction Is Correct ....... 39
    1. Regents Argued For Transparent To Be Given its Ordinary Meaning To A POSA—Until That Fact-Finding Went Against It ....... 40

2. The Intrinsic Record Supports The Commission’s Conclusions About Transparent ....41

3. Substantial Evidence Supports The Commission’s Fact-Finding About the Meaning Of Transparent To A POSA ....45

B. Substantial Evidence Showed That The Accused Submounts Are Not Transparent ....49

1. The Testing Data ....51

2. Professor Shanfield’s Testimony ....59

3. Admissions About Absorption ....59

C. Regents’ Substantive Arguments Are Contradicted By The Record ....59

1. The Commission Did Not Set A Minimum Transmissivity Threshold ....59

2. Regents Relies On Misleading Photographs ....61

3. Regents’ Argument About Excluding Preferred Embodiments Is Contradicted By The Record ....61

4. The Claim Language Relied On By Regents Actually Supports The Commission’s Decision ....63

5. Regents’ Arguments About Other Miscellaneous Matters Should Be Rejected ....63

D. Regents’ Procedural Arguments Should Be Rejected ....65

1. Regents’ *O2 Micro* And APA Arguments Are Wrong ....65

2. Regents’ Argument That The ALJ Failed To Define Transparency With Mathematical Precision Is Waived and Wrong ....68

E. The Commission’s Finding Of Non-Equivalence Is Supported By Substantial Evidence ....70

IV. The Accused Submounts Are Not Equivalent To Sapphire ....72

V. The Accused Products Do Not Have The Claimed “Molding” ....76

A. The Construction Of “Molding” Was Correct ....76

1. Regents’ Arguments Against The Commission’s Construction Are Meritless ....76

2. The Court Should Reject Regents’ Proposed Construction ....79

B. The Commission Properly Affirmed The ALJ's Non-Infringement "Molding" Findings ....79

1. Regents Raised One "Molding" Argument at Trial ....80

2. Regents Raises Waived And Meritless Arguments ....80

VI. The Commission Correctly Found the Appealed Claims Invalid ....81

A. Yamazaki ....82

1. The "Sapphire Growth Substrate" Limitation Is Obvious from Yamazaki's Blue LED ....82

2. The "Structural Support" Limitation Is Both Anticipated and Rendered Obvious by Yamazaki....88

B. Minato....95

1. The "Sapphire Growth Substrate" Limitation Is Obvious from Minato's Blue LED ....95

2. The Commission Correctly Found That Minato Renders The "Structural Support" Limitation Obvious In Combination With Uemura ....95

C. Secondary Considerations ....97

CONCLUSION....98

Part of one sentence containing Regents' Confidential Business Information has been redacted on page 97. The information relates to one of Regents' licensees.

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
471 F.3d 1363 (Fed. Cir. 2006) ....................................................................70

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ....................................................................43

*Artic Cat Inc. v. Polaris Indus. Inc.*,
No. 16-cv-0009 (D. Minn. Dec. 20, 2017) Dkt. No. 129 ..................................78

*AstraZeneca AB v. Mylan Pharms., Inc.*,
19 F.4th 1325 (Fed Cir. 2021) ...............................................................40, 60, 61

*Asyst Technologies, Inc. v. Emtrak, Inc.*,
544 F.3d 1310 (Fed. Cir. 2008) ...............................................................92, 93

*Aten Int'l Co. v. Uniclass Tech. Co.*,
932 F.3d 1364 (Fed. Cir. 2019) ....................................................................66

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ......................................................................79

*Bio-Rad Lab'ys, Inc. v. ITC*,
998 F.3d 1320 (Fed. Cir. 2021) ....................................................................73

*Broadcom Corp. v. ITC*,
542 F.3d 894 (Fed. Cir. 2008) ...............................................................38, 66, 81

*Cambrian Science Corp. v. Cox Commc'ns, Inc.*,
617 F. App'x 989 (Fed. Cir. 2015) ................................................................73

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
296 F.3d 1106 (Fed. Cir. 2002) ....................................................................79

*Certain Road Milling Machines & Components Thereof*,
No. 337-TA-1067, Comm'n Op. at 23 n.8 (Aug. 7, 2019)..........................38, 81

*Checkpoint Sys., Inc. v. ITC*,
54 F.3d 756 (Fed. Cir. 1995) ........................................................................75

*Crocs, Inc. v. Effervescent, Inc.*,
2017 WL 2787589 (D. Colo. June 27, 2017) ....................................................77

*Finnigan Corp. v. ITC*,
180 F.3d 1354 (Fed. Cir. 1999) ..................................................................38, 54

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
618 F.3d 1294 (Fed. Cir. 2010) ........................................................................98

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
757 Fed. App'x 974 (Fed. Cir. 2019) ................................................................88

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ........................................................................85

*Jang v. Boston Sci. Corp.*,
532 F.3d 1330 (Fed. Cir. 2008) ........................................................................69

*Kinik Co. v. ITC*,
362 F.3d 1359 (Fed. Cir. 2004) ..................................................................37, 72

*L&P Prop. Mgm't Co. v. Nat'l Prods. Inc.*,
No. IPR2016-00475, 2016 WL 8944533 (PTAB July 21, 2016).......................77

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ........................................................................86

*MEMS Tech. Berhard v. ITC*,
447 F. App'x 142 (Fed. Cir. 2011) ....................................................................64

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015) ........................................................................85

*Modine Mfg. Co. v. United States ITC*,
75 F.3d 1545 (Fed. Cir. 1996) ..........................................................................70

*Moore U.S.A., Inc. v. Std. Register Co.*,
229 F.3d 1091 (Fed. Cir. 2000) ........................................................................74

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ........................................................................38

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ....................65, 66

*Personalized User Model, LLP v. Google Inc.*,
797 F.3d 1341 (Fed. Cir. 2015) ....................69

*PPG Indus. v. Guardian Indus. Corp.*,
156 F.3d 1351 (Fed. Cir. 1998) ....................69

*Schoenhaus v. Genesco, Inc.*,
440 F.3d 1354 (Fed. Cir. 2006) ....................39, 72

*Symbol Technologies, Inc. v. Opticon, Inc.*,
935 F.2d 1569 (Fed. Cir. 1991) ....................84

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)....................39, 40

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
90 F.3d 1558 (Fed. Cir. 1996) ....................72

*Tic. AS v. ITC*,
848 F.3d 994 (Fed. Cir. 2017) ....................38

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F. 3d 1352 (Fed. Cir. 2019) ....................85

*TQ Delta, LLC v. DISH Network LLC*,
929 F.3d 1350 (Fed. Cir. 2019) ....................67, 68, 85

*Trading Techs Int'l., Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2020) ....................71

*Winbond Electronics Corp. v. ITC*,
262 F.3d 1363 (Fed. Cir. 2001) ....................38

**Statutes**

5 U.S.C. § 554(b)(3)....................83

**Other Authorities**

Federal Rule of Evidence 705....................83, 84

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ’854 patent | U.S. Patent No. 10,593,854 |
| ’557 patent | U.S. Patent No. 10,658,557 |
| ’529 patent | U.S. Patent No. 9,240,529 |
| ’464 patent | U.S. Patent No. 9,859,464 |
| Accused Products | The filament LED products accused of infringement in this case |
| ALJ | Administrative Law Judge |
| Appx | Joint Appendix |
| The Commission | Appellee United States International Trade Commission |
| Feit | Intervenor Feit Electric Company, Inc. |
| FID | The ALJ’s Final Initial Determination in this case |
| GE Lighting | Intervenors Savant Technologies, LLC and General Electric Company |
| Home Depot | Intervenors Home Depot Product Authority, LLC; Home Depot U.S.A., Inc.; and The Home Depot, Inc. |
| IKEA | Intervenors IKEA Supply AG; IKEA US Retail LLC; and IKEA of Sweden AB |
| Intervenors | Home Depot, IKEA, GE Lighting, Satco, and Signify |
| ITO | Indium Tin Oxide |
| LED | Light Emitting Diode |
| Minato | Japanese Patent No. JP 2001-126515, (Appx137815-137827) |
| Miyahara | Japanese Unexamined Patent Application No. 2005-35864 (Appx138616-139134) |
| Okamoto | Japanese Unexamined Patent Application Publication No. 2000-277808 (Appx138541-138556) |

| | |
|---|---|
| POSA | Person of skill in the art |
| Regents | Appellant The Regents of the University of California |
| Satco | Intervenor Satco Products, Inc. |
| Signify | Intervenor Signify North America Corp. |
| Tanda | U.S. Patent App. Pub. No. 2007/0139949 (Appx139177-139198) |
| Uemura | U.S. Patent No. 6,310,364 (Appx138148-138158) |
| Yamazaki | Japanese Patent Application No. 2003-249692, (Appx138576-138588) |

## STATEMENT OF RELATED CASES

No other appeal from the same proceeding was previously before this or any other appellate court.

The following United States Courts and PTAB proceedings are pending and may directly affect or be directly affected by the outcome of this appeal:

- *The Regents of the University of California v. Satco Products, Inc.*, 22-1106 (Fed. Cir.) (consolidating appeals 22-1106, 22-1107, 22-1108, 22-1109) (designated as companion cases to this appeal);
- *Satco Prods., Inc. v. The Regents of the Univ. of California*, IPR2021-00662 (PTAB);
- *Satco Prods., Inc. v. The Regents of the Univ. of California*, 2:20-cv-04956 (E.D.N.Y.);
- *Satco Prods., Inc. v. The Regents of the Univ. of California*, 2:19-cv-06444 (E.D.N.Y.);
- *The Regents of the Univ. of California v. The Home Depot, Inc.*, 2:20-cv-07943 (C.D. Cal.);
- *The Regents of the Univ. of California v. Gen. Elec. Co.*, 2:19-cv-10792 (C.D. Cal.);
- *The Regents of the Univ. of California v. Walmart Inc.*, 2:19-cv-06570 (C.D. Cal.);

- *The Regents of the Univ. of California v. Amazon.com, Inc. et al.*, 2:19-cv-06571 (C.D. Cal.);
- *The Regents of the Univ. of California v. Target Corp.*, 2:19-cv-06572 (C.D. Cal.);
- *The Regents of the Univ. of California v. IKEA of Sweden AB et al.*, 2:19-cv-06573 (C.D. Cal.).

## STATEMENT OF ISSUES

1. Whether substantial evidence supports the Commission's finding that the submounts in Intervenors' products[1] are not "transparent."

2. Whether substantial evidence supports the Commission's finding that the submount materials used in Intervenors' products (ceramics and polyimides) are not equivalent to sapphire.

3. Whether the Commission correctly construed "molding," and whether substantial evidence supports its noninfringement finding under that construction.

4. Whether the Commission's findings of obviousness were correct, including whether substantial evidence supports its underlying factual findings, and whether the Commission abused its discretion in striking Regents' arguments about "sapphire growth substrate" when Regents violated the ALJ's ground rules by raising those arguments for the first time after the evidentiary hearing.

---

[1] "Intervenors" in this brief means the Intervenors other than Feit Electric. Feit submitted different evidence on noninfringement and is filing a separate brief.

# INTRODUCTION

Regents accused Intervenors' LED-based light bulbs of infringing four patents. The Commission found noninfringement and invalidity for all four. Regents only appeals the Commission's findings as to two of them.

The appealed patents require LEDs on either a "transparent surface" ('854 patent) or a "sapphire plate" ('557 patent). Regents agree (at 4) that this is a "central concept" of the alleged inventions. The Commission found noninfringement because the LEDs in Intervenors' products are on submounts that are neither "transparent" nor "sapphire." Instead, the LEDs are mounted on either white ceramic or brown polyimide submounts. Illustrating the difference, one can see the black background through a sapphire submount (left), but not the accused submounts (center, right):




The Commission found that whereas the sapphire submount (left) is transparent, the ceramic and polyimide submounts (center and right) are not.

This conclusion is supported by evidence submitted throughout the five-day evidentiary hearing. The testing performed by Intervenors' expert (Professor Eden) showed that while a sapphire submount transmits ~85% of the light emitted by LEDs, the accused ceramic submounts transmit ~25% or less, and the accused polyimide submounts transmit 8% or less. Additional testing performed by Covalent Metrology showed that the accused submounts transmit between 2% and 46% of the incident light, while absorbing between 44% and 76% and reflecting the rest. That is 3 to 5 times more absorption than a tested transparent sapphire submount (16%). Regents did not contest the accuracy of any of this data in its brief to the Commission.

Regents' central argument on appeal is that the ordinary meaning of the word "transparent" includes objects that pass any amount of light, even 1%. Regents acknowledges that this implies that paper, white clothing, and human ears are "transparent," but dismisses that fact (at 35) as "irrelevant fluff." Regents is wrong. Virtually all of the evidence—including the intrinsic record, testimony from Regents' own scientists, and admissions from Regents' expert—supports the Commission's conclusion that the ceramic and polyimide submounts used in Intervenors' products are not transparent, and that these materials are not equivalent to sapphire.

The Commission should be affirmed for two additional independent reasons: the "molding" limitation and its finding of invalidity.

On "molding," Regents challenges the Commission's construction, arguing that "molding" means any "formed component." Yet the Commission's construction— "formed by or as if by a mold" —is supported by the intrinsic record, and Regents' proposed construction is so broad as to render the limitation meaningless. The Commission's finding that the Accused Products do not infringe under its correct construction is supported by substantial evidence.

Regents' validity arguments have no more merit. Multiple pieces of prior art show LEDs packaged on a transparent sapphire plate, and there was ample evidence the variations would have been obvious to a POSA, as well as evidence of simultaneous invention. Regents' weak secondary indicia of non-obviousness cannot overcome this substantial evidence.

## STATEMENT OF THE CASE

### I. Background

#### A. LED Packaging

Regents' patents describe structures for packaging LED chips. LED chips are semiconductor devices that emit light in response to electric current. In the right image, a square LED chip is visible at the center of a package, connected to thin gold wires. In the left image, the LED chip is not visible, but is mounted in the reflective cup at the top of the bottom lead (silver).






Appx6274 (annotated).

### B. Regents' Patents

Regents has limited this appeal to two patents, the '854 and '557 patents. These patents share a specification and claim priority to December 11, 2006.[2] Appx718-719, Appx751-752. The patents seek to improve the efficiency of packaged LEDs by mounting them on a transparent submount. *See* Appx10221.

The patents provide examples of "conventional" packaged LEDs in Figures 1-3. Appx743(10:62-63). In Figures 1 and 2, an LED chip (light blue) is mounted on a metal "lead frame" (purple) and encapsulated in an "epoxy molding" (yellow). Appx744(11:9-34). Within the LED chip, the "active layer" emits light in response to electric current. Appx744(11:10).

[2] Subsequent citations to the patents' specification are to the '854 patent.




FIG. 1

CONVENTIONAL LED




FIG. 2

CONVENTIONAL LED

Appx725-726 (colors added). While an LED chip emits light in all directions, these "conventional" LED packages direct the emitted light upwards. Appx744(11:9-48). The metal leads (purple) act as mirrors, reflecting downward-emitted light back up into the LED chip. *Id.*

The patents explain that a problem with this approach is that some of the "reflected light is re-absorbed by the LED emitting layer (active layer)," which decreases the "efficiency or output power" of the packaged LED. Appx742(8:37-38). The "Advantages and Improvements" section states that this problem is addressed by removing the mirrors that reflect light back into the LED chip: "by avoiding the use of intentional mirrors with the LED, re-absorption of light by the

LED is minimized, light extraction efficiency is increased, and light output power is increased." Appx748(20:64-67).

Approaches for accomplishing the goal of minimizing re-absorption are shown in the patents' figures. Figure 22 is most relevant:




FIG. 22A




FIG. 22B

Appx738 (colors added). In Figure 22, the reflective metal (purple) has been moved away from the bottom of the LED chip (dark blue) so that the downward-emitted light is extracted through transparent plate 2220 (light blue) and molding or shaped optical element 2212 (light yellow) instead of being reflected back up through the LED chip. This avoids the problem of having light be "re-absorbed by the LED emitting layer (active layer)" and thus increases efficiency. Appx748(20:24-58); Appx744(11:3-4), Appx743(9:15-18) ("Mirrors or mirrored surfaces are eliminated from the device … in order to minimize re-absorption of the light by the active region").

The patents explain that "the transparent plate 2220 may be comprised of glass, quartz, sapphire, diamond or other material transparent for the desired emission wavelength, wherein the transparent glass plate 2220 effectively extracts the light from the LED." Appx748(20:53-57).

The sole asserted claim in both patents describes this sort of structure: one or more LEDs "in mechanical communication with" a "transparent surface" ('854 patent) or "sapphire plate" ('557 patent), and "configured to extract light through" the transparent surface/sapphire plate. Appx749(22:12-14), Appx782(22:9-10). Each claim also requires a "molding" configured to extract light from both the front and back sides of the device. Appx749(22:16-18), Appx782(22:13-15).

In sum, the asserted claims address the alleged problem (re-absorption of reflected light by the active layer) by mounting the LED chip on something transparent: a "transparent surface" or a "sapphire plate."

### C. Intervenors' Accused Products

Intervenors' products are "filament" LED lightbulbs, where the LEDs are packaged in long strips. Some of Intervenors' filament-LED bulbs have rigid filaments (example below left), and some have flexible filaments (example below right).





Appx141232, Appx141340. When the filaments are taken out of the bulb, and the yellow encapsulant is removed, they look like this:

Example Rigid Filament



Example Flexible Filament



Appx141274, Appx141329.

The close-up images below show three LED chips on a decapsulated rigid filament (left) and a decapsulated flexible filament (right).





Appx141275, Appx141330; Appx444.

The rigid filaments use a ceramic submount, and the flexible filaments use a polyimide submount. Appx419.

### D. The Acclaim Licensed Product

A licensed filament-LED lightbulb is sold by Acclaim (branded as Tamarac):



Appx141068. When a filament is taken out of the bulb, and the yellow encapsulant is removed, it looks like this:



Appx141110.

The close-up image below shows three LED chips on a decapsulated filament from the Acclaim bulb:



Appx141111.

The Acclaim product differs from Intervenors' products because it uses a sapphire submount instead of a ceramic or polyimide submount. Appx99-100, Appx492.

A licensed Sylvania bulb also has a sapphire submount. Appx3465(941:1-4).

## II. Proceedings Below

### A. The ALJ's Claim Construction Order

The ALJ's claim construction order construed three terms relevant to this appeal. Those constructions are:

- "transparent" has "its plain and ordinary meaning"
- "sapphire" is "single crystal aluminum oxide"
- "molding" means "a component formed by or as if by a mold."

Appx660-661 (transparent), Appx661-663 (sapphire), Appx668-669 (molding).

### B. The ALJ's Final Initial Determination

The ALJ issued a FID on November 19, 2021, finding no violation of section 337. Appx401.

The FID found that none of Intervenors' products infringed any of the asserted claims in Regents' four patents. In particular, the FID found the '854 and '557 patents were not infringed because the ceramic and polyimide submounts in Intervenors' products were neither "transparent" ('854 patent) nor "sapphire" ('557

patent). Appx450-464, Appx548-554, Appx588-592. The FID also found that both patents were not infringed because Intervenors' products do not have the claimed "molding." Appx561-565, Appx594-598.

Regents accused more than 3000 LED bulb models of infringement, but only compared 18 of those bulbs to the asserted claims. Appx419-420. Satco and Regents stipulated that two Satco products were representative of Satco's other accused products. Appx430. For the other Intervenors, the FID found that Regents had failed to prove that *any* of the analyzed bulbs were representative of the other accused bulbs. Appx419-430. Thus, the FID found that Regents had failed to prove infringement for any of the non-Satco products that Regents did not specifically analyze at the hearing. Appx430. Regents has not challenged this finding on appeal.

The FID found all asserted claims in all four of Regents' patents invalid. As relevant here, the FID found claim 1 of the '854 patent invalid based on three primary references: Yamazaki (Appx579-581, Appx496-510), Minato (Appx581, Appx510-518), and Tamaoki (Appx582-585). The FID found claim 1 of the '557 patent invalid based on three primary references: Yamazaki (Appx601-602), Minato (Appx603), and Uemura (Appx604, Appx527-532).

The FID found that the technical prong of the domestic industry requirement was not met as to the '854 or '557 patents. Appx567-575, Appx594-598. However, the FID found that that the Acclaim licensed product—which as described above has

a sapphire submount—satisfied some claims of the non-appealed patents (the '529 and '464). Appx488-492, Appx494, Appx541-544, Appx545-546. The reason for the difference across patents is the "molding" limitation in the '854 or '557 patents, which the FID found was not met by the Acclaim product. Appx571-572, Appx575, Appx598.

### C. The Commission's Decision

The Commission affirmed the FID's claim constructions. Appx83, Appx88-94, Appx95-98, Appx112, Appx114-117.

On noninfringement, the Commission affirmed the FID's findings that: (1) the ceramic and polyimide submounts in Intervenors' products are neither transparent nor sapphire (Appx119-122, Appx88-95); (2) there is no molding in Intervenors' products (Appx134, Appx140); and (3) Regents had not shown representativeness, and thus failed to prove infringement for any of the non-Satco products that were not specifically analyzed at the hearing. Appx83-84.

On invalidity, the Commission found claim 1 of both the '854 and '557 patents obvious over both Yamazaki and Minato, with some modification to the ALJ's reasoning. Appx130-137(Yamazaki); Appx137-141(Minato). The Commission did not reach the FID findings that used Uemura and Tamaoki as primary references. Appx142.

On domestic industry, the Commission affirmed the FID's finding that the

technical prong is not met for the ’854 or ’557 patents. Appx126-129.

## SUMMARY OF THE ARGUMENT

The Commission’s determination of no violation is independently supported by three different sets of factual findings, related to (1) the transparent/sapphire limitations, (2) the molding limitation, and (3) invalidity. Affirmance on any one of those issues is dispositive.

**Transparent/Sapphire**. Intervenors’ products do not infringe because they use ceramic or polyimide submounts that are not transparent. The evidence showed that at the time of the alleged invention, the patents used the term “transparent” in its ordinary sense, and that Regents was wrong to assert that “transparent” includes all materials that transmit 1% or more of the light emitted by the LEDs. The Commission found that the accused submounts are not transparent because their transmission rates are nowhere near the 80% or even 90% transmission rates of materials that are undisputedly transparent, such as sapphire. The Commission also found that the accused ceramic and polyimide materials are structurally very different from sapphire, and that this structural difference makes the accused ceramics and polyimides non-transparent while making sapphire transparent. Substantial evidence supports the Commission’s findings, including the testing data submitted by both sides, the testimony of both sides’ witnesses, the documentary and physical evidence, and the patents’ intrinsic record.

Regents' procedural complaints about this conclusion are meritless. Because the evidence showed that Intervenors' submounts are not even close to being transparent, the Commission properly declined to draw a precise line separating transparent from non-transparent materials.

With respect to the claim requiring a "sapphire plate," Regents' sole argument on appeal is that Intervenors' ceramic and polyimide submounts are equivalent to sapphire. The Commission's conclusion that they are not is supported by substantial evidence, including the fundamental difference in material structure described above.

**(2) Molding**. In light of the plain language and the specification, the Commission correctly construed "molding" to mean "a component formed by or as if by a mold." Regents' argument that the Commission's construction improperly imposes a process limitation ignores that the second half of the construction focuses on outcome, not process. Regents' proposed construction—any "formed component"—is so broad as to be no limitation at all and so cannot be right.

Applying its construction, the Commission had substantial evidence that the Accused Products do not contain a molding, as the "glop-top" process by which they are made does not produce products with the regularity expected of a product formed using a mold. Regents' arguments to the contrary are waived and meritless.

**(3) Invalidity**. The purported "inventive concept" of the '854 and '557 patents is that light from an LED chip "is extracted through the transparent / sapphire plate." Appx7746. Regents does not appeal the Commission's finding that both Yamazaki and Minato describe extracting light from an LED chip through a transparent, sapphire plate. Instead, Regents challenges two unrelated aspects of the Commission's invalidity findings: those related to (1) the "sapphire growth substrate" limitation, and (2) the "structural support" limitation. Substantial evidence showed that these were commonplace features well within the grasp a POSA, and so the Commission's conclusion of obviousness was correct. Moreover, the Commission struck Regents "sapphire growth substrate" arguments because they were not properly raised, and that was not an abuse of discretion.

# ARGUMENT

## I. Standard Of Review

The following adds to Regents' statements (at 18-19).

Infringement under the doctrine equivalents is a question of fact reviewed for substantial evidence. *Kinik Co. v. ITC*, 362 F.3d 1359, 1361 (Fed. Cir. 2004).

Under the substantial evidence standard, the Commission's decision should be affirmed if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).

Evidentiary determinations of the Commission are reviewed for an abuse of discretion. *Winbond Electronics Corp. v. ITC*, 262 F.3d 1363, 1370 (Fed. Cir. 2001). An abuse of discretion occurs if the Commission's decision: (1) is clearly unreasonable, arbitrary or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) follows from a record that contains no evidence upon which the Commission rationally could have based its decision. *Organik Kimya, San. ve Tic. AS v. ITC*, 848 F.3d 994, 1001 (Fed. Cir. 2017).

On appeal, new arguments that could have been made before the ALJ are waived. *Broadcom Corp. v. ITC*, 542 F.3d 894, 900 (Fed. Cir. 2008); *Certain Road Milling Machines & Components Thereof*, No. 337-TA-1067, Comm'n Op. at 23 n.8 (Aug. 7, 2019).

Similarly, arguments that were not made to the Commission are waived. *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1362 (Fed. Cir. 1999).

## II. Regents Did Not Appeal The Commission's Findings On Representativeness

Regents does not challenge the Commission's findings on representativeness on appeal. Thus—except as to Satco's products—Regent's appeal on infringement is limited to only the specific products it addressed at the evidentiary hearing.

## III. The Accused Submounts Are Not Transparent

The Commission found noninfringement because the ceramic and polyimide submounts in the Accused Products are not transparent under the ordinary meaning of that term. Appx119-122, Appx88-95, Appx450-464, Appx548-552.

### A. The Commission's Claim Construction Is Correct

The Commission rejected Regents' arguments that a POSA would understand "transparent" to include any object that transmits "at least some light." Appx90-91. The Commission also found that at the time of the alleged invention, the term "transparent" did not include "semi-transparent." Appx91-92; *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1358 (Fed. Cir. 2006) (finding that "rigid" did not include "semi-rigid"). These factual findings were dispositive of the legal question of the proper meaning of "transparent" in the context of Regents' patents. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 333 (2015).

These factual findings were also sufficient to resolve the infringement issue against Regents, as explained in §III.B. For example, the Commission found that the accused submounts have transmission rates that are nowhere near the 80% or even 90% transmission rates of materials the parties and witnesses agreed are transparent, such as sapphire, glass and indium tin oxide (ITO). Appx89-92. The Commission also found that the ceramic and polyimide materials in the accused submounts have a material structure with grains and/or pores that are not present in

materials like sapphire, and that this structural difference makes the accused ceramics and polyimides non-transparent while making sapphire transparent. Appx89-90, Appx92. Since claims "must be construed only to the extent necessary to resolve the controversy," the Commission did not need to elaborate further. *AstraZeneca AB v. Mylan Pharms., Inc.*, 19 F.4th 1325, 1345 (Fed Cir. 2021) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

#### 1. Regents Argued For Transparent To Be Given its Ordinary Meaning To A POSA—Until That Fact-Finding Went Against It

In its claim construction brief, Regents asked the ALJ to construe transparent as having its "ordinary meaning in the relevant field":

> Because the patentee has neither served as its own lexicographer nor has it disavowed any meaning of "transparent," the plain and ordinary meaning in the relevant field should prevail.

Appx7749.

After receiving the claim construction order, Regents repeated this position verbatim in its pre-hearing brief (Appx10267), while asserting that the ordinary meaning should be adopted "as a matter of law." Appx10263.

The meaning of a term to a POSA is a factual finding. *Teva*, 574 U.S. at 331-32. Regents knew this and had its expert and fact witnesses testify at the evidentiary hearing about how the word "transparent" was used. Appx3173, Appx3208-3209, Appx3255, Appx3354-3355, Appx3360-3364, Appx3404, Appx137735-137739.

In sum, throughout the evidentiary hearing, Regents argued that the factual question about what "transparent" means in the field was dispositive of the legal question about the construction of "transparent." Thus, while Regents can argue that this factual question was resolved incorrectly, it cannot reasonably dispute that the factual question itself is dispositive.

#### 2. The Intrinsic Record Supports The Commission's Conclusions About Transparent

Regents' patents and their prosecution history support the Commission's conclusion that "transparent" should be given its ordinary meaning in the relevant field, and that this does not include objects that merely transmit "some light."

First, the Commission's finding is consistent with the examples the patents provide of transparent materials: glass, quartz, sapphire, and diamond. Appx91, Appx748(20:53-55), Appx3494(1056:25-1057:5). These materials transmit the large majority of light without significant scattering or absorption. Appx91; *see also* Appx748(20:55-56) ("the transparent glass plate 2220 effectively extracts the light"). For example, the figure below from a materials science textbook explains that a transparent object passes "virtually all light," whereas translucent and opaque objects transmit "some" or "none":




**Figure 1.2** Three thin disk specimens of aluminum oxide that have been placed over a printed page in order to demonstrate their differences in light-transmittance characteristics. The disk on the left is transparent (i.e., virtually all light that is reflected from the page passes through it), whereas the one in the center is translucent (meaning that some of this reflected light is transmitted through the disk). The disk on the right is opaque—that is, none of the light passes through it. These differences in optical properties are a consequence of differences in structure of these materials, which have resulted from the way the materials were processed. (Specimen preparation, P. A. Lessing; photography by S. Tanner.)

Appx137746, Appx3463(932:25-933:14). As another example, the image below shows a sapphire sample that was physically submitted to the ALJ:



Appx135233. Sapphire is like the disk that the materials science textbook describes as transparent, and unlike the disks described as translucent or opaque.[3]

Second, the Commission's finding is supported by the patents' description of the alleged invention. The patents address the problem that light can be reabsorbed by the LED chip's active layer if it is reflected back into the LED chip. Appx742(8:37-38). The patents' purported improvement is to minimize this re-absorption by using a transparent plate instead of a reflective surface. Appx91, Appx10221, Appx748(20:64-67). Regents' construction cannot be correct because it allows a "transparent surface" that transmits only 1% of the light while allowing the majority to be either scattered back into the LED or absorbed. This would defeat the alleged invention's stated purpose. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1311 (Fed. Cir. 2014).

Third, the Commission's finding is supported by the distinction that the patents draw between "transparent" and "semi-transparent" materials. Appx91-92, Appx744(11:9-12). *See also Schoenhaus*, 440 F.3d at 1358 ("rigid" does not include "semi-rigid").

---

[3] Dependent claims 3, 4, and 5 of the '854 patent (Appx749) support the Commission's finding for the same reason: they limit the "transparent surface" to materials ("glass," "quartz," and "diamond") that are like the transparent disk in the materials science textbook, and unlike the translucent and opaque disks. Appx91, Appx7557.

Fourth, the Commission's finding is supported by the prosecution history, where Regents distinguished prior art by explaining that "there is a difference between transparent and allowing some light to be transmitted." Appx6547. During prosecution of a related patent application (Appx718-719), the inventors claimed an LED with a "transparent substrate or sub-mount." Appx6490(claim 1). The Patent Office rejected this claim as obvious over U.S. Patent No. 6,515,308 ("Kneissl"), finding that Kneissl's distributed Bragg reflector ("DBR") was the claimed "transparent substrate or sub-mount." Appx6519-6520; *see* Appx6577(6:55-65). The examiner reasoned that in Kneissl, a "light beam 140" (yellow below) passes through the "upper DBR" (blue below). Appx6578(7:14-16).



Appx6571 (Fig. 1).

In response, Regents argued that Kneissl's DBR was not transparent even though it allows some light to pass: "While the above cited portions of Kneissl describe emitting a light beam through the DBR, the DBR is primarily reflective and would not be considered transparent (there is a difference between transparent and allowing some light to be transmitted)." Appx6547. The examiner then allowed the claim over Kneissl. *See* Appx6555-6565 (failing to re-raise Kneissl as a rejection); *see also* Appx6567-6568.

Regents' statement to the Patent Office that "there is a difference between transparent and allowing some light to be transmitted" directly contradicts its arguments on appeal. Regents argues (at 29-30) that these statements can be ignored because they do not rise to the level of a disclaimer. But Intervenors are not arguing disclaimer; Regents' statement to the Patent Office is merely additional evidence that the ordinary meaning of "transparent" does not encompass materials transmitting only a small amount of light.

### 3. Substantial Evidence Supports The Commission's Fact-Finding About the Meaning Of Transparent To A POSA

#### a. Professor Eden's Testimony

Professor Eden, one of Intervenors' experts, testified that a material is "transparent" if it is like the left disk in the materials science textbook that was reproduced above. Appx137746, Appx3463(932:25-933:14); *supra*, §III.A.2. The textbook describes "transparent" as meaning "virtually all light that is reflected from

the page passes through it." Appx137746. Professor Eden echoed this, explaining that a transmission of "at least 80 percent" was "perhaps a good place to start" in quantifying "transparent." Appx3494(1057:1-5).

Professor Eden also testified that a white shirt and human ears are not transparent, even though some light passes through them. Appx3494. And he explained that when only a "small fraction of light" that is incident on an object is transmitted, that is "characteristic of an opaque material," not a transparent one. Appx3480.

#### b. Professor Speck And Dr. Wong's Testimony

Testimony from two of Regents' witnesses, Professor Speck and Dr. Wong, also supports the Commission's factual findings on transparent.

Professor Speck conceded that transparent means "low light loss," which he quantified as "[m]aybe in the 1 to 10 percent range." Appx3245-3246(280:2-282:21), Appx451.

Professor Speck also contrasted transparent with semi-transparent. He explained that "quite often up until the mid 2000s we would talk about a semi-transparent contact," but that there was "a big change" where those semi-transparent contacts "were replaced with conducting oxides. And those were called transparent conducting oxides." Appx3252(306:16-307:2). He also explained that this change from semi-transparent to transparent contacts resulted in an efficiency improvement

that was "so great" that "the industry almost as a whole switched their contact technology." *Id.*[4]

Dr. Wong testified that older LED contact layers (like thin nickel-gold) were considered semi-transparent, and he contrasted these semi-transparent contact materials with more modern contact materials like ITO, which were considered transparent. Appx3262(311:2-6), Appx451. Dr. Wong also quantified this distinction, saying that for semi-transparent contacts, "transmission is about 40 percent, compared to ITO, which is at least 85 percent." Appx3263(349:9-17), Appx451.

#### c. Professor DenBaars And Schubert's Testimony

Professor DenBaars, one of the named inventors and a Regents witness, testified that anything that transmits "above 1 percent" is transparent. Appx3195(192:2-7). The Commission rejected this testimony as "absurd." Appx90-91. It had good reason, because one of Professor DenBaars' own papers describes an LED layer with a transmission of 60% as only "semi-transparent." Appx3196(193:23-194:13), Appx120705.

Professor Schubert, one of Regents' experts, testified that something is transparent if it "allows light to pass through." Appx3404(796:4-7). Thus, Professor

---

[4] Professor Speck also explained that both the semi-transparent contact layers and the transparent conducting oxides that replaced them were clear enough to allow someone to read a newspaper through them. Appx3252(310:11-16).

Schubert testified that his white shirt "may be transparent." *Id.* The Commission reasonably found that this was not plausible. Appx90, Appx450.[5] As with Professor DenBaars, Professor Schubert's testimony was contradicted by his own writings. For example, Professor's Schubert's 2006 LED textbook describes thin metal contacts with "a transmittance of approximately 50 percent" as "semi-transparent." Appx3448(871:3-9), Appx128269. This textbook also states that "[l]ayers of transparent DBRs have negligible absorption losses." Appx128278, *see also* Appx128279. Similarly, a patent that issued in 2004 with Professor Schubert as the sole inventor states that "[t]he term transparent means that light (in the relevant frequency range) passes through the composition or structure with little or no absorption." Appx3448-3449(873:10-874:1), Appx137927.

Professor Schubert was also cross-examined about the Wiley technical dictionary that Regents had relied upon. That dictionary defines transparent as "freely pass[ing] . . . light." Appx92, Appx7909. Professor Schubert admitted that in this definition, "freely passes" means "without significant absorption." Appx3405(900:6-15).

[5] Professors Schubert and DenBaars did not even agree with each other. When asked about Professor DenBaars' testimony, Professor Schubert stated: "there's a difference between Professor DenBaars and myself." Appx3404(796:8-797:3).

#### d. Dictionaries, Textbooks, And Journals

Intervenors presented seventeen dictionary and textbook definitions and two scientific journals, all of which consistently defined "transparent," and which consistently distinguish between transparent and translucent or opaque materials. Appx6283-6284, Appx7543(¶84), Appx6600 ("grain scattering that makes … this material translucent and not transparent"), Appx6612 (comparing "transparent Ce:YAG ceramics" to "translucent or scattering Ce:YAG ceramics"), Appx7683.

The Commission properly recognized that the dictionaries cited by Regents refute Regents' own position. Appx92-93. The McGraw-Hill reference defines "transparent medium" as "a medium which has the property of transmitting rays of light in such a way that the human eye may see through the medium distinctly." Appx92-93. Further, the first three definitions of "transparent" in the Wiley Dictionary define "transparent" as "freely" passing light. Appx7909; Appx92. The Regents improperly cherry-pick language from these dictionaries, but neither defines "transparent" as passing any amount of light (or any amount over 1 or 2 percent).

### B. Substantial Evidence Showed That The Accused Submounts Are Not Transparent

The Commission found that the white ceramic and brown polyimide submounts in the Accused Products are not transparent.

Regents' images below show the front and back of a rigid ceramic submount in an accused product. The LED chips are mounted on the front side (left image).



Appx141275-141277.

The images below show the front and back of a flexible polyimide submount in an accused product. The LED chips are mounted on the front side (left image).



Appx141330-141332.

In those images, the LED chips are not clearly discernible (if at all) from the back side of the submounts (right images). In contrast, the images below show the front and back of a sapphire submount from the licensed Acclaim product. The LED chips are mounted on the front side (left image).







Appx141111-141113.

The Commission found that the sapphire submount is transparent, and that the ceramic and polyimide submounts are not. Appx94, Appx450 (ceramic), Appx120, Appx551 (polyimide), Appx99-100, Appx492 (sapphire). This conclusion—which applies to both the accused products and the domestic industry products—was supported by the images above, the testing data submitted by both sides, the expert testimony, and all the evidence discussed above in the context of claim construction.

### 1. The Testing Data

#### a. Professor Eden's Transmission Testing

Intervenors' transmission testing showed that the ceramic and polyimide submounts are not transparent. Appx89, Appx451. The data plotted below compares the results of Professor Eden's testing of a sapphire submount (left) and a ceramic submount (right).







Appx136743 (sapphire), Appx136842 (ceramic), Appx3471, Appx3480, Appx135278. The left plot shows that for the sapphire submount, there is a light intensity of about 15,000 directly from the LEDs (black line), and about 13,000 on the back side, through the sapphire submount (red line). This means a transmission through the submount of about 85% (~13000 divided by ~15000). In contrast, the right plot shows that for a ceramic submount, the intensity of the light directly from the LEDs (black line) is about 6.6 times higher than the intensity of the light transmitted through the submount (red line). That means a transmission through the submount of only about 15% (1 divided by 6.6). Appx3471, Appx136842. Professor Eden's testing showed similar results for all of the ceramic submounts that he personally tested: the highest transmission through a ceramic submount that he measured was only 25%. Appx3471, Appx135250 (1 divided by 3.91), Appx454-457.

Professor Eden also tested polyimide submounts. The two plots below show that for the polyimide submounts that he tested, 8% (left) and 2.7% (right) of the light was transmitted.







Appx551-552 (500 divided by 6000 is only 8%, 417 divided by 15033 is 2.7%), Appx137048, Appx136989, Appx3472, Appx135254, Appx135255.

Professor Eden also submitted transmission testing from Duke University and the University of North Carolina showing a ceramic submount transmitted ~4% of the light, and a polyimide submount ~35%. Appx455, Appx137611-137613, Appx550-551, Appx137622-137625, Appx135262-135263.

Regents did not contest the accuracy of Professor Eden's transmission data in its brief to the Commission. Appx90.

**b. Covalent Metrology's Integrating Sphere Testing**

Intervenors also submitted testing of the submounts that was done with an integrating sphere by Covalent Metrology at Professor Eden's direction, in order to determine absorption ("A") and reflection ("R") in addition to transmission ("T").

Appx3475, Appx3477. This testing was important because of Regents' and Professor Schubert's position that transparent components have minimal absorption. *See* §III.B.3, *infra*.

The table below shows the results of that testing:

| Brand | Bulb | Exhibit | Type | T | R | A |
|---|---|---|---|---|---|---|
| Tamarac (licensed) | G16.5 | RX-0193.0005-08,10 | sapphire | 78.7 | 4.9 | 16.4 |
| GE | GE Refresh Candle (SKU 93122167) | RX-0192.0006-11 | ceramic | 24.1 | 26.6 | **49.4** |
| | GE Basic B11 Blunt Tip (SKU 48368) | RX-0187.0007-12 | ceramic | 1.8 | 31.7 | **66.5** |
| | GE Relax A15 (SKU 47957) | RX-0188.0007-12 | ceramic | 1.7 | 22.3 | **76.0** |
| GVL | GVL '737 SKU | RX-0186.0012-0014 | ceramic | 2.8 | 21.6 | **75.6** |
| IKEA | Sillbo 140 (104.501.82) | RX-0185.0011-0013 | ceramic | 24.6 | 14.2 | **61.2** |
| | Sillbo 370 (404.165.49) | RX-0184.0014-16 | ceramic | 12.6 | 19.1 | **68.4** |
| | Ryet 470 (404.468.67) | RX-0183.0014-16 | ceramic | 12.4 | 17.8 | **69.9** |
| Satco | S29876 | RX-1470.0011-13 | ceramic | 20.8 | 34.6 | **44.6** |
| GE | GE Vintage A19 (SKU 33574) | RX-0191.0006-11 | flexible | 38.6 | 5.9 | **55.6** |
| Satco | S9966 | RX-1480.0012-14 | flexible | 45.6 | 10.3 | **44.1** |

Appx140904. This testing showed that a sapphire submount transmitted 79% of incident light, whereas the accused submounts transmitted between 2% and 46%. Appx461, Appx89. This testing also showed that the accused submounts absorbed between 44% and 76% of the incident light, which is 3 to 5 times more than the amount absorbed by the sapphire submount (16%).

Regents did not contest the accuracy of the Covalent Metrology data in its brief to the Commission. Appx90. Thus, Regents waived its current argument (at 37) that this data is wrong. *Finnigan Corp.*, 180 F.3d at 1362. Regents' argument is also meritless for the reasons explained in the FID. Appx461-462.

### c. SEM Testing

Professor Eden performed scanning-electron-microscope (SEM) analyses of the ceramic and polyimide submounts.

The SEM images of the ceramic submounts (example below left) showed an abundance of pores, grains, and grain boundaries that cause scattering and absorption, which is why they are not transparent. Appx3478-3480, Appx89, Appx463.

Accused Ceramic Product (Satco S29876)




(RX-0178.0029)

Licensed Sapphire Submount (Tamarac)




(CX-0198.0021)

Appx135272. As Professor Eden explained, "you can see the … stark contrast" with the SEM images of a sapphire submount (above right). Appx3479(994:14-20). The sapphire is optically "pristine": smooth and uniform with "no sign of pores, grains, and grain boundaries." Appx3479(994:21-23), Appx89-90, Appx463.

The SEM images of the polyimide submounts (example below) also showed extensive pores, which means that the polyimide submounts will absorb and scatter light, and are not transparent. Appx3479(994:9-13), Appx120.




Appx135273.

### d. Regents' Testing

Regents did not perform any transmission testing of the submount, or any integrating sphere testing. Instead, Regents submitted testing data—summarized in "LUX" plots—which show the relative light intensity measured as a filament is rotated 360 degrees. For example, the three plots below show examples of Regents' data for a filament with a sapphire submount (left), a filament with a ceramic submount (center), and a filament with a polyimide submount (right).




Appx141108, Appx141272, Appx141327.

Regents' testing was done without removing the yellow silicone encapsulant. Appx451-452, Appx3473(970:15-21). This changes the results, because the silicone encapsulant acts as an optical waveguide that redistributes the light emitted out of the front side and guides some of it around to the back side. Appx457, Appx3473(973:16-20). Thus, Regents' testing overstates the amount of light transmitted through the submount. Appx3473. Professor Eden proved this by testing products both with and without the silicone encapsulant. For example, the left plot below shows Professor Eden's measurements of a ceramic submount with the silicone encapsulant, and the right plot shows his measurements of the same ceramic submount without the encapsulant.




Appx136821, Appx136820. These two plots of the same filament show that the back side light intensity (red lines) is much higher when the encapsulant is present to guide light around to the back (left image), and much lower when the encapsulant is not present (right image). Professor Eden obtained similar results for many other

ceramic or polyimide submounts. Appx454-457, Appx550-551. This shows that Regents' testing overstates the amount of light transmitted through the submount.

Nonetheless, even Regents' overstated data shows that significantly less light is emitted from the back side of the filaments. Regents' data showed that no ceramic submount had a transmissivity above roughly 60%. Appx457. It also showed that none of Intervenors' flexible submounts had transmissivity above roughly 60%. Appx550-551.

Regents' argument (at 23) that its data showed transmissivity of 80% is not correct for the Intervenors on this brief—that is, all the Intervenors other than Feit Electric. As noted above, Feit Electric submitted different evidence on noninfringement and is filing a separate brief on appeal. The only LUX plot showing close to 80% transmission is the one for the Feit Vintage ST19 product. Appx550, *cf.* Appx454-457, Appx551.

Notably, Regents opted not to submit integrating sphere testing, even though Regents' witnesses testified that they have two integrating spheres in their laboratories. Appx3148(146:21-147:5); Appx116593; Appx3196(195:10-17; 196:23-197:14); Appx3245(278:21-23; 279:2-8). Similarly, Professor Schubert has an integrating sphere in his laboratory which he uses "regularly," but that he did not use to test Intervenors' products. Appx3410(827:7-19).

#### 2. Professor Shanfield's Testimony

Professor Shanfield testified that the ceramic submounts are "opaque" and nothing like the examples of transparent materials in the Asserted Patents—"glass, quartz, sapphire, or diamond." Appx3451.

#### 3. Admissions About Absorption

Professor Schubert's cross-examination showed that transparent objects have "negligible absorption losses" (Appx128278), "little or no absorption" (Appx137927, Appx3448-3449), or no "significant absorption." Appx3405. Similarly, Regents stated below that transparent means "without absorption." Appx7740, Appx10241. The testing data from Covalent Metrology showed that the accused submounts absorbed between 44% and 76% of the incident light. Appx140904. This data in combination with Regents' and Professor Schubert's admissions shows that the accused submounts cannot possibly be transparent.

### C. Regents' Substantive Arguments Are Contradicted By The Record

#### 1. The Commission Did Not Set A Minimum Transmissivity Threshold

Regents asserts (at 25, 21) that the Commission erred by imposing "a minimum threshold of something greater than 60% transmissivity." That is not correct. What the Commission found was that the accused submounts are not transparent, because as explained above they transmit only a small percentage of the light hitting them, nowhere close to what a POSA would consider transparent.

Appx119-120. The FID expressly states, "I do not need to set a specific numerical threshold for light transmission to resolve the factual infringement inquiry." Appx450. The Commission adopted that aspect of the FID. Appx119-120. That approach is legally correct, because courts need only construe claims "to the extent necessary to resolve the controversy." *AstraZeneca AB*, 19 F.4th at 1345 (citing *Vivid Techs., Inc.*, 200 F.3d at 803).

Moreover, the transmission numbers Regents relies on (at 23) in making its 60% threshold argument are the numbers Regents obtained without removing the yellow silicone encapsulant from the filaments. As explained above, Professor Eden proved that this testing overstates the amount of light transmitted through the submount. The Commission did not adopt Regents' testing numbers. Instead, it weighed all the evidence, including the more accurate testing provided by Intervenors, which showed transmissions in the range of 1.7% to 46%, depending on the product.

The logic of the decision below is that the accused submounts cannot be transparent because even the worst data for Intervenors about their most transmissive submount shows a transmission rate that is not "anywhere near the 80% or even 90% transmission rates of materials the parties and experts agree are transparent," such as sapphire, glass and ITO. Appx89, Appx458. That conclusion was reasonable for all the reasons given above, and in the Commission's brief.

### 2. Regents Relies On Misleading Photographs

Regents relies (at 5) on photographs that the Commission found to be "misleading" because they are saturated and thus conceal the differences in intensity between the front and back sides. Appx451. This is evident from the white color in the photographs: the LEDs emit blue light, not white light, and the reason they appear white in the photographs is that Regents used an exposure time that was too long to capture the differences in light intensity between different parts of the photograph. Appx3538(1126:10-1127:20), Appx135315.

### 3. Regents' Argument About Excluding Preferred Embodiments Is Contradicted By The Record

Regents' argument (at 27-28) that the Commission's construction improperly excludes preferred embodiments is factually wrong. Regents asserts (at 16, 27-28) that the Commission's ordinary-meaning construction would exclude a transparent plate with a surface roughened to promote scattering. But the Commission did not so hold. The FID did address dependent claims in the non-appealed patents that say "wherein the transparent plate is roughened, textured or patterned to increase light extraction from the LED chip." Appx466-468, Appx534-545. The FID found these claims not infringed because Regents failed "to demonstrate that roughening present on the Accused Products—if any—will 'increase light extraction.'" Appx468. The FID did not reach question of whether the accused submounts were roughened. *Id.* Regents' argument attacks a problem that does not exist.

Additionally, as shown at the evidentiary hearing, the fact that the patents describe roughening a transparent plate to increase light extraction[6] supports the Commission's finding that the accused submounts are not transparent. *See* Appx112350-112351. The parties agree that roughening surfaces is intended to address the problem of light trapped by total internal reflection. Appx111878 (Regents), Appx112350 (Intervenors). This problem does not exist in a material that scatters light. The schematics below show a light ray trapped in a non-scattering material (left), and the same light ray in a material with grains and pores that cause scattering (right).



Appx112350; *see* Appx3478. In the right image there is no need to roughen the surface to obtain the unpredictable light paths that increase light extraction by reducing total internal reflection. The unpredictable light paths already exist, caused by the grains and pores in the material. *See* Appx3493-3494(1053:22-1054:9), Appx3539-3540 (1133:17-1134:6). Thus, when the patents describe roughening a

[6] *See* Appx745(13:51-52) (describing an ITO layer (which all agree is transparent) "having a surface 410 that is roughened, textured, patterned, or shaped"); Appx745(14:55-57), Appx746(16:22-25).

transparent plate to improve light extraction, a POSA would know that they are referring to materials like sapphire or glass, and not to materials like Intervenors' ceramic and polyimide submounts.

### 4. The Claim Language Relied On By Regents Actually Supports The Commission's Decision

Regents argues (at 26-27) that the claim language "at least one … light emitting diode (LED) … and the LED and transparent surface configured to extract light emitted by the LED through the transparent surface" shows that "transparent" includes anything that "allows [any] light to pass through."

Regents' argument is wrong because the "configured" clause defines the structural arrangement of the claim elements, not the word "transparent." Without the "configured" clause, the LED could be mounted on the transparent surface with a metal layer (*e.g.*, solder). That would provide the claimed "mechanical communication," but would not allow any LED light to be extracted "through the transparent surface," because the metal layer would block the light. In fact, Regents' argument cuts against its position: there would be no need to use the word transparent in the claims if all it means is "transmission of 'at least some light.'" Appx749(claim 1), Appx90.

### 5. Regents' Arguments About Other Miscellaneous Matters Should Be Rejected

Regents (at 24) relies on two district court proceedings that construed

"transparent" in unrelated patents. The Commission reasonably rejected this evidence, explaining that "those cases involved different patents, different inventors, and different intrinsic and extrinsic records." Appx93; *see also MEMS Tech. Berhard v. ITC*, 447 F. App'x 142, 153 (Fed. Cir. 2011).

Regents also argues (at 33) that the Miyahara reference (Appx138616-139134) supports its position. This is a new argument that Regents never made to the Commission or the ALJ and is therefore waived. It is also wrong. Miyahara was not cited during prosecution of the asserted patents. *See* Appx719-723. Its only relation to this case is that it was used as prior art. Regents asserts that Dr. Lebby "implicitly adopted" a definition of "transparent" from Miyahara, but that is not true. What Dr. Lebby said is that Miyahara "has a transparent plate." Appx3556(1200:12-13). Miyahara teaches use of submounts that transmit more than 80% of visible light, including blue LED light (which is at ~450nm, as shown in Professor Eden's transmission testing data):

FIG. 27




| Number | Translation |
|---|---|
| 1 | Light transmittance |
| 2 | Wavelength |

Appx139131. Thus, contrary to Regents' argument, Dr. Lebby's testimony about Miyahara supports the Commission's decision.

### D. Regents' Procedural Arguments Should Be Rejected

#### 1. Regents' *O2 Micro* And APA Arguments Are Wrong

Regents argues (at 12-13, 21-22) that the ALJ violated *O2 Micro* and the APA by receiving evidence on "transparent" at the evidentiary hearing, and by supposedly changing the construction at the hearing. Regents is wrong.

As explained above (§III.A.1), Regents consistently argued that the factual question about what transparent means in the field was dispositive of the legal question about the construction of transparent—until that factual question was resolved against it. Nothing in *O2 Micro* or the APA required the ALJ to resolve

this factual dispute *before* the administrative trial. *O2 Micro* concerns the division of responsibility between a judge and jury; it says nothing about whether an ITC ALJ can wait to hear from the experts until the evidentiary hearing. *See generally O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). Moreover, at no point did Regents tell the ALJ that it needed to resolve factual questions related to claim construction before the evidentiary hearing. Instead, Regents introduced evidence about "transparent" at the hearing. *E.g.* Appx3173, Appx3208-3209, Appx3255. Thus, this Court should reject Regents' argument (at 12, 21-22) that it was error to have fact testimony about "transparent" at the hearing. *See Broadcom Corp.*, 542 F.3d at 900 (finding that Broadcom could not rely on an argument it did not make to the ALJ); *see also Aten Int'l Co. v. Uniclass Tech. Co.,* 932 F.3d 1364, 1370 (Fed. Cir. 2019) (finding that even in the context of a jury trial, where "the risk of confusing the jury was high," there was "no ground for reversal since there was no objection to the expert testimony as to claim construction").

To the extent that the ALJ could be considered to have adjusted his claim construction based on the hearing record, this Court has recognized it is entirely proper to do so. For example, in *Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, this Court explained that "a trial judge may learn more about the technology during the trial that necessitates some clarification of claim terms before

the jury deliberates." 599 F.3d 1308, 1315 (Fed. Cir. 2010). Similarly, in *CytoLogix Corp. v. Ventana Medical Systems, Inc.*, the claims "were not construed until the close of evidence," but this court held that "was not erroneous" since "the district court has considerable latitude in determining when to resolve issues of claim construction." 424 F.3d 1168, 1172 (Fed. Cir. 2005). As a third example, in *California Institute of Technology v. Broadcom Ltd.*, this Court affirmed a claim construction that the "district court revisited and clarified" during the trial. 25 F.4th 976, 984 (Fed. Cir. 2022).

For its part, the APA only requires the ALJ to give a complainant "'notice' and a 'fair opportunity' to be heard." *TQ Delta, LLC v. DISH Network LLC*, 929 F.3d 1350, 1354 (Fed. Cir. 2019). Here, the ALJ's claim construction order told the parties that factual evidence concerning "transparent" was needed, and Regents was able to present expert testimony and other extrinsic evidence at the hearing. Nothing more was required.

Relatedly, Regents' suggestion (at 12-13) that it did not have the opportunity to present "infringement" evidence under the ALJ's "final" claim construction is false. Regents was aware during the expert report phase of all the evidence that Intervenors would submit, including that the submounts transmit only small amounts of light, absorb significant amounts of light, and have a different material structure from transparent materials. Appx10796-10824. Regents had the opportunity to

respond this evidence at the hearing—and it tried to do so, albeit unsuccessfully. Tellingly, the Regents' brief never identifies what evidence would have made a difference—nor could it, as no evidence was ever going to make the accused submounts transparent.

### 2. Regents' Argument That The ALJ Failed To Define Transparency With Mathematical Precision Is Waived and Wrong

Regents argues (at 16, 35-36) that the ALJ committed an error of law by reasoning that whatever the dividing line between "transparent" and "not transparent" may be, the Accused Products fall on the "not transparent" side of it. According to Regents, by reasoning in this manner, the ALJ both failed to construe the limitation and improperly relied on the Accused Products in reaching his construction. But there was no error.

First, Regents waived this argument because it did not demand any more precise construction below. As explained in *Kaufman v. Microsoft Corp.*, when a party fails to "sufficiently request further construction of the relevant limitation," that party has "forfeited" an argument that further construction was necessary. 34 F.4th 1360, 1369-70 (Fed. Cir. 2022). This rule is needed to prevent "after the fact/do over" arguments. *Id*. Here, Regents never sought a more precise construction of transparent. Regents had ample opportunity to do so because the claim construction order issued on June 15, 2021 and the evidentiary hearing only

began on August 31, 2021. Appx651, Appx661, Appx3150. Nor did Regents argue for a more precise construction in its petition to the Commission. Appx112860-112871. To the contrary, Regents told the ALJ that the "court need only construe the terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" Appx7742 (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

Second, there was no legal requirement that "transparent" be construed with precision. *Personalized User Model, LLP v. Google Inc.*, 797 F.3d 1341, 1350 (Fed. Cir. 2015) (explaining that if the claim construction process yields an imprecise claim limitation, that imprecise claim limitation can be applied in an infringement analysis); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) (explaining that some claim constructions will have some imprecision for fact finders to resolve). Here, it was unnecessary to define "transparent" according to some minimum transmissivity level because the Accused Products came nowhere close to what a POSA would have considered "transparent." The ALJ found that all of the accused rigid products had light "transmissivity below about 60 percent of their light incident on their submounts" (Appx451, Appx457, Appx458), far below what would be considered transparent, and so explained that "I do not need to set a specific numeral threshold for light transmission to resolve the factual infringement inquiry." Appx450. That approach was legally correct. *Jang v. Boston Sci. Corp.,*

532 F.3d 1330, 1336 (Fed. Cir. 2008); *see also Abbott Labs. v. Baxter Pharm. Prods., Inc.,* 471 F.3d 1363, 1368 (Fed. Cir. 2006) (holding that the phrase "prevent degradation" need not be construed with "numerical exactitude" to resolve the issues); *Modine Mfg. Co. v. United States ITC*, 75 F.3d 1545, 1557 (Fed. Cir. 1996) ("mathematical precision should not be imposed for its own sake").

### E. The Commission's Finding Of Non-Equivalence Is Supported By Substantial Evidence

Regents argues (at 38) that the Commission's factual findings in rejecting its doctrine of equivalents argument are unsupported by substantial evidence, and suggests the ALJ and Commission too simplistically applied the vitiation doctrine. That misstates the record.

The Commission explained that: (i) "there are clear and substantial structural differences" between a typical transparent submount and the Accused Products' submounts, including the grain boundaries and pores and absorption, and (ii) that the function-way-result test was not satisfied because of these structural differences and the resulting differences in light transmission. Appx94-95. The Commission's findings were supported by substantial evidence in the form of Professor Eden's extensive testimony concerning his testing of Accused non-transparent submounts and licensed transparent submounts. Appx3478-3479(993:11-994:23), Appx3480-3482(1004:7-1007:12), Appx135277-135278. On the other hand, the Commission (and the ALJ before it) correctly recognized that Regents' expert, Professor

Schubert, simply rehashed his "allows light to pass through" infringement theory. Appx94, Appx464.

In attacking the Commission's evidentiary basis, Regents (at 39) again misstates the record, arguing that the Accused Products' submounts exhibit only "relatively small differences in degree" of transmissibility from transparent submounts because the Accused Products' submounts have light transmission rates between 20% to 60%. Yet Intervenors' testing showed that 23 of 26 products tested have transmission below about 25% (some in the single digits) and all were below 45%. Appx135250, Appx135255, Appx135269, Appx135262-135263, Appx3471(962:6-964:21), Appx3472(969:14-25), Appx3474(977:3-978:9), Appx3477(987:22-989:8). Moreover, the evidence was that a POSA would view these products as opaque or at most "semi-transparent," where the patents distinguish semi-transparent materials from transparent materials, and the applicant distinguished transparent from "allowing some light to be transmitted" during prosecution. *Supra*, §III.A.2. A difference the applicants emphasized during prosecution to get around the prior art is not a "small difference[] in degree."

Regents further asserts (at 38-39) that the Commission improperly applied the vitiation doctrine. This argument has no merit because the Commission correctly found substantial differences. *Trading Techs Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1356 (Fed. Cir. 2020).

## IV. The Accused Submounts Are Not Equivalent To Sapphire

Regents no longer challenges the Commission's construction of "sapphire" as "single crystal aluminum oxide" or the agency's conclusion that the Accused Rigid Products do not literally infringe the "sapphire plate" limitation of the '557 patent. Instead, it urges this Court (at 46-48) to second-guess the agency's rejection of its doctrine-of-equivalence argument. Although that is a fact question reviewed for substantial evidence, *e.g.*, *Kinik*, 362 F.3d at 1361, Regents never really addresses the substantial-evidence standard, and its conclusory attacks on the Commission's well-reasoned findings fail.

1. Regents begins (at 46-47) by block-quoting Dr. Schubert's six sentences of testimony about his function-way-result test, without meaningful accompanying argument. But demonstrating equivalence requires "particularized testimony and linking argument"; "[g]eneralized testimony as to the overall similarity between the claims and the accused infringer's products or process will not suffice." *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996). As the Commission observed, Dr. Schubert's high-level theorizing about equivalence "was made without reference to the specification" or any other concrete evidence. Appx124, Appx590. That alone is fatal to Regents' equivalence argument. *See, e.g.*, *Texas Instruments*, 90 F.3d at 1567-68 (holding that testimony from two experts on equivalence was insufficient as a matter of law

because both experts offered "merely generalized testimony as to overall similarity."); *Cambrian Science Corp. v. Cox Commc'ns,, Inc.*, 617 F. App'x 989, 994 (Fed. Cir. 2015) (holding that an equivalence argument was insufficient because it was "limited to two paragraphs from its expert report, both of which [were] conclusory.")

By contrast, the Commission and ALJ found that Intervenors' evidence and expert testimony was "persuasive and clearly tied to the teachings of the patent." Appx124, Appx590. That evidence, including extensive testing, showed "clear and substantial structural differences between the ceramic submounts of the Accused Rigid Products and the sapphire plates." Appx126, Appx589; §III.B., *supra*.[7] Regents has no argument for why "a reasonable mind" could not "accept th[is]" extensive record "evidence as adequate to support" the agency's finding. *Bio-Rad Lab'ys, Inc. v. ITC*, 998 F.3d 1320, 1327 (Fed. Cir. 2021).

2. Regents' argument (at 48) that a polycrystalline alumina submount is equivalent to a sapphire plate because the two share an "elemental composition" fares no better. As the Commission noted, the argument is an obvious non sequitur—two materials, like "diamond and graphite," can "have identical constituent elements (carbon atoms) but different crystal structures and different

[7] *See also, e.g.*, Appx137930, Appx3479(994:11-995:6), Appx3487(1026:7-1028:7), Appx3554(1192:25-1193:5).

properties." Appx123. That is the case here: "despite sharing the same elemental composition," there are "substantial differences in structure and properties" between the polycrystalline alumina submounts of the Accused Rigid Products and sapphire, including that a polycrystalline alumina submount absorbs far more light than a sapphire submount. Appx123; *see also* §III.B., *supra*. Regents does not actually dispute these differences, except to make the unadorned assertion (at 48) that they involve "a matter of degree, not kind." But the whole point of the alleged invention—"LED structures that *more* effectively extract light"—is a "matter of degree." Appx128866 (emphasis added).

The evidence of structural differences deserves special weight here, given the "inherent narrowness of the claim language" involved. *Moore U.S.A., Inc. v. Std. Register Co*., 229 F.3d 1091, 1106 (Fed. Cir. 2000) (quoting *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997)). As the Commission emphasized, the '557 patent specifically claimed "a *sapphire* plate," not a broader category of materials (as in the "transparent surface" limitation of claim 1 of the '854 patent), and Regents cannot do an end run around that narrow limitation through the doctrine of equivalents. Appx125-126, Appx591.

3. Regents argues on appeal (at 47-48) that two supplier documents show that the "industry considers sapphire and ceramic submounts to be equivalents," and that Miyahara's discussion of "the desirable scattering functionality of

polycrystalline ceramic submounts" demonstrates equivalence. Regents never advanced these theories for equivalence to the Commission, or even cited to the Miyahara reference below, and so they are waived. *See supra*, §III.C.5.; *see also Checkpoint Sys., Inc. v. ITC*, 54 F.3d 756, 760 (Fed. Cir. 1995) (new claim construction argument was not preserved "merely because [appellant] asserted other claim construction defects" in its petition).

Even if the arguments had been preserved, they are meritless. As both the ALJ and the Commission observed, the two supplier documents "tell[] a different story" from Regents' arguments, and do not support its sweeping claims about the Accused Rigid Products. *See* Appx93, Appx428-439. For reasons already given, *see* §III.C.5., *supra*, Miyahara cannot shore up Regents' failed case on transparency. That reference also emphasizes the *differences* between materials that scatter light, like the Accused Rigid Products' polycrystalline ceramic submounts, and those that do not, like the "sapphire plate" required by claim 1 of the '557 patent, as the following illustration from Miyahara shows:



Appx139132; *see also* Appx138651.

In short, the Commission's rejection of Regents' doctrine-of-equivalents argument on the "sapphire plate" limitation was reasonable and supported by all the record evidence, and Regents' arguments to the contrary are meritless.

## V. The Accused Products Do Not Have The Claimed "Molding"

### A. The Construction Of "Molding" Was Correct

The Commission construed a "molding" as "a component formed by or as if by a mold." Appx668-669. That construction was correct. The plain language is clear that a "molding" must have some connection to either a molding process or be a structure formed as if by a molding process. The '854 patent specification confirms this. It uses the term "molding" as a noun to describe the product of the verb "molded" an "LED may be combined with epoxy or glass and *molded* as an inverted cone-shape 1214, 1216" and refers to those structures as "inverted cone *molding* shape 1214, 1216." Appx746(16:49-53) (emphases added). Accordingly, the Commission properly construed "molding" as "a component formed by or as if by a mold." Appx668-669.

#### 1. Regents' Arguments Against The Commission's Construction Are Meritless

Regents complains (at 41) that the Commission's construction relies on "one dictionary definition and legally unrelated patents." The ALJ, however, cited multiple dictionary definitions. Appx668. Further, the ALJ cited the two

supposedly "unrelated patents" only in his infringement analysis, not for purposes of claim construction. Appx564-565.

Regents also argues (at 16-17) that the Commission "impos[ed] a process limitation" and excluded products with mere "manufacturing imperfections." The Commission did no such thing. The Commission's construction includes components formed "*as if* by a mold," *i.e.*, components that were *not* formed using a mold but that nonetheless share the structural characteristics of components formed using a mold. That is not a process limitation, it is a structural limitation. For that reason, the ALJ's non-infringement analysis considered the structural features of the Accused Products—it did not stop after considering merely the process by which they were made. Appx564-565.

Even if the construction imposed a process limitation, it would still be proper. While not every invention is limited to the process by which the patent describes it being made, the claim limitation "molding" inherently references a process, and so properly can be construed as a product-by-process limitation. Appx6306-6307 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1315 (Fed. Cir. 2006)); *L&P Prop. Mgm't Co. v. Nat'l Prods. Inc.*, No. IPR2016-00475, 2016 WL 8944533, at *3, at 8-9 (PTAB July 21, 2016) ("molded" laptop docking station claims were product-by-process; they were "defined in part by the process by which they are made, namely molding"); *Crocs, Inc. v. Effervescent, Inc.*, 2017 WL

2787589, at *5 (D. Colo. June 27, 2017) ("moldable" and "molded" footwear claims were product-by-process; "rather than simply describing a feature …, the terms moldable and molded relate to the manufacturing process"); *Artic Cat Inc. v. Polaris Indus. Inc.*, No. 16-cv-0009, (D. Minn. Dec. 20, 2017) Dkt. No. 129 at 19-20 (vehicle fender claims having a "textured portion being molded unitarily with said smooth portion" were product-by-process).

Regents argues (at 13, 41-42) that the Commission "impos[ed] a new limitation on the construction of 'molding' neither present in the OCCC nor supported by any evidence: excluding 'random irregularities and an uneven surface,'" and so Regents could not "present[] arguments" under this construction. Not so. The ALJ's claim construction order always was limited to "a component formed by or as if by a mold." Appx669. It was clear at claim construction that "as if by a mold" was intended to capture products with the same uniformity as a molded product—at the *Markman* hearing, Respondents had emphasized that products created without using a mold were marked by "nonuniform[ity]" and "inconsistent shapes." Appx3129(199:15), Appx3131(201:6). Regents even presented evidence and made arguments at the hearing based on this understanding. *Cf.* Appx562 ("According to Dr. Schubert, because the purported molding's shape is consistent or constant along the length of the filament it is formed as if by a mold."). In any event,

Regents nowhere identifies what additional "arguments" (much less evidence) it would have presented to the Commission, and so has not demonstrated prejudice.

### 2. The Court Should Reject Regents' Proposed Construction

Regents' proposed construction for molding, "formed component," seemingly covers any manufactured article—Regents even says it requires no "specific shape." Appx9445. The proposal thus violates a central tenant of claim construction: it is "improper to broaden the scope of the claim[] . . . by ignoring clear limitations in the claim language." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). Further, Regents cites to no intrinsic or extrinsic evidence to support its construction. Instead, Regents argues (at 40) that "molding" should not be given *any* meaning because *other* claim elements require the molding to have a certain chemical composition, position, and function. But the law does not permit rendering "molding" meaningless simply because different limitations place different restrictions on the same component. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006) ("[C]laim language should not be treated as meaningless.").

## B. The Commission Properly Affirmed The ALJ's Non-Infringement "Molding" Findings

Regents does not dispute the Commission's analysis of the "molding" evidence that was presented at trial. Instead, it raises new arguments that are both waived and meritless.

**1. Regents Raised One "Molding" Argument at Trial**

Regents made one "molding" argument at trial, which it does not raise on appeal: it identified the entirety of the Accused Products' and domestic industry products' silicone coatings, and pointed to their "consistent or constant shape" to allege they were formed "as if by a mold." Appx562. The ALJ recognized this as Regents' only argument, which Regents did not dispute. Intervenors rebutted Regents' argument with trial evidence that the coatings do not have "consistent or constant" shapes "along the length of the filament," as evidence they were not made "by a mold or as if by a mold," and the ALJ agreed. Appx564 (citing Appx3483(1011:5-23, 1012:19-23); Appx3544(1151:1-5)).

**2. Regents Raises Waived And Meritless Arguments**

Regents' appeal raises new infringement arguments on appeal, but these arguments that are both waived and meritless.

Regents now argues (at 42-46) that only "portions" of the coating are the "molding" and these "portions" have no irregularities. It offers two theories: that (1) only a "cross section" of the coating, not its full length, needed to be analyzed; and (2) only sub-surface silicone should have been analyzed, based on the belief that "surface irregularities" are an unclaimed element permitted by the claims' "comprising" transitional phrase. But Regents did not advance these theories at trial or in trial briefing, *see* Appx561-565, Appx3364-3365(639:22-640:19)) (Professor

Schubert' molding-related testimony)); Appx111963-111964 (Regents' post-hearing briefing), so they are waived. *Broadcom*, 542 F.3d at 900; *see also Certain Road Milling Machines and Components Thereof*, No. 337-TA-1067, Comm'n Op. at 23.

These new theories are also meritless. There is no record evidence that any part of the Accused Products' coating was made "by a mold or as if by a mold." The ALJ found "the only evidence" suggests glob-top deposition, which Dr. Shanfield "credibly" testified "would 'absolutely not'" create a component that a POSA would consider was "formed by or as if by a mold." Appx564 (citing 3544(1151:1-5)).

Regents argues (at 45-46) that glob-top is "extrusion molding" that literally meets the ALJ's construction. This new argument is waived. *See* Appx561-565 (citing Appx3364-3365(639:22-640:19)), Appx111960-111968. It is also meritless. The only record evidence shows glob-top results in so many irregularities it cannot satisfy the "molding" limitation. Appx564.

## VI. The Commission Correctly Found the Appealed Claims Invalid

Regents' patents purport to improve on earlier LED packaging by mounting an LED chip on a transparent plate. Appx10221. The Commission found that Yamazaki and Minato both describe mounting an LED chip on a transparent plate and invalidate the claims of Regents' patents. On appeal, Regents challenges two aspects of the Commission's invalidity findings with respect to both Yamazaki and

Minato: those related to (1) the "sapphire growth substrate" limitation, and (2) the "structural support" limitation. Regents' arguments on appeal should be rejected for the same reasons they were rejected below.

### A. Yamazaki

#### 1. The "Sapphire Growth Substrate" Limitation Is Obvious from Yamazaki's Blue LED

The appealed claims require LEDs with a "sapphire growth substrate." Yamazaki discloses using known blue-emitting LED chips, but does not mention the substrate used to make those chips. Appx138585([0027]).[8] It was well known prior to the 2006 priority date, however, that blue LED chips typically contain sapphire growth substrates. The blue LED breakthrough in 1994—which led to a Nobel prize—used a sapphire growth substrate. Appx135788; *see also* Appx135783. A 2003 textbook written by Regents' expert explains that gallium-indium-nitride is the primary material system for blue LEDs, and sapphire substrates were "commonly used" to grow this material. Appx138393. Other prior art explains that using a sapphire substrate is "preferable" for blue LEDs, "in order to form gallium nitride of good crystallinity." Appx138185(14:9-11). Most importantly, the '854 and '557 patents themselves describe "conventional LEDs" as having sapphire growth substrates. Appx744(11:9-10, 11:25-26), Appx776-777.

---

[8] Yamazaki's "chip substrate 11" is a sapphire or glass submount for the LED chip, not the chip's growth substrate. Appx138585([0028]).

Regents did not dispute before or at the evidentiary hearing that it would have been obvious from a disclosure of a blue LED to use a sapphire growth substrate. But after Intervenors had filed their post-hearing brief on invalidity, Regents changed tack and argued that it was not obvious. Appx135. Intervenors moved to strike Regents' new argument because it violated the ALJ's Ground Rules. Appx135. The ALJ granted the motion, finding the argument was waived, and the Commission found that Regents waived this argument. Appx135-136. The Commission also found that Regents was substantively wrong, because Intervenors' evidence showed that the sapphire growth substrate limitation was obvious from Yamazaki's disclosure of a blue LED. Appx136. Those findings should be affirmed.

#### a. The Commission Did Not Abuse Its Discretion In Finding Waiver

The ALJ's Ground Rules required the parties' pre-hearing briefs to set forth their contentions on every issue, "no matter which party has the burden on the issue," and stated that any contentions "not set forth in detail in the pre-hearing brief shall be deemed abandoned or withdrawn." Appx3728. This rule gives effect to the APA's requirement that "other parties to the proceeding shall give prompt notice of issues controverted in fact or law." 5 U.S.C. § 554(b)(3). This rule also has a sound foundation in law permitting tribunals to conduct trials efficiently. For example, Federal Rule of Evidence 705 "functions to abbreviate trials by permitting opinion

testimony without factual foundation." *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1576 (Fed. Cir. 1991). Under Rule 705, an expert can provide an opinion on an ultimate issue—such as invalidity—and "the full burden of exploration of the facts and assumptions underlying [such] testimony" is on the opposing party. *Id.* at 1575–76. The purpose of Rule 705 is to "avoid complex and time consuming testimony," and patent cases are "particularly served by this purpose." *Id.* at 1576.

Consistent with that rule, Intervenors laid out their invalidity positions in detail in their pre-hearing brief (and prior to that, in their expert's report). *E.g.,* Appx136. After receiving Regents' pre-hearing brief, Intervenors identified the issues in dispute. Instead of wasting the ALJ's time with detailed testimony about undisputed issues, Intervenors presented summary opinion testimony from their expert for each prior art reference and each asserted claim, and then addressed the disputed issues in detail. *E.g.,* Appx3561(1220:10-1221:19), Appx135359-135360.

In contrast, despite the Ground Rules, Regents waited until *after* the evidentiary hearing was over to assert that Yamazaki did not render obvious the use of a sapphire growth substrate. This is exactly the sort of trial by ambush that the ALJ's rule was designed to avoid. Regents has no real argument that it complied with the Ground Rules, but it instead attacks them, arguing (at 54) that compliance "improperly inverts the burden of proof." Regents' position is the burden of proof

entitled it to ignore the ALJ's rule and wait until after the close of evidence to sandbag Intervenors with a new argument about Yamakazi. The Commission rejected this argument, observing that parties should not be allowed to "ignore the Ground Rules and then surprise the opponent with belated objections after that opponent no longer has an opportunity to develop the record." Appx104. This was not an abuse of discretion.

Regents tries to justify its decision to ignore the ALJ's rule by citing a case holding that a conclusory statement from an expert is insufficient to support a finding of obviousness and arguing that Dr. Lebby's summary testimony is thus inadequate. Regents Br. at 50-51 (citing *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F. 3d 1352 (Fed. Cir. 2019)). But *TQ Delta* involved *competing* expert testimony—not, as here, issues that were uncontested at trial. 942 F.3d at 1356, 1357. None of the decisions cited in *TQ Delta* involved uncontested issues either. *See InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352-53 (Fed. Cir. 2014) (competing expert testimony about multiple obviousness issues); *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) (competing expert testimony). Regents has not identified any case where an expert's summary testimony was found inadequate to support a point that was undisputed at trial.

The prejudice from accepting Regents' argument is manifest. If Intervenors had known that Regents would argue that using a sapphire growth substrate was not

obvious from Yamazaki's disclosure of a blue LED chip, then Intervenors would have had their expert address this point in greater detail. By raising a dispute about this issue for the first time after the close of evidence, Regents denied Intervenors the opportunity to respond to their argument, rendering Regents' argument improper. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("[A]n administrative agency must base its decision on arguments that were advanced by a party, and *to which the opposing party was given a chance to respond*") (emphasis added).

**b. The Evidence Showed It Was Obvious To Use Sapphire Growth Substrates For Blue LEDs**

Setting aside waiver, Regents is wrong to argue (at 50) that the record is "devoid of evidence" showing obviousness.

Two points are worth particular emphasis here. First, the '854 and '557 patents themselves describe "conventional LEDs" as having sapphire growth substrates. Appx744(11:9-10, 11:25-26), Appx776-777. Second, Intervenors' expert testified that it was obvious from Yamazaki that the sapphire growth substrate limitation was met, and this testimony was unrebutted. Appx3561(1220:10-1221:2), Appx135359.

Other evidence confirms that it was obvious from the disclosure of a blue LED to use one grown on sapphire. As stated previously, the 2003 textbook written by Regents' expert explains that sapphire substrates were "commonly used" to grow

blue LEDs, and the prior art explains that they are "preferable" for blue LEDs. §VI.A., *supra*. Dr. DeMille, one of the inventors of the asserted patents, testified that blue-emitting gallium nitride LEDs are "normally" grown on sapphire substrates. Appx134695(61:15-19). Professor Speck testified that sapphire substrates are "widely used in the LED industry" for growing LEDs. Appx3251(303:6-24). He explained that in his research he "always" uses LEDs "grown on patterned sapphire substrates" because "we know it's one of the highest light extraction structures" and a "very successful technology." Appx3251(301:18-25).[9] And when the prior art references mention the growth substrate of a blue LED, it is usually sapphire: Uemura's blue LED is grown on a sapphire substrate (Appx138157(7:30)), and Okamoto's blue LEDs are formed on "a sapphire substrate" (Appx137808([0031]).

This evidence all supports the Commission's conclusion that a POSA would find it obvious to use a sapphire growth substrate for the blue LED disclosed in Yamazaki. Appx136. Regents does not identify any evidence to the contrary. All it argues (at 49, 52-53) is that other growth substrates also were known. But that point is undisputed and is why Intervenors argued obviousness instead of inherency. If Regents wanted to argue that a POSA would not find it obvious from Yamazaki's

[9] Dr. Lebby explained that these patterned sapphire substrates—which were an improvement on regular sapphire substrates—were used for blue LEDs well before Regents' patents were filed. Appx3561(1218:5-14).

disclosure of a blue LED chip to use a chip with a sapphire growth substrate, then it needed to present rebuttal evidence, and it did not. *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 757 Fed. App'x 974, 979-80 (Fed. Cir. 2019) (reversing verdict contrary to uncontroverted expert testimony).

### 2. The "Structural Support" Limitation Is Both Anticipated and Rendered Obvious by Yamazaki

The claims require that "the cathode and anode provide structural support to the transparent surface ['854 patent]/sapphire plate ['557 patent]." Appx749, Appx782.

The Commission found that Yamazaki shows a surface-mount LED package whose anode and cathode leads (purple) are wrapped around the ends of the glass/sapphire plate (light blue), and thus support that plate:




Appx130-131, Appx138587, Appx135347.

The Commission also found that Yamazaki's anode and cathode leads are used to mount the package onto a circuit board, and that this is another reason that

they provide structural support: they are how the LED package is physically attached to an external circuit board. Appx130-131.

#### a. Yamazaki Discloses The "Structural Support" Limitation

Regents argues (at 50) that the Commission's anticipation decision is not supported by substantial evidence. None of its points have merit.

First, Regents argues (at 58-59) that the Commission's findings about Yamazaki's Figure 1 lack substantial evidence because Figures 2 and 3 supposedly show that Yamazaki's leads do not "wrap around" the edges of the plate 11. But, as can be seen in the image above, Figure 1 unmistakably shows the "electrically conductive patterns 11a" (purple) wrapped around the edge of plate 11. Appx135347([0026]); *see also* Appx138581(Fig. 1). Dr. Lebby confirmed that a POSA would understand that Yamazaki's leads were wrapped around the plate. Appx3561-3562(1221:23-1225:21). Regents' expert did not argue otherwise; he instead argued that the metallizations were "thin" (Appx3589(1331:18-1332:8)), a non sequitur addressed below. The Commission properly credited Dr. Lebby's unrebutted testimony in finding that the leads wrap around the plate. Appx133-134.

Second, Regents argues (at 60) that the Commission failed to address its argument that "conductive pattern 11a is a thin metallization that does not provide structural support." That is incorrect. The Commission identified Regents' argument about "thin metallization" and rejected it. Appx133-134. The

Commission credited evidence showing that Yamazaki's leads wrap around the plate and are used to physically attach the package as a whole to the circuit board. Appx131-132. Regents offers no evidence or explanation about how being "thin" matters to whether a metal layer wraps around a plate and attaches it to an outside support. The Commission reasonably rejected Regents' "conclusory attorney arguments." Appx133.

Third, Regents argues that the Commission was wrong to rely on Dr. Lebby's testimony that Yamazaki's leads physically attach the LED package to a circuit board. Regents asserts (at 61) that "Dr. Lebby could only 'guess' that Yamazaki would be connected to a circuit board with 'a solder bump or something like that.'" This too is wrong. Dr. Lebby testified in detail about how the "surface-mount J-leads" of the Yamazaki package would be attached to a circuit board using solder balls. Appx3561-3562(1221:20-1225:21). Dr. Lebby gave two examples of other prior art references that showed this attachment technique, and concluded that "once that package is surface mounted using a common technique like solder bump balls," then "structurally, it's going to be very strong." Appx3561-3562(1221:20-1225:21), Appx135361. The Commission properly credited this unrebutted testimony.

### b. Yamazaki Renders Obvious The "Structural Support" Limitation

Regents also challenges the Commission's alternative determination that it would have been obvious to modify Yamazaki to use the through-pin leads shown in Uemura, which indisputably provide structural support. Appx131-134.

The Commission found that by the mid-1990s a POSA knew that through-pin packages (like Uemura) and surface-mount J-lead packages (like Yamazaki) were interchangeable alternatives for LED packaging. Appx131 (*citing* Appx502, Appx3557(1204:8-24), Appx3563(1226:8-15)). The Shimizu reference shows the same LED chip packaged both ways:




Appx131-132, Appx502, Appx135364, Appx138159-138160. Dr. Lebby explained that in the 2000 timeframe, one could obtain the same LED in both package types, and that LEDs were manufactured using both form factors in "tens, hundreds, if not

billions of units." Appx3557(1203:24-25), Appx135343. The Commission concluded that it would have been obvious to use Uemura's through-pin leads with Yamazaki, because when "there are a finite number of identified, predictable solutions, a POSA has good reason to pursue the known options within his or her technical grasp." Appx132 (*citing KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007)), Appx502.

Additionally, the Commission found that Uemura provides specific motivation to use through-pin packaging with an LED mounted on a transparent plate (as shown in Yamazaki), because Uemura teaches a POSA that mounting an LED on a transparent plate lowers the manufacturing cost of through-pin packaging. Appx132, Appx503, Appx3564, Appx138155. The Commission found that the result of using Uemura's through-pin leads with Yamazaki's plate-mounted LED would be predictable, crediting the testimony of Dr. Lebby. Appx132, Appx504, Appx3563. These factual findings also support the Commission's obviousness determination.

Regents' arguments to the contrary should be rejected. First, Regents argues (at 62) that *Asyst Technologies, Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1315 (Fed. Cir. 2008) requires evidence of "the circumstances in which [a POSA] would have selected one of the two devices over the other," and that there is no such evidence. While *Asyst Technologies* refers to evidence regarding the advantages of

alternatives, it does not suggest that such evidence is required. Instead, that evidence was cited only to explain why the jury's finding of no motivation to combine should be reversed. *Asyst Techs.*, 544 F.3d at 1315. Here, the fact-finder found the opposite: that there was motivation to combine. Additionally, there *is* evidence about when one would use through-pin and j-lead packages: Dr. Lebby referred to his own experience at Motorola and explained that j-lead packages had a smaller form factor and were better suited for Motorola's mobile phone products, whereas through-pin packages were used in larger equipment. Appx3556-3557(1201:13-1204:3), Appx135343.

Second, Regents argues (at 62-63) that the Commission misinterpreted both Uemura and Dr. Lebby's testimony when it found that Uemura provided motivation to use through-pin packaging with the LED and transparent plate shown in Yamazaki. This argument should be rejected because it substitutes attorney argument for the Commission's fact-finding. The Commission was entitled to rely on Dr. Lebby's explanation that Uemura teaches that mounting an LED on a transparent plate lowers manufacturing costs. Appx3564. Moreover, Regents does not dispute that Uemura shows using through-pin packaging with an LED mounted on a transparent plate:




Appx528 ("Uemura teaches a through-pin LED package that mounts the LED chip on a transparent plate"), Appx135370, Appx138149. This supports the Commission's finding that Uemura provides motivation to use through-pin packaging with an LED mounted on a transparent plate, as shown in Yamazaki.

Third, Regents argues (at 62-63) that Yamazaki's leads are "thin metallization" and not j-leads, and that as a result the Commission's finding that through-pins and j-leads were known alternatives is off-point and insufficient to show obviousness. The Commission considered and rejected this argument. Appx133-134. Dr. Lebby testified that Yamazaki shows j-leads that wrap around the transparent plate. Appx3561-3562, Appx3558. The ALJ and the Commission adopted that testimony. Appx130, Appx580. While Dr. Schubert argued that Yamazaki's leads "are not j-leads," his testimony was not credited. Appx3589.

Finally, Regents argues (at 64) that the Commission's determination that Uemura's through-pin leads provide structural support "suffers from [a] failure of

proof" because at one point it cites a portion of the FID that refers to Shimizu, not Uemura. But the ALJ explicitly found that in Uemura, "the ends of the transparent plate are supported by through-pin lead frames." Appx527-528. That conclusion is amply supported by Uemura's figures. Appx135370, Appx138149. Moreover, Regents did not dispute below that Uemura's through-pin leads met the "structural support" limitation. Appx3565, Appx135377.

### B. Minato

#### 1. The "Sapphire Growth Substrate" Limitation Is Obvious from Minato's Blue LED

Like Yamazaki, Minato discloses using LED chips without specifying a substrate material. Appx137825. The Commission's determination that Minato's disclosure of blue LEDs renders use of a sapphire growth substrate obvious should be affirmed for the same reasons described above in the context of Yamazaki.

#### 2. The Commission Correctly Found That Minato Renders The "Structural Support" Limitation Obvious In Combination With Uemura

The Commission found that Minato discloses an LED package with three LED chips mounted on a transparent sapphire plate, and leads 32 and 33 (purple), which provide the electrical connection from the package to the outside:

known blue-emitting LED chips 25, 26, 27

transparent sapphire substrate 21

transparent resin body 34
- formed by a "prescribed mold"
- contains phosphor

leads 32 and 33




Appx139, Appx511, Appx135382, Appx137825(FIG. 2).

As discussed above, the Commission determined that a POSA would have been motivated to use through-pins (as shown in Uemura) with LEDs mounted on a transparent plate (as shown in Minato). Appx139, Appx514-515. The Commission held that this combination rendered the appealed claims obvious. Appx139-140.

Regents argues (at 67) that this finding should be reversed because Dr. Lebby supposedly failed to explain why a POSA would make this combination. But the Commission found that Dr. Lebby explained the Minato and Uemura references and "how an artisan would be motivated to combine them." Appx139, Appx514-515. This conclusion was supported by Dr. Lebby's testimony that Uemura taught how to lower manufacturing costs by using through-pin leads with LEDs mounted on transparent plates, his testimony about when through-pin leads were used, as well as his testimony it would be obvious to modify Minato to use this configuration. Appx3564(1231:22-1232:13), Appx3556-3557(1201:13-1204:3), Appx3568-3569(1249:8-1250:13).

### C. Secondary Considerations

Regents argues (at 68) that the Commission's findings on secondary considerations are flawed because the Commission supposedly did not explain how "one factor could outweigh three." In fact, the Commission explained at length why commercial success, licensing, and skepticism were entitled to little or no weight on the facts of this case. Appx142-145, Appx439-443. The Commission affirmed the ALJ's determination that no product practiced all the limitations of the '854 or '557 patents, so there was no nexus between Regents' purported evidence of commercial success and the claims. Appx126-127. The evidence of skepticism was merely the "uncorroborated, self-serving testimony of an inventor." Appx143, Appx440-441. The bulk of the licenses were coerced by Regents' enforcement campaign, and [---- ------------*redacted material discusses payments by one of Regents' licensees*-------- .] Appx144, Appx441-442. The Commission properly afforded these factors minimal weight.

On the other hand, there was unrebutted evidence of simultaneous invention. Appx145, Appx442-443. Tanda discloses all the limitations of the asserted claims of the '854 and '557 patents and was filed nearly a year before the earliest filing date of the '854 and '557 patents. Appx145, Appx442. This shows that the steps needed to make the purported invention were within a POSA's ability and supports the

conclusion of obviousness. *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304-06 (Fed. Cir. 2010).

## CONCLUSION

The Court should affirm the Commission's determination.

DATED: December 5, 2022 Respectfully submitted,


Michael J. Bonella
Joseph R. Klinicki
Aakash Patel
Coraleine Kitt
**Flaster Greenberg PC**
1835 Market Street
Philadelphia, PA 19103
(215) 279-9393

E-Mail: FG-IKEA-1120@flastergreenberg.com

*Counsel for IKEA*

Scott J. Bornstein
Brian J. Prew
**Greenberg Traurig**
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200

Nicholas A. Brown
**Greenberg Traurig**
101 Second Street
San Francisco, CA 94111
(415) 655-1271

Ryan K. Walsh
Parth H. Matalia
**Jones Day**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
(404) 521-3939

Rita J. Yoon
**Jones Day**
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
(312) 782-3939

Email:HomeDepot-ITC-Service@jonesday.com

*Counsel for Home Depot*

Adam D. Swain
**Alston & Bird LLP**
950 F Street, NW
Washington, DC 20004
(202) 239-3622
adam.swain@alston.com

Ross R. Barton
Karlee Wroblewski

Elaine Herrmann Blais
Douglas J. Kline
Lana Shiferman
Kevin Martin
**Goodwin Procter LLP**
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

Patrick J. McCarthy
**Goodwin Procter LLP**
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

E-Mail: DG-ConsumerLightingITC@goodwinlaw.com

*Counsel for GE Lighting*

Eric D. Hayes, P.C.
Jay Emerick
**Kirkland & Ellis LLP**
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000
jay.emerick@kirkland.com

E-Mail: Satco-ITC@gtlaw.com

Robert P. Lynn, Jr.
**Lynn Gartner Dunne & Frigenti, LLP**
330 Old Country Road,
Mineola, NY 11501
(516) 742-6200
rplynn@lgdlaw.com

*Counsel for Satco*

**Alston & Bird LLP**
101 S. Tryon Street,
Suite 4000
Charlotte, NC 28280
(704) 444-1000
ross.barton@alston.com

*Counsel for Signify*

Abigail Lauer Litow
**Kirkland & Ellis LLP**
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5164
abigail.litow@kirkland.com

*Counsel for GVL*

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1). The brief contains 13,854 words based on the "Word Count" feature of Microsoft Word (Version 2202), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word (Version 2202).

December 5, 2022

/s/ Nicholas A. Brown
Nicholas A. Brown

*Counsel for Intervenor*
*Satco Products, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the date listed below I served the foregoing document on the counsel of record for each party via electronic mail at the below listed e-mail addresses, as consented to by the parties, pursuant to Federal Circuit Rule 25(e)(4).

***Counsel for Appellant The Regents Of The University Of California***
Seth D. Levy
Shawn G. Hansen
Vincent C. Capati
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151

Evan H. Langdon
NIXON PEABODY LLP
799 9th Street, NW, Suite 500
Washington, DC 20001-5327

Angelo J. Christopher
Paulina M. Starostka
NIXON PEABODY LLP
70 West Madison Street, Suite 5200
Chicago, IL 60602-4378
regents_itc2@nixonpeabody.com

***Counsel for Appellee United States International Trade Commission***
Wayne W. Herrington
Sidney A. Rosenzweig
Houda Morad
Office of The General Counsel
U.S. INTERNATIONAL TRADE COMMISSION
500 E Street, S.W.
Washington, D.C. 20436

wayne.herrington@usitc.gov, sidney.rosenzweig@usitc.gov,
houda.morad@usitc.gov, itcgc_paralegals@usitc.gov

***Counsel for Intervenor Feit Electric Company, Inc.***
Jay Reiziss
Alexander P. Ott
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
jreiziss@mwe.com, aott@mwe.com, FeitITC1220mwe.com@mwe.com

Kal K. Shah
Simeon Papacostas
BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
kshah@beneschlaw.com, spapacostas@beneschlaw.com,
FeitITC1220@beneschlaw.com

***Counsel for Intervenors Home Depot Product Authority, LLC; Home Depot U.S.A., Inc.; The Home Depot, Inc.***
Ryan K. Walsh
Parth H. Matalia
JONES DAY
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361

Rita J. Yoon
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
HomeDepot-ITC-Service@jonesday.com

***Counsel for Intervenors IKEA Supply AG, IKEA US Retail LLC, and IKEA of Sweden AB***
Michael J. Bonella

Joseph R. Klinicki
Aakash Patel
FLASTER GREENBERG PC
1835 Market Street
Philadelphia, PA 19103
FG-IKEA-1120@flastergreenberg.com

***Counsel for Intervenor General Electric Company and Savant Technologies LLC***
Elaine Herrmann Blais
Douglas J. Kline
Lana Shiferman
Kevin Martin
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

Patrick J. McCarthy
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000
DG-ConsumerLightingITC@goodwinlaw.com

***Counsel for Intervenor Global Value Lighting, LLC***
Eric D. Hayes, P.C.
Jay Emerick
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000
ehayes@kirkland.com, jay.emerick@kirkland.com,
GVL_ITC_1220@kirkland.com

Abigail Lauer Litow
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5164
abigail.litow@kirkland.com

***Counsel for Intervenor Signify North America Corporation***
Adam D. Swain
Alston & Bird LLP
950 F Street, NW
Washington, DC 20004
(202) 239-3622
adam.swain@alston.com

Ross R. Barton
Karlee Wroblewski
Alston & Bird LLP
101 S. Tryon Street, Suite 4000
Charlotte, NC 28280
(704) 444-1000
ross.barton@alston.com, Signify-1220@alston.com

December 5, 2022

/s/ Nicholas A. Brown
Nicholas A. Brown

*Counsel for Intervenor*
*Satco Products, Inc.*